CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Jane VanLare
Adam Brenneman

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Automotores Gildemeister SpA, *et al.*,[1] | Case No.  21-10685 (LGB) |
| Debtors. | Joint Administration Pending |

<u>**NOTICE OF FILING OF AMENDED DISCLOSURE STAEMENT**</u>

**PLEASE TAKE NOTICE** that on April 12, 2021, Automotores Gildemeister SpA and

certain of its affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11

cases (collectively, the "<u>Debtors</u>") filed the *Disclosure Statement for the Joint Prepackaged Plan*

*of Reorganization of Automotores Gildemeister SpA and Its Debtor Affiliates Pursuant to Chapter*

*11 of the Bankruptcy Code* (ECF No. 3) (the "<u>Disclosure Statement</u>").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Amended*

*Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Automotores*

---

[1]    The Debtors, together with each of the Debtor's Chilean, Brazilian, and/or Uruguayan tax identification
number, as applicable, are:  Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc
Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A.
(217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A.
(89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial
Gildemeister S.A. (76.856.310-1), and Bramont Montadora Industrial e Comercial de Vehiculos S.A.
(04.926.142/0002-16).   The location of the corporate headquarters and the service address for Automotores
Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

*Gildemeister SpA and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, annexed hereto as **Exhibit A** (the "Amended Disclosure Statement").

        **PLEASE TAKE FURTHER NOTICE** that a redline (the "Redline") reflecting the changes from the Disclosure Statement is annexed hereto as **Exhibit B**.

Dated: April 14, 2021
      New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*/s/ Jane VanLare*
Jane VanLare
Adam Brenneman

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

## Exhibit A

**Amended Disclosure Statement**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Adam Brenneman
Jane VanLare

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

|  |  |
|---|---|
| *In re* | : |
| Automotores Gildemeister SpA, *et al.*, [1] | : Chapter 11 |
|  | : |
|  | : Case No. 21 -10685 (LGB) |
| Debtors. | : |
|  | : Joint Administration Requested |
|  | : |
|  | : |
|  | : |

-------------------------------------------------------------------- X

---

**AMENDED DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF AUTOMOTORES GILDEMEISTER SPA AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**Dated: April 14, 2021**

---

[1]     The Debtors, together with each of the Debtor's Chilean, Brazilian, and/or Uruguayan tax identification number, as applicable, are:  Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A. (217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A. (89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial Gildemeister S.A. (76.856.310-1), and Bramont Montadora Industrial e Comercial de Vehiculos S.A. (04.926.142/0002-16).   The location of the corporate headquarters and the service address for Automotores Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

Automotores Gildemeister SpA and certain of its affiliated entities (collectively, the "**Debtors**") are sending you this document and the accompanying materials (the "**Disclosure Statement**") because you may be a creditor entitled to vote on the Debtors' Joint Prepackaged Chapter 11 Plan (including all exhibits annexed thereto and the Plan Supplement, as it may be modified, amended or supplemented from time to time, the "**Plan**").[2] The Debtors are commencing the solicitation of your vote to approve the Plan (the "**Solicitation**") before the Debtors file voluntary cases under chapter 11 of Title 11 of the United States Code, as amended (the "**Bankruptcy Code**").

The Debtors may file voluntary reorganization cases under chapter 11 of the Bankruptcy Code to implement the Plan (the "**Chapter 11 Cases**"). Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Debtors file the Chapter 11 Cases, they will promptly seek an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with section 1126(b) of the Bankruptcy Code and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Plan Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "**SEC**") under the United States Securities Act of 1933, as amended (the "**Securities Act**"), or any securities regulatory authority of any state under any state securities law ("**Blue Sky Laws**"). Before the filing of the Chapter 11 Cases, including without limitation in connection with the Solicitation, the Debtors are relying on section 1145 of the Bankruptcy Code, section 4(a)(2) and Regulation S under the Securities Act, and similar Blue Sky Laws provisions, as applicable, to exempt from registration under the Securities Act the offer of the securities described in this Disclosure Statement to be issued under the Plan.

After the filing of the Chapter 11 Cases, the Debtors are relying on the exemption from the Securities Act, and equivalent state law registration requirements, provided by section section 1145 of the Bankruptcy Code, section 4(a)(2) and Regulation S under the Securities Act, and similar Blue Sky Laws provisions, as applicable, to exempt from registration under the Securities Act and Blue Sky Laws the offer and sale of the securities described in this Disclosure Statement to be issued under the Plan.

The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. In addition, none of the securities described herein have been approved or disapproved by the SEC, any state securities commission or any other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the Plan or the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

---

[2]     Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

**SPECIAL NOTICE REGARDING CHILEAN SECURITIES LAWS**

**The securities to be issued on or after the Plan Effective Date will not be registered under the Chilean Ley de Mercado de Valores No. 18,045 (the "Securities Market Law"), as amended, with the Chilean Financial Markets Commission (Comisión para el Mercado Financiero, the "CMF"), and, accordingly, may not be offered or sold to persons in Chile except in circumstances that do not constitute a public offering under Chilean law.**

***Los valores que se emitan en o después de la fecha de efectividad del Plan, no serán registrados en la Comisión para el Mercado Financiero de conformidad a la ley de Mercado de Valores No.18,045, por lo que de acuerdo a ello, no podrán ser ofrecidos a personas en Chile excepto en circunstancias que no constituyan una oferta pública de valores de acuerdo a ley chilena.***

The deadline for Holders of Claims relating to the 7.5% Notes due 2025 and Holders of the Unsecured Notes Claims and Related Party Claims to accept or reject the Plan is *5:00pm (Prevailing Eastern Time) on May 7, 2021* (the "Voting Deadline") unless the Debtors, with the prior consent of the Required Consenting Noteholders, and from time to time, extend the Voting Deadline.  To be counted, the ballot (the "Ballot") or master ballot (the "Master Ballot") indicating acceptance or rejection of the Plan must be received by the Debtors' notice, claims, and balloting agent ("Prime Clerk" or the "Balloting Agent") no later **than the Voting Deadline.**  Holders of 7.5% Notes due 2025 will be entitled to vote BOTH their 7.5% Notes due 2025 Secured Claims in Class 4 and their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5.

**The Debtors cannot assure you that the disclosure statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases (a) will contain all of the terms described in this Disclosure Statement or (b) will not contain different, additional, or material terms that do not appear in this Disclosure Statement.  The Debtors urge each Holder of a Claim or Interest (i) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under Article XI of this Disclosure Statement, entitled "Risk Factors") and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan.  You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.**

**If the Plan is confirmed by the Bankruptcy Court and the Plan Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including, without limitation, those Holders of Claims or Interests who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.**

**THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN.  SEE "RISK FACTORS". CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN THAT, THEREFORE, ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE DEBTORS OR REORGANIZED DEBTORS AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTORS, THEIR**

**ADVISORS, OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED. NEITHER THE DEBTORS' INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS AND THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, AND ASSUME NO RESPONSIBILITY FOR, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS OR LIQUIDATION ANALYSIS. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS WILL PROVE CORRECT OR THAT THE DEBTORS' ACTUAL ABILITY TO COVER THEIR FUTURE PRINCIPAL AND CASH INTEREST PAYMENT OBLIGATIONS WILL NOT DIFFER FROM THE INFORMATION CONTAINED WITHIN THIS DISCLOSURE STATEMENT. THE DEBTORS AND THEIR ADVISORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE ANY INFORMATION DISCLOSED HEREIN TO REFLECT ANY CHANGES ARISING AFTER THE DATE HEREOF OR TO REFLECT FUTURE EVENTS, EVEN IF ANY ASSUMPTIONS CONTAINED HEREIN ARE SHOWN TO BE IN ERROR. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.**

**Except as set forth elsewhere herein, no person has been authorized by the Debtors in connection with the Plan or the Solicitation to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities other than those to which it relates, or an offer to sell or a solicitation of an offer to buy any securities in any jurisdiction in which, or to any person to whom, it is unlawful to make such offer or solicitation.**

**The statements contained in this Disclosure Statement are made as of the date hereof, and neither the delivery of this Disclosure Statement nor any issuance of the securities made pursuant to the Plan will, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof. Any estimates of claims and interests set forth in this Disclosure Statement may vary from the amounts of claims or interests ultimately allowed by the Bankruptcy Court.**

**The summaries of the Plan and the other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto and all documents described herein. The information contained in this Disclosure Statement, including, but not limited to, the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information of the Debtors (including the projected results of operations of the Reorganized Debtors) and the liquidation analysis relating to the Debtors is included herein solely for purposes of soliciting acceptances of the Plan. Such information, including projected financial information and valuation of the Reorganized Debtors, is not to be construed as admissions or stipulations but rather as statements made in settlement negotiations.**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | **EXECUTIVE SUMMARY** | 1 |
| II. | **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** | 3 |
| III. | **FOREIGN EXCHANGE CONVERSION** | 4 |
| IV. | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** | 6 |
| | A. What is chapter 11? | 6 |
| | B. Why are the Debtors sending me this Disclosure Statement? | 6 |
| | C. Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated? | 6 |
| | D. How do I vote on the plan? | 8 |
| | E. Is there anything else that I will need to do to receive the New Notes? | 9 |
| | F. What happens to my recovery if the Plan is not confirmed, or does not go effective? | 9 |
| | G. Are any regulatory approvals required to consummate the Plan? | 9 |
| | H. If the Plan provides that I am entitled to a distribution, do I receive it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Plan Effective Date" and "Consummation?" | 9 |
| | I. Will the Reorganized Debtors be obligated to continue to pay statutory fees as part of the bankruptcy process after the Plan Effective Date? | 10 |
| | J. When will the Plan Supplement be Filed and what will it include? | 10 |
| | K. What are the Debtors' Intercompany Claims and Interests? | 10 |
| | L. How will Claims asserted with respect to rejection damages affect my recovery under the Plan? | 10 |
| | M. Will there be releases granted to parties in interest as part of the Plan? | 11 |
| | N. What is the deadline to vote on the Plan? | 11 |
| | O. What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation Hearing? | 11 |
| | P. What is the effect of the Plan on the Debtors' ongoing businesses? | 12 |
| | Q. Do the Debtors recommend voting in favor of the Plan? | 12 |
| V. | **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** | 13 |
| | A. The Debtors' Prepetition Organizational Structure | 13 |
| | B. Summary of the Debtors' Businesses and Corporate History | 13 |
| | C. Summary of the Company's Prepetition Capital Structure | 17 |
| | D. Related Party Transactions | 19 |

VI.     EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING
        INITIATIVES ...................................................................................................... 21

        A.      Recent Operations ...................................................................................... 21

                (i)      Complex and Competitive Market Environment ............................... 21
                (ii)     Impact of COVID-19 on Operations ................................................ 21
                (iii)    Sale of Uruguay BMW Business; Chile MINI Business; and Peru MINI and
                         BMW Businesses .......................................................................... 22
                (iv)     AGP Customs Disclosure .............................................................. 22

        B.      2019 Exchange Offer and Solicitation ........................................................ 23

        C.      The Debtors' Debt Service Obligations ...................................................... 23

        D.      Intercompany Loans .................................................................................. 23

        E.      Hyundai's Support of the Restructuring ..................................................... 23

                (i)      Extension of the Hyundai Agreements ........................................... 23
                (ii)     Hyundai's Assistance with Perú .................................................... 23

VII.    THE PROPOSED REORGANIZATION OF THE DEBTORS ............................ 25

        A.      Pre-Solicitation Negotiations ..................................................................... 25

                (i)      The New Notes ............................................................................ 25
                (ii)     Plan Milestones ........................................................................... 26

        B.      Debtor-in-Possession Financing ................................................................. 27

        C.      Solicitation ............................................................................................... 27

VIII.   SUMMARY OF THE PLAN .......................................................................... 29

        A.      General Basis for the Plan .......................................................................... 29

        B.      Governing Law .......................................................................................... 29

        C.      Treatment of Unclassified Claims .............................................................. 29

                (i)      Administrative Claims .................................................................. 29
                (ii)     DIP Claims .................................................................................. 30
                (iii)    Professional Claims ..................................................................... 30
                (iv)     Priority Tax Claims ...................................................................... 30
                (v)      Costs and Expenses of Ad Hoc Group Advisors .............................. 30

        D.      Classification and Treatment of Claims and Interests .................................. 31

                (i)      Classification of Claims and Interests ............................................ 31
                (ii)     Treatment of Classes of Claims and Interests ................................. 31

        E.      Means for Implementation of the Plan ....................................................... 33

                (i)      General Settlement of Claims ........................................................ 33
                (ii)     Subordination .............................................................................. 33
                (iii)    Sources of Cash for Plan Distributions ........................................... 34
                (iv)     Exit Financing ............................................................................. 34
                (v)      Issuance of the New Notes; Substitute Consideration for Non-Qualified Holders .......... 34
                (vi)     Chile Holdco ............................................................................... 35
                (vii)    USA Holdco ................................................................................. 36
                (viii)   Amendment of Pledges ................................................................ 36
                (ix)     Vesting of Assets in the Reorganized Debtors ................................ 36
                (x)      Discharge from Notes, Instruments, Certificates and Other Documents ........ 36
                (xi)     Execution of Plan Documents ....................................................... 37

(xii)    Corporate Action ................................................................................. 37
(xiii)    New Corporate Governance Documents ............................................. 37
(xiv)    Effectuating Documents; Further Transactions .................................. 37
(xv)    Section 1146(a) Exemption ................................................................ 37
(xvi)    Managers, Directors and Officers ...................................................... 37
(xvii)    Incentive Plans and Employee and Retiree Benefits .......................... 38
(xviii)    Preservation of Rights of Action ........................................................ 38

F.    Treatment of Executory Contracts and Unexpired Leases ............................... 39

(i)    Assumption of Executory Contracts and Unexpired Leases ............... 39
(ii)    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................. 39
(iii)    Pre-Existing Payment and Other Obligations .................................... 40
(iv)    Rejection Damages Claims and Objections to Rejections ................... 40
(v)    Contracts and Leases Entered Into After the Petition Date ................. 40
(vi)    Reservation of Rights ......................................................................... 40

G.    Provisions Governing Distributions ................................................................. 41

(i)    Distributions on Account of Claims Allowed as of the Plan Effective Date ................. 41
(ii)    Special Rules for Distributions to Holders of Disputed Claims .......... 41
(iii)    Disbursing Agent ............................................................................... 41
(iv)    Distributions of USA Holdco LLC Units ............................................ 42
(v)    Distributions of New Notes on Account of Allowed 7.5% Notes due 2025
Secured Claims and Allowed Unsecured Notes and Related Party Claims .................... 42
(vi)    Book Entry Transfer: ATOP ............................................................... 43
(vii)    Letter of Transmittal .......................................................................... 44
(viii)    Delivery of Distributions and Undeliverable or Unclaimed Distributions ................. 44
(ix)    Claims Paid or Payable by Third Parties ............................................ 46
(x)    Setoffs ................................................................................................ 46
(xi)    Allocation Between Principal and Accrued Interest ........................... 47

H.    Conditions Precedent to Confirmation and Consummation of the Plan ............ 47

(i)    Conditions Precedent to the Plan Effective Date ................................ 47
(ii)    Waiver of Conditions Precedent ......................................................... 49
(iii)    Effect of Non-Occurrence of Conditions to Consummation ............... 50

I.    Modification, Revocation or Withdrawal of the Plan ....................................... 50

(i)    Modification of Plan ........................................................................... 50
(ii)    Revocation or Withdrawal of Plan ..................................................... 50
(iii)    Confirmation of the Plan .................................................................... 50

J.    Effect of Confirmation of the Plan .................................................................. 50

(i)    Compromise and Settlement of Claims, Interests and Controversies ..... 50
(ii)    Discharge of Claims and Termination of Interests .............................. 51
(iii)    Releases by the Debtors ...................................................................... 51
(iv)    Releases by Releasing Parties ............................................................ 52
(v)    Exculpation ........................................................................................ 53
(vi)    Injunction ........................................................................................... 53
(vii)    Protection Against Discriminatory Treatment .................................... 54
(viii)    Indemnification .................................................................................. 54
(ix)    Recoupment ....................................................................................... 54
(x)    Release of Liens ................................................................................. 54
(xi)    Reimbursement or Contribution ......................................................... 55

IX.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES .......................................... 56

A.    Voluntary Petitions ........................................................................................ 56

B.      Expected Timetable of the Chapter 11 Cases ........................................................ 56

C.      First Day Relief ................................................................................................. 56

        (i)     Approval of Solicitation Procedures and Scheduling of Confirmation Hearing ............. 56
        (ii)    Joint Administration Motion ........................................................................... 56
        (iii)   Schedules Extension/Waiver Motion ................................................................ 56
        (iv)    Consolidated Creditors List Motion ................................................................. 56
        (v)     Automatic Stay Motion ................................................................................. 57
        (vi)    Cash Management System Motion .................................................................... 57
        (vii)   Employee Wages Motion ............................................................................... 57
        (viii)  General Unsecured Claims Motion .................................................................. 57
        (ix)    Taxes and Fees Motion .................................................................................. 57
        (x)     Insurance Motion ........................................................................................ 57
        (xi)    Factoring Arrangements ................................................................................ 57
        (xii)   Letter of Credit Programs .............................................................................. 57
        (xiii)  Other Procedural Motions and Professional Retention Applications ..................... 57

X.      PROJECTED FINANCIAL INFORMATION ........................................................ 58

XI.     RISK FACTORS ................................................................................................. 61

        A.      Risks Relating to the Plan Solicitation and Confirmation .................................... 61

        B.      Risks Related to the Debtors' and Reorganized Debtors' Businesses ..................... 66

        C.      Risks Related to the Plan Securities .............................................................. 74

        D.      Risks Related to Chile ............................................................................... 77

        E.      Risks Related to Peru ................................................................................ 78

CONFIRMATION OF THE PLAN .................................................................................... 80

        F.      Requirements for Confirmation of the Plan ..................................................... 80

        G.      Best Interests of Creditors/Liquidation Analysis ............................................. 80

        H.      Feasibility .............................................................................................. 80

        I.      Acceptance by Impaired Class ..................................................................... 80

XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................... 82

        A.      Liquidation Under Chapter 7 ....................................................................... 82

        B.      Alternative Plan(s) of Reorganization ........................................................... 82

        C.      Dismissal of the Debtors' Chapter 11 Cases .................................................... 82

XIII.   CERTAIN SECURITIES LAW MATTERS ........................................................ 83

        A.      Plan Securities ........................................................................................ 83

        B.      Issuance and Resale of Plan Securities under the Plan ....................................... 83

        (i)     Exemptions from Registration Requirements of the Bankruptcy Code, the
                Securities Act and State Blue Sky Laws ........................................................... 83

XIV.    CERTAIN CHILEAN AND UNITED STATES FEDERAL INCOME TAX
        CONSEQUENCES OF THE PLAN .................................................................... 85

        A.      Introduction ........................................................................................... 85

        B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ............ 85

C.      Certain Chilean Income Tax Consequences of the Plan to Holders of Allowed Claims .............. 85

        (i)     Exchange of Allowed Claims for US Holdco Stock ...................................... 86
        (ii)    Exchange of Allowed Claims for Chile Holdco Stock .................................. 86
        (iii)   Exchange of Allowed Claims for Reorganized Gildemeister Common Stock ............... 86
        (iv)    Exchange of Allowed Claims for New Notes .............................................. 86
        (v)     Chile Holdco Bonds ...................................................................... 87
        (vi)    New Notes ............................................................................... 87
        (vii)   US Holdco Shares ........................................................................ 87

D.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed
        Claims .......................................................................................... 88

XV.     SOLICITATION AND VOTING PROCEDURES ........................................................ 96

A.      The Solicitation Package ........................................................................ 96

B.      Voting Deadline ................................................................................. 96

C.      Voting Instructions ............................................................................. 96

        (i)     Note to Holders of Claims in Classes 4 and 5. ........................................ 97

D.      Voting Tabulation .............................................................................. 99

XVI.    RECOMMENDATION ............................................................................. 101

## EXHIBITS

EXHIBIT A    Debtors' Joint Prepackaged Chapter 11 Plan

EXHIBIT B    Restructuring and Plan Support Agreement

EXHIBIT C    Financial Projections

EXHIBIT D    Liquidation Analysis

EXHIBIT E    Organizational Chart

EXHIBIT F    Valuation Analysis

> **THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
> EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
> BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

## I.  EXECUTIVE SUMMARY

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims in connection with the solicitation of acceptances of the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.  The Plan constitutes a separate chapter 11 plan for each Debtor unless otherwise provided for in the Plan.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are placed in Classes for each of the Debtors.

As of December 31, 2020, the Debtors had outstanding debt in the aggregate principal amount of approximately US$566,690,000 consisting primarily of approximately US$509,806,002 in outstanding principal amount under their 7.5% Notes due 2025 (as defined in the Plan, or the "Secured Notes").

The Debtors are very pleased to report that after extensive, good faith negotiations with certain of the holders of the 7.5% Notes due 2025, the Plan embodies a settlement among the Debtors and their key creditor constituencies on a consensual transaction that will reduce the Debtors' debt service obligations and position the Debtors for continued operations.  To evidence their support of the Debtors' restructuring plan, Senior Secured Noteholders representing approximately 72.5% of the aggregate outstanding principal amount of the 7.5% Notes due 2025 (the "Consenting Noteholders") have executed the Restructuring and Plan Support Agreement, dated as of March 31, 2021 (the "RSA"), which provides for the implementation of the restructuring through an expedited chapter 11 process and commits the Consenting Noteholders and the Debtors to support the Plan subject to the terms and conditions of the RSA.  Additional holders of the 7.5% Notes due 2025, who, in the aggregate hold approximately $36,388,618 in principal amount, or approximately 7.1% of the outstanding 7.5% Notes due 2025, subsequently executed joinder agreements to the RSA (the "Joining Consenting Noteholders").  Together, the Ad Hoc Group of Consenting Noteholders and the Joining Consenting Noteholders hold approximately 79.6% of the outstanding 7.5% Notes due 2025.  As part of their obligations under the RSA, certain of the Consenting Noteholders (the "DIP Lenders") have agreed to provide post-petition financing to the Debtors, subject to the terms and conditions set forth in the RSA, the DIP Term Sheet, and the definitive documentation relaed to the DIP Credit Facility.

After giving effect to the following transactions contemplated by the RSA and the Plan, the Debtors will emerge from chapter 11 appropriately capitalized to support their emergence and going-forward business needs.

- On the Plan Effective Date, the Reorganized Debtors shall issue: (i) a senior tranche of secured notes (the "New Senior Tranche Secured Notes"), (ii) a junior tranche of secured notes (the "New Junior Tranche Secured Notes", and together with the New Senior Tranche Secured Notes, the "New Secured Notes"), and (iii) a subordinated tranche of unsecured notes (the "New Subordinated Notes" and together with the New Secured Notes, the "New Notes"), which shall have the terms indicated in the RSA and as described in Section VII.A(i).  On the Plan Effective Date, the New Notes will be distributed to the holders of DIP Claims, 7.5% Notes due 2025 Secured Claims, and Unsecured Notes and Related Party Claims in accordance with the Plan.

- On or prior to the Plan Effective Date, a newly formed holding company structured as a *sociedad por acciones* under the laws of Chile shall be formed ("Chile Holdco" and together with the Reorganized Debtors, the "Reorganized Business").  Upon implementation of the Restructuring Transactions on the Plan Effective Date, Chile Holdco shall hold all of the equity interests in Reorganized Gildemeister (the "Reorganized Gildemeister Common Stock") from and after the Plan Effective Date.

- On the Plan Effective Date, Chile Holdco shall issue (i) a single class of common equity interests with 100% economic and voting rights (the "Chile Holdco Stock") and having a paid in capital value of $44.3 million, and (ii) bonds in an aggregate principal amount of $132.8 million (the "Chile Holdco Bonds", and together with the Chile Holdco Stock, the "Chile Holdco Securities").  On the Plan Effective Date, the Chile Holdco Securities will be distributed to USA Holdco in accordance with the Plan.

- On or prior to the Plan Effective Date, a newly formed holding company structured as a limited liability company under the laws of Delaware shall be formed ("USA Holdco"), which, due to its ownership of Chile Holdco, will indirectly hold 100% of the equity interests in the Reorganized Business from and after the Plan Effective Date.  On the Plan Effective Date, USA Holdco shall issue a single class of limited liability

1

company units with 100% economic and voting rights (the "USA Holdco LLC Units") to the holders of the 7.5% Notes due 2025 Secured Claims in accordance with the Plan.

On the Plan Effective Date:

- Each holder of an Allowed DIP Claim (including all principal, accrued and unpaid interest, fees and expenses and non-contingent indemnity claims) shall have their DIP Expenses paid in full in Cash and, with respect to the remaining DIP Claims, at the Reorganized Debtors' option,  the Reorganized Debtors shall pay such DIP Claims (i) dollar for dollar with New Senior Tranche Secured Notes, or (ii) full Cash payment of the then unpaid balance of the DIP Claims.

- Except as otherwise expressly provided in the Plan, each holder of an Allowed Administrative Claim shall receive payment in full in cash.

- Each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

- Each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option subject to the consent of the Required Consenting Noteholders: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

- Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

- Each holder of an Allowed Prepetition Bank Financing Claim shall have their claim Reinstated.

- The 7.5% Notes due 2025 Secured Claims shall be Allowed in an amount of $409,300,000.  On the Plan Effective Date (or as soon as practicable thereafter), each holder of an Allowed 7.5% Notes due 2025 Secured Claim shall receive:

  o If such holder is not a Cash-Out Electing Holder (a "Non-Cash-Out Electing Holder"), shall receive with respect to such holder's Allowed 7.5% Notes due 2025 Secured Claims (i) $0.56046 in principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, (ii) $0.19789 in principal amount of New Subordinated Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, and (iii) its Pro Rata Share (based on the proportion that such Non-Cash-Out Electing Holder's Allowed 7.5% Notes due 2025 Secured Claims bears to the sum of all Allowed 7.5% Notes due 2025 Secured Claims held by all Non-Cash-Out Electing Holders) of 100.0% of the USA Holdco LLC Units[3]; or

  o If such holder of an Allowed 7.5% Notes due 2025 Secured Claim has affirmatively made a Plan Election on its Letter of Transmittal to receive a Cash-Out Distribution on its Ballot (a "Cash-Out Electing Holder"), shall receive with respect to such holder's Allowed 7.5% Notes due 2025 Secured Claims Cash in an aggregate amount equal to 18.6833% of such holder's Allowed 7.5% Notes due 2025 Secured Claim (a "Cash-Out Distribution") and such holder shall be deemed to have waived any distribution under the Plan under Class 5 on account of its Allowed 7.5% Notes due 2025 Unsecured Deficiency Claims.

- The Unsecured Notes and Related Party Claims shall be Allowed in the following amounts: (i) $111,796,081 of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,106 of 7.5% Notes due 2021 Claims, (iii)

---

[3]    Due to its ownership of Chile Holdco, USA Holdco will indirectly hold 100% of the equity interests of the Reorganized Debtors from and after the Plan Effective Date.

$23,205,373 of 8.25% Notes due 2021 Claims, and (iv) $2,664,771 of 6.75% Notes due 2023 Claims, which, in each case, for the Claims described in sub-clauses (ii) through (iv) includes the aggregate principal amount of such Claims and any accrued and unpaid interest through the Petition Date, (v) the Minvest Loan Claim shall be allowed in the amount of $1,643,500, and (vi) the Share Purchase Agreement Claim shall be allowed in the amount of $300,000.  On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, and discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each holder of an Allowed Unsecured Notes and Related Party Claim shall receive $0.20071 in principal amount of the New Subordinated Notes for each $1.00 of Unsecured Notes and Related Party Claims held by such holder.

- Each holder of an Allowed General Unsecured Claim shall be, at the option of the applicable Debtor or Reorganized Debtor, (a) Reinstated or (b) paid in full in cash.

- Each holder of an Allowed Intercompany Claim shall have its Claim (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Debtors' election subject to the consent of the Required Consenting Noteholders.

- Each holder of an Existing Equity Interest other than in Gildemeister shall have such Interest (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Debtors' election with the consent of the Required Consenting Noteholders and to the extent permitted under local law.

- Each Existing Equity Interest in Gildemeister, including, without limitation, each Existing Preferred Equity Interest in Gildemeister, each Existing Common Equity Interest in Gildemeister, and each Existing Series A Warrant and Existing Series B Warrant in Gildemeister shall be redeemed, cancelled, and released.[4]

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan.  The Debtors believe that the Plan is in the best interests of all creditors and urge all Holders of Claims entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, reference to "*we*," "*our*," and "*us*" are to the Debtors.

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of

---

[4]    The minority holders of Existing Equity Interests in Gildemeister (a) will in first instance be cancelled as a result of a capital reduction absorbing losses against capital; (b) then consenting shareholders agree to cancel their shares; and (c) any remaining shares shall be acquired and cancelled in exchange for a nominal redemption amount paid by a non-Debtor.

this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained in or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the SEC or the SVS, or any federal, state, local or foreign regulatory agency, nor has the SEC nor the SVS nor any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein.

Upon the Plan Effective Date, the securities described in this Disclosure Statement, including the New Notes and the USA Holdco LLC Units, will be issued without registration under the Securities Act, or similar federal, state, local or foreign laws, in reliance on the exemptions provided under section 1145 of the Bankruptcy Code, section 4(a)(2) and Regulation S under the Securities Act and similar Blue Sky Laws provisions, as applicable. Such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act, including, without limitation, Rule 144 of the Securities Act. See Section XIII, "Certain Securities Law Matters."

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## III.    FOREIGN EXCHANGE CONVERSION

This Disclosure Statement provides foreign exchange conversions[5] for amounts originally denominated in Chilean pesos. Please use the table below as a reference for all exchange rate conversions in this Disclosure Statement:

|  | 2017 | 2018 | 2019 | September 30, 2020[6] | December 31, 2020 |
|---|---|---|---|---|---|
| **Average US$/CLP$ Exchange Rate During Period** | 650.42 | 641.38 | 706.17 | 803.61 | 793.01 |

---

[5]    Exchange rates are from the Central Bank of Chile.

[6]    Reflects the cumulative average beginning January 1, 2020 through September 30, 2020.

| | | | | | |
|---|---|---|---|---|---|
| **US$/CLP$ Exchange Rate at the End of the Period** | 614.75 | 694.77 | 748.74 | 788.15 | 710.95 |

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

A.      What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession".

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy.  Because solicitation of acceptances begins before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.  Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.  If the solicitation of votes in this case extends beyond the Petition Date, the timeline of this prepackaged plan of reorganization may extend beyond the timeline of other prepackaged cases.

B.      Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  To perform a prepetition solicitation of the Plan, section 1126(b) of the Bankruptcy Code requires that the Debtors comply with section 1125 of the Bankruptcy Code, which requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding whether to accept or reject the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

C.      Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  In general, a Holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the Plan and (iii) the Holder of such Claim or Interest will receive or retain property under the Plan on account of such Claim or Interest.

Under the Plan, the only classes of claims that meet these requirements are Classes 4 and 5.  A Holder of a Claim in Classes 4 and 5 is entitled to vote to accept or reject the Plan if such Holder held such Claim as of April 9, 2021 (the "Voting Record Date").  Holders of 7.5% Notes due 2025 will be entitled to vote BOTH their 7.5% Notes due 2025 Secured Claims in Class 4 and their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5; their votes in each Class will be used to evaluate satisfaction with the Bankruptcy Code's requirements for Plan confirmation.

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted such plan, and thus the Holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Plan, the Holders of Claims in these Classes are not entitled to vote:

• Class 1;

- Class 2;

- Class 3;

- Class 6;

- Class 7 (to the extent Unimpaired pursuant to the Plan); and

- Class 8 (to the extent Unimpaired pursuant to the Plan).

In general, if the Holder of an Impaired Claim or Impaired Interest will not receive any distribution under a plan of reorganization in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the Holder of such Claim or Interest to have rejected such plan, and thus the Holders of Claims in such Classes are not entitled to vote on such plan. The Holders of Claims in Class 9 (and in Class 7 and Class 8 to the extent extinguished pursuant to the Plan) are conclusively presumed to have rejected the Plan and, therefore, not entitled to vote.

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class") and their respective status and entitlement to vote is set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein and in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 12.4 of the Plan.

Each Debtor has been assigned a number for the purposes of classifying and treating Claims against and Interests in each Debtor. The Claims against and Interests in each Debtor, in turn, have been assigned to separate lettered classes with respect to each Debtor based on the type of Claim or Interest involved:

| Class | Claim/Interest | Status | Voting Rights |
|:-----:|:---------------|:------:|:-------------:|
| 1 | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 3 | Prepetition Bank Financing Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 4 | 7.5% Notes due 2025 Secured Claims | Impaired | Entitled to Vote |
| 5 | Unsecured Notes and Related Party Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 7 | Intercompany Claims | Unimpaired or Impaired | Deemed To Accept or Deemed to Reject; Not Entitled To Vote |
| 8 | Existing Equity Interests Other Than in Gildemeister | Unimpaired or Impaired | Deemed To Accept or Deemed to Reject; Not Entitled To Vote |
| 9 | Existing Equity Interests in Gildemeister | Impaired | Deemed to Reject; Not Entitled To Vote |

As described in the Plan and in Section VIII.C of this Disclosure Statement, the "7.5% Notes due 2025 Claims" means (i) the 7.5% Notes due 2025 Secured Claims, and (ii) the 7.5% Notes due 2025 Unsecured Deficiency Claims. The 7.5% Notes due 2025 Secured Claims are classified in Class 4, and the 7.5% Notes due 2025 Unsecured Deficiency Claims are classified in Class 5.

D.      **How do I vote on the plan?**

The following materials constitute the solicitation package (the "Solicitation Package"):

- the appropriate Ballot or Master Ballot,[7] as applicable, and applicable voting instructions (the "Voting Instructions");[8]

- a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement with all exhibits, including the Plan.

**The voting Classes, Classes 4 and 5, entitled to vote to accept or reject the Plan were served the Solicitation Package (including the appropriate ballot) (i) to Nominees (as defined below) by overnight delivery and by electronic mail (if available) and (ii) to Beneficial Owners (as defined below) by first class mail. Additional paper copies of these documents may be requested from the Balloting Agent (i) by writing to Gildemeister Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (ii) by calling U.S. Toll Free: (877) 328-3687 or International Toll: (347) 532-5859; or (iii) by emailing gildemeisterballots@primeclerk.com.**

The Debtors have engaged Prime Clerk as the Balloting Agent to assist in the balloting and tabulation process. The Balloting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials and generally oversee the solicitation process.

**Only the Holders of Claims in Classes 4 and 5 are entitled to vote to accept or reject the Plan. Unless otherwise permitted by the Debtors, to be counted, Ballots or Master Ballots must be received by the Balloting Agent by 5 p.m. (prevailing Eastern Time) on May 7, 2021, the Voting Deadline**; **provided** that Holders of Claims who cast a Ballot prior to the time of filing of any of the Debtors' chapter 11 petitions shall not be entitled to change their vote or cast new Ballots after the Chapter 11 Cases are commenced, unless the Plan is modified in a manner that materially adversely affects the rights of the Holders of Claims; **provided**, **however**, that upon the occurrence of any termination of the RSA, any and all consents or votes tendered prior to such termination by the Consenting Noteholders shall be deemed, for all purposes, to be null and void ab initio. Upon any such termination, the affected Consenting Noteholders shall have the right (i) to freely vote their Claims on account of their 7.5% Notes due 2025 with respect to any chapter 11 plan with respect to the Debtors, (ii) to object to confirmation of any plan, including the Plan, whether or not an objection deadline regarding such plan has passed or (iii) seek the reversal or modification of the confirmation of any plan, including the Plan, in any of the Chapter 11 Cases. **VOTING INSTRUCTIONS ARE ATTACHED TO EACH BALLOT. PLEASE SEE ARTICLE XVI BELOW ENTITLED "SOLICITATION AND VOTING PROCEDURES" FOR ADDITIONAL INFORMATION.**

Unless the Debtors, in their discretion decide otherwise, any Ballot or Master Ballot received after the Voting Deadline shall not be counted. The Balloting Agent will process and tabulate the Ballots or Master Ballots for the Class entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") as soon as practicable after the Petition Date, which Voting Report will be supplemented as soon as practicable after the Voting Deadline, if necessary.

For answers to any questions regarding solicitation procedures, parties may contact the Balloting Agent directly, at Domestic Toll Free: (877) 328-3687 or International Toll: +1 (347) 532-5859, with any questions related to the solicitation procedures applicable to their Claims and Interests.

---

[7]     In accordance with customary practices, the Master Ballot(s) will be distributed approximately seven (7) days after the initial distribution of Solicitation Packages.

[8]     If you are a Holder of 7.5% Notes due 2025, you will have received a Ballot for both Class 4 and Class 5 and will be entitled to vote BOTH your 7.5% Notes due 2025 Secured Claims in Class 4 and your 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5.

Any Ballot or Master Ballot that is properly executed, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.

All Ballots and Master Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot and Master Ballot.

Section 506(a) of the Bankruptcy Code provides that holders of allowed Claims secured by Liens on property of a Debtor shall have an allowed secured claim to the extent of the value of such holder's interest in the Debtors' estates' property and shall have an unsecured claim to the extent the value of such holder's interest is less than the allowed amount of such claim. Under the Plan, the Holders of 7.5% Notes due 2025 shall have Allowed Claims in respect of the full $509,806,002 outstanding aggregate principal amount of the 7.5% Notes due 2025 plus all accrued and unpaid interest thereon as of the Petition Date. The Claims in respect of the 7.5% Notes due 2025 will be (1) Allowed in Class 4 of the Plan as 7.5% Notes due 2025 Secured Claims in an amount of $409,300,000, and (ii) Allowed in Class 5 of the Plan as 7.5% Notes due 2025 Unsecured Deficiency Claims in an amount of $111,796,081. The Holders of 7.5% Notes due 2025 will consequently be permitted to vote in each of Class 4 and Class 5 of the Plan for purposes of Plan confirmation and their ballots will allow them to vote in both Classes.

### E.    Is there anything else that I will need to do to receive the New Notes?

Yes. In order to receive the New Secured Notes and New Subordinated Notes, as applicable, Holders of Claims relating to the 7.5% Notes due 2025 and Unsecured Legacy Notes will be required to deliver their 7.5% Notes due 2025, 8.25% Notes due 2021, 6.75% Notes due 2023, and 7.5% Notes due 2021 as applicable, and certify that they are Qualified Holders. Holders of Related Party Claims will also be required to certify that they are Qualified Holders. *See* "Summary of the Plan – Provisions Governing Distributions – Distributions on Account of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims," which begins on page 41.

### F.    What happens to my recovery if the Plan is not confirmed, or does not go effective?

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario under U.S. or Chilean law, *see* "Confirmation of the Plan – Best Interests of Creditors/Liquidation Analysis" beginning on page 80 and the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.

### G.    Are any regulatory approvals required to consummate the Plan?

The Company may require a pre-merger approval in connection with the transactions contemplated under the Plan. Other than this, no additional regulatory approvals are required to consummate the Plan.

### H.    If the Plan provides that I am entitled to a distribution, do I receive it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Plan Effective Date" and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. Initial distributions to Holders of Allowed Claims will only be made on the Plan Effective Date or as soon as practicable thereafter. *See* "Confirmation of the Plan," which begins on page 80, for a discussion of the conditions to Consummation of the Plan.

In addition, whether Holders of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims will receive New Secured Notes and New Subordinated Notes, as applicable, or Substitute Consideration (as defined below), will depend on whether such Holder provides an election certifying that it is a Qualified Holder or a Non-Qualified Holder or fails to make such election in accordance with the procedures

described under "Summary of the Plan – Provisions Governing Distributions – Distributions on Account of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims," which begins on page 41. Upon Consummation of the Plan, the New Notes will be issued to Qualified Holders without registration under the Securities Act, or similar federal, state, local or foreign laws, in reliance on the exemptions provided under section 4(a)(2) and Regulation S of the Securities Act. These securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act, including, without limitation, Rule 144 of the Securities Act.

I.     **Will the Reorganized Debtors be obligated to continue to pay statutory fees as part of the bankruptcy process after the Plan Effective Date?**

Yes. On the Plan Effective Date the Debtors will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation. Additionally, on and after the Confirmation Date, the Reorganized Debtors must pay all statutory fees due and payable under 28 U.S.C. § 1930(a)(6) until the entry of a final decree, dismissal or conversion of the cases to chapter 7 of the Bankruptcy Code. The Reorganized Debtors will also be required to comply with reporting requirements, such as filing quarterly post-Confirmation reports and schedule quarterly post-Confirmation status conferences until the entry of a final decree, dismissal or conversion of the cases to chapter 7 of the Bankruptcy Code.

J.     **When will the Plan Supplement be Filed and what will it include?**

The Plan Supplement will be filed no later than five (5) Business Days before the date first scheduled for the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court, on notice to parties in interest, and additional documents may be filed before the Plan Effective Date as supplements or amendments to the Plan Supplement, all such documents being in form and substance satisfactory to the Requisite Consenting Noteholders in accordance with the terms of the Plan and the RSA, including the following: the New Corporate Governance Documents; the New Notes Documents; the Rejection Schedule, if any; the list of directors and officers of USA Holdco and the Reorganized Debtors; and the form of the Letter of Transmittal. The detailed terms of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors. When filed, the Plan Supplement will be available in both electronic and hard copy form, although the Debtors will not serve paper or compact disk read-only memory ("CD-ROM") copies. Details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest upon the commencement of the Chapter 11 Cases.

K.     **What are the Debtors' Intercompany Claims and Interests?**

In the ordinary course of business and as a result of their corporate structure, certain of the Debtor entities hold equity of other Debtor entities and maintain business relationships with each other, resulting in Intercompany Claims and Interests. The Intercompany Claims reflect costs and revenues, which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims. Further, the Intercompany Claims include Claims arising from intercompany receivables by and between certain Debtors.

The Plan's treatment of Intercompany Claims and Interests represents a common component of a chapter 11 plan involving multiple debtors in which the value of the going-concern enterprise may be replicated upon emergence for the benefit of creditor constituents receiving distributions under a plan.

L.     **How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

Because the Plan provides for payment in full to the Holders of General Unsecured Claims, Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases will not impact the recoveries to Holders of any Claims in any Class, unless Holders of Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases fail to file proofs of claim in accordance with the Plan.

**M.    Will there be releases granted to parties in interest as part of the Plan?**

The Plan proposes to release each of: (a) the Debtors; (b) Chile Holdco, USA Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agent and each DIP Lender; (d) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent; (e) the Unsecured Legacy Notes Trustees; (f) each Consenting Noteholder; (g) each current and former Affiliate of each Entity in clause (a) through (f); and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entity's current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

**PURSUANT TO THE PLAN, IF YOU RETURN A BALLOT THAT VOTES TO ACCEPT THE PLAN FOR ANY CLASS FOR WHICH YOU ARE ELIGIBLE TO VOTE, YOU WILL BE DEEMED, AS OF THE PLAN EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN). IF YOU RETURN A BALLOT IN RESPECT OF ANY CLASS FOR WHICH YOU ARE ELIGIBLE TO VOTE THAT VOTES TO REJECT OR ABSTAINS FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASE PROVISIONS IN ARTICLE VIII OF THE PLAN, YOU WILL BE DEEMED, AS OF THE PLAN EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN).**

For more detail see "Effect of Confirmation of the Plan," which begins on page 50.

**N.    What is the deadline to vote on the Plan?**

5 p.m. (prevailing Eastern Time) on May 7, 2021.

**O.    What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation Hearing?**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. If the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time approximately 35 days after the Petition Date for the Confirmation Hearing in the Bankruptcy Court. The Debtors also will request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing. The Confirmation Hearing, once set, may be continued from time to time, subject to the terms of the RSA, without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections.

**P.**        **What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, if the Debtors obtain Confirmation of the Plan and the Plan Effective Date of the Plan occurs, the Debtors will not be liquidated or forced to go out of business.  The Reorganized Debtors will continue to operate their businesses going forward using cash from operations.

**Q.**        **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Plan embodies a settlement among the Debtors and their key creditor constituencies on a consensual transaction that will reduce the Debtors' debt service obligations and position the Debtors for continued operations.  Therefore, the Debtors believe the Plan is in the best interest of all creditors.

V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

A.    The Debtors' Prepetition Organizational Structure

The Debtors' organizational chart is attached to this disclosure statement as Exhibit E.

B.    Summary of the Debtors' Businesses and Corporate History

Automotores Gildemeister SpA ("Gildemeister" and together with its Debtor and non-Debtor affiliates, the "Company") is a privately held company (*sociedad por acciones* or stock corporation) founded in 1986 as a limited liability company, which was transformed into a *sociedad anonima* in 1988 and later into a *sociedad por acciones* in 2016. Minvest S.A., a *sociedad anónima* organized under the laws of Chile, is the controlling shareholder of Gildemeister and owns 100.0% of the common stock of Gildemeister. Ricardo Lessmann, the President and Chief Executive Officer of Gildemeister, is also a shareholder of Minvest S.A. All of Gildemeister's direct and indirect subsidiaries are wholly-owned, other than for a nominal share owned by an affiliate of Automotores Gildemeister SpA to comply with Chilean and Peruvian corporate law. Automotores Gildemeister SpA includes the company's Chilean new and used vehicle sales and aftermarket business. All of Gildemeister's Chilean subsdiaries are Debtors in these proceedings. Gildemeister´s other direct subsidiaries which are Debtors in these proceedings include Fonedar S.A., Lodinem S.A., and Camur S.A. in Uruguay and Bramont Montadora Industrial e Comercial de Vehiculos S.A. in Brazil. Bramont S.A. was the sole importer of Mahindra in Brazil until 2016.

Gildemeister's non-Debtor subsidiaries include Automotores Gildemeister Peru S.A., which conducts Gildemeister's Peruvian vehicle sales. Automotores Gildemeister Peru S.A. has two subsidiaries, Manasa Peru S.A., which has concessions and supply agreements for the importation and distribution of a number of different vehicle brands in Peru, including Volvo Cars Overseas Corporation and Land Rover Exports Ltd., and Motor Mundo S.A., which has concessions and supply agreements for the importation and distribution of a number of vehicle brands in Peru, including Mahindra and Shenyang Brilliance (Jinbei). Other non-Debtor affiliates include Gildemeister Costa Rica S.A. and Inmobiliaria Los Seis CR ILS S.A. in Costa Rica.

Sociedad Comercial de Ecovalor S.A. ("Ecovalor"), Sociedad de Créditos Automotrices S.A. ("Amicar") and Sociedad Comercial e Inmobiliaria Autoshopping S.A. ("Autoshopping") are companies based in Chile, which are 50% joint ventures between Gildemeister and Derco Inversiones.

For operational purposes, the Company has divided its business into two main categories: (i) the vehicle business, the Company's core activity, which mainly consists of importing, distributing and selling new vehicles (primarily Hyundai), providing maintenance and repair services and selling associated parts, selling used vehicles and brokering insurance and financing services, and (ii) the third-party after-market accessories business, under which the Company sells vehicle accessories, although this business was wound down in 2020.

*Vehicle Business*

The Company's vehicle business consists primarily of the importation of vehicles from foreign original equipment manufacturers ("OEMs") and their subsequent distribution and sale to customers, either through independently owned and franchisee operated dealerships or the Company's owned dealerships, primarily in Chile and Peru. Since 1986, the Company has been the sole distributor of Hyundai passenger and light commercial vehicles in Chile and since 2002, the sole distributor of Hyundai passenger and light commercial vehicles in Peru. The Company is also the sole distributor of a number of global vehicle brands, such as Volvo and Jaguar Land Rover in Peru; Volvo, Jaguar Land Rover and Mini in Uruguay and Volvo in Costa Rica, as well as the sole distributor of Chinese and Indian brands, such as Mahindra, Geely, Brilliance, Jinbei and BAIC in Chile and Peru; JMC in Peru and Sinotruk, Yuejin and Yutong in Chile.

In connection with the sale of new vehicles, the Company provides services authorized by OEMs and OEM parts for the brands of cars that the Company sells, and brokers car loans through its affiliate, Amicar, for purchasers of the Company's new and used vehicles. Additionally, the Company offers insurance brokerage services to customers and carry out certain other ancillary business through joint ventures focused on developing and constructing dealership malls in Chile and developing an integrated system for the collection and recycling of used portable batteries.

13

*Importation and Distribution Agreements*

The Company's business operates pursuant to importation and distribution agreements that are customary for the industry. These agreements are entered into with the OEMs of each brand of vehicle that the Company distributes to its franchisees or sells at its dealerships. Under these agreements, in exchange for complying with certain provisions and standards governing certain aspects of the importation of the brand and operations of the dealerships, the Company is typically granted the non-exclusive right to distribute and sell the OEM's brand of vehicles and associated OEM parts, and to provide "official" post sales services for the OEM's brand of vehicles, as well as a non-exclusive license to use each OEM's trademarks, service marks and designs in connection with the Company's sales and services of its brands during the duration of the agreements.[9]

The Company's importation and distribution agreements typically expire after a specified period of time, ranging from one to three years, although some are automatically renewed or are renewed subject to the Company complying with certain conditions, such as achievement of certain sales targets. In practice, OEMs look at the Company's overall performance in considering renewal of agreements.

The importation and distribution agreements also entitle some OEMs to terminate or not renew the agreement for a variety of causes, including failure to comply with minimum purchase requirements, failure to comply with applicable laws or regulations, insolvency or bankruptcy, changes in management or ownership without consent, failure to have any permit or license necessary to operate the dealership, and material breaches of other provisions of the agreement.

On March 22, 2021, Hyundai Motor Company ("Hyundai"), one of the Company's most important OEMs, agreed to extend its Distributorship Agreements, dated January 1, 2020 between Hyundai and Gildemeister, and Hyundai and Automotores Gildemeister Perú S.A. (the "Distributorship Agreements") for a period of two years from the Plan Effective Date with respect to the Company, and for a period of two years from the expiry of the existing Distributorship Agreement with respect to Automotores Gildemeister Perú S.A. The Distributorship Agreements are described in further detail below at Section VI.E.

*Importation and Distribution Agreements with Affiliates*

The Debtors Fortaleza S.A. and Comercial Gildemeister S.A. hold the importation and distribution agreements for the sale and authorized service and repair in Chile of Mahindra, Geely, Renault Brilliance Jinbei, Huachen (Brilliance), Yuejin, Sinotruk, Yutong and Mini vehicles and OEM parts. These Debtors allowed Gildemeister to import and distribute these brands' products beginning in April 2009. Gildemeister does not pay these affiliates for the right to import the products for which they have the license.

*Dealerships*

<u>*The Company's Retail Network*</u>

The Company sells 12 brands through 70 vehicle dealerships that the Company owns and operates, including 46 owned dealerships in Chile, 19 owned dealerships in Peru, 3 owned dealerships in Uruguay and 2 owned dealership in Costa Rica. The Company's strategy has been to locate its owned dealerships in the largest cities in Chile and Peru. These dealerships may or may not be exclusive to a single brand of vehicle depending on the requirements of the Company's importation and distribution agreements with the OEMs. The Company's bigger brands such as Hyundai are sold in dedicated showrooms solely dedicated to that brand, while some of the smaller brands are bundled together in multi-brand dealerships, where each brand has a separate showroom located near the others.

<u>*Franchises*</u>

In addition, the Company distributes vehicles to 158 franchised dealerships, including 68 franchised dealerships located in Chile and 90 franchised dealerships located in Peru. Franchises operate very similarly to the

---

[9]       Although most of Gildemeister's relationships with vehicle OEMs are on a non-exclusive basis, some are exclusive contracts.

Company's owned dealerships. Franchises are usually given for a single brand, generally Hyundai, or a bundle of smaller brands. The Company does not offer its franchised dealerships brand or geographic exclusivity; franchises are granted to complement the Company's owned dealership network in larger cities, or to take advantage of sales opportunities in smaller and more remote markets.

### *Dealership Management*

The Company's retail network provides market-specific responses to sales, service, marketing and inventory requirements. These operations are complemented by the Company's centralized information technology and financial controls, as well as sharing of sales and marketing best practices throughout the organization. In managing its dealership portfolio, the Company employs a system whereby certain administrative and strategic functions of the business are centralized, while each franchise dealership is separately managed in accordance with the guidelines and operational recommendations established by the OEMs and the Company's requirements for its franchisees. The Company's training and implementation of industry best practices provides the Company with a competitive advantage over many dealerships.

### *Repairs and Maintenance Services and OEM Part Sales*

Some of the Company's owned dealerships also provide repairs and maintenance service and sales of OEM parts. These dealerships employ technicians who receive special training from the Company and from OEMs on the proper maintenance and repair of OEM vehicles.

### *Used Vehicles*

Some of the Company's dealerships also sell used vehicles through the Seminuevos Gildemeister brand. These vehicles are generally received as a trade-in or payment in kind for a new vehicle; however, the Company also receives used vehicles on consignment from customers, intermediates the sale of used vehicles by customers to third parties, and sells vehicles from the Company's own fleet when the Company determines they are no longer useful in the Company's business.

### *Marketing*

The Company's marketing programs have contributed to its sales growth in recent years. The Company's advertising and marketing efforts tend to target the local markets and are aimed at driving new business as well as attracting repeat customers. The Company utilizes many different media options for its marketing activities, including the internet, print, radio and television, and maintain a specialized advertising department that analyzes purchasing trends and focuses their advertising and marketing efforts where it believes it will likely provide the highest return. Vehicles are marketed under their brand names, but it believes that the Gildemeister, Fortaleza S.A. and Motormundo brands for new vehicles, and the Seminuevos Gildemeister brand for used vehicles, are well recognized by customers. The Company also continually upgrades the Hyundai brand to align its dealerships with Hyundai's global corporate identity. To this end, the aggregate cost of its marketing efforts was approximately Ch\$12.375 million in 2019 and Ch\$6.465 million in 2020.

### ***Third-Party After-Market Accessories***

The Company has historically sold after-market accessories such as batteries, motor oil and car stereos manufactured by third parties through an arrangement with its affiliate RTC S.A. The Company was the only distributor of some, but not all, of the third-party after-market accessories that it sold. In addition, the Company sold a number of accessories, such as car batteries and audio equipment under its own "RTC" name brands. Sales of third-party after-market accessories accounted for 4.4% and 1.8% of its sales in Chile and 2.4% and 0.9% of its total sales in 2019 and 2020, respectively. Gross profit from third-party after-market accessories accounted for 7.8% and -0.6% of its gross profit in Chile and 3.8% and -0.3% of its total gross profit in 2019 and 2020, respectively. However, the Company commenced a formal wind-down of the operation in early 2020 which was largely completed by the end of that year. There are no third-party business activities expected to be performed by RTC going forward.

### ***Ancillary Businesses***

15

*Financing and Insurance Brokerage*

At the Company's dealerships in Chile and Peru, the Company arranges for financing between clients and financial institutions through Amicar. In Chile, the Debtors also broker insurance services for customers through a third party authorized insurance broker, Mesos Corredora de Seguros Limitada ("Mesos"). Directly or indirectly, the Company charges a commission both from financing and insurance sales. Sales from commissions for financing and insurance represented 1.6% and 1.5% of total sales and 11.1% and 9.5% of the Company's total gross profit in 2019 and 2020, respectively.

*Amicar*

Amicar is a 50% joint venture between Gildemeister and Derco, through which the Company arranges for financing between its clients and financial institutions. Operating throughout the Company's dealership network in Chile and Peru, Amicar is an online auto credit portal acting as an intermediary between consumers and credit providers. Gildemeister and Derco customers can utilize Amicar's network of banks and financial institutions to obtain financing for the purchase of automobiles.

Amicar does not provide any credit to purchasers and it does not assume any of the credit risk associated with resulting loans. Amicar pays the Company a commission in respect of financing services brokered by the Company through it, which is recorded as sales revenue in the Company's income statement and which is recorded as a related party transaction in Amicar's financial statements. Amicar typically receives each such commission within a month of the disbursement of the loan. Amicar uses a portion of this premium to pay a commission to both the relevant dealership and automobile brand and retains the remainder.

In 2019 and 2020, approximately 59.3% and 57.2% respectively, of the Debtors' customers in Chile financed their vehicle purchases using Amicar brokered financing. In Peru, the Debtors' non-Debtor affiliates receive commissions for financing and insurance as a result of brokering activities as well. In Peru, approximately 31.6% and 22.3% of the Company's customers received financing brokered by the Company in 2019 and 2020. In brokering financing and insurance, the Company does not assume credit risk. All of the Company's owned and franchised dealerships in Chile and Peru are required to offer these financing and insurance services to all of its customers who want to purchase new vehicles.

*Gildemeister – Insurance Business*

Since September 2015, the Debtors provide insurance brokerage services through a third party authorized insurance broker, Mesos, to clients in Chile. Mesos offers insurance policies issued by BCI Seguros, SURA and HDI Seguros. Insurance brokerage is currently operating at the Debtors' 114 owned and third party dealerships in Chile. The Debtors collect a commission from these sales, which they receive on a monthly basis.

**Factoring and Inventory Financing**

In addition to the obligations described in Section C, below, the Company has certain short-term debt obligations which consist primarily of letters of credit for the purchase of inventory. The Company purchases inventory by requesting that a bank provide a letter of credit to the OEM. In the past, OEMs have required that the Company provides this letter of credit after it places an order. However, more recently, OEMs require that the letter of credit be provided prior to the initiation of the manufacturing process. The letter of credit remains outstanding and undrawn until the shipment of the inventory. The letter of credit is drawn when the OEM's correspondent bank provides the appropriate documents, including the bill of lading, to the bank that issued the letter of credit on the Company's behalf. Once the letter of credit has been drawn, the Company normally has 180 days to pay the issuing bank depending on the terms of the letter of credit. In the past, the Company has pre-paid a substantial number of letters of credit, from cash flow or from the incurrence of long-term debt, in order to maintain letter of credit issuance capacity. In general, the Company's letters of credit do not contain any covenants. The Company obtains its letters of credit through a number of different banks and it does not have any committed letter-of-credit facilities. The majority of the Company's letter of credit facilities are secured by liens on inventory.

16

C.        **Summary of the Company's Prepetition Capital Structure**

*7.5% Notes due 2025*

On November 7, 2019, Gildemeister issued US$509,806,002 aggregate principal amount of its 7.5% Notes due 2025 in the Exchange Offer (as defined below) (the "Secured Notes"), pursuant to an indenture among Gildemeister, the guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent, and TMF Group New York, LLC, as Collateral Agent (as amended and supplemented and in effect from time to time, the "2025 Notes Indenture"). *See* "Events Leading to Chapter 11 and Prepetition Restructuring Initiatives – 2019 Exchange Offer and Solicitation." Under the terms of the 2025 Notes Indenture, Gildemeister is required to pay fixed-rate interest at a rate of 7.50% per annum, payable quarterly in arrears, on March 31, June 30, September 30 and December 31 of each year. Gildemeister is obligated to make a $60 million scheduled amortization payment on May 15, 2021, $35 million on December 15, 2022, and $35 million on December 15, 2023. The 7.5% Notes due 2025 mature on November 7, 2025.

The 7.5% Notes due 2025 are guaranteed by AG Créditos SpA., Marc Leasing, S.A., Fonedar S.A., Camur S.A., Lodinem S.A., Carmeister S.A., Maquinaria Nacional S.A. (Chile), RTC S.A., Fortaleza S.A., Maquinarias Gildemeister S.A., Comercial Gildemeister S.A. and Bramont Montadora Industrial e Comercial de Vehiculos S.A, and are secured by substantially all of the assets of Gildemeister, and the guarantors and Gildemeister's Peruvian and Costa Rican subsidiaries that were unencumbered at the time of issuance, as well as a pledge by Minvest S.A. of 100% of the common shares of Gildemeister. The 7.5% Notes due 2025 are not listed on any exchange.

As of December 31, 2020, the aggregate outstanding principal amount of the 7.5% Notes due 2025 was approximately US$509,806,002 which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

***Unsecured Legacy Notes***

*8.25% Notes due 2021*

On May 24, 2011, Gildemeister issued US$300,000,000 aggregate principal amount of its 8.250% Senior Notes due 2021 (the "8.25% Notes due 2021"), pursuant to an indenture among Gildemeister, the guarantors party thereto, Deutsche Bank Trust Company Americas, as Trustee, Registrar, Paying Agent and Transfer Agent and Deutsche Bank Luxembourg S.A., as Luxembourg Listing Agent, Paying Agent, Registrar and Transfer Agent (as amended and supplemented and in effect from time to time, the "2021 8.25% Notes Indenture"). Under the terms of the 2021 8.25% Notes Indenture, Gildemeister is required to pay fixed-rate interest at a rate of 8.250% per annum, payable semi-annually in arrears, on May 24 and November 24 of each year. The 8.25% Notes due 2021 mature on May 24, 2021.

The 8.25% Notes due 2021 are guaranteed by Marc Leasing, S.A., Bramont Montadora Industrial e Comercial de Veiculos S.A., Fonedar S.A., Camur S.A., and Lodinem S.A., and are unsecured. The 8.25% Notes due 2021 are listed on the Luxembourg Stock Exchange and trade on the Euro MTF Market.

As of December 31, 2020, the outstanding principal amount of the 8.25% Notes due 2021 was approximately US$22,494,000 which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

*6.75% Notes due 2023*

On January 15, 2013, Gildemeister issued US$300,000,000 aggregate principal amount of its 6.750% Senior Notes due 2023 (the "6.75% Notes due 2023"), pursuant to an indenture among Gildemeister, the guarantors party thereto, Deutsche Bank Trust Company Americas, as Trustee, Registrar, Paying Agent and Transfer Agent and

Deutsche Bank Luxembourg S.A., as Luxembourg Listing Agent, Paying Agent, Registrar and Transfer Agent (as amended and supplemented and in effect from time to time, the "2023 Notes Indenture"). Under the terms of the 2023 Notes Indenture, Gildemeister is required to pay fixed-rate interest at a rate of 6.750% per annum, payable semi-annually in arrears, on January 15 and July 15 of each year. The 6.75% Notes due 2023 mature on January 15, 2023.

The 6.75% Notes due 2023 are guaranteed by Marc Leasing, S.A. and are unsecured. The 6.75% Notes due 2023 are listed on the Luxembourg Stock Exchange and trade on the Euro MTF Market.

As of December 31, 2020, the outstanding principal amount of the 6.75% Notes due 2023 was approximately US$2,622,000 which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

*7.5% Notes due 2021*

On February 24, 2016, Gildemeister issued US$421,903,404 aggregate principal amount of its 7.5% senior secured notes due 2021, which are unsecured following the Exchange Offer (as defined below) (the "7.5% Notes due 2021"), pursuant to an indenture among Gildemeister, the guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent and Lord Securities Corporation, as Collateral Agent (as amended and supplemented and in effect from time to time, the "2021 7.5% Notes Indenture"). *See* "Events Leading to Chapter 11 and Prepetition Restructuring Initiatives – 2019 Exchange Offer and Solicitation." Under the terms of the 2021 7.5% Notes Indenture, Gildemeister is required to pay fixed-rate interest at a rate of 7.50% per annum, payable quarterly in arrears, on March 31, June 30, September 30 and December 31 of each year. The 7.5% Notes due 2021 mature on May 23, 2021.

The 7.5% Notes due 2021 are guaranteed by Marc Leasing, S.A., Fonedar S.A., Camur S.A., Lodinem S.A., Carmeister S.A., Maquinaria Nacional S.A. Chile, RTC S.A., Fortaleza S.A., Maquinarias Gildemeister S.A., AG Creditos S.p.A., and Comercial Gildemeister S.A.. The 7.5% Notes due 2021 are not listed on any exchange.

As of December 31, 2020, the outstanding principal amount of the 7.5% Notes due 2021 was approximately US$9,644,520 which does not include unliquidated amounts including interest, fees, expenses, charges and other obligations, if applicable.

*Bank Loans*

In addition to the secured and unsecured bonds described above, Gildemeister has entered into various bank loans and loans with other financial institutions, which are mainly for working capital purposes and are typically secured by liens on vehicles. As of December 31, 2020, the Debtors had US$22.1 million outstanding in bank loans and loans with other financial institutions.[10]

*Obligations to Minvest*

Under that certain "Reconocimiento de Deuda" (or "Acknowledgment of Debt"), dated as of February 18, 2014, Automotores Motor Haus S.A. as borrower and Minvest S.A. as creditor acknowledged the pre-existing loan of USD$1,643,500 by Minvest S.A. to Automotores Motor Haus S.A. (the "Former Minvest Loan"). In connection with the sale of Automotores Motor Haus S.A. described below in Section VI.A(iii), Automotores Motor Haus S.A. repaid the Minvest Loan through an assignment dollar for dollar of a portion of an existing intercompany loan owed to Automotores Motor Haus S.A. by Lodinem S.A. The assignment was documented by a Contrato de Cesion de

---

[10] This figure also excludes certain financial leases to which the Company is a party, factoring receivable obligations, and inventory financing.

Creditors dated as of March 26, 2021, between Automotores Haus S.A. and acknowledged by Lodinem S.A. Following such assignment, Lodinem S.A. is obligated to Minvest in an amount of $1,643,500 (the "Minvest Loan").

Under that certain Contrato de Compraventa de Acciones (or "Share Purchase Agreement"), dated as of February 24, 2016, Gildemeister acquired 160 shares issued by Maquinaria Nacional S.A. owned by Minvest S.A.. Under the Share Purchase Agreement, the amount due after a series of transactions was of US$1,800,000, payable in 6 annual installments each June 30th. The last installment is due on June 30, 2021. No interest rate is applicable to this balance, except if the payment is not made on maturity.

### Stockholders' Equity

Gildemeister's share capital is composed as follows:

> *(i) Common Stock (Series A and B):* Gildemeister has two classes of common stock, Series A Common Stock, which has voting rights and Series B Common Stock, which does not have voting rights. Other than voting rights, the two classes have identical rights. As of December 31, 2020, Gildemeister's Series A Common Stock consisted of 1,050,000 fully subscribed and paid shares.

> *(ii) Preferred Stock (Series C and D):* Gildemeister also has two classes of preferred stock, Series C Preferred Stock, which has limited voting rights and Series D Preferred Stock, which does not have voting rights. Other than voting rights, the two classes have identical rights. As of December 31, 2020, Gildemeister's Series C Preferred Stock consisted of 272,500 fully subscribed and paid shares, and its Series D Preferred Stock consisted of 5,304 fully subscribed and paid shares.

> *(iii) Warrants (Series A and B):* In addition to common stock and preferred stock, Gildemeister has also issued two series of warrants, Series A Warrants and Series B Warrants, which are convertible into Common Stock of Gildemeister. The outstanding Series A and B Warrants represent, in the aggregate, the right to receive a total of 1,522,472 shares of Series A or B Common Stock. Each Series A Warrant is exercisable for one share of Series A Common Stock at an exercise price of US$0.01 at any time prior to February 1, 2027, and each Series B Warrant is exercisable for one share of Series B Common Stock at an exercise price of US$0.01 at any time prior to February 1, 2027.

> As of December 31, 2020, the total stockholders' equity of Gildemeister was $34,220,000, composed of $340,192,000 in total capital issued and $374,412,000 in total retained earnings and other items.

### D.    Related Party Transactions

#### Minvest Loan

Under the Minvest Loan, described above in Section V.C, Lodinem S.A. is obligated to Minvest in an amount of $1,643,500. Under the Plan, the Minvest Loan Claim will be Allowed as a Class 5 Claim in the amount of $1,643,500, plus accrued and unpaid interest, if any.

#### Share Purchase Agreement

Under the Share Purchase Agreement described above in Section V.C., Gildemeister acquired 160 shares issued by Maquinaria Nacional S.A. owned by Minvest S.A. The amount due after a series of transactions was of US$1,800,000, payable in 6 annual installments each June 30th. The last installment of $300,000 is due on June 30, 2021. Under the Plan, the Share Purchase Agreement Claim shall be Allowed as a Class 5 Claim in the amount of $300,000.

*Headquarters in Pudahuel*

The Company leases the headquarters in Pudahuel from Inmobiliaria Gildemeister S.A., a company controlled by certain of the shareholders that own Minvest S.A., including Ricardo Lessmann.  The lease is renewable from year to year and was extended on March 1, 2021 for a one year term.  The renewal of the lease and any increases in rent payable are subject to approval by the Board of Directors of Gildemeister.  At the time of the latest lease extension, an independent appraisal of the property's value was made by three independent firms who valued the property at between $15.9 to $17.9 million with an average valuation of $16.8 million.  Under the current terms of the lease (as amended and extended on March 1, 2021), the annual lease payments are approximately $1.2 million.

*Novapromo*

Importaciones y Exportaciones Novapromo Limitada ("Novapromo"), which is owned by Sebastian Lessmann, the son of Ricardo Lessman, provides services to Gildemeister under that certain Contrato de Abastecimiento (or "Supply Contract"), dated as of December 31, 2018.  Under the Supply Contract, Novapromo manufactures, develops and imports safety kits and document holders for Hyundai and Fortaleza vehicles.

Transctions between the Company and Novapromo are approved as related party transactions at board meetings of the Company and are reflected in the Company's financial statements.

## VI.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES

The Debtors intend to commence the Chapter 11 Cases to restructure a balance sheet burdened by approximately US$566,690,000 on account of the obligations under the 7.5% Notes due 2025, 8.25% Notes due 2021, 6.75% Notes due 2023, 7.5% Notes due 2021, the bank loans and loans with other financial institutions described in Section V.

A restructuring of the Debtors' balance sheet is necessary in order for the Debtors to be able to meet their financial obligations over the long-term.  Since the issuance of the 7.5% Notes due 2025, the Debtors' revenues have not grown to a level necessary to support the Debtors' existing capital structure.  The Debtors have struggled financially due to a number of factors, including the COVID-19 pandemic and macroeconomic conditions, which have resulted in decreased consumer confidence in the markets in which the Debtors operate.

As a result of these factors, revenue is substantially lower than expected at the time of the issuance of the 7.5% Notes due 2025.  The Debtors do not have the capacity to execute on their business strategy or continue paying their debt without the implementation and Consummation of the Plan.

### A.    Recent Operations

#### (i)    *Complex and Competitive Market Environment*

Prior to the pandemic, increased competition and market size challenged the Debtors' profitability.  Although the Debtors continue to maintain high levels of market share in their key market of Chile, this market was already suffering declines as a result of macroeconomic and other conditions prior to the pandemic, which resulted in the decrease of unit sales, revenues and EBITDA.  The Debtors believe that overall consumer confidence in this market has decreased substantially, which has adversely affected demand for vehicles.  In addition, Chile has recently experienced substantial depreciations in its currency relative to the U.S. dollar.  The Chilean peso has also depreciated from Ch$694.77 per US$1.00 as of December 31, 2018 to an average of Ch$803.61 per US$1.00 during the 9 month period ending September 30, 2019, with a recent uptick to Ch$710.95 per US$1.00 as of December 31, 2020.  Because the selling prices of the Debtors' cars are either denominated in U.S. dollars (in the case of Uruguay) or are significantly influenced by the U.S. dollar denominated prices charged by the Debtors' OEMs (in the case of Chile), significant depreciations have decreased the purchasing power of consumers, and therefore have decreased demand for the Debtors' products. In addition, significant depreciation also impacts gross margins as the company may not be able to pass on the depreciation fully to the end consumer (in the case of Chile).

As of December 31, 2020, the market for passenger and light commercial vehicles in Chile shrank by 31% as compared to December 31, 2019, from 372,983 vehicles to 259,043 vehicles.  The Debtors' sales of passenger and light commercial vehicles in Chile decreased 32% from 33,444 vehicles in 2019 to 22,669 vehicles in 2020.

Between 2019 and 2020, the U.S. dollar value of the Debtors' revenues decreased by 58%, from US$1,069.7 million in 2019 to US$677.3 million in 2020.  In addition, the Debtors' revenues stated in Chilean pesos decreased by 29% from Ch$755.420 million in 2019 to Ch$537.139 million in 2020.

#### (ii)    *Impact of COVID-19 on Operations*

The global COVID-19 pandemic has had a significant negative impact on the Company' financial position. In Chile, the light and medium vehicle wholesale market declined 83% year over year in April 2020 as a result of government mandated lock-downs.  Since then the market remained depressed relative to 2019, albeit with improvement since April 2020.  By September 2020, the market was about 2.5% higher than September 2019.  In Peru, the light and medium vehicle wholesale market declined 98% year over year in April 2020 as a result of the lock downs. Since then the market remained depressed relative to 2019, albeit improved since April 2020. By September 2020, the market was about 4% lower than September 2019. The pandemic negatively impacted the Company mainly as a result of forced distribution network closures due to government mandated lock-downs, availability of inventory and greater economic uncertainty negatively impacting demand.  In Chile, the Debtors were subject to mandatory lockdowns in Santiago, the Chilean Debtors' largest market, which not only limited potential customer movement

throughout the city but also forced the temporary closure of car dealerships between March 27, 2020 and August 1, 2020, which significantly reduced the Debtors' retail and wholesale sales during this period.  Upon easing of the closures, sales recovered albeit not to pre-pandemic levels, largely due to muted demand as a result of greater economic uncertainty due to the significant negative impact of the pandemic on GDP.  Furthermore, in the months following the closures, the Company's supply chain was negatively impacted due to inventory production and delivery delays from the Company's major OEM suppliers in Asia, resulting in inventory levels well below normal.  Recently, the Chilean authorities once again declared a "State of Catastrophe" until June 30, 2021.  In Uruguay, the pandemic negatively impacted sales largely due to the impact on consumer confidence as Uruguay did not have government mandated lock-downs.

### *(iii)*  *Sale of Uruguay BMW Business; Chile MINI Business; and Peru MINI and BMW Businesses*

On July 10, 2020, after the Company notified BMW of its intention to exit the BMW business in Uruguay, BMW designated Magna Motors S.A. as its new distributor to continue the business.  Following negotiations, in December 2020, the Company accepted a non-binding letter of intent from Magna Motors to acquire 100% of the shares of Automotores Motor Haus S.A., the entity in Uruguay through which the Company conducted its BMW business, at a purchase price of approximately US$12.3 million for its net assets, plus goodwill of US$350,000.  The parties subsequently agreed to a binding term sheet, dated December 31, 2020.  On March 26, 2021, the sale successfully closed, and the shares were transferred to Romey S.A. (an affiliate of Magna Motors S.A.) and the Company received payment of approximately 85% of the purchase price in escrow and, pursuant to the Indenture Amendment Agreement related to the sale, the funds were released to the Company upon the execution of the Restructuring Support Agreement on March 31, 2021. The remaining 15% of the purchase price was deposited into an escrow account in Uruguay for the benefit of Romey S.A. to cover tax, labor and other contingencies for up to five years.  With the consent of holders of a majority of the 7.5% Notes due 2025, the indenture trustee and collateral agent for the 7.5% Notes due 2025, the proceeds from the sale, net of expenses, will be used for working capital purposes.

The Company has also sold its MINI business in Chile and MINI and BMW businesses in Perú through separate asset sale agreements.  Both transactions included the sale of new vehicles, spare parts, equipment, computers, tools, and similar assets, as well as goodwill, and in both cases, BMW designated Inchcape as the new distributor.  The Company sold its MINI business in Chile by that certain Asset Purchase Agreement entered into as of December 1, 2020 by and between the Company as Seller and Williamson Balfour Motors SpA ("WBM") as the Purchaser, for a purchase price of Ch$1,307,267,333, plus goodwill of Ch$91,307,510, inclusive of VAT taxes  The Company sold its BMW business in Perú by that certain Asset Purchase Agreement entered into as of December 10, 2020 by and between the Company as Seller and Inchcape Motors Peru S.A. ("IMP") as the Purchaser, for a purchase price of US$3,705,289, inclusive of VAT taxes.  The proceeds from both transactions were used for working capital, and the proceeds from the sale of the Company's BMW business in Perú were used for an intercompany loan to Automotores Gildemeister SpA in the amount of US$2,500,000, which is described in Section VI.D ("Intercompany Loans") below.

### *(iv)*  *AGP Customs Disclosure*

On March 26, 2021, non-debtor AGP reported to Superintendencia Nacional de Aduanas y de Administración Tributaria ("SUNAT"), the customs authorities in Peru, that it had inadvertently imported vehicle models from Hyundai that did not meet the applicable emissions standards.  AGP is collaborating with SUNAT and authorities to provide all necessary information, and has implemented a vehicle recall and replacement plan.

AGP may also contact other Peruvian authorities as appropriate in connection with this matter, which has the potential to result in additional liabilities.  The Company is not aware of any claims which have been or may be asserted against the Debtors relating to this matter.  For further discussions, see "Risks Related to Peru" at page 78.

B.        **2019 Exchange Offer and Solicitation**

On September 30, 2019, in order to extend the maturity of Gildemeister's then-existing senior debt, Gildemeister commenced an offer to exchange (the "Exchange Offer") any and all of the outstanding 7.5% Notes due 2021, 8.25% Notes due 2021 and 6.75% Notes due 2023, in exchange for consideration consisting of a combination of newly issued 7.5% Notes due 2025, Series A Warrants and Series B Warrants.  The Exchange Offer was consummated on November 7, 2019 and, in total, 98.13% of the outstanding principal amount of 7.5% Notes due 2021 were validly tendered and accepted by Gildemeister for exchange.  Pursuant to the Exchange Offer, substantially all of the restrictive covenants and other provisions of the 7.5% Notes due 2021 were eliminated, including all of the collateral securing such notes.  Accordingly, following the Exchange Offer, the 7.5% Notes due 2021, which were previously secured by certain of Gildemeister's then-unencumbered assets, are unsecured.

C.        **The Debtors' Debt Service Obligations**

Finally, the Debtors' current debt service obligations place significant strain on the Debtors' available cash flows.  The Debtors have approximately US$566,690,000 in total debt outstanding, of which approximately US$35 million will become due between the Petition Date and the end of 2023.  At the same time, the Debtors are facing approximately US$100 million in scheduled cash interest payments over the next 3.5 years, putting severe pressure on the Debtors' ability to generate sufficient cash to service such debt obligations. Absent a substantial deleveraging of the Debtors' balance sheet and elimination of a substantial amount of obligations in respect of near- and medium-term debt, the Debtors will not be able to continue to service their debt or conduct their business in the ordinary course.

D.        **Intercompany Loans**

On January 11, 2021,the Company received a secured loan in the amount of $7.5 million from Automotores Gildemeister Perú S.A. ("AGP") in order to fund a cash shortfall. The loan is expected to be repaid on or before April 9, 2021.  Also on January 11, 2021, the Company received a secured loan in the amount of $2.5 million from AGP that will mature on June 15, 2023.

E.        **Hyundai's Support of the Restructuring**

(i)        *Extension of the Hyundai Agreements*

On March 22, 2021, Hyundai and Gildemeister and AGP respectively entered into letter agreements under which Hyundai agreed to support the Companies' restructuring by (1) agreeing to extend Hyundai's existing distributorship agreements with AG and AGP (together, the "Hyundai Distributorship Agreements") for two years from the Plan Effective Date, and (2) acknowledging and agreeing that, after the Plan Effective Date, the Consenting Noteholders will become the indirect shareholders of Gildemeister, and a new chief executive officer for Gildemeister will be selected.

(ii)        *Hyundai's Assistance with Perú*

On March 23, 2021, Hyundai and AGP entered into a certain agreement for undertaking and release, under which the parties agreed to mutual releases and Hyundai agreed to provide support to assist in AGP's plan for the resolution of the Customs Claims (the "Hyundai Undertaking Agreement").  Under the Hyundai Undertaking Agreement, Hyundai agreed to allow AGP to purchase up to 1854 model H-1 vehicles from Hyundai with the Euro-IV engines at a discount rate of 30% as replacement vehicles for the vehicles that are potentially affected by the Customs Claims.  The Hyundai Undertaking Agreement also reiterates that Hyundai will execute a two-year extension for its distributorship agreement with AGP.

***

In response to the Debtors' depressed financial performance and declining financial condition described above, and after thoroughly evaluating their options, the Debtors determined that it was in the best interests of their businesses to effectuate their reorganization through the Chapter 11 Cases.

The Debtors retained restructuring counsel, Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), and financial advisors, Rothschild & Co ("Rothschild & Co") and FTI Consulting ("FTI"), to assist them with the negotiation and implementation of this transaction and the Chapter 11 Cases.

In the months prior to the Petition Date, the Debtors, together with their advisors engaged in extensive negotiations with the Holders of approximately US$369,585,322 in principal amount, or 72.5%, of the outstanding 7.5% Notes due 2025 by amount. The Debtors negotiated the RSA with the Ad Hoc Group of Consenting Noteholders, which was executed on March 31, 2021. After the Ad Hoc Group of Consenting Noteholders executed the RSA and prior to solicitation, the Joining Consenting Noteholders, holders of approximately $36,388,618 in principal amount, or approximately 7.1% of the outstanding 7.5% Notes due 2025, subsequently executed joinder agreements to the RSA to solicitation. Together, the the Ad Hoc Group of Consenting Noteholders and the Joining Consenting Noteholders hold approximately 79.6% of the outstanding 7.5% Notes due 2025.

The Debtors now seek to consummate the Plan and emerge as reorganized entities. The Debtors believe that the Chapter 11 Cases represent the best prospect for restructuring the Debtors' capital structure and positioning the Debtors for successful operations as a going-forward concern.

## VII.    THE PROPOSED REORGANIZATION OF THE DEBTORS

### A.    Pre-Solicitation Negotiations

In the weeks leading up to the dissemination of this Disclosure Statement, the Debtors and their advisors engaged in extensive negotiations and discussions with the Consenting Noteholders and their respective advisors regarding the terms of a potential restructuring of the Debtors' obligations under the 7.5% Notes due 2025.

On March 31, 2021, the Debtors and the Consenting Noteholders agreed to the key features of the Chapter 11 Plan. After good faith, arm's length negotiations, the Debtors reached an agreement with the Consenting Noteholders with respect to a consensual restructuring on the terms set forth in the Plan, and formalized by the RSA. The Debtors received executed signature pages to the RSA from the Ad Hoc Group of Consenting Noteholders, Holders of approximately US$369,585,322 in principal amount, or approximately 72.5%, of the outstanding 7.5% Notes due 2025 by amount. Additional holders of the 7.5% Notes due 2025, who, in the aggregate hold approximately $36,388,618 in principal amount, or approximately 7.1% of the outstanding 7.5% Notes due 2025, subsequently executed joinder agreements to the RSA (the "Joining Consenting Noteholders"). Together, the Ad Hoc Group of Consenting Noteholders and the Joining Consenting Noteholders hold approximately 80% of the outstanding 7.5% Notes due 2025. Before commencing the Solicitation, the Debtors and the Consenting Noteholders finalized the Plan, which provides that the Allowed Claims of the Debtors' general unsecured creditors will be unimpaired and fully satisfied.

Furthermore, the Plan provides that the 7.5% Notes due 2025 Secured Claims shall be Allowed in the amount of $409,300,000. On the Plan Effective Date (or as soon as practicable thereafter), each holder of an Allowed 7.5% Notes due 2025 Secured Claim: (A) each Non-Cash-Out Electing Holder shall receive with respect to such holder's Allowed 7.5% Notes due 2025 Secured Claims (i) $0.56046 in principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, (ii) $0.19789 in principal amount of New Subordinated Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, and (iii) its Pro Rata Share (based on the proportion that such Non-Cash-Out Electing Holder's Allowed 7.5% Notes due 2025 Secured Claims bears to the sum of all Allowed 7.5% Notes due 2025 Secured Claims held by all Non-Cash-Out Electing Holders) of 100.0% of the USA Holdco LLC Units[11]; or (B) each Cash-Out Electing Holder shall receive with respect to such holder's Allowed 7.5% Notes due 2025 Secured Claims Cash in an aggregate amount equal to 18.6833% of such holder's Allowed 7.5% Notes due 2025 Secured Claim (a "Cash-Out Distribution") and such holder shall be deemed to have waived any distribution under the Plan under Class 5 on account of its Allowed 7.5% Notes due 2025 Unsecured Deficiency Claims. The Unsecured Notes and Related Party Claims shall be Allowed in the following amounts: (i) $111,796,081 of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,106 of 7.5% Notes due 2021 Claims, (iii) $23,205,373 of 8.25% Notes due 2021 Claims, and (iv) $2,664,771 of 6.75% Notes due 2023 Claims, which, in each case, for the Claims described in sub-clauses (ii) through (iv) includes the aggregate principal amount of such Claims and any accrued and unpaid interest through the Petition Date, (v) the Minvest Loan Claim shall be allowed in the amount of $1,643,500, and (vi) the Share Purchase Agreement Claim shall be allowed in the amount of $300,000. On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, and discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each holder of an Allowed Unsecured Notes and Related Party Claim shall receive $0.20071 in principal amount of the New Subordinated Notes for each $1.00 of Unsecured Notes and Related Party Claims held by such holder. *See* "Summary of the Plan – Provisions Governing Distributions – Distributions on Account of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims."

The Plan is materially consistent with the terms of the RSA, attached hereto as **Exhibit B**.

### (i)    The New Notes

As described further in the RSA, Reorganized Gildemeister will be the borrower under the New Notes which will have a maximum aggregate principal amount equal to (i) an aggregate principal amount equal to all DIP Claims

---

[11]    Due to its ownership of Chile Holdco, USA Holdco will indirectly hold 100% of the equity interests of the Reorganized Debtors from and after the Plan Effective Date.

outstanding on the Plan Effective Date (the New Senior Tranche Secured Notes), plus (ii) US$229,400,000 New Junior Tranche Secured Notes; and plus (iii) US$111 million in New Subordinated Notes. The New Notes will accrue interest at the rates provided in the RSA.

The New Secured Notes will be secured by first and second priority security interests, as applicable, over the same assets that secured the 7.5% Notes due 2025, plus (i) Chile Holdco shall grant first and second priority security interests, as applicable, over all equity interests in Gildemeister or Reorganized Gildemeister and (ii) first and second priority security interests, as applicable, will be granted over all equity interests in each other Debtor or Reorganized Debtor. The New Subordinated Notes will be unsecured.

The New Notes shall be redeemable at any time at a price equal to 100% of the principal amount plus accrued and unpaid interest thereon, if any, on the applicable redemption date.

The New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes shall benefit from the same collateral and guarantees; provided, however, that the New Junior Tranche Secured Notes and all liens and guarantees related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the New Senior Tranche Secured Notes pursuant to a New Secured Notes Intercreditor Agreement containing terms acceptable to the DIP Lenders. The New Subordinated Notes shall be unsecured and shall benefit from the same guarantees that support the New Secured Notes provided, however, that the New Subordinated Notes and guarantees related thereto shall be expressly subordinated in right of payment to the payment in full of the New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes pursuant to the New Senior/Subordinated Intercreditor Agreement.

The New Notes will be guaranteed on a joint and several basis by Reorganized Gildemeister and each of the same guarantors that had guaranteed the 7.5% Notes due 2025.

All New Notes under the Plan that would have been issuable and deliverable to Non-Qualified Holders if they had been Qualified Holders will be deposited with an agent (the "Selling Agent"). The Selling Agent shall offer such New Notes in one or more sale transactions within 180 days following the Plan Effective Date (the "Sale Period"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Holders at the end of the Sale Period (the "Substitute Consideration"). In the event that a sale of such New Notes is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such debt securities shall be cancelled. None of the Company Parties, the Ad Hoc Group of Consenting Noteholders and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities.

For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive the Substitute Consideration in respect thereof. Holders of 7.5% Notes due 2025 Secured Claims that are Non-Qualified Holders will receive that portion of their distributions under the Plan that constitutes their pro rata share of USA Holdco LLC Units regardless of whether they receive any Substitute Consideration in respect of their allocation of New Notes.

*(ii)*    ***Plan Milestones***

Pursuant to the RSA, the Consenting Noteholders have agreed to support the Plan, subject to certain terms and conditions and provided that the Debtors are successful in taking the steps necessary to meet the various agreed upon milestones, which include, but are not limited to, the following:

- The Gildemeister Shareholders Meeting (as defined in the RSA) shall have occurred on the date specified in the notice scheduling the Gildemeister Shareholders Meeting.

- No later than 19 days after the publication of the notice scheduling the Gilemeister Shareholders Meeting, the Required Amendments shall have

been passed.

- No later than April 2, 2021, the Debtors shall have commenced the solicitation of the Plan and distributed the Disclosure Statement and the Solicitation Materials to holders of Claims entitled to vote to accept or reject the Plan.[12]

- No later than April 15, 2021, the Debtors shall have filed petitions commencing the Chapter 11 Cases along with a motion seeking entry of an order scheduling the Confirmation Hearing.

- No later than the Petition Date, the Debtors shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion and the Solicitation Materials.

- No later than 5 days following the Petition Date, the Debtors shall have obtained entry of the Interim DIP Order.

- No later than 30 days following the Petition Date, the Debtors shall have completed solicitation of the Plan.

- No later than 35 days following the Petition Date, the Debtors shall have obtained entry of the Final DIP Order.

- No later than 50 days after the Petition Date, the Debtors shall have obtained entry of an order approving the Disclosure Statement and Solicitation Materials.

- No later than 50 days after the Petition Date, the Debtors shall have obtained entry of the Confirmation Order.

- No later than 15 days following the entry of the Confirmation Order, the Plan Effective Date shall have occurred.

If the RSA terminates due to the Debtors' failure to meet the conditions outlined above or otherwise, any and all consents given or votes of Consenting Noteholder Claims and Interests occurring prior to such termination by the Consenting Noteholders shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise, pursuant to Section 3 of the RSA.

## B.    Debtor-in-Possession Financing

In connection with the negotiation of the RSA, described in Section A above, the Company engaged in negotiations with the Ad Hoc Group of Consenting Noteholders to obtain debtor-in-possession financing. On March 31, 2021, the Ad Hoc Group of Consenting Noteholders agreed to the Summary of Indicative Terms regarding Debtor-in-Possession Financing ("DIP Term Sheet") which outlines the principal terms under which the Ad Hoc Group of Consenting Noteholders will provide senior secured, priming, super-priority, debtor-in-possession credit facility (the "DIP Credit Facility") in an aggregate principal amount of up to US$23,600,000 to the Company.

## C.    Solicitation

On or about April 9, 2021, before filing the Chapter 11 Cases, the Debtors caused a copy of this Disclosure Statement (with the Plan attached as **Exhibit A**) and the appropriate Ballots to be delivered to the Holders of Claims relating to the 7.5% Notes due 2025 and the Unsecured Legacy Notes and the Holders of the Related Party Claims in

---

[12]    The Ad Hoc Group of Consenting Noteholders agreed to extend this Milestone to April 9, 2021.

each case as of the Voting Record Date.  The Debtors established May 7, 2021 at 5 p.m. (prevailing Eastern Time) as the deadline for the receipt of votes to accept or reject the Plan.  On the Petition Date, along with the Plan and this Disclosure Statement, the Debtors intend to file a motion seeking approval of the adequacy of this Disclosure Statement, approval of the Solicitation Packages and Confirmation of the Plan.

# VIII.    SUMMARY OF THE PLAN[13]

## A.    General Basis for the Plan

The Debtors have determined that prolonged Chapter 11 Cases would damage severely their ongoing business operations and threaten their viability as a going concern. The prepackaged nature of the Plan (as set forth in the Plan and described herein) allows the Debtors to exit chapter 11 quickly, while the provisions of the Plan allow the Debtors to reduce their debt service obligations and position the Debtors for continued operations through the issuance of New Secured Notes.

Under the Plan, the 7.5% Notes due 2025, the Unsecured Legacy Notes, and the Related Party Claims will be cancelled, and the Reorganized Debtors will issue New Junior Tranche Secured Notes and New Subordinated Notes, and USA Holdco LLC Units in satisfaction of the 7.5% Notes due 2025 Secured Claims, Unsecured Notes and Related Party Claims. Additionally, the New Notes will provide the Reorganized Debtors' with important flexibility to manage their future cash interest obligations.

The Debtors' Plan proposes to pay all Allowed General Unsecured Claims (classified in Class 6) in full, in Cash on the later of the Plan Effective Date or in the ordinary course of business in accordance with the terms of particular transaction giving rise to such Allowed General Unsecured Claim.

## B.    Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## C.    Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims set forth in Article III of the Plan.

### (i)    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, the Required Consenting Noteholders, and the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than (i) Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code and (ii) Holders of DIP Claims) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Plan Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Plan Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in

---

[13]    This Section VIII is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan. Instead, reference is made to the Plan and all such documents for the full and complete statements of such terms and provisions. The Plan itself (including attachments) will control the treatment of creditors and equity holders under the Plan. To the extent there are any inconsistencies between this Section VIII and the Plan (including attachments thereto), the latter shall govern.

accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the Holders of such Allowed Administrative Claims.

### (ii)    DIP Claims

Pursuant to the DIP Orders or otherwise pursuant to the Confirmation Order, the DIP Claims shall be deemed to have been finally Allowed against each Debtor in the full amount outstanding under the DIP Credit Facility, including principal, interest, fees, costs, other charges, expenses, and DIP Expenses for all purposes as fully Secured Claims and shall not be subject to any avoidance, reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenge under any applicable law or regulation by any Person or Entity.

On the Plan Effective Date, all DIP Expenses shall be paid in full in Cash and, with respect to the remaining DIP Claims, at the Reorganized Debtors' option, the Reorganized Debtors shall pay each such DIP Claim (i) dollar for dollar with New Senior Tranche Secured Notes, or (ii) full Cash payment of the then unpaid balance of the DIP Claims.  Unless and until full payment of the DIP Claims in accordance with Section 2.2 of the Plan has occurred, notwithstanding entry of the Confirmation Order and anything to the contrary in the Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, and (ii) none of the Liens securing the DIP Facility shall be deemed to have been waived, released, satisfied, subordinated or discharged.

### (iii)    Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Plan Effective Date must be filed no later than 45 days after the Plan Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court Allows.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Rothschild is eligible to receive a completion fee of $5,850,000 upon the confirmation and effectiveness of the Plan, which is subject to crediting.

### (iv)    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Plan Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim:  (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Plan Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the applicable Debtor.  If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. § 6621.

### (v)    Costs and Expenses of Ad Hoc Group Advisors

The Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash pursuant to (and subject to) the RSA without the need to file a proof of such Claim and without further order of the Court.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay the Restructuring Expenses that have accrued and are unpaid as of the Effective Date.  For the avoidance of doubt, any Restructuring Expenses incurred but not yet paid on or prior to the Effective Date shall be payable by the Reorganized Debtors after the Effective Date.

D. **Classification and Treatment of Claims and Interests**

(i) *Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for those identified in Article II of the Plan, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

Except to the extent that a Holder of an Allowed Claim against or Interest in any of the Debtors, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date, or as soon as reasonably practicable thereafter.

(ii) *Treatment of Classes of Claims and Interests*

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

| | | **SUMMARY OF PLAN TREATMENT AND EXPECTED RECOVERIES** | |
|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Interest** | **Projected Recovery Under the Plan** |
| 1 | Other Secured Claims | On the Plan Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' option subject to the consent of the Required Consenting Noteholders: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | 100% |
| 2 | Other Priority Claims | On the Plan Effective Date, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | 100% |
| 3 | Prepetition Bank Financing Claims | On the Plan Effective Date, each Allowed Prepetition Bank Financing Claim shall be Reinstated. | 100% |
| 4 | 7.5% Notes due 2025 Secured Claims | On the Plan Effective Date, the 7.5% Notes due 2025 Secured Claims shall be Allowed in the amount of $409,300,000.<br><br>On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, and discharge of | 96.9% - 114.0% |

31

| | | | |
|---|---|---|---|
| | | and exchange for each Allowed 7.5% Notes due 2025 Secured Claim, each holder of an Allowed 7.5% Notes due 2025 Secured Claim:<br><br>A. If such holder is not a Cash-Out Electing Holder (a "Non-Cash-Out Electing Holder"), shall receive with respect to such holder's Allowed 7.5% Notes due 2025 Secured Claims (i) $0.56046 in principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, (ii) $0.19789 in principal amount of New Subordinated Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, and (iii) its Pro Rata Share (based on the proportion that such Non-Cash-Out Electing Holder's Allowed 7.5% Notes due 2025 Secured Claims bears to the sum of all Allowed 7.5% Notes due 2025 Secured Claims held by all Non-Cash-Out Electing Holders) of 100.0% of the USA Holdco LLC Units,[14] or<br><br>B. if such holder of an Allowed 7.5% Notes due 2025 Secured Claim has affirmatively made a Plan Election on its Letter of Transmittal to receive a Cash-Out Distribution on its Ballot (a "Cash-Out Electing Holder"), shall receive with respect to such holder's Allowed 7.5% Notes due 2025 Secured Claims Cash in an aggregate amount equal to 18.6833% of such holder's Allowed 7.5% Notes due 2025 Secured Claim (a "Cash-Out Distribution") and such holder shall be deemed to have waived any distribution under the Plan under Class 5 on account of its Allowed 7.5% Notes due 2025 Unsecured Deficiency Claims. | |
| 5 | Unsecured Notes and Related Party Claims | On the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) $111,796,081 million of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,106 of 7.5% Notes due 2021 Claims, (iii) $23,205,373 of 8.25% Notes due 2021 Claims, (iv) $2,664,771 of 6.75% Notes due 2023 Claims, plus in each case for the Claims described in sub-clauses (ii) through (iv) any accrued and unpaid interest on the respective series of notes through the Petition Date. The Minvest Loan Claim shall be Allowed in the amount of $1,643,500, plus accrued and unpaid interest, if any, and the Share Purchase Agreement Claim shall be Allowed in the amount of $300,000.<br><br>On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, and discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each holder of an Allowed Unsecured Notes and Related Party Claim shall receive $0.20071 in principal amount | 14.7% - 18.4% |

---

[14]      Due to its ownership of Chile Holdco, USA Holdco will indirectly hold 100% of the equity interests of the Reorganized Debtors from and after the Plan Effective Date.

| | | of the New Subordinated Notes for each $1.00 of Unsecured Notes and Related Party Claims held by such holder. | |
|---|---|---|---|
| 6 | General Unsecured Claims | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim shall be, at the option of the applicable Debtor or Reorganized Debtor, (a) Reinstated or (b) paid in full in cash. | 100% |
| 7 | Intercompany Claims | On the Plan Effective Date, each Allowed Intercompany Claim shall be either (i) Reinstated; or (ii) canceled, released, and extinguished, and without any distribution, in each case, at the Debtors' election subject to the consent of the Required Consenting Noteholders. | 100% |
| 8 | Existing Equity Interests Other Than in Gildemeister | On the Plan Effective Date, each holder of an Existing Equity Interest other than in Gildemeister shall have such Interest (a) Reinstated or (b) cancelled, released, and extinguished, and without any distribution, in each case, at the Debtors' election subject to the consent of the Required Consenting Noteholders and in accordance with applicable law. | 100% |
| 9 | Existing Equity Interests in Gildemeister | On the Plan Effective Date, each Allowed Existing Equity Interest in Gildemeister, including, without limitation, each Existing Preferred Equity Interest in Gildemeister, Existing Common Equity Interest in Gildemeister, and Existing Series A Warrant and Existing Series B Warrant in Gildemeister shall be redeemed, cancelled, and released.[15] | N/A |

As discussed in "An active trading market for the New Notes may not develop," if a market for the New Notes develops, the New Notes may trade at a discount, depending upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions, the ratings assigned to the debt by credit rating agencies, the liquidity of the New Notes, and the Reorganized Debtors' operating performance and financial condition.

### E.   Means for Implementation of the Plan

#### (i)   General Settlement of Claims

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

#### (ii)   Subordination

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided in the Plan, the Reorganized Debtors reserve the right (subject to the consent of the Required

---

[15]   The minority holders of Existing Equity Interests in Gildemeister (a) will in first instance be cancelled as a result of a capital reduction absorbing losses against capital; (b) then consenting shareholders agree to cancel their shares; and (c) any remaining shares shall be acquired and cancelled in exchange for a nominal redemption amount paid by a non-Debtor.

Consenting Noteholders) to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### (iii)    *Sources of Cash for Plan Distributions*

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to the Plan shall be obtained from Cash on hand from the Debtors, including Cash from business operations, other than as specified in Section 4.4 herein. Further, the Debtors and the Reorganized Debtors will, subject to the consent of the Required Consenting Noteholders, be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein and in the Plan, any changes in intercompany account balances resulting from such transfers will be disclosed to the Consenting Noteholders and accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan or the New Notes Documents.

### (iv)    *Exit Financing*

Subject to the terms, conditions and limitations as more fully set forth in the Exit Financing Commitment Agreement, on the Plan Effective Date, the Exit Financing Parties shall advance to the Debtors an amount not to exceed $15.6 million to fund all Cash-Out Distributions. The Exit Financing Parties will receive New Senior Tranche Secured Notes in aggregate principal amount equal to all amounts advanced to fund the Cash-Out Distributions.

### (v)    *Issuance of the New Notes; Substitute Consideration for Non-Qualified Holders*

On the Plan Effective Date, the Reorganized Debtors are authorized and directed to issue, execute, deliver or otherwise bring into effect, as the case may be, to or for the benefit of the Qualified Holders of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims, the New Notes Documents and any other instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to the Plan, and take any other necessary actions in connection with the foregoing, in each case without need for further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

The issuance of the New Secured Notes and New Subordinated Notes shall be exempt from registration under applicable securities laws pursuant to Section 4(a)(2) and Regulation S under the Securities Act, and similar Blue Sky Laws provisions, as applicable, and any indentures governing the New Secured Notes and the New Subordinated Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof. All documents, agreements and instruments entered into on or as of the Plan Effective Date contemplated by or in furtherance of the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

On the Plan Effective Date, the guarantees, pledges, liens and other security interests, as applicable, granted pursuant to the New Notes Documents (whether prior to or on the Plan Effective Date) shall be deemed to have been granted in good faith as an inducement to the Qualified Holders of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims to agree to the treatment contemplated by the Plan and (a) shall be deemed to be approved, (b) shall be legal, binding, and creating or continuing enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Documents, (c) shall be deemed perfected on the earlier of the date originally perfected and the Plan Effective Date, subject only to such Liens and security interests as may be permitted under the New Notes Documents, as the case may be, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non bankruptcy law, including any applicable law of the Republic of Chile. The Reorganized Debtors and their affiliates granting such Liens and the persons and entities granting such Liens and security interests are authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary to continue as perfect or to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan

and the Confirmation Order (it being understood that perfection or continuance of perfection shall occur automatically by virtue of the entry of the Confirmation Order and no such filings, recordings, approvals, and consents shall be necessary), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

All New Notes under the Plan that would have been issuable and deliverable to Non-Qualified Holders, if they had been Qualified Holders, will be deposited with an agent (the "Selling Agent"). The Selling Agent shall offer such New Notes in one or more sale transactions within 180 days following the Plan Effective Date (the "Sale Period"), pursuant to a selling agreement to be entered into between the Debtors and the Selling Agent (the "Selling Agent Agreement").

The consideration to be received by Non-Qualified Holders under the Selling Agent Agreement is referred to in this Disclosure Statement as the "Substitute Consideration."

The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for Cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a pro rata basis, to such Non-Qualified Holders at the end of the Sale Period (the "Net Cash Proceeds"). In the event that a sale of such New Notes is unable to be consummated at any price within the Sale Period and the Net Cash Proceeds are zero, the amount of Substitute Consideration such Non-Qualified Holders are entitled to receive shall also be zero, and such New Notes shall be cancelled. None of the Debtors, the Ad Hoc Group of Consenting Noteholders and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such New Notes.

For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive the Substitute Consideration in respect thereof. Holders of 7.5% Notes due 2025 Secured Claims that are Non-Qualified Holders will receive that portion of their distributions under the Plan that constitutes their pro rate share of USA Holdco LLC units regardless of whether they receive any Substitute Consideration in respect of their allocation of New Notes.

### (vi)    Chile Holdco

On or prior to the Plan Effective Date, the Reorganized Debtors are authorized and directed to create a newly formed holding company structured as a *sociedad por acciones* under the laws of Chile ("Chile Holdco" and together with the Reorganized Debtors, the "Reorganized Business"). Upon implementation of the Restructuring Transactions on the Plan Effective Date, Chile Holdco shall hold all of the equity interests in Reorganized Gildemeister (the "Reorganized Gildemeister Common Stock") from and after the Plan Effective Date.

On the Plan Effective Date, Chile Holdco shall be authorized and directed to issue (i) a single class of common equity interests with 100% economic and voting rights (the "Chile Holdco Stock") and having a paid in capital value of $44.3 million, and (ii) bonds in an aggregate principal amount of approximately $132.8 million (which amounts, in each case, may be subject to adjustment in the event any holders of Allowed 7.5% Notes due 2025 Secured Claims make the Plan Election for the Cash-Out Distribution) the "Chile Holdco Bonds", and together with the Chile Holdco Stock, the "Chile Holdco Securities").

On the Plan Effective Date, Chile Holdco shall be authorized and directed to issue the Chile Holdco Bonds pursuant to an indenture governed by the laws of the State of New York. The Child Holdco Bonds shall be unsecured and shall have terms acceptable to the Required Consenting Lenders in their sole and absolute discretion which shall include: (i) a maturity date on the thirtieth anniversary of the Plan Effective Date, (ii) cash interest accrual (payable semi-annually) at a rate of 15.0% per annum with the option, in Chile Holdco's sole discretion throughout the term of the bonds until their maturity, to defer payment of such interest, (iii) any unpaid deferred interest shall also accrue interest at the applicable interest rate plus additional default interest at a rate of 2% per annum, and (iv) other covenants customary for an investment of this kind. For the avoidance of doubt, the Chile Holdco Bonds shall be structured as "bonds" qualifying for a 4% withholding tax rate under Chilean law.

The corporate governance of Chile Holdco shall be subject to bylaws containing terms acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

On the Plan Effective Date, the Chile Holdco Securities will be distributed to USA Holdco in accordance with the Plan Term Sheet and the Plan.

*(vii)    USA Holdco*

On or prior to the Plan Effective Date, the Reorganized Debtors are authorized and directed to create a newly formed holding company structured as a limited liability company under the laws of Delaware ("USA Holdco"), which is authorized and directed to issue, on the Plan Effective Date, a single class of limited liability company units with 100% of the economic and voting rights of USA Holdco (the "USA Holdco LLC Units") to the holders of the 7.5% Notes due 2025 Secured Claims in exchange for the 7.5% Notes due 2025 Secured Claims contributed by such holders to USA Holdco. Due to its ownership of Chile Holdco, USA Holdco will indirectly hold 100% of the equity interests of the Reorganized Debtors from and after the Plan Effective Date.

The corporate governance of USA Holdco shall be subject to a limited liability company agreement (the "USA Holdco LLC Agreement") which shall contain terms acceptable to the Required Consenting Noteholders in their sole and absolute discretion including, *inter alia*, certain transfer restrictions with respect to the USA Holdco LLC Units intended to (i) ensure that USA Holdco remains a private company, (ii) restrict transfers, absent an exception from the registration requirements under United States and state securities laws and (iii) ensure USA Holdco is treated as a partnership for United States tax purposes. The USA Holdco LLC Agreement shall provide that USA Holdco shall conduct no operations other than those incidental to its holding of the Chile Holdco Securities. Any of the foregoing provisions will be reflected in the form of USA Holdco LLC Agreement filed in the Plan Supplement. On the Effective Date, the USA Holdco LLC Agreement, substantially in the form set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.

On the Plan Effective Date, USA Holdco shall be authorized to and shall issue the USA Holdco LLC Units in accordance with the terms of the Plan without the need for any further limited liability company action. All of the USA Holdco LLC Units, when so issued, shall be duly authorized, validly issued, and, fully paid, and non-assessable. The USA Holdco LLC Units will be issued in book-entry form via a registry that will be maintained by the Reorganized Gildemeister on behalf of USA Holdco and pursuant to the USA Holdco LLC Agreement. Transfers of the USA Holdco LLC Units will be recorded in the registry and will only occur in accordance with the USA Holdco LLC Agreement.

The USA Holdco LLC Agreement shall provide that USA Holdco shall conduct no operations other than those incidental to its holding of the Chile Holdco Securities.

*(viii)    Amendment of Pledges*

Prior to the Effective Date, the Required Consenting Noteholders and the non-Debtor Company Parties will enter into the Pledge Amendments and any other amendments or other documentation as is necessary to cause, effective on the Plan Effective Date, the liens on all collateral pledged to secure the obligations under the 2025 Notes Indenture by non-Debtor Company Parties to thereafter secure the Reorganized Debtors' obligations under the New Secured Notes from and after the Plan Effective Date.

*(ix)    Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, on the Plan Effective Date, all property in each Estate and all Causes of Action, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Plan Effective Date, except as otherwise provided in the Plan or in the New Notes Documents, or any other agreement or document related thereto or entered into in connection therewith, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*(x)    Discharge from Notes, Instruments, Certificates and Other Documents*

On the Plan Effective Date, the obligations of the Debtors or Reorganized Debtors under or in any way related to all notes, instruments, certificates, and other documents evidencing Claims or Interests, shall be discharged; provided, however, notwithstanding Confirmation or the occurrence of the Plan Effective Date, any such indenture or

agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan; provided further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan.

### (xi)    *Execution of Plan Documents*

Except as otherwise provided herein, and subject to the consent rights afforded the Required Consenting Noteholders under the Plan, on the Plan Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall execute all instruments and other documents required to be executed under the Plan.

### (xii)    *Corporate Action*

The Debtors or the Reorganized Debtors, as applicable, are authorized to take all further corporate actions necessary to effectuate the RSA and the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Plan Effective Date, including the Required Amendments, the Restructuring Transactions, and the issuance of the New Secured Notes and the New Subordinated Notes.

### (xiii)    *New Corporate Governance Documents*

To the extent required by applicable law, on or immediately before the Plan Effective Date, the Reorganized Debtors will file their respective New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code and shall be in form and substance satisfactory to the Required Consenting Noteholders in their sole and absolute discretion. To maintain compliance with agreements with Hyundai, the New Corporate Governance documents will include provisions that provide for the appointment of directors by holders of a supermajority of the USA Holdco LLC Units and will not include provisions that provide minority shareholders with any special rights or any substantive rights that would enable the minority to override the majority's management of Reorganized Gildemeister.

### (xiv)    *Effectuating Documents; Further Transactions*

On and after the Plan Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### (xv)    *Section 1146(a) Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

### (xvi)    *Managers, Directors and Officers*

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, on the Plan Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of (i) USA Holdco and (ii) Reorganized Gildemeister and the other Reorganized Debtors. The New Board

will consist of seven (7) directors including: (i) Ricardo Lessmann as Chairman of USA Holdco (upon termination of his employment as CEO of the Company), and (ii) six (6) directors selected by the Required Consenting Noteholders in their sole and absolute discretion. The directors of Reorganized Gildemeister and the other Reorganized Debtors shall be selected by the Required Consenting Noteholders prior to the Plan Effective Date and thereafter shall be established by the New Board.

Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan Supplement, on or prior to the Confirmation Date, to the extent known at the time of filing, the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's board of directors and, to the extent such Person is an Insider, the nature of any compensation for such Person.

Corporate governance for USA Holdco, Chile Holdco, Reorganized Gildemeister, and the other Reorganized Debtors including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with section 1123(a)(6) of the Bankruptcy Code; and (b) be acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

### (xvii)    *Incentive Plans and Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Plan Effective Date, subject to any Final Order, the Reorganized Debtors shall: (a) adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, non-compete agreements and wages and compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Plan Effective Date for accrued vacation time, and other employee benefits arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Plan Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid. As part of its existing agreements with senior management, as amended, the Company may be obligated to pay up to US$5.5 million in severance benefits, which would be triggered upon termination of such senior management on or after the Plan Effective Date, and which may be payable immediately or over some time period following termination. Any amendments to the foregoing obligations, other than ordinary course adjustments to the Debtors' existing wages, compensation, severance, non-compete, and benefits programs for non-management employees, shall be subject to the approval of the Required Consenting Noteholders in their sole and absolute discretion.

### (xviii)    *Preservation of Rights of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**F.       Treatment of Executory Contracts and Unexpired Leases**

*(i)       Assumption of Executory Contracts and Unexpired Leases*

On the Plan Effective Date, except as otherwise provided in the Plan or pursuant to the Confirmation Order, Executory Contracts (including for the avoidance of doubt the RSA) and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Rejection Schedule. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates..  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise provided in the Plan or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

*(ii)      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the Debtors' ordinary course of business. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Solicitation Agent on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. **In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan. Any such objection will be scheduled to be heard by the Bankruptcy Court at the earlier of the Confirmation Hearing or the Debtors' or the Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that**

**fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure pursuant to Section 5.2 of the Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant Section 5.2 of the Plan in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

### (iii)    *Pre-Existing Payment and Other Obligations*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide: (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

### (iv)    *Rejection Damages Claims and Objections to Rejections*

In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Solicitation Agent and served upon counsel for the Debtors or the Reorganized Debtors no later than 30 days after the later of (a) the Effective Date or (b) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

### (v)    *Contracts and Leases Entered Into After the Petition Date*

Subject to the consent of the Required Consenting Noteholders, contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

### (vi)    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### G.    Provisions Governing Distributions

#### (i)    *Distributions on Account of Claims Allowed as of the Plan Effective Date*

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors (as the case may be) and the Holder of the applicable Allowed Claim, on the Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Plan Effective Date, subject to the Debtors' and Reorganized Debtors' right to object to Claims; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Plan Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such Administrative Claim, (2) Allowed Priority Tax Claims shall be paid in accordance with Section 2.3 of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Plan Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Reorganized Debtors (as the case may be) and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business, and (3) Allowed General Unsecured Claims with respect to liabilities incurred by the Debtors in the ordinary course of business prior to the filing of the Chapter 11 Cases shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such General Unsecured Claim.

#### (ii)    *Special Rules for Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claim has been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall be paid also, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

#### (iii)    *Disbursing Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date. To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash by the Reorganized Debtors.

*(iv)*       ***Distributions of USA Holdco LLC Units***

On the Plan Effective Date, the USA Holdco LLC Units shall be deemed distributed upon their issuance in register form in the name of the Holders of the 7.5% Notes due 2025 Secured Claims as of the Distribution Record Date pursuant to the USA Holdco LLC Agreement and Section 4.7 of the Plan.  Each Holder of a 7.5% Notes due 2025 Secured Claim is required to provide the required information for the distribution for the USA Holdco LLC Units (the "LLC Units Registration Information") included in the Letter of Transmittal by the Distribution Election Deadline.  As a condition to receiving USA Holdco LLC Units under the Plan, each Holder of a 7.5% Notes due 2025 Secured Claim is required to review, complete, and return to the Disbursing Agent (on or before the Distribution Election Deadline) a duly-completed Letter of Transmittal and to take one of the following actions (as determined by the Debtors in their sole discretion) to verify such Holder's position in the 7.5% Notes due 2025 and to provide the Certification:

(a)       tender the Holder's 7.5% Notes due 2025 into DTC's Automated Tender Offer Program ("ATOP"), or

(b)       surrender and transfer the Holder's 7.5% Notes due 2025 to the applicable indenture trustee via a Deposit/Withdrawal at Custodian ("DWAC").

For the avoidance of doubt, the Debtors retain the sole discretion to determine which of the aforementioned procedures to implement for purposes of confirming holdings of 7.5% Notes due 2025 in connection with the distribution of USA Holdco LLC Units.

The Disbursing Agent shall provide holders of the Allowed 7.5% Notes due 2025 Secured Claims with notice of their final allocation of USA Holdco LLC Units and any protocols governing future transfers of the USA Holdco LLC Units under the USA Holdco LLC Agreement as soon as reasonably practicable after the Plan Effective Date (the "USA Holdco LLC Allocation and Protocols Notice").  The form of the USA Holdco LLC Allocation and Protocol Notice will be included in the Plan Supplement.

*(v)*       ***Distributions of New Notes on Account of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims***

(a)       New Secured Notes and New Subordinated Notes are being issued only to Qualified Holders.  A "Qualified Holder" is a Holder of an Allowed 7.5% Notes due 2025 Secured Claim or Allowed Unsecured Notes and Related Party Claim who provides either one of the following two certifications (the "Certification"):

(1)       A certification that it is located in the United States, and is either a "Qualified Institutional Buyers" as such term is defined in Rule 144A under the Securities Act or an "accredited investor" as defined in Regulation D under the Securities Act, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or

(2)       A certification that it is located or resident outside the United States and is qualified to participate in acquiring New Secured Notes and New Subordinated Notes, as applicable, in accordance with the laws of its jurisdiction of location or residence.

Any Holder of an Allowed 7.5% Notes due 2025 Secured Claim or an Allowed Unsecured Notes and Related Party Claims that is not a Qualified Holder or that fails to provide either of the two certifications above in order to qualify as a Qualified Holder shall be a "Non-Qualified Holder." Non-Qualified Holders shall not be entitled to receive any New Secured Notes or New Subordinated Notes, as applicable, and shall only be entitled the Substitute Consideration in respect thereof, which may be zero.

(b)       To receive its entitlement pursuant to the Plan, each Holder of a 7.5% Notes due 2025 Secured Claim or an Unsecured Notes and Related Party Claims that is a Qualified Holder is required to review, complete, and return to the Disbursing Agent (on or before the Distribution Election Deadline) a duly-completed Letter of Transmittal together with documents required in connection therewith and take one (1) of the following action as

applicable on or before the Distribution Election Deadline (as determined by the Debtors in their sole discretion) to verify its position in the 7.5% Notes due 2025 or Unsecured Legacy Notes and to provide the Certification:

> (1)     tender its 7.5% Notes due 2025 or Unsecured Legacy Notes into DTC's ATOP; or

> (2)     surrender and transfer to the applicable indenture trustee via DWAC its 7.5% Notes due 2025 or Unsecured Legacy Notes.

For the avoidance of doubt, the Debtors retain the sole discretion to determine which of the aforementioned procedures to implement for purposes of confirming the holding of 7.5% Notes due 2025 and/or Unsecured Notes in connection with the distribution of New Notes.

(c)     As a condition to participation under the Plan, each Holder of a Related Party Claim that is a Qualified Holder is required to review the Letter of Transmittal and provide their DWAC information.

(d)     On or promptly after the Effective Date, the Debtors will reserve the right to request that DTC impose a "chill order" on any 7.5% Notes due 2025 and Unsecured Legacy Notes positions that have not been validated prior to the Distribution Election Deadline.

(e)     On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with DTC's customary procedures (which may be through ATOP or via DWAC), the New Secured Notes and New Subordinated Notes corresponding to each Qualified Holder that has completed the procedures specified in clause (b)(1) above; provided, however, that if the Effective Date has not occurred by thirty (30) calendar days after the Distribution Election Deadline, the foregoing deadlines may be extended and the foregoing procedures may be amended by the Debtors and the Consenting Noteholders in a written notice provided to the Disbursing Agent.

(f)     The Substitute Consideration for Non-Qualified Holders shall be distributed by the Selling Agent after the Sale Period, as described in Section 4.4 of the Plan.

(g)     The Disbursing Agent and/or any applicable broker or agent shall use reasonable best efforts to cause the tender into ATOP or transfer via DWAC of all the 7.5% Notes due 2025 or Unsecured Legacy Notes.  Any Holder of the 7.5% Notes due 2025 or the Unsecured Legacy Notes who fails to (i) surrender the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes required to be tendered under the Plan or verify its position in the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes and (ii) provide a completed Letter of Transmittal to the Disbursing Agent together with any documents required in connection therewith within sixty (60) days after the Effective Date shall have its Claims and its distribution of New Notes pursuant to the Plan on account of its 7.5% Notes due 2025 Secured Claims or Unsecured Notes Claims discharged and forfeited and shall not participate in any distribution under the Plan.  Any property in respect of such forfeited 7.5% Notes due 2025 Secured Claims or the Unsecured Notes Claims would revert to the Reorganized Debtors.

The Debtors believe that the solicitation of votes from Qualified Holders to accept or reject the Plan is not a public offering (and is therefore exempt from the registration requirements of Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act) or is an offering of securities outside the United States (and therefore is not subject to the registration requirements of Section 5 as set forth in Regulation S, 230 CFR 900 et seq).

The Debtors believe that the solicitation of votes from Non-Qualified Holders constitutes a cash tender offer for the Secured Notes that complies with Regulation 14E under the Securities Exchange Act of 1934, 240 CFR 14e-1 et seq.

> (vi)     **Book Entry Transfer: ATOP**

The Disbursing Agent will work with DTC to establish this distribution event relating to the 7.5% Notes due 2025 and the Unsecured Legacy Notes on DTC's ATOP system.  A beneficial owner of 7.5% Notes due 2025 or

Unsecured Legacy Notes that are held by or registered in the name of a broker, dealer, commercial bank, trust company or other nominee or custodian (each, a "<u>Nominee</u>") is urged to contact such Nominee promptly if such beneficial owner wishes to participate. Only Nominees that are participants in DTC's ATOP system can effectuate an electronic delivery of the 7.5% Notes due 2025 or the Unsecured Legacy Notes on a Holder's behalf. Beneficial holders of the 7.5% Notes due 2025 or Unsecured Legacy Notes must allow sufficient time for its Nominee to effectuate the electronic delivery of its 7.5% Notes due 2025 or the Unsecured Legacy Notes via ATOP on or before the Distribution Election Deadline.

At the Holder's instruction, a Nominee will electronically deliver the Holder's 7.5% Notes due 2025 or Unsecured Legacy Notes into the appropriate contra-CUSIP[16] on DTC's ATOP platform on or before the Distribution Election Deadline. Once DTC receives the Nominee's instruction to initiate an electronic delivery of a Holder's 7.5% Notes due 2025 or Unsecured Legacy Notes into the appropriate contra-CUSIP, the Nominee will receive a unique "voluntary offer instruction" ("<u>VOI</u>") generated by ATOP. By tendering a Holder's 7.5% Notes due 2025 or Unsecured Legacy Notes into ATOP and receiving a VOI, the Nominee has made an express acknowledgment for such holder that such holder has received and agrees to be bound by the Letter of Transmittal and that the company may enforce the Letter of Transmittal against such holder (a "<u>Book-Entry Confirmation</u>").

ALL QUESTIONS AS TO THE VALIDITY, FORM, ELIGIBILITY (INCLUDING TIME OF RECEIPT), AND ACCEPTANCE OF LETTERS OF TRANSMITTAL AND TENDERED 7.5% NOTES DUE 2025 OR TENDERED UNSECURED LEGACY NOTES WILL BE RESOLVED BY THE REORGANIZED DEBTORS, WHOSE DETERMINATION WILL BE FINAL AND BINDING, SUBJECT ONLY TO REVIEW BY THE BANKRUPTCY COURT UPON APPLICATION WITH DUE NOTICE TO ANY AFFECTED PARTIES IN INTEREST. THE DEBTOR RESERVES THE RIGHT TO REJECT ANY AND ALL LETTERS OF TRANSMITTAL AND TENDERED 7.5% NOTES DUE 2025 OR TENDERED UNSECURED LEGACY NOTES NOT IN PROPER FORM, OR LETTERS OF TRANSMITTAL AND TENDERED 7.5% NOTES DUE 2025 OR TENDERED UNSECURED LEGACY NOTES, THE DEBTOR'S ACCEPTANCE OF WHICH WOULD, IN THE OPINION OF THE DEBTOR OR ITS COUNSEL, BE UNLAWFUL.

> (vii)    *Letter of Transmittal*

To the extent a Holder is required to deliver a Letter of Transmittal to the Disbursing Agent, signatures on such Letter of Transmittal must be guaranteed by an Eligible Institution. If 7.5% Notes due 2025 or Unsecured Legacy Notes are registered in the name of a person other than the person signing the Letter of Transmittal, in order to be validly tendered, the 7.5% Notes due 2025 or Unsecured Legacy Notes must be endorsed or accompanied by a properly completed power of authority, with signature guaranteed by an Eligible Institution.

> (viii)    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

> (a)    Delivery of Distributions

Except as otherwise provided in the Plan (including in <u>Section 6.4</u> of the Plan), distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Disbursing Agent, as appropriate: (a) as indicated on the applicable register or in the Debtors' records as of the date of any such distribution; (b) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date, <u>provided</u>, <u>however</u>, that distributions on account of the 7.5% Notes due 2025 Secured Claims and the Unsecured Notes and Related Party Claims shall be made in accordance with <u>Section 6.4</u> of the Plan. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the applicable procedures of the DTC. Subject to Article VI of the Plan,

---

[16]    A contra-CUSIP is the CUSIP used to segregate a Holder's position for a voluntary distribution event at the instruction of the Holder.

distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

(b)    Minimum; *De Minimis* Distributions.

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the Holder of any Allowed Claim or Allowed Interest if the amount of Cash or other property to be distributed on account of such Allowed Claim or Allowed Interest is less than $50. Any Holder of an Allowed Claim or Allowed Interest on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim or Interest, as applicable, discharged and shall be forever barred from asserting such Claim or Interest against the Debtors, the Reorganized Debtors, or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtors.

(c)    Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

(d)    Cash Payments

Except as otherwise set forth in Section 6.7(e) of the Plan, distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors) in U.S. dollars. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments to creditors outside of the United States of America may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(e)    Undeliverable and Unclaimed Distributions

(i)    *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address or other necessary information for delivery. Subject to the succeeding sentence, the Reorganized Debtors or their duly appointed disbursing agent shall retain undeliverable distributions until such time as a distribution becomes deliverable. Each Holder of an Allowed Claim whose distribution remains (i)

45

undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (ii) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan.  Nothing contained in the Plan shall require the Debtors, the Reorganized Debtors or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(ii)    *Reversion.*  Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor.  Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

### (ix)    *Claims Paid or Payable by Third Parties*

(a)    Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)    Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    Applicability of Insurance Policies

Except as otherwise expressly provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### (x)    *Setoffs*

Except as otherwise expressly provided in the Plan, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims,

rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Plan Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

      *(xi)*     ***Allocation Between Principal and Accrued Interest***

Except as otherwise provided in the Plan and to the extent permitted by applicable law, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan for income tax purposes as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest accrued through and including the Plan Effective Date.

### H.      Conditions Precedent to Confirmation and Consummation of the Plan

      *(i)*     ***Conditions Precedent to the Plan Effective Date***

It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

      (a)     the Confirmation Order shall have been entered and become a Final Order, in form and substance consistent in all respects with the RSA and otherwise in form and substance acceptable to the Debtors and the Required Consenting Noteholders, and the Confirmation Order, which shall:

      (i)     authorize the Debtors (subject to the consent of the Required Consenting Noteholders) to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan in a manner consistent in all respects with the Plan and the RSA and subject to the consent rights set forth therein;

      (ii)     decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

      (iii)     authorize Chile Holdco, USA Holdco, the Debtors, or Reorganized Debtors, as applicable/necessary, to (A) implement the Restructuring Transactions; (B) distribute the USA Holdco LLC Units and the Chilean Securities pursuant to the exemption from registration under the Securities Act of 1933 provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (C) make all distributions and issuances as required under this Plan; and (D) subject to the consent of the Required Consenting Noteholders, enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, in each case, in a manner consistent in all respects with the Plan and the RSA and subject to the consent rights set forth therein;

      (iv)     authorize the implementation of the Plan in accordance with its terms; and

(v)     provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(b)     Hyundai shall have executed letter agreements (the "Hyundai Letters") between Hyundai and Gildemeister and AGP respectively, which shall include: (1) Hyundai's agreement to extend its existing distributorship agreements with Gildemeister and AGP (together, the "Hyundai Distributorship Agreements") for two years from the Plan Effective Date, (2) Hyundai's acknowledgement and agreement that, after the Plan Effective Date, certain financial creditors of Gildemeister will become the indirect shareholders of Gildemeister and a new chief executive officer for Gildemeister will be selected, and (ii) an executed copy of the Agreement for Undertaking and Release between Hyundai and AGP containing Hyundai's agreement allowing AGP to purchase up to 1854 EURO-4 H-1 vehicles from Hyundai with a discount rate of 30% ("Hyundai Undertaking Agreement"), which Hyundai Letters and Hyundai Undertaking Agreement shall be on terms that are acceptable to the Required Consenting Noteholders in their sole and absolute discretion;

(c)     Hyundai shall not have repudiated any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement;

(d)     the RSA shall remain in full force and effect and shall not have been terminated at any time, and no circumstance that would excuse the Consenting Noteholders from performance thereunder shall exist;

(e)     no settlement or other agreement previously entered into between any Company Party and any Peruvian Authority relating to the Customs Claims shall have been terminated and each Company Party shall have maintained compliance in all material respects at all times with all provisions of such settlements or agreements;

(f)     Gildemeister shall not have received any notice of any charge, sanction, levy, or fine threatened or imposed by any government regulator or authority relating to the Customs Claims that, if sustained by any applicable court, government authority, or regulator of competent jurisdiction could have the effect of: (i) enjoining, prohibiting, ceasing, terminating, or impairing or limiting the ability of the Companies to conduct their business operations in a manner substantially consistent with their current practices in any jurisdiction, (ii) imposing felony criminal liability on any of the Companies or any Senior Managers, (iii) imposing any civil or criminal liability of any kind on any Consenting Noteholder, or (iv) causing the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, or other obligations associated with the Customs Claims, net of any tax credits related to the Customs Claims (recorded in accordance with IFRS), to exceed $40,000,000;

(g)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(h)     the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any

exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance acceptable to the Required Consenting Noteholders, and in compliance with the applicable consent rights set forth in the Restructuring Support Agreement, the Plan Term Sheet, and this Plan for such documents and shall not have been modified in any manner without the consent of the Required Consenting Noteholders in their sole and absolute discretion

(i)      the New Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Notes Documents shall have been satisfied or duly waived in writing in accordance with the terms of each the New Notes Documents and the issuance of each of the New Secured Notes and the New Subordinated Notes shall have occurred;

(j)      the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

(k)      all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

(l)      the Required Consenting Noteholders shall have confirmed to the Debtors that they have received evidence satisfactory in their sole and absolute discretion that the Credit Facilities (as defined in the 2025 Indenture) shall remain available to the Debtors, the Reorganized Debtors, or the Company Parties, as applicable, and that the Debtors, the Reorganized Debtors, or the Company Parties, as applicable, will have adequate working capital to finance their operations, in each case following consummation of the Restructuring;

(m)      the Required Consenting Noteholders have been satisfied, in their sole and absolute discretion, with (i) the information and/or documentation provided in response to their anti-corruption due diligence-related requests, and/or (ii) the results of their due diligence review of the compliance policies and procedures relating to, among other things, anti-corruption and other applicable laws of the Companies;

(n)      all Restructuring Expenses shall have been paid in Cash in full; and

(o)      the Plan and all documents and agreements necessary to implement the Plan shall have: (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) been effected or executed.

### (ii)      *Waiver of Conditions Precedent*

Subject to the consent of the Required Consenting Noteholders (to be provided in their sole and absolute discretion), the Debtors may amend, modify, supplement or waive any of the conditions to the Plan Effective Date set forth in Section 9.1 of the Plan at any time without any notice to any other parties in interest and without any further

notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

### (iii)    *Effect of Non-Occurrence of Conditions to Consummation*

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## I.    Modification, Revocation or Withdrawal of the Plan

### (i)    *Modification of Plan*

Effective as of the Plan Effective Date: (a) the Debtors, solely subject to the consent of the Required Consenting Noteholders (which consent shall be in the Required Consenting Noteholders' sole and absolute discretion), in accordance with the Bankruptcy Code and the Bankruptcy Rules, may amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable subject to the consent of the Required Consenting Noteholders (which consent shall be in the Required Consenting Noteholders' sole and absolute discretion), may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth in the Plan.

### (ii)    *Revocation or Withdrawal of Plan*

Subject to the conditions and limitations set forth in the RSA, the Debtors, subject to the consent of the Required Consenting Noteholders (which consent shall be in the Required Consenting Noteholders' sole and absolute discretion), reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Plan Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any allowance of a Claim or any other settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

### (iii)    *Confirmation of the Plan*

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. Subject to any applicable restrictions in the RSA, the Debtors, subject to their receipt of the prior written consent of the Required Consenting Noteholders (which consent shall be in the Required Consenting Noteholders' sole and absolute discretion), reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## J.    Effect of Confirmation of the Plan

### (i)    *Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute

the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

####    (ii)    *Discharge of Claims and Termination of Interests*

**Except as otherwise provided for in the Plan and effective as of the Plan Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, their assets and properties, and any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Plan Effective Date. For the avoidance of doubt, nothing in Section 8.2 of the Plan shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan or any post-Plan Effective Date obligations, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.**

####    (iii)    *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, for good and valuable consideration, as of the Plan Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Required Amendments, the 2021 8.25% Notes Indenture, the 2021 7.5% Notes Indenture, the 2023 Notes Indenture, the 2025 Notes Indenture (and any Notes Documents as defined therein), the DIP Credit Agreement (and any Loan Documents as defined therein), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; *provided*, *however*, that the foregoing provisions of Section 8.3 of the Plan shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct; *provided* *further* that nothing in Section 8.3 of the Plan shall release any post-Plan Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, as applicable; *provided* *further* *that* (x) if the Hyundai Distributorship Agreements are terminated or modified, or (y) if Hyundai repudiates any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement, or (z) if Gildemeister or AGP have breached any obligation under the Hyundai Letters or the**

Hyundai Undertaking Agreement or if any condition exists which would provide Hyundai the right to terminate its obligations under the Hyundai Letters or the Hyundai Undertaking Agreement, in each case without the consent of the Required Consenting Noteholders in their sole and absolute discretion at any time prior to the Plan Effective Date, then no releases shall be provided by any Debtor or any Releasing Party to any Related Party of the Debtors or any Affiliate of the Debtors in respect of any Cause of Action or any Claim arising out of or relating in any way to the Customs Claims or any other fact or circumstance for which the Debtors have provided an untrue representation to the Consenting Noteholders under the RSA.

For the avoidance of doubt, nothing in the foregoing proviso shall be construed as an admission or evidence that any such Causes or Action or Claims exist against any Related party or Affiliate of the Debtors.

For the avoidance of doubt, no Related Party's obligation to repay any loan or advance made to it by any Debtor shall be released under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.3 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 8.3 of the Plan; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any Claim or Cause of Action released by this Section 8.3 of the Plan.

(iv)    *Releases by Releasing Parties*

As of the Plan Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Estates, the Released Parties and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Required Amendments, the 2021 8.25% Notes Indenture, the 2021 7.5% Notes Indenture, the 2023 Notes Indenture, the 2025 Notes Indenture (and any Notes Documents as defined therein), the DIP Credit Agreement (and any Loan Documents as defined therein), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; provided, however, that the foregoing provisions of Section 8.4 of the Plan shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct; provided further that nothing in Section 8.4 of the Plan shall release any post-Plan Effective Date obligations (except Cure Claims that have not been timely filed) of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under the Plan; provided still further (x) if the Hyundai Distributorship

Agreements are terminated or modified, (y) if Hyundai repudiates any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement, or (z) if Gildemeister or AGP have breached any obligation under the Hyundai Letters or the Hyundai Undertaking Agreement or if any condition exists which would provide Hyundai the right to terminate its obligations under the Hyundai Letters or the Hyundai Undertaking Agreement, in each case without the consent of the Required Consenting Noteholders in their sole and absolute discretion at any time prior to the Plan Effective Date, then no releases shall be provided by any Debtor or any Releasing Party to any Related Party of the Debtors or any Affiliate of the Debtors in respect of any Cause of Action or any Claim arising out of or relating in any way to the Customs Claims or any other fact or circumstance for which the Debtors have provided an untrue representation to the Consenting Noteholders under the RSA.

For the avoidance of doubt, nothing in the foregoing proviso shall be construed as an admission or evidence that any such Causes or Action or Claims exist against any Related party or Affiliate of the Debtors.

For the avoidance of doubt, no Related Party's obligation to repay any loan or advance made to it by any Debtor shall be released under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in <u>Section 8.4</u> of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates and the Released Parties; (b) a good faith settlement and compromise of the Claims released by <u>Section 8.4</u> of the Plan; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under <u>Section 8.4</u> of the Plan from asserting any Claim or Cause of Action released by <u>Section 8.4</u> of the Plan.

*(v)    Exculpation*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; <u>provided</u>, <u>however</u>, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; <u>provided</u>, <u>further</u>, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*(vi)    Injunction*

Except as otherwise provided in the Plan or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.3 or Section 8.4 of the Plan, discharged pursuant to Section 8.2 of the Plan, or are subject to exculpation pursuant to Section 8.5 of the Plan are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any

**kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.**

### (vii)    *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### (viii)    *Indemnification*

On and from the Plan Effective Date, and except as otherwise provided under the Plan or prohibited by applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the execution of the RSA, provided that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

### (ix)    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### (x)    *Release of Liens*

Except (a) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims), (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, or (c) with respect to mortgages, deeds of trust, Liens, pledges, and other security interests related to the 7.5% Notes due 2025 if and to the extent that the governing documents of such security interests purport that such security documents will secure obligations incurred as a substitution, replacement, refunding or refinancing of the 7.5% Notes due 2025 (including the documents or security interests), on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest and revert to the applicable Reorganized Debtor and its successors and assigns.

From and after the Plan Effective Date, any holder of a Secured Claim (and the applicable agents for such holder) secured by Liens or security interests which are to be released under the Plan, including but not limited to the holders of DIP Claims secured by Liens over collateral pledged and perfected under the laws of Chile, Uruguay, Peru, Costa Rica and Brazil, shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested to give effect to the Plan by the Reorganized Debtors and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. To the extent that any holder of a Secured Claim that has been satisfied or

discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or DIP Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, including the making of any applicable filings or recordings under the laws of Chile, Uruguay, Peru, Costa Rica and Brazil, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

(xi)    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Plan Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Plan Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## IX.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

In order to facilitate the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors will seek certain relief, including but not limited to, the relief summarized below.  The relief sought will facilitate the administration of the Chapter 11 Cases, however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

### A.    Voluntary Petitions

The following entities will file chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases: Gildemeister, AG Créditos SpA, Marc Leasing, S.A., Fonedar S.A., Camur S.A., Lodinem S.A., Carmeister S.A., Maquinaria Nacional S.A., RTC S.A., Fortaleza S.A., Maquinarias Gildemeister S.A., Comercial Gildemeister S.A. and Bramont Montadora Industrial e Comercial de Vehiculos S.A.

### B.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly pursuant to the terms and timeframe set forth in the RSA.  As described above, the Debtors have been in extensive negotiations with the Consenting Noteholders to reduce their debt service burden through a prepackaged restructuring.

The Debtors cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.  On the Petition Date, the Debtors will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and to confirm the Plan approximately 35 days after the Petition Date or as soon thereafter as the Bankruptcy Court's schedule permits.  If the Plan is confirmed, the Plan Effective Date of the Plan is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order and the Confirmation Order becomes a Final Order and the other conditions to Consummation of the Plan set forth in Section 9.1 of the Plan are satisfied or waived (to the extent permitted under the Plan and applicable law).

### C.    First Day Relief

The Debtors intend to present certain motions (the "First Day Motions") to the Bankruptcy Court on the Petition Date seeking relief.  The First Day Motions may include, but are not necessarily limited to, the following:

#### (i)    Approval of Solicitation Procedures and Scheduling of Confirmation Hearing

To expedite the Chapter 11 Cases, the Debtors intend to seek an immediate order setting dates for a combined hearing to (a) approve the adequacy of this Disclosure Statement, (b) approve the procedures for the Solicitation and (c) confirm the Plan.  The Debtors will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearing.

#### (ii)    Joint Administration Motion

The Debtors, which include Gildemeister and twelve of its direct or indirect subsidiaries, will file a motion seeking entry an order directing the joint administration of the Chapter 11 Cases.

#### (iii)    Schedules Extension/Waiver Motion

The Debtors will seek entry of an order (a) extending the time within which the Debtors must file their schedules and statements required by Bankruptcy Rule 1007(a)(3) through and including sixty (60) days after the date required under Bankruptcy Rule 1007(c) and (b) waiving the requirement that the Debtors file their schedules and statements required by Bankruptcy Rule 1007(a)(3) upon the effective date of the Plan if the effective date occurs on or before the Deadline.

#### (iv)    Consolidated Creditors List Motion

The Debtors will seek entry of an order (i) waiving the requirement that each of the Debtors file a list of creditors and equity security holders and authorizing the Debtors to prepare a consolidated list of creditors in lieu of

submitting a formatted matrix and (ii) authorizing the Debtors to file a single, consolidated list of the Debtors' thirty largest unsecured creditors.

### (v)    *Automatic Stay Motion*

The Debtors will seek entry of an order enforcing the automatic stay existent pursuant to section 362 of the Bankruptcy Code and the ipso facto and anti-discrimination provisions of the Bankruptcy Code (the "Automatic Stay") and confirming the Debtors' authority to continue to operate their businesses post-petition, pursuant to sections 363, 1107 and 1108 of the Bankruptcy Code.

### (vi)    *Cash Management System Motion*

In order to, among other things, avoid administrative inefficiencies on and after the Petition Date, the Debtors intend to move the Bankruptcy Court for an order (i) approving the continued use of the existing cash management system and (ii) granting certain other relief.

### (vii)    *Employee Wages Motion*

The Debtors will seek authority to pay all employees their employment-related wage and benefit claims in the ordinary course of business, and for certain related relief.  Honoring pre-petition employee obligations will allow the Debtors to maintain employee morale and prevent costly distractions and retention issues.

### (viii)    *General Unsecured Claims Motion*

The Debtors will seek an order from the Bankruptcy Court authorizing the payment to trade creditors of their pre-petition unsecured claims as they become due in the ordinary course of business, subject to the continuation of customary trade terms.  This relief will allow the Debtors' to maintain critical business operations and avoid severe reputational damage.

### (ix)    *Taxes and Fees Motion*

The Debtors will seek entry of an order authorizing the payment of certain prepetition taxes and fees and to continue paying such taxes and fees in the ordinary course.

### (x)    *Insurance Motion*

In order to prevent costly distractions to key management employees, the Debtors will seek authority to pay certain liability, property and other insurance premiums in the ordinary course of business.

### (xi)    *Factoring Arrangements*

In order to preserve important operational flexibility and liquidity, the Debtors will seek entry of an order authorizing the Debtors to continue in the ordinary course of business certain factoring arrangements.

### (xii)    *Letter of Credit Programs*

In order to prevent disruptions to the purchase of inventory, the Debtors will seek authority to pay certain liability, property and other insurance premiums in the ordinary course of business.

### (xiii)    *Other Procedural Motions and Professional Retention Applications*

The Debtors also plan to file several procedural motions that are standard in Chapter 11 Cases.  On or shortly after the Petition Date, the Debtors will file applications to retain the various Professionals who will be assisting the Debtors during these Chapter 11 Cases and a motion for the retention of certain ordinary course professionals that will continue to provide services to the Debtors during these proceedings.

## X.    PROJECTED FINANCIAL INFORMATION

The Debtors have attached their projected financial information as **Exhibit C** to this Disclosure Statement.  The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management analyzed the Debtors' ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors' management developed a business plan and prepared financial projections (the "Projections") for the period ending June 30, 2021 through the December 31, 2028 (the "Projection Period").

After the date of the Disclosure Statement, the Reorganized Debtors do not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation in March 2021 or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.  Furthermore, the Reorganized Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors' management to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below and in **Exhibit C**.

**THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THE DEBTORS' ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.**

**MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE X OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-**

LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- projected price increases;

- projected general market conditions;

- benefits from new technology; and

- effect of changes in accounting due to recently issued accounting standards.

- projected and estimated liability costs;

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

Creditors and other interested parties should see the following section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XI.    RISK FACTORS

There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- the applicable Debtors' ability to comply with the terms of the New Notes;

- supplier, customer, and employee response to the Chapter 11 Cases;

- inability to have claims discharged/settled during the chapter 11 proceedings;

- general economic, business, and market conditions;

- interest rate fluctuations;

- exposure to litigation;

- dependence upon key personnel;

- the Debtors' ability to generate sufficient revenues or cash flow to meet their operating needs or other obligations;

- financial conditions of the Debtors' customers;

- the termination of the distributorship and other agreements with Hyundai and other OEMs;

- adverse tax changes;

- the devaluation of the Chilean Peso relative to the U.S. dollar;

- high levels of inflation in Chile relative to the United States;

- limited access to capital resources;

- changes in laws and regulations;

- inability to implement business plan; and

- significant existing and future competition.

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

### A.    Risks Relating to the Plan Solicitation and Confirmation

***The Debtors may fail to satisfy vote requirements to confirm the Plan.***

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from Class 4 or Class 5, the Debtors may elect to seek Confirmation regardless of the rejection by amending the Plan or seeking to confirm an alternative chapter 11 plan, in each case subject to the terms and conditions of the RSA.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

If the Debtors are not able to confirm the Plan or an alternative chapter 11 plan, there is substantial doubt that the Debtors will be able to generate the necessary cash to continue operations.  As a result, the Debtors may be required to file for bankruptcy proceedings in Chile, Brazil and Uruguay.  *See* "The Bankruptcy Court may not confirm the Plan" and "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***The Debtors may fail to satisfy solicitation requirements.***

The solicitation of votes by the Debtors to accept the Plan is subject to several requirements under applicable bankruptcy law. If the Bankruptcy Court does not find that the Debtors' solicitation complied with such requirements, confirmation of the Plan could be denied.

Section 1126(b) of the U.S. Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of "adequate information". Section 1125(a)(1) of the U.S. Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors intend to deliver this Disclosure Statement to all Holders of Allowed Class 4 and Class 5 claims as of the Voting Record Date. In that regard, the Debtors believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court. If such approval is not obtained, the confirmation of the Plan could be denied. *See* "The Bankruptcy Court may not confirm the Plan".

***If the original solicitation by the Debtors is not successful, the Debtors may opt to resolicit.***

If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. Typically, if done after filing for chapter 11 protection, this process involves a 60- to 90-day period and includes a court hearing for the required approval of disclosure statement(s), followed (after bankruptcy court approval) by another solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing where the bankruptcy court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances. The Debtors cannot provide any assurances that such a resolicitation would be successful. In addition, confirmation of the Plan could be delayed and possibly jeopardized as a result. Furthermore, if the Confirmation Date or Plan Effective Date is significantly delayed, there is a risk that the RSA may expire or be terminated in accordance with its terms. *See* "The Consenting Noteholders' support for the Plan is subject to the terms and conditions of the RSA". The need to undertake a resolicitation or any other delay in the Confirmation Date or Plan Effective Date may also result in a deterioration in the Debtors' relationships with trade vendors or holders of other indebtedness and could affect the Debtors' ability to continue operations. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Plan's classification of Claims and Interests.***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and, there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court agrees with the objection to the Plan's

classification of Claims and Interests, the Debtors may be required to modify the Plan, which could require re-solicitation of votes on the Plan.  In addition, the Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.  *See* "The Bankruptcy Court may not confirm the Plan".

### The Bankruptcy Court may not confirm the Plan.

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court.  However, even if the requisite votes are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed.  In addition, a dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the balloting results may be invalid.  Even if the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of sections 1122, 1123, 1129 and the other applicable provisions of the Bankruptcy Code have been met with respect to the Plan.  In addition, the Bankruptcy Court may decline to accept the Debtors' petition based on jurisdictional or venue grounds, which would also result in the Debtors not being able to obtain Confirmation of the Plan.  *See* "The Debtors may fail to satisfy solicitation requirements" and "Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Plan's classification of Claims and Interests".

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses, (b) the distributions that Holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain, (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims, (d) there can be no assurance that any Chapter 11 Cases would continue rather than be converted into liquidation cases under chapter 7 of the Bankruptcy Code and (e) the Debtors may be required to liquidate their entire operations through a liquidation process in Chile.  It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, under either the Bankruptcy Code or through a Chilean liquidation proceeding, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.  *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

### The Debtors may seek to amend, waive, modify or withdraw the Plan at any time prior to Confirmation.

The Debtors reserve the right, prior to the Confirmation of the Plan or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law and the RSA and the consent of the Required Consenting Noteholders in their sole and absolute discretion, and, as provided in the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, subject to the terms of the RSA and, as provided in the RSA, with the prior consent of the Requisite Consenting Noteholders in their sole and absolute discretion, the previously solicited acceptances will be valid only if (a) all classes of adversely affected creditors and interest holders accept the modification in writing, or (b) the Bankruptcy Court determines, after

notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

***Other parties in interest might be permitted to propose alternative plans of reorganization that may be less favorable to certain of the Debtors' constituencies than the Plan.***

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from filing. However, such exclusivity period can be reduced or terminated upon an order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests and may seek to exclude these holders from retaining any equity under their plan. Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including but not limited to Holders of the 7.5% Notes due 2025 Secured Claims, Unsecured Notes Claims, the Debtors' employees and the Debtors' trading partners and customers. The Debtors consider maintaining relationships with their senior secured creditors, common stockholders, employees and trading partners and customers as critical to maintaining the value of the Reorganized Debtors following the Plan Effective Date, and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated and much more expensive. In addition, there would be a greater likelihood that the Debtors would be required to file for liquidation of their operations in Chile, Brazil and Uruguay. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

***The Debtors may be unsuccessful in obtaining orders to permit them to pay their key suppliers and their employees, or to continue to provide service as expected by their customers in the ordinary course of business.***

The Debtors have tried to address potential concerns of their key customers, vendors, employees and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

***The Debtors' businesses may be negatively affected if the Debtors are unable to assume their executory contracts.***

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases, unless designated on a schedule of rejected contracts. The Debtors intend to preserve as much of the benefit of their existing contracts and leases as possible. However, with respect to some limited classes of Executory Contracts, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forgo the benefits offered by such contracts or to find alternative arrangements to replace them.

***Distributions under the Plan will not be made prior to Consummation and may be delayed due to appeal.***

The Debtors estimate that the process of obtaining Confirmation will last approximately 35 days from the date of the commencement of the Chapter 11 Cases and, although some prepackaged cases have been confirmed in less than 35 days, this period could be significantly longer.

*The conditions precedent to the Effective Date of the Plan may not occur.*

As more fully set forth in the Plan, the Plan Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Plan Effective Date will not take place. If the Plan Effective Date does not take place, the Debtors may not be able to restructure their operations and may be required to liquidate their operations. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

*The Debtors' emergence from chapter 11 is not assured.*

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining Confirmation of the Plan. Any significant delay in emerging from chapter 11 or in the Consummation of the reorganization will increase the risk that the Debtors will nonetheless be unable to continue operations in Chile. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings".

*The Consenting Noteholders' support for the Plan is subject to the terms and conditions of the RSA.*

Subject to the terms and conditions of the RSA, the Consenting Noteholders have agreed to vote in favor of the Plan and support the Debtors' Chapter 11 Cases and the Confirmation and Consummation of the Plan. However, if the Chapter 11 Cases last longer than permitted under the RSA or the Plan, there is a breach by any of the Debtors of the representations and warranties in the RSA or upon the occurrence of another termination event under the RSA, the RSA may terminate. If the RSA terminates pursuant to its terms, any votes in favor of the Plan submitted by the Consenting Noteholders will be deemed to be null and void and will not be considered or otherwise used in connection with the Plan. If that occurs, the Debtors may no longer have the support required under section 1126 of the Bankruptcy Code to proceed to Confirmation.

*If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of local liquidation proceedings.*

If the Debtors are unable to consummate a restructuring by means of the Plan, there is substantial doubt that the Debtors will be able to generate sufficient cash flows to service their existing obligations under the 7.5% Notes due 2025 and Unsecured Legacy Notes or to continue as going concerns. As a result of the Debtors' default on their obligations under the 7.5% Notes due 2025, some or all of the Debtors' creditors may attempt to take legal action against the Debtors, including through instituting local liquidation proceedings. *See* "Even if the requisite number and amount of Holders of Claims and Interests vote to accept the Plan and the Bankruptcy Court confirms the Plan, Holders of Claims and Interests who are not subject to the jurisdiction of a U.S. court may try to force the Debtors into local liquidation proceedings or take other adverse actions". In addition, the Debtors may opt to institute voluntary liquidation proceedings in Chile, Brazil and Uruguay. In any such liquidation proceedings, the Debtors cannot predict the duration thereof or the ability of the Debtors or the ability of the holders of the 7.5% Notes due 2025 or Unsecured Legacy Notes to influence the outcome of such proceedings. A liquidation proceeding is likely to result in significant changes to the Debtors' existing obligations, including the 7.5% Notes due 2025 and Unsecured Legacy Notes, which could include the cancellation or restructuring of all or part of those obligations. During the pendency of any such liquidation proceeding, the ability of the Debtors to operate or manage their businesses, to retain employees, to continue to collect payments for their services or to obtain any type of funding or financing would likely be materially adversely affected. In the opinion of the Debtors, the recovery that would be received by holders of the 7.5% Notes due 2025 or the Unsecured Legacy Notes in a liquidation scenario would very likely be materially less than they would receive under the Plan. *See* the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.

*Even if the requisite number and amount of Holders of Claims and Interests vote to accept the Plan and the Bankruptcy Court confirms the Plan, Holders of Claims and Interests who are not subject to the jurisdiction of a U.S. court may try to force the Debtors into local liquidation proceedings or take other adverse actions.*

If the Debtors meet the statutory conditions for an involuntary bankruptcy proceeding under local law, a Holder of a Claim or Interest who is not a U.S. citizen and who does not have a significant presence or significant assets in the U.S. may attempt to force the Debtors into a Chilean liquidation proceeding during the Chapter 11 Cases. Were that to occur, the Debtors may be unable to prevent a Chilean court from forcing the Debtors into such a proceeding. The Debtors cannot predict the duration or outcome of a Chilean liquidation proceeding or the ability of the Debtors or the Holders of 7.5% Notes due 2025 Secured Claims and Unsecured Notes Claims to influence the outcome of such proceedings. If the Debtors are forced to submit to a Chilean liquidation proceeding, the restructuring through the Plan will very likely not be implemented and the liquidation of the Debtors' operations will likely occur. *See* the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.

> *Local reorganization laws may not be as favorable to holders of Claims and Interests as U.S. insolvency and bankruptcy laws.*

The bankruptcy laws of Chile, Brazil and Uruguay currently in effect are significantly different from, and may be less favorable to creditors than, those of certain other jurisdictions. Particularly, these differences pertain to the voting rights of creditors, the priority of creditor claims and debts expressed in foreign currency, given that creditors may be obligated to receive local currencies in satisfaction of such debts.

Significant uncertainties are inherent in a local bankruptcy proceeding that may result in further delays that could adversely impact the value of the Debtors' businesses and their collateral. Delays in proceedings, the inadequacy of available remedies and the inability of the receiver to exercise available remedies could result in a substantial deterioration of the Debtors' businesses and their collateral during the pendency of any such proceeding.

> *It is difficult to predict whether creditors of the Debtors would be subject to greater risks in a liquidation proceeding under local law than under the U.S. Bankruptcy Code.*

In the event of liquidation, dissolution, reorganization, bankruptcy or any similar proceeding, secured creditors will have claims that have priority over claims of the holders of the claims with respect to the assets securing those obligations. However, those assets may not be enough to pay the amounts due under the claims. Accordingly, in the event of liquidation, dissolution, reorganization, bankruptcy or any similar proceeding, there may not be sufficient funds remaining to pay amounts due on all or any of the notes and the note guarantees. Whether specific creditor recoveries would be worse under a local liquidation or a U.S. proceeding cannot be determined with certainty. Please also *see* "Impediments exist to any foreclosure on the Collateral, which may adversely affect the proceeds of any foreclosure".

> *The effects of a U.S. bankruptcy on agreements between the Debtors and third parties upon commencement of the Chapter 11 Cases is uncertain.*

Certain of the agreements between the Debtors and various third parties, permit the termination of such agreements if the relevant Debtor party becomes the subject of a judicial declaration of bankruptcy or insolvency. Although such so-called *ipso facto* provisions are generally unenforceable under section 365(b)(2) of the Bankruptcy Code when a debtor is in chapter 11, no assurance can be given that local courts would prohibit a third party from terminating a contract pursuant to such *ipso facto* clauses in Chile, Brazil or Uruguay. Therefore, the Debtors can give no assurance that some of the Debtors' agreements would not be terminated as a result of the commencement of the Debtors' Chapter 11 Cases.

**B.      Risks Related to the Debtors' and Reorganized Debtors' Businesses**

> *The Debtors have a history of substantial losses and expect to incur future losses.*

The Debtors have not achieved profitability since 2012 and have incurred a net loss of Ch$46.73 million (approximately US$58.9 million) for the twelve months ending December 31, 2020. The Debtors' profitability depends substantially on factors beyond the Debtors' control, principally the foreign exchange rate and demand for discretionary items which is largely dependent on commodity prices in Chile. The depreciation of the foreign exchange rate directly increases operating costs, thus negatively affecting profitability due to the Debtors' inability to increase

prices to the end consumer at the same rate. Additionally, the depreciation of the foreign exchange rate increases the cost, in local currency terms, of debt service payments and leverage as the majority of the Debtors' indebtedness is in US dollars. The decrease in certain commodity prices for which Chile is a net exporter may also negatively affect local demand for discretionary big-ticket items such as vehicle purchases due to its impact on economic activity. Furthermore, the COVID-19 pandemic significantly negatively impacted demand for the nine months ending September 30, 2020, and although demand has partially recovered, it remains below pre-pandemic levels. The Debtors are uncertain as to when they will record positive profitability in the future. Any delay or failure to achieve positive profitability would adversely impact the Debtors' ability to pay interest and principal on the New Notes, service the Debtors' other indebtedness, and fund operations.

### *The Plan may have a material adverse effect on the Debtors' operations.*

The Plan or any subsequent commencement of a U.S. or local liquidation proceeding could adversely affect the relationships between the Debtors and their customers. There is a risk, due to uncertainty about the Debtors' future, that employees could be distracted from performance of their duties or more easily attracted to other career opportunities, employees may strike, and that parties with whom the Debtors have contractual relationships could terminate their relationship with the Debtors or require financial assurances or enhanced performance. In addition, bankruptcy cases are often viewed much more negatively in Chile, Brazil and Uruguay than in the U.S.

### *Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition.*

As of December 31, 2020, the Debtors had a consolidated indebtedness of approximately US$566,690,000. According to the terms and conditions of the Plan, upon the Plan Effective Date, the Reorganized Debtors will have outstanding indebtedness of approximately $386,000,000. The Reorganized Debtors' ability to service their debt obligations will depend, among other things, upon their future operating performance. These factors depend partly on economic, financial, competitive and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### *The Debtors' business and the automotive retail industry in general are sensitive to adverse economic conditions.*

The Debtors believe that vehicle sales, and hence their results of operations, are strongly influenced by economic conditions in the markets in which they operate, including inflation, recession or economic slowdown, consumer confidence, interest rates, the level of personal discretionary spending, credit availability and employment/unemployment rates. Historically, unit sales of motor vehicles, particularly new vehicles, have been cyclical, fluctuating with general economic cycles. During economic downturns, retail new vehicle sales typically experience periods of decline characterized by oversupply and weak demand. Although the Debtors have adjusted their pricing strategy from time to time in an attempt to mitigate these historical trends, the automotive industry may experience sustained periods of decline in vehicle sales in the future. In addition, local economic, competitive and other conditions affect the performance of the Debtors' dealerships. Accordingly, adverse changes in macroeconomic conditions in Chile, Uruguay and Brazil would adversely affect the Debtors' profitability and ability to service their debt. For further description of the primary factors affecting macroeconomic conditions in Chile, Brazil and Uruguay, *see Risks Related to Chile*, *Risks Related to Brazil*, and *Risks Related to Uruguay*. The Debtors are unable to control future economic conditions in their markets and cannot assure you that they will not adversely impact their business, results of operations, financial condition and cash flow.

### *The Debtors' operations or ability to emerge from bankruptcy may be impacted by the continuing COVID-19 pandemic.*

The COVID-19 pandemic has significantly impacted and may further impact the Debtors' workforce, operations and supply chain, as well as the operations of vendors, customers and suppliers including OEMs. The pandemic has also weakened demand for the Debtors' products and services, resulting in a decline in sales and customer orders.

The continued spread of the virus and the extended duration of the pandemic has had, and will continue to have, a negative impact on the Debtors' business, financial condition, cash flows, and results of operations, although the full extent of the impact is still uncertain. As the pandemic continues to rapidly evolve, the extent of the impact on the Debtors' business, financial condition, cash flows and results of operations will depend on future developments, including, but not limited to, the duration and spread of the pandemic (including any relapses), its severity, the actions to contain the virus and/or treat its impact, related restrictions on travel, the duration, timing and severity of the impact on customer spending (including any recession resulting from the pandemic), and how quickly and to what extent normal economic and operating conditions can resume, all of which are highly uncertain and cannot be predicted. As a result, there is the potential that the COVID-19 pandemic will cause a future material adverse effect on the Debtors' business, results of operations, and financial condition.

***The Debtors' business is highly dependent on the availability of working capital financing, and the Debtors' growth strategy may require additional working capital financing that may not be available on favorable terms or at all.***

The Debtors have, in the past, entered into loan agreements and letter of credit facilities for working capital. The Debtors' business requires significant working capital and although they believe that their current cash and cash flow from operations will be sufficient to meet current and reasonably anticipated cash needs, they may, in the future, require additional cash resources due to changed business conditions, implementation of investments or acquisitions the Debtors may decide to pursue. Working capital financing may not be available in amounts or on terms acceptable to the Debtors, if at all, in the future. Any failure by the Debtors to raise additional funds on terms favorable to the Debtors, or at all, could impair the Debtors' ability service the Debtors' indebtedness and to continue their business operations.

***A failure to renew or comply with the Debtors' agreements entered into with the Debtors' original equipment manufacturers may adversely affect their results of operations and financial condition.***

The Debtors' business depends on non-exclusive importation and distribution agreements entered into with OEMs for the distribution of their products. These agreements generally provide for one- to three-year terms and are subject to termination by the OEMs upon the occurrence of certain events, including the Debtors' failure to comply with minimum purchase requirements, failure to comply with certain laws or a bankruptcy of the Debtors. In certain agreements, an OEM may be entitled to terminate its agreement if the OEM wishes to reorganize its distribution network. Even if an OEM wishes to terminate its agreement without cause, there can be no assurance that the Debtors would be able to obtain an injunction to compel the OEM to continue supplying their products pending resolution of the dispute. In addition, the Debtors' agreements with OEMs may be renegotiated at the end of their term. Although the Debtors believe that they will be able to renew at expiration all of their existing agreements, it cannot be assured that the agreements will be renewed or that the terms of the renewals will be as favorable to the Debtors as their current agreements. Furthermore, actions taken by OEMs to exploit their bargaining position in negotiating the terms of renewals of the agreements or otherwise could have a material adverse effect on the Debtors' revenues and profitability. Also, if an OEM wishes to terminate or not renew its agreement with the Debtors, the Debtors would not be able to obtain that OEM's products through alternate sources and that OEM could enter into an agreement with one of the Debtors' competitors. As a result, complete or partial termination or nonrenewal of these agreements by an OEM could materially and adversely affect the Debtors' business, results of operations, financial condition and cash flows.

As of the date of this Disclosure Statement, the majority of the Debtors' importation and distribution agreements for vehicles with OEMs have been renewed, although the importation and distribution agreements with Huachen Automotive Group Holdings Co. Ltd and Geely Automobile International Corporation have expired and are in the process of renewal. However, there can be no assurance that these agreements will be renewed or that they will be renewed on the same terms as the lapsed agreements. In addition, the continuing arrangements with each of these OEMs is subject to termination with or without cause at any time until the agreements have been renewed. The Debtors' failure to renew any of these agreements could materially and adversely affect their business, results of operations, financial condition and cash flows.

***The Debtors do not have exclusive importation and distribution rights with most of their OEMs.***

Most of the Debtors' importation and distribution agreements with OEMs do not provide for the Debtors' exclusive right to import and distribute the OEM's products within the markets in which the Debtors operate. Although the Debtors have in practice been the exclusive importer and distributor for all of their OEMs in Chile and Peru since the Debtors' founding, any of the OEMs with whom the Debtors have importation and distribution agreements could enter into agreements with the Debtors' competitors or with other parties to import and distribute their products. In addition, if the Debtors lose a substantial number of their agreements, the practical exclusivity would end and the Debtors would be subject to competitive pressures, which could result in lower margins and lower sales and may adversely affect their results of operations.

*Because the Debtors' sales are dependent upon the continued viability and overall success of the OEMs with which the Debtors hold importation and distribution agreements, adverse conditions affecting those OEMs may negatively affect the Debtors' revenues and profitability.*

The Debtors' success depends to a great extent on the Debtors' OEMs' financial condition, competitiveness, marketing, product design, production and distribution capabilities, reputation, management and labor relations. In addition, the success of the Debtors' dealerships is dependent on the Debtors' OEMs in several key respects. First, the Debtors rely exclusively on their OEMs for the Debtors' product inventory, including new vehicles and OEM parts. The Debtors' ability to sell new vehicles and aftermarket accessories is dependent on the OEMs' ability to produce and allocate to the Debtors' stores attractive, high-quality and desirable products at the right time in order to satisfy customer demand. Second, OEMs have in the past provided advertising assistance. In addition, the Debtors rely on the OEMs' training, product brochures and point of sale materials, and other items for their products.

The Debtors' OEMs may be adversely impacted by economic downturns or recessions, significant declines in customer demand for their new vehicles, adverse economic conditions, currency fluctuations, increases in interest rates, declines in their credit ratings, labor strikes or similar disruptions (including within their major suppliers), supply shortages or rising raw material costs, rising employee benefit costs, adverse publicity that may reduce consumer demand for their products (including due to bankruptcy), product defects, vehicle recall campaigns, litigation, poor product mix or unappealing vehicle design, governmental laws and regulations or other adverse events. In addition, if OEMs fail to adequately gauge consumer opinion, OEMs may fail to develop high quality and desirable products in the future.

These and other risks could materially adversely affect any manufacturer and impact its ability to profitably design, market, produce or distribute new vehicles, which in turn could materially adversely affect the Debtors' business, results of operations, financial condition and cash flows.

*The Debtors are subject to restrictions imposed by, and significant influence from, the Debtors' OEMs that may adversely impact the Debtors' business, financial condition, results of operations, cash flows and prospects.*

OEMs with whom the Debtors hold importation and distribution agreements have influence over the Debtors' operations and dealerships. The terms and conditions of the Debtors' importation and distribution agreements and the OEMs' interests and objectives may, in certain circumstances, conflict with the Debtors' interests and objectives. For instance, OEMs may require the Debtors to meet certain image and facility guidelines and make capital investments, which may require the Debtors to divert financial resources from uses that management believes may be of better value to the Debtors' operations.

*External factors may limit the Debtors' ability to determine the prices they charge for their products.*

External conditions such as customer demand, macroeconomic conditions, the competitive environment in the markets the Debtors operate and the prices the Debtors pay to their OEMs for new vehicles and OEM parts, could affect the Debtors' ability to set prices. As a result, if the Debtors' OEMs increase the prices of the products that they sell to the Debtors (and which the Debtors distribute), the amount of local currency the Debtors pay to purchase their products increases, or their other costs increase, the Debtors may not be able to pass along those price increases to consumers promptly or at all. If the Debtors are unable to set prices to cover any increase in costs to them, such prices may negatively impact the Debtors' revenues, profit margins and results of operations, and may result in a loss of market share.

***The Debtors are vulnerable to supply shortages from their OEMs.***

All of the products that the Debtors sell are manufactured by OEMs. High demand for certain types of vehicles, may outstrip OEMs' abilities to produce those vehicles. As a result, importers and distributors, including Automotores Gildemeister SpA, may be subject to supply limitations, and may be unable to fully meet consumer demand for the Debtors' products and services, which can result in lost sales and lost market share, as not all customers are able to migrate to higher-priced or other branded products. The Debtors believe that these supply restrictions may impact many vehicle OEMs, and as a result, many vehicle importers and distributors in Chile. If the Debtors were to be disproportionately affected by supply problems from any of their OEMs in the future, the Debtors could also lose market share, which would adversely affect their results of operations.

In addition, the vehicle business has been subject to significant labor and financial turmoil, including strikes and bankruptcies, which at times has reduced or delayed the supply of vehicles. These disruptions to the Debtors' OEMs could also cause the Debtors to lose market share and adversely affect their results of operations, financial condition and cash flows.

***A potential bankruptcy or insolvency of any of the Debtors' OEMs would affect the Debtors' results of operations.***

Several vehicle OEMs have been insolvent in the past. Although none of the Debtors' vehicle OEMs have been insolvent in the past ten years, the Debtors cannot provide assurance that OEMs will not encounter substantial financial distress or insolvency in the future. In the event of bankruptcy or insolvency filings by the Debtors' OEMs, among other things, (i) the OEM could attempt to terminate all or certain of its importation and distribution agreements, and the Debtors may not receive adequate compensation for the termination, (ii) consumer demand for an OEM's products may be reduced and (iii) an OEM's production may decrease, and the Debtors may not receive sufficient vehicles to meet demand, which would adversely affect the Debtors' results of operations, financial condition and cash flows.

***The Debtors' new vehicle business is dependent on Hyundai.***

A significant portion of the Debtors' sales and net income are related to the sale of new vehicles manufactured by Hyundai. Unit sales of new Hyundai vehicles represented 85% and 77% of their total sales in Chile in 2019 and 2020 respectively. Accordingly, the loss of all or a substantial portion of the Debtors' sales of vehicles manufactured by Hyundai due to competitive factors or otherwise, would have a material adverse effect on the Debtors' results of operations.

***The Debtors inability to collect receivables from their franchises could adversely affect the Debtors' results of operations and financial condition.***

The Debtors maintain receivable balances from independently owned and operated franchises, consisting of payments for vehicles in connection with the franchise's floor plan. As of December 31, 2019 and 2020, their net receivables from franchises in Chile were Ch$12.896 million and Ch$14.180 million respectively. The Debtors factored receivables in 2019 and 2020 for Ch$9.642 million and Ch$7.025 million, respectively. Changes in the financial condition of one or more of these franchises could cause a delay or failure in collecting these receivable balances. A significant delay or failure in collecting these receivable balances could materially adversely affect the Debtors' results of operations and financial condition.

***The Debtors' operations are subject to governmental laws and regulations.***

The vehicle retail industry, including the Debtors' facilities and operations, are subject to national and local laws and regulations, such as those relating to motor vehicle sales, leasing, sales of finance and insurance, licensing, consumer protection, environmental, vehicle emissions and fuel economy, health and safety, and wage-hour and other employment practices. Violation by the Debtors of any of these regulations could subject the Debtors to lawsuits or governmental investigations and adverse publicity, in addition to administrative, civil, or criminal sanctions, which could include a cease and desist order against the Debtors' operations or even revocation or suspension of their license to operate, as well as significant fines and penalties.

The Debtors' existing compliance processes and internal control systems may not be sufficient to prevent or detect all inappropriate practices, fraud or violations of law by them, their subsidiaries, directors, officers, employees or other persons acting or their behalf.  They may in the future discover instances in which they have failed to comply with applicable laws and regulations or internal controls.  If their subsidiaries, directors, officers, employees or other persons acting on their behalf engage in fraudulent, corrupt or other unfair business practices or otherwise violate applicable laws, regulations or internal controls, they could become subject to one or more enforcement actions or otherwise be found to be in violation of such laws, which may result in penalties, fines and sanctions and in turn adversely affect their reputation, business, financial condition and results of operations.

**_Substantial competition in vehicle sales and services may adversely affect the Debtors' profitability due to their need to lower prices to sustain sales and profitability._**

The new vehicle retail industry in Chile, Brazil and Uruguay is highly competitive.  The Debtors primarily compete with importers that sell similar new vehicles to the vehicles offered by the Debtors by different brands such as Chevrolet, Toyota, Kia and Nissan.  The Debtors may face significant competition as they strive to gain market share.  Some of the Debtors' competitors may have greater financial, marketing and personnel resources and lower overhead and sales costs than do the Debtors.  The Debtors typically rely on advertising, merchandising, sales expertise, service reputation and dealership location in order to sell new vehicles.

In addition to competition for vehicle sales, the Debtors' dealerships compete with independent garages for non-warranty repair and routine maintenance business.  The Debtors' dealerships compete with other automotive dealers, service stores and automobile parts retailers in their parts operations.  The Debtors believe that the principal competitive factors in service and parts sales are the quality of customer service, the use of factory-approved replacement parts, familiarity with an OEM's brands and models, convenience, the competence of technicians, location, and price.

**_The Debtors rely on an adequate supply of skilled field personnel._**

In order to continue to provide high quality repair and maintenance services, the Debtors require an adequate supply of skilled field managers and technicians.  Trained and experienced vehicle field personnel are in high demand, and may be in short supply in some areas.  The Debtors cannot guarantee that they will be able to attract, motivate and maintain an adequate skilled workforce necessary to operate their existing and future dealerships efficiently, or that labor expenses will not increase as a result of a shortage in the supply of skilled field personnel, thereby adversely impacting the Debtors' financial performance.  While the vehicle repair industry generally operates with high field employee turnover, any material increases in employee turnover rates in the Debtors' dealerships or any widespread employee dissatisfaction could also have a material adverse effect on their business, financial condition and results of operations.

**_The Debtors' business is affected by advances in automotive technology._**

The demand for new vehicles as well as parts and the Debtors' repair and maintenance services could be adversely affected by continuing developments in vehicle technology.  Vehicle OEMs are producing cars that last longer and require service and maintenance at less frequent intervals in certain cases.  Quality improvement of OEMs' original equipment parts has in the past reduced, and may in the future reduce, demand for new vehicles, parts and services, adversely affecting the Debtors' sales.  For example, OEMs' use of stainless steel exhaust components has significantly increased the life of those parts, thereby decreasing the demand for exhaust repairs and replacements.  Longer and more comprehensive warranty or service programs offered by vehicle OEMs and other third parties also could adversely affect the demand for the Debtors' non-warranty repair and maintenance services.  In addition, advances in vehicle technology continue to require the Debtors to incur additional costs to update the Debtors' diagnostic capabilities and technical training programs.

**_The loss of any key members of the Debtors' management team may impair the Debtors' ability to identify and secure new contracts or renew expiring importation and distribution agreements with OEMs or otherwise manage the Debtors' business effectively._**

The Debtors' rely on its senior management to manage their business successfully.  In addition, the relationships and reputation that members of the Debtors' management team have established and maintained with

their OEMs contribute to the Debtors' ability to maintain good relations with their OEMs, which is important to the Debtors' ability to maintain importation and distribution agreements in the countries in which the Debtors operate. Employment contracts entered into between the Debtors and senior management cannot prevent the Debtors' senior management from terminating their employment, and the death, disability or resignation of any member of the Debtors' senior management team may impair the Debtors' ability to continue normal business operations and identify and develop new business opportunities or otherwise to manage their business effectively.

***The occurrence of natural disasters in the regions where the Debtors operate could adversely affect the Debtors assets and impair ability to conduct business.***

In Chile, the Debtors are exposed to the risk of natural disasters such as earthquakes, tsunamis and volcanic eruptions. Although the Debtors' operations are geographically dispersed and the Debtors maintain insurance coverage for their fixed assets and inventory, a natural disaster could adversely affect their fixed assets, such as their dealerships and warehouses, as well as their inventory. In addition, a natural disaster or multiple catastrophic events could have a material adverse effect on consumer demand for their products and services in the affected region and could result in substantial volatility in their results of operations for any fiscal quarter or year.

***The New Notes Documents and the terms of the Debtors' other indebtedness impose significant operating and financial restrictions, which may prevent the Reorganized Debtors from capitalizing on business opportunities.***

The New Notes Documents will contain, and any future indebtedness of the Debtors may contain, a number of restrictive covenants that impose significant operating and financial restrictions, including restrictions on the Debtors' ability to engage in acts that may be in the Debtors' best long-term interests. The New Notes Documents will include covenants that, among other things, restrict the Debtors' ability to:

- incur additional indebtedness or contingent obligations;

- pay dividends or make distributions to stockholders without consent from a majority of the holders;

- repurchase or redeem the Debtors' stock; make investments;

- grant liens;

- make capital expenditures;

- enter into transactions with the Debtors' stockholders and affiliates;

- sell determined assets; and

- acquire the assets of, or merge or consolidate with, other companies.

In addition, the Debtors may incur other indebtedness in the future with the same and/or additional covenants. The Debtors cannot assure the creditors that they will be able to maintain compliance with these covenants in the future and, if they fail to do so, that they will be able to obtain waivers from the agent and the lenders or amend the covenants.

Any breach of the covenants in the New Documents could result in a default of the obligations under such debt and cause a cross-default under other debt. If there were an event of default under the New Documents or future credit agreements that was not cured or waived, the lenders under the Debtor's credit agreements could cause all amounts outstanding thereunder to be due and payable immediately. The Debtors' assets and cash flow may not be sufficient to fully repay borrowings under future credit agreements and their obligations under the New Notes Documents if accelerated upon an event of default. If, as or when required, the Debtors are unable to repay, refinance or restructure their indebtedness under, or amend the covenants contained in, any future credit agreements, the lenders under the facilities could declare an event of default and thereafter institute foreclosure proceedings against the assets securing borrowings pursuant to the terms of the credit agreements and other related loan documents.

*Disruptions or volatility in global financial markets could limit the Debtors' sources of liquidity, or the liquidity of their customers, dealers and OEMs.*

Global economic conditions may cause volatility and disruptions in the capital and credit markets. During the 2009 global economic downturn, financial markets decreased the availability of liquidity, credit and credit capacity. Although the Debtors were able to obtain sufficient funding during this period to satisfy their working capital needs, there can be no assurance that the Debtors would be able to do so in a future downturn. An inability to access capital and credit markets may have an adverse effect on the Debtors' business, results of operations, financial condition and competitive position.

*Changes in interest rates could adversely impact the Debtors' profitability.*

A de minimis percentage of the debt issued by the Reorganized Debtors will bear interest based at a floating rate. Therefore, the Debtors' interest expense will rise with increases in interest rates. Rising interest rates may also have the effect of depressing demand in interest rate sensitive areas of the Debtors' business, particularly new and used vehicle sales, because many of the Debtors' customers finance their vehicle purchases. As a result, rising interest rates may have the effect of simultaneously increasing the Debtors' costs and reducing revenues.

*The Debtors' insurance does not fully cover all of the Debtors' operational risks, and changes in the cost of insurance or the availability of insurance could materially increase the Debtors' insurance costs or result in a decrease in insurance coverage.*

The operation of automobile dealerships is subject to a broad variety of risks. While the Debtors have property and liability insurance, the Debtors do not carry business interruption insurance, and are self-insured for a portion of their potential liabilities. In certain instances, the Debtors' insurance may not fully cover an insured loss depending on the magnitude and nature of the claim. Additionally, changes in the cost of insurance or the availability of insurance in the future could substantially increase the Debtors' costs to maintain their current level of coverage or could cause the Debtors to reduce their insurance coverage and increase the portion of the risks that the Debtors self-insure.

*Changes in the availability and cost of credit to customers could decrease demand for the Debtors' products and services and adversely affect the Debtors' sales.*

Slightly more than half of the Debtors' customers in Chile financed at least a portion of their vehicle purchase through financing services brokered by the Debtors in partnership with the Debtors' affiliate, Amicar. The Debtors record revenue from commissions generated by brokering financing for vehicle purchases in Chile through Amicar. Therefore, if there is a decline in the availability of credit for purchasers of the Debtors' products and services, or an increase in interest rates which makes credit unaffordable or otherwise unfeasible, the ability of certain customers to purchase vehicles could be limited, resulting in a decline in sales or profits.

*Due to the nature of the automotive retail business, the Debtors may be involved in legal proceedings or suffer losses that could have a material adverse effect on their business.*

The Debtors will continue to be involved in legal proceedings in the ordinary course of business. A significant judgment against the Debtors, the loss of a significant license or permit, or the imposition of a significant fine could have a material adverse effect on the Debtors' business, financial condition and future prospects. In addition, it is possible that the Debtors could suffer losses at individual dealerships due to fraud or theft.

*The assumptions and estimates contained in the financial projections may prove to be inaccurate, and the Debtors may not be able to achieve their projected financial results.*

The financial projections set forth in **Exhibit C** to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the Chilean and world economies in general and the industry in which the Debtors operate in particular.

The Debtors continue to operate in an unstable and uncertain political, economic and regulatory environment, including uncertainty and risks relating to the ongoing COVID-19 pandemic. The factors that have already materially and adversely affected the Debtors' results of operations and financial condition may continue to place significant strains on the Debtors' results of operations and liquidity.

In developing the financial projections, the Debtors have made certain assumptions and determinations based on current information and estimates with respect to these and other factors. However, the assumptions and estimates underlying these projections are inherently uncertain and are subject to significant business, economic and competitive risks and uncertainties, many of which are beyond the Debtors' control. As a result, the Debtors' actual financial results may differ significantly from the projections. The financial projections should not be regarded as a representation by the Debtors' management or their advisors or any other person that the projections will be achieved. Holders are cautioned not to place undue reliance on the financial projections.

In addition, the financial projections have been prepared on the assumption that the Debtors will operate as "going concerns". As a result, the financial projections set forth in **Exhibit C** do not include any adjustment that might result from the outcome of these significant uncertainties to the recorded amounts of assets or to the recorded amounts or classification of liabilities, which would be required if the Debtors were unable to realize the value of their assets and satisfy their liabilities and obligations in the normal course of business. Due to a number of significant uncertainties relating to the viability of the Debtors' businesses, there can be no assurance that the Debtors will be able to continue as going concerns.

If the Debtors do not achieve their projected financial results, the Debtors may lack sufficient liquidity to continue operating as planned after the Plan Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Plan Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

## C.    Risks Related to the Plan Securities

*Because the Debtors have a history of losses and may continue to incur significant expenses, the Reorganized Debtors may not be able to meet their debt service obligations.*

The Debtors have had a history of negative operating cash flows and could face difficulties in meeting their debt service obligations.

*The New Notes will be issued pursuant to section 4(a)(2) and Regulation S under the Securities Act.*

The Debtors will rely on section 4(a)(2) and Regulation S under the Securities Act to exempt the issuance of the New Notes from registration under the Securities Act. Section 4(a)(2) of the Securities Act exempts from registration the sale of an issuer's securities in a transaction not involving any public offering. Regulation S provides that offers and sales that occur outside the United States are not considered "offers" or "sales" under the Securities Act. Accordingly, the New Notes will only be offered to (i) Qualified Institutional Buyers, as such term is defined in Rule 144A under the Securities Act, (ii) Accredited Investors, as such term is defined in Regulation D under the Securities Act and (iii) non-U.S. persons outside of the United States, as such terms are defined in Regulation S under the Securities Act.

Securities issued in reliance on the exemption provided in section 4(a)(2) of the Securities Act will be considered "restricted securities", and therefore will not be able to be resold absent an exemption under the Securities Act, which may be available under Rule 144 under the Securities Act or Regulation S under the Securities Act. Parties are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144 or Regulation S.

*The Net Cash Proceeds to which the Non-Qualified Holders are entitled may be less than the face value of the New Notes due to such holder.*

Depending on market conditions, the volume of New Notes sold or other developments, the Net Cash Proceeds may be less than the face value of the New Notes due to such holder. The Debtors will not be obligated to pay any amount other than, or additional to, the Net Cash Proceeds, and payment of the Net Cash Proceeds (if any)

will fully and finally discharge the obligation to deliver the Substitute Consideration (instead of any New Notes) to the relevant Non-Qualified Holders.  For the avoidance of doubt, in the event the Net Cash Proceeds are zero, then the Debtors shall have no liability to any Non-Qualified Holder in respect thereof nor any obligation whatsoever to deliver securities or cash to such Non-Qualified Holders (other than USA Holdco LLC units owing to Non-Qualified Holders who are holders of the 7.5% Notes due 2025 Secured Claims).

*There are restrictions on the ability to transfer the New Notes.*

The New Notes have not been, and will not be, registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws.  For a discussion of certain restrictions on resale and transfer, see Article XIII of this Disclosure Statement.

*An active trading market for the New Notes may not develop.*

There is currently no market for the New Notes, and we do not currently intend to apply for the listing of the New Notes on any securities exchange.  There can be no assurance that any market for the New Notes will develop or be sustained.  If an active market does not develop or is not sustained, the market price and liquidity of the New Notes may be adversely affected.  The liquidity of any market for the New Notes will depend on a number of factors, including, without limitation:

- the number of holders of the New Notes;

- the Reorganized Debtors' operating performance and financial condition;

- the market for similar securities; and

- the interest of securities dealers in making a market in the New Notes.

If a market for the New Notes were to develop, the New Notes may trade at a discount, depending upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions, the ratings assigned to the debt by credit rating agencies, the liquidity of the New Notes and the Reorganized Debtors' operating performance and financial condition.

*There are restrictions on the ability to transfer the USA Holdco LLC Units.*

The New Notes have not been, and will not be, registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws.  For a discussion of certain restrictions on resale and transfer, see Article XIII of this Disclosure Statement.

*An active trading market for the USA Holdco LLC Units may not develop.*

There is currently no market for the USA Holdco LLC Units.  There can be no assurance that any market for the USA Holdco LLC Units will develop or be sustained.  If an active market does not develop or is not sustained, the market price and liquidity of the USA Holdco LLC Units may be adversely affected.  The liquidity of any market for the USA Holdco LLC Units will depend on a number of factors, including, without limitation:

- the number of holders of the USA Holdco LLC Units;

- the Reorganized Debtors' operating performance and financial condition;

- the market for similar securities; and

- the interest of securities dealers in making a market in the USA Holdco LLC Units.

If a market for the USA Holdco LLC Units were to develop, the USA Holdco LLC Units may trade at a discount, depending upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions, the ratings assigned to the debt by credit rating agencies, the liquidity of the USA Holdco LLC Units and the Reorganized Debtors' operating performance and financial condition.

***The value of the Collateral may not be sufficient to satisfy the Debtors' obligations under the New Notes.***

The New Secured Notes will be secured by first and second priority security interests, as applicable, in the Collateral and the New Subordinated Notes will be unsecured and subordinated in right of payment to the New Secured Notes. The value of the Collateral and any amount to be received upon a sale or foreclosure of such Collateral will fluctuate depending upon many factors including, among others, the Debtors' financial situation at the time of such sale or foreclosure, changes in the Debtors' industry that may have occurred, the availability of buyers at such time, the condition of the Chilean and U.S. economies and exchange rates. No appraisal of any of the Collateral has been prepared by the Debtors or on the Debtors' behalf in connection with the issuance of the New Notes. The Reorganized Debtors can provide no assurance as to the amount that would be distributed in respect of the New Secured Notes upon any foreclosure or otherwise, or that the proceeds from the sale of the Collateral would be sufficient to satisfy the Reorganized Debtors' obligations under the New Secured Notes. In addition, the Collateral is comprised of substantially all of the Reorganized Debtors' assets. If the value of the Collateral is insufficient to satisfy the Reorganized Debtors' obligations under the New Secured Notes, holders of New Secured Notes may experience losses.

***Impediments exist to any foreclosure on the Collateral, which may adversely affect the proceeds of any foreclosure.***

Substantially all of the documents that create liens on the Collateral for the benefit of the New Notes are governed by the laws of and substantially all of the Collateral is located in Chile, Peru, Uruguay and Costa Rica, and Brazil. Any foreclosure regarding the assets in these jurisdictions would therefore be required to comply with applicable local legal and procedural requirements, which may require that foreclosure only be permitted upon receipt of a judicial order and carried out by public auction before the same court, and differ substantially from those in the United States. In particular, Chilean law does not allow for self-executing mechanisms or expedited foreclosure proceedings with respect to these types of liens. Any proceeding against the Collateral in Chile would be required to be initiated in a Chilean court, and could involve significant delays. In the absence of a recognition of debt deed (as described below), in order to foreclose on the Collateral as a consequence of an event of default under the New Notes Documents, a Chilean court will require a final and conclusive judgment for the payment of money rendered from a U.S. court. The courts of Chile then will enforce such final and conclusive foreign judgment for the payment of money rendered by the U.S. court in accordance with the exequatur procedure used for the enforcement of foreign judgments (including, among other things, the issuance of letters rogatory) in the Chilean Civil Procedure Code without any retrial or re-examination of the merits of the original action. The time required to obtain a U.S. order and then have such order recognized and enforced by a Chilean court could result in a deterioration of the Collateral and a decrease in the value that would otherwise be realizable upon foreclosure.

In order to potentially expedite the process for foreclosing on the Collateral as a consequence of an event of default under the New Notes documents, the Debtors will enter into a recognition of debt deed, which may permit the Chilean Collateral Trustee to more expeditiously foreclose on the Collateral through an abbreviated proceeding which would typically take between three to six months.

***Third parties' rights may affect the ability of Holders of New Secured Notes to foreclose on the Collateral and the priority of the New Secured Notes with respect to the Collateral.***

Third parties may have rights and be entitled to remedies that diminish the ability of Holders of New Secured Notes to foreclose upon the Collateral or that affect the priority of the New Secured Notes with respect to the Collateral, or amounts available to pay the New Notes after foreclosure of the Collateral for repayment. Under Chilean law, amounts owed to employees or, with some limited exceptions, to tax authorities (including social security and retirement fund liabilities), must be paid by a debtor prior to the satisfaction of any other claims, including secured claims. The rights and remedies to which these and other third-party creditors are entitled may limit the ability to

foreclose on the Collateral for the New Secured Notes or may otherwise reduce the proceeds available to satisfy the Reorganized Debtors' obligations under the New Notes.

### D.    Risks Related to Chile

*The Debtors' growth and profitability depend on the level of economic activity in Chile.*

More than half of the Debtors' sales derive from their operations in Chile. Accordingly, their financial condition and results of operations are dependent to a significant extent on the level of economic activity and political climate in Chile. The Chilean economy has been influenced, to varying degrees, by economic and political conditions in other emerging and developed countries, including the deceleration of economic growth of Asian or other developed countries to which Chile exports its goods. In addition, economic activity in Chile is sensitive to fluctuations in commodities prices, particularly that of copper and copper products. Therefore, the Chilean economy is vulnerable to a sharp fall in key commodity prices. If commodity prices were to fall, employment and consumer spending would be adversely affected and as a result, demand for the Debtors' products and services could decrease.

In spite of the recent growth of the Chilean economy, the Debtors cannot guarantee that the Chilean economy will continue to grow in the future or that future developments in or affecting the Chilean economy, including consequences of continuing economic and political difficulties in other emerging and developed markets, including some of the Debtors' neighboring countries, will not materially and adversely affect the Debtors' business, financial condition or results of operations.

In addition, the Debtors' financial condition and results of operations could also be affected by regulatory changes, changes in administrative practices, changes in economic or other policies of the Chilean government or other political or economic developments in or affecting Chile, over which the Debtors have no control.

*Political developments in Chile could affect the Debtors' business, financial condition and results of operations.*

The Debtors' financial condition and results of operations may also be adversely affected by changes in Chile's political climate to the extent that these changes affect the nation's economic policies, growth, stability, outlook or regulatory environment.

*Inflation in Chile could adversely affect the Debtors' business, financial condition and results of operations.*

In Chile, the inflation rate is measured by the Chilean Consumer Price Index, which is calculated by the Chilean National Statistics Institute. This index includes prices of a selected group of goods and services typically consumed by Chilean families. In the past, Chile has experienced high levels of inflation. The measures taken by the Chilean Central Bank to control inflation have often included maintaining a tight monetary policy with high interest rates, thereby restricting the availability of credit and constraining economic growth. Inflation, measures to combat inflation and public speculation about possible additional actions have also contributed materially to economic uncertainty in Chile and to heightened volatility in its securities markets. Periods of higher inflation may also slow the growth rate of the Chilean economy and could lead to reduced demand for the Debtors' products and services and decreased sales. Any future increases in the rate of inflation could depress economic activity and consumer demand in Chile, which would adversely affect demand for the Debtors' products and services.

*A fluctuation in the Chilean peso could adversely affect the Debtors' financial condition, results of operations and value of the Debtors' securities.*

The Chilean peso has been subject to large depreciation and appreciations in the past and could be subject to significant fluctuations in the future. The value of the Chilean peso against the U.S. dollar may continue to fluctuate significantly in the future. Substantially all of the importation and distribution contracts between the Debtors and the Debtors' OEMs are denominated in U.S. dollars and the Debtors generally set the prices of their products to Chilean consumers in Chilean pesos. A depreciation of the Chilean peso against the U.S. dollar without a concomitant increase in the prices the Debtors charge to customers could result in the Debtors being required to generate higher amounts of revenues in Chilean pesos in order to satisfy the Debtors' dollar-denominated obligations. The Debtors' ability to

increase their prices is dependent on a number of factors outside of their control, including the competitive environment, demand for the Debtors' products and OEM requirements. In addition, substantial devaluations of the Chilean peso could impact the overall Chilean economy, thereby generally decreasing demand for the Debtors' products and services. Furthermore, the Debtors' Peruvian Consolidated Financial Statements are reported in U.S. dollars before being translated to Chilean pesos for consolidation into the Debtors' Consolidated Financial Statements. As a result, fluctuations in the exchange rate between the Chilean peso and the U.S. dollar may cause the results of the Debtors' Chilean operations to fluctuate.

### *Developments in other emerging markets or in the automotive market may adversely affect the Debtors.*

Developments in the global automotive market and in other emerging markets, particularly in Latin America, may adversely affect the market for the Debtors' securities and the availability of foreign capital in Chile. The Debtors cannot predict whether events in other markets will adversely affect the price of, or market for, the Debtors' securities. The Debtors cannot give any assurance that negative developments in Latin America or other emerging markets will not occur or that such negative developments would not adversely affect the market for the Debtors' securities or affect the Debtors' access to sources of financing.

### *Changes in tax laws may increase the Debtors' tax burden and, as a result, negatively affect financial performance.*

The Chilean tax rules applicable to the Debtors may change. From time to time the Chilean government presents to Congress bills of law with proposed changes to tax regulations that may increase the Debtors' tax burden. These changes may include increases on the Corporate Income Tax rate, limitations on the determination of the tax basis for Corporate Income Tax purposes, increases in certain specific taxes applicable to the automotive industry, or increases on the existing withholding tax rates for Chilean source income obtained by non-Chilean residents, among others.

The likelihood and effects of these tax reforms and any other changes resulting from the enactment of additional tax reforms have not been quantified. These reforms may result in increases in the Debtors' overall tax burden, which could negatively affect the Debtors' overall financial performance.

### *The ability to effect service of process on the directors and officers outside the U.S. and the ability to enforce U.S. judgments against the Debtors or the Debtors' directors, officers, and assets outside the U.S. may be limited.*

Substantially all of the Debtors' directors and officers reside outside the U.S. and have Chilean or other non-U.S. nationalities. As a result, it may not be possible for investors to effect service of process outside of Chile or within the U.S. upon the Debtors or persons associated with the Debtors that reside outside of the U.S., or to enforce a judgment obtained in the U.S. against the Debtors or such persons outside of Chile or in the U.S. courts that is based on the civil liability provisions under laws of jurisdictions other than Chile, including the federal and securities laws or other laws of the U.S.; rather, a party may only be able to effect service of process on directors and officers who are present in the U.S. Additionally, it may be difficult to enforce any U.S. court judgments against the Debtors or its assets, the Debtors' non-U.S. directors, or the Debtors' officers outside of the U.S. In order for a U.S. court judgment to be enforceable in Chile, an order from a Chilean court would be required, and it is possible that a Chilean court would find a U.S. court judgment to be unenforceable against persons or assets in Chile.

### *The Debtors are subject to different accounting standards than U.S. companies.*

Financial reporting requirements in Chile differ in certain significant respects from those required in the United States. With respect to accounting standards, there are material differences between IFRS and U.S. GAAP. Accordingly, the financial information about the Debtors made available herein will not be the same as the information available to holders of securities issued by a U.S. company.

### E.    Risks Related to Peru

On March 26, 2021, non-debtor AGP reported to Superintendencia Nacional de Aduanas y de Administración Tributaria ("SUNAT"), the customs authorities in Peru, that it had inadvertently imported vehicle

models from Hyundai that did not meet the applicable emissions standards.  More specifically, AGP imported 1,925 vehicles of the model H1 under the assumption that such vehicles complied with the applicable Peruvian regulations for engines: "Euro IV"-standard engine.  AGP subsequently discovered that these vehicles had "Euro III"-standard engines and were, therefore, prohibited from being shipped and imported into Peru, and informed SUNAT.  AGP will continue collaborating with SUNAT and authorities providing all required information between 2018-2020. AGP may also contact other Peruvian authorities as appropriate in connection with this matter, which has the potential to result in additional liabilities.The Debtors do not believe, after consulting with local counsel, that any liabilities will be imposed on any of the Debtors or their Related Parties other than AGP arising out of the importation of the non-compliant H1 vehicles in Peru, but there can be no assurance that this will be the case.

AGP has implemented a vehicle recall and replacement plan which will be implemented from approximately May 2021 until April 2022. The plan includes importing 1,854 new H1-model vehicles, and is supported by Hyundai which has agreed to provide the company with a 30% discount on the purchase of such vehicles.  The Company estimates the cost of all potential liabilities arising out of the importation of the non-compliant H1 vehicles including the cost of the recall and replacement plan to be approximately US$40 million over a 3-4 year period.  Hyundai and AGP have also agreed to mutual releases under the Hyundai Undertaking Agreement, discussed above.

**CONFIRMATION OF THE PLAN**

### F.   Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (i) is accepted by all impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### G.   Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

The Debtors have attached hereto as **Exhibit D**, a liquidation analysis prepared by the Debtors' management with the assistance of FTI, the Debtors' financial advisor.

### H.   Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors prepared the Projections, as set forth on **Exhibit C** attached hereto.

### I.   Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that, except in certain circumstances, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[17]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in that class, counting only those claims that _actually_ voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of allowed interests in that class, counting only

---

[17]   A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

those interests that _actually_ voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds (2/3) in amount actually voting cast their Ballots in favor of acceptance.

Section 506(a) of the Bankruptcy Code provides that holders of allowed Claims secured by Liens on property of a Debtor shall have an allowed secured claim to the extent of the value of such holder's interest in the Debtors' estates' property and shall have an unsecured claim to the extent the value of such holder's interest is less than the allowed amount of such claim.  Under the Plan, the Holders of 7.5% Notes due 2025 shall have Allowed Claims in respect of the full $509,806,002 outstanding aggregate principal amount of the 7.5% Notes due 2025 plus all accrued and unpaid interest thereon as of the Petition Date.  The Claims in respect of the 7.5% Notes due 2025 will be (1) Allowed in Class 4 of the Plan as 7.5% Notes due 2025 Secured Claims in an amount of $409,300,000, and (ii) Allowed in Class 5 of the Plan as 7.5% Notes due 2025 Unsecured Deficiency Claims in an amount of $111,796,081 _plus_ all accrued and unpaid interest on the 7.5% Notes due 2025 as of the Petition Date.  The Holders of 7.5% Notes due 2025 will consequently be permitted to vote in each of Class 4 and Class 5 of the Plan for purposes of Plan confirmation and their ballots will allow them to vote in both Classes.

## XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain highly leveraged and the Debtors will remain unable to service their debt obligations or to cure defaults thereunder.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

### A.    Liquidation Under Chapter 7

If no plan is confirmed, the Debtors may choose to file a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  However, there is substantial doubt as to whether the local government or creditors not subject to the jurisdiction of the Bankruptcy Court would choose to respect such a liquidation, and instead, the Debtors would likely file local bankruptcy proceedings under Chilean, Brazilian and Uruguayan law.  A discussion of the effects that a liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.  For the reasons articulated in Article XI above, the Debtors believe that a liquidation would result in lower aggregate distributions being made to Creditors than those provided in the Plan.

### B.    Alternative Plan(s) of Reorganization

The Debtors believe that failure to confirm the Plan will likely lead to expensive and protracted Chapter 11 Cases.  In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of holders of Claims and enable the holders of Claims to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS, AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### C.    Dismissal of the Debtors' Chapter 11 Cases

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante.  Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the Creditors, and possibly resulting in costly and protracted litigation in various jurisdictions.  Dismissal will also permit unpaid secured and unsecured creditors to obtain and enforce judgments against the Debtors.  The Debtors believe that these actions would seriously undermine their ability to continue operations.  Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a viable reorganizational alternative to the Plan.  However, the Debtors may determine that a Chilean law liquidation is necessary and advisable if the Plan cannot be consummated, in which circumstance the Debtors reserve their right to seek dismissal of these Chapter 11 Cases.

## XIII.   CERTAIN SECURITIES LAW MATTERS

### A.   Plan Securities

The Plan provides for the Reorganized Debtors to issue and distribute New Notes and USA Holdco LLC Units.

The Debtors believe that the New Notes and USA Holdco LLC Units constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws. The Debtors further believe that the offer and sale of the New Notes and USA Holdco LLC Units pursuant to the Plan are exempt from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) and Regulation S under the Securities Act, and similar Blue Sky Laws provisions, as applicable. However, as further described below, certain of the New Notes constitute "restricted securities" within the meaning of Rule 144 under the Securities Act and may therefore not be resold absent registration or an exemption from registration under the Securities Act.

Recipients of New Notes and/or USA Holdco LLC Units are advised to consult their own counsel as to their ability to freely trade such securities without compliance with the registration requirements under the Bankruptcy Code, the Securities Act and state Blue Sky Laws or a valid exemption from such requirements.

### B.   Issuance and Resale of Plan Securities under the Plan

#### (i)   *Exemptions from Registration Requirements of the Bankruptcy Code, the Securities Act and State Blue Sky Laws*

##### (a)   USA Holdco LLC Units

The Debtors believe that the offer and sale of the USA Holdco LLC Units will be exempt from the registration requirements of the Securities Act pursuant to section 1145 of the Bankruptcy Code. Section 1145 of the Bankruptcy Code exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interests in, or a claim for an administrative expense in a case concerning, such debtor. Accordingly, recipients will be able to resell those USA Holdco LLC Units without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of section 1145(b)(1) of the Bankruptcy Code or similar federal, state, local, or foreign laws.

Under section 1145(b)(1), an "underwriter" includes (a) any entity that is an "issuer" of the relevant securities or (b) any entity other than the issuer that, other than pursuant to "ordinary trading transactions," (a) purchases a claim against, interest in or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities offered or sold under the plan from the holders of such securities, if such offer to buy is made (i) under an agreement made in connection with the plan, with the consummation thereof or with the offer or sale of securities thereunder and (ii) with a view to distribution of such securities. Whether an entity is an "issuer" for these purposes will be determined by reference to section 2(a)(11) of the Securities Act; for these purposes, the "issuer" shall include all persons who, directly or indirectly, control, are controlled by or are under direct or indirect common control with, such issuer. Under Rule 405 of the Securities Act, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "affiliate" means a person that, with respect to another specified person, directly or indirectly controls, is controlled by or is under common control with the person specified.

The legislative history of section 1145 suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor (or its successor under a plan of reorganization) may be presumed to be a "controlling person" (and, accordingly, be deemed an "affiliate") of such debtor and thus an underwriter under section 1145. Any officer or director of a reorganized debtor or successor may similarly be deemed to be a "controlling person" or "affiliate" thereof, particularly when coupled with ownership of a significant percentage of the issuer's voting securities. To the

extent that entities who receive USA Holdco LLC Units under section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by such entities may not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Whether or not any entity would be deemed to be an "underwriter" with respect to any Security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that entity. Accordingly, the Debtors express no view as to whether any entity would be an "underwriter" with respect to any security to be issued pursuant to the Plan. YOU SHOULD CONFER WITH YOUR OWN LEGAL ADVISORS TO HELP DETERMINE WHETHER OR NOT YOU ARE AN "UNDERWRITER".

(b)    New Notes

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including section 4(a)(2) and Regulation S under the Securities Act to exempt the issuance of the New Notes from registration under the Securities Act. Section 4(a)(2) of the Securities Act exempts from registration the sale of securities by an issuer in a transaction not involving any public offering. Regulation S provides that offers and sales that occur outside the United States are not considered "offers" or "sales" under the Securities Act. Accordingly, the New Notes will only be offered to (i) "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, (ii) "accredited investors," as such term is defined in Regulation D under the Securities Act and (iii) persons (other than U.S. Persons) outside of the United States, as such terms are defined in Regulation S under the Securities Act.

Under current SEC interpretations, securities that are issued pursuant to section 4(a)(2) are restricted securities. New Notes issued pursuant to section 4(a)(2) will therefore be restricted and recipients may resell such New Notes subject to the provisions of Rule 144, absent registration or another appropriate exemption. Recipients of New Notes issued pursuant to Regulation S that are not "affiliates" of the Reorganized Debtors will receive New Notes that are not restricted and therefore may be sold without registration outside the United States in accordance with the exception on resale available pursuant to Regulation S. "Affiliates" of the Reorganized Debtors may resell their New Notes subject to the provisions of Rule 144, absent registration or another appropriate exemption. Generally, Rule 144 of the Securities Act would permit the public sale of securities issued pursuant to section 4(a)(2), if current information regarding the issuer is publicly available and certain other conditions are met.

Whether any particular Person would be deemed to be an "affiliate" would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "affiliate" with respect to the New Notes and, in turn, whether any Person may freely resell New Notes. The Debtors recommend that potential recipients of New Notes consult their own counsel concerning their ability to freely trade such securities without compliance with the Securities Act and applicable state Blue Sky Laws.

The Debtors are also relying on section 18(b)(4)(E) of the Securities Act to exempt from state securities law requirements the offer of the New Notes that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 18(b)(4)(E) provides, among other things, that state securities laws will not apply to securities that are exempt from federal registration under SEC rules or regulations issued under section 4(a)(2). The Debtors do not have any contract, arrangement or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent or any other person for soliciting votes to accept or reject the Plan. The Debtors have not authorized any person to provide any information to Holders of 7.5% Notes due 2025 Secured Claims or Unsecured Notes and Related Party Claims relating to the solicitation of votes on the Plan other than to refer the Holders of 7.5% Notes due 2025 Secured Claims and Unsecured Notes and Related Party Claims to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent or any other person, is engaged or authorized to express any statement, opinion, recommendation or judgment with respect to the relative merits and risks of the Plan.

## XIV. CERTAIN CHILEAN AND UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion is a summary of certain Chilean and U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to certain Holders of Allowed Claims. The following summary does not address the Chilean or U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities and published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and the Chilean Income Tax Law (*La Ley sobre Impuesto a la Renta*), the Stamp Tax Law (*Ley sobre Impuesto de Timbres y Estampillas*), and regulations issued by the Chilean tax authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts in the United States, or on the Chilean Internal Tax Service (*Servicio de Impuestos Internos*) (the "SII") or the courts in Chile. No assurance can be given that the IRS or the SII would not assert, or that a court would not sustain, a different position than any position discussed herein. This summary does not apply to Holders of Claims that (i) are not "Foreign Holders" or (ii) are not "U.S. Holders" (each as defined below for purposes of this summary). This discussion does not purport to address all aspects of U.S. federal income and Chilean taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders that are Cash Out Electing Holders with respect to the Cash Out Distribution or that are Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, Holders that own or are deemed to own 10% or more of USA Holdco LLC, and regulated investment companies and those holding, or who will hold, Old Notes or Reorganization Notes (both as defined below), as part of a hedge, straddle, conversion, or other integrated transaction). In addition, this summary does not address the Medicare tax on net investment income or the special timing rules prescribed under Section 451(b) of the IRC. No aspect of state, local, estate, gift, or taxes other than Chilean and U.S. federal taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds a "capital asset" (within the meaning of Section 1221 of the IRC). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN CHILEAN AND U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-CHILEAN AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

The Debtors do not have a material income tax presence in the United States, and therefore any U.S. federal income tax consequences to the Debtors as a result of the Plan are expected to be immaterial.

### C. Certain Chilean Income Tax Consequences of the Plan to Holders of Allowed Claims

For the purposes of this Disclosure Statement, the term "Foreign Holder" means a Holder of an Allowed Claim that is:

- an individual not resident or domiciled in Chile; or

- a legal entity that is not organized under the laws of Chile, unless the New Notes or the shares in US Holdco or Chile Holdco are assigned to a Chilean branch or other type of permanent establishment of such entity in Chile.

An individual is a tax resident in Chile if (i) such individual has resided in Chile for more than 183 days in a twelve-month period; or (ii) the individual provides evidence of his/her intention of staying in Chile.

Under general principles of the Chilean Income Tax Law, non-Chilean residents are taxed only on their Chilean source income. Chilean source income derives from assets located in Chile or activities developed in the country.

According to Chilean Law and regulations, only debt instruments issued in Chile by Chilean resident debtors are treated as Chilean assets. Accordingly, any gain on the disposal of Allowed Claims by Foreign Holders, either as a contribution, sale or exchange for any other asset will not be subject to Chilean income taxes.

Interest arising out of credits, bonds or other debt instruments is deemed Chilean source income if the debtor is a Chilean resident. The debtor is deemed Chilean resident if the debt was issued abroad by a permanent establishment of a Chilean company.

Shares in Chilean entites are deemed to be located in Chile.

Stamp Tax applies on documents evidencing cash credit operations and the issuance of bonds. Article 7, N°7 of the Stamp Tax Law states that the obligation to pay this tax corresponds to the Chilean debtor, in case the creditors or holders are not Chilean residents.

### (i)     *Exchange of Allowed Claims for US Holdco Stock*

The exchange of Allowed Claims for US Holdco Stock at nominal or face value is not subject to income taxation or Stamp Tax in Chile.

### (ii)    *Exchange of Allowed Claims for Chile Holdco Stock*

The exchange of Allowed Claims for Chile Holdco Stock at nominal or face value is not subject to income taxation or Stamp Tax in Chile.

### (iii)   *Exchange of Allowed Claims for Reorganized Gildemeister Common Stock*

The exchange of Allowed Claims for Reorganized Gildemeister Common Stock at nominal or face value is not subject to capital gain taxes or Stamp Tax in Chile.

The outstanding interests accrued on the Allowed Claims will be subject to a 4% withholding tax. According to the existing terms applicable to the Allowed Claims, the Debtors will bear the cost of the interest withholding tax, so the Holders receive an interest amount equivalent to the amount they would have received in the absence of such withholding tax.

While the bondholder is a Chilean resident company, the interests accrued will be subject to Chilean corporate income tax (27%).

### (iv)    *Exchange of Allowed Claims for New Notes*

The exchange of Allowed Claims for New Notes is not subject to income taxation in Chile.

The outstanding interests accrued on the Allowed Claims will be subject to a 4% withholding tax. According to the existing applicable terms to the Allowed Claims, the Debtors will bear the cost of the interest withholding tax, so the Holders receive an interest amount equivalent to the amount they would have received in the absence of such withholding tax.

While the bondholder is a Chilean resident company, the interests accrued will be subject to Chilean corporate income tax (27%).

Stamp Tax at a 0.8% could be triggered upon the exchange. The tax would apply on the difference between the New Notes and the principal amount of the Allowed Notes. According to the Stamp Tax Law, the tax will be borne by the Debtors.

### (v)    *Chile Holdco Bonds*

The issuance of the Chile Holdco Bonds will be subject to Stamp Tax at a 0.8% rate. According to the Stamp Tax Law, the tax is borne by Chile Holdco.

Interests paid on the Chile Holdco Bonds to Foreign Holders will be subject to a 4% withholding tax rate.

A 31% penalty tax -corresponding to the difference between the general 35% withholding tax rate and the 4% withholding tax rate-, may be imposed at the level of Chile Holdco on the amount of the interests paid from this entity to foreign related parties, if Chile Holdco is in an excess-indebtedness position. The 31% penalty tax is deductible at the level of Chile Holdco. It is expected that Chile Holdco will adopt the necessary controls to comply with the debt-to-equity limitation.

Any gain on the disposal of the Chile Holdco Bonds by the Foreign Holders will be foreign source income not subject to taxation in Chile.

### (vi)    *New Notes*

Interests paid on the New Notes to Foreign Holders will be subject to a 4% withholding tax rate. The Debtors will bear the cost of the interest withholding tax, so the Foreign Holders receive an interest amount equivalent to the amount it would have received in the absence of such withholding tax.

The 31% penalty tax may be imposed to the interests paid from the New Notes to related parties, if such entity is in an excess-indebtedness position. The 31% penalty tax is deductible at the level of Reorganized Gildemeister. It is expected that Reorganized Gildemeister will adopt the necessary controls to comply with the debt-to-equity limitation.

Any gain on the disposal of the New Notes by the Foreign Holders will be foreign sourced income not subject to taxation in Chile.

### (vii)    *US Holdco Shares*

The capital gain on the disposal of more than 10% of the shares of US Holdco by any foreign resident shareholder may be subject to Chilean indirect transfer rules if; (i) the Chilean underlying assets represent more than 20% of the fair market value of US Holdco; or (ii) the Chilean underlying assets have a fair market value greater than 210.000 Annual Tax Units (Unidades Tributarias Anuales). The capital gain is subject to a 35% tax and the seller has the right to choose between the tax basis on US Holdco—equivalent to the acquisition cost of the US Holdco shares, in the proportion the Chilean assets represent in the holding company—or the tax basis on Reorganized Gildemeister equivalent to the acquisition cost of these shares.

The capital gain—equilavent to the difference between the sales price and the acquisition cost- on the disposal of the shares in Chile Holdco by US Holdco may be subject to capital gain taxes at a 35% rate. Reduced rates may apply in case the US-Chile Tax Treaty enters into force, with the limitations and conditions established in such Treaty. All or part of the capital gain could be exempted from income taxes if Chile Holdco becomes publicly traded, with the limits and conditions established in article 107 of the Chilean Income Tax Law.

**D.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims**

As used in this Disclosure Statement, a "U.S. Holder" means a beneficial owner of an Allowed Claim, that is, for U.S. federal income tax purposes:

•      a citizen or individual resident of the United States;

•      a corporation (or entity treated as a corporation for such purposes) created or organized in or under the laws of the United States, or any State thereof or the District of Columbia;

•      an estate the income of which is includible in its gross income for U.S. federal income tax purposes without regard to its source; or

•      a trust, if either (x) it is subject to the primary supervision of a court within the United States and one or more "United States persons" has the authority to control all substantial decisions of the trust or (y) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a "United States person."

**1.      Consequences to U.S. Holders of Reorganization Notes**

Pursuant to the Plan, each U.S. Holder of an Allowed 7.5% Notes due 2025 Secured Claim or an Allowed Unsecured Notes Claim shall receive (as applicable) such U.S. Holder's Pro Rata Share of the New Junior Tranche Secured Notes and/or New Subordinated Notes (together the "Reorganization Notes"), and (as discussed below, under "Consequences to U.S. Holders of USA Holdco LLC Units") each U.S. Holder of an Allowed 7.5% Notes due 2025 Secured Claim shall also be issued USA Holdco LLC Units.

a.      Receipt of Reorganization Notes Pursuant to Plan

The treatment of the receipt of Reorganization Notes pursuant to the Plan is unclear. The form of the transaction will be an exchange of Reorganization Notes for Old Notes (as defined below). To accomplish this exchange, on the Plan Effective Date, and pursuant to a prearranged plan, a portion of the Old Notes will be contributed to USA Holdco, such Old Notes will then be immediately exchanged by USA Holdco with the Reorganized Debtors for Reorganization Notes, and such Reorganization Notes will then be immediately transferred by USA Holdco back to the U.S. Holders. There is no definitive guidance on how a U.S. Holder should treat this prearranged plan for U.S. tax purposes. We intend to take the position that each U.S. Holder is treated, for U.S. tax purposes, as exchanging a portion of its Allowed Claims directly to the Debtors in exchange for the issuance by the Debtors of the Reorganization Notes (the "Exchange"). In the alternative, it is possible that the IRS takes the position that each step of the plan is given independent significance, in which case USA Holdco, instead of the U.S. Holders, would be treated as effecting the exchange of Old Notes for Reorganization Notes with the Debtors. If such treatment were to prevail, then the U.S. Holders may be viewed as exchanging the Old Notes with USA Holdco for Reorganization Notes as a taxable sale transaction, rather than as exchanging the Old Notes for Reorganization Notes directly with the Debtors. The Debtors are not seeking a tax ruling with respect to the Plan, and U.S. Holders should consult their own tax advisors regarding the tax treatment of the Exchange. The remainder of the disclosure assumes that a U.S. Holder is treated as exchanging a portion of its Allowed Claims directly with the Debtors, but there is no guarantee that the IRS would agree with this position.

Under such treatment, whether a U.S. Holder of an Allowed Claim recognizes gain or loss as a result of the Exchange depends, in part, on whether the Exchange qualifies as a significant modification, and whether, if the Exchange is a significant modification, the Exchange qualifies as a tax-free recapitalization, which in turn depends on whether the 7.5% Notes due 2025, 7.5% Notes due 2021, 8.25% Notes due 2021, and 6.75% Notes due 2023 (collectively the "Old Notes") and the Reorganization Notes are treated as "securities" for the reorganization provisions of the IRC.

*i.      Significant Modification and Status of the Reorganization Notes*

Under general principles of federal income tax law, a U.S. Holder realizes gain or loss if an issuer exchanges an existing debt instrument for its new debt instrument if the new debt instrument differs materially either in kind or in extent from the original debt instrument (a "significant modification"). A U.S. Holder does not realize gain or loss

in an exchange of a debt instrument for a new debt instrument that does not result in a significant modification to the rights of a holder. Under applicable regulations, the Exchange results in a significant modification if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively (other than modifications that are subject to special rules), the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." In particular, the applicable regulations provide that a modification that changes the timing of payments (including any resulting change in the amount of payments) due under a debt instrument is a significant modification if it results in the material deferral of scheduled payments. The deferral may occur either through an extension of the final maturity date of an instrument or through a deferral of payments due prior to maturity. The materiality of the deferral depends on all the facts and circumstances, including the length of the deferral, the original term of the instrument, the amounts of the payments that are deferred, and the time period between the modification and the actual deferral of payments. The deferral of one or more scheduled payments within a safe harbor period equal to the lesser of five years or 50 percent of the original term of the instrument is not a material deferral provided that all deferred payments are unconditionally payable no later than the end of the safe-harbor period. In this case, the safe harbor is not satisfied with respect to any of the Old Notes]. Accordingly, although the status of the Exchange as a significant modification is subject to uncertainty, taking into account all the relevant facts and circumstances, including that the safe harbor is not satisfied, the Debtors intend to take the position that the Exchange constitutes a significant modification.

The determination of whether an instrument is debt or equity for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances. The presence of a fixed maturity date for repayment indicates a fixed obligation to repay and supports a debt characterization. The absence of the same, however, indicates that repayment of the advance depends on the success of the business and favors an equity finding. Although not free from doubt, the Debtors intend to take the position, and this discussion assumes, that the Reorganization Notes be treated as debt instruments for U.S. federal income tax purposes.

### ii.   Treatment of a Debt Instrument as a "Security"

The status of the Notes as securities is subject to uncertainty. Whether a financial instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances. A "security" represents a continuing interest in the affairs of a business. A security is contrasted with cash payments or short-term debt instruments, which provide little exposure to the risks and rewards of a debt instrument. Many authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five (5) years is evidence that the instrument is not a security, whereas a term of ten (10) years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. The Old Notes had initial final maturity dates of approximately five (5), six (6), and ten (10) years from their respective dates of issuance. The New Junior Tranche Secured Notes have a final maturity date of approximately ix (6) years from their date of issuance, and the New Subordinated Notes have a final maturity date of approximately fourteen (14) years from their date of issuance. Accordingly, the Debtors believe there is a reasonable basis for treating, and intend to treat, the Old Notes and the Reorganization Notes as securities.

### iii.   Treatment of a U.S. Holder of an Allowed Old Notes Claim if the Exchange of a portion of its Allowed Claim is Treated as a Reorganization

If the Old Notes and Reorganization Notes are treated as "securities" for U.S. federal income tax purposes, the Exchange would be treated as a recapitalization, and therefore a reorganization, under the IRC. In such case, a U.S. Holder would not recognize gain or loss with respect to the Exchange (except for amounts attributable to accrued interest). Such U.S. Holder's tax basis in its Reorganization Notes would be equal to the tax basis of the portion of the Allowed Old Notes Claim surrendered therefor, plus any amounts attributable to accrued interest. A U.S. Holder's holding period for its Reorganization Notes would include the holding period for the Allowed Old Notes Claim; provided that the tax basis of the Reorganization Notes treated as received in satisfaction of accrued interest would equal the amount of such accrued interest, and the holding period for any such Reorganization Notes would not include the holding period of the Allowed Old Notes Claim.

     *iv.    Treatment of a U.S. Holder of an Allowed Old Notes Claim if the Exchange of a portion of its Allowed Claim is not Treated as a Reorganization*

If the Old Notes or Reorganization Notes are not treated as "securities" for U.S. federal income tax purposes, a U.S. Holder of such a claim would be treated as exchanging its portion of the Allowed Old Notes Claim for Reorganization Notes in a fully taxable exchange. A U.S. Holder of an Allowed Old Notes Claim who is subject to this treatment would recognize gain or loss equal to the difference between the issue price of the Reorganization Notes and the U.S. Holder's adjusted tax basis in its portion of the Allowed Old Notes Claim exchanged. Subject to the discussions below of "Accrued Interest" and "Market Discount," such gain or loss will generally be capital gain or loss. A U.S. Holder's tax basis in the Reorganization Notes would equal their issue price. A U.S. Holder's holding period for the Reorganization Notes received on the Effective Date would begin on the day following the Effective Date.

### b.    Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount will be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of an Allowed Claim will generally recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

In general, the extent to which the consideration received by a U.S. Holder of an Allowed Claim will be attributable to accrued interest on the Old Notes is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The Plan provides, and Debtors intend to take the position that, consideration in respect of Allowed Claims shall be allocated first to the principal amount of such Allowed Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to accrued but unpaid interest. The IRS could, however, take a contrary position.

### c.    Foreign Tax Credits

Any gain or loss recognized by a U.S. Holder on the Exchange (if the Exchange does not qualify as a recapitalization) generally should be treated as U.S.-source income or loss for U.S. foreign tax credit purposes. Accrued interest income with respect to the Old Notes that is treated as paid as a result of the Exchange (including accrued market discount not previously included in income by the U.S. Holder) will constitute income from sources outside the United States and generally will constitute "passive category income" for U.S. foreign tax credit purposes. Subject to significant limitations, a U.S. Holder generally will be entitled to a foreign tax credit against its U.S. federal income tax liability in respect of any Chilean withholding taxes imposed on accrued interest. Alternatively, if a U.S. Holder does not claim the benefits of the foreign tax credit in respect of any foreign income taxes, a U.S. Holder is entitled to a deduction for Chilean withholding tax. The rules governing U.S. foreign tax credits are complex, and a U.S. Holder is urged to consult its tax advisor regarding the application of the rules to its particular circumstances.

### d.    Stated Interest and Additional Amounts on the Reorganization Notes

Subject to the discussion of "contingent payment debt instruments" below under "—Original Issue Discount," the stated interest on the Reorganization Notes is expected to be "qualified stated interest," which is stated interest unconditionally payable in cash or property at least annually at a single fixed rate of interest. A U.S. Holder generally must include in the U.S. Holder's gross income for U.S. federal income tax purposes all qualified stated interest with respect to the Reorganization Notes, and additional amounts thereon, if any, on account of non-U.S. withholding taxes (in each case, without reduction for any such taxes withheld), at the time they are paid or accrued in accordance with the U.S. Holder's usual method of accounting for U.S. federal income tax purposes. Because a U.S. Holder's stated interest income (including excess stated interest) will not be reduced by the non-U.S. taxes withheld, a U.S. Holder will generally be required to include more interest (or original issue discount ("OID")) in the U.S. Holder's gross income for U.S. federal income tax purposes than the U.S. Holder actually receives in cash interest.

However, a U.S. Holder may, subject to certain limitations, be eligible to claim the Chilean taxes withheld as a credit for purposes of computing its U.S. federal income tax liability, even though the payment of these taxes will be remitted by us. Alternatively, if a U.S. Holder does not claim the benefits of the foreign tax credit in respect of any foreign income taxes, a U.S. Holder is entitled to a deduction for Chilean withholding tax. Interest and additional amounts paid on the Reorganization Notes will constitute income from sources without the United States for U.S. foreign tax credit purposes. This foreign source income generally will constitute "passive category income" for U.S. foreign tax credit purposes. The rules relating to the calculation and timing of foreign tax credits and, in the case of a U.S. Holder that elects to deduct foreign taxes, the availability of deductions, involves the application of complex rules that depend upon a U.S. Holder's particular circumstances. U.S. Holders should consult with their own tax advisors with regard to the availability of a credit or deduction in respect of foreign taxes and, in particular, the application of the foreign tax credit rules to their particular situations.

e.   Issue Price

The issue price of the Reorganization Notes will depend on whether the Old Notes or the Reorganization Notes are considered, for U.S. federal income tax purposes, to be traded on an established market. If the Reorganization Notes are considered to be traded on an established market, the issue price of the Reorganization Notes for U.S. federal income tax purposes would be the fair market value of the Reorganization Notes on the date of the Exchange. If the Reorganization Notes are not considered to be traded on an established market but the Old Notes are considered to be traded on an established market, the issue price of the Old Notes would be the fair market value, on the date of the Exchange, of the portion of the Old Notes exchanged for the Reorganization Notes. If neither the Old Notes nor the Reorganization Notes are considered to be traded on an established market, the issue price of the Reorganization Notes would be their stated principal amount. Although not free from doubt, the Debtors believe that it is likely that both the Old Notes and the Reorganization Notes will be considered to be traded on an established market at the time of the Exchange, and, therefore, that the issue price of the Reorganization Notes will be the fair market value of such notes on the date of the Exchange. The Debtors' determination whether the Reorganization Notes are considered to be traded on an established market and, if so, the issue price of the Reorganization Notes, is binding on each U.S. Holder unless it explicitly discloses to the IRS, on its timely filed U.S. federal income tax return for the taxable year that includes the date of the Exchange, that its determination is different from the Debtors', the reason for its different determination, and, if appropriate, how it determined the issue price. The Debtors will notify the Trustee of their determination of the issue price, and the Trustee will make such determination available to Holders within 90 days of the Effective Date.

f.   Original Issue Discount

A Reorganization Note will have OID to the extent the issue price of such Reorganization Notes (determined as described above under "—Issue Price") is less than its "stated redemption price at maturity," subject to a statutory *de minimis* exception. The stated redemption price at maturity of a Reorganization Note will equal the sum of all payments required under the note other than payments of qualified stated interest. A U.S. Holder (whether a cash or accrual method taxpayer) generally will be required to include in gross income (as ordinary income) any OID as the OID accrues (on a constant yield to maturity basis), before the U.S. Holder's receipt of cash payments attributable to such OID. A U.S. Holder should consult its tax advisor to determine the appropriate amount of OID to accrue in each period, taking into account payments of principal prior to the Final Maturity Date.

In addition, because payments on the Reorganization Notes are subject to contingencies as to the timing of payments, it is possible the IRS could take the position that the Reorganization Notes are contingent payment debt instruments. In that event, the timing and character of income, gain or loss recognized with respect to the Reorganization Notes would be materially different from that summarized above. In general, a U.S. Holders would be required to accrue all income on the Reorganization Notes (including stated interest and additional amounts thereon) based on Gildemeister's normal cost of funds, subject to later adjustment to reflect differences between the accrued and actual income amounts, and all income from the Reorganization Notes (including gains on sale) would be ordinary interest income. U.S. Holders of the Reorganization Notes should, in consultation with their tax advisors, carefully consider the potential U.S. income tax characterization of the Reorganization Notes and the potential consequences thereof.

If a U.S. Holder has "acquisition premium" with respect to the Reorganization Notes (i.e., if such U.S. Holder's adjusted tax basis immediately after the Exchange is greater than the Reorganization Notes' issue price, and

less than the Reorganization Notes' stated redemption price at maturity), the amount of OID that such U.S. Holder would include in gross income would be reduced to reflect the acquisition premium. This situation could arise if the Exchange is treated as a recapitalization for U.S. federal income tax purposes and a U.S. Holder acquired its Old Notes for an amount greater than the issue price of the Reorganization Notes.

The rules regarding OID are complex. A U.S. Holder should consult their own tax advisors regarding the consequences of OID, including the amount of OID that such U.S. Holder would include in gross income for a taxable year.

g.  Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging a portion of its Old Notes for constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is or is treated as acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with OID (as described above), its adjusted issue price, by at least a *de minimis* amount.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described below) of debts that it acquired with market discount will generally be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

If a U.S. Holder held Old Notes with "market discount," the rules described above under "— Issue Price" and "—Original Issue Discount" generally will result in OID (and not market discount) with respect to the portion of such discount attributable to the difference between the issue price of such Reorganization Notes the Reorganization Notes' stated redemption price at maturity. U.S. Holders should consult their own tax advisors to determine the U.S. federal income tax consequences of OID and market discount, if any, on their Reorganization Notes.

h.  Amortizable Bond Premium

If a U.S. Holder has an adjusted tax basis in its Reorganization Notes immediately after the Exchange which exceeds the stated principal amount of its Reorganization Notes, the U.S. Holder would be considered to have amortizable bond premium equal to such excess, and such U.S. Holder would not be required to include any OID in gross income in respect of the Reorganization Notes. In general, a U.S. Holder may elect to amortize this premium using a constant yield method over the term of the Reorganization Notes. However, special rules may apply in the case of notes, like the Reorganization Notes, that are subject to optional redemption, and, in the case of the Reorganization Notes, these rules are likely to cause no portion of the premium on the Reorganization Notes to be amortizable. U.S. Holders should consult their own tax advisor regarding the availability of an election to amortize bond premium for U.S. federal income tax purposes.

i.  Sale, Exchange, or Other Taxable Disposition of Reorganization Notes

Unless a non-recognition provision applies and subject to the discussion above with respect to market discount, upon the sale, exchange or other taxable disposition of its Reorganization Notes, a U.S. Holder will generally recognize taxable gain or loss equal to the difference between the amount realized on the disposition (except amounts attributable to accrued but unpaid interest on Reorganization Notes, which amounts will be treated as ordinary interest income to the extent not previously included in the U.S. Holder's income) and the U.S. Holder's adjusted tax basis in

the Reorganization Notes immediately before the disposition. The adjusted tax basis of the Reorganization Notes generally will equal the U.S. Holder's initial tax basis in the Reorganization Notes calculated as described above, increased by any market discount and OID includible in income by the U.S. Holder with respect to the Reorganization Notes, and reduced by any premium amortized by such U.S. Holder with respect to the Reorganization Notes. For these purposes, the amount realized does not include amounts attributable to accrued interest. Except to the extent of any accrued market discount on the Reorganization Notes not previously included in income by the U.S. Holder, with respect to which any gain will be treated as ordinary income, gain or loss realized on the sale, exchange or other taxable disposition of a Reorganization Note will generally be capital gain or loss and will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition the Reorganization Note has been held by the U.S. Holder for more than one (1) year. Certain noncorporate U.S. Holders (including individuals) are eligible for reduced rates of taxation on long-term capital gains under current law. There are limitations on the deductibility of capital losses.

2. **Consequences to U.S. Holders of USA Holdco LLC Units**

   a. Receipt and Ownership of USA Holdco LLC Units

   Pursuant to the Plan, in addition to the Reorganization Notes, each U.S. Holder of an Allowed 7.5% Notes due 2025 Secured Claim shall receive such U.S. Holder's Pro Rata Share of the USA Holdco LLC Units from USA Holdco. On the Plan Effective Date, USA Holdco shall issue the USA Holdco LLC Units to the holders of the 7.5% Notes due 2025 Claims in exchange for the 7.5% Notes due 2025 Claims contributed by such holders to USA Holdco. USA Holdco LLC is expected to be taxable as a partnership for U.S. federal income tax purposes. As such, items of income, gain, loss, and deduction of USA Holdco LLC will be allocated to U.S. Holders of the USA Holdco LLC Units. Each item generally will have the same character as if the U.S. Holder had realized the item directly. U.S. Holders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from USA Holdco LLC for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from USA Holdco LLC. USA Holdco LLC's assets will consist of the equity interests in Chile Holdco and the Chile Holdco Bonds issued by Chile Holdco, both of which are expected to be disregarded for U.S. federal income tax purposes. Chile Holdco's sole asset will be the Reorganized Gildemeister Common Stock.

   A U.S. Holder is allowed to deduct its allocable share of USA Holdco LLC's losses (if any) only to the extent of such U.S. Holder's adjusted tax basis (discussed below) in the USA Holdco LLC Units at the end of the taxable year in which the losses occur. In addition, various other limitations in the IRC may significantly limit a U.S. Holder's ability to deduct its allocable share of deductions and losses of USA Holdco LLC against other income.

   USA Holdco LLC intends to provide each U.S. Holder with the necessary information to report its allocable share of USA Holdco LLC's tax items for U.S. federal income tax purposes. However, no assurance can be given that USA Holdco LLC will be able to provide such information prior to the initial due date of the U.S. Holder's U.S. federal income tax return and U.S. Holders may therefore be required to apply to the IRS for an extension of time to file their tax returns.

   USA Holdco LLC will determine how items will be reported on USA Holdco LLC's U.S. federal income tax returns in accordance with the New Organizational Documents, and all U.S. Holders of USA Holdco LLC Units will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that USA Holdco LLC's income tax returns are audited by the IRS, the tax treatment of USA Holdco LLC's income, gain, loss, and deductions generally will be determined at the level of USA Holdco LLC in a single proceeding, rather than in individual audits of U.S. Holders of USA Holdco LLC Units. USA Holdco LLC's "partnership representative" will have considerable authority under the IRC and the USA Holdco LLC Agreement to make decisions affecting the tax treatment and procedural rights of the U.S. Holders of USA Holdco LLC Units.

   Application of U.S. Controlled Foreign Corporation Rules

   Reorganized Gildemeister is expected to be treated as a controlled foreign corporation ("CFC") for U.S. federal income tax purposes. A U.S. Holder that indirectly owns stock of Reorganized Gildemeister through USA Holdco LLC, a domestic partnership, will be required to include income pursuant to the "global intangible low-taxed income" rules of the Code, as applicable, with respect to its investment in the CFC if such U.S. Holder owns or is

treated as owning (directly, indirectly or by attribution) 10% or more the CFC's stock by vote or value (such U.S. Holder, a "United States Shareholder").

Additionally, any U.S. Holder that indirectly owns stock of a CFC, including Reorganized Gildemeister, through a domestic partnership, will be required to include income under Subpart F of the Code with respect to its investment in such CFC. However, at the election of USA Holdco LLC, under proposed regulations, this rule does not apply, and such a U.S. Holder that indirectly owns stock of a CFC through a domestic partnership will be required to include income under Subpart F of the Code, as applicable, with respect to its investment in the CFC only if such U.S. Holder is a United States Shareholder of the CFC, provided that each such United States Shareholder and USA Holdco consistently apply this rule to all CFCs owned by USA Holdco LLC and any other partnerships related to USA Holdco LLC. There is no guarantee that these proposed regulations will be adopted in final form, or that they will not be modified or rescinded after the date hereof. U.S. Holders should consult their own tax advisors regarding the tax consequences of an investment in a CFC and the application of these proposed regulations to their investment in USA Holdco LLC.

In the event that USA Holdco LLC disposes, or is deemed to dispose, of any equity interests it owns in Reorganized Gildemeister, under special rules, a portion of the gains from sale may be recharacterized as a taxable dividend from Reorganized Gildemeister to USA Holdco LLC, rather than as capital gains. To the extent of any gain that is treated as a dividend under such rules, a U.S. Holder that is a domestic corporation and a United States Shareholder as described above with respect to Reorganized Gildemeister may be eligible for an exemption from taxable income with respect to its allocable share of such dividend.

<u>Application of U.S. Passive Foreign Investment Company Rules</u>

Special U.S. tax rules apply to companies that are considered to be passive foreign investment companies ("PFICs"). Reorganized Gildemeister will be classified as a PFIC in a particular taxable year if either

• 75 percent or more of its gross income for the taxable year is passive income; or

• the average percentage of the value of its assets that produce or are held for the production of passive income is at least 50 percent.

Although it is not currently anticipated that Reorganized Gildemeister will be classified as a PFIC or will become a PFIC in the foreseeable future, the determination whether the company is a PFIC must be made annually based on the facts and circumstances at that time. Accordingly, it is not certain that Reorganized Gildemeister will be a PFIC in the current year or in future years. If Reorganized Gildemeister is classified as a PFIC, and a U.S. Holder of USA Holdco LLC Units does not make one of the elections provided for under U.S. tax law (the availability of which is uncertain at this time), a U.S. Holder will be subject to a special tax at ordinary income tax rates on "excess distributions," including certain distributions by Reorganized Gildemeister and gain that a U.S. Holder is treated as recognizing on the sale of Reorganized Gildemeister shares. The amount of income tax on any excess distributions will be increased by an interest charge to compensate for tax deferral, calculated as if the excess distributions were earned ratably over the period a U.S. Holder is treated as owning its shares in Reorganized Gildemeister. U.S. Holders should consult their own tax advisors regarding the tax consequences of an investment in a PFIC.

b.    Distributions with Respect to USA Holdco LLC Units

A U.S. Holder of USA Holdco LLC Units generally will not recognize gain or loss on the receipt of a distribution of cash or property from USA Holdco LLC, provided that such U.S. Holder is not treated as exchanging such U.S. Holder's share of USA Holdco LLC's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the IRC, and together, "ordinary income items") for other partnership property. A U.S. Holder, however, will recognize gain on the receipt of a distribution of cash and, in some cases, marketable securities, from USA Holdco LLC (including any constructive distribution of money resulting from a reduction of the U.S. Holder's share of USA Holdco LLC's indebtedness) to the extent such distribution or the fair market value of such marketable securities distributed exceeds such U.S. Holder's adjusted tax basis in the USA Holdco LLC Units. Such distribution would be treated as gain from the sale or exchange of the USA Holdco LLC Units, which is described below.

A U.S. Holder's adjusted tax basis in the USA Holdco LLC Units generally will be equal to such U.S. Holder's initial tax basis, increased by the sum of (a) any additional capital contribution such U.S. Holder makes to USA Holdco LLC; (b) the U.S. Holder's allocable share of the income of USA Holdco LLC; and (c) increases in the U.S. Holder's allocable share of USA Holdco LLC's indebtedness, and reduced, but not below zero, by the sum of (a) the U.S. Holder's allocable share of USA Holdco LLC's losses, and (b) the amount of money or the adjusted tax basis of property distributed to such U.S. Holder, including constructive distributions of cash resulting from reductions in such U.S. Holder's allocable share of USA Holdco LLC's indebtedness.

c.    Sale, Exchange, or Other Taxable Disposition of USA Holdco LLC Units

A sale of all or part of the USA Holdco LLC Units will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such U.S. Holder's adjusted tax basis for the USA Holdco LLC Units disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the USA Holdco LLC Units have been held for more than one year, except to the extent (a) that the proceeds of the sale are attributable to a U.S. Holder's allocable share of certain of USA Holdco LLC's ordinary income items (including any amount that would have been recharacterized as a deemed dividend had USA Holdco LLC directly sold such U.S. Holder's indirect interest in Reorganized Gildemeister) and such proceeds exceed the Holder's adjusted tax basis attributable to such ordinary income items and (b) of previously allowed bad debt or ordinary loss deductions. A U.S. Holder's ability to deduct any loss recognized on the sale of the USA Holdco LLC Units will depend on the U.S. Holder's own circumstances and may be restricted under the IRC.

**3.    Withholding and Reporting**

The Trustee and Paying Agent will withhold all amounts required by law to be withheld from payments of interest. The Trustee and Paying Agent will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a U.S. Holder of a claim. Additionally, backup withholding, currently at a rate of 24%, will generally apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such U.S. Holder's U.S. federal income tax liability and may entitle such U.S. Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF CHILEAN AND U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-CHILEAN OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XV.    SOLICITATION AND VOTING PROCEDURES

### A.    The Solicitation Package

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims entitled to vote to accept or reject the Plan:

- the appropriate Ballots or Master Ballots[18] and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

- a paper copy or in ".pdf" format on a CD-ROM, at the Debtors' discretion, containing this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

Holders of Claims in Classes 4 and 5 shall be served with physical copies and by electronic mail, if available, of the Solicitation Package. **Any party who desires additional or paper copies of these documents may request copies from the Balloting Agent by (i) writing to Gildemeister Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (ii) by calling U.S. Toll Free: (877) 328-3687 or International Toll: (347) 532-5859; or (iii) by emailing gildemeisterballots@primeclerk.com**.

Prior to the Confirmation Hearing, the Debtors intend to file the Plan Supplement. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by: (i) calling U.S. Toll Free: (877) 328-3687 or International Toll: +1 (347) 532-5859; (ii) visiting the Debtors' restructuring website, http://cases.primeclerk.com/gildemeister; (iii) emailing gildemeisterballots@primeclerk.com; and/or (iv) writing to Gildemeister Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

### B.    Voting Deadline

The period during which Ballots and Master Ballots with respect to the Plan will be accepted by the Debtors will terminate at 5 p.m. (Prevailing Eastern Time) on May 7, 2021. Except to the extent the Debtors so determine, or as permitted by the Bankruptcy Court, Ballots and Master Ballots that are received after the Voting Deadline may not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the right at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots and Master Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

### C.    Voting Instructions

Only the Holders of Claims in Classes 4 and 5 as of the Voting Record Date are entitled to vote to accept or reject the Plan. Beneficial Owners of the Debtors' Secured Notes who hold their position through a nominee (the "Nominee") will receive Ballots from Nominees, and such Beneficial Owners will be instructed to comply with the return instructions provided by the Nominee. It is important to follow the specific instructions provided on each Ballot

---

[18]    In accordance with customary practice, the Master Ballot(s) will be served approximately seven (7) days after the initial distribution of the Solicitation Packages.

or Master Ballot, as applicable.  Master Ballots should be sent to the Balloting Agent on or before the Voting Deadline as indicated below.

The Debtors are providing the Solicitation Package to Holders of Claims in Classes Classes 4 and 5 and their Nominees whose names appear as of the Voting Record Date in the records maintained by the Depository Trust Company.

The Debtors have engaged Prime Clerk as the Balloting Agent to assist in the balloting and tabulation process. The Balloting Agent will process and tabulate Ballots and Master Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Petition Date, which Voting Report may be supplemented after being filed.

The deadline by which the Balloting Agent must receive your Nominee's Master Ballot is 5:00 p.m. (prevailing Eastern Time) on May 7, 2021.

**Any Ballot or Master Ballot that is properly executed, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**All Ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each Ballot.  All Ballots and Master Ballots must be properly executed, completed and delivered to the Balloting Agent, <u>so as to be actually received on or before the Voting Deadline</u> by using the envelope provided, or by delivery as follows:**

| BALLOTS AND MASTER BALLOTS |
| --- |
| **If sent in the envelope provided or otherwise by <u>First Class Mail, Overnight Courier or Hand Delivery</u>:**<br><br>Gildemeister Ballot Processing<br>c/o Prime Clerk LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440 |
| **If sent by <u>Electronic Mail</u>:**<br><br>gildemeisterballots@primeclerk.com<br><br>**<u>If you choose electronic mail as your return method, you should NOT return the original hard copy as well.</u>** |

*(i)      Note to Holders of Claims in Classes 4 and 5.*

(a)      Certification.

By signing and returning a Ballot or Master Ballot, each Holder of a Claim in Classes 4 and 5 a will be certifying to the Bankruptcy Court and the Debtors that, among other things:

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

- the Holder has cast the same vote with respect to all Claims in Classes 4 and 5; and

- no other Ballots or Master Ballots with respect to the same Claim have been cast, or, if any other Ballots or Master Ballots have been cast with respect to such Claim, then any such Ballots or Master Ballots are thereby revoked, in accordance with the procedures set forth herein.

(b)     Beneficial Owners.

Any Beneficial Owner holding a Claim in Classes 4 and 5 as of the Voting Record Date may vote on the Plan by one of the following two methods (as selected by such Beneficial Owner's Nominee):

- Complete and sign the enclosed Ballot.  Return the Ballot to the Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return it to the Balloting Agent on a Master Ballot by the Voting Deadline.  If no self-addressed, postage pre-paid envelope was enclosed for this purpose, the Nominee must be contacted for instructions.  If it is your custom to communicate with your Nominee by other means such as email, facsimile, internet or telephone, then your Nominee may accept your voting instructions by such means.

- Complete and sign the pre-validated Ballot (as described below) provided to the Holder by the Nominee.  The Holder will then return the pre-validated Ballot to the Balloting Agent by the Voting Deadline using the enclosed self-addressed, postage pre-paid envelope.

Any Ballot returned to a Nominee by a Beneficial Owner described in this section will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Balloting Agent that Ballot (properly validated) or a Master Ballot that reflects the vote of such Beneficial Owner.

If any Beneficial Owner holds Claims through more than one Nominee, such Beneficial Owner should execute a separate Ballot for each Nominee and complete Item 4 of each Ballot.  The Balloting Agent may validate the Ballot with the Nominees and by voting, the Beneficial Owner directs the Nominees to provide any information requested to make such validation.

(c)     Releases.

Each Ballot provides that if the Holder returns a Ballot and votes to accept the Plan for any class of Claims for which such Holder is eligible to vote they will be deemed as of the Plan Effective Date, to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged all Claims and all causes of action (as set forth in the Plan) against the Released Parties.  Additionally, each Ballot provides that if the Holder returns a Ballot for any Class of Claims for which such Holder is eligible to vote and votes to reject the Plan or abstains from voting on the Plan and does not affirmatively opt out of the release provisions of Section 8.4 of the Plan, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged all Claims and all causes of action (as set forth in the Plan) against the Released Parties.

(d)     Nominees.

A Nominee that on the Voting Record Date is the record Holder in "street name" of Claims for a Beneficial Owner should obtain the vote of such Beneficial Owner of such Claims.

(i)     Pre-validated Ballots.

A Nominee may pre-validate a Ballot by: (a) signing the Ballot and providing the Nominee's DTC Participant Number in Item 7 of the Ballot; (b) indicating the Beneficial Owner's account number and the amount of Senior Secured Notes that the Nominee holds in respect of such Beneficial Owner in Item 1 of the Ballot; and (c) forwarding such Ballot together with the Solicitation Package and other materials requested to be forwarded, to such Beneficial Owner for voting.  The Beneficial Owner must then review and complete the information requested in the Ballot, and return the Ballot directly to the Balloting Agent in the pre-addressed, postage pre-paid envelope (or as otherwise noted above) so that it is received by the Balloting Agent before the Voting Deadline.  A list of the Beneficial Owners to

98

whom "pre-validated" Ballots were delivered should be maintained by the Nominee for inspection for at least one year from the Plan Effective Date.

(ii)     Master Ballots.

A Nominee may obtain the votes of Beneficial Owners by forwarding to the Beneficial Owners the unsigned Ballots, together with the Disclosure Statement, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Beneficial Owner must then indicate its vote on the Ballot, review and complete the information requested in the Ballot, execute the Ballot, and return the Ballot to the Nominee, or, according to the customary practices of the parties, a Beneficial Owner may communicate voting instructions to the Nominee by other means, such as email, facsimile, internet or telephone.  After collecting the Ballots or voting instructions, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Ballot, execute the Master Ballot and deliver the Master Ballot to the Balloting Agent so that it is received by the Balloting Agent before the Voting Deadline.  All Ballots and evidence of voting instructions returned by Beneficial Owners should be retained by Nominees for a period of one year after the Plan Effective Date and should be produced upon written request of the Debtors or by order of the Bankruptcy Court.

**Each Nominee should advise its Beneficial Owners to return their Ballots or voting instructions to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Balloting Agent so that it is received by the Balloting Agent before the Voting Deadline.**

**D.      Voting Tabulation**

The Ballot and/or Master Ballot do not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim or Interest.  Only Holders of Claims in the voting Class shall be entitled to vote with regard to such Claims.

Unless the Debtors decide otherwise, Ballots and Master Ballots received after the Voting Deadline may not be counted.  Except as otherwise provided in the solicitation procedures, a Ballot or Master Ballot will be deemed delivered only when the Balloting Agent actually receives the executed Ballot or Master Ballot as instructed in the Voting Instructions.  No Ballot or Master Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent) or the Debtors' financial or legal advisors.  The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan and the RSA regarding modifications).  The Bankruptcy Code may require the Debtors to disseminate additional Solicitation Packages if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Plan Confirmation.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.  To the extent there are multiple Claims within Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

**The following additional procedures shall apply with respect to tabulating Master Ballots:**

- votes cast by holders of public securities through Nominees will be applied to the applicable positions held by such Nominees as of the Voting Record Date, as evidenced by the record and depository listings.  Votes submitted by a Nominee shall not be counted in excess of the amount of public securities held by such Nominee as of the Voting Record Date;

- if conflicting votes or "over-votes" are submitted by a Nominee, the Balloting Agent shall use reasonable efforts to reconcile discrepancies with the Nominee;

- if over-votes are submitted by a Nominee that are not reconciled prior to the

preparation of the certification of vote results, the votes to accept and to reject the Plan shall be approved in the same proportion as the votes to accept and to reject the Plan submitted by the Nominee, but only to the extent of the Nominee's Voting Record Date position in the public securities;

- for the purposes of tabulating votes, each Beneficial Owner shall be deemed (regardless of whether such holder includes interest in the amount voted on its Ballot) to have voted only the principal amount of its public securities; any principal amounts thus voted may be thereafter adjusted by the Balloting Agent, on a proportionate basis with a view to the amount of securities actually voted, to reflect the corresponding claim amount, including any accrued but unpaid prepetition interest, with respect to the securities thus voted; and

- the following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder; (b) any Ballot cast by a Person or Entity that does not hold a Claim that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; (e) any Ballot received after the Voting Deadline, unless otherwise determined by the Debtors; and (f) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan.

The Balloting Agent will file with the Bankruptcy Court, as soon as practicable after the Petition Date, the Voting Report prepared by the Balloting Agent; provided, however, that the Balloting Agent will file a supplemental Voting Report after the Voting Deadline, if necessary.  The Voting Report shall, among other things, delineate every Ballot or Master Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each, an "Irregular Ballot"), including, but not limited to, those Ballots or Master Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information or damaged.  The Balloting Agent will attempt to reconcile the amount of any Claim reported on a Ballot or Master Ballot with the records of the applicable Nominee, if applicable, or in the alternative with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Balloting Agent, the amount shown in the records of the Nominee, if applicable, or the Debtors' records shall govern.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots or Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## XVI.     RECOMMENDATION

The Debtors believe the Plan is in the best interest of all creditors and urge the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots and Master Ballots so they will be received by the Balloting Agent no later than May 7, 2021.

Dated:  April 14, 2021

Respectfully submitted,

Automotores Gildemeister SpA
(on behalf of itself and each of the Debtors)

By:/s/ *Eduardo Moyano*
    Name: Eduardo Moyano
    Title: Chief Financial Officer

Prepared by:

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
1 Liberty Plaza
New York, New York 10006

Telephone:     (212) 225-2000
Facsimile:     (212) 225-3999

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

# EXHIBIT A

## Plan of Reorganization

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AUTOMOTORES GILDEMEISTER SPA, *et al.*, | ) | Case No. 21-[____] ([____]) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

---

## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

---

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Adam Brenneman
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel to the Debtors and Debtors-in-Possession*

Dated: April 9, 2021

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
    GOVERNING LAW, AND OTHER REFERENCES .................................................................. 1

    1.1    Defined Terms ................................................................................................................... 1
    1.2    Rules of Interpretation ................................................................................................... 14
    1.3    Computation of Time ..................................................................................................... 14
    1.4    Governing Law ............................................................................................................... 14
    1.5    Reference to Monetary Figures ..................................................................................... 15
    1.6    Reference to the Debtors or the Reorganized Debtors ............................................... 15

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS ........................................................ 15

    2.1    Administrative Claims ................................................................................................... 15
    2.2    DIP Claims ...................................................................................................................... 15
    2.3    Professional Claims ....................................................................................................... 15
    2.4    Priority Tax Claims ........................................................................................................ 16
    2.5    Costs and Expenses of Ad Hoc Group Advisors .......................................................... 16

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS .................. 16

    3.1    Classification of Claims and Interests ......................................................................... 16
    3.2    Treatment of Classes of Claims and Interests ............................................................ 17
    3.3    Special Provision Governing Unimpaired Claims ...................................................... 20

ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN .......................................... 21

    4.1    General Settlement of Claims ....................................................................................... 21
    4.2    Subordination ................................................................................................................. 21
    4.3    Sources of Cash for Plan Distributions ....................................................................... 21
    4.4    Exit Financing. ................................................................................................................ 21
    4.5    Issuance of the New Notes; Substitute Consideration for Non-Qualified Holders ...... 21
    4.6    Chile Holdco .................................................................................................................... 22
    4.7    USA Holdco .................................................................................................................... 23
    4.8    Amendment of Pledges .................................................................................................. 24
    4.9    Vesting of Assets in the Reorganized Debtors ............................................................ 24
    4.10   Discharge from Notes, Instruments, Certificates, and Other Documents .................... 24
    4.11   Execution of Plan Documents ...................................................................................... 24
    4.12   Corporate Action ........................................................................................................... 24
    4.13   New Corporate Governance Documents ..................................................................... 24
    4.14   Effectuating Documents; Further Transactions ......................................................... 25
    4.15   Section 1146(a) Exemption ........................................................................................... 25
    4.16   Managers, Directors and Officers ............................................................................... 25
    4.17   Incentive Plans and Employee and Retiree Benefits .................................................. 25
    4.18   Preservation of Rights of Action ................................................................................. 26

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................. 26

    5.1    Assumption of Executory Contracts and Unexpired Leases ....................................... 26
    5.2    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ............... 27
    5.3    Pre-Existing Payment and Other Obligations ............................................................ 27
    5.4    Rejection Damages Claims and Objections to Rejections ........................................... 28
    5.5    Contracts and Leases Entered Into After the Petition Date ....................................... 28
    5.6    Reservation of Rights .................................................................................................... 28

2

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ............................................................. 28

6.1    Distributions on Account of Claims Allowed as of the Plan Effective Date................................. 28
6.2    Special Rules for Distributions to Holders of Disputed Claims............................................... 28
6.3    Disbursing Agent ............................................................................................................ 29
6.4    Distribution of USA Holdco LLC Units. ............................................................................. 29
6.5    Distributions of New Notes on Account of Allowed 7.5% Notes due 2025 Secured
       Claims and Allowed Unsecured Notes and Related Party Claims. ........................................... 30
6.6    Book Entry Transfer: ATOP .............................................................................................. 31
6.7    Letter of Transmittal ........................................................................................................ 32
6.8    Delivery of Distributions and Undeliverable or Unclaimed Distributions................................ 32
6.9    Claims Paid or Payable by Third Parties .............................................................................. 34
6.10   Setoffs .......................................................................................................................... 34
6.11   Allocation Between Principal and Accrued Interest ............................................................... 35

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS........................................... 35

7.1    Disputed Claims .............................................................................................................. 35
7.2    Resolution of Disputed Claims .......................................................................................... 35
7.3    Estimation of Claims ........................................................................................................ 35
7.4    No Interest ..................................................................................................................... 36
7.5    No Distributions Pending Allowance ................................................................................... 36
7.6    Disallowance of Claims and Interests .................................................................................. 36

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN ...................................................... 36

8.1    Compromise and Settlement of Claims, Interests, and Controversies ....................................... 36
8.2    Discharge of Claims and Termination of Interests.................................................................. 36
8.3    Releases by the Debtors .................................................................................................... 37
8.4    Releases by Releasing Parties ............................................................................................ 38
8.5    Exculpation .................................................................................................................... 39
8.6    Injunction ...................................................................................................................... 39
8.7    Protection Against Discriminatory Treatment ....................................................................... 39
8.8    Indemnification ............................................................................................................... 40
8.9    Recoupment ................................................................................................................... 40
8.10   Release of Liens .............................................................................................................. 40
8.11   Reimbursement or Contribution ......................................................................................... 41

ARTICLE IX CONDITIONS PRECEDENT TO THE PLAN EFFECTIVE DATE ............................... 41

9.1    Conditions Precedent to the Plan Effective Date. .................................................................. 41
9.2    Waiver of Conditions Precedent ......................................................................................... 43
9.3    Effect of Non-Occurrence of Conditions to Consummation .................................................... 43

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...................... 43

10.1   Modification of Plan ........................................................................................................ 43
10.2   Revocation or Withdrawal of Plan ...................................................................................... 43
10.3   Confirmation of the Plan ................................................................................................... 43

ARTICLE XI RETENTION OF JURISDICTION .......................................................................... 44

11.1   Jurisdiction .................................................................................................................... 44

ARTICLE XII MISCELLANEOUS PROVISIONS ........................................................................ 45

    12.1    Additional Documents ............................................................................. 45
    12.2    Payment of Statutory Fees ....................................................................... 45
    12.3    Reservation of Rights .............................................................................. 46
    12.4    Elimination of Vacant Classes ................................................................ 46
    12.5    Successors and Assigns ............................................................................ 46
    12.6    Service of Documents .............................................................................. 46
    12.7    Term of Injunctions or Stays .................................................................. 47
    12.8    Entire Agreement ..................................................................................... 47
    12.9    Plan Supplement Exhibits ........................................................................ 47
    12.10   Non-Severability ..................................................................................... 47

**INTRODUCTION**

Automotores Gildemeister SpA and its Debtor affiliates in the above-captioned chapter 11 cases jointly propose this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of claims and interests set forth in ARTICLE III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan contemplates no substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, properties and operations, projections, risk factors, a summary and analysis of this Plan and certain related matters.

**ARTICLE I**

**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME, GOVERNING LAW, AND OTHER REFERENCES**

1.1     **Defined Terms**

1.     "*2021 7.5% Notes Indenture*" means that certain indenture dated as of February 24, 2016, by and among Gildemeister, the guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent and Lord Securities Corporation, as Collateral Agent, as amended and supplemented and in effect from time to time.

2.     "*2021 8.25% Notes Indenture*" means that certain indenture dated as of May 24, 2011, by and among Gildemeister, the guarantors party thereto, Deutsche Bank Trust Company Americas, as Trustee, Registrar, Paying Agent and Transfer Agent and Deutsche Bank Luxembourg S.A., as Luxembourg Listing Agent, Paying Agent, Registrar and Transfer Agent, as amended and supplemented and in effect from time to time.

3.     "*2023 Notes Indenture*" means that certain indenture dated as of January 15, 2013, by and among Gildemeister, the guarantors party thereto, Deutsche Bank Trust Company Americas, as Trustee, Registrar, Paying Agent and Transfer Agent and Deutsche Bank Luxembourg S.A., as Luxembourg Listing Agent, Paying Agent, Registrar and Transfer Agent, as amended and supplemented and in effect from time to time.

4.     "*2025 Notes Indenture*" means that certain indenture by and among the Company, the Guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Paying Agent, and Transfer Agent, and TMP Group New York, LLC, as Collateral Agent, dated as of November 7, 2019, as amended or supplemented from time to time.

5.     "*6.75% Notes due 2023*" means the unsecured notes issued by Gildemeister pursuant to the 2023 Notes Indenture.

6.     "*6.75% Notes due 2023 Claims*" means any Claim evidenced by or arising under or on account of the 6.75% Notes due 2023 or the 2023 Notes Indenture.

7.     "*7.5% Notes due 2021*" means the unsecured notes issued by Gildemeister pursuant to the 2021 7.5% Notes Indenture.

8.     "*7.5% Notes due 2021 Claims*" means any Claim evidenced by or arising under or on account of the 7.5% Notes due 2021 or the 2021 7.5% Notes Indenture.

9.     "*7.5% Notes due 2025*" means the secured notes issued by Gildemeister pursuant to the 2025 Notes Indenture.

10.     "*7.5% Notes due 2025 Claims*" means (a) the 7.5% Notes due 2025 Secured Claims, and (b) the 7.5% Notes due 2025 Unsecured Deficiency Claims.

11. "*7.5% Notes due 2025 Secured Claims*" means the Secured portion of any Claim evidenced by or arising under or on account of the 7.5% Notes due 2025 or the 2025 Notes Indenture, including any guaranty obligations of the Guarantors with respect to any of the foregoing.

12. "*7.5% Notes due 2025 Unsecured Deficiency Claims*" means the unsecured portion of any Claim against any of the Debtors evidenced by or arising under or on account of the 7.5% Notes due 2025 or the 2025 Notes Indenture, including any guaranty obligations of the Guarantors with respect to any of the foregoing.

13. "*8.25% Notes due 2021*" means the unsecured notes issued by Gildemeister pursuant to the 2021 8.25% Notes Indenture.

14. "*8.25% Notes due 2021 Claims*" means any Claim arising on account of the 8.25% Notes due 2021 or the 2021 8.25% Notes Indenture.

15. "*Ad Hoc Group of Consenting Noteholders*" means that certain ad hoc group of Consenting Noteholders party to the Restructuring Support Agreement and represented by Dechert LLP.

16. "*Ad Hoc Group Advisors*" means, collectively, the professional advisors to the Ad Hoc Group of Consenting Noteholders, including, without limitation, Dechert LLP, Prieto Abogados, Pinheiro Neto, Hernández y Cía, Ferrere Abogados, and Link Capital Partners SpA.

17. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date to preserve the Estates and operate the Debtors' businesses; (b) Allowed Professional Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (d) DIP Claims.

18. "*Affiliate*" shall have the meaning ascribed to it in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

19. "*Agreement Effective Date*" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

20. "*Allowed*" means, with respect to any Claim or Interest: (a) a Claim or Interest (i) as to which no objection has been filed and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable bar date, if any, or (ii) that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; or (b) a Claim or Interest that is allowed (i) pursuant to the Plan, (ii) in any stipulation that is entered into with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld) and approved by the Bankruptcy Court, (iii) by Final Order of the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

21. "*ATOP*" means DTC's Automated Tender Offer Program.

22. "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

23.      "*Ballot*" means the form or forms distributed to certain Holders of Claims that are entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan.

24.      "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

25.      "*Bankruptcy Court*" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

26.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure.

27.      "*Book Entry Confirmation*" shall have the meaning given such term in Section 6.6 of the Plan.

28.      "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

29.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

30.      "*Cash-Out Distribution*" shall have the meaning given such term in Section 3.2 of the Plan.

31.      "*Cash-Out Electing Holder*" shall have the meaning given such term in Section 3.2 of the Plan.

32.      "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

33.      "*Chapter 11 Cases*" means the Debtors' voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

34.      "*Chile*" means the Republic of Chile.

35.      "*Chile Holdco*" has the meaning provided in Section 4.6 of the Plan.

36.      "*Chile Holdco Bonds*" has the meaning provided in Section 4.6 of the Plan.

37.      "*Chile Holdco Securities*" has the meaning provided in Section 4.6 of the Plan.

38.      "*Chile Holdco Stock*" has the meaning provided in Section 4.6 of the Plan.

39.      "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

40.      "*Claims and Solicitation Agent*" means the claims, noticing, and/or solicitation agent the Debtors may retain in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court.

41.      "*Class*" means a category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

42.    "*Company Parties*" means Gildemeister, each of the Guarantors, and all other direct and indirect subsidiaries of Gildemeister that have executed the RSA.

43.    "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

44.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

45.    "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

46.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

47.    "*Consenting Noteholders*" means the holders of 7.5% Notes due 2025 that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement (as defined in the RSA) to counsel to the Company Parties from time to time agreeing to be bound thereby.

48.    "*Consummation*" means the occurrence of the Plan Effective Date.

49.    "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

50.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default which is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

51.    "*Customs Claims*" means any Claim or Cause of Action assertable against Automotores Gildemeister Peru S.A., any Debtor, or any Related Party of any Debtor or Automotores Gildemeister Peru S.A., arising out of, or relating to the importation of certain H1 vehicles into Peru not in compliance with applicable law.

52.    "*Debtors*" means, collectively, each of the following: Gildemeister; AG Créditos SpA.; Marc Leasing, S.A.; Fonedar S.A.; Camur S.A.; Lodinem S.A.; Carmeister S.A.; Maquinaria Nacional S.A.; RTC S.A.; Fortaleza S.A.; Maquinarias Gildemeister S.A.; Comercial Gildemeister S.A.; Bramont Montadora Industrial e Comercial de Vehiculos S.A.

53.    "*Definitive Documents*" means the definitive documents governing the Restructuring, including, without limitation, the Plan, the Disclosure Statement and any motion seeking approval thereof, the Solicitation Materials and any motion seeking approval thereof, the DIP Credit Agreement, the DIP Orders and any motion seeking entry thereof, the Confirmation Order, the New Notes Documents, the Plan Supplement, and the corporate governance documents for Chile Holdco, USA Holdco, Reorganized Gildemeister, and the other Debtors. The Definitive Documents and any modifications thereto will be consistent with the Plan Term Sheet in all material respects and otherwise in form and substance acceptable to the Debtors and the Required Consenting Noteholders (in the sole and absolute discretion of the Required Consenting Noteholders subject to the rights of the DIP Lenders (in respect of the New Senior Tranche Secured Notes) in each case, as set forth in the Restructuring Support Agreement. The Plan Supplement shall include the corporate governance documents of USA Holdco, Chile Holdco, and Reorganized Gildemeister.

54.    "*DIP Agent*" means SRS Acquiom in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

55.    "*DIP Claims*" means all Claims arising under, derived from, based upon, or secured pursuant to the DIP Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, DIP Expenses, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

56.     "*DIP Credit Agreement*" means that certain Post-Petition Credit Agreement dated as of [●], as at any time amended, modified or supplemented in accordance with the terms therein, by and among Gildemeister, the other Debtors, the DIP Guarantors, and the DIP Lenders, approved by the DIP Orders.

57.     "*DIP Credit Facility*" means the credit facility provided to the Debtors by the DIP Lenders in accordance with the DIP Orders.

58.     "*DIP Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of (a) the DIP Lenders and their respective affiliates in any way related to the Debtors or the Restructuring including, without limitation, any such fees and expenses relating to the DIP Lenders' and their respective affiliates' holdings of the 7.5% Notes due 2025, any fees and expenses of any of their advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, the DIP Credit Facility, and the transactions contemplated thereby, and (b) the DIP Agent and the collateral agent under the DIP Credit Facility.

59.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

60.     "*DIP Orders*" means, together, the Interim DIP Order and the Final DIP Order.

61.     "*Disbursing Agent*" means the Reorganized Debtors or any Entity selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

62.     "*Disclosure Statement*" means the related disclosure statement with respect to the Plan as may be amended, supplemented, or modified from time to time.

63.     "*Disputed*" means a Claim or Interest, or any portion thereof, that (a) is not Allowed; (b) is not disallowed under the Plan, the Bankruptcy Code, as applicable, or a Final Order; (c) is the subject of an objection or request for estimation filed in the Bankruptcy Court and which objection or request for estimation has not been withdrawn or overruled by a Final Order of the Bankruptcy Court, or (d) is otherwise disputed by the Debtors or the Reorganized Debtors in accordance with applicable law, which dispute has not been withdrawn, resolved or overruled by a Final Order.

64.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors, on or after the Plan Effective Date, upon which the Debtors or their duly appointed Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

65.     "*Distribution Election Deadline*" means the date that is fourteen (14) days after the Distribution Record Date, which date shall be set forth in the Letter of Transmittal and be subject to extension with the consent of the Debtors and the Required Consenting Noteholders.

66.     "*Distribution Record Date*" means the earlier of (i) the date set by the Court in the Scheduling Order and (ii) the date that the Confirmation Order is entered by the Bankruptcy Court.  For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the applicable procedures of the DTC.

67.     "*DTC*" means the Depository Trust Company.

68.     "*Entity*" shall have the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

69.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

70.     "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in-court or out-of-court efforts to negotiate, enter into or implement the RSA, the Chapter 11 Cases, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the RSA, the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan, to the maximum extent permitted by law.

71.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) to the maximum extent permitted by law, each Consenting Noteholder, the Ad Hoc Group of Consenting Noteholders, and each member of the Ad Hoc Group of Consenting Noteholders; (d) to the maximum extent permitted by law, the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent; and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

72.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

73.     "*Existing Common Equity Interests*" means the common stock of Automotores Gildemeister S.p.A.

74.     "*Existing Equity Interest*" means an Interest in a Company Party existing as of the Agreement Effective Date of the RSA or created after the execution of the RSA and prior to the Plan Effective Date.

75.     "*Existing Preferred Equity Interests*" means the Preferred Stock in Automotores Gildemeister S.p.A, issued from time to time.

76.     "*Existing Series A Warrants*" means warrants exercisable for voting Existing Common Equity Interests in Automotores Gildemeister S.p.A, issued from time to time.

77.     "*Existing Series B Warrants*" means warrants exercisable for non-voting Existing Common Equity Interests in Automotores Gildemeister S.p.A, issued from time to time.

78.     "*Exit Financing Commitment*" means the commitment of the Exit Financing Parties to advance funds to the Debtors or Reorganized Debtors as applicable to pay all Cash-Out Distributions in accordance with the terms, and subject to the conditions, set forth in the Exit Financing Commitment Agreement.

79.     "*Exit Financing Commitment Agreement*" means that certain agreement dated [●], 2021 by and among the Exit Financing Parties and Gildemeister (on behalf of themselves, the other Debtors and the Reorganized Debtors), as amended and supplemented and in effect from time to time.

80.     "*Exit Financing Parties*" means the parties who are signatories to the Exit Financing Commitment Agreement.

81.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

82.     "*Final DIP Order*" means a final order by the Bankruptcy Court approving the Debtors' use of cash collateral, the DIP Credit Facility provided pursuant to the DIP Credit Agreement, and related relief.

83.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial,

reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

84.    "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, to be filed on or around the Petition Date and to be heard at the "first day" hearing.

85.    "*General Unsecured Claim*" means any Claim other than an Administrative Claim, an Other Priority Claim, a 7.5% Notes due 2025 Secured Claim, an Other Secured Claim, a Prepetition Bank Financing Claim, an Intercompany Claim, an Unsecured Notes Claim, or a Related Party Claim.

86.    "*Gildemeister*" means Automotores Gildemeister S.p.A. or any successor or assign, by merger, consolidation, or otherwise, prior to the Plan Effective Date.

87.    "*Governmental Unit*" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

88.    "*Guarantors*" means AG Créditos SpA., Marc Leasing, S.A., Fonedar S.A., Camur S.A., Lodinem S.A., Carmeister S.A., Maquinaria Nacional S.A. (Chile), RTC S.A., Fortaleza S.A., Maquinarias Gildemeister S.A., Comercial Gildemeister S.A., and Bramont Montadora Industrial e Comercial de Vehiculos S.A .

89.    "*Holder*" means an entity holding a Claim or Interest.

90.    "*Hyundai*" means Hyundai Motor Company.

91.    "*Hyundai Distributorship Agreements*" means Hyundai's existing distributorship agreements with Gildemeister and Automotores Gildemeister Peru S.A.

92.    "*Hyundai Letters*" means, collectively, (a) that certain letter agreement between Gildemeister and Hyundai dated as of March 22, 2021, and (b) that certain letter agreement between Automotores Gildemeister Peru S.A. and Hyundai dated as of March 22, 2021 which includes (i) Hyundai's agreement to extend the Hyundai Distributorship Agreements for two years from the Plan Effective Date and (ii) Hyundai's acknowledgement and agreement that, after the Plan Effective Date, certain financial creditors of Gildemeister will become the indirect shareholders of Gildemeister and a new chief executive officer for Gildemeister will be selected.

93.    "*Hyundai Undertaking Agreement*" means that certain Agreement for Undertaking and Release between Hyundai and Automotores Gildemeister Peru S.A. dated as of March 23, 2021 containing Hyundai's agreement allowing Automotores Gildemeister Peru S.A. to purchase up to 1854 EURO-4 H-1 vehicles from Hyundai with a discount rate of 30%.

94.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

95.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

96.    "*Intercompany Claim*" means a Claim held by a Debtor against a Debtor or an Affiliate of a Debtor.

97.    "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

98.     "*Interim DIP Order*" means an order by the Bankruptcy Court approving the Debtors' use of cash collateral, the credit facilities provided pursuant to the DIP Credit Agreement, and related relief on an interim basis.

99.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

100.    "*Joinder*" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as Exhibit B, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the Agreement Effective Date may become a Consenting Noteholder by executing such joinder agreement.

101.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

102.    "*Letter of Transmittal*" means a letter to be delivered by the beneficial Holder of 7.5% Notes due 2025 Secured Claims to either (i) its Nominee in accordance with the Book-Entry Confirmation procedure or (ii) directly to Disbursing Agent in which such Holder of 7.5% Notes due 2025 Secured Claims:  (a) certifies that it is either a Qualified Holder or a Non-Qualified Holder; (b) agrees to deliver its Senior Secured Notes through ATOP or as otherwise contemplated in Section 6.5 hereof; (c) provides its Plan Election; and (d) provides any additional certifications and representations as are consistent with the Plan.  The form of the Letter of Transmittal shall be included in the Plan Supplement.

103.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

104.    "***LLC Units Registration Information***" has the meaning given such term in Section 6.4 of the Plan.

105.    "*Minvest Loan Claim*" means a Claim evidenced by or arising under or on account of the Contrato de Cesion de Creditos dated as of March 26, 2021, between Automotores Motor Haus S.A., Lodinem S.A., and Minvest S.A. by which Automotores Motor Haus S.A. assigned its right to receive $1,643,500 from Lodinem S.A. to Minvest S.A. in satisfaction of a pre-existing debt to Minvest S.A. for the same amount.

106.    "*Net Cash Proceeds*" has the meaning given such term in Section 4.5 of the Plan.

107.    "*New Board*" means the board of directors (or similar governing bodies) of USA Holdco to be constituted as of the Plan Effective Date pursuant to Section 4.16 of the Plan, the identity of which directors shall be disclosed in the Plan Supplement.

108.    "*New Corporate Governance Documents*" means the form of the amended or restated articles of incorporation and bylaws, or other similar organizational and constituent documents, for each of USA Holdco, Chile Holdco, and the Reorganized Debtors, and which forms shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

109.    "*New Junior Tranche Secured Notes*" means the junior tranche of secured notes which shall be distributed to holders of Claims in Class 4 of the Plan as provided in Section 3.2(d) of the Plan and which shall have terms as described in Annex III to the Plan Term Sheet.

110.    "*New Notes*" means the New Secured Notes and the New Subordinated Notes.

111.    "*New Notes Documents*" means the New Secured Notes Documents and the New Subordinated Notes Documents.

112.    "*New Secured Notes*" means the New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes.

113.    "*New Secured Notes Documents*" means, collectively, the New Secured Notes, any indenture or other agreement governing the New Secured Notes, the New Secured Notes Intercreditor Agreement, the New Senior/Subordinated Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors and the Required Consenting Noteholders.

114.    "*New Secured Notes Intercreditor Agreement*" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the DIP Lenders by which the New Junior Tranche Secured Notes and all liens and guarantees related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the New Senior Tranche Secured Notes.

115.    "*New Senior Tranche Secured Notes*" means the senior tranche of secured notes which shall be distributed (a) to the DIP Lenders in exchange for and in an aggregate principal amount equal to their DIP Claims (other than Claims for DIP Expenses) to the extent such DIP Claims are not repaid in Cash on the Plan Effective Date, as provided in Section 2.2 of the Plan, and (b) to the Exit Financing Parties in exchange for and in an aggregate principal amount equal to their advance of funds to pay all Cash-Out Distributions on the Plan Effective Date as provided in Section 4.4 of the Plan, and which shall otherwise have the terms as described in Annex III to the Plan Term Sheet and be acceptable to the DIP Lenders and the Exit Financing Parties in their sole and absolute discretion. For the avoidance doubt and notwithstanding any other provision hereof or in the Plan Term Sheet, the total aggregate principal of the New Senior Tranche Secured Notes issued on the Plan Effective Date shall be equal to (i) the amount of all New Senior Tranche Secured Notes used to repay DIP Claims not repaid in Cash on the Plan Effective Date, plus (ii) the amount of all funds advanced by the Exit Financing Parties to pay all Cash-Out Distributions on the Plan Effective Date.

116.    "*New Senior/Subordinated Intercreditor Agreement*" means an intercreditor agreement having customary terms for such agreements between senior secured and subordinated unsecured creditors and acceptable to the DIP Lenders by which the New Subordinated Notes and all guarantees related thereto shall be expressly subordinated in right of payment to the payment in full of both the New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes.

117.    "*New Subordinated Notes*" means the subordinated tranche of unsecured notes which shall be distributed to holders of Claims in Classes 4 and 5 of the Plan as provided in Sections 3.2(d) and (e) of the Plan and which shall have terms as described in Annex III to the Plan Term Sheet.

118.    "*New Subordinated Notes Documents*" means, collectively, the New Subordinated Notes, any indenture or other agreement governing the New Subordinated Notes, the New Senior/Subordinated Intercreditor Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors and the Required Consenting Noteholders.

119.    "*Nominee*" shall have the meaning given such term in Section 6.6 of the Plan.

120.    "*Non-Cash-Out Electing Holder*" shall have the meaning given such term in Section 3.2 of the Plan.

121.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

122.    "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, a Prepetition Bank Financing Claim, or a 7.5% Notes due 2025 Secured Claim.

123. "*Paying Agent*" means The Bank of New York Mellon in its capacity as principal paying agent under the 2025 Notes Indenture.

124. "*Person*" shall have the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

125. "*Peruvian Authorities*" means all applicable national, regional, provincial, district, and municipal authorities with regulatory, oversight, or legal authority relating to the Customs Claims in Peru.

126. "*Petition Date*" means the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

127. "*Plan*" means the joint chapter 11 plan of reorganization filed by the Debtors as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with the Plan Term Sheet, and to the extent not consistent with the Plan Term Sheet in any material respect, in form and substance acceptable to the Debtors and the Required Consenting Noteholders.

128. "*Plan Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Plan Effective Date under Section 9.1 of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Noteholders) in accordance with the Plan.

129. "*Plan Election*" means the optional election available for each Holder of a 7.5% Notes due 2025 to make on its Letter of Transmittal for the treatment of such holder's Allowed 7.5% Notes due 2025 Secured Claims (and any waiver of distributions on account of such holder's Allowed 7.5% Notes due 2025 Unsecured Deficiency Claim), as set forth in Section 3.2(d) hereof.

130. "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in the RSA and the Plan Term Sheet, attached as Exhibit A to the RSA, where applicable, and which shall include, without limitation, the New Corporate Governance Documents; the New Notes Documents; the Rejection Schedule, if any; the list of directors and officers of USA Holdco and the Reorganized Debtors; the form of the Letter of Transmittal; and the USA Holdco LLC Allocation and Protocols Notice.

131. "*Plan Term Sheet*" means that certain term sheet attached as Exhibit A to the RSA, entered into by and among the Debtors and the Consenting Noteholders, as amended from time to time.

132. "*Pledge Amendments*" shall have the meaning given such term in the RSA and the Plan Term Sheet.

133. "*Prepetition Bank Financing Claim*" means any Secured Claims arising under any of the Credit Facilities (as defined in the 2025 Indenture) to which any Debtor is a party or any loan documents related thereto.

134. "*Priority Tax Claims*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

135. "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Plan Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

136. "*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

137.    "*Proof of Claim*" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

138.    "*Pro Rata Share*" means with respect to any holder of Claims in a Class receiving any distribution under the Plan, such holder's pro rata share of such distribution measured by reference to the aggregate amount of all Allowed Claims in such Class in each case as of the date of such distribution.

139.    "*Reinstatement or Reinstated*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

140.    "*Rejection Schedule*" means the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, as may be amended from time to time, setting forth certain Executory Contracts and Unexpired Leases for rejection as of the Plan Effective Date under section 365 of the Bankruptcy Code.

141.    "*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

142.    "*Related Party Claims*" means the Minvest Loan Claim and the Share Purchase Agreement Claim.

143.    "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) Chile Holdco, USA Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agent and each DIP Lender; (d) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent; (e) the Unsecured Legacy Notes Trustees; (f) each Consenting Noteholder, the Ad Hoc Group of Consenting Noteholders, and each member of the Ad Hoc Group of Consenting Noteholders; (g) each Exit Financing Party; (h) each current and former Affiliate of each Entity in clause (a) through (g); and (i) each Related Party of each Entity in clause (a) through (h); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

144.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) Chile Holdco, USA Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agent and each DIP Lender; (d) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent; (e) the Unsecured Legacy Notes Trustees; (f) each Consenting Noteholder; (g) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (h) all holders of Claims or Interests that are deemed to accept the Plan; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (j) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (k) each Exit Financing Party; (l) each current and former Affiliate of each Entity in clause (a) through (k), and (m) each Related Party of each Entity in clause (a) through (l).

145.    "*Reorganized Business*" has the meaning provided in Section 4.6 of the Plan.

146.    "*Reorganized Debtors*" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

147.    "*Reorganized Gildemeister*" means Gildemeister, or any successor or assign, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

148.    "*Reorganized Gildemeister Common Stock*" has the meaning provided in Section 4.6 of the Plan.

149.    "*Required Amendments*" means the amendments to the organizational documents of Gildemeister required to be executed pursuant to the RSA to facilitate the implementation of the Plan.

150.    "*Required Consenting Noteholders*" means, as of the relevant date, the holders of a majority of the 7.5% Notes due 2025 held by all Consenting Noteholders that are party to the Restructuring Support Agreement on such date.

151.    "*Restructuring*" means the restructuring of Gildemeister and its direct and indirect subsidiaries, as contemplated by and described in the RSA, the Plan Term Sheet and the Plan.

152.    "*Restructuring Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of (a) the Consenting Noteholders in any way related to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the Consenting Noteholders' holdings of the 7.5% Notes due 2025, any fees and expenses of any Ad Hoc Group Advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, and the transactions contemplated thereby, and (b) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent.

153.    "*Restructuring Support Agreement*" or "*RSA*" shall mean that certain support agreement for implementation of the Restructuring dated as of March 31, 2021 between Gildemeister, the Guarantors, the Company Parties, and the Consenting Noteholders in form and substance acceptable to the Consenting Noteholders, as amended from time to time, to which the Plan Term Sheet has been attached as Exhibit A.

154.    "*Restructuring Transactions*" means those certain restructuring and recapitalization transactions with respect to the Debtors' capital structure required to effect the Restructuring on the terms and conditions set forth in the Restructuring Support Agreement, the Plan Term Sheet, and the Plan.

155.    "*Sale Period*" has the meaning given such term in Section 4.5 of the Plan.

156.    "*Scheduling Order*" means the order of the Court scheduling the Confirmation Hearing.

157.    "*SEC*" means the United States Securities and Exchange Commission.

158.    "*Secured*" means when referring to a Claim, a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

159.    "*Secured Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

160.    "*Securities Act*" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Plan Effective date.

161.    "*Security*" means a security as defined in Section 2(a)(1) of the Securities Act of 1933.

162.    "*Selling Agent*" has the meaning given such term in Section 4.5 of the Plan.

163.    "*Selling Agent Agreement*" has the meaning given such term in Section 4.5 of the Plan.

164.    "*Senior Manager*" means any employee, officer, or director of any of the Debtors subject to a non-compete, severance, or change of control agreement with any of the Debtors or any direct or indirect subsidiary thereof.

165.    "*Senior Secured Notes Trustee*" means The Bank of New York Mellon, in its capacity as trustee in respect of the 7.5% Notes due 2025 and the indenture governing the 7.5% Notes due 2025.

166.    "*Senior Secured Notes Collateral Agent*" means TMF Group New York, LLC in its capacity as Collateral Agent in respect of the 7.5% Notes due 2025 and the indenture governing the 7.5% Notes due 2025.

167.    "*Share Purchase Agreement Claim*" means a Claim evidenced by or arising under or on account of the Contrato de Compraventa de Acciones (Share Purchase Agreement), dated as of February 24, 2016, between Automotores Gildemeister SpA and Minvest S.A.

168.    "*Solicitation Materials*" means the solicitation materials and documents included in the solicitation packages that will be sent to, among others, Holders of Claims and Interests entitled to vote to accept or reject the Plan, in compliance with Bankruptcy Rules 3017(d) and 2002(b), which shall be in form and substance acceptable to the Required Consenting Noteholders.

169.    "*Subordinated Claim*" means any Claim against any of the Debtors that is subordinated in priority of payment pursuant to section 510(b) or section 510(c) of the Bankruptcy Code as determined by a Final Order of the Bankruptcy Court.

170.    "*Substitute Consideration*" has the meaning given such term in Section 4.5 of the Plan.

171.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

172.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

173.    "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

174.    "*Transfer Agreement*" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

175.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

176.    "*United States Trustee*" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

177.    "*Unsecured Legacy Notes Claims*" means the 6.75% Notes due 2023 Claims, 7.5% Notes due 2021 Claims, and the 8.25% Notes due 2021 Claims.

178.    "*Unsecured Legacy Notes Trustees*" means the trustee in respect of the 6.75% Notes due 2023 and the indenture governing the 6.75% Notes due 2023, the trustee in respect of the 7.5% Notes due 2021 and the indenture

governing the 7.5% Notes due 2021, and the trustee in respect of the 8.25% Notes due 2021 and the indenture governing the 8.25% Notes due 2021.

179.    "*Unsecured Notes Claims*" means the 7.5% Notes due 2025 Unsecured Deficiency Claims and the Unsecured Legacy Notes Claims.  As of the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (a) $100.5 million in 7.5% Notes due 2025 Unsecured Deficiency Claims, (b) $9,644,520 of 7.5% Notes due 2021 Claims, (c) $22,494,000 of 8.25% Notes due 2021 Claims, and (d) $2,622,000 of 6.75% Notes due 2023 Claims, plus in each case, any accrued and unpaid interest on the respective series of notes through the Petition Date.

180.    "*Unsecured Notes and Related Party Claims*" means the Unsecured Notes Claims and the Related Party Claims.

181.    "*USA Holdco*" has the meaning given such term in Section 4.7 of the Plan.

182.    "*USA Holdco LLC Agreement*" has the meaning given such term in Section 4.7 of the Plan.

183.    "*USA Holdco LLC Allocation and Protocols Notice*" has the meaning given such term in Section 6.4 of the Plan.

184.    "*USA Holdco LLC Units*" has the meaning given such term in Section 4.7 of the Plan.

## 1.2    **Rules of Interpretation**

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; and (i) the Debtors shall be authorized to and may rely upon any written statement (including by email) from Dechert LLP that confirms or declines a consent, waiver or other form of approval by the Required Consenting Noteholders.

## 1.3    **Computation of Time**

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

## 1.4    **Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

1.5   **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

1.6   **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**ARTICLE II**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Professional Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III.

2.1   **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, the Required Consenting Noteholders, and the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than (i) Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code and (ii) Holders of DIP Claims) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Plan Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Plan Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the Holders of such Allowed Administrative Claims.

2.2   **DIP Claims**

Pursuant to the DIP Orders or otherwise pursuant to the Confirmation Order, the DIP Claims shall be deemed to have been finally Allowed against each Debtor in the full amount outstanding under the DIP Credit Facility, including principal, interest, fees, costs, other charges, expenses, and DIP Expenses for all purposes as fully Secured Claims and shall not be subject to any avoidance, reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenge under any applicable law or regulation by any Person or Entity.

On the Plan Effective Date, all DIP Expenses shall be paid in full in Cash and, with respect to the remaining DIP Claims, at the Reorganized Debtors' option, the Reorganized Debtors shall pay each such DIP Claim (i) dollar for dollar with New Senior Tranche Secured Notes, or (ii) full Cash payment of the then unpaid balance of the DIP Claims. Unless and until full payment of the DIP Claims in accordance with this Section 2.2 has occurred, notwithstanding entry of the Confirmation Order and anything to the contrary in the Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, and (ii) none of the Liens securing the DIP shall be deemed to have been waived, released, satisfied, subordinated or discharged.

2.3   **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Plan Effective Date must be filed no later than 45 days after the Plan Effective Date. The

Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court Allows.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.4    **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Plan Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim:  (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Plan Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the applicable Debtor.  If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. § 6621.

2.5    **Costs and Expenses of Ad Hoc Group Advisors**

The Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash pursuant to (and subject to) the Restructuring Support Agreement without the need to file a proof of such Claim and without further order of the Court. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay the Restructuring Expenses that have accrued and are unpaid as of the Effective Date.  For the avoidance of doubt, any Restructuring Expenses incurred but not yet paid on or prior to the Effective Date shall be payable by the Reorganized Debtors after the Effective Date.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in <u>Article II</u>, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

3.1    **Classification of Claims and Interests**

Claims against and Interests in each of the Debtors are divided into the following Classes:

| Number | Class |
| --- | --- |
| Class 1 | Class 1 consists of all Other Secured Claims. |
| Class 2 | Class 2 consists of all Other Priority Claims. |
| Class 3 | Class 3 consists of all Prepetition Bank Financing Claims. |
| Class 4 | Class 4 consists of all 7.5% Notes due 2025 Secured Claims. |

16

Class 5          Class 5 consists of all Unsecured Notes and Related Party Claims.

Class 6          Class 6 consists of all General Unsecured Claims.

Class 7          Class 7 consists of all Intercompany Claims.

Class 8          Class 8 consists of all Existing Equity Interests Other Than in Gildemeister

Class 9          Class 9 consists of all Existing Equity Interests in Gildemeister

3.2    **Treatment of Classes of Claims and Interests**

The following chart designates the Class of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 12.4 of the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 3 | Prepetition Bank Financing Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 4 | 7.5% Notes due 2025 Secured Claims | Impaired | Entitled To Vote |
| 5 | Unsecured Notes and Related Party Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 7 | Intercompany Claims | Unimpaired or Impaired | Deemed To Accept or Deemed to Reject; Not Entitled To Vote |
| 8 | Existing Equity Interests Other Than in Gildemeister | Unimpaired or Impaired | Deemed To Accept or Deemed to Reject; Not Entitled To Vote |
| 9 | Existing Equity Interests in Gildemeister | Impaired | Deemed To Reject; Not Entitled To Vote |

Except to the extent that a Holder of an Allowed Claim against or Interest in any of the Debtors, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date, or as soon as reasonably practicable thereafter:

(a)    **Class 1 (Other Secured Claims)**

(1)    *Classification*: Class 1 consists of all Allowed Other Secured Claims against the applicable Debtor.

(2)    *Treatment*: Each Holder of an Allowed Other Secured Claim shall, at the election of the Reorganized Debtors, subject to the consent of the Required Consenting Noteholders,

17

receive: (i) Cash in an amount equal to such Allowed Other Secured Claim, (ii) the property of the Debtors that constitutes collateral securing such Allowed Other Secured Claim, or (iii) reinstatement of the legal, equitable and contractual rights of such Holder; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(3)   *Voting*: Class1 is Unimpaired.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

(b)   **Class 2 (Other Priority Claims)**

(1)   *Classification*:  Class 2 consists of all Allowed Other Priority Claims against the applicable Debtor.

(2)   *Treatment*:  On the Plan Effective Date, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(3)   *Voting*:  Class 2 is Unimpaired.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

(c)   **Class 3 (Prepetition Bank Financing Claims)**

(1)   *Classification*:  Class 3 consists of all Allowed Prepetition Bank Financing Claims against the applicable Debtor.

(2)   *Treatment*:   On the Plan Effective Date, each Allowed Other Secured Claim shall be Reinstated.

(3)   *Voting*:  Class 3 is Unimpaired.  Holders of Allowed Prepetition Bank Financing Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Prepetition Bank Financing Claims are not entitled to vote to accept or reject the Plan.

(d)   **Class 4 (7.5% Notes due 2025 Secured Claims)**

(1)   *Classification*:  Class 4 consists of the 7.5% Notes due 2025 Secured Claims against the applicable Debtor.

(2)   *Allowance:*  On the Plan Effective Date, the 7.5% Notes due 2025 Secured Claims shall be Allowed in the amount of $409,300,000.

(3)   *Treatment*:  On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release and discharge of and exchange for each Allowed 7.5% Notes due 2025 Secured Claim, each holder of an Allowed 7.5% Notes due 2025 Secured Claim shall receive:

A.   if such holder is not a Cash-Out Electing Holder (a "<u>Non-Cash-Out Electing Holder</u>"), (i) $0.56046 in principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, (ii) $0.19789 in principal amount of New Subordinated Notes for each $1.00 of Allowed 7.5% Notes due 2025 Secured Claims held by such holder, and

18

(iii) its Pro Rata Share (based on the proportion that such Non-Cash-Out Electing Holder's Allowed 7.5% Notes due 2025 Secured Claims bears to the sum of all Allowed 7.5% Notes due 2025 Secured Claims held by all Non-Cash-Out Electing Holders) of 100.0% of the USA Holdco LLC Units; or

B.      if such holder of an Allowed 7.5% Notes due 2025 Secured Claim has affirmatively made a Plan Election on its Letter of Transmittal to receive a Cash-Out Distribution (a "Cash-Out Electing Holder"), Cash in an aggregate amount equal to 18.6833% of such holder's Allowed 7.5% Notes due 2025 Secured Claim (a "Cash-Out Distribution") and such holder shall be deemed to have waived any distribution under the Plan under Class 5 on account of its Allowed 7.5% Notes due 2025 Unsecured Deficiency Claims.

(4)      *Voting*: Class 4 is Impaired.  Holders of 7.5% Notes due 2025 Secured Claims are entitled to vote to accept or reject the Plan.  For the avoidance of doubt, Cash-Out Electing Holders shall be permitted to vote the full Allowed amount of their 7.5% Notes due 2025 Secured Claims in Class 4 for purposes of confirmation of the Plan.

(e)      **Class 5 (Unsecured Notes and Related Party Claims)**

(1)      *Classification*:  Class 5 consists of the Unsecured Notes and Related Party Claims against the applicable Debtor.

(2)      *Allowance*:  On the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) $111,796,081 of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,106 of 7.5% Notes due 2021 Claims, (iii) $23,205,373 of 8.25% Notes due 2021 Claims, (iv) $2,664,771 of 6.75% Notes due 2023 Claims which, in each case, for the Claims described in sub-clauses (i) through (iv) includes the aggregate principal amount of such Claims and any accrued and unpaid interest through the Petition Date.  The Minvest Loan Claim shall be Allowed in the amount of $1,643,500, and the Share Purchase Agreement Claim shall be Allowed in the amount of $300,000.

(3)      *Treatment*:  On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each holder of an Allowed Unsecured Notes and Related Party Claim shall receive $0.20070 in principal amount of the New Subordinated Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such holder.

(4)      *Voting*:  Class 5 is Impaired.  Holders of Unsecured Notes and Related Party Claims are entitled to vote to accept or reject the Plan.  For the avoidance of doubt, notwithstanding the Cash-Out Electing Holders' waiver of distributions on account of their 7.5% Notes due 2025 Unsecured Deficiency Claims, the Cash-Out Electing Holders shall be permitted to vote the full Allowed amount of their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5 for purposes of confirmation of the Plan.

(f)      **Class 6 (General Unsecured Claims)**

(1)      *Classification*:  Class 6 consists of all Allowed General Unsecured Claims against the applicable Debtor.

(2)      *Treatment*:  On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall, at the election of the applicable Debtor or Reorganized Debtor, (i) have the legal, equitable and contractual rights of such Holder Reinstated or (ii) receive Cash in an amount equal to such Allowed General Unsecured Claims.

(3) *Voting*:  Class 6 is Unimpaired.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(g) **Class 7 (Intercompany Claims)**

(1) *Classification*:  Class 7 consists of all Allowed Intercompany Claims against the applicable Debtor.

(2) *Treatment*:  On the Plan Effective Date, each Allowed Intercompany Claim shall be either (i) Reinstated; or (ii) canceled, released, and extinguished, and without any distribution, in each case, at the Debtors' election with the consent of the Required Consenting Noteholders.

(3) Voting: Class 7 is Unimpaired or impaired.  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted or rejected the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

(h) **Class 8 (Existing Equity Interests Other Than in Gildemeister)**

(1) *Classification*:  Class 8 consists of all Allowed Existing Equity Interests Other Than in Gildemeister in the applicable Debtor.

(2) *Treatment*:  On the Plan Effective Date, the Allowed Existing Equity Interests Other Than in Gildemeister shall be either (i) Reinstated; or (ii) canceled, released, and extinguished, and without any distribution, in each case at the Debtors' election with the consent of the Required Consenting Noteholders and to the extent permitted under local law.

(3) *Voting*:  Class 8 is Unimpaired or impaired.  Holders of Allowed Existing Equity Interests Other Than in Gildemeister are conclusively presumed to have accepted or rejected the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Existing Equity Interests Other Than in Gildemeister are not entitled to vote to accept or reject the Plan.

(i) **Class 9 (Existing Equity Interests in Gildemeister)**

(1) *Classification*: Class 9 consists of all Allowed Existing Equity Interests in Gildemeister.

(2) *Treatment*:  On the Plan Effective Date, each Allowed Existing Equity Interest in Gildemeister, including, without limitation, each Existing Preferred Equity Interest in Gildemeister, Existing Common Equity Interest in Gildemeister, and Existing Series A Warrant and Existing Series B Warrant in Gildemeister shall be redeemed, cancelled, and released for no consideration.

(3) *Voting*: Class 9 is Impaired.  Holders of Allowed Interests in the Debtors are conclusively presumed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Allowed Interests are not entitled to vote to accept or reject the Plan.

3.3    **Special Provision Governing Unimpaired Claims**

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## ARTICLE IV

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

4.1    **General Settlement of Claims**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

4.2    **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right (with the consent of the Required Consenting Noteholders) to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4.3    **Sources of Cash for Plan Distributions**

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to this Plan shall be obtained from Cash on hand from the Debtors, including Cash from business operations, other than as specified in Section 4.4 herein.  Further, the Debtors and the Reorganized Debtors will, subject to the consent of the Required Consenting Noteholders, be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be disclosed to the Consenting Noteholders and accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan or the New Notes Documents.

4.4    **Exit Financing.**

Subject to the terms, conditions and limitations as more fully set forth in the Exit Financing Commitment Agreement, on the Plan Effective Date, the Exit Financing Parties shall advance to the Debtors an amount not to exceed $15.6 million to fund all Cash-Out Distributions.  The Exit Financing Parties will receive New Senior Tranche Secured Notes in aggregate principal amount equal to all amounts advanced to fund the Cash-Out Distributions.

4.5    **Issuance of the New Notes; Substitute Consideration for Non-Qualified Holders**

On the Plan Effective Date, the Reorganized Debtors are authorized and directed to issue, execute, deliver or otherwise bring into effect, as the case may be, to or for the benefit of the Qualified Holders of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes Claims, the New Notes Documents and any other instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to the Plan, and take any other necessary actions in connection with the foregoing, in each case without need for further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.  The issuance of the New Secured Notes and New Subordinated Notes shall be exempt from registration under applicable securities laws pursuant to Section 4(a)(2) and Regulation S under the Securities Act, and similar Blue Sky Laws provisions, as applicable, and any indentures governing the New Secured Notes and the New Subordinated Notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.  All documents, agreements and instruments entered into and delivered on or as of the Plan Effective Date contemplated by or in furtherance of the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without

further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

On the Plan Effective Date, the guarantees, pledges, liens and other security interests, as applicable, granted pursuant to the New Notes Documents (whether prior to or on the Plan Effective Date) shall be deemed to have been granted in good faith as an inducement to the Qualified Holders of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes Claims to agree to the treatment contemplated by the Plan and (a) shall be deemed to be approved, (b) shall be legal, binding, and creating or continuing enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Documents, (c) shall be deemed perfected on the earlier of the date originally perfected and the Plan Effective Date, subject only to such Liens and security interests as may be permitted under the New Notes Documents, as the case may be, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non bankruptcy law, including any applicable law of the Republic of Chile. The Reorganized Debtors and their affiliates granting such Liens and the persons and entities granted such Liens and security interests are authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary to continue as perfect or to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection or continuance of perfection shall occur automatically by virtue of the entry of the Confirmation Order and no such filings, recordings, approvals, and consents shall be necessary), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

All New Notes under the Plan that would have been issuable and deliverable to Non-Qualified Holders, if they had been Qualified Holders, will be deposited with an agent (the "Selling Agent"). The Selling Agent shall offer such New Notes in one or more sale transactions within 180 days following the Plan Effective Date (the "Sale Period"), pursuant to a selling agreement to be entered into between the Debtors and the Selling Agent (the "Selling Agent Agreement").

The consideration to be received by Non-Qualified Holders under the Selling Agent Agreement is referred to in this Disclosure Statement as the "Substitute Consideration."

The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for Cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a pro rata basis, to such Non-Qualified Holders at the end of the Sale Period (the "Net Cash Proceeds"). In the event that a sale of such New Notes is unable to be consummated at any price within the Sale Period and the Net Cash Proceeds are zero, the amount of Substitute Consideration such Non-Qualified Holders are entitled to receive shall also be zero, and such New Notes shall be cancelled for no consideration. None of the Debtors, the Ad Hoc Group of Consenting Noteholders and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such New Notes.

For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive the Substitute Consideration in respect thereof. Holders of 7.5% Notes due 2025 Secured Claims that are Non-Qualified Holders will receive that portion of their distributions under the Plan that constitutes their pro rata share of USA Holdco LLC units regardless of whether they receive any Substitute Consideration in respect of their allocation of New Notes.

4.6    **Chile Holdco**

On or prior to the Plan Effective Date, the Reorganized Debtors are authorized and directed to create a newly formed holding company structured as a *sociedad por acciones* under the laws of Chile ("Chile Holdco" and together with the Reorganized Debtors, the "Reorganized Business"). Upon implementation of the Restructuring Transactions on the Plan Effective Date, Chile Holdco shall hold all of the equity interests in Reorganized Gildemeister (the "Reorganized Gildemeister Common Stock") from and after the Plan Effective Date.

On the Plan Effective Date, Chile Holdco shall be authorized and directed to issue (i) a single class of common equity interests with 100% economic and voting rights (the "Chile Holdco Stock") and having a paid in capital value of $44.3 million, and (ii) bonds in an aggregate principal amount of approximately $132.8 million (which amounts, in each case, may be subject to adjustment in the event any holders of Allowed 7.5% Notes due 2025 Secured Claim make the Plan Election for the Cash-Out Distribution) (the "Chile Holdco Bonds", and together with the Chile Holdco Stock, the "Chile Holdco Securities").

On the Plan Effective Date, Chile Holdco shall be authorized and directed to issue the Chile Holdco Bonds pursuant to an indenture governed by the laws of the State of New York. The Chile Holdco Bonds shall be unsecured and shall have terms acceptable to the Required Consenting Lenders in their sole and absolute discretion which shall include: (i) a maturity date on the thirtieth anniversary of the Plan Effective Date, (ii) cash interest accrual (payable semi-annually) at a rate of 15.0% per annum with the option, in Chile Holdco's sole discretion throughout the term of the bonds until their maturity, to defer payment of such interest, (iii) any unpaid deferred interest shall also accrue interest at the applicable interest rate plus additional default interest at a rate of 2% per annum, and (iv) other covenants customary for an investment of this kind. For the avoidance of doubt, the Chile Holdco Bonds shall be structured as "bonds" qualifying for a 4% withholding tax rate under Chilean law.

The corporate governance of Chile Holdco shall be subject to bylaws containing terms acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

On the Plan Effective Date, Chile Holdco shall be authorized and directed to distribute the Chile Holdco Securities to USA Holdco in accordance with this Plan.

4.7    **USA Holdco**

On or prior to the Plan Effective Date, the Reorganized Debtors are authorized and directed to create a newly formed holding company structured as a limited liability company under the laws of Delaware ("USA Holdco"), which is authorized and directed to issue, on the Plan Effective Date, a single class of limited liability company units with 100% of the economic and voting rights of USA Holdco (the "USA Holdco LLC Units") to the holders of the 7.5% Notes due 2025 Secured Claims in exchange for the 7.5% Notes due 2025 Secured Claims contributed by such holders to USA Holdco. Due to its ownership of Chile Holdco, USA Holdco will indirectly hold 100% of the equity interests of the Reorganized Debtors from and after the Plan Effective Date.

The corporate governance of USA Holdco shall be subject to a limited liability company agreement (the "USA Holdco LLC Agreement") which shall contain terms acceptable to the Required Consenting Noteholders in their sole and absolute discretion including, *inter alia*, certain transfer restrictions with respect to the USA Holdco LLC Units intended to (i) ensure that USA Holdco remains a private company, (ii) restrict transfers, absent an exception from the registration requirements under United States and state securities laws and (iii) ensure USA Holdco is treated as a partnership for United States tax purposes.

The USA Holdco LLC Agreement shall provide that USA Holdco shall conduct no operations other than those incidental to its holding of the Chile Holdco Securities. Any of the foregoing provisions will be reflected in the form of USA Holdco LLC Agreement filed in the Plan Supplement. On the Effective Date, the USA Holdco LLC Agreement, substantially in the form set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.

On the Plan Effective Date, USA Holdco shall be authorized to and shall issue the USA Holdco LLC Units in accordance with the terms of the Plan without the need for any further limited liability company action. All of the USA Holdco LLC Units, when so issued, shall be duly authorized, validly issued, and, fully paid, and non-assessable. The USA Holdco LLC Units will be issued in book-entry form via a registry that will be maintained by the Reorganized Gildemeister on behalf of USA Holdco and pursuant to the USA Holdco LLC Agreement. Transfers of the USA Holdco LLC Units will be recorded in the registry and will only occur in accordance with the USA Holdco LLC Agreement.

The USA Holdco LLC Agreement shall provide that USA Holdco shall conduct no operations other than those incidental to its holding of the Chile Holdco Securities.

4.8    **Amendment of Pledges**

Prior to the Effective Date, the Required Consenting Noteholders and the non-Debtor Company Parties will enter into the Pledge Amendments and any other amendments or other documentation as is necessary to cause, effective on the Plan Effective Date, the liens on all collateral pledged to secure the obligations under the 2025 Notes Indenture by non-Debtor Company Parties to thereafter secure the Reorganized Debtors' obligations under the New Secured Notes from and after the Plan Effective Date.

4.9    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Plan Effective Date, all property in each Estate and all Causes of Action, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Plan Effective Date, except as otherwise provided in the Plan or in the New Notes Documents, or any other agreement or document related thereto or entered into in connection therewith, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.10    **Discharge from Notes, Instruments, Certificates, and Other Documents**

On the Plan Effective Date, other than any securities, instruments, certificates, or other documents governing or evidencing obligations or interests that will remain Unimpaired under the Plan, the obligations of the Debtors or Reorganized Debtors under or in any way related to all notes, instruments, certificates, agreements, and other documents evidencing Claims or Interests (including, without limitation, any agreement or other document evidencing Related Party Claims), shall be discharged; provided further, however, notwithstanding Confirmation or the occurrence of the Plan Effective Date, such discharge shall not affect (i) any such indenture or agreement that governs the rights of the Holder of a Claim, in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein and (ii) any such notes or other documents entered into related to the incurrence of debt in the ordinary course after the Petition Date; provided further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.

4.11    **Execution of Plan Documents**

Except as otherwise provided herein, and subject to the consent rights afforded the Required Consenting Noteholders under this Plan, on the Plan Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall execute all instruments and other documents required to be executed under the Plan.

4.12    **Corporate Action**

The Debtors or the Reorganized Debtors, as applicable, are authorized to take all further corporate actions necessary to effectuate the RSA and the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Plan Effective Date, including the Required Amendments, the Restructuring Transactions and the issuance of the New Secured Notes and the New Subordinated Notes.

4.13    **New Corporate Governance Documents**

To the extent required by applicable law, on or immediately before the Plan Effective Date, the Reorganized Debtors will file their respective New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.  The New Corporate

Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code and shall be in form and substance satisfactory to the Required Consenting Noteholders in their sole and absolute discretion.

## 4.14    **Effectuating Documents; Further Transactions**

On and after the Plan Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## 4.15    **Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

## 4.16    **Managers, Directors and Officers**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, on the Plan Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of (i) USA Holdco and (ii) Reorganized Gildemeister and the other Reorganized Debtors.  The New Board will consist of seven (7) directors including: (i) Ricardo Lessmann who shall serve as Chairman of USA Holdco, and (ii) six (6) directors selected by the Required Consenting Noteholders in their sole and absolute discretion.  The directors of Reorganized Gildemeister and the other Reorganized Debtors shall be selected by the Required Consenting Noteholders prior to the Plan Effective Date and thereafter shall be established by the New Board.

Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan Supplement, on or prior to the Confirmation Date, to the extent known at the time of filing, the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's board of directors and, to the extent such Person is an Insider, the nature of any compensation for such Person.

Corporate governance for USA Holdco, Chile Holdco, Reorganized Gildemeister, and the other Reorganized Debtors including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with section 1123(a)(6) of the Bankruptcy Code; and (b) be acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

## 4.17    **Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Plan Effective Date, subject to any Final Order, the Reorganized Debtors shall:  (a) adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, non-compete agreements and wages and compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Plan Effective Date for accrued vacation time, and other employee benefits arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Plan Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid. Any amendments to the foregoing obligations, other than ordinary course adjustments to the Debtors' existing wages,

compensation, severance, non-compete, and benefits programs for non-management employees, shall be subject to the approval of the Required Consenting Noteholders in their sole and absolute discretion.

## 4.18    Preservation of Rights of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## 5.1    Assumption of Executory Contracts and Unexpired Leases

On the Plan Effective Date, except as otherwise provided herein or pursuant to the Confirmation Order, Executory Contracts (including for the avoidance of doubt the RSA) and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or assume and assign Filed on or before the Confirmation Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Rejection Schedule. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.2    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the Debtors' ordinary course of business. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Solicitation Agent on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. **In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objections to confirmation of the Plan. Any such objection will be scheduled to be heard by the Bankruptcy Court at the earlier of the Confirmation Hearing or the Debtors' or the Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure pursuant to this Section 5.2, in the amount and at the time dictated by the Debtors' ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Section 5.2, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

5.3    **Pre-Existing Payment and Other Obligations**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide: (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

5.4     **Rejection Damages Claims and Objections to Rejections**

        In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Solicitation Agent and served upon counsel for the Debtors or the Reorganized Debtors no later than 30 days after the later of (a) the Effective Date or (b) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of this Plan.

5.5     **Contracts and Leases Entered Into After the Petition Date**

        With the consent of the Required Consenting Noteholders, contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

5.6     **Reservation of Rights**

        Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1     **Distributions on Account of Claims Allowed as of the Plan Effective Date**

        Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors (as the case may be) and the Holder of the applicable Allowed Claim, on the Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Plan Effective Date, subject to the Debtors' and Reorganized Debtors' right to object to Claims; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Plan Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such Administrative Claim, (2) Allowed Priority Tax Claims shall be paid in accordance with Section 2.3.  To the extent any Allowed Priority Tax Claim is not due and owing on the Plan Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Reorganized Debtors (as the case may be) and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business, and (3) Allowed General Unsecured Claims with respect to liabilities incurred by the Debtors in the ordinary course of business prior to the filing of the Chapter 11 Cases shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, subject to all of the Debtors' and Reorganized Debtors' legal and equitable defenses to or setoffs or recoupments against any such General Unsecured Claim.

6.2     **Special Rules for Distributions to Holders of Disputed Claims**

        Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such

disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claim has been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall be paid also, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

6.3     **Disbursing Agent**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date. To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash by the Reorganized Debtors.

6.4     **Distribution of USA Holdco LLC Units.**

On the Plan Effective Date, the USA Holdco LLC Units shall be deemed distributed upon their issuance in register form in the name of the Holders of the 7.5% Notes due 2025 Secured Claims as of the Distribution Record Date pursuant to the USA Holdco LLC Agreement and Section 4.7 herein. Each Holder of a 7.5% Notes due 2025 Secured Claim is required to provide the required information for the distribution for the USA Holdco LLC Units (the "LLC Units Registration Information") included in the Letter of Transmittal by the Distribution Election Deadline. As a condition to receiving USA Holdco LLC Units under the Plan, each Holder of a 7.5% Notes due 2025 Secured Claim is required to review, complete, and return to the Disbursing Agent (on or before the Distribution Election Deadline) a duly-completed Letter of Transmittal and to take one of the following actions (as determined by the Debtors in their sole discretion) to verify such Holder's position in the 7.5% Notes due 2025 and to provide the Certification:

(a)     tender the Holder's 7.5% Notes due 2025 into DTC's Automated Tender Offer Program ("ATOP"), or

(b)     surrender and transfer the Holder's 7.5% Notes due 2025 to the applicable indenture trustee via a Deposit/Withdrawal at Custodian ("DWAC").

For the avoidance of doubt, the Debtors retain the sole discretion to determine which of the aforementioned procedures to implement for purposes of confirming holdings of 7.5% Notes due 2025 in connection with the distribution of USA Holdco LLC Units.

The Disbursing Agent shall provide holders of the Allowed 7.5% Notes due 2025 Secured Claims with notice of their final allocation of USA Holdco LLC Units and any protocols governing future transfers of the USA Holdco LLC Units under the USA Holdco LLC Agreement as soon as reasonably practicable after the Plan Effective Date

(the "USA Holdco LLC Allocation and Protocols Notice"). The form of the USA Holdco LLC Allocation and Protocol Notice will be included in the Plan Supplement.

6.5 **Distributions of New Notes on Account of Allowed 7.5% Notes due 2025 Secured Claims and Allowed Unsecured Notes and Related Party Claims.**

(a)    New Secured Notes and New Subordinated Notes are being issued only to Qualified Holders. A "Qualified Holder" is a Holder of an Allowed Secured Notes Claim or Allowed Unsecured Notes Claims who provides either one of the following two certifications (the "Certification"):

(1)    A certification that it is located in the United States, and is either a "Qualified Institutional Buyer" as such term is defined in Rule 144A under the Securities Act or an "accredited investor" as defined in Regulation D under the Securities Act, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or

(2)    A certification that it is located or resident outside the United States and is qualified to participate in acquiring New Secured Notes and New Subordinated Notes, as applicable, in accordance with the laws of its jurisdiction of location or residence.

Any Holder of an Allowed 7.5% Notes due 2025 Secured Claim or an Allowed Unsecured Notes and Related Party Claims that is not a Qualified Holder or that fails to provide either of the two certifications above in order to qualify as a Qualified Holder shall be a "Non-Qualified Holder." Non-Qualified Holders shall not be entitled to receive any New Secured Notes or New Subordinated Notes, as applicable, and shall only be entitled the Substitute Consideration in respect thereof, which may be zero.

(b)    To receive its entitlement pursuant to the Plan, each Holder of a 7.5% Notes due 2025 Secured Claim or an Unsecured Notes and Related Party Claims that is a Qualified Holder is required to review, complete, and return to the Disbursing Agent (on or before the Distribution Election Deadline) a duly-completed Letter of Transmittal together with documents required in connection therewith and take one (1) of the following action as applicable on or before the Distribution Election Deadline (as determined by the Debtors in their sole discretion) to verify its position in the 7.5% Notes due 2025 or Unsecured Legacy Notes and to provide the Certification:

(1)    tender its 7.5% Notes due 2025 or Unsecured Legacy Notes into DTC's ATOP; or

(2)    surrender and transfer to the applicable indenture trustee via DWAC its 7.5% Notes due 2025 or Unsecured Legacy Notes.

For the avoidance of doubt, the Debtors retain the sole discretion to determine which of the aforementioned procedures to implement for purposes of confirming the holding of 7.5% Notes due 2025 and/or Unsecured Notes in connection with the distribution of New Notes.

(c)    As a condition to participation under the Plan, each Holder of a Related Party Claim that is a Qualified Holder is required to review the Letter of Transmittal and provide their DWAC information.

(d)    On or promptly after the Effective Date, the Debtors will reserve the right to request that DTC impose a "chill order" on any 7.5% Notes due 2025 and Unsecured Legacy Notes positions that have not been validated prior to the Distribution Election Deadline.

(e)    On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with DTC's customary procedures (which may be through ATOP or via DWAC), the New Secured Notes and New Subordinated Notes corresponding to each Qualified Holder that has completed the procedures specified in clause (b)(1) above; provided, however, that if the Effective Date has not occurred by thirty (30) calendar days after the Distribution Election Deadline, the foregoing deadlines may be extended and the foregoing

procedures may be amended by the Debtors and the Consenting Noteholders in a written notice provided to the Disbursing Agent.

(f)     The Substitute Consideration for Non-Qualified Holders shall be distributed by the Selling Agent after the Sale Period, as described in Section 4.4 of the Plan.

(g)     The Disbursing Agent and/or any applicable broker or agent shall use reasonable best efforts to cause the tender into ATOP or transfer via DWAC of all the 7.5% Notes due 2025 or Unsecured Legacy Notes.  Any Holder of the 7.5% Notes due 2025 or the Unsecured Legacy Notes who fails to (i) surrender the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes required to be tendered under the Plan or verify its position in the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes and (ii) provide a completed Letter of Transmittal to the Disbursing Agent together with any documents required in connection therewith within sixty (60) days after the Effective Date shall have its Claims and its distribution of New Notes pursuant to the Plan on account of its 7.5% Notes due 2025 Secured Claims or Unsecured Notes Claims discharged and forfeited and shall not participate in any distribution under the Plan.  Any property in respect of such forfeited 7.5% Notes due 2025 Secured Claims or the Unsecured Notes Claims would revert to the Reorganized Debtors.

The Debtors believe that the solicitation of votes from Qualified Holders to accept or reject the Plan is not a public offering (and is therefore exempt from the registration requirements of Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act) or is an offering of securities outside the United States (and therefore is not subject to the registration requirements of Section 5 as set forth in Regulation S, 230 CFR 900 et seq).

The Debtors believe that the solicitation of votes from Non-Qualified Holders constitutes a cash tender offer for the Secured Notes that complies with Regulation 14E under the Securities Exchange Act of 1934, 240 CFR 14e-1 et seq.

6.6     **Book Entry Transfer: ATOP**

The Disbursing Agent will work with DTC to establish this distribution event relating to the 7.5% Notes due 2025 and the Unsecured Legacy Notes on DTC's ATOP system.[1]  A beneficial owner of 7.5% Notes due 2025 or Unsecured Legacy Notes that are held by or registered in the name of a broker, dealer, commercial bank, trust company or other nominee or custodian (each, a "Nominee") is urged to contact such Nominee promptly if such beneficial owner wishes to participate.  Only Nominees that are participants in DTC's ATOP system can effectuate an electronic delivery of the 7.5% Notes due 2025 or the Unsecured Legacy Notes on a Holder's behalf.  Beneficial holders of the 7.5% Notes due 2025 or Unsecured Legacy Notes must allow sufficient time for its Nominee to effectuate the electronic delivery of its 7.5% Notes due 2025 or the Unsecured Legacy Notes via ATOP on or before the Distribution Election Deadline.

At the Holder's instruction, a Nominee will electronically deliver the Holder's 7.5% Notes due 2025 or Unsecured Legacy Notes into the appropriate contra-CUSIP[2] on DTC's ATOP platform on or before the Distribution Election Deadline.  Once DTC receives the Nominee's instruction to initiate an electronic delivery of a Holder's 7.5% Notes due 2025 or Unsecured Legacy Notes into the appropriate contra-CUSIP, the Nominee will receive a unique "voluntary offer instruction" ("VOI") generated by ATOP. By tendering a Holder's 7.5% Notes due 2025 or Unsecured Legacy Notes into ATOP and receiving a VOI, the Nominee has made an express acknowledgment for

---

[1]     In the event DTC is unwilling or unable to utilize the ATOP system to facilitate the distribution event, the Debtors reserve the right to require a Nominee to certify each Holder's position in the 7.5% Notes due 2025 or Unsecured Legacy Notes by including its DTC participant number and a medallion guarantee stamp on the Letter of Transmittal, validating the Holder's position in the 7.5% Notes due 2025 and Unsecured Legacy Notes. Additionally, in the event that DTC is unwilling or unable to utilize the ATOP system to facilitate distributions, the Debtors reserve the right to request that as soon as practicable after entry of the Confirmation Order, all transfers of the 7.5% Notes due 2025 or the Unsecured Legacy Notes held on the books of DTC shall be chilled.

[2]     A contra-CUSIP is the CUSIP used to segregate a Holder's position for a voluntary distribution event at the instruction of the Holder.

such holder that such holder has received and agrees to be bound by the Letter of Transmittal and that the company may enforce the Letter of Transmittal against such holder (a "Book-Entry Confirmation").

ALL QUESTIONS AS TO THE VALIDITY, FORM, ELIGIBILITY (INCLUDING TIME OF RECEIPT), AND ACCEPTANCE OF LETTERS OF TRANSMITTAL AND TENDERED 7.5% NOTES DUE 2025 OR TENDERED UNSECURED LEGACY NOTES WILL BE RESOLVED BY THE REORGANIZED DEBTORS, WHOSE DETERMINATION WILL BE FINAL AND BINDING, SUBJECT ONLY TO REVIEW BY THE BANKRUPTCY COURT UPON APPLICATION WITH DUE NOTICE TO ANY AFFECTED PARTIES IN INTEREST. THE DEBTOR RESERVES THE RIGHT TO REJECT ANY AND ALL LETTERS OF TRANSMITTAL AND TENDERED 7.5% NOTES DUE 2025 OR TENDERED UNSECURED LEGACY NOTES NOT IN PROPER FORM, OR LETTERS OF TRANSMITTAL AND TENDERED 7.5% NOTES DUE 2025 OR TENDERED UNSECURED LEGACY NOTES THE DEBTOR'S ACCEPTANCE OF WHICH WOULD, IN THE OPINION OF THE DEBTOR OR ITS COUNSEL, BE UNLAWFUL.

6.7    **Letter of Transmittal**

To the extent a Holder is required to deliver a Letter of Transmittal to the Disbursing Agent, signatures on such Letter of Transmittal must be guaranteed by an Eligible Institution. If 7.5% Notes due 2025 or Unsecured Legacy Notes are registered in the name of a person other than the person signing the Letter of Transmittal, in order to be validly tendered, the 7.5% Notes due 2025 or Unsecured Legacy Notes must be endorsed or accompanied by a properly completed power of authority, with signature guaranteed by an Eligible Institution.

6.8    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)    Delivery of Distributions

Except as otherwise provided in the Plan (including in Section 6.5 above), distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Disbursing Agent, as appropriate: (a) as indicated on the applicable register or in the Debtors' records as of the date of any such distribution; (b) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date, provided, however, that distributions on account of the 7.5% Notes due 2025 Secured Claims and the Unsecured Notes Claims shall be made in accordance with Section 6.5 above. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the applicable procedures of the DTC. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

     (b)       Minimum; *De Minimis* Distributions.

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the Holder of any Allowed Claim or Allowed Interest if the amount of Cash or other property to be distributed on account of such Allowed Claim or Allowed Interest is less than $50. Any Holder of an Allowed Claim or Allowed Interest on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim or Interest, as applicable, discharged and shall be forever barred from asserting such Claim or Interest against the Debtors, the Reorganized Debtors, or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtors.

     (c)       Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

     (d)       Cash Payments

Except as otherwise set forth in this Section 6.7(e), distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors) in U.S. dollars. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments to creditors outside of the United States of America may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

     (e)       Undeliverable and Unclaimed Distributions

          (1)     *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address or other necessary information for delivery. Subject to the succeeding sentence, the Reorganized Debtors or their duly appointed disbursing agent shall retain undeliverable distributions until such time as a distribution becomes deliverable. Each Holder of an Allowed Claim whose distribution remains (i) undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (ii) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan. Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

33

(2)    *Reversion.*  Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor.  Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

## 6.9    **Claims Paid or Payable by Third Parties**

(a)    Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)    Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    Applicability of Insurance Policies

Except as otherwise expressly provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## 6.10    **Setoffs**

Except as otherwise expressly provided herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Plan Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

6.11    **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan and to the extent permitted by applicable law, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan for income tax purposes as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest accrued through and including the Plan Effective Date.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

7.1    **Disputed Claims**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all General Unsecured Claims under the Plan, except as required by Article II, Section 5.4, and any other sections of the Plan that require filing Proofs of Claims, Holders of Claims need not file Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced, except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

All Proofs of Claim filed in these Chapter 11 Cases, except those permitted by Article II and Section 5.4, shall not be considered Allowed for any purposes under the Plan and without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below, and such creditor that Files a Proof of Claim with the Bankruptcy Court retains any right it may have to pursue remedies in a forum other than the Bankruptcy Court in accordance with applicable law, and the Debtors and Reorganized Debtors shall retain all rights to assert all claims, legal and equitable defenses, and setoffs or recoupments with respect to all such Claims. Notwithstanding anything in this Section 7.1, (a) all Claims against the Debtors that result from the Debtors' rejection of an executory contract or unexpired lease, (b) disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

7.2    **Resolution of Disputed Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors (in each case with the consent of the Required Consenting Noteholders), as applicable, shall be entitled to object to the Claim.  Any objections to Claims shall be served and filed on or before the 120th day after the Plan Effective Date or by such later date as ordered by the Bankruptcy Court.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if service is effected in any of the following manners:  (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; or (b) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.  The Debtors and the Reorganized Debtors shall be authorized to, and shall resolve all Disputed Claims or Interests by withdrawing or settling such objections thereto or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof.  All Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Plan Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Plan Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to <u>Section 4.18</u>.

7.3    **Estimation of Claims**

The Debtors or the Reorganized Debtors (in each case with the consent of the Required Consenting Noteholders), as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any

35

Disputed Claim that is contingent or unliquidated in accordance with section 502(c) of the Bankruptcy Code for any reason, regardless of whether any Entity previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, the estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

7.4     **No Interest**

Unless otherwise expressly provided in the Plan or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Plan Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.5     **No Distributions Pending Allowance**

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim. Distributions on account of Disputed Claims that become Allowed Claims shall be made pursuant to Section 6.2.

7.6     **Disallowance of Claims and Interests**

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII

## EFFECT OF CONFIRMATION OF THE PLAN

8.1     **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

8.2     **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein and effective as of the Plan Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete**

satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, their assets and properties, and any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Plan Effective Date. For the avoidance of doubt, nothing in this section shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan or any post-Plan Effective Date obligations, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.

8.3     **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided herein, for good and valuable consideration, as of the Plan Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Required Amendments, the 2021 8.25% Notes Indenture, the 2021 7.5% Notes Indenture, the 2023 Notes Indenture, the 2025 Notes Indenture (and any Notes Documents as defined therein), the DIP Credit Agreement (and any Loan Documents as defined therein), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; _provided_, _however_, that the foregoing provisions of this Section 8.3 shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct; _provided further_ that nothing in this Section 8.3 shall release any post-Plan Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes Documents and any other agreement or document related thereto or entered into in connection therewith, as applicable; _provided further_ that (x) if the Hyundai Distributorship Agreements are terminated or modified, (y) if Hyundai repudiates any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement, or (z) if Gildemeister or Automotores Gildemeister Peru S.A. have breached any obligation under the Hyundai Letters or the Hyundai Undertaking Agreement or if any condition exists which would provide Hyundai the right to terminate its obligations under the Hyundai Letters or the Hyundai Undertaking Agreement, in each case without the consent of the Required Consenting Noteholders in their sole and absolute discretion at any time prior to the Plan Effective Date, then no releases shall be provided by any Debtor or any Releasing Party to any Related Party of the Debtors or any Affiliate of the Debtors in respect of any Cause of Action or any Claim arising out of or relating in any way to the Customs Claims or any other fact or circumstance for which the Debtors have provided an untrue representation to the Consenting Noteholders under the RSA.

For the avoidance of doubt, nothing in the foregoing proviso shall be construed as an admission or evidence that any such Causes or Action or Claims exist against any Related party or Affiliate of the Debtors.

For the avoidance of doubt, no Related Party's obligation to repay any loan or advance made to it by any Debtor shall be released under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.3</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by this <u>Section 8.3</u>; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any Claim or Cause of Action released by this <u>Section 8.3</u>.

8.4    <u>Releases by Releasing Parties</u>

As of the Plan Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Estates, the Released Parties and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Required Amendments, the 2021 8.25% Notes Indenture, the 2021 7.5% Notes Indenture, the 2023 Notes Indenture, the 2025 Notes Indenture (and any Notes Documents as defined therein), the DIP Credit Agreement (and any Loan Documents as defined therein), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date; <u>provided</u>, <u>however</u>, that the foregoing provisions of this <u>Section 8.4</u> shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct; <u>provided further</u> that nothing in this <u>Section 8.4</u> shall release any post-Plan Effective Date obligations (except Cure Claims that have not been timely filed) of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan; <u>provided still further</u> that (x) if the Hyundai Distributorship Agreements are terminated or modified, (y) if Hyundai repudiates any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement, or (z) if Gildemeister or Automotores Gildemeister Peru S.A. have breached any obligation under the Hyundai Letters or the Hyundai Undertaking Agreement or if any condition exists which would provide Hyundai the right to terminate its obligations under the Hyundai Letters or the Hyundai Undertaking Agreement, in each case without the consent of the Required Consenting Noteholders in their sole and absolute discretion at any time prior to the Plan Effective Date, then no releases shall be provided by any Debtor or any Releasing Party to any Related Party of the Debtors or any Affiliate of the Debtors in respect of any Cause of Action or any Claim arising out of or relating in any way to the Customs Claims or any other fact or circumstance for which the Debtors have provided an untrue representation to the Consenting Noteholders under the RSA.

**For the avoidance of doubt, nothing in the foregoing proviso shall be construed as an admission or evidence that any such Causes or Action or Claims exist against any Related party or Affiliate of the Debtors.**

**For the avoidance of doubt, no Related Party's obligation to repay any loan or advance made to it by any Debtor shall be released under the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.4</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates and the Released Parties; (b) a good faith settlement and compromise of the Claims released by this <u>Section 8.4</u>; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under this <u>Section 8.4</u> from asserting any Claim or Cause of Action released by this <u>Section 8.4</u>.**

8.5    <u>Exculpation</u>

**No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; <u>provided, however,</u> that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; <u>provided, further,</u> that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8.6    <u>Injunction</u>

**Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Section 8.3</u> or <u>Section 8.4</u>, discharged pursuant to <u>Section 8.2</u>, or are subject to exculpation pursuant to <u>Section 8.5</u> are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.**

8.7    <u>Protection Against Discriminatory Treatment</u>

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter

39

11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**8.8**    **Indemnification**

On and from the Plan Effective Date, and except as otherwise provided under the Plan or prohibited by applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place as of November 7, 2019, provided that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

**8.9**    **Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**8.10**    **Release of Liens**

Except (a) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims), (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, or (c) with respect to mortgages, deeds of trust, Liens, pledges, and other security interests related to the 7.5% Notes due 2025 if and to the extent that the governing documents of such security interests purport that such security documents will secure obligations incurred as a substitution, replacement, refunding or refinancing of the 7.5% Notes due 2025 (including the documents or security interests), on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest and revert to the applicable Reorganized Debtor and its successors and assigns.

From and after the Plan Effective Date, any holder of a Secured Claim (and the applicable agents for such holder) secured by Liens or security interests which are to be released under this Plan, including but not limited to the holders of DIP Claims secured by Liens over collateral pledged and perfected under the laws of Chile, Uruguay, Peru, Costa Rica and Brazil, shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested to give effect to the Plan by the Reorganized Debtors and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or DIP Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, including the making of any applicable filings or recordings under the laws of Chile, Uruguay, Peru, Costa Rica and Brazil, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

8.11    **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Plan Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Plan Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE PLAN EFFECTIVE DATE

9.1    **Conditions Precedent to the Plan Effective Date.**

It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance acceptable to the Debtors and the Required Consenting Noteholders, which shall:

(1)    authorize the Debtors (subject to the consent of the Required Consenting Noteholders) to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with this Plan in a manner consistent in all respects with this Plan and with the consent of the Required Consenting Noteholders in their sole and absolute discretion;

(2)    decree that the provisions in the Confirmation Order and this Plan are nonseverable and mutually dependent;

(3)    authorize Chile Holdco, USA Holdco, the Debtors, or Reorganized Debtors, as applicable/necessary, to: (A) implement the Restructuring Transactions; (B) distribute the USA Holdco LLC Units and the Chilean Securities pursuant to the exemption from registration under the Securities Act of 1933 provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (C) make all distributions and issuances as required under this Plan; and (D) subject to the consent of the Required Consenting Noteholders, enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, in each case, in a manner consistent in all respects with the terms of this Plan and with the consent of the Required Consenting Noteholders in their sole and absolute discretion;

(4)    authorize the implementation of this Plan in accordance with its terms; and

(5)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(b)    Hyundai shall have executed the Hyundai Letters and the Hyundai Undertaking Agreement, which Hyundai Letters and Hyundai Undertaking Agreement shall be on terms that are acceptable to the Required Consenting Noteholders in their sole and absolute discretion;

(c)    Hyundai shall not have repudiated any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement;

(d)        the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time and no condition shall exist which would permit the Consenting Noteholders to terminate the Restructuring Support Agreement;

(e)        no settlement or other agreement previously entered into between any Company Party and any Peruvian Authority relating to the Customs Claims, if any, shall have been terminated and each Company Party shall have maintained compliance in all material respects at all times with all provisions of any such settlements or agreements;

(f)        Gildemeister shall not have received any notice of any charge, sanction, levy, or fine threatened or imposed by any government regulator or authority relating to the Customs Claims that, if sustained by any applicable court, government authority, or regulator of competent jurisdiction could have the effect of: (i) enjoining, prohibiting, ceasing, terminating, or impairing or limiting the ability of the Companies to conduct their business operations in a manner substantially consistent with their current practices in any jurisdiction, (ii) imposing felony criminal liability on any of the Companies or any Senior Managers (as defined in the Restructuring Support Agreement), (iii) imposing any civil or criminal liability of any kind on any Consenting Noteholder, or (iv) causing the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, or other obligations associated with the Customs Claims, net of any tax credits related to the Customs Claims (recorded in accordance with IFRS), to exceed $40,000,000;

(g)        the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan;

(h)        the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance acceptable to the Required Consenting Noteholders, and in compliance with the applicable consent rights set forth in the Restructuring Support Agreement, the Plan Term Sheet, and this Plan for such documents and shall not have been modified in any manner without the consent of the Required Consenting Noteholders in their sole and absolute discretion;

(i)        the New Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Notes Documents shall have been satisfied or duly waived in writing in accordance with the terms of each the New Notes Documents and the issuance of each of the New Secured Notes and the New Subordinated Notes shall have occurred;

(j)        the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

(k)        all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

(l)        the Required Consenting Noteholders shall have confirmed to the Debtors that they have received evidence satisfactory in their sole and absolute discretion that the Credit Facilities (as defined in the 2025 Indenture) shall remain available to the Debtors, the Reorganized Debtors, or the Company Parties, as applicable, and that the Debtors, the Reorganized Debtors, or the Company Parties, as applicable, will have adequate working capital to finance their operations, in each case following consummation of the Restructuring; and

(m)        the Required Consenting Noteholders have been be satisfied, in their sole and absolute discretion, with (i) the information and/or documentation provided in response to their anti-corruption due diligence-related requests, and/or (ii) the results of their due diligence review of the compliance policies and procedures relating to, among other things, anti-corruption and other applicable laws of the Companies;

42

(n)        all Restructuring Expenses shall have been paid in Cash in full; and

(o)        this Plan and all documents and agreements necessary to implement the Plan shall have: (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) been effected or executed.

9.2        **Waiver of Conditions Precedent**

With the consent of the Required Consenting Noteholders (to be provided in their sole and absolute discretion), the Debtors may amend, modify, supplement or waive any of the conditions to the Plan Effective Date set forth in Section 9.1 at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

9.3        **Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

10.1        **Modification of Plan**

Effective as of the date hereof: (a) the Debtors, solely with the consent of the Required Consenting Noteholders (which consent shall be in the Required Consenting Noteholders' sole and absolute discretion), in accordance with the Bankruptcy Code and the Bankruptcy Rules, may amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable with the consent of the Required Consenting Noteholders (which consent shall be in the Required Consenting Noteholders' sole and absolute discretion), may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth herein.

10.2        **Revocation or Withdrawal of Plan**

Subject to the conditions and limitations set forth in the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Plan Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any allowance of a Claim or any other settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

10.3        **Confirmation of the Plan**

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors, subject to their receipt of the prior written consent

of the Required Consenting Noteholders (which consent shall be in the Required Consenting Noteholders' sole and absolute discretion), reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**ARTICLE XI**

**RETENTION OF JURISDICTION**

11.1    **Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by applicable law, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement, after the Plan Effective Date, pursuant to ARTICLE V, of the list of Executory Contracts and Unexpired Leases to be rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement, including, for the avoidance of doubt, the New Notes Documents, and any other agreement or document related thereto or entered into in connection therewith;

7.    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

44

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.8(a); (b) with respect to the releases, injunctions, and other provisions contained in ARTICLE VIII, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order, including those arising under agreements, documents, or instruments executed in connection with the Plan; (d) related to section 1141 of the Bankruptcy Code; or (e) with respect to any Claims arising under or in connection with the 7.5% Notes due 2025 or Unsecured Legacy Notes asserted against the Reorganized Debtors by any current or former Holder of 7.5% Notes due 2025 or the Unsecured Legacy Notes;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

14.     hear and determine matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

18.     enforce all orders previously entered by the Bankruptcy Court; and

19.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### 12.1    **Additional Documents**

On or before the Plan Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.2    **Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

12.3    **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

12.4    **Elimination of Vacant Classes**

Any Class of Claims or Interests that (a) does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing or (b) is entitled to vote on the Plan but with respect to which no Ballots are cast or no Ballots are deemed to be cast, shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

12.5    **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

12.6    **Service of Documents**

After the Plan Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **Automotores Gildemeister, SpA**<br>Piso 7A - Av. Las Condes N° 11.000, Vitacura<br>Santiago, Chile<br>Attn:    Ricardo Lessmann<br><br>With a copy to: Counsel to the Debtors |
| **Counsel to Debtors** | **Cleary Gottlieb Steen & Hamilton LLP**<br>One Liberty Plaza<br>New York, New York 10006<br>Attn:    Adam Brenneman, Esq.<br>           Jane VanLare, Esq. |
| **Counsel to the Ad Hoc Group of Consenting Noteholders** | **Dechert LLP**<br>Three Bryant Park, 1095 Avenue of the Americas<br>New York, New York 10036-6797<br>Attn:    Allan S. Brilliant, Esq. |
| **The Senior Secured Notes Trustee** | **Bank of New York Mellon**<br>The Bank of New York Mellon<br>240 Greenwich Street, Floor 7E<br>New York, NY, 10286<br>Fax : 1-212-815-5917<br>Attention: Global Corporate Trust |

12.7   **Term of Injunctions or Stays**

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

12.8   **Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.9   **Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

12.10   **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) nonseverable and mutually dependent.

*[The remainder of this page is intentionally left blank.]*

Dated:  April 9, 2021

Respectfully Submitted,

**AUTOMOTORES GILDEMEISTER SPA**

_____

Name:  EDUARDO MOYANO
Title:  CFO

Dated:  April 9, 2021

Respectfully Submitted,

**MARC LEASING S.A.**

Name:  EDUARDO  MOYANO
Title:  CFO

Dated: April 9, 2021

Respectfully Submitted,

COMERCIAL GILDEMEISTER S.A.

_____

Name: EDUARDO MOYANO

Title: CFO

Dated:  April 9, 2021

Respectfully Submitted,

FORTALEZA S.A.

Name: _____

Title:

Dated:  April 9, 2021

Respectfully Submitted,

**RTC S.A.**

Name:
Title:

Dated:  April 9, 2021

Respectfully Submitted,

**MAQUINARIA NACIONAL S.A.**

_____

Name:  EDUARDO MOYANO

Title:  CFO

Dated:  April 9, 2021

Respectfully Submitted,

**MAQUINARIAS GILDEMEISTER S.A.**

Name: EDUARDO MOYRUD
Title: CFO

Dated: April 9, 2021

Respectfully Submitted,

**AG CRÉDITOS SPA**

_____

Name: ENCARDO ROYKWO

Title: CFO

Dated:  April 9, 2021

Respectfully Submitted,

**CARMEISTER S.A.**

Name: EDUARDO KOYAMO

Title: CEO

Dated:  April 9, 2021

Respectfully Submitted,

**FONEDAR S.A.**

_____

Name:  EDUARDO NOYNOS

Title:  CFO

Dated:  April 9, 2021

Respectfully Submitted,

**LODINEM S.A.**

Name:
Title:

Dated:  April 9, 2021

Respectfully Submitted,

**CAMUR S.A.**

Name: _____
Title:

Dated:  April 9, 2021

Respectfully Submitted,

**BRAMONT MONTADORA INDUSTRIAL E
COMERCIAL DE VEÍCULOS S.A.**

Name: _____

Title:

# EXHIBIT B

## Restructuring Support Agreement

*Execution Version*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of March 31, 2021, is entered into by and among Automotores Gildemeister SpA ("Gildemeister"), AG Créditos SpA., Marc Leasing S.A., Fonedar S.A., Camur S.A., Lodinem S.A., Carmeister S.A., Maquinaria Nacional S.A. (Chile), RTC S.A., Fortaleza S.A., Maquinarias Gildemeister S.A., Comercial Gildemeister S.A., Bramont Montadora Industrial e Comercial de Vehiculos S.A., and Gildemeister Costa Rica S.A., Inmobiliaria Los Seis CR ILS S.A., Maquinaria Nacional S.A., Motor Mundo S.A. and Automotores Gildemeister Peru S.A. (all of the foregoing, together with Gildemeister, the "Companies"), Minvest S.A. (the "Shareholder"), and those certain holders, or investment managers for holders, of certain instruments issued by the Companies, which may include (i) the 7.50% senior secured notes due 2025 (the "7.50% Notes due 2025") issued by Gildemeister pursuant to an indenture dated as of November 7, 2019 (as amended or supplemented from time to time, the "2025 Notes Indenture"), (ii) the Series C and D preferred stock issued by Gildemeister (the "Preferred Stock") and (iii) warrants to purchase Series A and B common stock issued by Gildemeister (the "Warrants," and together with all existing Series A and Series B common stock of Gildemeister (the "Common Stock"), the 7.50% Notes due 2025, the Preferred Stock, the 7.50% unsecured notes due 2021 (the "7.50% Notes due 2021") issued by Gildemeister pursuant to an indenture dated as of February 24, 2016 (as amended or supplemented from time to time, the "2016 Indenture"), the 6.75% unsecured notes due 2023 (the "6.75% Notes due 2023") issued by Gildemeister pursuant to an indenture dated as of January 15, 2013 (as amended or supplemented from time to time, the "2013 Indenture"), and the 8.25% unsecured notes due 2021 (the "8.25% Notes due 2021") issued by Gildemeister pursuant to an indenture dated as of May 24, 2011 (as amended or supplemented from time to time, the "2011 Indenture"), the "Gildemeister Securities")) signatory hereto (collectively, the "Consenting Noteholders"). The Companies and the Consenting Noteholders may each be referred to herein as a "Party" and, collectively, as the "Parties."

## RECITALS

WHEREAS, an ad hoc group of Consenting Noteholders (the "Ad Hoc Group of Consenting Noteholders"), the Companies, the Shareholder, and their respective counsel and other advisors have engaged in negotiations regarding a comprehensive restructuring of the Companies' obligations and indebtedness (the "Restructuring") pursuant to a consensual restructuring plan (the "Plan") in accordance with a term sheet attached as Exhibit A hereto (as amended and supplemented with the consent of the Required Consenting Noteholders (as defined below), the "Plan Term Sheet");[1]

WHEREAS, the Companies intend to implement the Restructuring in accordance with the terms and conditions set forth in the Plan Term Sheet and this Agreement (the "Restructuring Documents") by (i) commencing voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to effect the Restructuring as set forth in the Plan, including the issuance of (A) a senior tranche of secured

---

[1]     Capitalized terms used but not defined in this Agreement have the meanings ascribed to them in the Plan Term Sheet.

notes to be distributed to the DIP Lenders (as defined below) in exchange for their DIP Claims, to the extent such DIP Claims are not repaid in cash on the Plan Effective Date, as provided in the Plan Term Sheet and the Plan (the "New Senior Tranche Secured Notes"), (B) a junior tranche of secured notes to be distributed as provided in the Plan Term Sheet and the Plan (the "New Junior Tranche Secured Notes", and together with the New Senior Tranche Secured Notes, the "New Secured Notes"), (C) a subordinated tranche of unsecured notes to be distributed as provided in the Plan Term Sheet and the Plan (the "New Subordinated Notes"), (D) a single class of common equity interests with 100% economic and voting rights in a newly formed holding company structured as a *sociedad por acciones* under the laws of Chile ("Chile Holdco"), which shall hold all of the equity interests in Reorganized Gildemeister (the "Chile Holdco Stock") as provided in the Plan Term Sheet and the Plan, (E) bonds issued by Chile Holdco in an aggregate principal amount of US$132.8 million (the "Chile Holdco Bonds", and together with the Chile Holdco Stock, the "Chile Holdco Securities") and (F) a single class of limited liability company units with 100% economic and voting rights in a newly formed holding company structured as a limited liability company under the laws of Delaware (the "USA Holdco LLC Units", and together with the New Secured Notes, the New Subordinated Notes and the Chile Holdco Securities, the "New Securities"), (ii) obtaining consents from holders of the 7.50% Notes due 2025 to amend (A) the liens on all collateral pledged under the 2025 Notes Indenture by Gildemeister Costa Rica S.A., Inmobiliaria Los Seis CR ILS S.A., Maquinaria Nacional S.A., Motor Mundo S.A. and Automotores Gildemeister Peru S.A. and (B) the liens on all collateral pledged by the Shareholder in favor of the Senior Secured Notes Collateral Agent on November 7, 2019, to provide that such liens will secure the Reorganized Debtors' obligations, from and after the Plan Effective Date, under the New Secured Notes (as defined below) (the "Pledge Amendments") as set forth in the Restructuring Documents, (iii) redeeming, canceling, or otherwise terminating the Preferred Stock, the Warrants, and the Common Stock pursuant to the Plan as more fully described in the Plan Term Sheet, and (iv) the consummation of the other transactions contemplated in the Restructuring Documents (clauses (i) through (iv), collectively, the "Restructuring Transactions");

**WHEREAS**, as a result of the Restructuring and the Plan, all guarantees of the Gildemeister Securities will be discharged, released in full and extinguished completely;

**WHEREAS**, the members of the Ad Hoc Group of Consenting Noteholders have expressed interest in providing the Companies with post-petition secured financing (the "DIP Credit Facility") subject to the applicable terms and conditions set forth herein and in the term sheet attached as Annex II to the Plan Term Sheet (the "DIP Term Sheet"), with SRS Acquiom serving as administrative agent (in such capacity, the "DIP Agent") and TMF Group New York, LLC serving as collateral agent, (the "DIP Collateral Agent") pursuant to definitive documentation (which documentation shall include a motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Companies to obtain post-petition secured financing (the "DIP Financing Motion"), the orders approving the DIP Financing Motion on an interim and final basis (the "Interim DIP Order" and the "Final DIP Order" and together, the "DIP Orders") and a post-petition credit agreement (the "DIP Credit Agreement," and together with certain related loan documents, the "DIP Loan Documents"), in each case on the terms and subject to the consent rights set forth in the DIP Term Sheet; and

**WHEREAS**, each Party and its respective counsel and other advisors has reviewed or has had the opportunity to review the Restructuring Documents and each Party has agreed, subject to the conditions contained in the Restructuring Documents, to participate in the Restructuring in accordance with this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**     Commitments Regarding the Restructuring.

1.01.     Effectiveness of Agreement. This Agreement shall be effective from the date all of the following conditions precedent have been satisfied to the satisfaction of the Required Consenting Noteholders in their sole and absolute discretion (such date, the "Agreement Effective Date"):

(a)     receipt by counsel to the Consenting Noteholders of an original (or faxed or electronic copy) of this Agreement, duly authorized, executed and delivered by each of the Parties hereto;

(b)     all of the representations and warranties contained in this Agreement shall be true and correct in all respects;

(c)     the delivery by the Companies of executed letter agreements under which the Companies have agreed to pay all fees and expenses of each of (i) Dechert LLP, legal counsel to the Consenting Noteholders, (ii) Prieto Abogados SpA, Chilean legal counsel to the Consenting Noteholders; and (c) Link Capital Partners SpA, as financial advisor to Dechert LLP as counsel to the Consenting Noteholders, in each case in a form acceptable to the Required Consenting Noteholders in their sole and absolute discretion;

(d)     the Companies shall have paid (i) all outstanding fees and expenses incurred since November 7, 2019 by any of the Consenting Noteholders relating to their holding of the 7.5% Notes due 2025 including, but not limited to, any fees and expenses of any of the Ad Hoc Group Advisors (as defined below), and (ii) $500,000 to Dechert LLP as a retainer for legal services to the Consenting Noteholders in connection with this Agreement and any negotiations or other transactions contemplated hereby;

(e)     the Companies shall have provided (i) copies of all existing employment, non-compete, severance, change of control, and other agreements between the Chief Executive Officer of Gildemeister and Gildemeister (or any direct or indirect subsidiary thereof) which, in respect of the existing employment agreement and the existing non-compete agreement to be assumed on the Plan Effective Date in accordance with the Plan Term Sheet, shall be in the form to be assumed, and (ii) a summary of the base salary and the amounts of all obligations under employment, non-compete, severance, change of control, and other agreements with Gildemeister or any direct or indirect subsidiary thereof (collectively, such agreements, the "Senior Management Agreements") claimable by certain senior executives of Gildemeister specified in a list attached hereto as Exhibit G (the "Senior Manager List") or any of its direct or indirect subsidiaries specified in such list

3

attached hereto as <u>Exhibit G</u> that is party to a Senior Management Agreement (collectively with the Chief Executive Officer of Gildemeister, the "<u>Senior Managers</u>");

(f)    (i) the board of directors of Gildemeister shall have passed the board resolutions (the executed copies of which are attached hereto as <u>Exhibit C</u>) approving the entry into the RSA, the convening of a meeting of the Gildemeister shareholders (the "<u>Gildemeister Shareholders Meeting</u>") to pass the Required Amendments (as defined in the Plan Term Sheet), the filing of the Chapter 11 Cases, and the other Restructuring Transactions contemplated hereby, (ii) Gildemeister shall have published a notice in accordance with the laws of Chile scheduling the Gildemeister Shareholders Meeting substantially in the form attached hereto as <u>Exhibit D</u>, to pass the Required Amendments and hold the Gildemeister Shareholders Meeting in accordance with the form of minutes for such meeting set forth substantially in the form attached hereto as <u>Exhibit E</u>, and (iii) the Shareholder shall have delivered an irrevocable proxy and power of attorney (an executed copy of which is attached hereto as <u>Exhibit F</u>), authorizing Prieto Abogados SpA to vote all common stock owned by the Shareholder at the Gildemeister Shareholders Meeting in support of the Required Amendments, in each case in the form attached hereto, which shall be valid, in effect, and legally binding on Gildemeister, the Shareholder, and the officers and directors of Gildemeister;

(g)    the Companies shall have provided to the Consenting Noteholders (i) executed copies of letter agreements (the "<u>Hyundai Letters</u>") between Hyundai Motor Company ("<u>Hyundai</u>") and Gildemeister and Automotores Gildemeister Peru S.A. ("<u>AGP</u>") respectively, which shall include: (1) Hyundai's agreement to extend its existing distributorship agreements with AG and AGP (together, the "<u>Hyundai Distributorship Agreements</u>") for two years from the Plan Effective Date, (2) Hyundai's acknowledgement and agreement that, after the Plan Effective Date, certain financial creditors of Gildemeister will become the indirect shareholders of Gildemeister and a new chief executive officer for Gildemeister will be selected, and (ii) an executed copy of the Agreement for Undertaking and Release between Hyundai and AGP containing Hyundai's agreement allowing AGP to purchase up to 1854 EURO-4 H-1 vehicles from Hyundai with a discount rate of 30% ("<u>Hyundai Undertaking Agreement</u>"), which Hyundai Letters and Hyundai Undertaking Agreement shall be on terms that are acceptable to the Required Consenting Noteholders in their sole and absolute discretion;

(h)    AGP shall have reported to the Deputy National Superintendent of Customs of the National Superintendence of Customs and Tax Administration ("<u>SUNAT</u>") the facts and circumstances relating to the Customs Claims;

(i)    the Required Consenting Noteholders shall have determined in their sole and absolute discretion that the Companies will have adequate working capital financing to fund their operations at all times; and

(j)    the Required Consenting Noteholders shall have provided written notice to the Companies of their determination that the conditions set forth in Section 1.01 (a) through (i) have been satisfied.

1.02.    <u>Agreement to Support</u>.  So long as (x) this Agreement has not been terminated, (y) no circumstance exists which would (1) cause this Agreement to terminate automatically, or (2)

4

give the Required Consenting Noteholders the right to deliver a written notice of termination of this Agreement, in each case under the terms of Sections 3.01(b) through (dd) and notwithstanding any cure periods that would be otherwise applicable, and (z) the Companies are pursuing the Restructuring in a manner consistent in all material respects with the Restructuring Documents and otherwise in form and substance acceptable to holders of a majority of the 7.50% Notes due 2025 held by all Consenting Noteholders party to this Agreement (the "Required Consenting Noteholders"), each Consenting Noteholder agrees, severally and not jointly, that it shall:

(a)    with respect to all Gildemeister Securities and any other claims and all interests held by such Consenting Noteholder, whether beneficially owned or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, and inclusive of any claims acquired pursuant to Section 1.05 hereof (the "Consenting Noteholder Claims and Interests"):

(i)    following the commencement of any solicitation in accordance with this Agreement and section 1126(b) of the Bankruptcy Code and subject to its actual receipt of the Plan and related disclosure statement and other solicitation materials (the "Solicitation Materials"), vote to accept the Plan, and elect not to "opt out" of the releases set forth in the Plan (the "Release Election"), by delivering its duly executed and completed ballot before the date on which votes on the Plan are required to be submitted in accordance with the Solicitation Materials which shall in no event fall after April 30, 2021 or such later date as is agreed to by the Required Consenting Noteholders in their sole and absolute discretion (the "Voting Deadline");

(ii)    not change or withdraw (or cause to be changed or withdrawn) such vote or Release Election; *provided* that if, prior to consummation of the Plan, the Plan is modified without the consent of the Required Consenting Noteholders or this Agreement is terminated in accordance with the terms of Section 3 hereof, each of the Consenting Noteholders shall have the right to revoke its vote in favor of the Plan and its Release Election, and the Companies shall take all steps necessary to assist in such revocation, and upon such revocation any such vote and Release Election shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, and the ballots casting such votes and Release Elections may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission); and

(iii)    provide its consent in favor of, and execute and deliver, such reasonable and customary documents as may be requested by Gildemeister to effect the Pledge Amendments, including any amendments to the 2025 Notes Indenture or other Note Documents (as defined in the 2025 Notes Indenture), *provided* that if this Agreement is terminated in accordance with the terms of Section 3 hereof at any time prior to the Plan Effective Date, the Consenting Noteholders shall have the right to revoke all (or, at their election, any portion) of their consents given to effect the Pledge Amendments and any related amendment to the 2025 Notes Indenture or other Note Documents and the Companies shall take all steps necessary to assist in such revocation and upon such revocation any such consents shall automatically be deemed, for all purposes, to be null

5

and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, and any ballots or other documents providing such consents may be changed or resubmitted regardless of whether the deadline to submit or revoke such consents has passed (without the need to seek a court order or consent from the Companies allowing such change or resubmission);

(b)      subject to the terms and conditions set forth herein (including, but not limited to, section 1.06 hereof), in the DIP Term Sheet (including any specified allocations of DIP Commitments as defined therein), and in the DIP Loan Documents, perform any obligations set forth in the DIP Loan Documents;

(c)      attend the Gildemeister Shareholders Meeting, vote in favor of the Required Amendments, and not change or withdraw (or cause to be changed or withdrawn) such votes, *provided* that if, prior to consummation of the Plan, the Plan is modified without the consent of the Required Consenting Noteholders or this Agreement is terminated in accordance with the terms of Section 3 hereof, each of the Consenting Noteholders shall have the right to revoke its votes in favor of the Required Amendments, and the Companies shall take all steps necessary to assist in such revocation, and upon such revocation any such votes shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, and the ballots casting such votes or any other documents evidencing such votes may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

(d)      consent to the use of cash collateral during the pendency of the Chapter 11 Cases subject to the terms and conditions set forth in the DIP Term Sheet and the DIP Orders if and when entered by the Bankruptcy Court;

(e)      consider in good faith any reasonable request from the Companies to amend or supplement the Plan that is necessary or advisable to preserve the expected rights and benefits contemplated under the Plan or that would not otherwise adversely affect the rights or interests of the Consenting Noteholders; *provided, however,* that no Consenting Noteholder shall be under any obligation to consent or agree to any such amendment or supplement;

(f)      not, in any capacity, (i) object, initiate any legal proceedings, or enforce rights as a holder of the Consenting Noteholder Claims and Interests that would have the effect of preventing the acceptance, approval or implementation of the Restructuring or the Plan (other than to enforce the rights of the Consenting Noteholders under this Agreement); (ii) file, vote for, or enter into any letter of intent or other agreement regarding any restructuring, workout, liquidation or plan of reorganization for any of the Companies under any applicable bankruptcy or insolvency laws other than the Restructuring or the Plan; (iii) take any action to accelerate any Consenting Noteholder Claims and Interests or to enforce or foreclose on, or otherwise exercise remedies in respect of, the collateral securing the 7.50% Notes due 2025; or (iv) solicit or direct any person, including, without limitation, the indenture trustee or any collateral trustee under the 2025 Notes Indenture, to undertake any action prohibited by the foregoing clauses (i)-(iii) of this paragraph (e);

6

(g)      negotiate in good faith with the goal of reaching agreement regarding the definitive indentures, amendments to the constitutive documents and agreements governing the issuance of New Securities, all forms of collateral documents, and all organizational documents (including such documents as are necessary or desirable to issue any New Securities, amend any collateral documents securing the Companies' obligations under the 7.5% Notes due 2025, shareholder agreements, employment agreements, and all other documents necessary to consummate the Plan and the other Restructuring Transactions (which shall include for the avoidance of doubt the Definitive Documents (as defined in the Plan Term Sheet)) in accordance with the Restructuring Documents (collectively, the "Definitive Documentation"), which shall be consistent in all material respects with the Restructuring Documents, and otherwise in form and substance acceptable to the Required Consenting Noteholders in their sole and absolute discretion;

(h)      (i) provide its support in favor, in accordance with the Plan Term Sheet, of the assumption on the Plan Effective Date of the Senior Management Agreements on the terms provided to the Required Consenting Noteholders as a condition to the effectiveness of this Agreement pursuant to Section 1.01(e) hereof (and otherwise reflecting such modifications or amendments acceptable to the Required Consenting Noteholders in their sole and absolute discretion), and, (ii) if necessary, on or after the Plan Effective Date, vote its equity interests in USA Holdco, Chile Holdco, or Reorganized AG, as applicable, in favor of the assumption of the Senior Management Agreements in accordance with the Plan Term Sheet, *provided*, *however*, that, the Consenting Noteholders shall have no obligations to support, or vote for any plan that provides for, the assumption of any one of the Senior Management Agreements under clauses (i) or (ii) of this Section 1.02(h) if, prior to the Plan Effective Date, such Senior Manager has at any time following the execution of this Agreement, except to the extent required by his or her fiduciary duties under applicable law in the written opinion of his or her counsel (after providing five (5) business days prior written notice to the Consenting Noteholders and counsel to the Consenting Noteholders of such required action): (w) directly or indirectly, sought, solicited, encouraged, proposed, assisted, engaged in negotiations in connection with or regarding or participated in the formulation or preparation of, any restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Companies, the appointment of a receiver, other than the Restructuring (as the terms of which may be modified by written agreement of the Companies and the Required Consenting Noteholders), or transfer any Gildemeister Securities or Series A and B stock of Gildemeister (except, with respect to any such transfer, with the prior written consent of the Required Consenting Noteholders), (x) taken any action that would reasonably be expected to prevent or interfere with the Chapter 11 Cases or the consummation of the Plan or any of the Restructuring Transactions, (y) taken any action to interfere with or that materially adversely affects (1) the business relationship that any material supplier, creditor or customer has with Gildemeister or any direct or indirect subsidiary thereof (including, but not limited to, any action seeking or that encourages the termination or adverse modification of, the Hyundai Distributorship Agreements, the Hyundai Letters, or the Hyundai Undertaking Agreement) or (2) the relationship of any of the Companies with any applicable regulator or authority, including the Peruvian Authorities (as defined in the Plan Term Sheet), or (z) fails to take all good faith efforts to ensure continued compliance by the Companies under and avoid termination of the Hyundai Letters, the Hyundai Distributorship Agreements, and the Hyundai Undertaking Agreement; and

(i)     not take any action to solicit any material supplier, creditor or customer to terminate or materially and adversely affect its business relationship with any Company (including, but not limited to, any action seeking the termination of, or the exercise of remedies in respect of, Hyundai Distributorship Agreements), *provided, however*, that (i) any actions taken by any Consenting Noteholders or their representatives in any negotiations related to the renewal of the Hyundai Distributorship Agreements, the Hyundai Letters, the Hyundai Undertaking Agreement, the resolution of the Customs Claims, discussions with Peruvian Authorities relating to the Customs Claims, or matters ancillary thereto or at the request of any of the Peruvian Authorities shall not be considered to be in violation of this provision, and (ii) this provision shall not create any obligation for any Consenting Noteholder to consent or agree to any request from any material supplier, creditor, or customer.

Notwithstanding the foregoing, this Agreement shall not limit any of the following Consenting Noteholder rights, except to the extent inconsistent with this Agreement: (i) to enforce any rights under this Agreement, including the right to terminate this Agreement in accordance with the provisions hereof, (ii) any Consenting Noteholder's rights under any applicable indenture, credit agreement, other loan document or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case under the Bankruptcy Code or under the laws of any other applicable jurisdiction concerning the Companies in any forum, so long as such appearance and the positions advocated in connection therewith are consistent with the Plan Term Sheet, the Plan, this Agreement and the Restructuring and do not materially hinder, delay or prevent the date that the Plan becomes effective (the "Plan Effective Date"), (iii) to take or direct any action relating to maintenance, protection or preservation of any collateral, the perfection or priority of any security interest or other lien, or the proof, allowance, or enforcement of any claim against any Debtor or non-Debtor person or otherwise authorized by any DIP Loan Document; (iv) to limit claims against any parties other than the Companies, or (v) the ability of a Consenting Party, a Debtor, or its respective advisors to consult with other Parties or their respective advisors or any other interested party in any of the Bankruptcy Cases.

Notwithstanding anything to the contrary herein or otherwise, (A) the Gildemeister Securities held by a holder shall not include any Gildemeister Security for which the holder does not have the right to control voting or is not permitted by a preexisting contractual obligation or operation of law to vote in favor of the Restructuring (the "Non-Controlled Securities") until such times as the holder acquires the right to control voting or the preexisting contractual obligations or provisions of law no longer restrict the ability of the holder to vote such Non-Controlled Securities in favor of the Restructuring and (B) the failure of any Consenting Noteholder to vote any of its Gildemeister Securities or deliver any consents in accordance with the Restructuring Documents in each case due to any change in law that prohibits or limits such vote or delivery shall not be a breach of this Agreement.

    1.03.   Covenants of the Companies.

    (a)     Consummation of the Restructuring.  The Companies shall: (i) not, directly or indirectly, seek, solicit, encourage, propose or assist in the formulation or preparation of any restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Companies, or the appointment of a receiver, other than the Restructuring (as the terms of which may be modified by written agreement of the

Companies and the Required Consenting Noteholders); *provided* that the Companies may engage in negotiations in connection with or regarding any unsolicited restructuring proposal (other than a restructuring proposal made by the Shareholder, any Senior Manager, or any entity affiliated with the Shareholder or any Senior Manager), to the extent required by their fiduciary duties under applicable law in the written opinion of their counsel, *provided*, *further*, that the Companies shall, promptly upon (and in any event no later than two (2) business days after) receiving any unsolicited restructuring proposal, inform the Consenting Noteholders of its receipt of such proposal, provide a summary of the terms thereof, and share with the Consenting Noteholders copies of all materials delivered in connection therewith, (ii) not take any action that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Cases or the consummation of the Plan or any of the other Restructuring Transactions, including, without limitation, entering into any agreements, documents, contracts or instruments that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Cases or the consummation of the Plan or any of the other Restructuring Transactions and (iii) take all actions reasonably necessary or reasonably requested by the Required Consenting Noteholders to consummate the Plan and the other Restructuring Transactions in accordance with the terms set forth in the Restructuring Documents, including:

(A)     providing drafts of all Definitive Documents (as defined in the Plan Term Sheet) including any material pleadings and other filings seeking substantive relief to be filed with the Bankruptcy Court to legal counsel for the Ad Hoc Group of Consenting Noteholders at the times and subject to the consents provided in the Plan Term Sheet;

(B)     (1) convening the Gildemeister Shareholders Meeting no later than nineteen (19) calendar days after the publication of the notice scheduling the Gildemeister Shareholders Meeting, and (2) commencing the Chapter 11 Cases only after the Gildemeister Shareholders Meeting and on or before April 15, 2021 (the "Outside Petition Date," and the actual commencement date, the "Petition Date");

(C)     filing on the Petition Date the following pleadings and documents, in each case in form and substance satisfactory to the Required Consenting Noteholders in their sole and absolute discretion:

(1)     the First Day Pleadings;

(2)     a proposed order scheduling the Confirmation Hearing;

(3)     a proposed Interim DIP Order; and

(4)     the Plan, the Disclosure Statement, and the Solicitation Materials;

(D)     taking no actions to propose or otherwise consent to, and timely filing a formal objection to any motion filed with the Bankruptcy Court by a third party seeking, the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file

and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional official committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with this Agreement, the Plan, or the DIP Loan Documents;

(E)   taking all steps reasonably necessary or desirable to obtain an order of the Bankruptcy Court, which shall be satisfactory in form and substance to the Required Consenting Noteholders in their sole and absolute discretion, confirming the Plan pursuant to section 1129 of the Bankruptcy Code (the "Confirmation Order") in a manner that is consistent in all respects with the terms and conditions set forth in the Plan and the Plan Term Sheet, on or before the deadline set forth in this Agreement;

(F)   providing prompt written notice to the Consenting Noteholders in accordance with Section 6.09 hereof of (1) the occurrence, or failure to occur, of any event, change, effect, occurrence, development, circumstance or change of fact of which any of the Companies have knowledge, which occurrence or failure to occur would reasonably likely cause, or has caused (a) any representation or warranty of any of the Companies contained in this Agreement or the DIP Loan Documents to be untrue or inaccurate in any respect, (b) any covenant of any of the Companies contained in this Agreement or the DIP Loan Documents not to be satisfied in any respect, (c) any occurrence that would cause any Condition Precedent to the Plan Effective Date or any condition precedent to the DIP Lenders' funding commitments specified in Section 1.06(b) hereof: (i) not to be satisfied or (ii) become materially less likely to be satisfied or (d) a material adverse impact on the ability of the Companies to initiate solicitation of acceptance of the Plan, file the Chapter 11 Cases as contemplated herein, or consummate any other Restructuring Transaction, (2) receipt of any written notice from any third party whose consent or agreement the Companies reasonably believe may be required in connection with the Restructuring Transactions (a) indicating that such consent or agreement will not be provided by such party, (b) requesting consideration in exchange for such consent, or (c) conditioning such consent on terms that are inconsistent with the terms hereof, (3) receipt by Gildemeister of any written notice from any governmental body in connection with this Agreement, the Chapter 11 Cases, the Plan, or any of the other Restructuring Transactions, (4) receipt by Gildemeister of any written notice of any proceeding commenced against the Companies, relating to or involving or otherwise adversely affecting in any material respect this Agreement, the Customs Claims, discussions with Peruvian Authorities relating to the Customs Claims, the Hyundai Letters, the Hyundai Distributorship Agreements, the Hyundai Undertaking

10

Agreement, the Chapter 11 Cases, the Plan, or any of the other Restructuring Transactions, (5) receipt by any of the Companies of notice from Hyundai that it does not intend to renew the Hyundai Distributorship Agreements as provided herein, in the Hyundai Letters, the Hyundai Undertaking Agreement, or in the Plan Term Sheet or otherwise repudiates any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement, (6) any event, occurrence, change, development or circumstance indicating that Hyundai either (a) has commenced a process (i) for winding down its business relationships with the Companies or (ii) to initiate a business relationship with a replacement distributor of automobiles in Chile or Peru other than the Companies or (b) has initiated any business relationship with any distributor of automobiles in Chile or Peru other than the Companies, (7) any lender under any of the Credit Facilities (as defined in the 2025 Notes Indenture) delivering any notice (and the Companies agree to provide a copy of such notice to the Consenting Noteholders) of any default or acceleration of the Companies' obligations under such Credit Facility or otherwise terminating any or all funding obligations under such Credit Facility, (8) any termination of any of the Hyundai Letters, the Hyundai Undertaking Agreement, or the Hyundai Distributorship Agreements without the consent of the Required Consenting Noteholders, (9) the taking by any Senior Manager of any action which would permit the Consenting Noteholders to not support the assumption of the Senior Management Agreements under Section 1.02(h) of this Agreement, or (10) the taking by any of the Companies of any action prohibited under Section 1.03(a)(H) of this Agreement;

(G)    using commercially reasonable efforts to conduct the Companies' businesses as currently conducted (subject to the other provisions of this Section 1.03(a) and as required to facilitate the Restructuring Transactions in accordance with this Agreement) and to keep intact the material assets, operations and relationships of the Companies' businesses, and promptly inform the Consenting Noteholders about all occurrences that would reasonably be expected to have a material adverse effect on the assets, operations, conditions (financial or otherwise), liquidity, or relationships (including, but not limited to, with creditors and suppliers) of the Companies' businesses, in each case taken as a whole;

(H)    absent the prior written consent of the Required Consenting Noteholders in their sole and absolute discretion in accordance with Section 6.09 hereof, refraining from:  (1) issuing any new equity interests or any securities or instruments convertible or exchangeable or exercisable into equity interests; (2) engaging in any transactions that would violate the covenants in the 2025 Notes Indenture or the documents governing the terms of Gildemeister's currently outstanding Preferred Stock; (3) making any payments (including through redemptions or acquisitions or by way of distributions of assets) to holders of equity interests of Gildemeister or making any declarations for payments of dividends, including payments

11

on account of equity interests issued to any employees or directors of the Companies pursuant to any compensation or benefit plans under any agreement in effect as of the date hereof; (4) enter into any new compensation arrangements with, or modify any Senior Management Agreements with, any member of the management of Gildemeister or any direct or indirect subsidiary thereof who have existing severance agreements with Gildemeister or any direct or indirect subsidiary; (5) except as provided in clause (6) of this Section 1.03(a)(H), granting liens or suffering any liens to exist on any assets, in each case to secure debt or derivatives or other financing arrangements, other than in respect of continuing working capital financing under the Credit Facilities existing as of the date hereof; (6) lending or advancing to, or making any capital contribution to, or otherwise investing in or making any payment on behalf of, any of the Companies or any direct or indirect subsidiary thereof organized in the country of Peru other than a loan that is: (x) secured by valid and perfect liens upon assets of the borrower of such loan having a fair market value in excess of the amount of such loan, (y) pledged as collateral in favor of the DIP Lenders to secure the obligations under the DIP Loan Documents, and (z) on terms acceptable to the Required Consenting Noteholders in their sole and absolute discretion; (7) terminating or modifying the Hyundai Letters, the Hyundai Distributorship Agreements (other than as may be required to implement the extension of the Hyundai Distributorship Agreements as contemplated in the Hyundai Letters), or the Hyundai Undertaking Agreement; and (8) waiving any reasonable objection or defense against, or otherwise failing to reasonably contest, any material adverse action, material fine, or material penalty imposed against any of the Companies by any Peruvian Authorities in connection with the Customs Claims;

(I)     refraining from entering into any agreements with any Peruvian Authorities with respect to Customs Claims without the consent of the Required Consenting Noteholders in their sole and absolute discretion;

(J)     taking all steps reasonably necessary to cause the Restructuring Transactions to occur on or before the Milestones set forth in the Plan Term Sheet;

(K)     taking no actions, directly or indirectly, and not encouraging any other person to take any actions that are inconsistent with or are reasonably likely to interfere with, frustrate, delay or prevent the timely approval, confirmation and consummation of the Plan in accordance with the terms and conditions of the Plan and this Agreement, including, without limitation, (x) taking any action in contravention of the Required Amendments or taking any action intending to reverse, undo, negate or limit the effect of the Required Amendments, or (y) entering into any agreements, documents, contracts, or instruments that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11

12

Cases or the consummation of the Plan or any of the other Restructuring Transactions, subject to Section 3.02 hereof in all respects;

(L)  executing such documentation as is required to comply with its obligations under Section 6.01 hereof, and causing any affiliate of the Companies not party to this Agreement to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Restructuring in a manner materially consistent with the terms and conditions set forth in the Restructuring Documents including, for the avoidance of doubt, the Pledge Amendments;

(M)  keeping the Consenting Noteholders informed regarding the Customs Claims by (i) providing the Consenting Noteholders and their counsel with all known information materially relating to the Customs Claims, any negotiations or discussions with Peruvian Authorities relating to the Customs Claims, or discussions by Senior Managers with the board of directors of any of Companies, the media, Hyundai or any creditors of or claimants against the Companies, any trading counterparties, or any of the foregoing's agents or professionals of any kind materially related to the Customs Claims within one (1) business day of receipt of such information and (ii) providing the Consenting Noteholders' counsel with at least forty-eight (48) hours' notice (or, if such notice is impossible, as much notice as is practicable) of all meetings scheduled with any Peruvian Authorities regarding the Customs Claims, and allowing the Consenting Noteholders' counsel to attend all such meetings that are attended by AGP's counsel;

(N)  taking all actions necessary to remain in compliance with and avoid the termination of the Hyundai Letters, the Hyundai Undertaking Agreement, and the Hyundai Distributorship Agreements;

(O)  taking all reasonable, necessary and prudent actions to expeditiously resolve the Customs Claims in the best interest of the Companies and their stakeholders in consultation with the Required Consenting Noteholders;

(P)  taking all actions reasonably necessary to maintain access to the Credit Facilities and adequate working capital financing to fund the operations of the Companies at all times; and

(Q)  providing within a reasonable period of time, to the Required Consenting Noteholders or their counsel, all information and documentation requested by the Required Consenting Noteholders, in their sole and absolute discretion, for the purposes of completing their due diligence of the Company Parties' respective compliance policies and procedures relating to, among other things, anti-corruption and compliance with anti-

13

corruption and other applicable laws, and cooperating with the Required Consenting Noteholders in the completion of such review.

(b)    Payment of Fees and Expenses.  The Companies shall promptly pay and reimburse the reasonable and documented fees and expenses incurred by Dechert LLP, Prieto Abogados SpA, Pinheiro Neto, Hernández y Cía, Ferrere Abogados, Costa Rican counsel selected by the Required Consenting Noteholders, any other counsel reasonably necessary to advise the Required Consenting Noteholders in connection with the Restructuring Transactions (including the transactions contemplated under the DIP Loan Documents), and Link Capital Partners SpA, as financial advisor to Dechert LLP as counsel to the Consenting Noteholders (such advisors, collectively, the "Ad Hoc Group Advisors") set forth on summary statements that provide general descriptions of the work performed during the relevant period (which descriptions may be limited or redacted in the professionals' sole discretion to protect matters that may be privileged or confidential), which statements are delivered to the Companies and/or Cleary Gottlieb Steen & Hamilton LLP, whether incurred before or after the date hereof and regardless of whether the Restructuring contemplated herein is actually consummated or the documentation related to the Restructuring (including the DIP Loan Documents) is executed; provided, however, that to the extent this Agreement is terminated in accordance with the terms hereof, the Companies shall have no such obligation to pay such fees and expenses pursuant to this Section 1.03(b) with respect to any fees or expenses incurred after the date of such termination, provided further, that the Companies shall have the obligation to pay all fees and expenses of the Consenting Noteholders or any other lenders under the DIP Credit Facility (in such capacities as lenders, the "DIP Lenders") in accordance with the DIP Loan Documents incurred in connection with the enforcement, collection or protection of any of their rights and remedies under the DIP Loan Documents.

(c)    Agreement to Negotiate.  The Companies shall negotiate in good faith with the goal of reaching agreement regarding the Definitive Documentation, which shall be consistent in all material respects with the Restructuring Documents and this Agreement and in form and substance reasonably acceptable to the Companies and in form and substance acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

1.04.    Covenants of the Shareholder.  The Shareholder shall (a) not, directly or indirectly, seek, solicit, encourage, propose, assist, engage in negotiations in connection with or regarding or participate in the formulation or preparation of, any restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Companies, the appointment of a receiver (other than the Restructuring (as the terms of which may be modified by written agreement of the Companies and the Required Consenting Noteholders)), or transfer any Gildemeister Securities or Series A and B stock of Gildemeister (except, with respect to any such transfer, with the prior written consent of the Required Consenting Noteholders), (b) not take any action that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Cases, the consummation of the Plan or any of the other Restructuring Transactions, including, without limitation, (x) taking any action in contravention of the Required Amendments or taking any action intending to reverse, undo, negate or limit the effect of the Required Amendments, or (y) entering into any agreements, documents, contracts, or instruments that would reasonably be expected to prevent, interfere with, delay or impede the Chapter 11 Cases or the consummation of the Plan or any of the other Restructuring Transactions,

14

(c) (x) in its capacity as a creditor of the Debtors, vote in favor of the Plan, (y) not contest the treatment of any Claims or Interests held by the Shareholder (whether in its capacity as shareholder of Gildemeister or otherwise) under the Plan, and (z) be bound in all respects by the Confirmation Order, and (d) take all actions reasonably necessary or reasonably requested by the Required Consenting Noteholders to consummate the Plan and the other Restructuring Transactions in accordance with the terms set forth in the Restructuring Documents; *provided* that, if the Consenting Noteholders seek to or support any request or motion to subordinate any Claims of the Shareholder, the Shareholder shall not be required to vote in favor of the Plan and shall have the right to revoke any prior vote in favor of the Plan.

1.05.    Transfer of Interests.

(a)    Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Noteholder to sell, use, assign, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly, any or all of its Gildemeister Securities; *provided, however*, that for the period commencing as of the Agreement Effective Date until (x) the termination of this Agreement pursuant to the terms hereof, or (y) the existence of any circumstance which would (1) cause this Agreement to terminate automatically, or (2) give the Required Consenting Noteholders the right to deliver a written notice of termination of this Agreement, in each case under the terms of Sections 3.01(b) through (dd) and notwithstanding any cure periods that would be otherwise applicable (the period until the occurrence of (x) or (y), the "Restricted Period"), no Consenting Noteholder shall sell, assign, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly ("Transfer") any Gildemeister Securities and any purported Transfer of any Gildemeister Securities shall be void and without effect (other than any Transfer or purported Transfer to a prime broker or in connection with derivatives or financing transactions, including repurchase agreements, until such time as the prime broker or counterparty to a derivative or financing transaction acquires title free and clear of any obligation to return the Gildemeister Securities to the Consenting Noteholder sufficiently in advance of the Voting Deadline to permit the Consenting Noteholder to comply with its obligations hereunder), *unless* (i) the transferee is a Consenting Noteholder or (ii) if the transferee is not a Consenting Noteholder prior to the Transfer, such transferee delivers to the Companies, at or prior to the time of the proposed Transfer, an executed copy of the transfer agreement (each, a "Transfer Agreement") in the form attached as Exhibit B hereto pursuant to which such transferee shall assume all obligations of the Consenting Noteholder transferor hereunder in respect of the Gildemeister Securities being Transferred; *provided* that no Consenting Noteholder shall Transfer any or all of its Gildemeister Securities to any person or entity that the Consenting Noteholder has actual knowledge of the identity of such counterparty and actual knowledge that such counterparty is an adverse party to any pending litigation against any of the Companies; *provided further* that the Consenting Noteholders shall have no duty to inquire or determine the identity of the counterparty to the Transfer or whether such counterparty is an adverse party to any pending litigation against any of the Companies.

(b)    Upon consummation of any Transfer in compliance with Section 1.05(a), (i) any person or entity that is a transferee shall be fully bound by this Agreement as a "Consenting Noteholder" and shall be a "Party" hereunder and (ii) the transferor shall no longer be bound by the Agreement or the obligations, nor have any rights, hereunder with respect to any Gildemeister Securities that have been Transferred. This Agreement shall in no way be construed to preclude

the Consenting Noteholders from acquiring additional Gildemeister Securities; *provided*, *however*, that any additional claims and interests acquired by any Consenting Noteholder after executing this Agreement shall automatically and immediately upon acquisition by such Consenting Noteholder be deemed subject to all of the terms of this Agreement whether or not notice is given to the Companies and counsel to the Consenting Noteholders of such acquisition. Upon execution of this Agreement (on its signature pages hereto), and promptly upon receipt of Gildemeister's written request in accordance with <u>Section 6.09</u> hereof, a Consenting Noteholder shall notify Gildemeister of the total principal amount of claims and interests held by such Consenting Noteholder as of the date of such request; *provided* that the Companies shall keep such information confidential, which obligation shall survive termination of this Agreement.

     1.06.   <u>Financing Commitments</u>.

     (a)    Capitalized terms used but not otherwise defined in this Section 1.06 shall have the meanings ascribed to such terms in the DIP Term Sheet.

     (b)    <u>Conditions Precedent</u>. The Commitments (as defined in the DIP Term Sheet) of certain of the Consenting Noteholders to make extensions of credit as DIP Lenders as contemplated by the DIP Term Sheet, and the related agreements of each DIP Lender thereunder and under the DIP Loan Documents, are subject to the satisfaction or waiver in writing by such Consenting Noteholders of the following conditions precedent:

     (i)    since the Agreement Effective Date, there shall not have occurred or exist any changes, circumstances or events that, individually or in the aggregate, have caused or would reasonably be expected to:

     (A)   cause any representation made in Section 2.01 hereof to become untrue; or

     (B)   cause a Material Adverse Effect; for all purposes in this Agreement "<u>Material Adverse Effect</u>" shall mean any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a material adverse effect on (i) the business, results of operations, value, or financial condition of the Companies taken as a whole, (ii) the legality, validity or enforceability of any DIP Loan Document or any DIP Order, (iii) the ability of the Companies to perform their respective obligations under this Agreement or the DIP Loan Documents, (iv) the value of the Collateral, (v) the perfection or priority of the liens granted pursuant to the DIP Loan Documents or any DIP Order, or (vi) the ability of the DIP Agent, the DIP Collateral Agent, or the DIP Lenders to enforce the DIP Loan Documents; <u>provided</u>, <u>however</u>, <u>that</u> none of the following shall constitute, or shall be considered in determining whether there has occurred or could reasonably be expected to occur, a "Material Adverse Effect": (i) effects resulting from changes generally affecting financial, banking, credit, securities, or commodities markets, the economy in general,

or prevailing interest rates or general capital market conditions in the United States, (ii) a change in the International Financial Reporting Standards or interpretations thereof after the date hereof, (iii) the filing of the Chapter 11 Cases, the DIP Orders, any actions or omissions taken with the consent of such Consenting Noteholder or compliance by any party with the covenants and agreements herein, or (iv) any natural disaster, weather-related events or other acts of God, acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway, or (v) the impact of the COVID-19 pandemic; provided, further, however, that any of the changes, events or effects referred to in clauses (i), (ii), (iv) or (v) immediately above may be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent any such change, event or effect affects the Companies, taken as a whole, in a disproportionate manner when compared to the effect of such changes, events or effects on other persons engaged in the business and geographic market in which the Companies operate; and provided, further, however, that any failure by the Companies to meet internal or other financial projections or forecasts for any period shall not, by itself, be deemed a Material Adverse Effect (it being understood, however, that the facts or occurrences giving rise to or contributing to such failure may be taken into account in determining whether there has been a Material Adverse Effect); and provided, further, however, that any event, change, effect, occurrence, development, circumstance or change of fact related to the Customs Claims (a "Customs Claims Event") disclosed orally or in writing to the Required Consenting Noteholders or the Required Consenting Noteholders' counsel prior to the date that is five (5) Business Days prior to the DIP Closing Date (as defined in the DIP Credit Agreement) shall not, individually or in the aggregate with another Customs Claims Event, be deemed a Material Adverse Effect (it being understood, however, that the facts or occurrences arising out of the Customs Claims Events may be taken into account in determining whether there has been a Material Adverse Effect);

(ii)      the accuracy and completeness, in all material respects, of all representations that the Companies and their affiliates make to the DIP Lenders in the DIP Loan Documents and to the Consenting Noteholders in Section 2.01 of this RSA; provided, that any of such representations that are expressly qualified as to "materiality" or "material adverse effect" shall be accurate and complete in all respects;

(iii)     since the Agreement Effective Date, the Companies not (x) receiving any proceeds from any offering, placement or arrangement of any debt securities or bank financing (other than the Credit Facilities or working capital facilities permitted under the 2025 Notes

Indenture) or (y) issuing, offering, placing or arranging any debt securities or bank financing (other than the Credit Facilities or working capital facilities permitted under the 2025 Notes Indenture);

(iv)    the payment in full of all fees, expenses and other amounts payable under, and in accordance with, this Agreement, the Plan Term Sheet and the DIP Term Sheet;

(v)    the negotiation, execution and delivery of definitive documentation with respect to the DIP Loan Documents that is consistent with this Agreement, the Plan Term Sheet and the DIP Term Sheet and otherwise satisfactory to the Consenting Noteholders in their sole and absolute discretion;

(vi)    the satisfaction of each of the "Conditions Precedent" to effectiveness of the DIP Credit Facility and to the funding of the DIP Loans as are set forth in the DIP Term Sheet;

(vii)    with respect to execution of the DIP Loan Documents, the Interim DIP order shall have been entered and shall be in full force and effect in accordance with its terms and no "Event of Default" (as defined in the DIP Credit Facility) shall have occurred and be continuing unless otherwise waived in writing by the Requisite Lenders;

(viii)    the Hyundai Letters and the Hyundai Undertaking Agreement shall have been executed, shall remain in full force and effect, and shall not have been terminated or modified and no obligation of any signatory thereto shall have been repudiated for any reason;

(ix)    (A) this Agreement shall have been executed, become effective, and shall not have been terminated, (B) no circumstance exists which would (x) cause this Agreement to terminate automatically, or (y) give the Required Consenting Noteholders the right to deliver a written notice of termination of this Agreement, in each case under the terms of Sections3.01(b) through (dd) and notwithstanding any cure periods that would be otherwise applicable, (C) the Companies and Minvest S.A. shall not be in breach of any provision of this Agreement, and (D) no Senior Manager shall have taken any action that would permit the Consenting Noteholders to not support the assumption of the Senior Management Agreements under Section 1.02(h) hereof; and

(x)    the Companies shall represent in writing to the Consenting Noteholders, as of the date of the DIP Loan Documents, that they have no reason at such time to believe that the Companies will fail to meet any of the Milestones.

(c)    Commitment Termination.  The Commitment of each Consenting Noteholder described in this Section 1.06 and in the DIP Term Sheet shall terminate, at the sole option and absolute discretion of such Consenting Noteholder, on the earliest of the following to occur: (a) the Closing Date (as defined in the DIP Term Sheet), (b) any issuance, placement, incurrence or funding of debt securities or bank financing by any of the Companies with third parties (other than the Credit Facilities or working capital facilities permitted under the 2025 Notes Indenture), (c) notice from any of the Companies to the Consenting Noteholders at any time that it wishes to terminate this Agreement, (d) any breach of this Agreement by any of the Companies or Minvest S.A., (e) any Senior Manager shall have taken any action that would permit the Consenting Noteholders to not support the assumption of the Senior Management Agreements under Section 1.02(h) hereof, (f) the existence of any circumstance which would (x) cause this Agreement to

terminate automatically, or (y) give the Required Consenting Noteholders the right to deliver a written notice of termination of this Agreement, in each case under the terms of Sections 3.01(b) through (dd) and notwithstanding any cure periods that would be otherwise applicable, and (g) a termination by any Consenting Noteholder of its Commitment under this Section 1.06.

(d)    Indemnification.  Whether or not any of the transactions contemplated under the DIP Term Sheet are consummated, each of the Companies (each, an "Indemnitor") jointly and severally agree to indemnify and hold harmless the DIP Agent, the DIP Collateral Agent, or the DIP Lenders, each of the Consenting Noteholders and each of its respective affiliates and each of its respective partners (general and limited), shareholders, directors, members, principals, agents, advisors (including the Consenting Noteholders' Advisors (as defined below)), legal counsel, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "Indemnified Person") from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person (including, without limitation, fees and disbursements of counsel for each such party), joint or several, that may be incurred by or asserted or awarded against any Indemnified Person (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of this Agreement, the Plan Term Sheet, DIP Term Sheet, the DIP Credit Facility, the Collateral, the DIP Loan Documents or the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the DIP Credit Facility, whether or not brought by any Company or other Indemnitor or any other person or entity, *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to any damage, loss, settlement payment, obligation, liability, claim, action, cause of action or expense to the extent it is found in a final, non-appealable order of a court of competent jurisdiction to have resulted from the willful misconduct, gross negligence or bad faith of such Indemnified Person. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective, subject to the proviso to the immediately preceding sentence, whether or not such investigation, litigation or proceeding is brought by any Company or other Indemnitor, any securityholder or creditor thereof, any affiliate thereof, an Indemnified Person or any other person or entity, or an Indemnified Person is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

Neither the DIP Agent, the DIP Collateral Agent, or the DIP Lenders nor any other Indemnified Person shall be responsible or liable to the Companies or any other person or entity for (w) any determination made by such Indemnified Person (or any other Indemnified Person) pursuant to this Agreement in the absence of gross negligence or willful misconduct by such Indemnified Person (all as determined by a court of competent jurisdiction in a final and non-appealable judgment), (x) any damages arising from the use by persons or entities (other than the Consenting Noteholders, the DIP Agent, the DIP Collateral Agent, or the DIP Lenders) of information or other materials obtained through electronic, telecommunications, internet-based or other information transmission systems (including IntraLinks, SyndTrak Online or email), except to the extent such damages have resulted solely from the willful misconduct or gross negligence of the DIP Agent, the DIP Collateral Agent, or such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (y) any indirect, special, exemplary, incidental, punitive or consequential damages (including, without limitation, any loss of profits,

business or anticipated savings) which may be alleged as a result of the financing contemplated hereby.

(e)      PATRIOT ACT Notification. Each of the Consenting Noteholders hereby notifies the Company, in connection with the transactions contemplated in the DIP Term Sheet that pursuant to the requirements of the USA PATRIOT Act (the "PATRIOT Act"), such Consenting Noteholder, the DIP Agent, or the DIP Collateral Agent under the DIP Credit Facility may be required to obtain, verify and record information that identifies each borrower under each of the DIP Credit Facility, which information includes the name, address, tax identification number and other information regarding each borrower that will allow such Consenting Noteholder, the DIP Lenders, the DIP Agent, or the DIP Collateral Agent to identify each borrower in accordance with the PATRIOT Act and is effective as to each Consenting Noteholder, the DIP Agent, the DIP Collateral Agent, and each DIP Lender.

**Section 2.**      Representations and Warranties.

2.01.      Representations and Warranties of the Companies.  The Companies represent and warrant, jointly and severally, to each of the Consenting Noteholders as of the date hereof to the best of their knowledge after due inquiry and as of: (1) the Petition Date, (2) the date of the Gildemeister Shareholders Meeting, (3) the date the DIP Credit Facility is executed, (4) the date any loans are advanced under the DIP Credit Facility, (5) the Voting Deadline, (6) the date of entry of the Confirmation Order, and (7) the Plan Effective Date, to the best of their knowledge, that:

(a)      the statements, information, reports, financial statements, certificates, memoranda and schedules furnished (or to be furnished) by or on behalf of the Companies in connection with the negotiation, preparation, or delivery and performance of this Agreement, the Restructuring Transactions, and the Solicitation Materials, do not, and will not as of the time they were or shall be made or furnished, (i) contain any untrue statement of any material fact, (ii) omit to state any material fact necessary to make such statements, information, reports, financial statements, certificates, memoranda and schedules, taken as a whole and in light of the circumstances under which they were made and as of the time at which they were made, not materially misleading, or (iii) fail to disclose any material facts, occurrences, circumstances, or events including without limitation any contingent or non-contingent liabilities of the Companies or any direct or indirect subsidiaries thereof the value of which liabilities individually (or with respect to related liabilities, in aggregate) would reasonably be expected to exceed $500,000;

(b)      the Companies have not taken, between November 7, 2019 and any date on which this representation is given, and will not take prior to the Plan Effective Date, absent the prior written consent of the Required Consenting Noteholders in their sole and absolute discretion in accordance with Section 6.09 hereof, any of the actions prohibited by Section 1.03(a);

(c)      (x) the Companies have provided to the Consenting Noteholders (i) exact copies of all existing employment, non-compete, severance, change of control, and other agreements between the Chief Executive Officer of Gildemeister and Gildemeister (or any direct or indirect subsidiary thereof) which, in respect of the existing employment agreement and the existing non-compete agreement of the Chief Executive Officer of Gildemeister reflect the form to be assumed by the Reorganized Debtors on the Plan Effective Date, and (ii) a complete list and summary of

21-10685-lgb    Doc 27    Filed 04/14/21    Entered 04/14/21 12:50:21    Main Document
Pg 201 of 396

the base salary and the amounts of all obligations under employment, non-compete, severance, change of control, and other agreements that may be claimable by any member of management of Gildemeister or any of its direct or indirect subsidiaries that is party to a severance agreement with Gildemeister or any direct or indirect subsidiary thereof all of whom are listed on the Senior Manager List, and (y) there has been no modification to any of the agreements referenced in clause (x) of this Section 2.01(c);

(d)    the following representations are true in all respects:

(i)    The Companies have disclosed to the Consenting Noteholders all known facts relating to the Customs Claims and, other than with respect to the Customs Claims, none of the Companies or any direct or indirect subsidiaries thereof has violated or received written notice of any violation, with respect to any law, rule, regulation, order, decree or judgment (each, a "Law") applicable to it and its business, including without limitation Laws relating to transactions with affiliates, lending, debt collection, notice, privacy, customs, the import or export of materials or goods, environment Laws, safety or similar Laws, anti-money laundering Laws, anti-corrupt practices Laws, or national, federal, state, or municipal Laws relating to discrimination in hiring, promotion or pay of employees, or wages and hours Laws. Each of the Companies and each of the direct or indirect subsidiaries thereof has all necessary licenses, permits, certificates, authorizations, consents and approvals and has made all necessary filings required under any Law (collectively, the "Authorizations") required in order to conduct its respective business.

(ii)    Other than with respect to the Customs Claims, (1) each of the Companies and any direct or indirect subsidiaries thereof have obtained and are in compliance in all material respects with all material Authorizations required by applicable Law including but not limited to any environmental, customs, import and export, and criminal Laws (collectively, the "Fundamental Operations Laws") to operate their respective businesses as currently conducted, (2) there are no pending or threatened claims, investigations, complaints, or litigation proceedings involving environmental matters, anti-money laundering, anti-corrupt practices, hazardous materials, customs matters, import or export matters, criminal actions of any kind, or Fundamental Operations Laws against any the Companies and any direct or indirect subsidiaries thereof, (3) none of the Companies or any of their direct or indirect subsidiaries is required or obligated to make any capital expenditure or pay any fine in excess of $100,000 or any other material expenditure not ordinarily or routinely incurred to comply with any Fundamental Operations Law nor is there any reasonable basis on which any governmental authority would reasonably be expected to take any action against the Companies or any direct or indirect subsidiaries thereof that would require the Companies or any direct or indirect subsidiaries thereof to undertake any material capital or other expenditure to comply with Fundamental Operations Laws, and (4) each of the Companies and each of their direct and indirect subsidiaries have instituted and maintain policies, procedures, systems of accounting and operational controls, designed to ensure, and which are reasonably expected to continue to ensure, continued compliance with all Fundamental Operations Laws.

(iii)    None of the Companies or any direct or indirect subsidiaries thereof or their respective directors, officers, or employees, or, any other person or entity acting on

behalf of the Companies, is or is owned or controlled by an individual or entity that is: (i) the target of any sanctions administered or enforced by Chile, Peru, Uruguay, Costa Rica, Brazil, the United States or any other country ("Sanctions"), or (ii) located, organized or headquartered in a country or territory that is the subject of comprehensive Sanctions (including, without limitation, Cuba, Iran, North Korea, Sudan and Syria).  None of the Companies or any direct or indirect subsidiaries thereof have knowingly engaged in, nor are they now knowingly engaged in, any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of applicable Sanctions Laws or with any country or territory that is the subject or target of any Sanctions Laws whether or not permitted by applicable law.  None of the Companies or any direct or indirect subsidiaries thereof or any of their respective directors, officers, employees, or any other person acting on behalf of the Companies or any direct or indirect subsidiaries thereof is the subject of any current, pending or threatened investigation, inquiry or enforcement proceedings for violations of any applicable Sanctions Law by any governmental authority in any country.

(iv)     None of the Companies or any direct or indirect subsidiaries thereof have any material off-balance sheet transactions, arrangements, obligations (including contingent obligations), or any other similar relationships with unconsolidated entities or other persons.

(v)     There has not been as of any date on which this representation is given (i) any event, circumstance or change in circumstance that, individually or in the aggregate, has or would reasonably be expected to have a Material Adverse Effect, (ii) except as provided for in this Agreement, the occurrence or consummation of any transaction, other than in the ordinary course of business, contemplated in any substantive manner or entered into by any of the Companies or any direct or indirect subsidiaries thereof, (iii) except as provided for in this Agreement, any incurrence of any obligation, contingent or otherwise, directly or indirectly incurred by any of the Companies or any direct or indirect subsidiaries thereof, other than in the ordinary course of business, (iv) any payment of any dividend or distribution of any kind by any of the Companies or any direct or indirect subsidiaries thereof on any class of equity securities, or any purchase by any of the Companies or any direct or indirect subsidiaries thereof of any of such entities' outstanding equity securities or repayment or repurchase of such entities' indebtedness since November 19, 2019, or (v) except as expressly provided for under the terms of this Agreement, any change of the equity securities or indebtedness of any of the Companies or any direct or indirect subsidiaries thereof since November 19, 2019.

(vi)     Except with respect to Rothschild & Company and FTI, none of the Companies or their direct or indirect subsidiaries has incurred any liability for any finder's fees, success fees, financial advisory fees, or similar payments to any advisors or agents acting on behalf of the Companies, their direct or indirect subsidiaries, or any officer, director, or employee of the foregoing in connection with the transactions contemplated hereby.

2.02.   <u>Representations and Warranties of the Consenting Noteholders</u>. Each of the Consenting Noteholders, severally and not jointly, represents and warrants to the Companies (and not to each other) that:

(a)   <u>Securities Law Representations</u>.   Such Consenting Noteholder (i) intends to acquire its portion of the New Securities hereunder for investment, solely for its own account (or for the account of those for whom or for which, as the case may be, it is acting as investment advisor, manager or in a similar capacity) and not with a view to, or for resale in connection with, the distribution thereof in violation of applicable securities laws; (ii) will not distribute any portion of the New Securities it may acquire, except in compliance with this Agreement and the registration requirements of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and applicable state securities laws or pursuant to an available exemption therefrom, and (iii) acknowledges that (A) the offer and sale of the New Securities has not been registered under the Securities Act, (B) the offering and sale of the New Securities is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) or Regulation S of the Securities Act or Section 1145 of the Bankruptcy Code, as applicable and (C) there is no established market for the New Securities and it is not anticipated that there will be any public market for the New Securities in the foreseeable future; and

(b)   <u>Beneficial Ownership; No Transfer</u>.   (i) Such Consenting Noteholder (A) has full power and authority to act on behalf of and consent to matters concerning such 7.50% Notes due 2025 for which it is the sole beneficial owner or has sole investment or voting discretion and to dispose of, exchange, assign and transfer such 7.50% Notes due 2025, (B) holds no other 7.50% Notes due 2025 (other than Non-Controlled Securities, *provided* that the holder shall be entitled to vote in favor of the Restructuring (other than due to law)) on or prior to the Voting Deadline and (C) has made no prior Transfer of, and has not entered into any other agreement to Transfer, in whole or in part, any portion of its right, title, or interests in any of the 7.50% Notes due 2025 that is inconsistent or conflicts with the representations and warranties of such Consenting Noteholder set forth in this <u>Section 2.02(b)</u>, would otherwise render it unable to comply with this Agreement and perform its obligations hereunder or would breach <u>Section 1.05(a)</u>; and (ii) other than pursuant to this Agreement, such 7.50% Notes due 2025 are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

2.03.   <u>Representations and Warranties of the Shareholder</u>. The Shareholder represents and warrants to the Companies and the Consenting Noteholders that the Shareholder holds, in the aggregate, 100% of the common equity interests in Gildemeister, and (i) the Shareholder (A) has full power and authority to act on behalf of and consent to matters concerning the equity interests in the Companies of which it is the sole beneficial owner or has sole investment or voting discretion and to dispose of, exchange, assign and transfer, such equity interests (it being understood that the Shareholder does not have such power or authority with respect to the Series A stock, which it pledged in favor of the Senior Secured Notes Collateral Agent to secure the 7.50% Notes due 2025 without the consent of the Senior Secured Notes Collateral Agent), (B) holds no other equity interests in the Companies, and (C) except as provided herein, has made no prior Transfer of, and has not entered into any other agreement to Transfer, in whole or in part, any portion of its right,

title, or interests in any of the equity interests in the Companies that would render it unable to comply with this Agreement and perform its obligations hereunder; and (ii) other than pursuant to this Agreement, such equity interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way the Shareholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed (it being understood that the Shareholder pledged all of its Series A stock to secure the 7.50% Notes due 2025).

2.04.    <u>Mutual Representations and Warranties</u>.  Each of the Companies represents and warrants, jointly and severally, and each of the Consenting Noteholders represents and warrants, severally and not jointly, and the Shareholder represents and warrants, jointly and severally, to each of the other Parties that the following statements are true and correct as of the date hereof (each of which is a continuing representation and warranty), as of the Agreement Effective Date, and as of the Plan Effective Date:

(a)    <u>Existence; Enforceability</u>.  It is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms.

(b)    <u>No Consent or Approval</u>.  Except as expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for it to carry out the Restructuring contemplated by, and perform its respective obligations under, the Restructuring Documents.

(c)    <u>Power and Authority</u>.  It has, or will have, all requisite corporate, partnership, limited liability company or similar power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, the Restructuring Documents.

(d)    <u>Authorization; Execution</u>.  The execution, delivery and performance of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or similar action on its part.  This Agreement has been duly executed and delivered by it.

(e)    <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by it do not and will not violate (i) any provision of law, rule or regulation applicable to it, (ii) its certificate of incorporation or by-laws (or other organizational documents), (iii) any order of any court or other governmental authority or regulatory body applicable to it, or (iv) any of the Companies' material contracts or agreements except as would be waived, consented to or cured, if curable, prior to the consummation of the Restructuring.

(f)    <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and will not require any registration or filing with, consent or approval of, or notice to, or any other action to, with, or by, any federal, state or other governmental authority or regulatory body, except any filings in connection with the Chapter 11 Cases, including the

approval of the Solicitation Materials, the confirmation of the Plan and any filings with Chilean or Peruvian regulatory authorities as required by applicable law or regulation.

(g)     <u>Representation by Counsel</u>.  It has been represented by counsel in connection with this Agreement and the Restructuring Transactions contemplated by this Agreement.

(h)     <u>Proceedings</u>.  Other than the Chapter 11 Cases filed pursuant to the terms of this Agreement, no litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would materially adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

**Section 3.**     <u>Termination Events</u>.

3.01.     <u>Consenting Noteholder Termination Events</u>.  The Consenting Noteholders may terminate this Agreement with respect to the Parties upon the occurrence of any of the following events (each, a "<u>Consenting Party Termination Event</u>"):

(a)     at any time prior to the Petition Date, the Required Consenting Noteholders have determined, in their sole and absolute discretion, to terminate this Agreement for any reason, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(b)     the breach in any material respect by any of the Companies or the Shareholder of any of the covenants or any other obligation of the Companies or the Shareholder set forth in this Agreement and such breach or action, if curable, shall continue uncured until the earliest of (A) three (3) business days after receipt by Gildemeister or the Shareholder of written notice of the breach or action from the Required Consenting Noteholders in accordance with <u>Section 6.09</u> hereof or (B) three (3) business days after receipt by the Consenting Noteholders of written notice provided by any of the Companies pursuant to <u>Section 1.03(a)(F)</u> hereof, or (C) if notice of the breach has been provided by either the Required Consenting Noteholders or the Companies, the day immediately prior to the Voting Deadline, in each case, which termination shall be effective automatically unless the Required Consenting Noteholders provide a prior written waiver of such termination in accordance with Section 6.09 hereof;

(c)     any representation or warranty in this Agreement made by the Companies or the Shareholder (i) shall have been untrue in any material respect when made or (ii) shall have become untrue in any material respect, and such breach, if curable, shall continue uncured until the earliest of (A) three (3) business days after receipt by Gildemeister of written notice of the breach from the Required Consenting Noteholders in accordance with <u>Section 6.09</u> hereof, (B) three (3) business days after receipt by the Consenting Noteholders of written notice provided by any of the Companies pursuant to <u>Section 1.03(a)(F)</u> hereof, or (C) if notice of the breach has been provided by either the Required Consenting Noteholders or the Companies, the day immediately prior to the Voting Deadline; *provided* that the failure of any representation contained in Section 2.01(a) or Section 2.01(d) to be true when made or any such representation becoming untrue shall not be curable, *provided further* that such termination shall be effective automatically unless the Required Consenting Noteholders provide a prior written waiver of such termination in accordance with Section 6.09 hereof;

(d)       at any time following the Petition Date, the Required Consenting Noteholders determine in their sole and absolute discretion that any of the Companies may not have adequate working capital financing to fund any of their operations in any jurisdiction at any time after confirmation of the Plan, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(e)       the occurrence of any event, circumstance, change of fact, or other condition, as a result of which any representation contained in Section 2.01(a) or Section 2.01(d) shall have become untrue in any respect, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(f)       the taking by any Senior Manager of any action which would permit the Consenting Noteholders to not support the assumption of the Senior Management Agreements under Section 1.02(h) of this Agreement, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(g)       the receipt by any of the Company Parties of any notice of any charge, sanction, levy, or fine threatened or imposed by any government regulator or authority relating to the Customs Claims that, if sustained by any applicable court, government authority, or regulator of competent jurisdiction could have the effect of: (i) enjoining, prohibiting, ceasing, terminating, or impairing or limiting the ability of the Companies to conduct their business operations in a manner substantially consistent with their current practices in any jurisdiction, (ii) imposing felony criminal liability on any of the Companies or any of the Senior Managers, (iii) imposing any civil or criminal liability of any kind on any Consenting Noteholder, or (iv) causing the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, or other obligations associated with the Customs Claims, net of any tax credits related to the Customs Claims (recorded in accordance with IFRS), to exceed $40,000,000, which termination, following the occurrence of any event or circumstance satisfying clause (i) through (iv) of this Section 3.01(g), shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(h)       (i) Any repudiation by Hyundai of any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement, (ii) any termination or modification of the Hyundai Letters, the Hyundai Undertaking Agreement, or the Hyundai Distributorship Agreements without the consent of the Required Consenting Noteholders in their sole and absolute discretion, in each case, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(i)       the issuance by any governmental authority having jurisdiction over any of the Companies, the Shareholder or their assets, including any regulatory authority or court of competent jurisdiction, of any ruling, order or any other document or official record (i) enjoining the substantial consummation of the Restructuring, (ii) making illegal or otherwise restricting, preventing, or prohibiting the Restructuring or compliance with any term or condition of the Restructuring or (iii) otherwise substantially impeding or rendering impossible or impracticable

26

the substantial consummation of the Restructuring, and such ruling, order, or other document is not dismissed, stayed, reversed or lifted by the earlier of (x) five (5) business days following the issuance thereof or (y) the day immediately prior to the Voting Deadline, in each case, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(j)      any of the Companies have filed, propounded, solicited votes upon, sought confirmation of or otherwise supported an alternative restructuring transaction relating to any of the Gildemeister Securities other than the Plan, including without limitation, the filing of any other chapter 11 plan or any other plan of reorganization under any applicable law, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(k)      any of the Companies has filed with the Bankruptcy Court any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, whether in the ordinary course of its business or otherwise, which motion or application is in a form not acceptable to the Required Consenting Noteholders in their sole and absolute discretion, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(l)      an examiner with expanded powers (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) or a trustee shall have been appointed in any of the Chapter 11 Cases, any of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code, or any of the Chapter 11 Cases shall have been dismissed by an order of the Bankruptcy Court or converted to a case under chapter 7 of the Bankruptcy Code, or the Gildemeister Shareholder or any of the Companies file or encourage a motion seeking any of the foregoing, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(m)      any of the Companies announces its intention to withdraw or revoke the Plan, dismiss the Chapter 11 Cases, terminate the Restructuring or otherwise not to consummate the Restructuring on terms and conditions consistent in all material respects with this Agreement and the Plan, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(n)      Gildemeister shall be declared the subject of any insolvency, bankruptcy, liquidation or reorganization proceeding (other than the Chapter 11 Cases contemplated herein) under the laws of any jurisdiction that prevents the implementation of the Restructuring and, only if such proceeding is an involuntary insolvency proceeding, it is not dismissed, stayed, reversed or lifted within twenty (20) days of such declaration, which termination shall be effective automatically unless the Required Consenting Noteholders provide a prior written waiver of such termination in accordance with Section 6.09 hereof;

(o)      any of the Companies makes a general assignment for the benefit of creditors, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(p)      the amendment, modification or filing of a pleading by any of the Companies seeking to amend or modify the Restructuring Documents, the Definitive Documentation, the DIP Orders, the DIP Loan Documents or any documents related to the foregoing, including motions, notices, exhibits, appendices and orders, in respect of which the consent of the Required Consenting Noteholders is required under the Agreement, without the prior consent of the Required Consenting Noteholders, and such pleading or related document has not been withdrawn prior to the earlier of (i) three (3) business days of the Companies' receiving written notice in accordance with Section 6.09 hereof from counsel to the Required Consenting Noteholders that such motion or pleading violates this Section 3.01(p), and (ii) entry of an order of the Bankruptcy Court approving such motion, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(q)      the Bankruptcy Court or any court with requisite jurisdiction grants relief that is (i) materially inconsistent with this Agreement or the Plan, (ii) in a form materially different from a Restructuring Document, a DIP Order, a DIP Loan Document, or other Definitive Documentation approved by the Required Consenting Noteholders or (iii) materially and adversely affects the rights of the Consenting Noteholders under this Agreement, without the consent of the Required Consenting Noteholders, or any of the Companies request or encourage any of the foregoing, and the Companies have not obtained an order amending or modifying the relief in form and substance acceptable to the Required Consenting Noteholders in their sole and absolute discretion within five (5) business days following entry of an order granting such relief, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(r)      the entry by the Bankruptcy Court of an order invalidating, disallowing, subordinating, or limiting the enforceability, priority, or validity of any claims held by the Consenting Noteholders, including without limitation, claims arising out of or relating to the 7.5% Notes due 2025, the 2025 Notes Indenture, the DIP Credit Facility, or the DIP Loan Documents, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(s)      either the order approving the Solicitation Materials and the Disclosure Statement or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not acceptable to the Required Consenting Noteholders in their sole and absolute discretion, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(t)      (i) the occurrence of the Maturity Date (as defined in DIP Credit Agreement) of the DIP Credit Facility without the Plan having been substantially consummated which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof or (ii) following the occurrence of an "Event of Default" under either of the DIP Credit Facility and the acceleration of the loans thereunder, which termination shall be effective automatically upon any such acceleration;

(u)      the Companies have failed to satisfy any Milestone specified in the Plan Term Sheet, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(v)      a custodian or receiver or similar entity is appointed with respect to any of the Companies or any substantial part of the property of any of the Companies, and such appointment is not revoked, dismissed, reversed or lifted within five (5) days of such appointment, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(w)      Hyundai has provided notice to any of the Companies that it does not intend to renew the Hyundai Distributorship Agreements or Hyundai (i) has commenced a process (A) for winding down its business relationships with the Companies or (B) to initiate a business relationship with a replacement distributor of automobiles in Chile other than the Companies or (ii) has initiated any business relationship with any distributor of automobiles in Chile other than the Companies, in each case, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(x)      the failure by the Companies to pay any fee in accordance with Section 1.03(b) hereof when due, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(y)      the commencement of any litigation, action, lawsuit or adverse proceeding before a governmental authority regarding the Restructuring or the transactions contemplated hereby or by the Restructuring Documents by any person other than a Consenting Noteholder or any person acting on its behalf or at the instruction, behest or with the encouragement of any Consenting Noteholder (other than a litigation, action, lawsuit or adverse proceeding by the Companies to enforce this Agreement) naming any of the Companies, the Shareholder or any Consenting Noteholders as a party, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(z)      the holders of any indebtedness in excess of US$2 million owed by any of the Companies have obtained a final non-appealable judgment against the Companies and the Companies fail to cure or obtain a permanent waiver with respect to such indebtedness by the earlier of (i) five (5) business days after the receipt of such written notice in accordance with Section 6.09 hereof (which cure or permanent waiver may be conditioned on the successful consummation of the Plan and other Restructuring Transactions), and (ii) the day immediately prior to the Voting Deadline, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(aa)      any of the Companies loses the exclusive right to file and solicit acceptances of a plan of reorganization, or any of the Companies files or encourages the filing of a motion seeking the termination of exclusivity, which termination shall be effective upon the Required Consenting

Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(bb)    the occurrence of any material change, effect, event, circumstance or development (collectively, "Material Changes") that individually or in the aggregate and taken together with all other Material Changes, has had or would reasonably be expected to have, a materially adverse effect on (i) the business, operations, financial condition or results of operations of the Companies or (ii) the ability of any of the Companies to consummate the Plan or any of the other Restructuring Transactions, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof;

(cc)    (i) the Debtors file a voluntary petition for any insolvency, bankruptcy, liquidation or reorganization proceeding (including the Chapter 11 Cases contemplated herein) at any time prior to the occurrence of the Gildemeister Shareholders Meeting and the passage of the Required Amendments, (ii) if following the Gildemeister Shareholders Meeting and the passage of the Required Amendments, the Debtors file the Chapter 11 Cases before April 8, 2021, or (iii) the Debtors do not obtain approval of the Required Amendments at the Gildemeister Shareholders Meeting on or before nineteen (19) calendar days after the publication of the notice scheduling the Gildemeister Shareholders Meeting (unless in the case of this clause (iii) the Required Amendments are not approved due to a breach of Section 1.02(c) hereof by the Required Consenting Noteholders), which termination, in each case, shall be effective automatically upon the occurrence of such event described in clauses (i), (ii), or (iii) hereof;

(dd)    the Debtors provide notice to the Required Consenting Noteholders on or before three (3) business days after the Voting Deadline that they have not received the sufficient number or amount of votes for the acceptance of the Plan as required under Section 1126 of the Bankruptcy Code, which termination shall be effective upon the Required Consenting Noteholders' delivery of written notice of termination to all Parties in accordance with Section 6.09 hereof; or

(ee)    the Required Consenting Noteholders shall not be satisfied, in their sole and absolute discretion, with (i) the information and/or documentation provided in response to their anti-corruption due diligence-related requests, and/or (ii) the results of their due diligence review of the compliance policies and procedures relating to, among other things, anti-corruption and other applicable laws, by the date falling forty-five days after the Petition Date, which termination shall be effective automatically unless the Required Consenting Noteholders provide a prior written waiver of such termination in accordance with Section 6.09 hereof.

Notwithstanding the foregoing, the right to terminate pursuant to this Section 3.01 shall not be available to any Consenting Noteholder based on a Consenting Party Termination Event if a breach of this Agreement by any of the Consenting Noteholders has resulted in such Consenting Party Termination Event.

3.02.    Companies Termination Events. The Companies may terminate this Agreement with respect to the Parties as specified herein upon prior written notice, delivered to all Parties in accordance with Section 6.09 hereof, upon the occurrence of any of the following events (each, a "Companies Termination Event"):

(a)    the breach by any Consenting Noteholder in any material respect of any of the representations, warranties or covenants of such Consenting Noteholder set forth in this Agreement, which breach, if curable, shall continue uncured until five (5) business days after the receipt by such Consenting Noteholder of written notice of such breach from the Companies;

(b)    prior to the occurrence of the Voting Deadline, the breach by one or more Consenting Noteholders of any of the representations, warranties or covenants of such Consenting Noteholder set forth in this Agreement, such that the non-breaching Consenting Noteholders, at any time, hold or control less than 75% of the principal amount of the 7.50% Notes due 2025 held by the all of the Consenting Noteholders, and which breach remains uncured for a period of five (5) business days after the receipt by such breaching Consenting Noteholder(s) of written notice of such breach from the Companies in accordance with Section 6.09 hereof;

(c)    after the occurrence of the Voting Deadline, the material breach by one or more Consenting Noteholders of any of the representations, warranties or covenants of such Consenting Noteholder set forth in this Agreement, such that the non-breaching Consenting Noteholders, at any time, together with all other holders of the 7.5% Notes due 2025 who vote in favor of the Plan, in the aggregate, hold or control less than 66 2/3% of the principal amount of the 7.50% Notes due 2025 or constitute less than one-half in number of such holders who voted in favor of the Plan, and which breach remains uncured for a period of five (5) business days after the receipt by such breaching Consenting Noteholder(s) of written notice of such breach from the Companies;

(d)    the issuance by any governmental authority having jurisdiction over the Companies or their respective assets, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Restructuring;

(e)    the Plan Effective Date shall not have occurred on or prior to August 23, 2021, provided, that, the date included in this Section 3.02(e) shall automatically be increased by the same number of calendar days that any Milestone is extended at the request of the Company with the consent of the Required Consenting Noteholders;

(f)    the commencement of any litigation, action, lawsuit or adverse proceeding before a governmental authority regarding the Restructuring or the transactions contemplated hereby or by the Restructuring Documents by any person other than the Shareholder, any Senior Manager, one of the Companies or any person acting on behalf of or at the instruction, behest or with the encouragement of any of the Companies, the Shareholder, or any Senior Manager (other than a litigation, action, lawsuit or adverse proceeding by the Consenting Noteholders to enforce this Agreement) naming any of the Consenting Noteholders, the Shareholder, or any of the Companies as a party, which litigation, if resolved against the Consenting Noteholders, the Shareholder, or any of the Companies named as parties therein, would in the opinion of the Companies (after consultation with counsel, the Consenting Noteholders and counsel to the Consenting Noteholders) reasonably be expected to prevent the Companies from initiating solicitation of acceptance of the Plan, filing the Chapter 11 Cases, or consummating any other Restructuring Transaction on the terms contemplated herein ; or

(g)     the Companies determine, based on the advice of outside advisors (after consultation with counsel, the Consenting Noteholders and counsel to the Consenting Noteholders), that termination of this Agreement is required under any fiduciary duties the Companies owe to creditors or other stakeholders and Gildemeister delivers to the Consenting Noteholders a written notice of termination in accordance with Section 6.09 hereof.

Notwithstanding the foregoing, the right to terminate pursuant to this Section 3.02 shall not be available to any of the Companies based on a Companies Termination Event if a breach of this Agreement by any of the Companies has resulted in such Companies Termination Event.

3.03.   Mutual Termination.

(a)     This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among the Companies and the Required Consenting Noteholders.

3.04.   Effect of Termination.

(a)     Upon termination of this Agreement under Sections 3.01, 3.02 or 3.03 hereof, this Agreement shall be of no further force and effect and each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement (including, in the case of the Companies, filing for a *procedimiento concursal de liquidación* in Chile (a "Liquidation Proceeding")); *provided, however*, that no such termination shall relieve any Party of its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon the occurrence of any termination of this Agreement, any and all consents given or votes of Consenting Noteholder Claims and Interests occurring prior to such termination by the Consenting Noteholders shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

3.05.   Automatic Termination Upon Plan Effective Date. This Agreement shall terminate automatically, without any further required action or notice by any Party, immediately following the effectiveness of the Plan on the Plan Effective Date.

**Section 4.**     [Reserved].

**Section 5.**     Amendments. This Agreement may not be modified, amended, or supplemented (except as expressly provided herein) except in writing signed by the Companies, and each Shareholder and each Consenting Noteholder bound by such modification, amendment or supplement, *provided* that a writing transmitted by electronic mail shall be sufficient for the purposes of this provision. Except as specifically provided herein and subject to any higher consent threshold, no condition, requirement, or obligation of the Companies under the Plan (including conditions precedent to the Plan Effective Date), the Definitive Documentation, the Plan Term Sheet, or the DIP Term Sheet may be waived, modified, supplemented, or amended except with the written consent of the Required Consenting Noteholders, provided that a writing transmitted by electronic mail shall be sufficient for the purposes of this provision.

**Section 6.**    <u>Miscellaneous</u>.

6.01.    <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Restructuring in a manner materially consistent with the terms and conditions set forth in the Restructuring Documents.

6.02.    <u>Complete Agreement</u>.  This Agreement and the exhibits, schedules and other attachments hereto represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, among the Parties with respect thereto; *provided*, *however*, that upon the Plan Effective Date, the Plan, the Confirmation Order, and the Definitive Documentation executed in accordance therewith shall survive and supersede this Agreement and shall continue to be in full force and effect in accordance with its terms irrespective of this Agreement.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party or as may be carried out in accordance with <u>Section 5</u> hereof.  Notwithstanding anything herein to the contrary, the provisions of Section 1.03(b), Section 1.06(d), and Section 1.06(e) shall survive the termination of this Agreement whether or not the DIP Loan Documents shall have been executed and delivered, except to the extent that such provisions are expressly superseded by the DIP Loan Documents.

6.03.    <u>Parties; Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in <u>Section 1.05</u> hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

6.04.    <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

6.05.    <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK**,** WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

(b)    All actions and claims pursuant to this Agreement shall be heard and determined in any New York federal court sitting in the Borough of Manhattan of The City of New York or in any New York state court sitting in the Borough of Manhattan of The City of New York (and of the appropriate appellate courts therefrom) (the "<u>Chosen Courts</u>").  Consistent with the preceding sentence, the Parties hereby (i) irrevocably submit to the exclusive jurisdiction of the Chosen Courts, (ii) waive any objection to laying of venue in any such action or proceeding in the Chosen Courts, and (iii) waive any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party; *provided, however*, that each of the Parties hereby agrees that,

for the duration of any Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with, and that the Bankruptcy Code shall govern, the Plan.  The foregoing shall not limit the rights of any Party to introduce this Agreement in any court in any jurisdiction in order to defend against a cause of action that has been brought against it or any of its affiliates or representatives in such court.

(c)    EACH PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING PURSUANT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(d)    The Companies appoint CT Corporation (the "New York Process Agent"), with an office on the date hereof at 28 Liberty Street, New York, NY 10005, as its agent to receive on behalf of itself and its property, service of copies of all writs, claims, process, complaint, summonses and any other process that may be served in any legal or other proceeding with respect to matters arising out of, based upon or in connection with this Agreement or the transactions contemplated hereby, and agrees to promptly appoint a successor New York Process Agent in the City of New York (which appointment the successor New York Process Agent shall accept in writing prior to the termination for any reason of the appointment of the initial New York Process Agent).  In any such legal or other proceeding, such service may be made on the Companies by delivering a copy of such process to it in care of the appropriate New York Process Agent at such New York Process Agent's address.  Nothing in this Agreement shall in any way be deemed to limit the ability to serve any such writs, process or summonses in any other manner permitted by applicable law.

6.06.    Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

6.07.    Interpretation.  This Agreement is the product of negotiations between the Companies, the Shareholder and the Consenting Noteholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

6.08.    Severability.  If the whole or any part of a provision of this Agreement is declared void, unenforceable or illegal in any jurisdiction, it is severed for the purposes of that jurisdiction and the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect in such jurisdiction.  In this event, the remainder of this Agreement will have full force and effect and the validity or enforceability of the relevant provision in any other jurisdiction is not affected.

6.09.    Notices.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)        if to the Companies, to:

Automotores Gildemeister, S.A.
11000 Avenida Las Condes
Las Condes, Santiago,
Chile
Attention:  Ricardo Lessmann; Eduardo Moyano
E-mail addresses:  rlessmann@gildemeister.cl; emoyano@gildemeister.cl

with copies (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention:  Adam J. Brenneman
                    Jane VanLare
E-mail addresses:  abrenneman@cgsh.com; jvanlare@cgsh.com

(b)        if to a Consenting Noteholder or a transferee thereof, to the addresses set forth below following the Consenting Noteholder's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attention:  Allan S. Brilliant
E-mail address:  allan.brilliant@dechert.com

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice that is required to or may be delivered on behalf of the Companies hereunder shall be deemed delivered on behalf of all of the Companies when delivered by any one of the Companies.

6.10.    Reservation of Rights; Waiver.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Noteholders or the ability of each of the Consenting Noteholders to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against or interests in the Companies under the 2025 Notes Indenture and other agreements and documents relating thereto, as well as under applicable law.  If the Restructuring is not consummated in accordance with the terms of the Restructuring Documents (including this Agreement), or if this Agreement is terminated for any reason (other than under Section 3.05 hereof), the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rules of Evidence and any

other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

6.11.    <u>Specific Performance</u>.    It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

6.12.    <u>Several, Not Joint, Obligations</u>.    Unless otherwise provided herein, the agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

6.13.    <u>Remedies Cumulative</u>.    All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

6.14.    <u>No Third-Party Beneficiaries</u>.    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

6.15.    <u>Automatic Stay</u>.    The Parties acknowledge that the giving of notice or the disclosure of information, including under <u>Section 7</u> hereof, or termination by any Party, including under <u>Section 3</u> hereof, shall not be stayed by section 362 of the Bankruptcy Code or other similar applicable law, to the extent applicable, and to the extent the Bankruptcy Court determines otherwise, the delivering Party shall not be subject to any damages on account of the giving of such notice or disclosure or with respect to termination.

6.16.    <u>Acknowledgement</u>.    Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.    Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.    The Companies will not solicit acceptances of the Plan from the holders of Gildemeister Securities in any manner inconsistent with the Bankruptcy Code or applicable non-bankruptcy law, and no obligation by any Consenting Noteholder to vote to accept the Plan will be enforceable unless and until the Solicitation Materials are approved by the Bankruptcy Court in accordance with the terms herein.

6.17.    <u>Survival</u>.    Notwithstanding anything contained herein to the contrary, upon the termination of this Agreement (whether as a result of the consummation of the Restructuring, or its termination pursuant to <u>Section 3</u> hereof or otherwise), the agreements and obligations of the Parties set forth in  <u>Section 1.03(b)</u> (*provided* that <u>Section 1.03(b)</u> is not intended to supersede, or provide rights in addition to, those set forth in the agreements set forth with the firms named therein), <u>Section 1.04(c)</u>, the proviso to the last sentence of <u>Section 1.05(b)</u>, <u>Section 2.01</u>, <u>Section</u>

2.02, Section 2.03, Section 2.04, Section 3.05, Section 6, and Section 7 hereof shall survive the termination of this Agreement.

**Section 7.**    Disclosure.

7.01.    Holdings Information.  The Parties agree that the holdings information provided by each Consenting Noteholder with respect to each series of their respective Gildemeister Securities and the identity of such Consenting Noteholder shall be kept confidential, and such information shall not be disclosed to any person; *provided*, *however*, (a) the Companies shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, the 7.5% Notes due 2025 held by the Consenting Noteholders and (b) the legal and financial advisors to the Companies may disclose the names of holders (or nominees, investment managers or advisors of beneficial holders) of 7.5% Notes due 2025 (but shall be prohibited from disclosing the principal amount or percentage of the 7.50% Notes due 2025 held by particular holders) solely to the extent such advisors deem necessary to satisfy the obligations to make disclosures of connections to parties in interest in connection with being retained to advise the Companies under section 327(a) or section 328 of the Bankruptcy Code; *provided*, *further, however*, that if the Companies file this Agreement publicly in any form, the Companies shall redact any signature pages hereto or file such signature pages under seal.

7.02.    Relationship Among Parties; Consents.

(a)    It is understood and agreed that no Consenting Noteholder has any duty of trust or confidence in any form with any other Consenting Noteholder, and, except as provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Noteholder may trade in the New Securities without the consent of the Companies or any other Consenting Noteholder, subject to applicable securities laws and the terms of this Agreement, including, specifically, Section 1.05; *provided*, *further*, that no Consenting Noteholder shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Consenting Noteholders shall in any way affect or negate this understanding and agreement.

(b)    As used in this Agreement, any consent, waiver or other form of approval by or from the Required Consenting Noteholders shall be exercised or withheld in the sole and absolute discretion, exercised in good faith, of the Consenting Noteholders.  The Companies shall be permitted to rely upon any written confirmation (including by email) from Dechert LLP expressly confirming a consent, waiver or other form of approval by the Required Consenting Noteholders.

7.03.    Publicity.

(a)    The Consenting Noteholders shall not (i) use the name of any of the Companies in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other communications relating to this Agreement or the Restructuring Transactions and any amendments thereof without first (A) submitting such press releases, public filings, public announcements or other communications to counsel for the Companies for review and potential suggestions and (B) receiving the prior written consent of the Companies.  Nothing

contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Companies and any Consenting Noteholder.

(b)    At least one (1) business day prior to making any public disclosure that (i) constitutes disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, (ii) makes any other disclosure that includes descriptions of the Restructuring or any Consenting Noteholder or (iii) constitutes disclosure of the aggregate amount or percentage of claims held by the Consenting Noteholders, the Companies shall submit drafts to counsel of each Required Consenting Noteholder of any press releases and public documents, shall negotiate any proposed changes thereto in good faith and shall not publish such documents unless they are satisfactory to the Required Consenting Noteholders in their sole and absolute discretion.

[*Signature pages to follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the Agreement Effective Date.

| AUTOMOTORES GILDEMEISTER SPA<br><br>By:<br>    Name: Ricardo Lessmann Cifuentes<br>    Title: Chief Executive Officer | |
|---|---|
| AG CRÉDITOS SPA<br><br>By:<br>    Name:<br>    Title: | MARC LEASING S.A.<br><br>By:<br>    Name:<br>    Title: |
| FONEDAR S.A.<br><br>By:<br>    Name:<br>    Title: | LODINEM S.A.<br><br>By:<br>    Name:<br>    Title: |
| CAMUR S.A.<br><br>By:<br>    Name:<br>    Title: | MAQUINARIA NACIONAL S.A. (CHILE)<br><br>By:<br>    Name:<br>    Title: |
| CARMEISTER S.A.<br><br>By:<br>    Name:<br>    Title: | FORTALEZA S.A.<br><br>By:<br>    Name:<br>    Title: |
| RTC S.A.<br><br>By:<br>    Name:<br>    Title: | COMERCIAL GILDEMEISTER S.A.<br><br>By:<br>    Name:<br>    Title: |
| MAQUINARIAS GILDEMEISTER S.A.<br><br>By:<br>    Name:<br>    Title: | |
| GILDEMEISTER COSTA RICA S.A.<br><br>By:<br>    Name:<br>    Title: | INMOBILIARIA LOS SEIS CR ILS S.A.<br><br>By:<br>    Name:<br>    Title: |

[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]



| MAQUINARIA NACIONAL S.A. | MOTOR MUNDO S.A. |
|---|---|
| By: _____ <br>    Name: <br>    Title: | By: _____ <br>    Name: <br>    Title: |
| AUTOMOTORES GILDEMEISTER PERU S.A. | BRAMONT MONTADORA INDUSTRIAL E COMERCIAL DE VEÍCULOS S.A. |
| By: _____ <br>    Name: <br>    Title: | By: _____ <br>    Name: <br>    Title: |
| MINVEST S.A. | |
| By: _____ <br>    Name: <br>    Title: | |

[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[*Signature Pages to Restructuring Support Agreement*]



[*Signature Pages to Restructuring Support Agreement*]

**CONSENTING NOTEHOLDERS**





*[Signature Pages to Restructuring Support Agreement]*



*[Signature Pages to Restructuring Support Agreement]*



[*Signature Pages to Restructuring Support Agreement*]





[*Signature Pages to Restructuring Support Agreement*]

DocuSign Envelope ID: 2C58C006-4031-429C-B93F-C4D809490A88



[*Signature Pages to Restructuring Support Agreement*]

## EXHIBIT A

**RESTRUCTURING PLAN TERM SHEET**

*Execution Version*

## AUTOMOTORES GILDEMEISTER S.P.A.

### INDICATIVE TERM SHEET

*The terms set out in this indicative term sheet (this "**Plan Term Sheet**") are preliminary and indicative solely for discussion purposes, and are not intended to describe or include all of the terms and conditions of the restructuring of indebtedness issued by Automotores Gildemeister S.p.A. (the "**Company**") or to set forth the definitive contractual language of any provisions summarized below. This Plan Term Sheet is not binding on any party, is subject to, among other things, ongoing diligence and the negotiation and is solely for the purpose of promoting discussion of the structure and other terms applicable to the restructuring.*

***This Plan Term Sheet is not an offer with respect to any securities, or a solicitation of acceptances of any chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code or any other plan of reorganization, scheme of arrangement, or similar process under any other applicable law. Any such offer or solicitation will comply with all applicable securities laws, provisions of the Bankruptcy Code and/or other applicable laws. No party shall be bound with respect to any transaction until the agreement, execution, and delivery of definitive documentation after obtaining all necessary internal approvals.***

*Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in __Annex I__ attached hereto.*

*This Plan Term Sheet (and communications concerning it) is being provided in furtherance of settlement discussions entered into by the Company and the members of the Ad Hoc Group of Consenting Noteholders (as defined below), and it is entitled to the protections from use or disclosure afforded by New York C.P.L.R. Section 4547, Fed. R. Evid. 408 and any similar U.S. or Chilean state, federal or other applicable rule that restricts or prohibits use. All statements made in this Plan Term Sheet or in communications concerning it are in the nature of settlement discussions and compromise, are not intended to be and do not constitute representations of any fact or admissions of any liability, are to be used only for the purpose of attempting to reach a consensual compromise and settlement, are subject to and governed by the terms and conditions of existing confidentiality agreements, and are not admissible in any court. In the event of a conflict between the terms and conditions of this Plan Term Sheet, including this paragraph, and any existing confidentiality agreement, the terms and conditions of such confidentiality agreement shall govern.*

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Implementation** | No later than April 15, 2021, the Company and each of the Guarantors (collectively, the "**Debtors**") will file voluntary Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York. The following is a summary of a proposed plan of reorganization for the Debtor (the "**Plan**") and accompanying disclosure statement (the "**Disclosure Statement**") to be filed in the Bankruptcy Cases on the date the petitions are filed (the "**Petition Date**").<br><br>On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Interest, as applicable, shall |

| | |
|---|---|
| | receive under the Plan the treatment described in this Plan Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Debtors, the Required Consenting Noteholders and the holder of such Allowed Claim or Interest, as applicable.<br><br>The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Plan Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter.<br><br>The Restructuring will be subject to the terms and conditions of this Plan Term Sheet (including the Milestones) and the Definitive Documents. |
| **DIP Credit Facility** | Subject to the terms and conditions set forth in the Restructuring Support Agreement and the DIP Term Sheet (as defined below), the members of the Ad Hoc Group of Consenting Noteholders may provide up to $23.6 million of financing (the "**Commitments**") in the form of a senior secured, priming super-priority debtor-in-possession credit facility (the "**DIP Credit Facility**") comprised of: (x) following entry of the Interim DIP Order, no more than $15.1 million in principal amount of senior secured, super-priority debtor-in-possession delayed draw term loans (the "**DIP Loans**"), and (y) following entry of the Interim DIP Order, an aggregate principal amount of DIP Loans that will not, when combined with all DIP Loans advanced prior to such date, exceed the aggregate amount of the Commitments.<br><br>As further described in the term sheet attached hereto as **Annex II** (the "**DIP Term Sheet**"), the loans under the DIP Credit Facility will be funded in no more than two (2) draws prior to the entry of the Final DIP Order. Following the entry of a Final DIP Order, the Debtors may request and receive no more than two (2) advances of DIP Loans in an aggregate principal amount that will not, when combined with all DIP Loans prior to such date, exceed the aggregate amount of the Commitments.<br><br>The DIP Credit Facility shall have the terms specified in the DIP Term Sheet and be documented by a senior secured priming super-priority delayed draw term loan debtor in possession credit agreement in form and substance acceptable to the Agent and the lenders party thereto (the "**DIP Credit Agreement**"). |
| **New Secured Notes and New Subordinated Notes** | On the Plan Effective Date, the Reorganized Debtors shall issue: (i) a senior tranche of secured notes which shall be distributed to the DIP Lenders in exchange for their DIP Loans, to the extent not repaid in cash on the Plan Effective Date, as provided in this Plan Term Sheet and the Plan (the "**New Senior Tranche Secured Notes**"), (ii) a junior tranche of secured notes which shall be distributed as provided in this Plan Term Sheet and the Plan (the "**New Junior Tranche Secured Notes**", and together with the New Senior Tranche Secured Notes, the "**New Secured Notes**") and (iii) a subordinated tranche of unsecured notes which shall be distributed as provided in this Plan Term Sheet and the Plan (the "**New Subordinated** |

2

| | |
|---|---|
| | Notes"). The New Secured Notes and the New Subordinated Notes shall have terms acceptable to the Required Consenting Noteholders and otherwise consistent with the term sheet attached hereto as **<u>Annex III.</u>** The New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes shall benefit from the same collateral and guarantees provided, however, that the New Junior Tranche Secured Notes and all liens and guarantees related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the New Senior Tranche Secured Notes pursuant to a New Secured Notes Intercreditor Agreement on terms acceptable to the DIP Lenders. The New Subordinated Notes will be unsecured and will benefit from the same guarantees as the New Secured Notes provided that the New Subordinated Notes and the guarantees thereof shall be expressly subordinated in right of payment to the New Junior Tranche Secured Notes and to the New Senior Tranche Secured Notes pursuant to a New Senior/Subordinated Intercreditor Agreement. |
| **Chile Holdco** | On or prior to the Plan Effective Date, a newly formed holding company structured as a *sociedad por acciones* under the laws of Chile shall be formed ("**Chile Holdco**" and together with the Reorganized Debtors, the "**Reorganized Business**"). Upon implementation of the Restructuring Transactions on the Plan Effective Date, Chile Holdco shall hold all of the equity interests in Reorganized Gildemeister (the "**Reorganized Gildemeister Common Stock**") from and after the Plan Effective Date. |
| | On the Plan Effective Date, Chile Holdco shall issue (i) a single class of common equity interests with 100% economic and voting rights (the "**Chile Holdco Stock**") and having a paid in capital value of $44.3 million, and (ii) bonds in an aggregate principal amount of $132.8 million (the "**Chile Holdco Bonds**", and together with the Chile Holdco Stock, the "**Chile Holdco Securities**"). |
| | The Chile Holdco Bonds shall be issued pursuant to an indenture governed by the laws of the State of New York, shall be unsecured and shall have terms acceptable to the Required Consenting Lenders in their sole and absolute discretion which shall include: (i) a maturity date on the thirtieth anniversary of the Plan Effective Date, (ii) cash interest accrual (payable semi-annually) at a rate of 15.0% per annum with the option, in Chile Holdco's sole discretion throughout the term of the bonds until their maturity, to defer payment of such interest, (iii) any unpaid deferred interest shall also accrue interest at the applicable interest rate *plus* additional default interest at a rate of 2% per annum, and (iv) other covenants customary for an investment of this kind. For the avoidance of doubt, the Chile Holdco Bonds shall be structured as "bonds" qualifying for a 4% withholding tax rate under Chilean law. |
| | The corporate governance of Chile Holdco shall be subject to bylaws containing terms acceptable to the Required Consenting Noteholders in their sole and absolute discretion. |
| | On the Plan Effective Date, the Chile Holdco Securities will be distributed to USA Holdco in accordance with this Plan Term Sheet and the Plan. |

| | |
|---|---|
| **USA Holdco** | On or prior to the Plan Effective Date, a newly formed holding company structured as a limited liability company under the laws of Delaware shall be formed ("**USA Holdco**").<br><br>On the Plan Effective Date, USA Holdco shall issue a single class of limited liability company units with 100% economic and voting rights (the "**USA Holdco LLC Units**") to the holders of the 7.5% Notes due 2025 Secured Claims in exchange for the 7.5% Notes due 2025 Secured Claims contributed by such holders to USA Holdco.<br><br>The corporate governance of USA Holdco shall be subject to a limited liability company agreement (the "**USA Holdco LLC Agreement**") which shall contain terms acceptable to the Required Consenting Noteholders in their sole and absolute discretion including, *inter alia*, customary protections for minority investors and certain transfer restrictions with respect to the USA Holdco LLC Units intended to (i) ensure that USA Holdco remains a private company, (ii) minimize the transfer of USA Holdco LLC Units among U.S. investors that are not "accredited investors" for purposes of United States securities laws and (iii) ensure USA Holdco is treated as a partnership for United States tax purposes.<br><br>The USA Holdco LLC Agreement shall provide that USA Holdco shall conduct no operations other than those incidental to its holding of the Chile Holdco Securities. |
| **Cash on Hand** | Cash distributions in accordance with this Plan Term Sheet and the Plan shall be made from cash on hand as of the Plan Effective Date. |
| **Definitive Documents** | All Definitive Documents to be consistent with this Plan Term Sheet and otherwise in form and substance acceptable to the Required Consenting Noteholders in their sole and absolute discretion. Structural, mechanical, and implementation issues to be resolved in Definitive Documents, to the extent not previously resolved. |
| **Investor Questionnaires** | The Solicitation Materials shall include the Letter of Transmittal with questionnaires (the "**Investor Questionnaires**") in which each holder of Claims (1) certifies whether such holder is a "**Qualified Holder**" or a Non-Qualified Holder (as defined herein), (2) to the extent such holder of Claims arising from Unsecured Legacy Notes or 7.5% Notes due 2025, agrees to deliver such notes through ATOP or as otherwise contemplated in the Plan; and (3) provides any additional certifications and representations as are consistent with the Plan. A "**Qualified Holder**" is any holder of Claims who provides either one of the following certifications:<br><br>    (i) a certification that it is located in the United States, and is either a "Qualified Institutional Buyer" as defined in Rule 144A of the Securities Act or an "accredited investor" as defined in Regulation D under the Securities Act, and it acknowledges that it will be receiving "restricted securities" within the meaning of Rule 144 under the Securities Act; or<br>    (ii) a certification that it is located or resident outside the United States and is qualified to participate in acquiring the securities offered to |

| | |
|---|---|
| | it under the Plan in accordance with the laws of its jurisdiction of location or residence.<br><br>Each holder that is not a Qualified Holder (or that fails to provide either of the two certifications above in order to qualify as a Qualified Holder) shall be a "**Non-Qualified Holder.**" |
| **Court Filings** | The Debtors shall provide draft copies of (i) the Plan, the Disclosure Statement and the Solicitation Materials at least seven (7) days prior to the date upon which the Debtors commence solicitation of acceptance of the Plan; (ii) the petitions commencing the Chapter 11 Cases, all First Day Pleadings and the Disclosure Statement Motion at least five (5) days prior to the Petition Date; (iii) the Confirmation Order, the Plan Supplement and the corporate governance documents for Chile Holdco, USA Holdco, Reorganized Gildemeister and the other Reorganized Debtors at least seven (7) days prior to the date on which the Debtors intend to file any such documents; and (iv) any other pleadings or court documents at least two (2) days prior to the date when the Debtors intend to file any such pleadings or documents with the Bankruptcy Court which pleadings or documents shall be in form and substance reasonably acceptable to the Required Consenting Noteholders. |
| **Milestones** | The Debtors will implement the Restructuring in accordance with the following Milestones (the "**Milestones**"):<br><br>1. The Gildemeister Shareholders Meeting (as defined in the Restructuring Support Agreement) shall have occurred on the date specified in the notice scheduling the Gildemeister Shareholders Meeting.<br><br>2. No later than 19 days after the publication of the notice scheduling the Gildemeister Shareholders Meeting, the Required Amendments shall have been passed.<br><br>3. No later than April 2, 2021, the Debtors will commence the solicitation of the Plan and distribute the Disclosure Statement and the Solicitation Materials to holders of Claims entitled to vote to accept or reject the Plan.<br><br>4. No later than April 15, 2021, the Debtors shall have filed petitions commencing the Chapter 11 Cases along with a motion seeking entry of an order scheduling the Confirmation Hearing.<br><br>5. No later than the Petition Date, the Debtors shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion and the Solicitation Materials.<br><br>6. No later than 5 days following the Petition Date, the Debtors shall have obtained entry of the Interim DIP Order.<br><br>7. No later than 30 days following the Petition Date, the Debtors shall have completed solicitation of the Plan.<br><br>8. No later than 35 days following the Petition Date, the Debtors shall have obtained entry of the Final DIP Order. |

|  | 9. | No later than 50 days after the Petition Date, the Debtors shall have obtained entry of an order approving the Disclosure Statement and Solicitation Materials. |
|  | 10. | No later than 50 days after the Petition Date, the Debtors shall have obtained entry of the Confirmation Order. |
|  | 11. | No later than 15 days following the entry of the Confirmation Order, the Plan Effective Date shall have occurred. |

| **Tax Matters** | The Debtors, in a manner satisfactory to the Required Consenting Noteholders, will seek to effectuate the terms and conditions of the Restructuring in a tax efficient manner. |
| --- | --- |
| **Amendment of Pledges** | The Required Consenting Noteholders and the non-Debtor Company Parties will enter into any amendments or other documentation as is necessary to cause, effective on the Plan Effective Date, the liens on all collateral pledged to secure the obligations under the 2025 Notes Indenture by non-Debtor Company Parties (the "**Pledge Amendments**") to therefrom secure the Reorganized Debtors' obligations under the New Secured Notes from and after the Plan Effective Date. |

## TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
| --- | --- | --- | --- |
| | | **Unclassified Non-Voting Claims** | |
| N/A | **DIP Claims** | On the Plan Effective Date, all DIP Expenses shall be paid in full in Cash and, with respect to the remaining DIP Claims, at the Reorganized Debtors' option, the Reorganized Debtors shall pay such DIP Claims (i) dollar for dollar with New Senior Tranche Secured Notes, or (ii) full Cash payment of the then unpaid balance of the DIP Claims. | N/A |
| N/A | **Administrative Claims** | On the Plan Effective Date, except as otherwise expressly provided elsewhere in this Plan Term Sheet, each holder of an Allowed Administrative Claim shall receive payment in full in cash. | N/A |
| N/A | **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |

6

| Classified Claims and Interests of the Debtors | | | |
|---|---|---|---|
| Class 1 | **Other Secured Claims** | On the Plan Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option with the consent of the Required Consenting Noteholders: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 2 | **Other Priority Claims** | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 3 | **Prepetition Bank Financing Claims** | On the Plan Effective Date, each holder of an Allowed Prepetition Bank Financing Claim shall be Reinstated. | Unimpaired / Deemed to Accept |
| Class 4 | **7.5% Notes due 2025 Secured Claims** | As of the Plan Effective Date, the 7.5% Notes due 2025 Secured Claims shall be Allowed as a Class 4 Secured Claim in an amount of approximately $409.3 million. On the Plan Effective Date, each holder of an Allowed Secured Note Claim shall receive its Pro Rata Share of: (i) $229.4 million aggregate principal amount of the New Junior Tranche Secured Notes; (ii) $81.0 million aggregate principal amount of the New Subordinated Notes; and (iii) 100.0% of the USA Holdco LLC Units. | Impaired / Entitled to Vote |

| | | | |
|---|---|---|---|
| Class 5 | **Unsecured Notes Claims and Related Party Claims** | As of the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following approximate amounts: (i) $100.5 million in 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9.6 million of 7.5% Notes due 2021 Claims, (iii) $22.5 million of 8.25% Notes due 2021 Claims, (iv) $2.6 million of 6.75% Notes due 2023 Claims, plus in each case for the Claims described in sub-clauses (i) through (iv) any accrued and unpaid interest on the respective series of notes through the Petition Date.  The Minvest Loan Claim shall be Allowed in the amount of approximately $1.6 million, plus accrued and unpaid interest, if any, and the Share Purchase Agreement Claim shall be Allowed in the amount of $300,000.<br><br>On the Plan Effective Date, each holder of an Allowed Unsecured Notes and Related Party Claim shall receive its Pro Rata share of $30.0 million aggregate principal amount of the New Subordinated Notes. | Impaired / Entitled to Vote |
| Class 6 | **General Unsecured Claims** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim shall be, at the option of the applicable Debtor or Reorganized Debtor, (a) Reinstated or (b) paid in full in cash. | Unimpaired / Deemed to Accept |
| Class 7 | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Debtors' election with the consent of the Required Consenting Noteholders. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |
| Class 8 | **Existing Equity Interests Other Than in Gildemeister** | On the Plan Effective Date, each holder of an Existing Equity Interest other than in the Company shall have such Interest (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Debtors' election with the consent of the Required Consenting Noteholders and to the extent permitted under local law. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |

| Class 9 | Existing Equity Interests in Gildemeister | On the Plan Effective Date, each Existing Equity Interest in Gildemeister, including, without limitation, each Existing Preferred Equity Interest in Gildemeister, each Existing Common Equity Interest in Gildemeister, and each Existing Series A Warrant and Existing Series B Warrant in Gildemeister shall be redeemed, cancelled, and released. | Impaired / Deemed to Reject |
|---|---|---|---|

## GENERAL PROVISIONS REGARDING THE PLAN

| Subordination | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
|---|---|
| Restructuring Transactions | The Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring.<br><br>In anticipation of the execution of the Restructuring Support Agreement and the consummation of the Restructuring Transactions, Gildemeister shall have scheduled a special meeting of shareholders, to take place before the Petition Date, in accordance with its bylaws and existing shareholders agreement pursuant to which the holders of Gildemeister's Existing Equity Interests will, among other things, (x) approve the terms of the Plan Term Sheet and Gildemeister's entry into the Restructuring Support Agreement, (y) authorize certain amendments to the existing Gildemeister bylaws and shareholders agreement intended to facilitate the Restructuring Transactions (the "**Required Amendments**") which Required Amendments shall be acceptable to the Required Consenting Noteholders in their sole and absolute discretion and provide for, among other things, (1) the postponement of any automatic conversion of the Existing Preferred Equity Interests to Existing Common Equity Interests and provide for such conversion only upon the Plan Effective Date, (2) the postponement of any automatic termination of the board of directors of Gildemeister upon a bankruptcy filing, (3) the cancellation of the Existing Common Equity Interests held by Minvest S.A. on the Plan Effective Date by means of an equity reduction, (4) the amendment of the exercise date of the Existing Series A Warrants and Existing Series B Warrants to the date preceding the anticipated Plan Effective Date, (5) the issuance of the Reorganized Gildemeister Common Stock on the Plan Effective Date in an amount sufficient to dilute all outstanding Existing Common Equity Interests (including Existing Common Equity Interests issued following the conversion of the Preferred Equity Interests on the Plan Effective Date) to 0.000001% of the outstanding common equity of Reorganized Gildemeister, (6) the redemption and cancellation by Reorganized Gildemeister on the Plan Effective Date of all |

9

| | |
|---|---|
| | then outstanding Existing Common Equity Interests (including Existing Common Equity Interests issued following the conversion of the Preferred Equity Interests on the Plan Effective Date), (7) such amendments to the existing bylaws and shareholders agreement of Gildemeister as are necessary to effect the foregoing Required Amendments and to adopt the new corporate governance documents of Reorganized Gildemeister on the Plan Effective Date, and (8) such additional provisions as are required to reverse or nullify the aforementioned Required Amendments in the event the Restructuring Support Agreement is breached by any Company Party or its Affiliates prior to the Plan Effective Date.<br><br>**Annex IV** hereto outlines the chronological steps by which certain of the Restructuring Transactions shall be implemented on or prior to the Plan Effective Date. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Plan Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Releases and Exculpation** | Consummation of the Plan will be subject to approval by the Bankruptcy Court of customary release provisions for the benefit of the Released Parties and exculpation provisions for Exculpated Parties, in each case other than claims arising from gross negligence, willful misconduct, or fraud. Such provisions shall include (i) mutual releases among each of the Debtors and the Released Parties; and (ii) consensual third party releases from the Releasing Parties in favor of each of the parties identified in the foregoing clause (i), provided, that, (x) if the Hyundai Distributorship Agreements are terminated or modified, (y) if Hyundai repudiates any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement, or (z) if Gildemeister or AGP have breached any obligation under the Hyundai Letters or the Hyundai Undertaking Agreement or if any condition exists which provide Hyundai the right to terminate its obligations under the Hyundai Letters or the Hyundai Undertaking Agreement, in each case without the consent of the Required Consenting Noteholders in their sole and absolute discretion at any time prior to the Plan Effective Date, then no releases shall be provided by any Debtor or any Releasing Party to any Related Party of the Debtors or any Affiliate of the Debtors in respect of any Cause of Action or any Claim arising out of or relating in any way to the Customs Claims or any other fact or circumstance for which the Debtors |

10

| | |
|---|---|
| | have provided an untrue representation to the Consenting Noteholders under the Restructuring Support Agreement. |
| | For the avoidance of doubt, nothing in the foregoing proviso shall be construed as an admission or evidence that any such Causes or Action or Claims exist against any Related party or Affiliate of the Debtors. |
| | For the avoidance of doubt, no Related Party's obligation to repay any loan or advance made to it by any Debtor shall be released under the Plan. |
| **Governance** | The new board of directors of USA Holdco (the "**New Board**") will consist of seven (7) directors including: (i) Ricardo Lessmann who shall serve as Chairman of USA Holdco and (ii) six (6) directors selected by the Required Consenting Noteholders in their sole and absolute discretion. The directors of Reorganized Gildemeister and the other Reorganized Debtors shall be selected by the Required Consenting Noteholders prior to the Plan Effective Date and thereafter shall be established by the New Board. The identities of directors on the New Board and of each of the Reorganized Debtors shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for USA Holdco, Chile Holdco, Reorganized Gildemeister, and the other Reorganized Debtors including charters, bylaws, operating agreements, or other organization documents, as applicable, shall: (a) be consistent with this Plan Term Sheet and section 1123(a)(6) of the Bankruptcy Code; and (b) be acceptable to the Required Consenting Noteholders in their sole and absolute discretion. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under Section 4(a)(2) or Regulation S of the Securities Act or Section 1145 of the Bankruptcy Code, as applicable. |
| **Treatment of the Non-Qualified Holders** | All New Notes under the Plan that would have been issuable and deliverable to Non-Qualified Holders if they had been Qualified Holders will be deposited with an agent (the "**Selling Agent**"). The Selling Agent shall offer such New Notes in one or more sale transactions within 180 days following the Plan Effective Date (the "**Sale Period**"). The price, terms and manner of sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash. The proceeds of any and all such sales (net of the costs of sale including the fees of any agent, broker, marketing agent, placement agent or underwriter appointed in relation to the sale and any taxes and provisions for taxes on sale) shall be distributed, on a *pro rata* basis, to such Non-Qualified Holders at the end of the Sale Period (the "**Substitute Consideration**").  In the event that a sale of such New Notes is unable to be consummated at any price within the Sale Period, the amount of Substitute Consideration shall be zero, and such debt securities shall be cancelled for no consideration.  None of the Company Parties, any member of the Ad Hoc Group of Consenting Noteholders, and the Selling Agent shall have any liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for any such debt securities. |
| | For the avoidance of doubt, any Non-Qualified Holders who would have been entitled to receive any New Notes under the Plan if they had been Qualified Holders shall only be entitled to receive the Substitute Consideration in |

11

| | |
|---|---|
| | respect thereof. Holders of 7.5% Notes due 2025 Secured Claims that are Non-Qualified Holders will receive that portion of their distributions under the Plan that constitutes their pro rate share of USA Holdco LLC units regardless of whether they receive any Substitute Consideration in respect of their allocation of New Notes. |
| **Employment Obligations** | In respect of (i) the Reorganized Debtors' senior management who have existing severance agreements with the Debtors, the material terms of whose employment, change of control, severance, non-compete and any other agreements with the Debtors have been disclosed to the Consenting Noteholders prior to entry into the Restructuring Support Agreement, and (ii) Ricardo Lessmann, the actual terms of whose employment, change of control, severance, non-compete and any other agreements with the Debtors shall have been disclosed to the Consenting Noteholders, prior to entry into the Restructuring Support Agreement, the Reorganized Debtors shall, subject to the terms of the Restructuring Support Agreement and the consummation of the Plan on the Plan Effective Date, assume and continue (a) the Debtors' existing wages, compensation, severance, non-compete and benefits programs according to existing terms and practices and (b) any amendments thereto approved by the Required Consenting Noteholders in their sole and absolute discretion; *provided, however*, that the foregoing shall not apply to any ordinary course adjustments to the Debtors' existing wages, compensation, severance, non-compete and benefits programs for individuals not included in clauses (i) or (ii) of this sentence whose existing agreements shall be assumed and continued on the terms in effect on the Plan Effective Date. |
| | Mr. Lessmann's employment as Chief Executive officer may be terminated at the option of the New Board in their sole discretion from and after the Plan Effective Date. Mr. Lessmann shall have agreed that effective upon the Plan Effective Date, Mr. Lessmann shall serve as Chairman of USA Holdco for a period of time mutually agreed from time to time by the New Board and Mr. Lessmann (but not to exceed 2 years). Mr. Lessmann will be entitled to customary indemnities and D&O insurance coverage in his capacity as Chairman, including the right to seek legal counsel in connection with his position as Chairman (including independent legal counsel in the event of a conflict, as determined in Mr. Lessmann's sole discretion, and subject to a cap of $40,000 per year for fees and expenses) the costs for which will be borne by USA Holdco. Other than as provided under Mr. Lessmann's existing employment agreement and non-compete agreement, as amended in a manner approved by the Required Consenting Noteholders in their sole and absolute discretion, Mr. Lessmann shall receive no compensation for his service as Chairman of USA Holdco. |
| | On the Plan Effective Date, other than the agreements mentioned above and any indemnity agreement entered into with the Company, any other existing employment, change-of-control, severance and compensation agreements with Mr. Lessmann shall be terminated and of no further force or effect and the Company and Mr. Lessmann shall reciprocally waive all claims in respect thereof. |

| | |
|---|---|
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no more or less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place as of November 19, 2019, provided that the Reorganized Debtors shall not indemnify officers, directors, managers, employees, attorneys, accountants, investment bankers or other professionals of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. |
| **Retained Causes of Action** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions outlined in this Plan Term Sheet and implemented pursuant to the Plan. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent**"): <br><br> a. the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement and otherwise in form and substance acceptable to the Debtors and the Required Consenting Noteholders , which shall: <br><br> i. authorize the Debtors (subject to the consent of the Required Consenting Noteholders) to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan in a manner consistent in all respects with this Plan Term Sheet and subject to the consent rights set forth herein; <br><br> ii. decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent; <br><br> iii. authorize Chile Holdco, USA Holdco, the Debtors, or Reorganized Debtors, as applicable/necessary, to: (A) implement the Restructuring Transactions; (B) distribute the USA Holdco LLC Units and the Chilean Securities pursuant to the exemption from registration under the Securities Act of 1933 provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (C) make all distributions and issuances as required under the Plan; and (D) subject to the consent of the |

13

Required Consenting Noteholders, enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, in each case, in a manner consistent in all respects with the terms of this Plan Term Sheet and subject to the consent rights set forth herein;

    iv.    authorize the implementation of the Plan in accordance with its terms; and

    v.    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

b.    Hyundai Motor Company ("**Hyundai**") shall have executed letter agreements (the "**Hyundai Letters**") between Hyundai and Gildemeister and Automotores Gildemeister Peru S.A. ("**AGP**") respectively, which shall include: (1) Hyundai's agreement to extend its existing distributorship agreements with Gildemeister and AGP (together, the "**Hyundai Distributorship Agreements**") for two years from the Plan Effective Date, (2) Hyundai's acknowledgement and agreement that, after the Plan Effective Date, certain financial creditors of Gildemeister will become the indirect shareholders of Gildemeister and a new chief executive officer for Gildemeister will be selected, and (ii) an executed copy of the Agreement for Undertaking and Release between Hyundai and AGP containing Hyundai's agreement allowing AGP to purchase up to 1854 EURO-4 H-1 vehicles from Hyundai with a discount rate of 30% ("**Hyundai Undertaking Agreement**"), which Hyundai Letters and Hyundai Undertaking Agreement shall be on terms that are acceptable to the Required Consenting Noteholders in their sole and absolute discretion;

c.    Hyundai shall not have repudiated any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement;

d.    the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time;

e.    no settlement or other agreement previously entered into between any Company Party and any Peruvian Authority relating to the Customs Claims, if any, shall have been terminated and each Company Party shall have maintained compliance in all material respects at all times with all provisions of any such settlements or agreements;

f.    Gildemeister shall not have received any notice of any charge, sanction, levy, or fine threatened or imposed by any government regulator or authority relating to the Customs Claims that, if sustained by any applicable court, government authority, or regulator of

14

competent jurisdiction could have the effect of: (i) enjoining, prohibiting, ceasing, terminating, or impairing or limiting the ability of the Companies to conduct their business operations in a manner substantially consistent with their current practices in any jurisdiction, (ii) imposing felony criminal liability on any of the Companies or any Senior Managers (as defined in the Restructuring Support Agreement), (iii) imposing any civil or criminal liability of any kind on any Consenting Noteholder, or (iv) causing the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, or other obligations associated with the Customs Claims, net of any tax credits related to the Customs Claims (recorded in accordance with IFRS), to exceed $40,000,000;

g.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

h.    the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or filed, as applicable, in form and substance consistent in all respects with this Plan Term Sheet and the Plan, and comply with the applicable consent rights set forth in this Plan Term Sheet and the Plan for such documents and shall not have been modified in any manner without the consent of the Required Consenting Noteholders in their sole and absolute discretion;

i.    the New Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the New Notes Documents shall have been satisfied or duly waived in writing in accordance with the terms of each the New Notes Documents and the issuance of each of the New Secured Notes and the New Subordinated Notes shall have occurred;

j.    the Final Order approving the DIP Credit Facility shall have been entered and shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

k.    all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

l.    the Required Consenting Noteholders shall have confirmed to the Debtors that they have received evidence satisfactory in their sole and absolute discretion that the Credit Facilities (as defined in the 2025 Indenture) shall remain available to the Debtors, the Reorganized Debtors, or the Company Parties, as applicable, and

| | that the Debtors, the Reorganized Debtors, or the Company Parties, as applicable, will have adequate working capital to finance their operations, in each case following consummation of the Restructuring; |
| | m. the Required Consenting Noteholders have been be satisfied, in their sole and absolute discretion, with (i) the information and/or documentation provided in response to their anti-corruption due diligence-related requests, and/or (ii) the results of their due diligence review of the compliance policies and procedures relating to, among other things, anti-corruption and other applicable laws of the Companies; and |
| | n. the payment in cash in full of all Restructuring Expenses. |

**Annex I**

**DEFINITIONS**

"**2021 7.5% Notes Indenture**" means that certain indenture dated as of February 24, 2016, by and among Gildemeister, the guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent and Lord Securities Corporation, as Collateral Agent, as amended and supplemented and in effect from time to time.

"**2021 8.25% Notes Indenture**" means that certain indenture dated as of May 24, 2011, by and among Gildemeister, the guarantors party thereto, Deutsche Bank Trust Company Americas, as Trustee, Registrar, Paying Agent and Transfer Agent and Deutsche Bank Luxembourg S.A., as Luxembourg Listing Agent, Paying Agent, Registrar and Transfer Agent, as amended and supplemented and in effect from time to time.

"**2023 Notes Indenture**" means that certain indenture dated as of January 15, 2013, by and among Gildemeister, the guarantors party thereto, Deutsche Bank Trust Company Americas, as Trustee, Registrar, Paying Agent and Transfer Agent and Deutsche Bank Luxembourg S.A., as Luxembourg Listing Agent, Paying Agent, Registrar and Transfer Agent, as amended and supplemented and in effect from time to time.

"**2025 Notes Indenture**" means that certain indenture by and among the Company, the Guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Paying Agent, and Transfer Agent, and TMP Group New York, LLC, as Collateral Agent, dated as of November 7, 2019, as amended or supplemented from time to time.

"**6.75% Notes due 2023**" means the unsecured notes issued by Gildemeister pursuant to the 2023 Notes Indenture.

"**6.75% Notes due 2023 Claims**" means any Claim evidenced by or arising under or on account of the 6.75% Notes due 2023 or the 2023 Notes Indenture.

"**7.5% Notes due 2021**" means the unsecured notes issued by Gildemeister pursuant to the 2021 7.5% Notes Indenture.

"**7.5% Notes due 2021 Claims**" means any Claim evidenced by or arising under or on account of the 7.5% Notes due 2021 or the 2021 7.5% Notes Indenture.

"**7.5% Notes due 2025**" means the secured notes issued by Gildemeister pursuant to the 2025 Notes Indenture.

"**7.5% Notes due 2025 Claims**" means (i) the 7.5% Notes due 2025 Secured Claims, and (ii) the 7.5% Notes due 2025 Unsecured Deficiency Claims.

"**7.5% Notes due 2025 Secured Claims**" means the Secured portion of any Claim evidenced by or arising under or on account of the 7.5% Notes due 2025 or the 2025 Notes Indenture, including any guaranty obligations of the Guarantors with respect to any of the foregoing.

"**7.5% Notes due 2025 Unsecured Deficiency Claims**" means the unsecured portion of any Claim against any of the Debtors evidenced by or arising under or on account of the 7.5% Notes due 2025

or the 2025 Notes Indenture, including any guaranty obligations of the Guarantors with respect to any of the foregoing.

"**8.25% Notes due 2021**" means the unsecured notes issued by Gildemeister pursuant to the 2021 8.25% Notes Indenture.

"**8.25% Notes due 2021 Claims**" means any Claim arising on account of the 8.25% Notes due 2021 or the 2021 8.25% Notes Indenture.

"**Ad Hoc Group of Consenting Noteholders**" means that certain ad hoc group of Consenting Noteholders party to the Restructuring Support Agreement and represented by Dechert LLP.

"**Administrative Claim**" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date to preserve the Estates and operate the Debtors' businesses; (b) Allowed Professional Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (d) DIP Claims.

"**Affiliate**" shall have the meaning ascribed to it in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

"**Agreement Effective Date**" means the date on which the conditions to the effectiveness of the Restructuring Support Agreement set forth therein have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement.

"**Allowed**" means, with respect to any Claim or Interest: (a) a Claim or Interest (i) as to which no objection has been filed and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable bar date, if any, or (ii) that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; or (b) a Claim or Interest that is allowed (i) pursuant to the Plan, (ii) in any stipulation that is entered into with the consent of the Required Consenting Creditors (such consent not to be unreasonably withheld) and approved by the Bankruptcy Court, (iii) by Final Order of the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

"**Avoidance Actions**" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cause of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"**Chapter 11 Cases**" means the Debtors' voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**Class**" means a category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

"**Company Parties**" means Gildemeister, each of the Guarantors, and all other direct and indirect subsidiaries of Gildemeister that have executed the RSA.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Consenting Noteholders**" means the holders of 7.5% Notes due 2025 that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement (as defined in the RSA) to counsel to the Company Parties from time to time agreeing to be bound thereby.

"**Consummation**" means the occurrence of the Plan Effective Date.

"**Customs Claims**" means any Claim or Cause of Action assertable against AGP, any Debtor, or any Related Party of any Debtor, arising out of, or relating to the importation of certain H1 vehicles into Peru not in compliance with applicable law.

"**Debtors**" means, collectively, each of the following: Gildemeister; AG Créditos SpA.; Marc Leasing, S.A.; Fonedar S.A.; Camur S.A.; Lodinem S.A.; Carmeister S.A.; Maquinaria Nacional S.A.;

RTC S.A.; Fortaleza S.A.; Maquinarias Gildemeister S.A.; Comercial Gildemeister S.A.; Bramont Montadora Industrial e Comercial de Vehiculos S.A.

"**Definitive Documents**" means the definitive documents governing the Restructuring, including, without limitation, the Plan, the Disclosure Statement and any motion seeking approval thereof, the Solicitation Materials and any motion seeking approval thereof, the DIP Credit Agreement, the DIP Orders and any motion seeking entry thereof, the Confirmation Order, the New Notes Documents, the Plan Supplement, and the corporate governance documents for Chile Holdco, USA Holdco, Reorganized Gildemeister, and the other Debtors. The Definitive Documents and any modifications thereto will be consistent with the Plan Term Sheet in all material respects and otherwise in form and substance acceptable to the Debtors and the Required Consenting Noteholders (in the sole and absolute discretion of the Required Consenting Noteholders subject to the rights of the DIP Lenders included in the DIP Term Sheet) in each case, as set forth in the Restructuring Support Agreement. The Plan Supplement shall include the corporate governance documents of USA Holdco, Chile Holdco, and Reorganized Gildemeister.

"**DIP Agent**" means SRS Acquiom in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

"**DIP Claims**" means all Claims arising under, derived from, based upon, or secured pursuant to the DIP Credit Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Credit Facility.

"**DIP Credit Facility**" means the credit facility provided to the Debtors by the DIP Lenders in accordance with the DIP Orders.

"**DIP Expenses**" all prepetition and postpetition reasonable and documented fees and expenses of (a) the DIP Lenders and their respective affiliates in any way related to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the DIP Lenders' and their respective affiliates' holdings of the 7.5% Notes due 2025, any fees and expenses of any of their advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, the DIP Credit Facility, and the transactions contemplated thereby, and (b) the DIP Agent and the collateral agent under the DIP Credit Facility.

"**DIP Lenders**" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

"**DIP Orders**" means, together, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan as may be amended, supplemented, or modified from time to time.

"**Entity**" shall have the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

"**Estate**" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) to the maximum extent permitted by law, the Consenting Noteholders; (d) to the maximum extent permitted by law, the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent; and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current

and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"**Existing Common Equity Interests**" means the common stock of Automotores Gildemeister S.p.A.

"**Existing Equity Interest**" means an Interest in a Company Party existing as of the Agreement Effective Date of the RSA or created after the execution of the RSA and prior to the Plan Effective Date.

"**Existing Preferred Equity Interests**" means the Preferred Stock in Automotores Gildemeister S.p.A, issued from time to time.

"**Existing Series A Warrants**" means warrants exercisable for voting Existing Common Equity Interests in Automotores Gildemeister S.p.A, issued from time to time.

"**Existing Series B Warrants**" means warrants exercisable for non-voting Existing Common Equity Interests in Automotores Gildemeister S.p.A, issued from time to time.

"**Final DIP Order**" means a final order by the Bankruptcy Court approving the Debtors' use of cash collateral, the DIP Credit Facility provided pursuant to the DIP Credit Agreement and its refinancing of the Prepetition Credit Facility, and related relief.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"**First Day Pleadings**" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, to be filed on or around the Petition Date and to be heard at the "first day" hearing.

"**General Unsecured Claim**" means any Claim other than an Administrative Claim, an Other Priority Claim, a 7.5% Notes due 2025 Secured Claim, an Other Secured Claim, a Prepetition Bank Financing Claim, or an Intercompany Claim.

"**Gildemeister**" means Automotores Gildemeister S.p.A. or any successor or assign, by merger, consolidation, or otherwise, prior to the Plan Effective Date.

"**Governmental Unit**" shall have the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

"**Guarantors**" means AG Créditos SpA., Marc Leasing, S.A., Fonedar S.A., Camur S.A., Lodinem S.A., Carmeister S.A., Maquinaria Nacional S.A. (Chile), RTC S.A., Fortaleza S.A., Maquinarias Gildemeister S.A., Comercial Gildemeister S.A., and Bramont Montadora Industrial e Comercial de Vehiculos S.A.

"**Impaired**" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Intercompany Claim**" means a Claim held by a Debtor against a Debtor or an Affiliate of a Debtor.

"**Intercompany Interest**" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

"**Interim DIP Order**" means an order by the Bankruptcy Court approving the Debtors' use of cash collateral, the credit facilities provided pursuant to the DIP Credit Agreement, and related relief on an interim basis.

"**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"**Joinder**" means a joinder agreement, substantially in the form attached to the Restructuring Support Agreement as Exhibit B, whereby a holder of Claims that is not a party to the Restructuring Support Agreement as of the Agreement Effective Date may become a Consenting Noteholder by executing such joinder agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Letter of Transmittal**" means a letter to be delivered by the beneficial Holder of 7.5% Notes due 2025 Secured Claims to the Reorganized Debtors in which such Holder of 7.5% Notes due 2025 Secured Claims: (a) certifies that it is either a Qualified Holder or a Non-Qualified Holder; (b) agrees to deliver its Senior Secured Notes through ATOP or as otherwise contemplated in the Plan; and (c) provides any additional certifications and representations as are consistent with the Plan. The form of the Letter of Transmittal shall be included in the Plan Supplement.

"**Minvest Loan Claim**" means a Claim evidenced by or arising under or on account of the Contrato de Cesion de Creditos dated as of March 26, 2021, between Automotores Motor Haus S.A. and Minvest S.A. by which Automotores Motor Haus S.A. assigned to Minvest S.A. certain intercompany credits in an amount of $1,643,500 owed to Automotores Motor Haus S.A. by Lodinem S.A. in satisfaction of Claims Automotores Motor Haus owed to Minvest S.A. under that certain Reconocimiento de Deuda (Acknowledgment of Debt) dated as of February 18, 2014, between Automotores Motor Haus S.A. and Minvest S.A.

"**New Notes**" means the New Secured Notes and the New Subordinated Notes.

"**New Notes Documents**" means the New Secured Notes Documents and the New Subordinated Notes Documents.

"**New Secured Notes Documents**" means, collectively, the New Secured Notes, any indenture or other agreement governing the New Secured Notes, the New Secured Notes Intercreditor Agreement, the New Senior/Subordinated Intercreditor Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors and the Required Consenting Noteholders.

"**New Secured Notes Intercreditor Agreement**" means an intercreditor agreement having customary terms for such agreements between senior and junior creditors and acceptable to the DIP Lenders by which the New Junior Tranche Secured Notes and all liens and guarantees related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the New Senior Tranche Secured Notes.

"**New Senior Tranche Secured Notes**" means the senior tranche of secured notes which shall be distributed to the DIP Lenders in exchange for their DIP Claims (other than Claims for DIP Expenses), to the extent not repaid in Cash on the Plan Effective Date, and which shall have terms as described in the RSA.

"**New Senior/Subordinated Intercreditor Agreement**" means an intercreditor agreement having customary terms for such agreements between senior and subordinated unsecured creditors and acceptable to the DIP Lenders by which the New Subordinated Notes and all guarantees related thereto shall be expressly subordinated in right of payment to the payment in full of both the New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes.

"**New Subordinated Notes**" means the subordinated tranche of unsecured notes which shall be distributed to holders of Claims in Classes 4 and 5 of the Plan, and which shall have terms as described in the RSA.

"**New Subordinated Notes Documents**" means, collectively, the New Subordinated Notes, any indenture or other agreement governing the New Subordinated Notes, the New Senior/Subordinated Intercreditor Agreement,  and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be acceptable to the Debtors and the Required Consenting Noteholders.

"**Other Priority Claim**" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Other Secured Claim**" means any Secured Claim other than a DIP Claim, an Prepetition Bank Financing Claim, or a 7.5% Notes due 2025 Secured Claim.

"**Person**" shall have the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

"**Peruvian Authorities**" means all applicable national, regional, provincial, district, and municipal authorities with regulatory, oversight, or legal authority relating to the Customs Claims in Peru.

"**Plan**" means the joint chapter 11 plan of reorganization filed by the Debtors as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with this Plan Term Sheet, and to the extent not consistent with this Plan Term Sheet in any material respect, in form and substance acceptable to the Debtors and the Required Consenting Noteholders.

"**Plan Effective Date**" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the Plan Effective Date under of the Plan have been satisfied or waived (in the sole and absolute discretion of the Required Consenting Noteholders) in accordance with the Plan.

"**Plan Supplement**" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in the RSA and the Plan Term Sheet, attached as Exhibit A to the RSA, where applicable, and which shall include, without limitation, the New Corporate Governance Documents; the New Notes Documents; the Rejection Schedule, if any; the list of directors and officers of USA Holdco and the Reorganized Debtors; and the form of the Letter of Transmittal.

"**Prepetition Bank Financing Claim**" means any Secured Claims arising under any of the Credit Facilities (as defined in the 2025 Indenture) to which any Debtor is a party or any loan documents related thereto.

"**Priority Tax Claims**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Pro Rata Share**" means with respect to any holder of Claims in a Class receiving any distribution under the Plan such holder's pro rata share of such distribution measured by reference to the aggregate amount of all Allowed Claims in such Class in each case as of the date of such distribution.

"**Professional Claim**" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"**Proof of Claim**" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

"**Reinstatement or Reinstated**" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Required Consenting Noteholders in their sole and absolute discretion.

"**Related Party**" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and

24

present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"**Related Party Claims**" means the Minvest Loan Claim and the Share Purchase Agreement Claim.

"**Released Parties**" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) Chile Holdco, USA Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agent, and each DIP Lender; (d) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent; (e) the Unsecured Legacy Notes Trustees; (f) each Consenting Noteholder; (g) each current and former Affiliate of each Entity in clause (a) through (f); and (h) each Related Party of each Entity in clause (a) through (g); *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) Chile Holdco, USA Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agent and each DIP Lender; (d) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent; (e) the Unsecured Legacy Notes Trustees; (f) each Consenting Noteholder; (g) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to accept for any Class, (h) all holders of Claims or Interests that are deemed to accept the Plan; (i) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (j) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that vote to reject the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (k)  each current and former Affiliate of each Entity in clause (a) through (j), and (l) each Related Party of each Entity in clause (a) through (k).

"**Reorganized Debtors**" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

"**Reorganized Gildemeister**" means Gildemeister, or any successor or assign, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

"**Required Consenting Noteholders**" means, as of the relevant date, the holders of a majority of the 7.5% Notes due 2025 held by all Consenting Noteholders that are party to the Restructuring Support Agreement on such date.

"**Restructuring**" means the restructuring of Gildemeister and its direct and indirect subsidiaries, as contemplated by and described in the RSA, the Plan Term Sheet and the Plan.

"**Restructuring Expenses**" means all prepetition and postpetition reasonable and documented fees and expenses of (i) the Consenting Noteholders in any way related to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the Consenting Noteholders' holdings of the 7.5% Notes due 2025, any fees and expenses of any Ad Hoc Group Advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, and the transactions contemplated thereby, and (ii) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent.

"**Restructuring Support Agreement**" shall mean that certain support agreement for implementation of the Restructuring dated as of March 31, 2021 between Gildemeister, the Guarantors, the Company Parties, and the Consenting Noteholders in form and substance acceptable to the Consenting Noteholders to which this Plan Term Sheet has been attached as Exhibit A.

"**Restructuring Transactions**" means those certain restructuring and recapitalization transactions with respect to the Debtors' capital structure required to effect the Restructuring on the terms and conditions set forth in the Restructuring Support Agreement, this Plan Term Sheet, and the Plan.

"**SEC**" means the United States Securities and Exchange Commission.

"**Secured**" means when referring to a Claim, a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

"**Securities Act**" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Plan Effective date.

"**Security**" means a security as defined in Section 2(a)(1) of the Securities Act of 1933.

"**Senior Secured Notes Trustee**" means The Bank of New York Mellon, in its capacity as trustee in respect of the 7.5% Notes due 2025 and the indenture governing the 7.5% Notes due 2025.

"**Senior Secured Notes Collateral Agent**" means TMF Group New York, LLC in its capacity as Collateral Agent in respect of the 7.5% Notes due 2025 and the indenture governing the 7.5% Notes due 2025.

"**Share Purchase Agreement Claim**" means a Claim evidenced by or arising under or on account of the Contrato de Compraventa de Acciones (Share Purchase Agreement), dated as of February 24, 2016, between Automotores Gildemesiter SpA and Minvest S.A.

"**Solicitation Materials**" means the solicitation materials and documents included in the solicitation packages that will be sent to, among others, Holders of Claims and Interests entitled to vote to accept or reject the Plan, in compliance with Bankruptcy Rules 3017(d) and 2002(b), which shall be in form and substance acceptable to the Required Consenting Noteholders.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement and substantially in the form attached to the Restructuring Support Agreement as Exhibit B.

"**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

"**United States Trustee**" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

"**Unsecured Legacy Notes Claims**" means the 6.75% Notes due 2023 Claims, 7.5% Notes due 2021 Claims, and the 8.25% Notes due 2021 Claims.

"**Unsecured Legacy Notes Trustees**" means the trustee in respect of the 6.75% Notes due 2023 and the indenture governing the 6.75% Notes due 2023, the trustee in respect of the 7.5% Notes due 2021 and the indenture governing the 7.5% Notes due 2021, and the trustee in respect of the 8.25% Notes due 2021 and the indenture governing the 8.25% Notes due 2021.

"**Unsecured Notes Claims**" means the 7.5% Notes due 2025 Unsecured Deficiency Claims and the Unsecured Legacy Notes Claims.  As of the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) $100.5 million in 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9.6 million of 7.5% Notes due 2021 Claims, (iii) $22.7 million of 8.25% Notes due 2021 Claims, and (iv) $2.7 million of 6.75% Notes due 2023 Claims, plus in each case, any accrued and unpaid interest on the respective series of notes through the Petition Date.

"**Unsecured Notes and Related Party Claims**" means the Unsecured Notes Claims and the Related Party Claims.

**ANNEX II**

**DIP TERM SHEET**

ANNEX II

## SUMMARY OF INDICATIVE TERMS
## DEBTOR-IN-POSSESSION FINANCING

*This Summary of Indicative Terms (this "**Term Sheet**") outlines certain terms of the DIP Credit Facility (as defined herein) and does not reflect all of the terms, conditions, representations, warranties and other provisions that would be set forth in definitive credit documentation relating to such DIP Credit Facility to be reflected in the DIP Loan Documents (as defined below), and is qualified in its entirety by such DIP Loan Documents. The DIP Loan Documents when executed will constitute the sole agreements among the parties with respect to the matters addressed herein. Any such agreements will be subject to (1) the conditions set forth in this Term Sheet below and the execution and delivery of DIP Loan Documents, acceptable to the DIP Lenders (as defined below) and their respective counsel, in their sole and absolute discretion, (2) the accuracy and completeness in all material respects of the information provided by or on behalf of the Credit Parties (as defined below), and (3) completion of due diligence by the DIP Lenders and their respective advisors. The following describes the terms of a senior secured, priming, super-priority, debtor-in-possession credit facility (the "**DIP Credit Facility**" to be used to fund working capital of Automotores Gildemeister S.p.A. (the "**Company**") and its direct and indirect subsidiaries (collectively, the "**Subsidiaries**") prior to and during the pendency of the Chapter 11 Cases. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Restructuring Term Sheet to which this Term Sheet is annexed (the "**Restructuring Term Sheet**").*

| | |
|---|---|
| **Credit Parties:** | With respect to the DIP Credit Facility, each of the Debtors, each as a borrower or a guarantor, as applicable, and each of its non-guarantor Subsidiaries (the "**Pledgors**") that have pledged assets (such assets, the "**Prepetition Pledged Assets**") to secure the Prepetition Borrower's obligations under the 7.5% Notes due 2025 (the "**2025 Notes**"). (the Debtors and the Pledgors, collectively, the "**Credit Parties**"). |
| | For the avoidance of doubt, the Pledgors shall not provide guarantees in respect of the DIP Credit Facility and shall not be Debtors in the Chapter 11 Cases, but shall provide *pari passu* perfected liens in their Prepetition Pledged Assets to secure the DIP Credit Facility Obligations (as defined below), in each case as described on <u>**Exhibit A**</u> attached hereto (the "**Collateral Annex**").. |
| **DIP Lenders** | Each member of the Ad Hoc Group of Consenting Noteholders party to the Restructuring Support Agreement (or such member's designated affiliate) (the "**DIP Lenders**"). |
| | All references to the "**Requisite Lenders**" herein shall mean the DIP Lenders holding a majority of all Commitments under the DIP Credit Agreement. |
| **Agent** | Acquiom Agency Services LLC (in such capacity, the "**Agent**") will act as administrative agent. |
| | TMF Group New York, LLC (acting directly and through its affiliated sub-agents in each relevant jurisdiction) (in such capacity, the "**Collateral Agent**") will serve as the collateral agent. |

| | |
|---|---|
| **Credit Facility** | The DIP Loan Documents (as defined below) shall provide that the DIP Lenders (i) commit to provide the DIP Credit Facility in an aggregate principal amount of up to US$23,600,000 (the "**DIP Commitments**")<br><br>On and after the Petition Date, subject to entry of the Interim DIP Order, and satisfaction or waiver by the Requisite Lenders of the conditions related to the occurrence of the DIP Closing Date (as defined below) set forth in the section "Conditions Precedent" of this Term Sheet, the Debtors may request and receive an advance of a loan or loans (the "**DIP Loans**") in an aggregate principal amount up to $15,100,000 (the "**Interim Availability**"). Subject to the entry of the Final DIP Order, and satisfaction of all of the other conditions to drawing any DIP Loan set forth in herein, the Debtors may request and receive an advance of one or more DIP Loans that will not, when combined with all loans advanced prior to such date in accordance herewith and the DIP Loan Documents, exceed the aggregate amount of the DIP Commitments. Any DIP Loans repaid or prepaid may not be reborrowed.<br><br>As used herein, the "**DIP Facility Obligations**" means, at any time, all indebtedness and other obligations (including, without limitation, contingent obligations, principal, interest, fees and expenses) owing to the DIP Lenders under the DIP Credit Facility at such time.<br><br>The DIP Lenders ███████████ ███████████ ███ shall provide $3,646,886 aggregate principal amount of the total DIP Commitments and the DIP Lenders ███████████ ███ shall fund the remaining DIP Commitments.<br><br>All entities that are Guarantors (as defined in the 2025 Notes Indenture) under the 2025 Notes shall provide guarantees in respect of the DIP Credit Facility providing for payment of all DIP Obligations. |
| **Certain Intercreditor Matters** | On the DIP Closing Date, the Indenture Trustee and the collateral agent under the 2025 Notes Indenture and the Agent and the Collateral Agent under the DIP Credit Facility will enter into an intercreditor agreement (acknowledged by each of the Credit Parties, including the Pledgors, as binding thereon) on terms reasonably acceptable to the parties thereto and to the Company, whether or not the Company is a party to the agreement (the "**DIP Intercreditor Agreement**"). The DIP Intercreditor Agreement shall describe the relative rights among the Agent, the DIP Lenders, the Indenture Trustee, the holders of the 2025 Notes and the other secured parties under the 2025 Notes Indenture, and shall provide, among other things, that the liens on and security interests in the Pre-Petition Pledged Assets pledged by the Pledgors to secure the DIP Obligations shall be *pari passu* to the liens granted by the Pledgors to secure the obligations under the 2025 Notes Indenture and the liens on and security interests in the Pre-Petition Pledged Assets pledged by Debtors to secure the DIP Obligations shall prime the liens granted by the Debtors to secure the obligations under the 2025 Notes Indenture, in each case subject to and in accordance with the DIP Orders.<br><br>For the avoidance of doubt, releases of the vehicle Collateral sold in the ordinary course of business of the Credit Parties shall be automatic and not subject to consent by the Requisite Lenders. |

| | |
|---|---|
| | The DIP Order will effectuate the authorization, perfection and seniority of the priming liens on and security interests in the Pre-Petition Pledged Assets pledged by the Debtors to secure the DIP Obligations. |
| **DIP Orders** | On the Petition Date, the Debtors shall file a motion with the Bankruptcy Court seeking entry of (i) an order approving the DIP Credit Facility on an interim basis (the "**Interim DIP Order**") and (ii) an order approving the DIP Credit Facility on a final basis (the "**Final DIP Order**" and together with the Interim DIP Order, the "**DIP Orders**" and either one individually, a "**DIP Order**"). The Interim DIP Order shall approve the Debtor's use of cash collateral and the entry into the DIP Credit Facility and will include customary stipulations, relief and protections for the DIP Lenders as specified herein. The Final DIP Order shall provide for the other protections of the DIP Orders from and after the entry of the Final DIP Order.

The DIP Orders shall be in form and substance reasonably acceptable to each of the Credit Parties, the Agent and each of the DIP Lenders, each in its respective reasonable discretion and acceptable to the Requisite Lenders in their sole discretion. The DIP Orders shall not be vacated, reversed, modified, amended or stayed except as otherwise agreed to in writing by the Credit Parties, the Agent and the Requisite Lenders. |
| **Fees** | OID: 5.0%

**Agent Fees**: As set forth in that certain engagement letter to be entered into by the Company and the Agent on or prior to the date of the DIP Credit Facility.

All fees owed under the DIP Credit Facility shall be fully earned and payable in accordance with the DIP Orders and withheld from the initial advance of DIP Loans (other than OID in respect of DIP Loans to be made after such date). |
| **Interest Rate; Default Rate** | **Interest Rate**. All DIP Loans outstanding will bear interest, payable in kind, at a rate of 11.75% *per annum*.

**Default Rate**. Upon an Event of Default, interest on the DIP Obligations shall accrue at the otherwise applicable interest rate plus an additional 2.0% *per annum*. |
| **Maturity Date** | The DIP Facility shall terminate and all DIP Obligations outstanding thereunder shall be payable in full in cash on the date of the earliest to occur of (the "**Maturity Date**"): (a) the date occurring sixty five (65) days after the DIP Closing Date (which date may be extended by AG Chile for an additional period to be agreed in the definitive documents in the event that the Confirmation Order has been entered), (b) the conversion of any of the Chapter 11 Cases to a case under chapter 7 without the prior written consent of the Requisite Lenders, (c) the dismissal of any of the Chapter 11 Cases without the prior written consent of the Requisite Lenders, (d) the appointment of a chapter 11 trustee without the prior written consent of the Requisite Lenders, (e) the appointment of an examiner with expanded powers without the prior written consent of the Requisite Lenders, (f) the date of consummation of a sale of all or substantially all of the Debtors' assets, unless |

3

| | |
|---|---|
| | otherwise consented to in writing by the Requisite Lenders, (g) the effective date of a chapter 11 plan confirmed in the Chapter 11 Cases, (h) the acceleration of any outstanding amounts due to the occurrence of an Event of Default (as defined below), (i) if the Final DIP Order has not been entered by the date that is thirty-five (35) days after the Petition Date (which date may be extended with the prior written consent of the Requisite Lenders), and (j) other customary events, subject to the Documentation Principles (set forth below). |
| **Use of Proceeds** | Proceeds of the DIP Loans will be used only for the following purposes, and, if applicable, in accordance with the Approved Budget (as defined below) and subject to the Permitted Variances (as defined below), each as described in the officer's certificate delivered in connection with each requested borrowing: (i) general corporate and working capital purposes; (ii) the costs of the administration of the Debtors' Chapter 11 Cases, including without limitation, the restructuring costs and professional fees of the Credit Parties; (iii) payment of reasonable and documented transaction costs, fees and expenses with respect to the Credit Facility, including reasonable fees and expenses of legal and other professional advisors to the DIP Lenders and the Agent as provided under the DIP Loan Documents and the DIP Orders; (iv) adequate protection payments, if any, approved by the Bankruptcy Court to the extent such payments are included in the Approved Budget (as defined below); (v) other items agreed to by the parties to the DIP Loan Documents; and (vi) as approved by the Bankruptcy Court in the DIP Orders or any other orders so long as such use is consistent with the terms of the DIP Credit Agreement (as defined below). |
| **Budget** | <u>Form of Budget:</u><br><br>The initial budget shall be delivered no later than 2 Business Days prior to Closing Date, take into account market conditions and obligations under the Debtors' distribution agreements, shall be acceptable to the Requisite Lenders in their sole and absolute discretion, and shall consist of the following (the "**Initial Approved Budget**"):<br><br>1) forecasted receipts and disbursements for the 13-weeks commencing on the Monday prior to the Closing Date with respect to Automotores Gildemeister S.p.A. ("**AG Chile**") and its Debtor subsidiaries (the "**AG Chile Subsidiaries**") and Automotores Gildemeister Peru S.A. ("**AG Peru**"),<br><br>2) projections for the anticipated amount of Inventory Debt to be outstanding during each week with respect to AG Chile, the AG Chile Subsidiaries and AG Peru, and<br><br>3) projections of the accounts receivable subject to factoring arrangements during each week and the amount of proceeds from such factoring arrangements with respect to AG Chile, the AG Chile <u>Subsidiaries and AG Peru.</u> |

| | |
|---|---|
| | <u>Delivery and Form of Updated Budgets</u>: The Initial Approved Budget shall be updated by the tenth (10th) calendar day of each calendar month thereafter (or the first Business Day thereafter if the 10th is not a Business Day).  Each such updated budget shall be in form and substance substantially similar to the Initial Approved Budget and reasonably satisfactory to the Requisite Lenders, provided that if the Requisite Lenders do not object to such updated budget within two (2) Business Days following receipt thereof, it shall be deemed reasonably satisfactory to the Requisite Lenders (each, an "**Updated Approved Budget**"), provided further, that neither the Initial Approved Budget nor any Updated Approved Budget shall be modified in any manner without the prior written consent of the Requisite Lenders (which shall not be unreasonably withheld).<br><br>The term "**Approved Budget**" shall mean the Initial Approved Budget until such time as an Updated Approved Budget is approved, following which such Updated Approved Budget shall constitute the Approved Budget until a subsequent Updated Approved Budget is so approved. |
| **Budget Variance Report** | <u>Delivery of Budget Variance Report</u>:  Commencing on April 23, 2021, and bi-weekly thereafter (or the next Business Day if such Friday is not a Business Day), the Credit Parties shall deliver to each of the DIP Lenders a variance report for the two-week period ending on the Friday prior to the reporting date (the "**Reporting Period**") comparing the actual receipts and disbursements of the AG Chile, AG Chile Subsidiaries and AG Peru on a line-item basis, to the values set forth in the Approved Budget for such Reporting Period (each, a "**Budget Variance Report**") with an explanation of each material variance.<br><br><u>Permitted Variance and Variance Period</u>. The total aggregate disbursements for each of:  (x) AG Chile and the AG Chile Subsidiaries in aggregate, and (y) AG Chile, the AG Chile Subsidiaries, and AG Peru in aggregate, shall not exceed 120% of the total aggregate disbursement amounts set forth in the Approved Budget for the periods (each such period, a "**Variance Period**") from (1) April 1, 2021 through and including April 30, 2021, and (2) during each calendar month thereafter, (those variances from the Approved Budget within a Variance Period beneath both of the 120% thresholds, collectively, the "**Permitted Variances**").<br><br>On the fifth (5th) Business Day after the end of the Variance Period, AG Chile shall provide to the DIP Lenders an explanation of all material variances in the Variance Period and a certification that budget variances of (x) AG Chile and the AG Chile Subsidiaries in aggregate, and (y) AG Chile, the AG Chile Subsidiaries, and AG Peru in aggregate, have not exceeded the Permitted Variances during the Variance Period ("**Permitted Variance Reporting**"). |
| **Milestones** | The DIP Loan Documents shall require the Debtors to commence and execute the Chapter 11 Cases in accordance with the Milestones reflected in the Restructuring Term Sheet.<br><br>The Debtors shall provide the DIP Lenders with drafts of pleadings and proposed orders in accordance with the "Court Filings" section of the Restructuring Term Sheet (and in any event no later than three (3) business |

| | |
|---|---|
| | days prior to their filing with the Bankruptcy Court), unless circumstances render such notice impracticable, in which case the Debtors shall consult in good faith with the Requisite Lenders and their counsel regarding the substance of any such proposed filing. Such pleadings shall not conflict with the terms of this Term Sheet, the DIP Loan Documents, or the Restructuring Term Sheet and, prior to the filing with the Bankruptcy Court, shall be in form and substance reasonably acceptable to the Requisite Lenders; provided that, if the Requisite Lenders fail to provide a response to any draft pleading within three (3) business days of receipt, the Debtors shall be entitled to treat such failure as the Requisite Lenders' consent to the filing of such pleading, provided that in no event shall failure to respond to the draft pleadings constitute a waiver by the Requisite Lenders of their right to object to any such pleading after it is filed.

Unless otherwise provided in this Term Sheet, the DIP Loan Documents or the Restructuring Term Sheet, orders entered by the Bankruptcy Court throughout the pendency of the Chapter 11 Cases must be reasonably acceptable to the Requisite Lenders. Notwithstanding anything to the contrary herein, the DIP Loan Documents and the Restructuring Term Sheet, the form and substance of the DIP Orders shall be acceptable to the Requisite Lenders and the Agents in their sole discretion.

"**Acceptable Plan**" means the Plan (as defined in the Restructuring Term Sheet). |
| **Collateral** | As security for the DIP Obligations owing to the DIP Lenders:

Upon entry of the Interim DIP Order, the DIP Facility Obligations shall be secured by liens (collectively, the "**DIP Liens**") on the Prepetition Pledged Assets and other assets of the Debtors and of the Pledgors (the "**Collateral**") in each case, as described in the Collateral Annex and as follows:

(a)    pursuant to section 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected first-priority priming lien on the Prepetition Pledged Assets pledged by the Debtors together with the proceeds thereof and all books and records relating thereto, provided, that such first-priority liens shall be subject only to the Prior Permitted Liens (as defined below) (other than the liens securing the 2025 Notes and the obligations under the 2025 Notes Indenture which shall be junior and subordinate in all respects to the DIP Liens);

(b)    pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, upon entry of the Final DIP Order and to the extent approved by the Bankruptcy Court, a first-priority lien on any and all property and proceeds recovered from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, and all unencumbered assets of the Debtors, provided however, that the local law collateral documents to be executed will be those described on the Collateral Annex;

(c)    pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected lien on any property or assets subject to any Prior Permitted Lien (other than the liens securing the 2025 Notes |

and the 2025 Notes Indenture, each of which shall be junior and subordinate in all respects to the DIP Liens); and

(d)     pursuant to local law collateral documents, (i) a valid perfected *pari passu* lien on the Pre-Petition Pledged Assets granted by any Pledgors and (ii) a valid, perfected first priority lien on certain unencumbered inventory, receivables and cash accounts of the Pledgors in Costa Rica as reflected in the Collateral Annex, which shall be subject to certain limitations and operational provisions to be agreed to ensure the continued operation of the Company's business in the ordinary course.

provided, however, that the Collateral shall specifically exclude (and the DIP Liens shall not attach to) certain assets to be agreed among the parties, including, without limitation, that certain peso denominated bank account maintained at Santander in Chile (with an account number ending in 6924626-5) which shall not at any time maintain a balance exceeding US$5,000,000.00, and all inventory, receivables and cash accounts of the Credit Parties in Peru (such assets, collectively, the "**Excluded Assets**"), and provided further, that all steps to be taken under local law to pledge and perfect the Collateral are as described in the Collateral Annex.

"**Prior Permitted Liens**" means valid, perfected and unavoidable liens in favor of third parties that (a) were in existence on the Petition Date or (b) were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

"**Priority Collateral Value**" means, at any given time, the aggregate value of the accounts receivable then owed to Automotores Gildemeister S.p.A. *plus* the aggregate value of all inventory and cash and cash equivalents of any Credit Parties, in each case, (x) that are pledged to secure the DIP Facility on a first lien basis and which are not subject to any other liens, (y) calculated in accordance with IFRS and (z) multiplied by the following factors: 100% in respect of cash and cash equivalents, 50% in respect of accounts receivable, and 45% in respect of inventory.

"**Priority Collateral Coverage Failure**" means with respect to the DIP Credit Agreement, the failure of the Priority Collateral Value to equal or exceed 125% of the DIP Commitments; provided that, with respect to any incurrence of Inventory Debt (as defined in the 2025 Notes Indenture) or the factoring of any accounts receivable, the test for a Priority Collateral Coverage Failure shall be on a pro forma basis immediately before and immediately after giving effect to the grant of any Inventory Financing Liens, the sale of any accounts receivable, and the proposed release of any liens securing the DIP Credit Facility in connection with such incurrence or factoring.

Unless an Event of Default has occurred and is continuing, and subject to the Approved Budget, the Credit Parties shall at all times in any Reporting Period be permitted to incur Inventory Debt and to grant liens on Vehicles, Vehicle parts, Vehicle accessories and /or other inventory or receivables securing such Inventory Debt to the extent permitted under the 2025 Notes Indenture and consistent with its past practices (such liens, collectively, the "**Inventory Financing Liens**"), *provided that* the Credit Parties shall not be permitted to

| | incur Inventory Debt without the consent of the Requisite Lenders if doing so would cause a Priority Collateral Coverage Failure. Upon the granting of any permitted Inventory Financing Lien, all DIP Liens on the Collateral securing such Inventory Financing Lien shall, with respect to such Collateral, be automatically and unconditionally released, provided the proceeds of inventory financing will be subject to DIP Liens. |
|---|---|
| **Super-priority DIP Claim** | Subject to the Carve-Out (as defined below), all of the claims of the Agent and the DIP Lenders shall with respect to DIP Loans at all times be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having super-priority over any and all administrative expenses of the kind that are specified in, or contemplated by, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code (collectively, the "**Super-priority DIP Claims**"). |
| **Local Perfection** | The DIP Liens secured by Debtor's Pre-Petition Pledged Assets shall be granted and deemed perfected pursuant to the DIP Orders.  In addition, the Debtors shall execute and file local law collateral documentation (or amendments thereto) as described in the Collateral Annex to document the priming Liens with respect to the existing Liens granted over the Pre-Petition Pledged Assets, and certain of the DIP Liens to be secured by the other Collateral.  The *pari passu* priority of DIP Liens secured by Pre-Petition Pledged Assets pledged by the Pledgors shall be as set forth in Collateral Annex and the DIP Intercreditor Agreement. <br><br> The Credit Parties, the Collateral Agent and DIP Lenders shall take such steps and execute such documentation within the timeframe and in accordance with the procedures described in the Collateral Annex. |
| **Adequate Protection** | The DIP Orders shall include a customary adequate protection package, ("**Adequate Protection**") including payment of certain professional fees for a debtor-in-possession financing of this type to the holders of the 2025 Notes, the other secured parties under the 2025 Notes Indenture including the Adequate Protection Expenses (as defined below), for the protection of their prepetition liens in the Collateral securing the prepetition claims under the 2025 Notes Indenture , to the extent of the diminution of such Collateral, and consent to use of cash collateral, provided that such Adequate Protection liens and claims shall be junior to the DIP Liens, the Super-priority DIP Claims, the Permitted Prior Liens (other than any lien securing the 2025 Notes or any obligation under the 2025 Notes Indenture) and prior payment of the Carve-Out. <br><br> "**Adequate Protection Expenses**" means all prepetition and postpetition reasonable and documented fees and expenses of the Indenture Trustee and the collateral agent under the 2025 Notes Indenture. |
| **Carve-Out** | The DIP Orders shall provide that the "**Carve-Out**" shall be the sum total of: <br><br> (a)      all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of |

|  | title 28 of the United States Code, and interest at the statutory rate (without regard to the notice set forth in iii. below); |
|  | (b) all reasonable fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; |
|  | (c) to the extent allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, whether by interim order, interim compensation procedures order, final order, or otherwise, all unpaid fees, costs, and expenses of persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "**Debtors' Professional Fees**") or any official committee of unsecured creditors (the "**Creditors' Committee**") pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (the "**Committee's Professional Fees**" and, together with the Debtors' Professional Fees, the "**Professional Fees**"), in each case incurred or accrued at any time on or before the first business day following delivery by the Agent of a Trigger Date Notice (as defined below); |
|  | (d) all unpaid Professional Fees incurred or accrued on and after the Trigger Date (including all success, incentive or other similar fees not earned prior to the Trigger Date) and allowed by the Bankruptcy Court at any time whether by interim order, interim compensation procedures order or otherwise; provided that, (i) the payment of any such Debtors' Professional Fees incurred or accrued on or after the Trigger Date shall not exceed $500,000 in the aggregate and (ii) the payment of any such Committee's Professional Fees incurred or accrued on or after the Trigger Date shall not exceed $50,000 in the aggregate. |
|  | "**Trigger Date**" shall mean the date upon which a Trigger Date Notice is delivered to the Debtors. |
|  | "**Trigger Date Notice**" shall mean a written notice delivered by email (or other electronic means) by the Agent, at the direction of the DIP Lenders, to the Debtors, their lead restructuring counsel, counsel to the Creditors' Committee (if a Creditors' Committee is appointed) and the U.S. Trustee, which notice may be delivered following the occurrence of an Event of Default under the DIP Order then in effect or under the DIP Loan Documents. |
| **Prohibited Actions** | No portion of the Carve-Out or of any Collateral or the proceeds thereof may be used for the payment of the fees and expenses incurred by anyone challenging, or in connection with any challenge of, any liens or claims of the Agent, the DIP Lenders (including liens or claims arising prior to the Petition Date), or the secured parties under the 2025 Notes Indenture or initiating or prosecuting any claim or cause of action against the Agent, the DIP Lenders (or any of their respective affiliates), or the secured parties under the 2025 Notes Indenture, including, without limitation, any claim (i) seeking to invalidate any liens or claims of the Agent, the DIP Lenders (including but not limited to any claims or challenges relating to the allocation of value as between encumbered or unencumbered assets), or the secured parties under the 2025 Notes Indenture, or (ii) under chapter 5 of the Bankruptcy Code relating to any transaction, occurrence, omission or action related to the DIP |

| | |
|---|---|
| | Liens, DIP Obligations, or 2025 Notes. In addition, neither the Carve-Out nor any portion of loan proceeds under the DIP Credit Facility or proceeds of Collateral shall be used in connection with preventing, hindering or delaying the Agent's enforcement or realization upon the Collateral for the benefit of the DIP Lenders once an Event of Default has occurred under the DIP Loan Documents and the Trigger Date Notice has been delivered. |
| **Documentation Principles** | The DIP Credit Facility shall be documented by a senior secured, super-priority, debtor-in-possession credit agreement (the "**DIP Credit Agreement**" and, together with any and all security agreements and other relevant documentation required to give effect to the DIP Credit Facility on the terms contemplated in this Term Sheet, the "**DIP Loan Documents**"), in form and substance acceptable to the Agent, the DIP Lenders, the Debtors and the Pledgors, and reflecting the terms and provisions of this Term Sheet and, to the extent any terms are not set forth in this Term Sheet, such terms shall include customary exceptions and materiality qualifiers in the representations and warranties, covenants, events of default and other similar provisions acceptable to the Debtors, the Pledgors and the Requisite Lenders in their sole discretion. |
| **Events of Default** | The DIP Loan Documents shall contain usual and customary events of default (any such event, an "**Event of Default**"), subject to customary cure provisions and materiality thresholds, which shall include, without limitation: |
| | (i) nonpayment of DIP Obligations when due; |
| | (ii) non-performance of covenants and obligations under the DIP Loan Documents, as applicable (subject to customary grace periods to be agreed); |
| | (iii) uninsured judgments are entered with respect to any liabilities against any of the Debtors, as applicable, or any of their respective properties in an aggregate amount in excess of $2,000,000 (subject to a customary grace period and/or challenge period to be agreed); |
| | (iv) breach of any representation or warranty under the DIP Credit Agreement, as applicable, in any material respect (subject to customary grace periods to be agreed); |
| | (v) default on other post-petition material obligations (subject to customary grace periods to be agreed); |
| | (vi) the termination of the Restructuring Support Agreement; |
| | (vii) occurrence of any Consenting Party Termination Event (as defined in the Restructuring Support Agreement) or Companies Termination Event (as defined in the Restructuring Support Agreement); |
| | (viii) the Credit Parties, directly or indirectly, contesting, impeding or taking any other action, (including the commencement by or on behalf of the Debtors of an avoidance action or other legal proceeding seeking any of the following relief or seeking the entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction) objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens |

10

securing the DIP Obligations, the 2025 Notes, or the obligations under the 2025 Notes Indenture or (b) the validity, enforceability, characterization or non-avoidability of any of the DIP Obligations or the obligations in respect of the 2025 Notes or the 2025 Notes Indenture;

(ix) entry by the Bankruptcy Court of an order (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Cases, or (d) terminating or modifying the exclusive right of the Debtors to file a plan of reorganization under section 1121 of the Bankruptcy Code;

(x) the occurrence of an unfavorable variance from an Approved Budget in excess of the Permitted Variances in respect of the aggregate disbursements of (x) AG Chile and the AG Chile Subsidiaries, in aggregate or (y) AG Chile, the AG Chile Subsidiaries, and AG Peru, in aggregate;

(xi) any Event of Default under any DIP Order shall have occurred;

(xii) the filing of a motion seeking authority to enter into debtor in possession facility, other than indebtedness permitted under the DIP Credit Facility or the filing of a chapter 11 plan by the Debtors that is not an Acceptable Plan, in each case, without the prior written consent of the Requisite Lenders;

(xiii) an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Requisite Lenders;

(xiv) the failure to meet any one of the Milestones;

(xv) any of the Debtors filing a pleading seeking to vacate or modify any of the DIP Orders over the objection of the DIP Lenders;

(xvi) the entry of an order without the prior consent of the Requisite Lenders amending, supplementing or otherwise modifying any of the DIP Orders;

(xvii) reversal, vacation or stay of the effectiveness of any of the DIP Orders;

(xviii) any sale of all or substantially all assets of all of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) the proceeds of such sale indefeasibly satisfy the DIP Obligations in full in cash or (b) such sale is supported by the Requisite Lenders;

(xix) the granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of any Debtor above an agreed-upon threshold;

(xx) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any super-priority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Credit Facility;

(xxi) payment of or granting adequate protection with respect to prepetition debt, other than as expressly agreed in the DIP Loan Documents, or in any of the DIP Orders;

(xxii) as applicable, cessation of the DIP Liens, or the Super-priority DIP Claims to be valid, perfected and enforceable in all respects provided for herein and in the DIP Loan Documents;

(xxiii) any of AG Chile, the AG Chile Subsidiaries, or AG Peru uses cash collateral or DIP Loans for any item other than those set forth in, and in accordance with, the Approved Budget (subject to the Permitted Variances tested on an aggregate basis for each of (x) AG Chile and the AG Chile Subsidiaries and (y) AG Chile, the AG Chile Subsidiaries, and AG Peru);

(xxiv) any Pledgor makes a voluntary filing for insolvency or is declared the subject of any insolvency, bankruptcy, liquidation or reorganization proceeding under the laws of any jurisdiction and, only if such proceeding is an involuntary insolvency proceeding, it is not dismissed, stayed, reversed or lifted within twenty (20) days of such declaration;

(xxv) [*Reserved*];

(xxvi) any repudiation by Hyundai Motor Company ("Hyundai") of any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement (each as defined in the Restructuring Support Agreement);

(xxvii) any termination or modification of the Hyundai Letters, the Hyundai Undertaking Agreement, or the Hyundai Distributorship Agreements (as defined in the Restructuring Support Agreement) without the consent of the Requisite Lenders in their sole and absolute discretion;

(xxviii) without the consent of the Requisite Lenders, any Credit Party (x) waives any reasonable objection or defense against, or otherwise fails to reasonably contest, any material adverse action, material fine, or material penalty imposed against such Credit Party by any Peruvian Authorities in connection with the Customs Claims, or (y) enters into any agreements with any Peruvian Authorities with respect to Customs Claims without the consent of the Required Consenting Noteholders (as defined in the Restructuring Support Agreement) in their sole and absolute discretion;

(xxix) the termination or modification of any settlement or other agreement previously entered into by any Credit Party with any Peruvian Authorities or any third parties relating to the Customs Claims on terms that are not acceptable to the Requisite Lenders in their sole and absolute discretion, provided that the Requisite Lenders shall not unreasonably delay notice of whether they consent to any such modification or amendment;

(xxx) the receipt by the Credit Parties of any notice of any charge, sanction, levy, or fine threatened or imposed by any government regulator or authority relating to the Customs Claims that, if sustained by any applicable court, government authority, or regulator of competent jurisdiction could have the effect of: (i) enjoining, prohibiting, ceasing, terminating, or impairing or limiting the ability of the any Credit Party to conduct their business operations in a manner substantially consistent with their current practices in any jurisdiction, (ii) imposing felony criminal liability on any of the Credit Parties or any of the Senior Managers (as defined in the Restructuring Support Agreement), (iii) imposing any civil or criminal liability of any kind on any Consenting Noteholder (as defined in the Restructuring Support Agreement), any DIP Lender, or any of their affiliates, or (iv) causing the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, or other obligations associated with the Customs Claims, net of any tax credits related

12

| | |
|---|---|
| | to the Customs Claims (recorded in accordance with IFRS), to exceed $40,000,000; |
| | (xxxi) the Company' or any of its Subsidiaries' loss of access to adequate working capital financing to fund any of their operations in any jurisdiction at any time as determined by the Requisite Lenders in their sole and absolute discretion; |
| | (xxxii) the occurrence of a Priority Collateral Coverage Failure; |
| | (xxxiii) the Requisite Lenders, shall not be satisfied, in their sole and absolute discretion, with (i) the information and/or documentation provided in response to their anti-corruption due diligence-related requests, and/or (ii) the results of their due diligence review of the compliance policies and procedures relating to, among other things, anti-corruption and other applicable laws, by the date falling forty-five days after the Petition Date, unless the Requisite Lenders provide a prior written waiver; and |
| | (xxxiv) failure to use the proceeds of any DIP Loans in accordance with the proposed use of proceeds described in an officer's certificate delivered to the DIP Lenders at the time of such borrowing. |
| **Remedies** | The DIP Loan Documents shall contain usual and customary remedies for debtor-in-possession financing facilities, including, without limitation, that upon the occurrence of an Event of Default under the DIP Loan Documents, the Agent, acting at the direction of the Requisite Lenders, may (x) immediately, take any or all of the following actions without further order of or application to the Bankruptcy Court: (a) terminate any remaining DIP Commitments of the DIP Lenders under the DIP Credit Facility; and (b) declare all DIP Obligations to be immediately due and payable; (y) following the delivery of two (2) Business Days written notice by the Agent to the Debtors and the Pledgors (and their restructuring counsel) (the "**Cash Collateral Notice Period**"), subject to the Carve Out, cease to permit the Debtors' and Pledgors' continued use of any cash collateral, provided, that during the Cash Collateral Notice Period, the Credit Parties shall only be permitted to make ordinary course operational cash disbursements; and (z) following the delivery of five (5) business days' written notice by the Agent to the Debtors and the Pledgors (and their restructuring counsel), the Creditors Committee, if any, and the U.S. Trustee thereof (the "Remedies Notice Period"), exercise all rights and remedies provided for in the DIP Loan Documents or at law including: (a) foreclose upon all of the Collateral, including freezing cash collateral held in the Debtors' or Pledgors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors or the Pledgors against the DIP Obligations, or otherwise enforce any and all rights against the Collateral in its possession or otherwise, including, without limitation, disposition of the Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations; and (c) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents or applicable law. The Debtors shall cooperate with the Agent and the DIP Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise. |

| | Further, the DIP Loan Documents shall provide that, during the Remedies Notice Period, (i) the Debtors are prohibited from requesting any further draws and (ii) the only basis on which the Debtors and/or the Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court shall be to contest whether an Event of Default has occurred and/or is continuing and the Priming/DIP Lenders shall consent to such emergency hearing. The automatic stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise, as to the DIP Lenders and Agent, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order in the event that the Debtors, the Creditors' Committee, if any, any other party in interest and/or the U.S. Trustee have not obtained an order from the Bankruptcy Court to the contrary prior to the expiration of the Remedies Notice Period. |
|---|---|
| **Credit Bid** | The Agent, at the direction of the Requisite Lenders, shall have the authority to credit bid all or any portion of the amounts owed under the DIP Credit Facility, whether pursuant to a sale under section 363 of the Bankruptcy Code, a chapter 11 plan pursuant to section 1129(b) of the Bankruptcy Code, or otherwise. |
| **Voluntary Prepayments** | The DIP Loans may be prepaid in whole or in part by the Credit Parties at any time without premium (but subject to payment of all applicable interest and fees accrued or accruing on the prepaid amount as of the date of such prepayment, as applicable, as described herein). All DIP Loans shall be paid ratably to the DIP Lenders. |
| **Mandatory Prepayments** | In addition to other customary mandatory prepayment provisions for transactions of this type, the DIP Loans shall be subject to immediate mandatory prepayment (subject to exceptions that are consistent with those exceptions applicable to prepayments from collateral asset sales under the 2025 Notes Indenture or as otherwise agreed to by the Requisite Lenders in their sole discretion) in an amount equal to (i) 100% of the net cash proceeds from the sale of any Collateral, non-ordinary course asset sales, non-ordinary course sales of assets of subsidiaries; provided that the application of proceeds from the sale of any Pre-Petition Pledged Assets pledged by the Pledgors shall, in light of the *pari passu* ranking of the DIP Liens over such assets, be applied pro rata to repay the DIP Loans and redeem the 2025 Notes in accordance with the DIP Intercreditor Agreement; (ii) 100% of the net cash proceeds from incurrence of non-permitted indebtedness; and (iii) 100% of insurance proceeds, including condemnation and similar proceeds, subject to any agreed-to dollar baskets; provided that, for so long as no Event of Default shall be continuing, the net proceeds described in the foregoing clauses (i) – (iii) shall not be required to be applied to the extent that, within five (5) business days following the receipt of any net proceeds, the Company shall have delivered an officer's certificate to the Agent stating that such net proceeds are reasonably expected to be reinvested (or committed to be reinvested) to replace with additional Collateral or, solely in the event of insurance proceeds received under the foregoing clause (iii), to repair the assets which are the subject of the property or casualty insurance claim or condemnation proceeding giving rise to such net proceeds, in each case within ninety (90) days after such net proceeds are received and the Requisite |

14

| | |
|---|---|
| | Lenders have delivered written approval (which may be via electronic mail) in their sole discretion of the reinvestment of such proceeds in the manner described in the officer's certificate; provided further that each such mandatory prepayment under clauses (i), (ii), or (iii) above, to the extent applied to repay the DIP Loans, shall result in an immediate corresponding dollar-for-dollar permanent reduction of the aggregate amount of DIP Obligations outstanding. For the avoidance of doubt, net proceeds of sales of receivables and inventory in the ordinary course of business shall not be subject to the mandatory prepayment provisions but with respect to net proceeds of sales of receivables and inventory in the ordinary course of business by AG Chile, AG Chile Subsidiaries and AG Peru, shall be subject to the Approved Budget. |
| **Affirmative Covenants** | The DIP Loan Documents shall contain usual and customary affirmative covenants for transactions of this type, including, without limitation:<br><br>(i) use of proceeds;<br><br>(ii) delivery of monthly, quarterly and annual financial statements; budgets and variance reports in accordance herewith;<br><br>(iii) delivery of other information reasonably requested from time to time by the DIP Lenders and conducting lender calls upon reasonable request and reasonable prior notice;<br><br>(iv) adherence to the Approved Budget by AG Chile, the AG Chile Subsidiaries and AG Peru (subject to the Permitted Variances tested on an aggregate basis for each of (x) AG Chile and the AG Chile Subsidiaries and (y) AG Chile, the AG Chile Subsidiaries, and AG Peru);<br><br>(v) payment of administrative expenses and any other claims permitted by a bankruptcy court order;<br><br>(vi) continuation of business and maintenance of existence and material rights and privileges;<br><br>(vii) compliance with laws; use of proceeds;<br><br>(viii) further assurances; location of collateral; additional guarantors; monthly Chilean receivables pledges, subject to a reasonable grace period (not to exceed two (2) Business Days) for the closing of month end and mid-month accounts and the preparation of such reports,<br><br>(ix) (x) reporting of weekly actuals of certain inventory, A/R and cash value for AG Chile, the AG Chile Subsidiaries, AG Peru and the Pledgors in Costa Rica and restricted cash of AG Chile and the AG Chile Subsidiaries and (y) weekly reporting of Priority Collateral Value to be delivered each Friday (or on the immediate preceding Business Day if Friday is not a Business Day) for and as of the Friday of the immediate prior week along with an officer's certificate executed by the chief financial officer of AG Chile certifying that, as of the Friday of the immediate prior week, there did not exist a Priority Collateral Coverage Failure;<br><br>(x) maintenance of property in present condition and maintenance of insurance; maintenance of books and records; right of the DIP Lenders and Agent to inspect property and books and records upon reasonable notice and |

|  | during regular business hours; notices of defaults, litigation and other material events; |
|  | (xi) payment of taxes including stamp taxes; |
|  | (xii) the taking of all reasonable, necessary and prudent actions to expeditiously resolve the Customs Claims on terms acceptable to the Required Consenting Noteholders (as defined in the Restructuring Support Agreement) in their sole and absolute discretion; |
|  | (xiii) compliance with the Hyundai Letters, the Hyundai Distributorship Agreements, the Hyundai Undertaking Agreement; |
|  | (xiv) compliance with laws, including environmental laws (in each case, subject to exceptions, qualifications and carve-outs to be negotiated in good faith between the parties); |
|  | (xv) reporting of the occurrence of any event, change or circumstance that would reasonably be expected to(a) cause any condition precedent to the Plan to not be satisfied or (b) become materially less likely to be satisfied; |
|  | (xvi) (A) providing the DIP Lenders and their counsel with all known information materially relating to the Customs Claims, any negotiations or discussions with Peruvian Authorities relating to the Customs Claims, or discussions by Senior Managers (as defined in the Restructuring Support Agreement) with the board of directors of any of Credit Parties, the media, Hyundai or any creditors of or claimants against the Credit Parties, any trading counterparties, or any of the foregoing's agents or professionals of any kind materially related to the Customs Claims within one (1) business day of receipt of such information and (B) providing the DIP Lenders' counsel with at least forty-eight (48) hours' notice (or, if such notice is impossible, as much notice as is practicable) of all meetings scheduled with any Peruvian Authorities regarding the Customs Claims, and allowing the DIP Lenders' counsel to attend all such meetings that are attended by AG Peru's counsel; |
|  | (xvii) providing within a reasonable period of time, to the DIP Lenders or their counsel, all information and documentation requested by the DIP Lenders, in their sole and absolute discretion, for the purpose of completing their due diligence of the Company Parties' respective compliance policies and procedures relating to, among other things, anti-corruption and compliance with anti-corruption and other applicable laws, and cooperating with the DIP Lenders in the completion of such review, the results of which review must be satisfactory to the Requisite Lenders in their sole and absolute discretion; and |
|  | (xviii) all other covenants and obligations of the Debtors set forth in the Restructuring Support Agreement. |
|  | "**Customs Claims**" shall have the meaning given such term in the Restructuring Term Sheet. |
| **Negative Covenants** | The DIP Loan Documents shall contain usual and customary negative covenants for transactions of this type, including, without limitation, that = |

the Debtors shall not (subject, in each case, to exceptions, qualifications, grace periods and carve-outs to be negotiated in good faith between the parties):

(i) incur indebtedness (including guarantee obligations);

(ii) incur liens; merge, consolidate, liquidate, or dissolve;

(iii) sell assets;

(iv) make restricted payments (including dividends and other payments in respect of capital stock);

(v) make capital expenditures; make investments (including acquisitions), loans and advances;

(vi) enter into sale and leaseback transactions;

(vii) enter into swap agreements;

(viii) make optional payments and modifications of subordinated and other debt instruments (including principal payments of intercompany debt to non-Debtor entities except as otherwise agreed);

(ix) enter into transactions with affiliates;

(x) make changes in fiscal year;

(xi) violate negative pledge clauses; and

(xii) amend material documents,

which in each case, for the DIP Loan Documents, shall be substantially consistent with the covenants for the 7.5% Notes due 2025, provided however, that the Borrower will not, and will not permit any of its subsidiaries to (i) consolidate, merge, sell or lease substantially of their assets nor create any new accounts holding cash that are not pledged to the Collateral Agent in form and substance satisfactory to the Requisite Lenders and the Collateral Agent and (ii) take any action prohibited by the Restructuring Support Agreement (taking into account any and all grace periods, cure periods and notice periods under the Restructuring Support Agreement).

Notwithstanding anything herein to the contrary, the Credit Parties shall be entitled, in each case subject to the Approved Budget or otherwise with the prior written consent of the Requisite Lenders:

(i) unless an Event of Default has occurred and is continuing, to incur Inventory Debt (as defined in the 2025 Notes Indenture) and to grant Inventory Financing Liens securing such Inventory Debt on a senior basis in the ordinary course of business and consistent with past practices, provided that, any incurrence of Inventory Debt which would result in a Priority Collateral Coverage Failure shall require the prior written consent of the Requisite Lenders,

(ii) to purchase and sell inventory in the ordinary course of business and consistent with past practices,

(iii) unless an Event of Default has occurred and is continuing, to factor receivables (with and without recourse) in the ordinary course of business and consistent with past practices, provided that, any factoring arrangement which

17

<table>
<tr><td></td><td>would result in a Priority Collateral Coverage Failure shall require the prior written consent of the Requisite Lenders,

(iv) to use cash collateral and any cash proceeds resulting from the collection of receivables or sale of inventory for general corporate or working capital purposes in the ordinary course of business, consistent with past practices,

(v) with the prior written consent of the Requisite Lenders, to use Collateral located in Peru to secure working capital financing,

provided that in each case under clauses (i) through (v), all proceeds from the foregoing transactions shall be subject to the DIP Liens.</td></tr>
<tr><td><strong>Conditions Precedent</strong></td><td>The DIP Loan Documents shall contain usual and customary conditions for debtor-in-possession loan facilities (the first date on which all of such conditions to effectiveness of the DIP Credit Facility shall have been satisfied, or waived by the Requisite Lenders, being the "<strong>DIP Closing Date</strong>"), including, without limitation:

i.    as conditions precedent to effectiveness of the DIP Credit Facility:

    a.   the Interim DIP Order shall have been entered;

    b.   the DIP Lenders shall have received an Approved Budget;

    c.   all DIP Loan Documents shall have been executed by the parties thereto;

    d.   the DIP Liens shall be valid and perfected (except as otherwise expressly set forth herein, in Exhibit A, or agreed by the parties);

    e.   [*Reserved*]

    f.   the Hyundai Letter, the Hyundai Undertaking Agreement and the Hyundai Distributorship Agreements shall have not been terminated, modified, or repudiated and remain in full force and effect;

    g.   any settlement or other agreement previously entered into between any of the Credit Parties and any Peruvian Authorities or any other third party relating to the Customs Claims shall have not been terminated, modified, or repudiated and remain in full force and effect;

    h.   the Restructuring Support Agreement is still in effect and no condition that would afford the Consenting Noteholders party thereto the right to terminate the Restructuring Support Agreement exists;

    i.   the Requisite Lenders shall have determined in their sole and absolute discretion that the Company and its Subsidiaries will have adequate working capital financing to fund their operations at all times; and

    j.   no default or Event of Default under the DIP Loan Documents shall have occurred and be continuing.</td></tr>
</table>

ii.  as conditions precedent to each drawing on or after the DIP Closing Date (subject to a maximum of two (2) total drawings during the term of the DIP Credit Facility, in each case in an amount no less than $1 million):

    a.  the DIP Lenders shall have received a borrowing request and an Approved Budget;

    b.  the Hyundai Letter, the Hyundai Undertaking Agreement and the Hyundai Distributorship Agreements shall have not been terminated, modified, or repudiated and remain in full force and effect;

    c.  any settlement or other agreement previously entered into between any of the Credit Parties and any Peruvian Authorities or any other third party relating to the Customs Claims shall have not been terminated, modified, or repudiated and remain in full force and effect;

    d.  the Restructuring Support Agreement is still in effect and there exists no circumstance, event or condition that would afford the Consenting Noteholders party thereto the right to terminate the Restructuring Support Agreement (disregarding any grace, notice or cure period thereunder);

    e.  no default or Event of Default shall have occurred and be continuing;

    f.  the Requisite Lenders shall have determined in their sole and absolute discretion that the Company and its Subsidiaries will have adequate working capital financing to fund their operations at all times;

    g.  all invoiced and outstanding DIP Agent and Lenders' Fees shall have been paid, to the extent payable by the Debtor under the terms of the DIP Orders; and

    h.  there shall have been no change, circumstance or event that individually or in the aggregate have had or would reasonably be expected to result in a Material Adverse Effect (as defined below).

"**Material Adverse Effect**" shall mean any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a material adverse effect on (i) the business, results of operations, value, or financial condition of the Credit Parties taken as a whole, (ii) the legality, validity or enforceability of any DIP Loan Document or any DIP Order, (iii) the ability of the Credit Parties to perform their respective obligations under the Restructuring Support Agreement or the DIP Loan Documents, (iv) the value of the Collateral, (v) the perfection or priority of the liens granted pursuant to the DIP Loan Documents or any DIP Order, or (vi) the ability of the DIP Agent, the DIP Collateral Agent, or the DIP Lenders to enforce the DIP Loan Documents; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred or could reasonably be expected to occur, a

19

| | |
|---|---|
| | "Material Adverse Effect": (i) effects resulting from changes generally affecting financial, banking, credit, securities, or commodities markets, the economy in general, or prevailing interest rates or general capital market conditions in the United States, (ii) a change in the International Financial Reporting Standards or interpretations thereof after the date hereof, (iii) the filing of the Chapter 11 Cases, the DIP Orders, any actions or omissions taken with the consent of such Consenting Noteholder or compliance by any party with the covenants and agreements herein, (iv) any natural disaster, weather-related events or other acts of God, acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway; or (v) the impact of the COVID-19 pandemic; provided, further, however, that any of the changes, events or effects referred to in clauses (i), (ii), (iv) or (v) immediately above may be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent any such change, event or effect affects the Credit Parties, taken as a whole, in a disproportionate manner when compared to the effect of such changes, events or effects on other persons engaged in the business and geographic market in which the Credit Parties operate; and provided, further, however, that any failure by the Credit Parties to meet internal or other financial projections or forecasts for any period shall not, by itself, be deemed a Material Adverse Effect (it being understood, however, that the facts or occurrences giving rise to or contributing to such failure may be taken into account in determining whether there has been a Material Adverse Effect); and provided, further, however, that any event, change, effect, occurrence, development, circumstance or change of fact related to the Customs Claims (a "**Customs Claims Event**") disclosed orally or in writing to the DIP Lenders or DIP Lenders' counsel prior to the date that is five (5) Business Days prior to the DIP Closing Date shall not, individually, or in the aggregate with another Customs Claims Event, be deemed a Material Adverse Effect, (it being understood, however, that the facts or occurrences arising out of the Customs Claims Events may be taken into account in determining whether there has been a Material Adverse Effect). |
| **Representations and Warranties** | The DIP Loan Documents shall contain usual and customary representations and warranties for prepetition loan facilities to be made by the Debtors as of the date they execute the DIP Loan Documents, and as of the date of any borrowing under the DIP Credit Facility, subject to qualifications, disclosure schedules and limitations for materiality to be mutually agreed-upon, and shall include without limitation:<br><br>(i) valid existence and good standing;<br><br>(ii) requisite power, due authorization and validity;<br><br>(iii) no conflict with agreements, orders or applicable law;<br><br>(iv) governmental consents;<br><br>(v) enforceability of DIP Loan Documents;<br><br>(vi) accuracy of financial statements and reasonable preparation of projections, budgets and all other information provided; |

|  | |
|---|---|
|  | (vii) compliance with laws and material contracts; |
|  | (viii) absence of Material Adverse Effect; |
|  | (ix) absence of material litigation and contingent obligations; |
|  | (x) payment of taxes and other material obligations; |
|  | (xi) subsidiaries; |
|  | (xii) pension and benefit plans; |
|  | (xiii) absence of other liens on assets; |
|  | (xiv) ownership of assets and necessary rights to intellectual property; insurance; |
|  | (xv) bank accounts, owned real estate and leases, no burdensome restrictions; |
|  | (xvi) inapplicability of Investment Company Act; |
|  | (xvii) regulatory matters; |
|  | (xviii) environmental matters; |
|  | (xix) margin stock; |
|  | (xx) labor; |
|  | (xxi) compliance with provisions of the Hyundai Letters, the Hyundai Undertaking Agreement and the Hyundai Distributorship Agreements and, if executed, any settlements entered into with Peruvian Authorities relating to the Customs Claims; |
|  | (xxii) validity, priority and perfection of liens and security interests in the Collateral under the DIP Loan Documents and the Note Documents; |
|  | (xxiii) disclosure of all known facts relating to the Customs Claims to the DIP Lenders orally or in writing; |
|  | (xxiv) no other material assets in Brazil or Costa Rica that have not already been disclosed to the DIP Lenders in writing prior to the DIP Closing Date. |
| **Assignments and Participations** | The DIP Lenders may assign their loans, rights and obligations under the DIP Loan Documents in a minimum amount not less than $1,000,000 (except such lesser amount as approved by the Agent) (or, if less, the remaining Commitments and/or DIP Loans of any assigning DIP Lender), without the consent of the Agent or the Borrower: (a) to eligible assignees to be defined in the DIP Loan Documents and (b) with respect to any assignment to another DIP Lender, to an affiliate of such DIP Lender or a fund engaged in investing in commercial loans that is advised or managed by such DIP Lender or the advisor or manager of such DIP Lender; provided that any assignee under this clause (b) shall execute a joinder to the Restructuring Support Agreement. The DIP Lenders will also have rights to sell participations, subject to customary limits on voting rights. Assignments and transfers of DIP Loans to the Company or its Subsidiaries or affiliates thereof shall not be permitted. |
| **Lender Financing** | The DIP Loan Documents will permit the DIP Lenders to finance their DIP Loans and Commitments under the DIP Loan Documents, including by granting a security interest therein to their respective financing sources as |

21

| | |
|---|---|
| | collateral security, in each case without the consent of the Company or any other person, but without in any way limiting such DIP Lender's obligations in respect of the DIP Credit Facility. |
| **Professional Fees** | The Credit Parties shall be jointly and severally liable to pay all prepetition and post-petition fees, costs, disbursements and expenses of the Agents and the DIP Lenders which, |
| | (i)(1) with respect to each Agent, shall be limited to the reasonable and documented fees, costs and expenses of one primary firm of legal counsel plus one firm of local counsel in each appropriate jurisdiction, including, without limitation, any jurisdiction where any Collateral is located and (2) with respect to each DIP Lender, shall include the reasonable and documented fees, costs and expenses of one primary firm of legal counsel plus one firm of local counsel in each appropriate jurisdiction, including, without limitation, Dechert LLP, Prieto Abogados SpA, Pinheiro Neto, Hernández y Cía, Ferrere Abogados, Costa Rican counsel, and Juan Luis Goldenberger and any other additional counsel reasonably necessary to advise in each appropriate jurisdiction, including without limitation, any jurisdiction where any Collateral is located, plus Link Capital Partners SpA, as financial advisor to Dechert LLP as counsel to the DIP Lenders), in each case that in any way relate to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the DIP Lenders' and their respective affiliates' holdings of the 7.5% Notes due 2025, any fees and expenses of any of their advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, the DIP Loan Documents, the Chapter 11 Cases or the administration of the DIP Credit Facility, and any other transactions contemplated thereby and (ii) with respect to each Agent and each DIP Lender, shall include all documented fees, costs and expenses incurred in connection with enforcement of rights and remedies with respect to the DIP Credit Facility, the DIP Loan Documents, and/or the Collateral, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith (collectively, the "Agent and Lenders' Fees"). |
| | All invoiced and outstanding Agent and Lenders' Fees shall be due and payable in accordance with the DIP Orders and the DIP Loan Documents, which shall provide for (x) a standard period of ten (10) days for the Creditors' Committee and the U.S. Trustee to review and object in writing to such invoice and (y) with respect to any invoice, (1) if no objection is served within the applicable ten-day objection period, payment by the Debtors within five (5) business days of receiving written notice from the applicable counsel of the expiration of the period to object and the absence of any objection or (2) if, within the applicable ten-day objection period, an objection is served by the Creditors' Committee or the U.S. Trustee upon the requesting party (specifying in detail the basis for such objection), payment by the Debtors of all amounts not subject to dispute or objection, with the disputed amount to be paid either upon resolution of the objection by the parties or as ordered by the Bankruptcy Court. All invoices for Agent and Lenders' Fees (i) shall be |

| | |
|---|---|
| | summary invoices without any detailed time entries and (ii) shall not be subject to the US Trustee guidelines. |
| **Indemnification** | The DIP Loan Documents shall provide that the Credit Parties agree, jointly and severally, to indemnify and hold the Agent and the DIP Lenders and their respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "**Indemnified Person**") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Credit Facility, the DIP Loan Documents, the Collateral, this Term Sheet, the transactions contemplated thereby or hereby or by any thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any such Indemnified Person is a party thereto and whether or not brought by any Debtor or any other person or entity, except to the extent resulting from the gross negligence, bad faith, or willful misconduct of an Indemnified Person, in each case as determined by a final non-appealable order of a court of competent jurisdiction. In all such litigation, or the preparation therefor, the Agent and the DIP Lenders shall each be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of all such counsel. |
| **Yield Protection** | The DIP Loan Documents will include customary cost and yield protection provisions and customary provisions protecting the DIP Lenders from withholding tax liabilities that are currently in effect or may arise in the future (including a customary tax gross up) in form and substance acceptable to the Requisite Lenders in their sole discretion. |
| **Releases** | The DIP Orders shall provide the Agent, the DIP Lenders (each in its capacity as such) and the Indemnified Persons with customary releases reasonably acceptable to the Agent and the DIP Lenders, subject to a customary challenge period for investigation by any Creditors' Committee, if one is appointed in the Chapter 11 Cases, with respect to prepetition conduct. |
| **Section 506(c) Waiver** | The Final DIP Order shall include a waiver of any surcharge to the Collateral under section 506(c) of the Bankruptcy Code or otherwise. |
| **Marshaling Waiver** | The Final DIP Order shall include a waiver of any claims under the equitable doctrine of "marshaling" or any other similar doctrine with respect to any Collateral. |
| **Governing Law** | The DIP Loan Documents will provide that the Credit Parties, the Agent and the DIP Lenders will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of New York; and shall waive any right to trial by jury. |

| | The laws of the State of New York law shall govern the DIP Loan Documents except (i) to the extent preempted by federal bankruptcy laws and (ii) with respect to any security agreements (where the applicable collateral is located outside of the U.S.) governed by non-US law. |
|---|---|

**EXHIBIT A**

**COLLATERAL FOR DIP CREDIT FACILITY**

*The following summary supplements the terms of the Term Sheet and the Restructuring Term Sheet to which it is attached, outlines certain terms relating to the grant of DIP Liens, and does not reflect all of the terms, conditions, representations, warranties, and other provisions that would be set forth in definitive documentation relating to such DIP Liens to be reflected in the DIP Loan Documents. This summary is qualified in its entirety by such DIP Loan Documents. The Company and its Subsidiaries acknowledge and agree that to the extent required by applicable law they will execute such DIP Loan Documents as are required to grant the DIP Liens on the assets and the terms outlined herein including where necessary, following the initial execution of DIP Loan Documents to grant such DIP Liens to secure the DIP Credit Facility, the execution of additional DIP Loan Documents or the execution of amendments or supplements to previously executed DIP Loan Documents in order to secure the obligations under the DIP Credit Facility. Notwithstanding anything herein to the contrary, (i) the DIP Orders shall provide that each of the Debtors shall be deemed to grant priming liens in favor of the collateral agent under the DIP Credit Facility over all Prepetition Pledged Assets pledged by the Debtors and first priority liens in favor of the collateral agent under the DIP Credit Facility over all unencumbered assets of the Debtors (regardless of where any such assets are located) and (ii) each of the Pledgors shall grant liens in favor of the collateral agent under the DIP Credit Facility over all Prepetition Pledged Assets pledged by the Pledgors, which liens shall be pari passu to the liens granted by the Pledgors to the collateral agent under the 2025 Notes Indenture. Capitalized terms used but not defined herein shall have the meanings given such terms in the Term Sheet.*

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| **Chile** | 1. **Priming lien**:<br>   o  The Chilean collateral agency agreement will be amended to reflect that the local collateral agent (TMF Chile) is authorized to use the proceeds to pay the DIP Lenders with preference over the 2025 Notes Indenture bondholders.<br>   o  There will be one public deed amending the definition of "Secured Obligations" from the Chilean collateral documents is extended to include the DIP Loan documents.<br>   o  However, this amendment will not be registered in public registries in Chile. The registration process in Chile would take a long time (i.e. mortgages), it is likely that the registration would not be completed before exiting the Chapter 11 proceeding. In case an event of default occurs, the DIP Lenders' collateral agent will be entitled to request the registration of the collateral.<br>   o  A new Collateral Agency Agreement will be executed for purposes of the DIP Credit Facility collateral documents.<br><br>2. **Vehicles**:<br>   o  Floating pledge without conveyance (*prenda sin desplazamiento flotante*) over vehicles inventory, with carve-outs for (i) inventory pledged to Banco Santander and BTG; (ii) vehicles under consignment with dealers (*vehículos en consignación a concesionarios*); (iii) vehicles financed by Hyundai Corp.; and |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | (iv) inventory to be pledged to new financing providers (if any). |

- o  Within one (1) business day after closing, pledge to be filed for registration in the *Registro de Prenda Sin Desplazamiento.*
- o  Absent an event of default and subject to the terms of the DIP Loan Documents, AG should be able to: (i) sell cars in the ordinary course of business; (ii) grant those assets as collateral to Banco Santander- Chile and BTG; and (iii) grant those assets as collateral to local banks or new creditors for working capital.
- o  AG to provide periodical reports as of the value of the inventory subject to the floating pledge (for example, every two weeks).
- o  In respect of inventory consisting of used vehicles, no registration of the pledge in the National Motor Vehicles Registry *(Registro Nacional de Vehículos Motorizados)* shall be made absent an event of default. Upon an event of default, the DIP Lenders' collateral agent will have the authority to require the registration of the pledge in the National Motor Vehicles Registry *(Registro Nacional de Vehículos Motorizados)* without AG's consent.

3.  **Accounts**:
- o  Pledge without conveyance over all bank accounts (*Prenda sin desplazamiento sobre dinero*), except for a new CL$ denominated account to be opened in Banco Santander (which will hold a maximum of $5 mm to support existing working capital lines).
- o  Within one (1) business day after closing, pledge to be filed in the *Registro de Prenda Sin Desplazamiento.*
- o  Santander accounts: AG will pledge the US$ account and the CL$ account but will open the new CL$ account where the Company will keep US$5 MM free of liens.
- o  Absent an event of default, AG shall be able to use these funds in the ordinary course of business.

4.  **Accounts receivable**:
- o  Pledge without conveyance over accounts receivable (*Prenda sin desplazamiento sobre créditos*).
- o  Within one (1) business day after closing, pledge to be filed for registration in the *Registro de Prenda Sin Desplazamiento.*
- o  To be implemented periodically (e.g. every month) regarding all new accounts receivable for each period. AG will have an obligation to execute these pledges periodically.
- o  No debtor shall be notified of the pledge absent an event of default. Upon an event of default, the DIP Lenders' collateral agent will have the authority to notify the debtors of the pledged accounts without AG's consent.
- o  Absent an event of default, AG shall be empowered to collect such accounts and use the proceeds in the ordinary course of

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | business. |
| | ○ Also absent an event of default, AG will be entitled to sell and assign invoices in factoring transactions (with or without recourse) subject to the terms of the DIP Loan Documents. The pledge over those invoices shall be automatically released for these purposes. Such factoring shall be reflected in and limited by the approved budget under the DIP Facility. |
| | 5. **Leaseback agreements**: (lessor's prior consent required) |
| | ○ If lessor's consent is obtained, pledge without conveyance over AG's purchase option in its leaseback agreements with Banco Internacional and Tanner (*prenda sin desplazamiento sobre derechos*). No pledge will be granted if consent is not obtained. |
| | ○ The current leaseback agreements require lessor's prior consent for pledging the purchase option. |
| | ○ Within one (1) business day after closing, file for registration in the *Registro de Prenda Sin Desplazamiento*. |
| **Uruguay** | 1. **Priming lien**: |
| | ○ Current trust agreement (*fideicomiso*) will be amended to provide that the assets under the property of the trust will also secure the DIP Loan Documents. The current trustee (*fiduciario*) will act as trustee for both the DIP Lenders and the 2025 Notes Indenture bondholders. |
| | ○ Further, the trust agreement will provide that in case of enforcement the trustee shall act according to the beneficiary´s (TMF New York) instructions. As collateral agent, the beneficiary will proceed as indicated under the Intercreditor Agreement. |
| | ○ Within one (1) business day after closing, the amendment to the trust agreement shall be filed for registration in the appropriate public registry, *provided however*, that to the extent there exists any expected delays caused in light of COVID restrictions, the timing for such filing shall be determined prior to execution based on availability at such time. |
| | 2. **Vehicles**: |
| | ○ Two different agreements will create this security interest: |
| | (A) a specific vehicle pledge agreement (Pledge without conveyance - *prenda sin desplazamiento)* for the cars with plates (vehicles that are fixed assets -with car plates- but not inventory of the company). Used cars and demos shall not be covered by any pledge; |
| | (B) a Pledge without conveyance (*prenda sin desplazamiento*) creating a floating pledge over (i) not customs cleared vehicles |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | located inside the port of Montevideo or out of such port in one or more specific warehouses (as equipment); (ii) customs cleared vehicles under exhibition (without car plate, as equipment) located in specific exhibition locations.<br><br>o Filing for registration of the floating charge agreement and vehicles pledge in the appropriate public registry will be determined prior to execution based on availability at the time. Definitive registration may take up to 150 days.<br>o To avoid obstructing ordinary course of business, DIP Lenders' collateral agent shall grant AG a power of attorney to move the vehicles between warehouses and release pledges of sold vehicles (under the pledge referred to in A) above). The power of attorney would terminate upon an event of default.<br>o Cars without plates which are pledged (under the floating charge) do not require release from the DIP Lenders and the security interest will automatically expire when the car is taken out of warehouses and/or exhibition locations for the purpose of being sold by AG.<br>o The not cleared vehicles list (under a pledge) will be updated each 15 days to reflect the vehicles that enter and come out of the referred warehouses and exhibition locations.<br>o Absent an event of default, AG should be able to: (i) sell cars in the ordinary course of business; and (ii) grant the cars as collateral to existing creditors or new creditors for working capital, under a first priority lien as long as this is permitted under the DIP Credit Agreement.<br><br>3. **Accounts**:<br>o Pledge over bank accounts (*Prenda sobre cuentas bancarias*).<br>o Absent an event of default, AG shall be able to use these funds in the ordinary course of business.<br>o This pledge does not need to be registered.<br>o This pledge will be originally executed by the relevant company and TMF Uruguay. After the execution of the pledge, banks will execute an annex giving their consent to the terms and conditions of the pledge, within the timeframe set forth below.<br>o In case any of the accounts banks do not give its consent within 10 business days following the execution of the RSA and no later than 2 business days after the DIP Closing Date, the relevant company shall have a term of 5 business days to select one of the already existing bank accounts and transfer the assets from the non-consenting accounts bank to the consenting accounts banks. Should none of the existing accounts bank give its consent, then AG shall open a new bank account, with the consent of the Lenders within 15 business days following the date of the |

4

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | execution of the RSA. In case no accounts bank accedes to the pledge agreement in the afore-said term, an Event of Default under the DIP Credit Agreement shall occur. |
| | 4. **Accounts receivable**: <br>   o  Factoring agreement over all of the accounts receivable, which will be implemented as a master assignment of receivables, will include all receivables generated as of closing and thereafter. The receivables (and payment documents, such as checks, etc.) that correspond to an operation, can be substituted by other receivables (and payment documents such as checks, etc.) that correspond to the same operation. <br>   o  The master assignment does not require registration. <br>   o  No account debtor shall be notified of the pledge absent an event of default. Upon an event of default, in order to enforce the assignment, the collateral agent will notify account debtors to collect the receivables. <br>   o  Absent an event of default, AG shall be empowered to collect such accounts and use the proceeds in the ordinary course of business subject to the approved budget. <br>   o  Also absent an event of default, AG will be entitled to sell and assign invoices in factoring transactions, subject to the approved budget and the terms of the DIP Loan Documents. The pledge over those invoices shall be automatically released for these purposes. |
| **Peru** | No new collateral will be granted, only the *pari passu* lien and a priming lien over certain shares owned by AG Chile and AG Créditos as further described below. <br><br>• The existing trust agreement (*fideicomiso*) shall be amended to reflect: (i) that the assets conforming the trust estate will also secure the DIP Loan Documents; (ii) the lien in favor of the DIP Lenders will be pari passu with the liens on the assets pledged under the 2025 Notes Indenture bondholders, except for the lien over the shares in AG Peru owned by AG Chile and AG-Créditos which is further described in (iii) below (for the avoidance of doubt, the interests in such pari passu shared collateral and proceeds thereof shall be applied pro-rata); and (iii) the lien in favor of the DIP Lenders over the shares in AG Peru owned by AG Chile and AG-Créditos will be senior over the liens on the assets pledged under the 2025 Notes Indenture (for the avoidance of doubt, the proceeds from the foreclosure of the shares in AG Peru will be used to pay first any outstanding obligation owed to the DIP Lenders, and the remaining proceeds (if any) will be used to pay any outstanding obligation owed to the bondholders. <br><br>• This amendment of the trust agreement must be executed through a public |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | deed, which shall be recorded in the public registry entry of each of the properties transferred in trust; for the other assets subject to the trust agreement (i.e. shares, insurance policies, etc.) the amendment to the trust agreement shall be also recorded in the public Peruvian Contracts Agreement Registry (*Registro Mobiliario de Contratos*) and in the relevant share ledgers of the applicable companies (i.e. AGP, MANASA and Motor Mundo).<br><br>• Within one (1) business day after signing, the amendment will be filed by Notary Public with the relevant Public Registries (*Registro de la Propiedad Inmueble y Registro Mobiliario de Contratos*). The Company will have the obligation to complete the registration process within a term of 30 business days following signing, provided that this term will be automatically renewed for an additional 30 days period in case the applicable registry office raises any issues with respect to the filing, and provided that the grantors of the trust perform all actions required to address and solve the issues raised by the registry office. The amendment will be valid and effective between the parties as from its signing date, and it will be enforceable against third parties upon the registration in the Public Registries. |
| **Costa Rica** | 1. Liens:<br>  o Mortgage Notes (Cédulas Hipotecarias):<br>    ▪ A new endorsement of the Note shall be executed since currently TMF is only representing the bondholders under the 2025 Notes Indenture. This new endorsement should add as secured obligations the obligations under the new DIP Loan documents and that the notes granted in favor of the DIP Lenders will be pari passu to the notes under the 2025 Notes Indenture bond holders. Auction in case of event of default. Base auction price shall be the nominal value of the notes. Foreclosure proceeds to be distributed by TMFCR according to Intercreditor Agreement.<br><br>  o Movable Secured Collateral Agreement (Garantía Mobiliaria) of Shares of Costa Rican Subsidiaries:<br>    ▪ Current movable secured collateral agreement will be amended to provide that the collateral will also secure the DIP Loan Documents and that the liens granted in favor of the DIP Lenders will have first priority priming liens over the liens granted under the 2025 Notes, and to update amount secured. Pursuant to the digital system of the Costan Rican National Registry, they will not be pari-passu for purposes of third parties.<br>    ▪ Even if TMFCR is the beneficiary for purposes of the DIP Loan Documents, it will be necessary to register a |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | new separate moveable secured collateral agreement to secure the DIP Loan Documents. The amount secured shall be the equity of the Costa Rican subsidiaries according to CPA certification.  Auction in case of event of default. Base auction price shall be the amounts secured.<br>▪ TMFCR to distribute auction proceeds to the DIP Lenders or exercise voting rights in Costa Rican Subsidiaries on behalf of the DIP Lenders. At closing, entries shall be inserted and signed in the share certificates and registries of shareholders of the Costa Rican Subsidiaries to reflect the priming lien in favor of the DIP Lenders in accordance with the Intercreditor Agreement.<br>▪ Within one (1) business day after closing, the Amendment to the current movable secured collateral agreement and new moveable secured collateral agreement shall be filed and registered with the National Registry of Costa Rica (Registro Nacional de Costa Rica).  This registration is to be executed by TMFCR.<br><br>2.  First Priority Lien on Vehicles.<br>   o  Common pledge on recorded /used vehicles (garantía prendaria tradicional). Within one (1) day after closing, file and register the common pledge at the National Registry of Costa Rica (Registro Nacional de Costa Rica). The registration procedure could be taken 2 weeks. This registration is to be executed by TMFCR.<br>   o  Movable Secured Collateral Agreement (Garantía Mobiliaria) on the bills of lading representing new vehicles. However, absent an event of default, the Costa Rican Subsidiary will be able to keep 1 bill of lading in order to continue with the ordinary course of the business. For the avoidance of doubt, this bill of lading will not be endorsed to TMFCR and will not have any reference to the movable guaranty.<br>   o  Within one (1) day after closing, file and register the pledge and movable guaranty with the National Registry of Costa Rica (Registro Nacional de Costa Rica). This registration is to be executed by TMFCR.<br>   o  Absent an event of default, AG should be able to: (i) use 1 bill of lading representing same vehicles as evidence of ownership, pay import duties, and release and sell vehicles in the ordinary course of business; and (ii) release and grant those assets as collateral to existing creditors or new creditors for working capital.<br>   o  Requires release each time a used vehicle is sold. A power of attorney to be granted to one or more representatives appointed by AG Costa Rica to release pledge of: (a) sold vehicles, or (b) |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | vehicles to be pledged to secure inventory debt; provided however, that the rights under the Power of Attorney will automatically terminate upon either (i) an Event of Default under the DIP Credit Agreement, (ii) if the sale or pledge of the inventory would cause a Priority Collateral Coverage Failure (as defined in the DIP Term Sheet), or (iii) if AG does not provide monthly updates of the assets sold or acquired, income/cash deposited in the bank accounts in Costa Rica. |

    o   Common pledge and Movable Secured Collateral Agreement should be updated every 30 days to include and exclude vehicles/bills of lading, and respectively registered.

    o   Amounts secured will be those at the time the common pledge and movable secured collateral agreement are executed and subsequently updated.

    o   Auction in case of event of default.

    o   Base auction prices shall be values of individual vehicles.

3.   First Priority Lien on Bank Accounts.

    o   Movable Secured Collateral Agreement (Garantía Mobiliaria).

    o   Lien only on bank accounts and cash flow related with those bank accounts.

    o   Within one (1) day after closing, file and register the agreement with the National Registry of Costa Rica (Registro Nacional de Costa Rica). This registration is to be executed by TMFCR.

    o   Absent an event of default, funds may be used in the ordinary course without need for consent or minimum balance, subject to the Credit Agreement.

    o   The Costa Rican Subsidiaries shall execute and deliver a notice to TMFCR on the closing date, which notice will be delivered to the respective banks for the banks to execute an agreement to disburse funds upon an event of default, according to instructions from TMFCR.  Costa Rican Subsidiaries shall have 2 weeks from closing to sign agreements with the respective banks, and such 2 weeks term can be renewed by mutual agreement of the Costa Rican Subsidiaries and TMFCR.

    o   For purposes of applicable taxes, amount secured shall be average balance in bank accounts of the previous 12 months.

    o   No auction.

4.   First Priority Lien on Accounts receivable.

    o   Movable Secured Collateral Agreement (Garantía Mobiliaria).

    o   Within one (1) day after closing, file and register the lien with the National Registry of Costa Rica (Registro Nacional de Costa Rica). This registration is to be executed by TMFCR.

    o   Accounts receivable will not be assigned to TMFCR.

    o   No debtor or payer shall be notified of the lien absent an event of

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | default. The Costa Rican Subsidiaries shall execute and deliver a notice to TMFCR on the closing date, indicating the accounts receivable are the object of a Movable Secured Collateral agreement granted to TMFCR, and that upon an event of default, accounts receivable shall be considered as assigned to TMFCR, which notice will be held by TMFCR until the occurrence of an Event of Default, at which time such notice will be delivered to account debtors and payors.<br><br>o  Absent an event of default, Costa Rican Subsidiaries shall be empowered to collect such accounts and use the proceeds in the ordinary course of business subject to the approved budget.<br><br>o  Also absent an event of default, Costa Rican subsidiaries will be entitled to sell and assign invoices in factoring transactions subject to the approved budget (or otherwise with prior written consent of the DIP Lenders). The lien over those accounts receivable shall be automatically released for these purposes.<br><br>o  For purposes of applicable taxes, amount secured shall be value of accounts receivable at the time of closing or updates of accounts receivable.<br><br>o  Lien shall be updated every 30 days to include and exclude accounts receivable.<br><br>o  Accounts receivable may be auctioned in case of event of default, and auction base shall be amount secured. |
| **Brazil** | No new collateral will be granted, only the priming lien.<br><br>**Priming lien**:<br>•  Current Fiduciary Sale Agreement and Guaranty Agreement will be amended to provide that the collateral will also secure the DIP Loan Documents.<br><br>•  Further, the Fiduciary Sale Agreement and Guaranty Agreement will provide a payment waterfall in terms that the DIP Lenders shall be paid with preference to any payment to the 2025 Notes Indenture bondholders.<br><br>•  Within two (2) business days after closing, the Amendment needs to be filed online with the Registry of Deeds and Documents (*Registro de Títulos e Documentos*). It will take approximately a week to receive acknowledgement/receipt from the registry, but the effective date of perfection is the date of the online filing. |

# ANNEX III

## NEW SECURED NOTES AND NEW SUBORDINATED NOTES TERM SHEET

| Term | Description |
|---|---|
| **Borrower** | Reorganized Gildemeister |
| **Collateral** | New Secured Notes:<br><br>• Secured by first and second priority security interests, as applicable, over the same assets that secured the 7.5% Notes due 2025, *plus* (i) Chile Holdco shall grant first and second priority security interests, as applicable, over all equity interests in Gildemeister or Reorganized Gildemeister and (ii) first and second priority security interests, as applicable, will be granted over all equity interests in each other Debtor or Reorganized Debtor.<br><br>New Subordinated Notes:  Unsecured |
| **New Secured Notes Intercreditor Agreement** | The New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes shall benefit from the same collateral and guarantees provided, however, that the New Junior Tranche Secured Notes and all liens and guarantees related thereto shall be expressly subordinated, in both right of payment and lien priority, to the payment in full of the New Senior Tranche Secured Notes pursuant to a New Secured Notes Intercreditor Agreement containing terms acceptable to the DIP Lenders. |
| **New Senior/Subordinated Intercreditor Agreement** | The New Subordinated Notes shall be unsecured and shall benefit from the same guarantees that support the New Secured Notes provided, however, that the New Subordinated Notes and guarantees related thereto shall be expressly subordinated in right of payment to the payment in full of the New Senior Tranche Secured Notes and the New Junior Tranche Secured Notes pursuant to the New Senior/Subordinated Intercreditor Agreement. |
| **Guarantors** | On a joint and several basis by Reorganized Gildemeister and each of the same guarantors that had guaranteed the 7.5% Notes due 2025. |
| **Noteholders** | New Senior Tranche Secured Notes: The DIP Lenders<br><br>New Junior Tranche Secured Notes: The holders of the 7.5% Notes due 2025 Secured Claims.<br><br>New Subordinated Notes: The holders of the 7.5% Notes due 2025 Secured Claims and the holders of the Unsecured Notes Claims. |
| **Trustee; Collateral Agent** | The Bank of New York Mellon; TMF Group New York, LLC |

| **Term** | **Description** |
|---|---|
| **Amounts** | New Senior Tranche Secured Notes:  An aggregate principal amount equal to all DIP Claims outstanding on the Plan Effective Date.<br><br>New Junior Tranche Secured Notes:  $229.4 million<br><br>New Subordinated Notes:  $111 million |
| **Maturity** | New Senior Tranche Secured Notes: 6 years from the Plan Effective Date.<br><br>New Junior Tranche Secured Notes: 6 years from the Plan Effective Date.<br><br>New Subordinated Notes: 14 years from the Plan Effective Date. |
| **Interest Rate** | New Senior Tranche Secured Notes:<br><br>• Cash: 7.5% cash interest paid semi-annually<br>• PIK: At Company's option, ability to PIK for 3.5 years at 9.0%<br><br>New Junior Tranche Secured Notes:<br><br>• Cash: 7.5% cash interest paid semi-annually<br>  PIK: At Company's option, ability to PIK for 3.5 years at 9.0%<br><br>New Subordinated Notes:<br><br>• For the first 3.5 years from the Plan Effective Date:<br>  ○ Cash/PIK: 10% cash interest paid semi-annually with ability to PIK at the Company's option;<br>• For the remainder of the life of the New Subordinated Notes:<br>  ○ Cash: 2.5% cash interest paid semi-annually; *plus*<br>  ○ Cash/PIK: 7.5% cash interest paid semi-annually with ability to PIK at the Company's option. |
| **Fees** | TBD |
| **Conditions to Borrowings** | a.  Effectiveness of the Plan;<br>b.  Others TBD. |
| **Mandatory Cash Sweeps** | Revised from the 2025 Indenture to include only sweeps for:<br><br>a.  Any asset sale proceeds in excess of $7.5 million in respect of collateral securing the New Secured Notes in any fiscal quarter subject to customary exceptions for acquisition of replacement assets and other assets useful in the business (so long as such replacement assets and such other assets are pledged as collateral) and other customary exceptions; and<br><br>b.  Any proceeds of debt incurrences not permitted under the indenture governing the New Secured Notes. |

| **Term** | **Description** |
|---|---|
| **Covenants** | To include covenants generally consistent with those governing the 7.5% Notes due 2025 and the 2025 Indenture provided that the Restricted Payment covenant shall permit the payment of dividends from time to time with the consent of the majority of the holders of the New Senior Tranche Secured Notes and the majority of the holders of the New Junior Tranche Secured Notes with corresponding affiliate transactions carveout. |
| **Events of Default** | Same as under the 7.5% Notes due 2025 and the 2025 Indenture except no Event of Default regarding Minvest S.A. insolvency. |
| **Other Terms and Conditions** | Definition of Permitted Holders:  To be updated to include the members of the Ad Hoc Group of Consenting Noteholders.<br><br>Optional Redemption:  Same as under the 7.5% Notes due 2025 and the 2025 Indenture.<br><br>Additional Amounts:  Payments of additional amounts on account of Chilean interest or other withholding tax on the same terms as under the 2025 Indenture.<br><br>Repurchase Upon Change of Control:  Same as under the 7.5% Notes due 2025 and the 2025 Indenture.<br><br>Transfer Restrictions:  Same as under the 7.5% Notes due 2025 and the 2025 Indenture.<br><br>Amendments and Waivers:  Same as under the 7.5% Notes due 2025 and the 2025 Indenture. |

<u>**ANNEX IV**</u>

**RESTRUCTURING TRANSACTIONS IMPLEMENTATION STEPS**

| <u>Chronological Steps</u> | <u>Description</u> |
|---|---|
| **1.** | On or prior to the Plan Effective Date, USA Holdco and Chile Holdco shall be organized in accordance with local legal requirements and subject to the terms of the Definitive Documentation.  Chile Holdco will elect (on IRS Form 8832) to be treated as a "disregarded entity" of USA Holdco for U.S. federal income tax purposes effective as of the date of its formation. |
| **2.** | Prior to the Plan Effective Date, the exercise date of the Existing Series A Warrants and Existing Series B Warrants shall be amended to a date that precedes the Plan Effective Date under the terms provided for in the Required Amendments. |
| **3.** | On the Plan Effective Date, the Pledge Amendments shall have been effectuated. |
| **4.** | On or prior to the Plan Effective Date, the Existing Preferred Equity Interests shall be converted to common stock of Reorganized Gildemeister under the terms provided for in the Required Amendments. |
| **5.** | On the Plan Effective Date, Reorganized Gildemeister shall issue the New Secured Notes and the New Subordinated Notes. |
| **6.** | On the Plan Effective Date, the Holders of Class 4 Claims shall be deemed to have contributed their Class 4 Claims to USA Holdco. |
| **7.** | On the Plan Effective Date, the Holders of Class 5 Claims shall be deemed to have contributed their Class 5 Claims to USA Holdco. |
| **8.** | On the Plan Effective Date, USA Holdco shall be deemed to have contributed all Class 4 Claims and Class 5 Claims to Chile Holdco. |
| **9.** | On the Plan Effective Date, Chile Holdco shall be deemed to capitalize the Class 4 Claims and the Class 5 Claims into Reorganized Gildemeister, in exchange for:  (i) all New Junior Tranche Secured Notes, (ii) all New Subordinated Notes and (iii) Reorganized Gildemeister Common Stock, diluting all pre-existing shareholders in Reorganized Gildemeister (including holders of common stock issued upon the conversion of the Existing Preferred Equity Interests) to an insignificant participation (0.000001% of the common stock of Reorganized Gildemeister). |
| **10.** | On the Plan Effective Date, (1) the common stock of Reorganized Gildemeister held by Minvest S.A. shall be cancelled, and (2) Reorganized Gildemeister shall redeem the remaining 0.000001% of its common stock from pre-existing shareholders (including holders of common stock issued upon the conversion of the Existing Preferred Equity Interests), and in consequence Chile Holdco shall become the holder of 100% of the Reorganized Gildemeister Common Stock. |

| Chronological Steps | Description |
|---|---|
| **11.** | On the Plan Effective Date, Chile Holdco shall be deemed to have approved a capital reduction paid in kind, distributing to USA Holdco the New Junior Tranche Secured Notes, the New Subordinated Notes, and the Chile Holdco Bonds in accordance with the Plan. |
| **12.** | On the Plan Effective Date, USA Holdco shall be deemed to have approved a capital reduction paid in kind, distributing the New Junior Tranche Secured Notes and the New Subordinated Notes to the former holders of Class 4 Claims and Class 5 Claims in accordance with the Plan. |

## <u>EXHIBIT B</u>

## FORM OF TRANSFER AGREEMENT

The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "<u>Agreement</u>"), dated as of [●], by and among the Companies, the Shareholder and Consenting Noteholders, or investment managers for Consenting Noteholders, of the 7.50% Notes due 2025, including the transferor (the "<u>Transferor</u>") to the Transferee of any 7.50% Notes due 2025, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a Consenting Noteholder under the terms of the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Date Executed: _____

_____
Print name of Transferee

_____
Name:
Title:

Address:
_____

_____

_____

Attention:
_____
Telephone:
_____
Facsimile:
_____

## **Transferor's Principal Amount Held**

| *Note* | *Amount* |
|---|---|
| 7.50% Notes due 2025 | US$ |

# EXHIBIT C

**EXECUTED BOARD RESOLUTIONS**

<u>SESIÓN EXTRAORDINARIA DE DIRECTORIO</u>

<u>DE</u>

<u>AUTOMOTORES GILDEMEISTER SpA</u>

En Santiago de Chile, a 22 de marzo de 2021, siendo las 15:00 horas, en las oficinas de la sociedad ubicadas en Av. Las Condes 11.000, comuna de Vitacura, tiene lugar la presente Sesión Extraordinaria de Directorio de Automotores Gildemeister SpA, en adelante indistintamente la "<u>Sociedad</u>".

### I.    <u>ASISTENCIA.</u>

Asistieron a la reunión los directores señores Osvaldo Ricardo Lessmann Cifuentes, Manuel Baumann, Fernando de Solminihac Tampier, Tomás Casanegra Rivera, Klaus Winkler Speringer, Donald Mackenzie y Aurelio García-Miró, todos quienes asistieron vía video conferencia.

Presidió la reunión con Osvaldo Ricardo Lessmann Cifuentes quien certifica junto con la Secretaria del directorio, doña Elena Yubero Goncalves, Gerente de Asuntos Legales de la Sociedad, que todos los miembros del directorio asistieron vía videoconferencia y estuvieron debida y permanentemente conectados por toda la duración de ésta.

Asistieron especialmente invitados, y también por videoconferencia, los señores Eduardo Moyano Luco, Gerente Corporativo de Administración y Finanzas de la Sociedad; Matías Marambio Calvo, subgerente de tesorería, y Francisco Marchant Menendez, Gerente Corporativo de Operaciones. Asimismo, asistieron especialmente invitados al efecto, y también por videoconferencia, el abogado externo Francisco Javier Illanes Munizaga; el asesor legal de la Sociedad en Nueva York, doña Jane VanLare; y el señor Marcelo Messer, asesores financieros de Rothschild & Co.

### II.    <u>ACTA DE LA SESIÓN ANTERIOR.</u>

Se deja constancia que el acta de la sesión anterior fue redactada, aprobada y suscrita al término de la misma.

### III.    <u>TABLA.</u>

El Presidente da la bienvenida a los directores presentes y da por abierta la sesión, señalando que la presente sesión fue convocada para tratar las materias que se indican a continuación:

1. Información de las negociaciones con el comité de acreedores constituido por tenedores de una mayoría de los bonos actualmente vigentes de la Sociedad emitidos

mediante contrato en idioma inglés denominado "*Indenture – 7,5% Notes due 2025*" (el "<u>Grupo Ad Hoc</u>") respecto del proceso de restructuración de la deuda de la Sociedad;

2. Ratificar la firma de los documentos denominados Support Letters que fueron firmados con Hyundai Motor Company por la Sociedad y por su filial Automotores Gildemeister Perú S.A.;

3. Aprobación del *Restructuring Support Agreement* negociado con el Grupo Ad Hoc, el que contiene los términos y condiciones bajo los cuales el Grupo Ad Hoc (el "<u>Plan Term Sheet</u>") apoyará la realización de una operación de restructuración financiera (el "<u>Plan</u>") a ser implementada mediante un procedimiento en los Estados Unidos de América conforme a las disposiciones del Capítulo 11 del Bankruptcy Code de Estados Unidos, en su variante *prepackaged* (el "<u>Prepack Chapter 11</u>"), incluyendo una nueva estructura de capital y la emisión de nuevos bonos por la Sociedad, así como los términos y condiciones del compromiso del Grupo Ad Hoc para otorgar un financiamiento adicional a la Sociedad durante el Prepack Chapter 11 (el "<u>DIP Term Sheet</u>"), documentos que fueron circulados con anterioridad a los miembros del directorio (en adelante, el Restructuring Support Agreement y sus anexos referidos conjuntamente como el "<u>RSA</u>"), así como ratificar todo lo obrado por la administración en ese proceso;

4. Aprobación de la suscripción de los documentos necesarios para el financiamiento a ser otorgado por el Grupo Ad Hoc o sus personas relacionadas conforme a los términos del RSA (los "<u>Documentos del Financiamiento</u>"), así como el otorgamiento de las garantías para garantizar el cumplimiento de las obligaciones derivadas de los Documentos del Financiamiento, incluyendo, pero no limitado a: (i) las modificaciones o autorizaciones requeridas en virtud de los bonos emitidos en virtud del *Indenture – 7,5% Notes due 2025* y sus garantías, (ii) el contrato de crédito posterior al inicio del Prepack Chapter 11 (el "<u>DIP Credit Facility</u>"); y (iii) las garantías (incluidas las modificaciones a las garantías otorgadas en virtud del *Indenture – 7,5% Notes due 2025)* que regularán el grado de preferencia entre los acreedores y garantizarán el DIP Credit Facility, así como el contrato entre acreedores (*intercreditor agreement)* relacionado a dichos contratos y descrito en los Documentos del Financiamiento;

5. Aprobación de la propuesta de (i) suscribir un documento de *waiver* respecto de ciertos derechos y obligaciones del actual pacto de accionistas de la Sociedad, para efectos de implementar la restructuración conforme a los términos del RSA; (ii) modificar la fecha de ejercicio de las opciones de suscripción preferente de acciones (Warrants) para efectos de implementar la restructuración conforme a los términos del RSA, y (iii) terminar el actual pacto de accionistas de la Sociedad sujeto a la condición suspensiva consistente en que se produzca el "*Plan Effective Date*" (según dicho término se define en el Plan Term Sheet);

6. Aprobación de la suscripción de un contrato denominado Agreement for Undertaking and Release, el que será firmado por la filial Automotores Gildemeister Perú S.A. y

Hyundai Motor Company; y posteriormente, informar a la autoridad aduanera competente de Perú y/o Indecopi la situación de la importación de vehículos y el plan de reemplazo que se ejecutará en dicho país.

7. Otorgamiento de poderes para suscribir el RSA, los Documentos del Financiamiento y los otros acuerdos y/o documentos que sean necesarios para implementar lo acordado con el Grupo Ad Hoc;

8. Aprobar someter a Junta Extraordinaria de Accionistas, la aprobación y/o ratificación de los actos o contratos otorgados con motivo de la negociación de la restructuración de la Sociedad que tengan el carácter de operaciones entre partes relacionadas; y

9. Citación a Junta Extraordinaria de Accionistas para realizar las modificaciones estatutarias contempladas en el RSA, y que serán necesarias para someter a la Sociedad a un Prepack Chapter 11 así como para implementar, sujeto a su aprobación por el tribunal competente, el Plan.

El Presidente da la bienvenida a los directores presentes y da por abierta la sesión.

## IV.   INFORMACIÓN DE LAS NEGOCIACIONES CON EL GRUPO AD HOC RESPECTO DEL PROCESO DE RESTRUCTURACIÓN DE LA DEUDA DE LA SOCIEDAD.

El señor Presidente recuerda al Directorio que, en sesiones anteriores, se han considerado diversas alternativas para la restructuración de la Sociedad, y que en base a la información entregada por la administración así como por los asesores de la Sociedad y al proceso de negociación con el Grupo Ad Hoc, antes referido, se determinó que la alternativa más adecuada para la restructuración de la Sociedad era mediante la realización de un procedimiento en los Estados Unidos de América, apoyado por ciertos acreedores financieros que constituyen la mayoría de los tenedores de bonos internacionales, conforme a las disposiciones del Capítulo 11 del Bankruptcy Code de Estados Unidos, en su variante *prepackaged*. Las negociaciones llevadas por la administración de la Sociedad con el Grupo Ad Hoc culminaron en el RSA, cuyos términos se expondrán a continuación.

## V.   RATIFICACIÓN DE LA SUSCRIPCIÓN DE LOS HYUNDAI SUPPORT LETTERS.

El señor Presidente explica al Directorio que, en el contexto de la negociación con el Grupo Ad Hoc, se acordaron con Hyundai Motor Company ciertas materias del plan de restructuración de la Sociedad, a saber: (i) la extensión de los contratos de distribución con la Sociedad y con Automotores Gildemeister Perú, y (ii) que se producirá un cambio de control una vez se consume la transacción, pasando la Sociedad a ser controlada por el Grupo Ad Hoc. Lo anterior se reflejó en las cartas enviadas por Hyundai (*Hyundai Support Letters*) con fecha 18 de marzo de 2021, las que fueron firmadas y aceptadas por la Sociedad. En atención a que lo anterior era necesario para el proceso de restructuración que se describirá a

continuación, se propone al directorio ratificar la suscripción de las Hyundai Support Letters. Luego de un breve debate, el directorio por la unanimidad de los directores asistentes, incluyendo a los directores elegidos por las acciones de la Serie C, ratificaron la suscripción de las Hyundai Support Letters.

VI.    **APROBACIÓN DEL *RESTRUCTURING SUPPORT AGREEMENT* NEGOCIADO CON EL GRUPO AD HOC DE TENEDORES DE BONOS, EL QUE CONTIENE LOS TÉRMINOS Y CONDICIONES DEL COMPROMISO DEL GRUPO AD HOC PARA APOYAR LA REALIZACIÓN DE UNA OPERACIÓN DE RESTRUCTURACIÓN FINANCIERA A SER IMPLEMENTADA MEDIANTE UN PROCEDIMIENTO PREPACK CHAPTER 11 EN LOS ESTADOS UNIDOS DE AMÉRICA, INCLUYENDO UNA NUEVA ESTRUCTURA DE CAPITAL Y LA EMISIÓN DE NUEVOS BONOS POR LA SOCIEDAD, ASÍ COMO LOS TÉRMINOS Y CONDICIONES DEL GRUPO AD HOC PARA OTORGAR UN FINANCIAMIENTO ADICIONAL A LA SOCIEDAD ANTES Y DURANTE EL PREPACK CHAPTER 11, DOCUMENTOS QUE FUERON ENTREGADOS CON ANTERIORIDAD A LOS MIEMBROS DEL DIRECTORIO.**

El señor Presidente entrega la palabra al abogado externo Francisco Javier Illanes , quien expone los términos y condiciones del borrador más reciente del RSA, documento que fue entregado a todos los miembros del Directorio con anticipación a la presente sesión, y de los términos y condiciones de sus anexos, en particular el Plan Term Sheet y el DIP Term Sheet.

Los términos y condiciones del RSA, a ser sometidos a aprobación de este Directorio, son los siguientes:

1. Conforme a lo contemplado en el RSA, la Sociedad y sus filiales realizarán una reestructuración financiera de sus obligaciones, deudas y estructura de capital (la "Restructuración"), mediante la implementación del Plan conforme a los términos del RSA. La Restructuración se implementará, entre otros actos, mediante:

    a. El inicio de un procedimiento concursal voluntario bajo el Capítulo 11 del Bankruptcy Code de los Estados Unidos de América, por la Sociedad y cada una de sus filiales (salvo por las filiales peruanas y costarricenses), en virtud del cual se aprobará el Plan y la emisión de: (i) nuevos bonos garantizados senior de la Sociedad ("Nuevos Bonos Senior"), que serían distribuidos, en canje de los créditos del Financiamiento DIP, conforme a los términos del Plan; (ii) nuevos bonos garantizados junior ("Nuevos Bonos Junior" y en conjunto con los Nuevos Bonos Senior, los "Nuevos Bonos Garantizados"), a ser distribuidos a los acreedores de la Sociedad conforme al Plan; (iii) nuevos bonos no garantizados y subordinados ("Nuevos Bonos Subordinados") a ser distribuidos a los acreedores de la Sociedad conforme al Plan; (iv) nuevas acciones de la Sociedad con motivo de la capitalización de deudas, las que

serán emitidas en una cantidad tal que permita la dilución de los actuales accionistas de la Sociedad; (v) acciones en una nueva sociedad por acciones (Chile Holdco), que será titular de un 100% de las acciones de la Sociedad reestructurada; (vi) nuevos bonos a ser emitidos por Chile Holdco; y (vii) derechos (*units*) en una sociedad de responsabilidad limitada (*limited liability company*) a ser constituida en los Estados Unidos de América (USA Holdco), que sería titular de un 100% de las acciones de Chile Holdco.

b.  La obtención del consentimiento de los tenedores de los bonos garantizados senior 7,50% con vencimiento en 2025 (los "Bonos 2025") emitidos por la Sociedad conforme al contrato de emisión de bonos (*indenture*) de fecha 7 de noviembre de 2019 (el "Indenture 2025"), para efectos de modificar las garantías reales otorgadas por las filiales peruanas (Automotores Gildemeister Peru S.A. Maquinaria Nacional S.A., y Motor Mundo S.A.) y costarricenses (Gildemeister Costa Rica S.A. e Inmobiliaria Los Seis CR ILS S.A.), para que estas garantías también garanticen, a contar del Plan Effective Date, las obligaciones de la Sociedad y sus filiales bajo los Nuevos Bonos Garantizados.

c.  Luego de la emisión de nuevas acciones de la Sociedad y la dilución de los actuales accionistas, la recompra, cancelación y/o terminación de todas las actuales acciones de la Sociedad, tanto ordinarias como preferentes, así como de las opciones de suscripción de las acciones de las Series A y B vigentes ("Warrants").

2.  El RSA contiene las obligaciones que asume el antes referido Grupo Ad Hoc de tenedores de Bonos con respecto a la Restructuración, entre ellos apoyar a la Sociedad y sus filiales en esta Restructuración, incluyendo, pero no limitado a: (i) votar para aceptar el Plan que se presente en cualquier procedimiento de solicitud de votos ("Solicitation") conforme a los términos del RSA y no revocar su voto, así como otorgar su consentimiento para la celebración de los documentos necesarios para la modificación de las garantías reales otorgadas por aquellas filiales que no se sujetarán al Prepack Chapter 11, (ii) cumplir sus obligaciones respecto del financiamiento adicional a la Sociedad, conforme a los términos del RSA; y (iii) negociar de buena fe los términos del nuevo *indenture* que regulará los términos y condiciones de los Nuevos Bonos Garantizados y los Nuevos Bonos Subordinados conforme al RSA, las modificaciones a los documentos y acuerdos necesarios para la emisión de las nuevas acciones, bonos y títulos de deuda conforme a los términos del RSA, incluyendo las modificaciones de los contratos de garantía que correspondan.

3.  Junto con ello, el RSA contempla que se otorgarán ciertas liberaciones de responsabilidad (*releases*) en relación al Plan y, sujeto a los términos establecidos en el RSA, obligarán al Grupo Ad Hoc a no rechazar (*opt out*) las liberaciones de responsabilidad que se contemplen el Plan.

4. Asimismo, en el RSA, la Sociedad y sus filiales se obligan, entre otras obligaciones, a (i) no iniciar directa o indirectamente ningún proceso de disolución, liquidación, reestructuración, venta, disposición, reorganización, fusión, o estructura corporativa o la designación de un veedor, distinto a la Restructuración que se aprobará a continuación; (ii) a entregar borradores de la documentación definitiva en los plazos contemplados en el documento; (iii) iniciar el Prepack Chapter 11 en o antes del 15 de abril de 2021; y asumen todas y cada una de las obligaciones que en dicho documento se detallan.

5. Por su parte, Minvest S.A. (como único accionista de la Serie A) se obliga, entre otras obligaciones, a: (i) no iniciar directa o indirectamente ningún proceso de disolución, liquidación, reestructuración, venta, disposición, reorganización, fusión, o estructura corporativa o la designación de un veedor, distinto a la Restructuración que se aprobará a continuación, (ii) votar cualquier acreencia que tenga en apoyo del Plan y a obligarse por la Orden de Confirmación (*Confirmation Order*) que confirma el Plan, y (iii) tomar todas las medidas necesarias para consumar el Plan y la Restructuración.

6. La efectividad del RSA estará sujeta a una serie de condiciones, que incluye entre otras la celebración de la presente sesión de directorio, la entrega de ciertos documentos debidamente firmados por Hyundai Motor Company, y la realización de ciertos reportes a las autoridades peruanas, entre otros.

Asimismo, se describen los términos principales del Plan Term Sheet, que forma parte del RSA que se sujeta a la consideración del Directorio:

1. Los términos del Plan que se someterá a votación de los tenedores de bonos en el Solicitation y luego a la aprobación de la corte competente en el Prepack Chapter 11 (la "Corte"), y que describen qué recibirá cada acreedor de la Sociedad, se describen en el Plan Term Sheet.
2. Para efectos de implementar la Restructuración, la Sociedad deberá modificar sus estatutos conforme a lo que se indica más adelante en esta misma sesión.
3. La ocurrencia del Plan Effective Date, y por tanto, la efectividad de la Restructuración, estará sujeta a una serie de condiciones precedentes que se describen en el Plan Term Sheet.

Luego, se describen los principales términos de los Nuevos Bonos Garantizados y los Nuevos Bonos Subordinados (los términos en mayúscula que no estén aquí definidos tendrán el significado que se les asigna en el Plan Term Sheet):

1. Se emitirán en moneda dólar de los Estados Unidos de América ("Dólares"), y se regirán por la Ley del Estado de Nueva York, Estados Unidos de América. Asimismo, quedarán sujetos a la jurisdicción no exclusiva del Estado de Nueva York y cortes federales ubicadas en Manhattan, ciudad de Nueva York.

2. Los Nuevos Bonos Junior estarán subordinados a favor de los Nuevos Bonos Senior. Por su parte, los Nuevos Bonos Subordinados estarán subordinados a favor de los Nuevos Bonos Garantizados.

3. Los Nuevos Bonos Garantizados tendrán una tasa de interés de un 7.5% anual que se pagará semestralmente, con opción PIK a elección de la Sociedad por 3.5 años a una tasa de interés de 9.0%. Por su parte, los Bonos Subordinados, durante los primeros 3.5 años, tendrán una tasa de interés de un 10% anual, pagadera semestralmente, en dinero o con opción PIK a la misma tasa a discreción de la Sociedad; y por el resto de su vigencia, una tasa de interés de 2,5% anual , pagadero semestralmente, más una tasa adicional de 7,5% anual, pagadero semestralmente, con opción PIK a la misma tasa a discreción de la Sociedad.

4. En el caso de los Nuevos Bonos Garantizados, su vencimiento será el sexto aniversario de la fecha del Plan Effective Date, y en el de los Nuevos Bonos Subordinados, el décimo cuarto aniversario desde la fecha del Plan Effective Date.

5. El monto total de la emisión de los Nuevos Bonos Senior será igual al monto de todos los Préstamos DIP (*DIP Claims*, según su definición en el Plan Term Sheet) pendientes de pago en el Plan Effective Date. El monto de la emisión de los Nuevos Bonos Junior será de USD 229 millones. El monto de la emisión de los Nuevos Bonos Subordinados será de USD 111 millones.

6. El pago de los Nuevos Bonos Garantizados se garantizará con:
   a. Garantías personales otorgadas por las mismas filiales que garantizaban los Bonos 2025 (conjuntamente, los "<u>Garantes</u>").
   b. Garantías de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior), sobre los mismos bienes que garantizaban los Bonos 2025.
   c. Prenda de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior) sobre todas las acciones de la Sociedad, a ser otorgada por Chile Holdco.
   d. Prenda de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior) sobre todas las acciones de la Sociedad, en las acciones de los Deudores y Deudores Reorganizados (*Debtor* y *Reorganized Debtor* según estos términos se definen en el Plan Term Sheet).

7. El pago de los Nuevos Bonos Subordinados sólo estará garantizado por garantías personales de los Garantes, pero no tendrá a su favor garantías reales.

Luego de un análisis e intercambio de opiniones, el Directorio acordó, por la unanimidad de los directores asistentes, incluyendo a los directores elegidos por las acciones de la Serie C, aprobar los términos y condiciones del RSA presentados por los asesores financieros y legales de la Sociedad en forma conjunta con la administración de ésta y en el mismo documento que fue entregado con anterioridad a cada uno de los miembros del Directorio, sin perjuicio de los cambios que pueda experimentar el borrador durante la negociación del mismo y hasta su firma. Se acuerda, asimismo, que se inicie el Solicitation en la forma y términos contemplados en el RSA.

El Directorio, luego de un breve debate, acordó también por la unanimidad de los directores asistentes, incluyendo a los directores elegidos por las acciones de la Serie C, ratificar todos los contratos, documentos y actos realizados hasta la fecha por la administración de la Sociedad, relacionados, directa e indirectamente, con la Operación de Restructuración, el Prepack Chapter 11, el Financiamiento DIP y con la negociación y suscripción del RSA y sus anexos (incluyendo el Plan Term Sheet y el DIP Term Sheet) y los Documentos del Financiamiento, entre otros.

## VII. APROBACIÓN DE LA SUSCRIPCIÓN DE LOS DOCUMENTOS NECESARIOS PARA LA IMPLEMENTACIÓN DEL FINANCIAMIENTO ADICIONAL A SER OTORGADO POR EL GRUPO AD HOC, Y EVENTUALMENTE OTROS PRESTAMISTAS, CONFORME AL DIP TERM SHEET, INCLUYENDO, PERO NO LIMITADO A: (I) EL CONTRATO DE CRÉDITO POSTERIOR AL INICIO DEL PREPACK CHAPTER 11 (EL "DIP CREDIT FACILITY"); Y (II) LOS DOCUMENTOS DE GARANTÍA QUE GARANTIZARÁN EL DIP CREDIT FACILITY.

A continuación, se pasan a describir los principales términos y condiciones del nuevo financiamiento a otorgarse conforme a los términos del DIP Term Sheet (el "Financiamiento DIP"), que forma parte del RSA (los términos en mayúscula que no estén aquí definidos tendrán el significado que se les asigna en el DIP Term Sheet):

1. Los acreedores del Financiamiento DIP serán cada uno de los miembros del Grupo Ad Hoc (los "Acreedores DIP").

2. Se celebrará un nuevo contrato de línea de crédito con posterioridad al inicio del Prepack Chapter 11 (el "DIP Credit Facility"). Los Deudores (*Debtors*) serán deudores o garantes de este contrato, según corresponda, y las filiales no garantes serán constituyentes de garantías reales.

3. El monto comprometido por los Acreedores DIP a ser entregado bajo el DIP Credit Facility asciende al monto de hasta USD 23.600.000.

4. Al cierre del DIP Credit Facility, se suscribiría un Intercreditor Agreement con el Trustee del Indenture 2025 y/o el Agente de Garantías, para regular ciertas materias según se describe en mayor detalle en el RSA.

5. La tasa de interés de las obligaciones del Financiamiento DIP será de 11.75% anual, con un interés moratorio adicional de 2% anual.

6. Las obligaciones del Financiamiento DIP serán pagaderas en la primera fecha de: (a) la fecha que corresponda a la fecha tentativa de salida del Prepack Chapter 11 según el RSA; (b) la conversión del Prepack Chapter 11 en un procedimiento de liquidación sin consentimiento de los Acreedores Requeridos; (c) el rechazo de cualquiera de los procedimientos del Prepack Chapter 11 sin consentimiento de los Acreedores Requeridos; (d) la designación de un síndico (*trustee*) en el Prepack Chapter 11 sin consentimiento de los Acreedores Requeridos; (e) la designación de un examinador (*examiner*) en el Prepack Chapter 11 sin consentimiento de los Acreedores Requeridos; (f) la fecha de consumación de la venta de todos o sustancialmente todos los activos de los Deudores, sin consentimiento de los Acreedores Requeridos; (g) la fecha del Plan Effective Date; (h) la aceleración de los montos adeudados por la

ocurrencia de un *Event of Default* (según lo dispuesto en el RSA); y (j) otros eventos usuales para este tipo de contratos.

7. Las obligaciones del Financiamiento DIP estarán garantizadas por las siguientes garantías reales (las "Garantías Reales del Financiamiento"): al cierre del DIP Credit Facility, una vez se haya emitido la orden del tribunal competente de Estado de Nueva York, Estados Unidos de América, se otorgarán nuevas garantías y/o modificarán las garantías existentes para que el DIP Credit Facility esté garantizado por: (i) un Priming Lien sobre las garantías reales de los Bonos 2025 otorgadas por el Deudor o los Garantes del DIP Credit Facility, y en el caso de que sean otorgadas por las filiales no garantes, tendrán el mismo grado de preferencia (*pari passu*); (ii) garantías sobre inventario, cuentas por cobrar y cuentas corrientes de la Sociedad y sus filiales en Chile, Costa Rica y Uruguay, sujeto a reglas que permitan la continuidad de la operación de la Sociedad en el curso ordinario de los negocios, las que serán documentadas de acuerdo a los requisitos que en cada jurisdicción se establezca, y sujeto, en todo caso, a la posibilidad de prendar esos activos para obtener capital de trabajo adicional. Un listado de las garantías específicas a ser otorgadas en cada jurisdicción se incluye como **Anexo A** a la presente acta, y se incluye asimismo como anexo en el RSA..

8. Sin perjuicio de ciertas excepciones, las obligaciones del Financiamiento DIP tendrán, sujeto a la condición de que así sea determinado en la orden de un tribunal competente del Estado de Nueva York, Estados Unidos de América, en la forma contemplada en el RSA y el DIP Term Sheet, super preferencia sobre todos los gastos administrativos del Prepack Chapter 11.

9. Asimismo, y de ser necesario para efectos de implementar lo anterior, se suscribirán también sendas modificaciones y/o suplementos al Indenture 2011, al Indenture 2016 y al Indenture 2025 (las "Modificaciones de Indentures") bajo la legislación del Estado de Nueva York, Estados Unidos.

Luego de un análisis e intercambio de opiniones, el Directorio acordó, por la unanimidad de los directores asistentes, incluyendo a los directores elegidos por las acciones de la Serie C, aprobar la suscripción, otorgamiento y firma de los Documentos del Financiamiento, incluyendo pero sin estar limitado a, el DIP Credit Facility, y de ser necesario, los instrumentos bajo ley chilena que documenten los créditos que el Grupo Ad Hoc y/o los otros prestamistas desembolsen en virtud de dichos contratos, las Garantías Reales del Financiamiento que sean requeridas por el Grupo Ad Hoc, y/o cualesquiera otros instrumentos relacionado con los Documentos del Financiamiento que sean requeridos por el Grupo Ad Hoc y/o los otros prestamistas, según corresponda, o bien necesario o conveniente para obtener y materializar el Financiamiento DIP y la Restructuración descrita en esta sesión de directorio.

VIII.  **APROBACIÓN DE LA PROPUESTA DE SUSCRIBIR UN WAIVER RESPECTO DE LOS DERECHOS Y OBLIGACIONES DEL ACTUAL PACTO DE ACCIONISTAS DE LA SOCIEDAD; DE ANTICIPAR LA FECHA DE EJERCICIO DE LAS OPCIONES DE SUSCRIPCIÓN PREFERENTE DE ACCIONES (WARRANTS) PARA EFECTOS DE IMPLEMENTAR LA RESTRUCTURACIÓN CONFORME A LOS TÉRMINOS DEL PLAN TERM SHEET; Y DETERMINAR EL ACTUAL PACTO DE ACCIONISTAS DE LA**

**SOCIEDAD, SUJETOS A LA CONDICIÓN SUSPENSIVA CONSISTENTE EN QUE SE PRODUZCA EL "PLAN EFFECTIVE DATE".**

Continuó el Presidente explicando a los señores directores que, con el objeto de implementar la Restructuración en los términos descritos precedentemente, resulta necesario que los accionistas de la Sociedad que son partes del pacto de accionistas actualmente vigente (el "Pacto") suscriban un *waiver* o renuncia respecto de ciertos derechos y obligaciones contenidos en el mismo así como modificar la fecha de ejercicio de la conversión en acciones de la Sociedad a que tienen derecho aquellos tenedores de opciones de suscripción preferente de acciones (Warrants), debiendo ejercer aquel derecho el día inmediatamente anterior a que se verifique la llegada del Plan Effective Date, sujeto a la condición suspensiva de que se produzca el *"Plan Effective Date"* (según dicho término se define en el Plan Term Sheet). Además, el waiver contemplaría que, en la medida que el RSA no sea terminado con anterioridad al "Plan Effective Date", que la Restructuración y el inicio del Prepack Chapter 11 no gatillarán la conversión automática de acciones de la Serie C y Serie D de la Sociedad conforme a la Sección V del Pacto, ni producirán la revocación del directorio conforme a la Sección 2.03 del mismo. En caso que se ponga término al RSA con anterioridad al Plan Effective Date, la modificación al plazo de ejercicio de los Warrants quedará sin efecto. Asimismo, se producirá la conversión de las series C y D y se gatillará la revocación del Directorio si la Sociedad iniciase un procedimiento de reorganización o insolvencia de cualquier tipo, conforme a lo contemplado actualmente en el Pacto.

Adicionalmente, el Presidente recordó a los señores directores que, conforme a lo expuesto en la presente sesión, una vez implementada la Restructuración, la Sociedad tendrá una nueva estructura de capital que comprende la existencia de un solo accionista y que hará innecesaria la existencia del actual Pacto de la Sociedad.

Luego de un breve análisis, el Directorio acordó, por la unanimidad de los directores asistentes, incluyendo a los directores elegidos por las acciones de la Serie C, aprobar la suscripción de un *waiver* respecto de los referidos derechos y obligaciones del actual Pacto de la Sociedad, incluyendo la modificación de la fecha para ejercer los Warrants, todo lo anterior sujeto a la condición suspensiva, en la parte que corresponda, de que se produzca el *"Plan Effective Date"* (según dicho término se define en el Plan Term Sheet). Asimismo, el Directorio acordó aprobar la terminación del actual pacto de accionistas de la Sociedad, sujeto a la condición suspensiva de que se produzca el *"Plan Effective Date"* (según dicho término se define en el Plan Term Sheet).

IX.    **APROBACIÓN DE LA SUSCRIPCIÓN DE UN CONTRATO DENOMINADO *AGREEMENT FOR UNDERTAKING AND RELEASE*, EL QUE SERÁ FIRMADO POR LA FILIAL AUTOMOTORES GILDEMEISTER PERÚ S.A. Y HYUNDAI MOTOR COMPANY.**

Se informa a los directores que, en relación a la filial Automotores Gildemeister Perú S.A., se ha negociado con Hyundai on contrato denominado "Agreement for Undertaking and Release" respecto de la sitación de ciertos vehículos importados en Perú que no cumplían el estándar Euro IV. Este contrato regula la obligación de Hyundai de ofrecer vehículos de reemplazo a un precio reducido (30% sobre valor FOB), además de incluir ciertas

indemnidades a favor de Hyundai, así como ciertos finiquitos recíprocos entre AG Perú y Hyundai.

Luego de un breve análisis, el Directorio acordó, por la unanimidad de los directores asistentes, incluyendo a los directores elegidos por las acciones de la Serie C, aprobar la suscripción, por parte de AG Perú, del "Agreement for Undertaking and Release" con Hyundai.

## X. OTORGAMIENTO DE PODERES PARA SUSCRIBIR EL RSA, LOS DOCUMENTOS DEL FINANCIAMIENTO Y LOS OTROS ACUERDOS Y/O DOCUMENTOS QUE SEAN NECESARIOS PARA IMPLEMENTAR LO ACORDADO CON EL GRUPO AD HOC.

El Directorio, por unanimidad de sus miembros, acordó conferir poder especial a los señores **Ricardo Lessmann Cifuentes, y/o Eduardo Moyano y/o Francisco Marchant** (los "Apoderados") para que, actuando individualmente, representen a la Sociedad, en Chile y en el extranjero, con las más amplias facultades posibles, en todos los actos que permitan firmar y suscribir el RSA y sus anexos, el contrato de emisión de los Nuevos Bonos Garantizados y los Nuevos Bonos Subordinados, y los Documentos del Financiamiento. En especial, entendiendo que la siguiente enumeración o descripción es meramente ilustrativa y enunciativa, los Apoderados antes identificados tendrán facultades para:

a) Celebrar y suscribir, en la calidad que le corresponda a la Sociedad, los documentos de la Restructuración, incluyendo, los Documentos del Financiamiento y todos los demás instrumentos públicos o privados que sean necesarios o pertinentes, directa o indirectamente, para los efectos de la emisión de los Nuevos Bonos Garantizados y los Nuevos Bonos Subordinados, la reorganización del pasivo de la Sociedad mediante el Prepack Chapter 11 en Estados Unidos, llevar a cabo las modificaciones estatutarias contempladas en el RSA, el otorgamiento del Financiamiento DIP, el otorgamiento de las Garantías Reales del Financiamiento, y para todo otro acto necesario o conveniente para la verificación completa de la Restructuración, incluyendo la facultad para suscribir los documentos que sean requeridos para constituir en nombre de la Sociedad, las garantías reales y/o personales que sean necesarias según lo acordado en esta sesión (incluyendo, en su caso, su modificación), y cualquier otro instrumento a ser otorgado o modificado en virtud de, o relacionado con, los acuerdos adoptados precedentemente, en que sea necesario que la Sociedad sea parte. Lo anterior, incluirá la facultad de fijar el contenido de tales instrumentos públicos o privados, así como de convenir y modificar en ellos toda clase de pactos y estipulaciones, en estén o no contemplados especialmente en las leyes e independientemente de que sean de su esencia, de su naturaleza o meramente accidentales, efectuar todas las declaraciones y pronunciamientos que estimen necesarios o convenientes, contraer todas las obligaciones, limitaciones o prohibiciones que sean necesarias o convenientes; someterse a las leyes y tribunales de cualquier jurisdicción.

b) Realizar, ejecutar y celebrar todos los actos, contratos, trámites y gestiones que puedan ser necesarios con el propósito de concretar la Restructuración, la emisión de los nuevos bonos, las modificaciones estatutarias contempladas en el RSA, el procedimiento de reorganización del Prepack Chapter 11, el otorgamiento del Financiamiento DIP y la suscripción de los Documentos del Financiamiento, ante el Servicio de Impuestos Internos, ante cualquier otra autoridad nacional o extranjera y ante cualesquiera otros organismos fiscales, semifiscales, judiciales, autónomos o particulares que correspondan, pudiendo suscribir todos los documentos, solicitudes, prospectos y demás instrumentos que sean necesarios.

c) Designar a los intermediarios, agentes, mandatarios, depositarios y administradores que sean necesarios para la Restructuración, así como para negociar con ellos las condiciones en que se desempeñarán y las remuneraciones que percibirán como intermediarios, representantes o agentes.

d) Designar a, o aceptar la designación de, la institución o entidad que prestará servicios como representante de los tenedores de los nuevos bonos o *Trustee* de conformidad con el nuevo contrato de emisión de bonos y para ejecutar todas y cualquiera de las acciones que sean necesarias en relación con el nuevo contrato de emisión de bonos de acuerdo a la normativa aplicable o cualquier otro instrumento similar de los otros países, territorios o jurisdicciones que correspondan.

e) Designar a, o aceptar la designación de, la institución o entidad que prestará servicios como agente de garantías o *Collateral Agent* de conformidad con el nuevo contrato de emisión, para efecto de los documentos necesarios para constituir las Garantías del Financiamiento que garanticen el Financiamiento DIP a ser otorgado por el Grupo Ad Hoc, y para ejecutar todas y cualquiera de las acciones que sean necesarias en relación con dichos documentos de acuerdo con la normativa aplicable o cualquier otro instrumento similar de los otros países, territorios o jurisdicciones que correspondan.

f) Participar en cualquier proceso de negociación adicional que pudiese existir en relación con la Restructuración.

g) Designar un agente autorizado como representante de la Sociedad para recibir notificaciones, judiciales o extrajudiciales, en los Estados Unidos de América y suscribir todos los documentos y efectuar todas las gestiones necesarias al efecto.

Por último, el Directorio acordó dejar expresa constancia que el presente poder no revoca ningún otro poder que se hubiere otorgado por le Sociedad con anterioridad a esta fecha y que no hubiera sido especialmente revocado.

XI.    **ACORDAR SOMETER A JUNTA EXTRAORDINARIA DE ACCIONISTAS LA RATIFICACIÓN DE LOS ACTOS O CONTRATOS OTORGADOS CON MOTIVO DE LA NEGOCIACIÓN DE LA RESTRUCTURACIÓN DE LA SOCIEDAD QUE TENGAN EL CARÁCTER DE OPERACIONES ENTRE PARTES RELACIONADAS.**

El Presidente expone al Directorio que, con motivo del proceso de negociación llevado a cabo con el Grupo Ad Hoc para llevar a cabo la restructuración financiera del pasivo de la Sociedad, ésta ha realizado diversas actuaciones y contratos con directores, administradores y ejecutivos principales de la Sociedad y de sus sociedades filiales en otros países, las cuales tienen el carácter de operaciones entre partes relacionadas conforme a lo señalado en el artículo 44 de la Ley sobre Sociedades Anónimas.

Para efectos de cumplir con la citada normativa, el Presidente propuso a los señores directores que los actos o contratos que tengan el carácter de operaciones entre partes relacionadas sean ratificados en junta extraordinaria de accionistas por el 75% de los accionistas de la Serie A de la Sociedad, la cual deberá ser citada de conformidad con el número XIII siguiente.

Luego de un breve debate, el Directorio aprobó, por unanimidad, someter la ratificación de todos aquellos actos o contratos otorgados en virtud de la negociación de la restructuración del pasivo financiero con el Grupo Ad Hoc que tengan el carácter de operaciones entre partes relacionadas en la Junta Extraordinaria de Accionistas de la Sociedad a ser convocada conforme a la presente sesión.

XII.    **CITACIÓN A JUNTA EXTRAORDINARIA DE ACCIONISTAS.**

Conforme a todo lo expuesto en la presente sesión, y atendidas las explicaciones del Presidente, el Directorio, por unanimidad, acuerda convocar a los accionistas de la Sociedad a Junta Extraordinaria de Accionistas, a celebrarse el día 9 de abril de 2021, a las 11:00 horas, en estas mismas oficinas, para que los accionistas se pronuncien sobre las siguientes materias:

1. Informar sobre la situación legal, económica y financiera de la Sociedad; y en especial sobre los términos y condiciones de la operación de restructuración del pasivo y de la estructura de capital de la Sociedad a que se refiere el documento denominado *Restructuring Support Agreement* ("RSA") negociado con el comité de acreedores constituido por tenedores de una mayoría de los bonos actualmente vigentes de la Sociedad emitidos mediante contrato en idioma inglés denominado "Indenture – 7,5% Notes due 2025" (el "Grupo Ad Hoc"), el que contiene los términos y condiciones del compromiso del Grupo Ad Hoc para apoyar la realización de una operación de restructuración (el "Plan Term Sheet") a ser implementada mediante un procedimiento en Estados Unidos de América conforme a las disposiciones del Capítulo 11 del Bankruptcy Code de Estados Unidos, en su variante prepackaged (el "Prepack Chapter 11").

2. Informar y pronunciarse sobre las modificaciones de los estatutos sociales contempladas en el RSA, las cuales son necesarias para someter a la Sociedad a un *Prepack Chapter 11* de acuerdo a los términos que establece el RSA y el Plan Term Sheet. Estas modificaciones estarán sujetas a la condición resolutoria de que el RSA no sea terminado con anterioridad al "Plan Effective Date" según dicho término se define en el Plan Term Sheet: (a) Modificación de la fecha de conversión automática de las acciones de la Serie C y Serie D de la Sociedad, de acuerdo a lo dispuesto en el artículo Décimo de los estatutos sociales de manera que ésta ocurra sólo en la fecha efectiva de reorganización a ser propuesta en el Prepack Chapter 11; (b) modificación de las reglas de conversión automática de acciones de la Serie C y Serie D de la Sociedad en los eventos y casos señalados en los literales (ii), (iii) y (iv) del numeral Uno del artículo Décimo de los estatutos sociales; (c) modificación de la revocación automática del directorio de la Sociedad, de acuerdo a lo contemplado en el numeral Tres del artículo Décimo de los estatutos sociales; y (d) capitalización de los bonos emitidos por la Sociedad sin la necesidad de contar con un informe de peritos, bastando a este respecto la aprobación de la mayoría de las acciones de la Serie A.

3. Informar y pronunciarse sobre las siguientes modificaciones adicionales de los estatutos sociales, contempladas en el RSA y sujetas a la condición suspensiva consistente en que se verifique el *Plan Effective Date*:

   a) En la fecha del Plan Effective Date, conversión automática de las acciones preferentes de las Series C y D en acciones Serie A y B.
   b) Eliminar las series de acciones en la Sociedad, incluyendo la eliminación de las acciones reservadas para el derecho de canje de que trata el artículo Décimo Primero de los estatutos.
   c) Modificar el capital de la Sociedad en dos etapas: (a) primeramente, disminuir el capital de la Sociedad hasta el monto de 241,665,967,987 pesos mediante la absorción de pérdidas, y cancelar las acciones de Minvest S.A. y aquellos accionistas que consientan en ello; y (b) en segundo lugar, aumentar el capital social, desde la suma en que se disminuyó previamente, en la suma de hasta 217 millones de dólares o la que determine esta Junta, mediante la emisión de nuevas acciones ordinarias de la Sociedad en el Plan Effective Date que serán pagadas en especie, mediante la capitalización de los bonos emitidos por la Sociedad, y renunciar al derecho de suscripción preferente para que las acciones sean entregadas a Chile HoldCo conforme a los términos del Plan.
   d) Modificar los términos del derecho de recompra de la Sociedad, de modo que ésta pueda recomprar y cancelar, en el Plan Effective Date, la totalidad de las acciones de las Series A y B de la Sociedad que no hayan consentido en la cancelación de sus acciones.
   e) Modificar la fecha de ejercicio de las opciones de suscripción preferente de acciones de la Serie A y B (Warrants), adelantándola al día inmediatamente anterior al Plan Effective Date.
   f) Eliminar las disposiciones de los estatutos vinculadas a las operaciones de canje de 2016 y 2019.

4. De aprobarse las materias discutidas anteriormente, acordar las modificaciones a los estatutos sociales que resulten pertinentes para incorporar los acuerdos adoptados por la Junta Extraordinaria de Accionistas con motivo de los asuntos anteriores, acordando un nuevo texto modificado y refundido de los estatutos sociales que entraría en vigencia en el Plan Effective Date, sujeto a la condición suspensiva antes referida.

5. Acordar un nuevo texto simplificado de los estatutos de la Sociedad, el que, sujeto a a la condición suspensiva antes referida, entrará en vigencia una vez terminado el proceso de restructuración de la Sociedad, en el Plan Effective Date.

6. Informar y pronunciarse sobre la propuesta de (i) suscribir un waiver respecto de los derechos y obligaciones del actual pacto de accionistas de la Sociedad, para efectos de implementar la restructuración conforme a los términos del RSA y el Plan Term Sheet; (ii) anticipar la fecha de ejercicio de los Warrants para efectos de implementar la restructuración conforme a los términos del RSA y el Plan Term Sheet y (iii) terminar el actual pacto de accionistas de la Sociedad, sujeto a la condición suspensiva consistente en que se produzca el "Plan Effective Date".

7. Acordar la aprobación del otorgamiento de las garantías reales y personales necesarias para garantizar la emisión de nuevos bonos bajo un nuevo *Indenture*, conforme a lo contemplado en el RSA y el *Plan Term Sheet* y a los Documentos del Financiamiento, incluyendo la modificación del actual contrato de agencia de garantías y suscripción de un nuevo contrato de agencia de garantías.

8. Ratificación de los actos o contratos otorgados con motivo de la negociación de la restructuración de la Sociedad y que tengan el carácter de operaciones entre partes relacionadas.

## XIII.    VIGENCIA DE LOS ACUERDOS.

El Directorio resolvió que los acuerdos adoptados en la presente sesión producirán sus efectos una vez que el acta que de ella se levante sea firmada por todos los directores asistentes, sin que sea necesaria su aprobación por sesión de directorio posterior.

## XIV.    REDUCCIÓN A ESCRITURA PÚBLICA.

El Directorio acordó facultar a uno cualquiera de los señores Elena Yubero Goncalves, Francisco Javier Illanes Munizaga, Sergio Balharry Rovegno y Cristóbal Morales Deik para que uno cualquiera de ellos actuando individualmente, reduzca a escritura pública todo o parte del acta que se levante de esta sesión de Directorio, así como facultar al portador de copia autorizada de dicha escritura para requerir las inscripciones, subinscripciones y anotaciones que se estimen convenientes.

## XV.    CIERRE DE LA SESIÓN.

El Presidente señala que, si ningún director desea mayor información o hacer uso de la palabra, se pondrá término a esta sesión.

Se ofrece la palabra.  Nadie hace uso de la palabra.

No habiendo otras materias que tratar, se levanta la sesión siendo las 17:00  horas.


_____
Ricardo Lessmann Cifuentes
Presidente

_____
Manuel Baumann


_____
Fernando de Solminihac Tampier

_____
Tomás Casanegra Rivera


_____
Klaus Winkler Speringer

_____
Donald Mackenzie


_____
Aurelio García-Miró

_____
Elena Yubero Goncalves
Secretario

## XV.   CIERRE DE LA SESIÓN.

El Presidente señala que, si ningún director desea mayor información o hacer uso de la palabra, se pondrá término a esta sesión.

Se ofrece la palabra. Nadie hace uso de la palabra.

No habiendo otras materias que tratar, se levanta la sesión siendo las 17:00 horas.


_____
**Ricardo Lessmann Cifuentes**
**Presidente**

_____
**Manuel Baumann**


_____
**Fernando de Solminihac Tampier**

_____
**Tomás Casanegra Rivera**


_____
**Klaus Winkler Speringer**

_____
**Donald Mackenzie**


_____
**Aurelio García-Miró**

_____
**Elena Yubero Goncalves**
**Secretario**

## XV.  CIERRE DE LA SESIÓN.

El Presidente señala que, si ningún director desea mayor información o hacer uso de la palabra, se pondrá término a esta sesión.

Se ofrece la palabra.  Nadie hace uso de la palabra.

No habiendo otras materias que tratar, se levanta la sesión siendo las 17:00  horas.


<table>
<tr><td>_____<br>**Ricardo Lessmann Cifuentes**<br>**Presidente**</td><td>_____<br>**Manuel Baumann**</td></tr>
<tr><td>_____<br>**Fernando de Solminihac Tampier**</td><td>_____<br>**Tomás Casanegra Rivera**</td></tr>
<tr><td>_____<br>**Klaus Winkler Speringer**</td><td>_____<br>**Donald Mackenzie**</td></tr>
<tr><td>_____<br>**Aurelio García-Miró**</td><td>_____<br>**Elena Yubero Goncalves**<br>**Secretario**</td></tr>
</table>

## XV.   **CIERRE DE LA SESIÓN**.

El Presidente señala que, si ningún director desea mayor información o hacer uso de la palabra, se pondrá término a esta sesión.

Se ofrece la palabra.  Nadie hace uso de la palabra.

No habiendo otras materias que tratar, se levanta la sesión siendo las 17:00  horas.

|  |  |
|---|---|
| **Ricardo Lessmann Cifuentes**<br>**Presidente** | **Manuel Baumann** |
| **Fernando de Solminihac Tampier** | **Tomás Casanegra Rivera** |
| **Klaus Winkler Speringer** | **Donald Mackenzie** |
| **Aurelio García-Miró** | **Elena Yubero Goncalves**<br>**Secretario** |

## XV.    CIERRE DE LA SESIÓN.

El Presidente señala que, si ningún director desea mayor información o hacer uso de la palabra, se pondrá término a esta sesión.

Se ofrece la palabra.  Nadie hace uso de la palabra.

No habiendo otras materias que tratar, se levanta la sesión siendo las 17:00  horas.

| | |
|---|---|
| **Ricardo Lessmann Cifuentes**<br>**Presidente** | **Manuel Baumann** |
| **Fernando de Solminihac Tampier** | **Tomás Casanegra Rivera** |
| **Klaus Winkler Speringer** | **Donald Mackenzie** |
| **Aurelio García-Miró** | **Elena Yubero Goncalves**<br>**Secretario** |

**Anexo A: Listado de Garantías**

El Directorio acordó facultar a uno cualquiera de los señores Elena Yubero Goncalves, Francisco Javier Illanes Munizaga, Sergio Balharry Rovegno y Cristóbal Morales Deik para que uno cualquiera de ellos actuando individualmente, reduzca a escritura pública todo o parte del acta que se levante de esta sesión de Directorio, así como facultar al portador de copia autorizada de dicha escritura para requerir las inscripciones, subinscripciones y anotaciones que se estimen convenientes.

## XV. CIERRE DE LA SESIÓN.

El Presidente señala que, si ningún director desea mayor información o hacer uso de la palabra, se pondrá término a esta sesión.

Se ofrece la palabra. Nadie hace uso de la palabra.

No habiendo otras materias que tratar, se levanta la sesión siendo las 17:00 horas.

<table>
<tr><td>Ricardo Lessmann Cifuentes<br>Presidente</td><td>Manuel Baumann</td></tr>
<tr><td>Fernando de Solminihac Tampier</td><td>Tomás Casanegra Rivera</td></tr>
<tr><td>Klaus Winkler Speringer</td><td>Donald Mackenzie</td></tr>
</table>

{C-0850566/VSS/v.22}                    16

**XV.    CIERRE DE LA SESIÓN.**

El Presidente señala que, si ningún director desea mayor información o hacer uso de la palabra, se pondrá término a esta sesión.

Se ofrece la palabra.  Nadie hace uso de la palabra.

No habiendo otras materias que tratar, se levanta la sesión siendo las 17:00  horas.

_____
**Ricardo Lessmann Cifuentes**
**Presidente**

_____
**Manuel Baumann**

_____
**Fernando de Solminihac Tampier**

_____
**Tomás Casanegra Rivera**

_____
**Klaus Winkler Speringer**

_____
**Donald Mackenzie**

_____
**Aurelio García-Miró**

_____
**Elena Yubero Goncalves**
**Secretario**

**Anexo A: Listado de Garantías**

## EXHIBIT A

## COLLATERAL FOR DIP CREDIT FACILITY

*The following summary supplements the terms of the Term Sheet and the Restructuring Term Sheet to which it is attached, outlines certain terms relating to the grant of DIP Liens, and does not reflect all of the terms, conditions, representations, warranties, and other provisions that would be set forth in definitive documentation relating to such DIP Liens to be reflected in the DIP Loan Documents. This summary is qualified in its entirety by such DIP Loan Documents. The Company and its Subsidiaries acknowledge and agree that to the extent required by applicable law they will execute such DIP Loan Documents as are required to grant the DIP Liens on the assets and the terms outlined herein including where necessary, following the initial execution of DIP Loan Documents to grant such DIP Liens to secure the DIP Credit Facility, the execution of additional DIP Loan Documents or the execution of amendments or supplements to previously executed DIP Loan Documents in order to secure the obligations under the DIP Credit Facility. Notwithstanding anything herein to the contrary, (i) the DIP Orders shall provide that each of the Debtors shall be deemed to grant priming liens in favor of the collateral agent under the DIP Credit Facility over all Prepetition Pledged Assets pledged by the Debtors and first priority liens in favor of the collateral agent under the DIP Credit Facility over all unencumbered assets of the Debtors (regardless of where any such assets are located) and (ii) each of the Pledgors shall grant liens in favor of the collateral agent under the DIP Credit Facility over all Prepetition Pledged Assets pledged by the Pledgors, which liens shall be pari passu to the liens granted by the Pledgors to the collateral agent under the 2025 Notes Indenture. Capitalized terms used but not defined herein shall have the meanings given such terms in the Term Sheet.*

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| **Chile** | 1. **Priming lien**: <br>    o The Chilean collateral agency agreement will be amended to reflect that the local collateral agent (TMF Chile) is authorized to use the proceeds to pay the DIP Lenders with preference over the 2025 Notes Indenture bondholders. <br>    o There will be one public deed amending the definition of "Secured Obligations" from the Chilean collateral documents is extended to include the DIP Loan documents. <br>    o However, this amendment will not be registered in public registries in Chile. The registration process in Chile would take a long time (i.e. mortgages), it is likely that the registration would not be completed before exiting the Chapter 11 proceeding. In case an event of default occurs, the DIP Lenders' collateral agent will be entitled to request the registration of the collateral. <br>    o A new Collateral Agency Agreement will be executed for purposes of the DIP Credit Facility collateral documents. <br><br> 2. **Vehicles**: <br>    o Floating pledge without conveyance (*prenda sin desplazamiento flotante*) over vehicles inventory, with carve-outs for (i) inventory pledged to Banco Santander and BTG; (ii) vehicles under consignment with dealers (*vehículos en consignación a concesionarios*); (iii) vehicles financed by Hyundai Corp.; and |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | (iv) inventory to be pledged to new financing providers (if any). |
| | o Within one (1) business day after closing, pledge to be filed for registration in the *Registro de Prenda Sin Desplazamiento.* |
| | o Absent an event of default and subject to the terms of the DIP Loan Documents, AG should be able to: (i) sell cars in the ordinary course of business; (ii) grant those assets as collateral to Banco Santander- Chile and BTG; and (iii) grant those assets as collateral to local banks or new creditors for working capital. |
| | o AG to provide periodical reports as of the value of the inventory subject to the floating pledge (for example, every two weeks). |
| | o In respect of inventory consisting of used vehicles, no registration of the pledge in the National Motor Vehicles Registry *(Registro Nacional de Vehículos Motorizados)* shall be made absent an event of default. Upon an event of default, the DIP Lenders' collateral agent will have the authority to require the registration of the pledge in the National Motor Vehicles Registry *(Registro Nacional de Vehículos Motorizados)* without AG's consent. |
| | 3. **Accounts**: |
| | o Pledge without conveyance over all bank accounts (*Prenda sin desplazamiento sobre dinero*), except for a new CL$ denominated account to be opened in Banco Santander (which will hold a maximum of $5 mm to support existing working capital lines). |
| | o Within one (1) business day after closing, pledge to be filed in the *Registro de Prenda Sin Desplazamiento.* |
| | o Santander accounts: AG will pledge the US$ account and the CL$ account but will open the new CL$ account where the Company will keep US$5 MM free of liens. |
| | o Absent an event of default, AG shall be able to use these funds in the ordinary course of business. |
| | 4. **Accounts receivable**: |
| | o Pledge without conveyance over accounts receivable (*Prenda sin desplazamiento sobre créditos*). |
| | o Within one (1) business day after closing, pledge to be filed for registration in the *Registro de Prenda Sin Desplazamiento.* |
| | o To be implemented periodically (e.g. every month) regarding all new accounts receivable for each period. AG will have an obligation to execute these pledges periodically. |
| | o No debtor shall be notified of the pledge absent an event of default. Upon an event of default, the DIP Lenders' collateral agent will have the authority to notify the debtors of the pledged accounts without AG's consent. |
| | o Absent an event of default, AG shall be empowered to collect such accounts and use the proceeds in the ordinary course of |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | business. |
| | o   Also absent an event of default, AG will be entitled to sell and assign invoices in factoring transactions (with or without recourse) subject to the terms of the DIP Loan Documents. The pledge over those invoices shall be automatically released for these purposes. Such factoring shall be reflected in and limited by the approved budget under the DIP Facility. |
| | 5.  **Leaseback agreements**: (lessor's prior consent required) |
| | o   If lessor's consent is obtained, pledge without conveyance over AG's purchase option in its leaseback agreements with Banco Internacional and Tanner (*prenda sin desplazamiento sobre derechos*). No pledge will be granted if consent is not obtained. |
| | o   The current leaseback agreements require lessor's prior consent for pledging the purchase option. |
| | o   Within one (1) business day after closing, file for registration in the *Registro de Prenda Sin Desplazamiento*. |
| **Uruguay** | 1.  **Priming lien**: |
| | o   Current trust agreement (*fideicomiso*) will be amended to provide that the assets under the property of the trust will also secure the DIP Loan Documents. The current trustee (*fiduciario*) will act as trustee for both the DIP Lenders and the 2025 Notes Indenture bondholders. |
| | o   Further, the trust agreement will provide that in case of enforcement the trustee shall act according to the beneficiary´s (TMF New York) instructions. As collateral agent, the beneficiary will proceed as indicated under the Intercreditor Agreement. |
| | o   Within one (1) business day after closing, the amendment to the trust agreement shall be filed for registration in the appropriate public registry, *provided however*, that to the extent there exists any expected delays caused in light of COVID restrictions, the timing for such filing shall be determined prior to execution based on availability at such time. |
| | 2.  **Vehicles**: |
| | o   Two different agreements will create this security interest: |
| | (A) a specific vehicle pledge agreement (Pledge without conveyance - *prenda sin desplazamiento)* for the cars with plates (vehicles that are fixed assets -with car plates- but not inventory of the company). Used cars and demos shall not be covered by any pledge; |
| | (B) a Pledge without conveyance (*prenda sin desplazamiento*) creating a floating pledge over (i) not customs cleared vehicles |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | located inside the port of Montevideo or out of such port in one or more specific warehouses (as equipment); (ii) customs cleared vehicles under exhibition (without car plate, as equipment) located in specific exhibition locations.<br><br>o  Filing for registration of the floating charge agreement and vehicles pledge in the appropriate public registry will be determined prior to execution based on availability at the time. Definitive registration may take up to 150 days.<br>o  To avoid obstructing ordinary course of business, DIP Lenders' collateral agent shall grant AG a power of attorney to move the vehicles between warehouses and release pledges of sold vehicles (under the pledge referred to in A) above). The power of attorney would terminate upon an event of default.<br>o  Cars without plates which are pledged (under the floating charge) do not require release from the DIP Lenders and the security interest will automatically expire when the car is taken out of warehouses and/or exhibition locations for the purpose of being sold by AG.<br>o  The not cleared vehicles list (under a pledge) will be updated each 15 days to reflect the vehicles that enter and come out of the referred warehouses and exhibition locations.<br>o  Absent an event of default, AG should be able to: (i) sell cars in the ordinary course of business; and (ii) grant the cars as collateral to existing creditors or new creditors for working capital, under a first priority lien as long as this is permitted under the DIP Credit Agreement.<br><br>3.  **Accounts**:<br>o  Pledge over bank accounts (*Prenda sobre cuentas bancarias*).<br>o  Absent an event of default, AG shall be able to use these funds in the ordinary course of business.<br>o  This pledge does not need to be registered.<br>o  This pledge will be originally executed by the relevant company and TMF Uruguay. After the execution of the pledge, banks will execute an annex giving their consent to the terms and conditions of the pledge, within the timeframe set forth below.<br>o  In case any of the accounts banks do not give its consent within 10 business days following the execution of the RSA and no later than 2 business days after the DIP Closing Date, the relevant company shall have a term of 5 business days to select one of the already existing bank accounts and transfer the assets from the non-consenting accounts bank to the consenting accounts banks. Should none of the existing accounts bank give its consent, then AG shall open a new bank account, with the consent of the Lenders within 15 business days following the date of the |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | execution of the RSA. In case no accounts bank accedes to the pledge agreement in the afore-said term, an Event of Default under the DIP Credit Agreement shall occur.<br><br>4. **Accounts receivable**:<br>  o  Factoring agreement over all of the accounts receivable, which will be implemented as a master assignment of receivables, will include all receivables generated as of closing and thereafter. The receivables (and payment documents, such as checks, etc.) that correspond to an operation, can be substituted by other receivables (and payment documents such as checks, etc.) that correspond to the same operation.<br>  o  The master assignment does not require registration.<br>  o  No account debtor shall be notified of the pledge absent an event of default.  Upon an event of default, in order to enforce the assignment, the collateral agent will notify account debtors to collect the receivables.<br>  o  Absent an event of default, AG shall be empowered to collect such accounts and use the proceeds in the ordinary course of business subject to the approved budget.<br>  o  Also absent an event of default, AG will be entitled to sell and assign invoices in factoring transactions, subject to the approved budget and the terms of the DIP Loan Documents. The pledge over those invoices shall be automatically released for these purposes. |
| **Peru** | No new collateral will be granted, only the *pari passu* lien and a priming lien over certain shares owned by AG Chile and AG Créditos as further described below.<br><br>• The existing trust agreement (*fideicomiso*) shall be amended to reflect: (i) that the assets conforming the trust estate will also secure the DIP Loan Documents; (ii) the lien in favor of the DIP Lenders will be pari passu with the liens on the assets pledged under the 2025 Notes Indenture bondholders, except for the lien over the shares in AG Peru owned by AG Chile and AG-Créditos which is further described in (iii) below (for the avoidance of doubt, the interests in such pari passu shared collateral and proceeds thereof shall be applied pro-rata); and (iii) the lien in favor of the DIP Lenders over the shares in AG Peru owned by AG Chile and AG-Créditos will be senior over the liens on the assets pledged under the 2025 Notes Indenture (for the avoidance of doubt, the proceeds from the foreclosure of the shares in AG Peru will be used to pay first any outstanding obligation owed to the DIP Lenders, and the remaining proceeds (if any) will be used to pay any outstanding obligation owed to the bondholders.<br><br>• This amendment of the trust agreement must be executed through a public |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | deed, which shall be recorded in the public registry entry of each of the properties transferred in trust; for the other assets subject to the trust agreement (i.e. shares, insurance policies, etc.) the amendment to the trust agreement shall be also recorded in the public Peruvian Contracts Agreement Registry (*Registro Mobiliario de Contratos*) and in the relevant share ledgers of the applicable companies (i.e. AGP, MANASA and Motor Mundo).<br><br>• Within one (1) business day after signing, the amendment will be filed by Notary Public with the relevant Public Registries (*Registro de la Propiedad Inmueble y Registro Mobiliario de Contratos*). The Company will have the obligation to complete the registration process within a term of 30 business days following signing, provided that this term will be automatically renewed for an additional 30 days period in case the applicable registry office raises any issues with respect to the filing, and provided that the grantors of the trust perform all actions required to address and solve the issues raised by the registry office. The amendment will be valid and effective between the parties as from its signing date, and it will be enforceable against third parties upon the registration in the Public Registries. |
| **Costa Rica** | 1. Liens:<br>   o Mortgage Notes (Cédulas Hipotecarias):<br>      ▪ A new endorsement of the Note shall be executed since currently TMF is only representing the bondholders under the 2025 Notes Indenture. This new endorsement should add as secured obligations the obligations under the new DIP Loan documents and that the notes granted in favor of the DIP Lenders will be pari passu to the notes under the 2025 Notes Indenture bond holders. Auction in case of event of default. Base auction price shall be the nominal value of the notes. Foreclosure proceeds to be distributed by TMFCR according to Intercreditor Agreement.<br><br>   o Movable Secured Collateral Agreement (Garantía Mobiliaria) of Shares of Costa Rican Subsidiaries:<br>      ▪ Current movable secured collateral agreement will be amended to provide that the collateral will also secure the DIP Loan Documents and that the liens granted in favor of the DIP Lenders will have first priority priming liens over the liens granted under the 2025 Notes, and to update amount secured. Pursuant to the digital system of the Costan Rican National Registry, they will not be pari-passu for purposes of third parties.<br>      ▪ Even if TMFCR is the beneficiary for purposes of the DIP Loan Documents, it will be necessary to register a |

6

| JURISDICTION | DESCRIPTION OF COLLATERAL<br>AND IMPLEMENTATION |
|---|---|
| | new separate moveable secured collateral agreement to secure the DIP Loan Documents. The amount secured shall be the equity of the Costa Rican subsidiaries according to CPA certification.  Auction in case of event of default. Base auction price shall be the amounts secured.<br>▪ TMFCR to distribute auction proceeds to the DIP Lenders or exercise voting rights in Costa Rican Subsidiaries on behalf of the DIP Lenders. At closing, entries shall be inserted and signed in the share certificates and registries of shareholders of the Costa Rican Subsidiaries to reflect the priming lien in favor of the DIP Lenders in accordance with the Intercreditor Agreement.<br>▪ Within one (1) business day after closing, the Amendment to the current movable secured collateral agreement and new moveable secured collateral agreement shall be filed and registered with the National Registry of Costa Rica (Registro Nacional de Costa Rica).  This registration is to be executed by TMFCR.<br><br>2. First Priority Lien on Vehicles.<br> o Common pledge on recorded /used vehicles (garantía prendaria tradicional). Within one (1) day after closing, file and register the common pledge at the National Registry of Costa Rica (Registro Nacional de Costa Rica). The registration procedure could be taken 2 weeks. This registration is to be executed by TMFCR.<br> o Movable Secured Collateral Agreement (Garantía Mobiliaria) on the bills of lading representing new vehicles. However, absent an event of default, the Costa Rican Subsidiary will be able to keep 1 bill of lading in order to continue with the ordinary course of the business. For the avoidance of doubt, this bill of lading will not be endorsed to TMFCR and will not have any reference to the movable guaranty.<br> o Within one (1) day after closing, file and register the pledge and movable guaranty with the National Registry of Costa Rica (Registro Nacional de Costa Rica). This registration is to be executed by TMFCR.<br> o Absent an event of default, AG should be able to: (i) use 1 bill of lading representing same vehicles as evidence of ownership, pay import duties, and release and sell vehicles in the ordinary course of business; and (ii) release and grant those assets as collateral to existing creditors or new creditors for working capital.<br> o Requires release each time a used vehicle is sold. A power of attorney to be granted to one or more representatives appointed by AG Costa Rica to release pledge of: (a) sold vehicles, or (b) |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
|  | vehicles to be pledged to secure inventory debt; provided however, that the rights under the Power of Attorney will automatically terminate upon either (i) an Event of Default under the DIP Credit Agreement, (ii) if the sale or pledge of the inventory would cause a Priority Collateral Coverage Failure (as defined in the DIP Term Sheet), or (iii) if AG does not provide monthly updates of the assets sold or acquired, income/cash deposited in the bank accounts in Costa Rica.<br>○ Common pledge and Movable Secured Collateral Agreement should be updated every 30 days to include and exclude vehicles/bills of lading, and respectively registered.<br>○ Amounts secured will be those at the time the common pledge and movable secured collateral agreement are executed and subsequently updated.<br>○ Auction in case of event of default.<br>○ Base auction prices shall be values of individual vehicles.<br><br>3.  First Priority Lien on Bank Accounts.<br>○ Movable Secured Collateral Agreement (Garantía Mobiliaria).<br>○ Lien only on bank accounts and cash flow related with those bank accounts.<br>○ Within one (1) day after closing, file and register the agreement with the National Registry of Costa Rica (Registro Nacional de Costa Rica). This registration is to be executed by TMFCR.<br>○ Absent an event of default, funds may be used in the ordinary course without need for consent or minimum balance, subject to the Credit Agreement.<br>○ The Costa Rican Subsidiaries shall execute and deliver a notice to TMFCR on the closing date, which notice will be delivered to the respective banks for the banks to execute an agreement to disburse funds upon an event of default, according to instructions from TMFCR.  Costa Rican Subsidiaries shall have 2 weeks from closing to sign agreements with the respective banks, and such 2 weeks term can be renewed by mutual agreement of the Costa Rican Subsidiaries and TMFCR.<br>○ For purposes of applicable taxes, amount secured shall be average balance in bank accounts of the previous 12 months.<br>○ No auction.<br><br>4.  First Priority Lien on Accounts receivable.<br>○ Movable Secured Collateral Agreement (Garantía Mobiliaria).<br>○ Within one (1) day after closing, file and register the lien with the National Registry of Costa Rica (Registro Nacional de Costa Rica). This registration is to be executed by TMFCR.<br>○ Accounts receivable will not be assigned to TMFCR.<br>○ No debtor or payer shall be notified of the lien absent an event of |

| JURISDICTION | DESCRIPTION OF COLLATERAL AND IMPLEMENTATION |
|---|---|
| | default. The Costa Rican Subsidiaries shall execute and deliver a notice to TMFCR on the closing date, indicating the accounts receivable are the object of a Movable Secured Collateral agreement granted to TMFCR, and that upon an event of default, accounts receivable shall be considered as assigned to TMFCR, which notice will be held by TMFCR until the occurrence of an Event of Default, at which time such notice will be delivered to account debtors and payors. <br> ○ Absent an event of default, Costa Rican Subsidiaries shall be empowered to collect such accounts and use the proceeds in the ordinary course of business subject to the approved budget. <br> ○ Also absent an event of default, Costa Rican subsidiaries will be entitled to sell and assign invoices in factoring transactions subject to the approved budget (or otherwise with prior written consent of the DIP Lenders). The lien over those accounts receivable shall be automatically released for these purposes. <br> ○ For purposes of applicable taxes, amount secured shall be value of accounts receivable at the time of closing or updates of accounts receivable. <br> ○ Lien shall be updated every 30 days to include and exclude accounts receivable. <br> ○ Accounts receivable may be auctioned in case of event of default, and auction base shall be amount secured. |
| **Brazil** | No new collateral will be granted, only the priming lien. <br><br> **Priming lien**: <br> • Current Fiduciary Sale Agreement and Guaranty Agreement will be amended to provide that the collateral will also secure the DIP Loan Documents. <br><br> • Further, the Fiduciary Sale Agreement and Guaranty Agreement will provide a payment waterfall in terms that the DIP Lenders shall be paid with preference to any payment to the 2025 Notes Indenture bondholders. <br><br> • Within two (2) business days after closing, the Amendment needs to be filed online with the Registry of Deeds and Documents (*Registro de Títulos e Documentos*). It will take approximately a week to receive acknowledgement/receipt from the registry, but the effective date of perfection is the date of the online filing. |

**<u>EXHIBIT D</u>**

**FORM OF SHAREHOLDERS MEETING NOTICE**

**AUTOMOTORES GILDEMEISTER SpA**
**SOCIEDAD POR ACCIONES**

**JUNTA EXTRAORDINARIA DE ACCIONISTAS**

Por acuerdo del Directorio de Automotores Gildemeister SpA ("**Sociedad**") se cita a Junta Extraordinaria de Accionistas para el día 9 de abril de 2021, a las 11:00 horas, a realizarse en las oficinas de la Sociedad ubicadas en Avenida Las Condes N° 11.000, comuna de Vitacura, Santiago.

Las materias a tratar en esta junta extraordinaria de accionistas serán las siguientes:

1. Informar sobre la situación legal, económica y financiera de la Sociedad; y la eventual aprobación por la Junta de una o más operaciones relacionadas con una nueva estructura de capital de la Sociedad.

2. Informar y pronunciarse sobre la propuesta de realizar las siguientes modificaciones de los estatutos sociales: (i) la modificación de las reglas de conversión automática de las acciones de las Series C y D de la Sociedad; (ii) la modificación de las reglas de revocación automática del directorio de la Sociedad; y (iii) permitir, en ciertos casos, la capitalización en especie sin la necesidad de contar con un informe de peritos, bastando a este respecto la aprobación de la mayoría de las acciones de la Serie A.

3. Informar y pronunciarse sobre la propuesta de realizar las siguientes modificaciones de los estatutos sociales sujetas al éxito del proceso de restructuración de la Sociedad:
   a. Conversión automática de las acciones preferentes de las Series C y D por acciones Serie A y B, respectivamente.
   b. Eliminar las series de acciones en la Sociedad.
   c. Modificar el capital de la Sociedad en dos etapas, primeramente disminuirlo hasta el monto de 241.665.967.987 pesos o aquel que determine la Junta Extraordinaria de Accionistas, mediante la absorción de pérdidas y en segundo lugar aumentarlo, desde la suma que en que se disminuyó previamente, en la suma equivalente de hasta 217 millones de dólares o la que determine la Junta Extraordinaria de Accionistas.
   d. Modificar los términos del derecho de recompra de acciones de la Sociedad.
   e. Modificar la fecha de ejercicio de las opciones preferentes de suscripción de acciones de la Serie A y B.
   f. Eliminar referencias a las operaciones relativas a los canjes de bonos de los años 2016 y 2019.

4. De aprobarse las materias discutidas anteriormente, efectuar las modificaciones a los estatutos sociales que resulten pertinentes para incorporar los acuerdos adoptados por

la Junta Extraordinaria de Accionistas con motivo de los asuntos anteriores, acordando un nuevo texto refundido de los estatutos sociales.

5. Acordar un nuevo texto simplificado de los estatutos de la Sociedad, el que entrará en vigencia sujeto a ciertas condiciones.

6. Informar sobre ciertas materias relacionadas con el pacto de accionistas de la Sociedad.

7. Aprobación del otorgamiento de las garantías requeridas para garantizar una eventual nueva emisión de bonos y la aprobación del otorgamiento de las garantías requeridas para garantizar el financiamiento a ser otorgado por diversos acreedores.

8. Ratificación de los actos o contratos otorgados con motivo de la negociación de la restructuración de la Sociedad y que tengan el carácter de operaciones entre partes relacionadas.

## PARTICIPACIÓN EN LA JUNTA Y CALIFICACIÓN DE PODERES

Podrán participar en la Junta anteriormente indicada, con los derechos que la ley y los estatutos sociales les otorgan, los titulares de acciones inscritas en el Registro de Accionistas al momento del inicio de la Junta.

La calificación de poderes para la Junta, si procediere, se efectuará el mismo día y lugar de la Junta, entre las 10:30 horas y la hora de su inicio.

LA GERENCIA

AvisosLegales

**EXHIBIT E**

**FORM OF REQUIRED AMENDMENTS**

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

### JUNTA EXTRAORDINARIA DE ACCIONISTAS

### DE

### AUTOMOTORES GILDEMEISTER SpA

En Santiago de Chile, a [•] de [•] de [•], siendo las [•] horas, en Avenida Las Condes N°11.000, comuna de Vitacura, Santiago, Chile, se reúne la Junta Extraordinaria de Accionistas de la sociedad **Automotores Gildemeister SpA** (la "Sociedad").

**1.- ASISTENCIA.**

Asisten a la Junta los siguientes accionistas, titulares del número de acciones y representados, en su caso, por las personas que a continuación se indica para cada uno de ellos:

1.1.    Un 100% de las acciones de la Serie A emitidas por la Sociedad, representadas por:

    **a)**    Minvest S.A., titular de 1.050.000 acciones, representado por don [•].

1.2.    Un [•]% de las acciones de la Serie C emitidas por la Sociedad, representadas por:

    **a)**



*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

**p)** ███████████████████████████████

En consecuencia, se encuentran presentes accionistas titulares de la cantidad de [•] acciones, todas de una misma y única serie y que se encuentran totalmente suscritas y pagadas, que corresponden a la [totalidad] de las acciones emitidas por la Sociedad, según se acredita con el Registro de Accionistas que se tuvo a la vista.

**2.- <u>MESA</u>.**

Presidió la reunión el [Presidente don Ricardo Lessmann Cifuentes], y como Secretaria especialmente designada al efecto, doña Elena Yubero Goncalves.

**3.- <u>CALIFICACIÓN DE PODERES</u>.**

Revisados los poderes presentados por los representantes de los accionistas, se estima que los mismos se encuentran ajustados a derecho. Se deja expresa constancia que ni el directorio ni ningún accionista solicitó por escrito que se efectuara un procedimiento de calificación de los poderes. En razón de lo anterior, la Junta, por unanimidad de los presentes en la sala, acordó tener tales poderes por aceptados, sin perjuicio de lo cual ellos se mantendrán archivados en la Sociedad.

**4.- <u>CONSTITUCIÓN LEGAL DE LA JUNTA</u>.**

Previo a referirse a las materias propias de la Junta, el Presidente recordó a los accionistas presentes que Automotores Gildemeister SpA es una sociedad por acciones y no una sociedad anónima abierta y que, por lo tanto, ni las acciones ni las opciones preferentes de suscripción de acciones de la Serie A y de la Serie B en la Sociedad (los "<u>Warrants</u>") se encuentran registrados en la Comisión para el Mercado Financiero, ni en registros públicos ni en bolsas de valores, sea en Chile o en el extranjero. Indicó asimismo que ni las acciones ni los Warrants pueden ser transados en condiciones que constituyan una oferta pública de valores en Chile.

Según los antecedentes que se tuvieron hasta ese momento, se encontraba acreditada la concurrencia de 1.050.000 acciones Serie A y [•] acciones Serie C, que equivalen al 100% de las acciones Serie A y a un [•]% de las acciones Serie C, respectivamente, de manera que existió un quórum suficiente para declarar válidamente constituida la presente Junta Extraordinaria de Accionistas. Concluido lo anterior, el Presidente declaró legalmente constituida la Junta.

**5.- <u>FORMALIDADES PREVIAS A LA CELEBRACIÓN DE LA JUNTA</u>.**

El Presidente, exhibiendo en su caso los antecedentes respectivos, solicita que se deje expresa constancia en el acta del cumplimiento de las siguientes formalidades, que de conformidad

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

con la legislación y estatutos sociales, son necesarias para la celebración de esta Junta Extraordinaria de Accionistas:

**a)**     La presente Junta fue convocada por acuerdo del Directorio de la Sociedad adoptado con fecha 22 de marzo de 2021.

**b)**  La citación a los señores accionistas de la Serie A, Serie C y Serie D se despachó oportunamente de conformidad a las normas legales aplicables, con fecha [•].

**c)**  Por otra parte, los avisos de citación fueron publicados en el diario [•] en tres ocasiones en los días [•], [•] y [•] de [•] del presente año.

**d)**  El Presidente propuso a los accionistas omitir la lectura del aviso y la carta de convocatoria a la presente Junta, sin perjuicio que se incorporarían en el acta de la Junta.

**e)**  La Junta, por unanimidad de los presentes, acordó omitir la lectura del aviso y la carta de convocatoria a la presente Junta, sin perjuicio de ser incorporados al final del acta de la presente Junta.

**f)**  Con la misma fecha en que los avisos fueron publicados en los diarios, se publicó el aviso de citación en la página web de la Sociedad, el que se mantuvo en tal página hasta la fecha de la Junta.

**g)**  Participaron en esta Junta los accionistas inscritos en el respectivo registro al momento de iniciarse la presente asamblea.


## 6.- <u>NOTARIO PÚBLICO.</u>

En cumplimiento a lo dispuesto en el artículo cincuenta y siete de la Ley sobre Sociedades Anónimas, se encuentra presente en la reunión, desde su inicio, el Notario Público de Santiago [don/doña] [•], quien asistirá a todo su desarrollo y practicará la certificación ordenada por la ley.

## 7.- <u>FIRMA DEL ACTA.</u>

A continuación, el Presidente indicó que correspondía, de acuerdo con el artículo 72 de la LSA, proceder a designar a 3 accionistas que, junto con el Presidente y el Secretario, firmarían el acta de la presente asamblea.

El Presidente propuso designar a 4 accionistas presentes en la Junta, para que a lo menos 3 cualesquiera de ellos firmen el acta respectiva.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

Por la unanimidad de los accionistas presentes, la Junta designó a los siguientes accionistas, de modo que con la firma de 3 cualesquiera de ellos, junto a la firma del Presidente y Secretario, se tenga por aprobada el acta de la Junta:

    i.    Minvest S.A.;
   ii.    [•];
  iii.    [•]; y
  iv.    [•].

## 8.- <u>SISTEMA DE VOTACIÓN</u>.

El Presidente informó que, de conformidad con lo dispuesto en el artículo 62 de la Ley N° 18.046, "*Las materias sometidas a decisión en la Junta deberán llevarse individualmente a votación, salvo que, por acuerdo unánime de los accionistas presentes con derecho a voto, se permita omitir la votación de una o más materias y se proceda por aclamación*", por lo que propuso a la Junta de Accionistas proceder a votar por aclamación cada una de las materias sometidas al pronunciamiento de la Junta, sin perjuicio del derecho de los accionistas, que así lo deseen, de solicitar que su voto quede debidamente consignado en el acta.

Al efecto, la unanimidad de los accionistas presentes acordó, de conformidad con lo establecido en el artículo 62 de la Ley 18.046 y en el artículo 119 del Reglamento de Sociedades Anónimas, que todas las materias que se sometan a la decisión de la Junta fueran resueltas por aclamación.

## 9.- <u>TABLA</u>.

El Presidente procedió a dar lectura a las materias para las cuales había sido citada la Junta y que fueron las siguientes:

    (i)    Informar sobre la situación legal, económica y financiera de la Sociedad, y en especial sobre los términos y condiciones de la operación de reestructuración del pasivo y de la estructura de capital de la Sociedad a que se refiere el documento denominado *Restructuring Support Agreement* negociado con el comité de acreedores constituido por tenedores de una mayoría de los bonos actualmente vigentes de la Sociedad emitidos mediante contrato en idioma inglés denominado "Indenture – 7,5% Notes due 2025" (el "<u>Grupo Ad Hoc</u>"), el que contiene los términos y condiciones bajo los cuales el Grupo Ad Hoc (el "<u>Plan Term Sheet</u>") apoyará la realización de una operación de reestructuración (el "<u>Plan</u>") a ser implementada mediante un procedimiento en los Estados Unidos de América conforme a las disposiciones del Capítulo 11 del *Bankruptcy Code* de dicho país, en su variante *prepackaged* (el "<u>Prepack Chapter 11</u>"), (en adelante, el Restructuring Support Agreement y sus anexos referidos conjuntamente como el "<u>RSA</u>"). Tal operación de

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

restructuración (en adelante, la "<u>Transacción</u>") fue aprobada por el Directorio de la Sociedad con fecha 22 de marzo de 2021.

(ii)    Informar y pronunciarse sobre las modificaciones de los estatutos sociales contempladas en el RSA, las cuales son necesarias para someter a la Sociedad a un *Prepack Chapter 11* de acuerdo a los términos que establece RSA y el Plan Term Sheet. Estas modificaciones estarán sujetas a la condición resolutoria de que el RSA no sea terminado con anterioridad al "Plan Effective Date" según dicho término se define en el Plan Term Sheet: (a) Modificación de la fecha de conversión automática de las acciones de la Serie C y Serie D de la Sociedad, de acuerdo a lo dispuesto en el artículo Décimo de los estatutos sociales de manera que ésta ocurra sólo en la fecha efectiva de reorganización a ser propuesta en el Prepack Chapter 11; (b) modificación de las reglas de conversión automática de acciones de la Serie C y Serie D de la Sociedad en los eventos y casos señalados en los literales (ii), (iii) y (iv) del numeral Uno del artículo Décimo de los estatutos sociales; (c) modificación de la revocación automática del directorio de la Sociedad, de acuerdo a lo contemplado en el numeral Tres del artículo Décimo de los estatutos sociales; y (d) capitalización de los bonos emitidos por la Sociedad en la fecha efectiva del plan de reorganización sin la necesidad de contar con un informe de peritos, bastando a este respecto la aprobación de la mayoría de las acciones de la Serie A.

(iii)    Informar y pronunciarse sobre las siguientes modificaciones adicionales de los estatutos sociales, contempladas en el RSA y sujetas a la condición suspensiva consistente en que se verifique el *Plan Effective Date*:

-    En la fecha del Plan Effective Date, conversión automática de las acciones preferentes de las Series C y D en acciones Serie A y B.
-    Eliminar las series de acciones en la Sociedad, incluyendo la eliminación de las acciones reservadas para el derecho de canje de que trata el artículo Décimo Primero de los estatutos.
-    Modificar el capital de la Sociedad en dos etapas: (a) primeramente, disminuir el capital de la Sociedad hasta el monto de 241.665.967.987 pesos mediante la absorción de pérdidas, y cancelar las acciones de Minvest S.A. y aquellos accionistas que consientan en ello; y (b) en segundo lugar, aumentar el capital social, desde la suma en que se disminuyó previamente, en la suma equivalente de hasta 217 millones de dólares o la que determine esta Junta, mediante la emisión de nuevas acciones ordinarias de la Sociedad en el Plan Effective Date que serán pagadas en especie, mediante la capitalización de los bonos emitidos por la Sociedad, y renunciar al derecho de suscripción preferente para que las acciones sean entregadas a Chile HoldCo conforme a los términos del Plan.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

- Modificar los términos del derecho de recompra de la Sociedad, de modo que ésta pueda recomprar y cancelar, en el Plan Effective Date, la totalidad de las acciones de la Sociedad (a excepción de las Nuevas Acciones), incluyendo las de las Series A y B que no hayan consentido en la cancelación de sus acciones.
- Modificar la fecha de ejercicio de las opciones de suscripción preferente de acciones de la Serie A y B (Warrants), adelantándola al día inmediatamente anterior al Plan Effective Date.
- Eliminar las disposiciones de los estatutos vinculadas a las operaciones de canje de 2016 y 2019.

(iv)   De aprobarse las materias discutidas anteriormente, acordar las modificaciones a los estatutos sociales que resulten pertinentes para incorporar los acuerdos adoptados por la Junta Extraordinaria de Accionistas con motivo de los asuntos anteriores, acordando un nuevo texto modificado y refundido de los estatutos sociales que entraría en vigencia en el Plan Effective Date, sujeto a la condición suspensiva antes referida.

(v)   Informar sobre la propuesta de (i) suscribir un waiver respecto de los derechos y obligaciones del actual pacto de accionistas de la Sociedad, para efectos de implementar la restructuración conforme a los términos del RSA y el Plan Term Sheet; (ii) anticipar la fecha de ejercicio de los Warrants para efectos de implementar la restructuración conforme a los términos del RSA y el Plan Term Sheet y (iii) terminar el actual pacto de accionistas de la Sociedad, sujeto a la condición suspensiva consistente en que se produzca el "Plan Effective Date".

(vi)   Acordar la aprobación del otorgamiento de las garantías reales y personales necesarias para garantizar la emisión de nuevos bonos bajo un nuevo *Indenture*, conforme a lo contemplado en el RSA y el *Plan Term Sheet* y a los Documentos del Financiamiento, que garantizarán el DIP Credit Facility, así como la modificación del actual contrato de agencia de garantías y suscripción de un nuevo contrato de agencia de garantías.

(vii)   Ratificación de los actos o contratos otorgados con motivo de la negociación de la restructuración de la Sociedad y que tengan el carácter de operaciones entre partes relacionadas.

## 10.- SITUACIÓN LEGAL, ECONÓMICA Y FINANCIERA DE LA SOCIEDAD Y DESCRIPCIÓN DE LA TRANSACCIÓN.

El Presidente manifestó a la Junta que [resumen de la situación de la Sociedad, a incorporarse por AG]

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

El señor Presidente explica a la Junta que el Directorio de la Sociedad ha considerado diversas alternativas para la restructuración de la Sociedad, y que en base a la información entregada por la administración así como por los asesores de la Sociedad y al proceso de negociación con el Grupo Ad Hoc, antes referido, el Directorio determinó que la alternativa más adecuada para la restructuración de la Sociedad era mediante la realización de un procedimiento en los Estados Unidos de América, apoyado por ciertos acreedores financieros que constituyen la mayoría de los tenedores de bonos internacionales, conforme a las disposiciones del Capítulo 11 del Bankruptcy Code de Estados Unidos, en su variante *prepackaged*. Las negociaciones llevadas por la administración de la Sociedad con el Grupo Ad Hoc culminaron en el RSA, cuyos términos se expondrán a continuación.

El señor Presidente entrega la palabra a doña Elena Yubero Goncalves, quien expone los términos y condiciones del borrador más reciente del RSA, y de los términos y condiciones de sus anexos, en particular el Plan Term Sheet y el DIP Term Sheet.

Los términos y condiciones del RSA, a ser sometidos a la consideración de esta Junta, son los siguientes:

1. Conforme a lo contemplado en el RSA, la Sociedad y sus filiales realizarán una reestructuración financiera de sus obligaciones, deudas y estructura de capital (la "Restructuración"), mediante la implementación del Plan conforme a los términos del RSA. La Restructuración se implementará, entre otros actos, mediante:

    a. El inicio de un procedimiento concursal voluntario bajo el Capítulo 11 del Bankruptcy Code de los Estados Unidos de América, por la Sociedad y cada una de sus filiales (salvo por las filiales peruanas y costarricenses), en virtud del cual se aprobará el Plan y la emisión de: (i) nuevos bonos garantizados senior de la Sociedad ("Nuevos Bonos Senior"), que serían distribuidos, en canje de los créditos del Financiamiento DIP, conforme a los términos del Plan; (ii) nuevos bonos garantizados junior ("Nuevos Bonos Junior" y en conjunto con los Nuevos Bonos Senior, los "Nuevos Bonos Garantizados"), a ser distribuidos a los acreedores de la Sociedad conforme al Plan; (iii) nuevos bonos no garantizados y subordinados ("Nuevos Bonos Subordinados") a ser distribuidos a los acreedores de la Sociedad conforme al Plan; (iv) nuevas acciones de la Sociedad con motivo de la capitalización de deudas, las que serán emitidas en una cantidad tal que permita la dilución de los actuales accionistas de la Sociedad; (v) acciones en una nueva sociedad por acciones ([Chile Holdco]), que será titular de un 100% de las acciones de la Sociedad reestructurada; (vi) [nuevos bonos a ser emitidos por [Chile Holdco]; y (vii) derechos (*units*) en una sociedad de responsabilidad limitada (*limited liability company*) a ser constituida en los Estados Unidos de América ([USA Holdco]), que sería titular del 100% de las acciones de [Chile Holdco].

    b. La obtención del consentimiento de los tenedores de los bonos garantizados senior 7,50% con vencimiento en 2025 (los "Bonos 2025") emitidos por la Sociedad conforme al contrato de emisión de bonos (*indenture*) de fecha 7 de noviembre de 2019 (el "Indenture 2025"), para efectos de modificar las

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

garantías reales otorgadas por las filiales peruanas (Automotores Gildemeister Peru S.A., Maquinaria Nacional S.A., y Motor Mundo S.A.) y costarricenses (Gildemeister Costa Rica S.A. e Inmobiliaria Los Seis CR ILS S.A.); para que estas garantías también garanticen, a contar del Plan Effective Date, las obligaciones de la Sociedad y sus filiales bajo los Nuevos Bonos Garantizados.

c. Luego de la emisión de nuevas acciones de la Sociedad y la dilución de los actuales accionistas, la recompra, cancelación y/o terminación de todas las actuales acciones de la Sociedad, tanto ordinarias como preferentes, así como de las opciones de suscripción de las acciones de las Series A y B vigentes ("Warrants").

2. El RSA contiene las obligaciones que asume el antes referido Grupo Ad Hoc de tenedores de Bonos con respecto a la Restructuración, entre ellos apoyar a la Sociedad y sus filiales en esta Restructuración, incluyendo, pero no limitado a: (i) votar para aceptar el Plan que se presente en cualquier procedimiento de solicitud de votos ("Solicitation") conforme a los términos del RSA y no revocar su voto, así como otorgar su consentimiento para la celebración de los documentos necesarios para la modificación de las garantías reales otorgadas por aquellas filiales que no se sujetarán al Prepack Chapter 11; (ii) cumplir sus obligaciones respecto del financiamiento adicional a la Sociedad, conforme a los términos del RSA; y (iii) negociar de buena fe los términos del nuevo *indenture* que regulará los términos y condiciones de los Nuevos Bonos Garantizados y los Nuevos Bonos Subordinados conforme al RSA, las modificaciones a los documentos y acuerdos necesarios para la emisión de las nuevas acciones, bonos y títulos de deuda conforme a los términos del RSA, incluyendo las modificaciones de los contratos de garantía que correspondan.

3. Junto con ello, el RSA contempla que se otorgarán ciertas liberaciones de responsabilidad (*releases*) en relación al Plan y, sujeto a los términos establecidos en el RSA, obligarán al Grupo Ad Hoc a no rechazar (*opt out*) las liberaciones de responsabilidad que se contemplen en el Plan.

4. Asimismo, en el RSA, la Sociedad y sus filiales se obligan, entre otras obligaciones, a (i) no iniciar directa o indirectamente ningún proceso de disolución, liquidación, reestructuración, venta, disposición, reorganización, fusión, o estructura corporativa o la designación de un veedor, distinto a la Restructuración en los términos contemplados en el RSA que se aprobará a continuación; (ii) a entregar borradores de la documentación definitiva en los plazos contemplados en el documento; (iii) iniciar el Prepack Chapter 11 en o antes del [15 de abril de 2021], y asumen todas y cada una de las obligaciones que en dicho documento se detallan.

5. Por su parte, Minvest S.A. (como único accionista de la Serie A) se obliga, entre otras obligaciones, a: (i) no iniciar directa o indirectamente ningún proceso de disolución, liquidación, reestructuración, venta, disposición, reorganización, fusión, o estructura corporativa o la designación de un veedor, distinto a la Restructuración en los términos contemplados en el RSA que se aprobará a continuación; (ii) votar cualquier acreencia que tenga en apoyo del Plan y a obligarse por la Orden de Confirmación (*Confirmation Order*) que confirma el Plan; y (iii) tomar todas las medidas necesarias para consumar el Plan y la Restructuración.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

6.  La efectividad del RSA estará sujeta a una serie de condiciones, que incluye, entre otras, la entrega de ciertos documentos debidamente firmados por Hyundai Motor Company, y la realización de ciertos reportes a las autoridades peruanas.

Asimismo, se describen los términos principales del Plan Term Sheet, que forma parte del RSA que se sujeta a la consideración de la Junta:

1.  Los términos del Plan que se someterá a votación de los tenedores de bonos en el Solicitation y luego a la aprobación de la corte competente en el Prepack Chapter 11 (la "Corte"), y que describen qué recibirá cada acreedor de la Sociedad, se describen en el Plan Term Sheet

2.  Para efectos de implementar la Restructuración, la Sociedad deberá modificar sus estatutos conforme a lo que se indica más adelante en esta misma Junta.

3.  La ocurrencia del Plan Effective Date, y por tanto, la efectividad de la Restructuración, estará sujeta a una serie de condiciones precedentes que se describen en el Plan Term Sheet.

Luego, se describen los principales términos de los Nuevos Bonos Garantizados y los Nuevos Bonos Subordinados (los términos en mayúscula que no estén aquí definidos tendrán el significado que se les asigna en el Plan Term Sheet):

1.  Se emitirán en moneda dólar de los Estados Unidos de América ("Dólares"), y se regirán por la Ley del Estado de Nueva York, Estados Unidos de América. Asimismo, quedarán sujetos a la jurisdicción no exclusiva del Estado de Nueva York y cortes federales ubicadas en Manhattan, ciudad de Nueva York.

2.  Los Nuevos Bonos Junior estarán subordinados a favor de los Nuevos Bonos Senior. Por su parte, los Nuevos Bonos Subordinados estarán subordinados a favor de los Nuevos Bonos Garantizados.

3.  Los Nuevos Bonos Garantizados tendrán una tasa de interés de un [7,5]% anual que se pagará [semestralmente], con opción PIK [a elección de la Sociedad] por [3,5 años] a una tasa de interés de [9.0]%. Por su parte, los Bonos Subordinados, durante los primeros [3.5%] años, tendrán una tasa de interés de un [10%] anual, pagadera [semestralmente], en dinero o con opción PIK a la misma tasa a discreción de la Sociedad; y por el resto de su vigencia, una tasa de interés de [2,5%] anual , pagadero [semestralmente], más una tasa adicional de [7,5%] anual, pagadero [semestralmente], con opción PIK a la misma tasa a discreción de la Sociedad.

4.  En el caso de los Nuevos Bonos Garantizados, su vencimiento será el [sexto] aniversario de la fecha del Plan Effective Date, y en el de los Nuevos Bonos Subordinados, el [décimo cuarto] aniversario desde la fecha del Plan Effective Date.

5.  El monto total de la emisión de los Nuevos Bonos Senior será igual al monto de todos los Préstamos DIP (*DIP Claims*, según su definición en el Plan Term Sheet) pendientes de pago en el Plan Effective Date. El monto de la emisión de los Nuevos Bonos Junior será de [USD 229.4] millones. El monto de la emisión de los Nuevos Bonos Subordinados será de [USD 111] millones.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

6. El pago de los Nuevos Bonos Garantizados se garantizará con:
   a. Garantías personales otorgadas las mismas filiales que garantizaban los Bonos 2025 (conjuntamente, los "Garantes").
   b. Garantías de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior), sobre los mismos bienes que garantizaban los Bonos 2025.
   c. Prenda de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior) sobre todas las acciones de la Sociedad, a ser otorgada por [Chile Holdco].
   d. Prenda de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior) sobre todas las acciones de la Sociedad, en las acciones de los Deudores y Deudores Reorganizados (*Debtor* y *Reorganized Debtor* según estos términos se definen en el Plan Term Sheet).
7. El pago de los Nuevos Bonos Subordinados sólo estará garantizado por garantías personales de los Garantes, pero no tendrá a su favor garantías reales.

Finalmente, se pasan a describir los principales términos y condiciones del nuevo financiamiento a otorgarse conforme a los términos del DIP Term Sheet (el "Financiamiento DIP"), que forma parte del RSA (los términos en mayúscula que no estén aquí definidos tendrán el significado que se les asigna en el DIP Term Sheet):

1. Los acreedores del Financiamiento DIP serán cada uno de los miembros del Grupo Ad Hoc (los "Acreedores DIP").

2. Se celebrará un nuevo contrato de línea de crédito con posterioridad al inicio del Prepack Chapter 11 (el "DIP Credit Facility"). Los Deudores (*Debtors*) serán deudores o garantes de este contrato, según corresponda, y las filiales no garantes serán constituyentes de garantías reales.

3. El monto comprometido por los Acreedores DIP a ser entregado bajo el DIP Credit Facility asciende al monto de hasta USD 23.600.000.

4. Al cierre del DIP Credit Facility, se suscribiría un Intercreditor Agreement con el Trustee del Indenture 2025 y/o el Agente de Garantías, para regular ciertas materias, según se describe en mayor detalle en el RSA.

5. La tasa de interés de las obligaciones del Financiamiento DIP será de [11,75%] anual, con un interés moratorio adicional de 2% anual.

6. Las obligaciones del Financiamiento DIP serán pagaderas, en la primera fecha de: (a) la fecha que corresponda a la fecha tentativa de salida del Prepack Chapter 11 según el RSA; (b) la conversión del Prepack Chapter 11 en un procedimiento de liquidación sin consentimiento de los Acreedores Requeridos; (c) el rechazo de cualquiera de los procedimientos del Prepack Chapter 11 sin consentimiento de los Acreedores Requeridos; (d) la designación de un síndico (*trustee*) en el Prepack Chapter 11 sin consentimiento de los Acreedores Requeridos; (e) la designación de un examinador (*examiner*) en el Prepack Chapter 11 sin consentimiento de los Acreedores Requeridos; (f) la fecha de consumación de la venta de todos o sustancialmente todos los activos de los Deudores, sin consentimiento de los Acreedores Requeridos; (g) la

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

fecha del Plan Effective Date; (h) la aceleración de los montos adeudados por la ocurrencia de un *Event of Default* (según lo dispuesto en el RSA); y (j) otros eventos usuales para este tipo de contratos.

7. Las obligaciones del Financiamiento DIP estarán garantizadas por las siguientes garantías reales (las "Garantías Reales del Financiamiento"):

   a. Al cierre del DIP Credit Facility, una vez se haya emitido la orden del tribunal competente de Estado de Nueva York, Estados Unidos de América, se otorgarán nuevas garantías y/o modificarán las garantías existentes para que el DIP Credit Facility esté garantizado por: (i) un "Priming Lien", sobre las garantías reales de los Bonos 2025 otorgadas por el Deudor o los Garantes del DIP Credit Facility, y en el caso de que sean otorgadas por las filiales no garantes, tendrán el mismo grado de preferencia (*pari passu*); (ii) garantías sobre inventario, cuentas por cobrar y cuentas corrientes de la Sociedad y sus filiales en Chile, Costa Rica y Uruguay, sujeto a reglas que permitan la continuidad de la operación de la Sociedad en el curso ordinario de los negocios, las que serán documentadas de acuerdo a los requisitos que en cada jurisdicción se establezca, y sujeto, en todo caso, a la posibilidad de prendar esos activos para obtener capital de trabajo adicional. Un listado de las garantías específicas a ser otorgadas en cada jurisdicción se incluye como **Anexo A** a la presente acta, y se incluye asimismo como anexo en el RSA.

8. Sin perjuicio de ciertas excepciones, las obligaciones del Financiamiento DIP tendrán, sujeta a la condición de que así sea determinado en la orden de un tribunal competente del Estado de Nueva York, Estados Unidos de América, en la forma contemplada en el RSA y el DIP Term Sheet, super preferencia sobre todos los gastos administrativos del Prepack Chapter 11.

9. Asimismo, y de ser necesario para efectos de implementar lo anterior, se suscribirán también sendas modificaciones y/o suplementos al Indenture 2011, al Indenture 2016 y al Indenture 2025 (las "Modificaciones de Indentures") bajo la legislación del Estado de Nueva York, Estados Unidos.

Culminada la exposición, el Presidente agradeció sus palabras y manifestó que, adicionalmente a lo indicado, con motivo de la [Transacción], sería necesario modificar los estatutos sociales en los términos que se señalarían más adelante en esta Junta.

## 11.- ACUERDOS RELATIVOS A LA TRANSACCIÓN.

El Presidente explicó a la Junta que algunos de los aspectos de la Transacción requieren contar con el voto favorable de la mayoría absoluta de las acciones de la Serie A, y de al menos un 62,5% de las acciones de la Serie C. En primer lugar, se requiere modificar los estatutos sociales, en los términos que se señalarán más adelante en esta Junta. Y en segundo lugar, se requiere entregar en garantía una parte sustantiva de los bienes de la Sociedad y sus filiales, según se expresó previamente.

El Presidente sometió a la aprobación de la Junta los términos de la Transacción descrita en detalle en el punto anterior que requieren de aprobación de la Junta, sin perjuicio de las

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

aprobaciones específicas que se tratarán más adelante.

Luego de un breve debate, se acordó por la unanimidad de los accionistas de la Serie A, y por un [•]% de las acciones de la Serie C, aprobar en todas y cada una de sus partes las proposiciones presentadas a su consideración en este punto de la tabla respecto de la Transacción.

**12.- MODIFICACIONES DE LOS ESTATUTOS SOCIALES CONTEMPLADAS EN EL RSA, NECESARIAS PARA SOMETER A LA SOCIEDAD A UN *PREPACK CHAPTER 11* Y SUJETAS A LA CONDICIÓN RESOLUTORIA CONSISTENTE EN QUE SE NO SE PONGA TÉRMINO AL RSA:**

El Presidente inicia la exposición aclarando que las modificaciones al Artículo Décimo de los estatutos sociales que a continuación se proponen (con la excepción de la modificación contemplada en la letra (d) siguiente), estarán sujetas a la condición resolutoria consistente en que se produzca el término anticipado del RSA con anterioridad a la ocurrencia del "Plan Effective Date" (según este término se define en el Plan Term Sheet), caso en el cual dichas modificaciones quedarán sin efecto a contar de la fecha de certificación del directorio, o de los directores de la Serie C, del cumplimiento de la condición resolutoria. En tal evento, la Sociedad volverá a estar regida por sus estatutos vigentes con anterioridad a estas modificaciones. El Directorio de la Sociedad, o los directores de la Serie C, deberán certificar el cumplimiento de la referida condición resolutoria dentro del plazo de 3 días hábiles contados desde la fecha en que se ponga término al RSA, certificación que deberá reducirse a escritura pública y anotarse al margen de la inscripción de la Sociedad en el Registro de Comercio. Por el contrario, la condición resolutoria se entenderá fallida en caso que se produzca el Plan Effective Date.

(a)   *Modificación de las reglas de conversión automática de acciones en los eventos y casos señalados en los literales (iii) y (iv) del numeral Uno del artículo Décimo de los estatutos sociales.*

En relación con el artículo Décimo, el Presidente les recuerda a los señores accionistas que, en el caso de verificarse alguno de los procedimientos concursales señalados en los literales (iii) y (iv) del numeral Uno de dicho artículo de los estatutos de la Sociedad, las acciones de la Serie C se convertirían automáticamente, sin necesidad de acto alguno, o notificación a los accionistas de la Sociedad, en el 99,9% de las acciones suscritas y pagadas de la Serie A; y en el caso de las acciones de la Serie D, en el 99,9% de las acciones suscritas y pagadas de la Serie B. En consideración a lo dispuesto en los términos y condiciones de la Transacción previamente descrita, se hace necesario modificar los estatutos de la Sociedad para efectos de contemplar una excepción a dicha conversión, en el sentido de incluir la posibilidad de que la Sociedad sea sujeta a un procedimiento concursal en los Estados Unidos de América bajo el Capítulo 11 del *Bankruptcy Code,* conforme a los términos del RSA.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

(b)     *Modificación de las reglas de revocación automática del directorio de la Sociedad, de acuerdo a lo contemplado en el numeral Tres del artículo Décimo de los estatutos sociales.*

Por último, el Presidente hace presente que, en consideración a los efectos que producirá la presentación de la solicitud para someterse al procedimiento bajo el Capítulo 11 antes señalado, se somete también a aprobación de los accionistas la postergación de las reglas de revocación automática del directorio de la Sociedad dispuestas en el numeral Tres del artículo Décimo de los estatutos sociales, contemplando la misma excepción señalada en el párrafo precedente.

(c)     *Capitalización de los bonos emitidos por la Sociedad sin la necesidad de contar con un informe de peritos, bastando aprobación de la mayoría de las acciones de la Serie A.*

Indica el Presidente que, de acuerdo a lo dispuesto en el inciso cuarto del artículo 15 de la Ley N° 18.046 sobre Sociedades Anónimas, régimen supletorio a la normativa del Código de Comercio para las Sociedades por Acciones, corresponde requerir informes de peritos en el caso de que las acciones de la Sociedad sean enteradas mediante aportes no consistentes en dinero, tal como sucedería en el caso que se capitalizaran los bonos actualmente emitidos por la Sociedad. Adicionalmente, y en el mismo supuesto antes señalado, el numeral Dos del artículo Quinto de los estatutos sociales dispone que, la valorización de tales aportes deberá ser aprobada por los accionistas mediante escritura pública o instrumento privado protocolizado en que conste el acuerdo de los accionistas para un aumento del capital social o en una junta de accionistas especialmente convocada para estos efectos.

En razón de lo anterior, y en vista de los términos y condiciones de la Transacción, el Presidente propone a los señores accionistas modificar el artículo Quinto de los estatutos de la Sociedad, en el sentido de contemplar que, en el caso que se enteren acciones de pago mediante bienes no dinerarios, la valorización de tales aportes sea únicamente aprobada por la mayoría absoluta de las acciones de la Serie A.

**13.- ACUERDOS EN RELACIÓN CON LAS MODIFICACIONES DE LOS ESTATUTOS SOCIALES CONTEMPLADAS EN EL RSA, NECESARIAS PARA SOMETER A LA SOCIEDAD A UN *PREPACK CHAPTER 11* DE ACUERDO A LOS TÉRMINOS CONTEMPLADOS EN EL PLAN TERM SHEET:**

Sometidos los asuntos anteriormente señalados por el señor Presidente a la consideración de los accionistas, se aprobaron por la unanimidad de los accionistas de la Serie A, y por un [•]% de las acciones de la Serie C, las siguientes materias:

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

(a)     Mientras se encuentre vigente el RSA, contemplar una excepción a las causales de conversión de acciones señaladas en los literales (iii) y (iv) del numeral Uno del artículo Décimo de los estatutos sociales vigentes, para efectos de permitir que la Sociedad se someta un procedimiento concursal en los Estados Unidos de América bajo el Capítulo 11 del Bankruptcy Code, conforme a los términos del RSA sin gatillar la conversión de acciones. El texto de los literales (iii) y (iv) del numeral Uno del artículo Décimo serán complementado por aquel indicado más adelante en la presente acta.

(b)     Mientras se encuentre vigente el RSA, la modificación de las reglas de revocación automática del directorio de la Sociedad dispuestas en el numeral Tres del artículo Décimo de los estatutos sociales, contemplando la misma excepción señalada en el párrafo precedente. El texto de reemplazo será propuesto más adelante en la presente acta.

(c)     Autorizar que los bonos emitidos por la Sociedad sean capitalizados sin la necesidad de contar con un informe de peritos bastando sólo la aprobación de la mayoría de las acciones de la Serie A. El texto de reemplazo del numeral Dos del artículo Quinto de los estatutos sociales será señalado más adelante.

La Junta acordó, asimismo, que las modificaciones contempladas en las letras a y b precedentes estarán sujetas a la condición resolutoria consistente en que se produzca el término anticipado del RSA con anterioridad a la ocurrencia del Plan Effective Date, caso en el cual dichas modificaciones quedarán sin efecto a contar de la fecha de certificación del directorio del cumplimiento de la condición resolutoria. En tal evento, la Sociedad volverá a estar regida por sus estatutos vigentes con anterioridad a estas modificaciones. El Directorio de la Sociedad, o los directores de la Serie C, deberán certificar el cumplimiento de la referida condición resolutoria dentro del plazo de [3] días hábiles contados desde la fecha en que se ponga término al RSA, certificación que deberá reducirse a escritura pública y anotarse al margen de la inscripción de la Sociedad en el Registro de Comercio. Por el contrario, la condición resolutoria se entenderá fallida en caso que se produzca el Plan Effective Date.

A continuación, el Presidente manifestó que, con motivo de los acuerdos adoptados por los accionistas en los literales (a) a (c) anteriores, se propone a los accionistas los siguientes textos de reemplazo para los artículos modificados:

(a) Se inserta la siguiente oración al final del numeral (iii) y del numeral (iv) del Artículo Décimo, numeral Uno: "*Con todo, y sujeto a la condición resolutoria referida en el numeral Siete de este artículo, no se producirá la conversión automática de acciones, ni se gatillará la revocación automática del directorio, por el evento contemplado en este numeral, en caso de que la sociedad se someta un procedimiento concursal en los Estados Unidos de América bajo el Capítulo 11 del Bankruptcy Code y los demás procesos previstos en el RSA*".

(b) Se agrega el siguiente nuevo numeral Siete al Artículo Décimo: "***Siete**. La condición resolutoria referida en los numerales (iii) y (iv) del numeral Uno anterior consiste en*

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

*que se produzca el término anticipado del RSA con anterioridad a la ocurrencia del Plan Effective Date. De producirse tal evento, y a contar de la fecha de certificación del directorio del cumplimiento de esa condición resolutoria, quedará sin efecto la excepción contemplada en la oración final de los numerales (iii) y (iv), en ambos casos del numeral Uno de este artículo Décimo. El Directorio de la Sociedad deberá certificar el cumplimiento de la referida condición resolutoria dentro del plazo de [3] días hábiles contado desde la fecha en que se ponga término al RSA, certificación que deberá reducirse a escritura pública y anotarse al margen de la inscripción de la Sociedad en el Registro de Comercio. Por el contrario, la condición resolutoria se entenderá fallida, y las disposiciones antes citadas se mantendrán plenamente vigentes, en caso de que se produzca el Plan Effective Date sin que se haya producido el término del RSA".*

(c) El numeral Dos del Artículo Quinto será reemplazado por el siguiente texto: "***Dos. En caso de aportes en bienes no dinerarios, incluyendo la capitalización de bonos emitidos por la sociedad, la valorización de tales aportes deberá ser aprobada por los accionistas en la escritura pública o en el instrumento privado protocolizado en que conste el acuerdo de los accionistas para un aumento del capital social o en una junta de accionistas especialmente convocada para estos efectos, bastando para estos efectos la mayoría de las acciones de la Serie A, sin necesidad de contar con un informe de peritos.***

Sometida la cuestión a la consideración de los accionistas, se aprobó por la unanimidad de los accionistas de la Serie A, y por un [•]% de las acciones de la Serie C, los textos propuestos.

**14.- <u>MODIFICACIONES ADICIONALES DE LOS ESTATUTOS SOCIALES, CONTEMPLADAS EN EL RSA Y SUJETAS A LA CONDICIÓN SUSPENSIVA CONSISTENTE EN QUE SE VERIFIQUE EL *PLAN EFFECTIVE DATE*</u>:**

El Presidente inicia la exposición aclarando que las siguientes propuestas de modificación de los estatutos sociales, estarán sujetas a la condición suspensiva consistente en que se produzca el "Plan Effective Date" (según este término se define en el Plan Term Sheet), lo cual deberá ser certificado por el directorio de la Sociedad, o por los directores de la Serie C, dentro del plazo de [3] días hábiles contados desde el Plan Effective Date, certificación que deberá reducirse a escritura pública y anotarse al margen de la inscripción de la Sociedad en el Registro de Comercio. Salvo que se indique expresamente lo contrario, cada una de las modificaciones indicadas más abajo requieren contar con el voto favorable de la mayoría absoluta de las acciones de la Serie A, y de al menos un 62,5% de las acciones de la Serie C.

(a)    <u>Conversión Automática de las Acciones Preferentes de las Series C y D</u>.

El Presidente hace presente que, con motivo de los términos y condiciones de la Transacción, se hace necesario proceder con la conversión de las acciones preferentes de las Series C y D, en acciones Series A y B, conforme a las reglas de conversión automática, en la fecha del Plan Effective Date. Para estos efectos, el Presidente de la Sociedad propone a los señores accionistas agregar al actual artículo Décimo de los

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

estatutos sociales la posibilidad de que, una vez que se produzca el Plan Effective Date, la totalidad de las acciones Series C y D sean convertidas automáticamente en acciones Serie A y B, respectivamente.

Así, una vez verificada la condición suspensiva antes señalada, se incorporaría al numeral Uno del artículo Décimo de los Nuevos Estatutos Sociales (según este término se define más adelante), un nuevo literal (v), en los términos señalados en el texto que se indicará en el texto refundido más adelante.

*(b) Eliminación de las series de acciones en que se divide actualmente el capital de la Sociedad incluyendo la eliminación de las acciones reservadas para el derecho de canje de que trata el artículo Décimo Primero de los estatutos.*

El Presidente informa que el capital social, una vez producida la modificación señalada en la letra (a) precedente y perfeccionada la conversión de las acciones allí señaladas, estará compuesto de la siguiente forma:

    i.    <u>Series A y B</u>. Serie A: formada por [•] acciones con derecho a voto, y Serie B: formada por [•] acciones sin derecho a voto, habida consideración que la suma total de acciones de la Serie A y de la Serie B que se encuentren suscritas en un determinado momento no podrá exceder de la cantidad de [•] acciones, con la única excepción de las [•] acciones adicionales de la Serie B.

                Las acciones Serie A suscritas y pagadas ascienden a la cantidad de [•], estando pendientes de suscripción y pago la cantidad de [•]. Las acciones Serie B suscritas y pagadas ascienden a la cantidad de [•], estando pendientes de suscripción y pago la cantidad de [•].

    ii.    <u>Series C y D</u>. No existirían acciones Serie C y Serie D.

Continua el señor Presidente señalando que, en consideración a los términos y condiciones de la Transacción, se hace necesario eliminar la actual división de las acciones de la Sociedad en Series A, B, C y D, incluyendo la eliminación de las acciones reservadas para el derecho de canje de que trata para el artículo Décimo Primero de los estatutos, debiendo pasar el capital social a estar compuesto únicamente por una sola serie de acciones ordinarias. Para estos efectos, la relación de canje entre acciones Serie A y Serie B por las nuevas acciones ordinarias de la sociedad será de uno a uno. Así, quienes sean accionistas de la Serie A o de la Serie B en la fecha de la conversión automática, recibirán, cada uno, un número de acciones ordinarias equivalente a la suma de sus acciones de la Serie A y B.

En consecuencia, en caso de aprobarse la propuesta, el capital de la Sociedad ascendente a $[•], estará dividido en [•] acciones ordinarias, nominativas, de una sola

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

serie y sin valor nominal. Se deja constancia que este capital incluye las acciones a que tienen derecho los tenedores de Warrants,

Adicionalmente, en caso de aprobarse la propuesta antes señalada, será necesario modificar los artículos Quinto y Primero Transitorio de los Nuevos Estatutos Sociales con el objeto de plasmar la nueva distribución del capital accionario.

*(c) Modificar el capital social en dos etapas, primeramente una disminución del capital de la Sociedad mediante la absorción de pérdidas, y cancelar las acciones de Minvest S.A. y aquellos accionistas que consientan en ello; y en segundo lugar un aumento del capital desde la suma en que se disminuyó previamente.*

Continua el señor Presidente informando que, en consideración a los términos y condiciones de la Transacción, una vez aprobado por el tribunal competente el correspondiente Plan, se hace necesario disminuir el capital desde la actual suma de $[•] a la nueva suma de $[•], considerando una disminución equivalente a la suma de $[•] mediante la capitalización de pérdidas de ejercicios anteriores por la suma de $[•], disminuyendo en consecuencia el número de acciones a [•] acciones. Para estos efectos, con motivo de la disminución de capital, cada accionista de la Sociedad quedará con una cantidad de acciones equivalente al número de sus acciones después de la conversión automática, dividido entre [●]. En caso de decimales, el número de acciones que retendrán se redondeará al número entero superior.[1]

Se deja constancia que, en la disminución de capital, no se consideran las acciones pendientes de pago de la Sociedad destinadas a ser suscritas por los tenedores de Warrants de la Sociedad, sin perjuicio de lo acordado más adelante en esta misma Junta en relación a los Warrants.

i.     Hace presente el Presidente que la totalidad de los accionistas de la Sociedad que votarán favorablemente a esta modificación han manifestado irrevocablemente su voluntad que, sujeto a la condición de que se apruebe el Plan, se cancelen la totalidad de las acciones que estos poseen en la Sociedad producto de la dilución de las mismas luego de la disminución de capital aprobada.

El Presidente luego señala que, la disminución de capital tratada en la presente letra (c), no dará derecho a pagos por concepto de devolución de capital, en consideración a que dicha disminución de capital tiene por efecto absorber las pérdidas acumuladas a la fecha por la Sociedad. De esta forma, la disminución propuesta por un monto ascendente a $[•], será destinada íntegramente a absorber las pérdidas de la Sociedad.

Por último el señor Presidente señala que en caso de aprobarse la disminución de capital en los términos antes indicados, será necesario reformar los Nuevos Estatutos

---

[1] **Nota**: El documento definitivo deberá incluir una reducción de acciones tal, que permita que cada accionista quede con una acción, para facilitar la recompra.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

Sociales, sustituyendo al efecto el artículo Quinto y el artículo Primero Transitorio por nuevos textos, los que se propondrán más adelante en esta Junta, una vez que se hayan tratado las demás materias objeto de esta reunión.

El Presidente explicó que esta propuesta de aumento de capital, a partir del capital de la Sociedad después de su disminución antes referida, había sido estudiada por el Directorio de la Sociedad, concluyéndose la conveniencia de llevarla a cabo en virtud de la necesidad de cumplir con los términos y condiciones de la Transacción, una vez verificada la llegada el Plan Effective Date. Para estos efectos, se contó con los estados financieros de la Sociedad de fecha [•], debidamente auditados por la firma [•].

Al respecto, el señor Presidente informó a los señores accionistas que, en caso de cumplirse la condición suspensiva antes referida, el capital social, considerando las modificaciones sociales referidas previamente en esta Junta, sería la cantidad de $[•], dividido en [•] acciones ordinarias, nominativas, de una sola serie y sin valor nominal.

Continuando con su exposición, el señor Presidente señaló que, para materializar la Transacción, se propone, sujeto a la condición suspensiva ya referida, aumentar el capital desde la actual suma de $[•] a la nueva suma de $[•]. El aumento de capital será pagadero mediante el aporte al equivalente en pesos del valor facial de parte de los bonos emitidos por la Sociedad bajo el Indenture 2016, el Indenture 2013 y el Indenture 2021, esto es, el monto total de US$[●], que se valorizan en este acto en [●] pesos. El aumento sería pagadero mediante la capitalización, en la fecha del Plan Effective Date de parte de los bonos emitidos por la Sociedad bajo el Indenture 2025, el Indenture 2016, el Indenture 2013 y el Indenture 2021, por un monto total de US[●], y que los accionistas valorizan en [●] pesos, conforme al valor del dólar observado publicado por el Banco Central de Chile el día [●].

En vista de lo anterior, se sometieron a la consideración de los accionistas las siguientes proposiciones:

i.    Acordar y aprobar el aumento de capital de la Sociedad en la suma de $[●] (correspondiente al equivalente en pesos del valor facial de los bonos capitalizados esto es, el monto de US$[●], de conformidad con el valor del dólar observado publicado por el Banco Central de Chile el día [●]).

      A continuación, y para los efectos de lo dispuesto en el artículo 23 del Reglamento de Sociedades Anónimas, se dio cuenta a los señores accionistas de los antecedentes disponibles sobre los elementos de valoración de las acciones de la Sociedad, y en especial, de los beneficios que para la Sociedad se derivarían del éxito de la Transacción. Al respecto, se informó, para el sólo efecto de dar cumplimiento a lo indicado en el artículo 23 del Reglamento de Sociedades Anónimas, que el valor libro actualizado de cada acción,

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

determinado en la forma establecida en el artículo 130 del Reglamento de Sociedades Anónimas, ascendía a \$[•].

Se dejó constancia que, de conformidad con el artículo Décimo Segundo, numeral Uno, de los estatutos de la Sociedad, no es aplicable a la Sociedad lo dispuesto en el artículo 19 del Reglamento sobre Sociedades Anónimas, por lo que el aumento de capital puede efectuarse sin incremento previo alguno por concepto de capitalización de reservas.

En razón de lo anterior, y para el efecto del citado aumento de capital por la suma de \$[•], se emitirían [•] acciones ordinarias de pago, nominativas, sin valor nominal y con derecho a voto, al valor individual de \$[•] por cada acción. Las referidas [•] nuevas acciones correspondientes al aumento de capital por la suma de \$[•] deberían quedar emitidas, suscritas y pagadas en la fecha que determine el directorio de la Sociedad y a más tardar el día [•].

En conformidad a los términos del numeral Uno de los actuales estatutos sociales, las [•] nuevas acciones que serían emitidas en virtud de este aumento de capital, deben ser ofrecidas preferentemente a los accionistas de las Series A y B a prorrata de las acciones que tengan inscritas a su nombre. Al respecto, la totalidad de los accionistas titulares de Acciones de la Serie A informan su decisión de renunciar y no ejercer su derecho de opción preferente de suscripción de las [•] nuevas acciones. Asimismo, se deja constancia de que a la fecha no existen accionistas titulares de acciones de la Serie B, por lo que no es necesaria su renuncia para ofrecer las acciones a terceros. Lo anterior se realizó con el objeto de permitir que la Sociedad, en conformidad con lo dispuesto en los términos y condiciones de la Transacción, pueda otorgar el derecho de opción preferente de suscripción de las [•] nuevas acciones, a una sociedad que será la única titular de los bonos emitidos bajo el Indenture 2025, el Indenture 2016, el Indenture 2013 y el Indenture 2011, a la fecha del Plan Effective Date, conforme a los términos del Plan.

Como consecuencia de lo anterior, luego del aumento de capital que se propuso, el capital social alcanzaría en definitiva la suma de \$[•], dividido en [•] acciones ordinarias, nominativas, de una sola serie y sin valor nominal, de las cuales: **(a)** [•] se encontrarían suscritas y pagadas; **(b)** [•] se encontrarían pendientes de suscripción y pago.

ii.    Facultar al Directorio para acordar, con las más amplias atribuciones, la emisión de las acciones correspondientes al aumento de capital acordado en esta Junta, y los términos de la emisión y colocación de las acciones de pago necesarias para la materialización del aumento de capital propuesto precedentemente, en una o varias emisiones, en las oportunidades que el directorio estime, y en un valor de colocación ascendente a \$[•] por cada acción; y para adoptar todos los acuerdos, medidas y actos necesarios para la

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

debida y total materialización del aumento de capital antes referido, lo que deberá quedar verificado dentro del plazo de [•] años contados desde el [•].

iii.    Que los acuerdos anteriores se encuentran sujetos a la condición suspensiva de verificarse la llegada del Plan Effective Date.

iv.    Finalmente, se indicó que, de aprobarse el aumento de capital propuesto, deberían modificarse los artículos Quinto y Primero Transitorio de los Nuevos Estatutos Sociales, de acuerdo a los textos que se indican más adelante.

*(d) Modificación de los términos del derecho de recompra de modo que la Sociedad pueda recomprar y cancelar, en el Plan Effective Date, la totalidad de las acciones de las Series A y B de la Sociedad que no hayan consentido en la cancelación de sus acciones.*

Hace presente el Presidente que, como parte de la Transacción, la Sociedad se ha comprometido a modificar los términos del derecho de recompra dispuesto en el artículo Octavo de los Nuevos Estatutos Sociales, de modo que ésta pueda recomprar y cancelar, una vez acaecido el *Plan Effective Date*, el remanente de las acciones existentes después de disminución de capital antes referida pero antes del aumento de capital referido en el literal anterior.

El Presidente de la Sociedad propone a los señores accionistas incorporar en el artículo Octavo de los Nuevos Estatutos Sociales un nuevo numeral Seis, que contemple un derecho de recompra adicional en favor de la Sociedad, por la totalidad, y no menos que la totalidad, de las acciones suscritas y pagadas a esa fecha por los accionistas de la Sociedad, a un precio de $[0,0001] [por acción]. Una vez adquiridas aquellas acciones, se aplicará lo dispuesto en el artículo Séptimo de los Nuevos Estatutos Sociales, reduciéndose de pleno derecho el capital y eliminándose del registro de accionistas las acciones recompradas, tal como lo dispone el actual numeral Cuatro del artículo Octavo de los Nuevos Estatutos Sociales.

El texto del nuevo numeral Seis a ser insertado en el artículo Octavo de los Nuevos Estatutos Sociales, es el siguiente:

"**Seis.** *En forma adicional al derecho de recompra referido en el numeral Uno anterior, la sociedad tendrá el derecho de recomprar, y los accionistas de las Series A y B que sean accionistas antes de la ocurrencia del Plan Effective Date, según este término se define en el contrato denominado "Restructuring Support Agreement", suscrito con fecha [●] entre la sociedad, sus filiales, Minvest S.A. y un grupo de tenedores de bonos emitidos por la sociedad, la obligación de vender, en cualquier momento, todas y no menos que todas sus acciones de las Series A y B (incluyendo las acciones ordinarias de la sociedad que reciban en caso de que se eliminen las series de acciones de la sociedad), pero sin afectar las acciones del aumento de capital acordado con fecha [●], para cuyos efectos la sociedad deberá enviar una notificación por escrito manifestando su voluntad de ejercer tal derecho*

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

*a todos los referidos titulares de acciones de la Serie A o B (o acciones ordinarias, en su caso), con una anticipación mínima de [5] días a la fecha en que se vaya a efectuar la recompra. Esta notificación deberá incluir, a lo menos, las siguientes menciones: (a) el precio de recompra, determinado en conformidad a lo indicado más adelante en este numeral Seis; (b) el número de acciones a ser recompradas, que deberá corresponder a la totalidad de las acciones del respectivo accionista; (c) la fecha en que se recomprarán y pagarán las acciones; y (d) el lugar en que los accionistas deberán hacer entrega de los títulos de las acciones que se recompren, en caso que tales títulos hubiesen sido emitidos. El precio de recompra por cada acción de las Series A o B será de $[0,0001] y será pagadero en pesos. Al derecho de recompra contemplado en este numeral le será aplicable, mutatis mutandis, lo dispuesto en el numeral Cuatro y Cinco de este artículo. Con todo, en este caso, la sociedad podrá actuar como agente pagador y reservar el precio de recompra a favor de los accionistas que hayan vendido sus acciones. Asimismo, al derecho de recompra contemplado en este numeral se aplicará, mutatis mutandis, lo contemplado en el numeral Tres del artículo Décimo Sexto.*"

(d) *Anticipación de fecha de ejercicio de las opciones de suscripción preferente de acciones (Warrants) al día inmediatamente anterior al Plan Effective Date.*

Comienza el Presidente señalando que, de acuerdo a lo dispuesto en el artículo Primero Transitorio de los Nuevos Estatutos Sociales, aquellos tenedores de opciones de suscripción preferente de acciones (*Warrants*) tienen derecho a convertir dichas opciones en acciones de la Sociedad hasta el día 1 de febrero de 2027. En consideración a los términos y condiciones de la Transacción aprobada precedentemente, se hace necesario anticipar la fecha de ejercicio de aquella conversión en acciones de la Sociedad, debiendo ejercer aquel derecho el día inmediatamente anterior a que se verifique la llegada del *Plan Effective Date*.

Para estos efectos, el Presidente de la Sociedad propone, sujeto a la condición suspensiva antes referida, que el texto del artículo Primero Transitorio de los Nuevos Estatutos Sociales sea reemplazado por el siguiente:

"***ARTÍCULO PRIMERO TRANSITORIO.- Suscripción y Pago del Capital.***

*El capital de la sociedad, que asciende a la suma de $[●], se encuentra dividido en [•] acciones ordinarias, nominativas, de una sola serie y sin valor nominal. El capital se suscribe y paga, o se suscribirá y pagará, de la siguiente manera:*

***Uno.*** *[●] acciones ordinarias se encuentran suscritas y pagadas con anterioridad a la fecha de ocurrencia del Plan Effective Date. Estas acciones están sujetas a ser recompradas por la sociedad conforme a lo señalado en el artículo Octavo, numeral Seis, de los estatutos sociales.*

***Dos. Aumento de capital febrero 2016.*** *Con fecha 24 de febrero de 2016, se aprobó un aumento de capital de la sociedad, en virtud del cual se emitió, entre otras*

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

*acciones, la cantidad de 659.524 acciones de la Serie A o de la Serie B, según lo determine el titular del derecho de opción preferente de suscripción de acciones al momento de ejercer su derecho, a un precio de suscripción por acción de cero coma cero cero cero un Dólar, todas las cuales se encuentran pendientes de suscripción y pago. Se deja constancia que, en caso se suscriban acciones de la Serie A, quedarán en reserva de la sociedad la misma cantidad de acciones de la Serie B, para efectos del ejercicio del derecho de canje de que trata el artículo Décimo Primero. De conformidad al acta de la junta de accionistas que aprobó el aumento de capital, el derecho de opción preferente para suscribir estas acciones fue renunciado por los accionistas correspondientes, y asignado por la sociedad a aquellos tenedores de los bonos emitidos por la sociedad en virtud de los contratos denominados "Indenture - Dated as of May 24, 2011 – 8.250% Senior Notes due 2021" e "Indenture - Dated as of January 15, 2013 – 6.750% Senior Notes due 2023" que participaron en la oferta de canje de acuerdo a los términos del documento denominado "Offering and Solicitation Memorandum" de fecha 17 de diciembre de 2015, a prorrata de sus bonos canjeados en relación al total de la deuda de que dan cuenta los contratos antes mencionados. Los tenedores de bonos que participaron en la oferta, así como el número de acciones a las que tienen derecho cada uno de ellos, se indican en la nómina de tenedores de opciones preferentes de suscripción de acciones que consta en el acta de la junta extraordinaria de accionistas de la sociedad de fecha 24 de febrero de 2016 que aprobó el aumento de capital a que se refiere este numeral Dos. Estas acciones pendientes de suscripción y pago podrán ser suscritas por la persona a cuyo nombre se encuentren anotados los derechos de opción de suscripción preferente de acciones en el registro a que se refiere el artículo Décimo Octavo a la fecha en que se ejerzan, y deberán ser pagadas en dinero efectivo según el valor del dólar a la fecha de suscripción. Estas acciones deberán emitirse, suscribirse y pagarse en la forma indicada a más tardar el día [anterior a la fecha en que se produzca el Plan Effective Date], sin que se apliquen en su respecto las normas contenidas en los numerales Dos y Tres del artículo Décimo Segundo. En caso que estas acciones no sean suscritas o bien que las acciones suscritas no sean pagadas, total o parcialmente, dentro del plazo estipulado en el contrato de suscripción, el capital de la sociedad quedará reducido de pleno derecho y en forma automática a la cantidad efectivamente pagada, quedando el capital dividido en el número de acciones pagadas. El directorio de la sociedad quedará plena y absolutamente eximido de proceder a ejercer el cobro de los saldos insolutos correspondientes a las acciones suscritas y no pagadas.*

**Tres. Aumento de capital septiembre 2016.** *Con fecha 26 de septiembre de 2016, se aprobó un aumento de capital de la sociedad, en virtud de la cual se emitió, entre otras acciones, la cantidad de 40.476 acciones de la Serie A o de la Serie B, según lo determine el titular del derecho de opción preferente de suscripción de acciones al momento de ejercer su derecho, a un precio de suscripción por acción de cero coma cero cero cero un Dólar de los Estados Unidos de América, todas las cuales se encuentran pendientes de suscripción y pago. Se deja constancia que, en caso que se suscriban acciones de la Serie A, quedarán en reserva de la sociedad la misma*

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

*cantidad de acciones de la Serie B, para efectos del ejercicio del derecho de canje de que trata el artículo Décimo Primero. De conformidad al acta de la junta de accionistas que aprobó el aumento de capital, el derecho de opción preferente para suscribir estas acciones fue renunciado por los accionistas correspondientes, con el objeto de que el directorio de la sociedad, de tiempo en tiempo, asigne tales derechos a aquellos tenedores de los bonos emitidos por la sociedad en virtud de los contratos denominados "Indenture - Dated as of May 24, 2011 – 8.250% Senior Notes due 2021" e "Indenture - Dated as of January 15, 2013 – 6.750% Senior Notes due 2023" que no participaron de la oferta de canje de bonos referida en el número Dos anterior, pero que sí participaran de la nueva oferta de canje de bonos a la que se hace referencia en el acta de la referida junta de accionistas celebrada el 26 de septiembre de 2016, a prorrata de sus bonos canjeados en relación al total de la deuda vigente a esa fecha de que dan cuenta los contratos antes mencionados. Estas acciones pendientes de suscripción y pago podrán ser suscritas por la persona a cuyo nombre se encuentren anotados los derechos de opción de suscripción preferente de acciones en el registro a que se refiere el artículo Décimo Octavo a la fecha en que se ejerzan, y deberán ser pagadas en dinero efectivo según el valor del dólar a la fecha de suscripción. Estas acciones deberán emitirse, suscribirse y pagarse en la forma indicada a más tardar el día [anterior a la fecha en que se produzca el Plan Effective Date], sin que se apliquen en su respecto las normas contenidas en los numerales Dos y Tres del artículo Décimo Segundo. En caso que estas acciones no sean suscritas o bien que las acciones suscritas no sean pagadas, total o parcialmente, dentro del plazo estipulado en el contrato de suscripción, el capital de la sociedad quedará reducido de pleno derecho y en forma automática a la cantidad efectivamente pagada, quedando el capital dividido en el número de acciones pagadas. El directorio de la sociedad quedará plena y absolutamente eximido de proceder a ejercer el cobro de los saldos insolutos correspondientes a las acciones suscritas y no pagadas.*

**Cuatro. Aumento de capital noviembre 2019.** *Con fecha 7 de noviembre de 2019, se aprobó un aumento de capital de la sociedad, en virtud del cual se emitieron:*

A) *La cantidad de 330.082 acciones de la Serie A o de la Serie B, según lo determine el titular del derecho de opción preferente de suscripción de acciones al momento de ejercer su derecho, a un precio de suscripción por acción de 0,074365 pesos chilenos, todas las cuales se encuentran pendientes de suscripción y pago. Se deja constancia que, en caso que se suscriban acciones de la Serie A, quedarán en reserva de la sociedad la misma cantidad de acciones de la Serie B, para efectos del ejercicio del derecho de canje de que trata el artículo Décimo Primero.*

B) *La cantidad de 492.390 acciones de la Serie B, a un precio de suscripción por acción de 0,074365 pesos chilenos, todas las cuales se encuentran pendientes de suscripción y pago.*

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

*De conformidad al acta de la junta de accionistas que aprobó el referido aumento de capital, el derecho de opción preferente para suscribir las acciones referidas en las letras A y B anteriores fue renunciado por los accionistas correspondientes, y asignado por la sociedad a aquellos tenedores de los bonos emitidos por la sociedad en virtud del contrato denominado "Indenture - Dated as of February 24, 2016 – 7.50% Senior Notes due 2021" que participaron en la oferta de canje de acuerdo a los términos del documento denominado "Offering and Solicitation Memorandum" de fecha 30 de septiembre de 2019, a prorrata de sus bonos canjeados en relación al total de la deuda de que da cuenta el contrato antes mencionado. Los tenedores de dichos bonos que participaron en la oferta, así como el número de acciones a las que tendrán derecho cada uno de ellos, se indican en la nómina de tenedores de opciones preferentes de suscripción de acciones que consta en el acta de la junta extraordinaria de accionistas de la sociedad de fecha 7 de noviembre de 2019 que aprobó el aumento de capital a que se refiere este numeral Cuatro. Estas acciones pendientes de suscripción y pago podrán ser suscritas por la persona a cuyo nombre se encuentren anotados los derechos de opción de suscripción preferente de acciones en el registro a que se refiere el artículo Décimo Octavo a la fecha en que se ejerzan, y deberán ser pagadas en dinero efectivo según el valor del dólar a la fecha de suscripción. Estas acciones deberán emitirse, suscribirse y pagarse en la forma indicada a más tardar el día [anterior a la fecha en que se produzca el Plan Effective Date], sin que se apliquen en su respecto las normas contenidas en los numerales Dos y Tres del artículo Décimo Segundo. En caso que estas acciones no sean suscritas o bien que las acciones suscritas no sean pagadas, total o parcialmente, dentro del plazo estipulado en el contrato de suscripción, el capital de la sociedad quedará reducido de pleno derecho y en forma automática a la cantidad efectivamente pagada, quedando el capital dividido en el número de acciones pagadas. El directorio de la sociedad quedará plena y absolutamente eximido de proceder a ejercer el cobro de los saldos insolutos correspondientes a las acciones suscritas y no pagadas.*

***Cinco. Aumento de capital de [fecha].*** *Con fecha [●], se aprobó un aumento de capital de la sociedad, en virtud del cual se emitieron acciones ordinarias de la sociedad, a un precio de suscripción por acción de [●], todas las cuales se suscritas y pagadas. De conformidad al acta de la junta de accionistas que aprobó el aumento de capital, el derecho de opción preferente para suscribir estas acciones fue renunciado por los accionistas correspondientes, y asignado por la sociedad a una compañía que será la única titular de los bonos emitidos por la sociedad con anterioridad a esta fecha, conforme a los términos del plan de reorganización de la sociedad contemplado en el RSA, quien las pagó mediante la capitalización de su crédito contra la sociedad por [●] Dólares. "*

## 15.- ACUERDOS RESPECTO A LAS MODIFICACIONES ADICIONALES DE LOS ESTATUTOS SOCIALES, CONTEMPLADAS EN EL RSA Y SUJETAS A LA

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

## CONDICIÓN SUSPENSIVA CONSISTENTE EN QUE SE VERIFIQUE EL *PLAN EFFECTIVE DATE*:

Sometidos los asuntos anteriormente señalados por el señor Presidente en el número 14 anterior, a la consideración de los accionistas, se aprobaron las siguientes materias por los accionistas de la Sociedad, todas sujetas a la condición suspensiva consistente en que se produzca el "Plan Effective Date" (según este término se define en el Plan Term Sheet), acordándose asimismo que el cumplimiento de esta condición deberá ser certificado por el directorio de la Sociedad, o por los directores Serie C, dentro del plazo de [3] días hábiles contados desde el Plan Effective Date, certificación que deberá reducirse a escritura pública y anotarse al margen de la inscripción de la Sociedad en el Registro de Comercio:

(a) La modificación de las reglas de conversión de las acciones preferentes de las Series C y D, en acciones Series A y B, añadiendo al actual artículo Décimo de los estatutos sociales la posibilidad de que, una vez aprobado por el tribunal competente el correspondiente Plan y en la fecha en que se produzca el Plan Effective Date, la totalidad de las acciones Series C y D sean convertidas en acciones Serie A y B, respectivamente.

(b) Eliminar la actual división de las acciones de la Sociedad en Series A, B, C y D, las que serán reemplazadas por nuevas acciones ordinarias de la Sociedad conforme a la relación de canje descrita más arriba, e incluyendo la eliminación de las acciones reservadas para el derecho de canje de que trata el artículo Décimo Primero de los estatutos, en los términos señalados precedentemente por el Presidente. En ese sentido, se aprueba también la modificación de los artículos Quinto y Primero Transitorio de los estatutos sociales con el objeto de plasmar la nueva distribución del capital accionario.

(c) La modificación del capital social en dos etapas, en primer lugar, mediante la disminución de capital por absorción de pérdidas, en la forma y por los montos antes señalados por el señor Presidente, aprobando reformar los estatutos sociales sustituyendo el actual artículo Quinto y el artículo Primero Transitorio por nuevos textos, los que se propondrán más adelante en esta Junta.

Adicionalmente, para efectos de lo expuesto, se facultó al Directorio para que, con las más amplias atribuciones y facultades, acuerde los términos necesarios para la materialización de la disminución de capital acordado precedentemente, lo que deberá quedar verificado dentro del plazo de [3] días hábiles contados desde el Plan Effective Date.

Por su parte, los accionistas que aprobaron la presente modificación, manifiestan desde ya que aceptan, sujeto a la condición suspensiva referida, participar en la disminución de capital, mediante la cancelación de la totalidad de las acciones que poseen en la Sociedad.

Y como segunda etapa de la modificación del capital social, aumentar el capital de la Sociedad, en la suma de $[●] (correspondiente al equivalente en pesos del valor facial de los bonos capitalizados esto es, el monto de US$[●], de conformidad con el valor del dólar observado publicado por el Banco Central de Chile el día [●]), mediante la emisión de [•]

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

acciones ordinarias de pago, nominativas, sin valor nominal y con derecho a voto, al valor individual aproximado de \$[•] por cada acción, todas las cuales deberán quedar emitidas, suscritas y pagadas a más tardar el [•]. Así, el capital social alcanzaría en definitiva la suma de \$[•], dividido en [•] acciones ordinarias, nominativas, de una sola serie y sin valor nominal, de las cuales: **(a)** [•] se encuentran suscritas y pagadas; **(b)** [•] se encuentran pendientes de suscripción y pago.

Asimismo, se deja expresa constancia que la totalidad de los accionistas de la Serie A presentes han manifestado su decisión, sujeta a la condición suspensiva antes referida, de no ejercer su derecho de opción preferente de suscripción de las [•] nuevas acciones, con el objeto de permitir que la Sociedad, en conformidad con lo dispuesto en los términos y condiciones de la Transacción, pueda otorgar el derecho de opción preferente de suscripción de las [•] nuevas acciones a una sociedad que será la única titular de los bonos emitidos bajo el Indenture 2025, el Indenture 2016, el Indenture 2013 y el Indenture 2011, a la fecha del Plan Effective Date, conforme a los términos del Plan.

Por otra parte, se aprobó facultar al Directorio para acordar, con las más amplias atribuciones, la emisión de las acciones correspondientes al aumento de capital acordado en esta Junta, y los términos de la emisión y colocación de las acciones de pago necesarias para la materialización del aumento de capital acordado precedentemente, en una o varias emisiones, en las oportunidades que el directorio estime, y en un valor de colocación, en principio, ascendente a \$[•] por cada acción; y para adoptar todos los acuerdos, medidas y actos necesarios para la debida y total materialización del aumento de capital antes referido, lo que deberá quedar verificado dentro del plazo de [•] años contados desde el [•].

Finalmente, se aprueba modificar los artículos Quinto y Primero Transitorio de los Nuevos Estatutos Sociales, de acuerdo a los textos que se indican más adelante en la presente Junta.

(d) Incorporar en el artículo Octavo de los estatutos sociales un nuevo numeral Seis, que contemple un derecho de recompra adicional en favor de la Sociedad, por la totalidad, y no menos que la totalidad, de las acciones suscritas y pagadas a esa fecha por los accionistas de la Sociedad distintos a los tenedores de las nuevas acciones emitidas por la Sociedad conforme al aumento de capital referido, a un precio de \$[0,0001] [por acción], reduciéndose de pleno derecho el capital y eliminándose del registro de accionistas las acciones recompradas, tal como lo dispone el numeral Cuatro del artículo Octavo de los estatutos sociales. Lo anterior, conforme al texto propuesto anteriormente en esta Junta.

(e) Anticipar la fecha de ejercicio de las opciones de suscripción preferente de acciones (Warrants) dispuesta en el artículo Primero Transitorio de los estatutos, debiendo ejercer aquel derecho no más allá del día inmediatamente anterior a que se verifique la llegada del *Plan Effective Date*.

(f) Eliminar las referencias a las operaciones relativas a los canjes de bonos de bonos de los años 2016 y 2019, ajustándose los estatutos de la Sociedad en la forma descrita anteriormente en esta Junta.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

**16.- MODIFICACIÓN, ACTUALIZACIÓN Y SIMPLIFICACIÓN DE LOS ESTATUTOS SOCIALES Y NUEVO TEXTO REFUNDIDO.**

A continuación, el Presidente manifestó que, para efectos de un mayor orden, y con motivo de los acuerdos adoptados por los accionistas en los puntos 13 y 15 de esta Junta, se propone a los accionistas efectuar las modificaciones, actualizaciones y simplificaciones que fueren necesarias a los estatutos de la Sociedad para reflejar e incorporar los acuerdos adoptados por la presente Junta Extraordinaria de Accionistas con motivo de los asuntos anteriores, emitiendo el siguiente nuevo texto modificado y refundido de los estatutos de la Sociedad (en adelante, los "**Nuevos Estatutos Sociales**"). Se deja expresa constancia que la entrada en vigencia de los Nuevos Estatutos Sociales estará sujeta a la condición suspensiva consistente en que se verifique el "Plan Effective Date" (según este término se define en el Plan Term Sheet), lo cual deberá ser certificado por el directorio de la Sociedad, o por los directores de la Serie C, dentro del plazo de [3] días hábiles contados desde el Plan Effective Date, certificación que deberá reducirse a escritura pública y anotarse al margen de la inscripción de la Sociedad en el Registro de Comercio.

*"[•]"*

Sometida la cuestión a la consideración de los accionistas, se aprobó por la unanimidad de las acciones de la Sociedad, efectuar las modificaciones, actualizaciones y simplificaciones que fueren necesarias a los estatutos de la Sociedad para reflejar e incorporar los acuerdos adoptados por la presente Junta Extraordinaria de Accionistas, emitiendo un nuevo texto modificado y refundido de los estatutos de la Sociedad, sujeto a la condición indicada anteriormente.

**17.- INFORMAR SOBRE LA PROPUESTA DE SUSCRIBIR UN WAIVER RESPECTO DE LOS DERECHOS Y OBLIGACIONES DEL ACTUAL PACTO DE ACCIONISTAS DE LA SOCIEDAD; DE ANTICIPAR LA FECHA DE EJERCICIO DE LAS OPCIONES DE SUSCRIPCIÓN PREFERENTE DE ACCIONES (WARRANTS) PARA EFECTOS DE IMPLEMENTAR LA RESTRUCTURACIÓN CONFORME A LOS TÉRMINOS DEL PLAN TERM SHEET; Y DE TERMINAR EL ACTUAL PACTO DE ACCIONISTAS DE LA SOCIEDAD, SUJETO A LA CONDICIÓN SUSPENSIVA CONSISTENTE EN QUE SE PRODUZCA EL "PLAN EFFECTIVE DATE".**

El señor Presidente explica a los accionistas que, con el objeto de implementar la Restructuración en los términos descritos precedentemente, resulta necesario que los accionistas de la Sociedad que son parte del pacto de accionistas actualmente vigente (el "Pacto") suscriban un *waiver* o renuncia respecto de ciertos derechos y obligaciones contenidos en el mismo así como modifiquen la fecha de ejercicio de la conversión en acciones de la Sociedad a que tienen derecho aquellos tenedores de opciones de suscripción

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

preferente de acciones (Warrants), debiendo ejercer aquel derecho el día inmediatamente anterior a que se verifique la llegada del Plan Effective Date, sujeto a la condición suspensiva de que se produzca el "*Plan Effective Date*" (según dicho término se define en el Plan Term Sheet). Además, el waiver contemplaría que, en la medida que el RSA no sea terminado con anterioridad al "Plan Effective Date", que la Restructuración y el inicio del Prepack Chapter 11 no gatillarán la conversión automática de acciones de la Serie C y Serie D de la Sociedad conforme a la Sección V del Pacto, ni producirán la revocación del directorio conforme a la Sección 2.03 del mismo. En caso que se ponga término al RSA con anterioridad al Plan Effective Date, la modificación al plazo de ejercicio de los Warrants quedará sin efecto. Asimismo, se producirá la conversión de las series C y D y se gatillará la revocación del Directorio si la Sociedad iniciase un procedimiento de reorganización o insolvencia de cualquier tipo, conforme a lo contemplado actualmente en el Pacto.

Adicionalmente, [•] informó a los accionistas que, conforme a lo expuesto en la presente sesión, una vez implementada la Restructuración, la Sociedad tendrá una nueva estructura de capital que comprende la existencia de un solo accionista y que hará innecesaria la existencia del actual Pacto de la Sociedad.

Luego de la exposición del Presidente, los accionistas de la Sociedad tomaron conocimiento de que, para efectos de implementar la Restructuración, se otorgará un waiver respecto del Pacto (incluyendo la modificación de la fecha para ejercer los Warrants) y que con motivo de la misma se producirá terminación del actual pacto de accionistas de la Sociedad, sujeto a la condición suspensiva, en la parte que corresponda, de que se produzca el "*Plan Effective Date*" (según dicho término se define en el Plan Term Sheet). Se deja constancia de que ninguno de los accionistas presentes objetó lo anterior.

**18.- <u>APROBACIÓN DEL OTORGAMIENTO DE LAS GARANTÍAS REALES Y PERSONALES NECESARIAS PARA GARANTIZAR LA EMISIÓN DE NUEVOS BONOS BAJO UN NUEVO INDENTURE, CONFORME A LO CONTEMPLADO EN EL PLAN TERM SHEET Y LOS DOCUMENTOS DEL FINANCIAMIENTO, INCLUYENDO LA MODIFICACIÓN DEL ACTUAL CONTRATO DE AGENCIA DE GARANTÍAS Y SUSCRIPCIÓN DE UN NUEVO CONTRATO DE AGENCIA DE GARANTÍAS</u>.**

El Presidente explica que, conforme a lo señalado precedentemente, con motivo de la Restructuración la Sociedad emitirá, en el Plan Effective Date Nuevos Bonos Garantizados, cuyo pago se garantizará con:

    a. Garantías personales otorgadas las mismas filiales que garantizaban los Bonos 2025 (conjuntamente, los "<u>Garantes</u>").

    b. Garantías de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior), sobre los mismos bienes que garantizaban los Bonos 2025.

    c. Prenda de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior) sobre todas las acciones de la Sociedad, a ser otorgada por [Chile Holdco].

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

    d. Prenda de primer grado (para los Nuevos Bonos Senior) y de segundo grado (para los Nuevos Bonos Junior) sobre todas las acciones de la Sociedad, en las acciones de los Deudores y Deudores Reorganizados (*Debtor* y *Reorganized Debtor* según estos términos se definen en el Plan Term Sheet).

Un listado de las garantías de los Nuevos Bonos Garantizados se incluirá como **Anexo B** en el acta de esta Junta. Luego de un breve debate, se acordó por la unanimidad de los accionistas de la Serie A, y por un [●]% de las acciones de la Serie C, aprobar el otorgamiento de las garantías que se señalan en el Anexo B.

Adicionalmente, el Presidente explica que, para efectos de implementar la Restructuración, se deberán otorgar garantías para el Financiamiento DIP, que incluyen:

    a. Al cierre del DIP Credit Facility, una vez se haya emitido la orden del tribunal competente de Estado de Nueva York, Estados Unidos de América, se otorgarán nuevas garantías y/o modificarán las garantías existentes para que el DIP Credit Facility esté garantizado por: (i) un "Priming Lien", sobre las garantías reales de los Bonos 2025 otorgadas por el Deudor o los Garantes del DIP Credit Facility, y en el caso de que sean otorgadas por las filiales no garantes, tendrán el mismo grado de preferencia (pari passu); (ii) garantías sobre inventario, cuentas por cobrar y cuentas corrientes de la Sociedad y sus filiales en Chile, Costa Rica y Uruguay, sujeto a reglas que permitan la continuidad de la operación de la Sociedad en el curso ordinario de los negocios, las que serán documentadas de acuerdo a los requisitos que en cada jurisdicción se establezca, y sujeto, en todo caso, a la posibilidad de prendar esos activos para obtener capital de trabajo adicional. Un listado de las garantías específicas a ser otorgadas en cada jurisdicción se incluye como Anexo A a la presente acta, y se incluye asimismo como anexo en el RSA.

Un listado de las garantías del Financiamiento DIP se incluirá como Anexo A en el acta de esta Junta. Luego de un breve debate, se acordó por la unanimidad de los accionistas de la Serie A, y por un [●]% de las acciones de la Serie C, aprobar el otorgamiento de las garantías que se señalan en el Anexo B.

## 21.- RATIFICACIÓN DE LOS ACTOS O CONTRATOS OTORGADOS CON MOTIVO DE LA NEGOCIACIÓN DE LA RESTRUCTURACIÓN DE LA SOCIEDAD Y QUE TENGAN EL CARÁCTER DE OPERACIONES ENTRE PARTES RELACIONADAS.

Continua el señor Presidente indicando a los accionistas que, con motivo del proceso de negociación llevado a cabo con el Grupo Ad Hoc para llevar a cabo la restructuración financiera del pasivo de la Sociedad, ésta ha realizado diversas actuaciones y contratos con directores, administradores y ejecutivos principales de la Sociedad y de sus sociedades filiales en otros países, las cuales tienen el carácter de operaciones entre partes relacionadas conforme a lo señalado en el artículo 44 de la Ley sobre Sociedades Anónimas.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

Para efectos de cumplir con la citada normativa, el Directorio de la Sociedad acordó en sesión celebrada con fecha [•], que los actos o contratos que tengan el carácter de operaciones entre partes relacionadas sean ratificados en junta extraordinaria de accionistas por el 75% de los accionistas de la Serie A de la Sociedad.

El Presidente da cuenta a los señores accionistas de las siguientes operaciones con partes relacionadas efectuadas por la Sociedad desde la última junta ordinaria de accionistas:

1. [•];
2. [•]; y
3. [•].

Luego de un breve debate, la unanimidad de los accionistas Serie A aprueban y ratifican todos aquellos actos o contratos celebrados por la Sociedad en el marco de la negociación de la restructuración del pasivo financiero con el Grupo Ad Hoc.

## 22.- REDUCCIÓN A ESCRITURA PÚBLICA.

La Junta acordó, por la unanimidad de las acciones presentes, facultar a Eduardo Moyano Luco, Elena Yubero Goncalves, Francisco Javier Illanes Munizaga, Sergio Balharry Rovegno y Cristóbal Morales Deik para que, actuando conjunta o separadamente uno cualquiera de ellos, puedan reducir a escritura pública el todo o parte del acta que se levante de la Junta, y al portador de copia autorizada de dicha escritura para requerir las inscripciones, subinscripciones, anotaciones y cancelaciones que procedan.

Luego que el señor Presidente ofreciera la palabra, y sin que se hubieran formulado observaciones, la Junta dio por aprobado lo propuesto por el señor Presidente.

No habiendo otros asuntos que tratar, se levantó la Junta a las [•] horas.

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

**Anexo A**
**Listado de Garantías del Financiamiento DIP**

*CONFIDENCIAL Y NO VINCULANTE*
*Borrador Cariola*
*25.03.2021*

**Anexo B**
**Listado de Garantías de los Nuevos Bonos Garantizados**

## **EXHIBIT F**

**EXECUTED SHAREHOLDER PROXY AND POWER OF ATTORNEY**

Santiago, Chile

March 30, 2021

### PROXY TO ATTEND THE EXTRAORDINARY SHAREHOLDERS´ MEETING OF

### AUTOMOTORES GILDEMEISTER SpA

**Minvest S.A.** (the "Shareholder"), hereby authorizes and grants a power of attorney, as ample required by law (subject to the limitations set forth herein), to Benjamin Grebe Lira, Juan Alberto Tagle Quiroz, Isabel Monge Prieto, and Isabel Margarita Wolleter Eguiguren (each of them the "Agent"), so that, acting indistinctly and separately, any of them attends the Extraordinary Shareholders´ Meeting (the "Meeting") of **Automotores Gildemeister SpA** (the "Company"), to be held on April 9th, 2021, commencing at 11:00 a.m., at the offices of the Company located in Avenida Las Condes No. 11,000, Vitacura, Santiago, or at any other Meeting held in its substitution, if the first one does not take place by lack of quorum of defects in its summons or by any other cause in accordance with the law, within 45 days from the date mentioned above.

In the exercise of its power of attorney, subject to the immediately following sentence, the Agent will be able to exercise in the Meeting all the rights that belong to the Shareholder as shareholder of the Company, in accordance with the Commerce Code, the Corporations Act, the Regulations of the Corporations Act and the corporate by-laws. Acting in its capacity as representative of the Shareholder, the only action that the Agent shall be entitled to take pursuant to this power of attorney is to vote the approval of the matters provided in the draft of the shareholders' meeting minutes attached hereby as Annex A.

The Agent may not delegate its powers at any time, provided that it may delegate to another attorney at Prieto Abogados subject to the same limitations as set forth herein.

This power of attorney is granted for the total number of shares enrolled under the Shareholder's name in the Shareholders Registry of the Company, at the date of the Meeting.

This power of attorney may only be revoked by a subsequent writing by the Shareholder.

This power of attorney shall expire and be revoked immediately after the Meeting without any further action.

Ricardo Lessmann Cifuentes

p.p. Minvest S.A.

{C-0860592/CMD/v.4}

## <u>EXHIBIT G</u>

## LIST OF SENIOR MANAGERS

1. Ricardo Lessmann, Executive President

2. Eduardo Moyano, CFO

3. Francisco Marchant, COO

4. Fernando Mendoza Barreda, CEO Perú

5. Ivan Contreras, CFO Perú

6. Martín Oyarzun, CEO Uruguay

7. Máximo Morel, Manager for HMC

8. Cristóbal Lessmann, Manager for Fortaleza S.A.

9. Elena Yubero, GC

# EXHIBIT C

## Financial Projections

**FINANCIAL PROJECTIONS OF THE REORGANIZED DEBTORS ON A CONSOLIDATED BASIS**

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared these Financial Projections for the years 2021 through 2028. The Financial Projections were prepared by Management and are based on several assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations on a consolidated basis.

The Debtors have prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. The Financial Projections have not been audited or reviewed by independent accountants. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or the Financial Projections to holders of Claims or Interests or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or other regulatory bodies or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

**THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITITUE OF CERTIFIED PUBLIC ACCOUNTANTS, THE CHILEAN ASSOCIATION OF ACCOUNTANTS OR THE INTERNATIONAL ACCOUNTING STANDARDS BOARD FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.**

**ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE UNDERLYING ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' CONSOLIDATED FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.**

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that such plan, intentions and expectations will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements are attributable to the Debtors acting on their behalf and are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only to circumstances as of the date on

which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to: (a) fluctuations in the supply of and demand for new vehicles; (b) the uncertainty inherent in estimating future revenues and discounted future cash flows; (c) changes in the availability and cost of capital; (d) planned asset sales; (e) the foreign exchange rate of local currency relative to the US dollar; and (f) the effects of existing and future laws and governmental regulations. The Debtors believe, based on preliminary tax and accounting analyses, that they will not incur significant income taxes over the forecast horizon. To the extent it is later determined that these accounting and tax analyses are incorrect, the Reorganized Debtors' consolidated projections could be materially impacted. Additional information regarding these uncertainties are described in the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factors or combinations may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the Reorganized Debtors' consolidated performance.

**Overview**

Actual balances may vary from those reflected in the opening balance due to variances in projections. The reorganized pro forma debt capital structure from the period ending June 30, 2021 through December 31, 2028 contain certain pro forma adjustments as a result of consummation of the Plan.

**Assumptions**

A.  Overview

The Debtors or entities controlled by the Debtors (collectively, the "Company") are engaged in the importation and distribution of vehicles in Chile, Peru, Costa Rica and Uruguay, as well as any other business reasonably incidental, complementary or accessory to the above. For instance, these subsidiaries are engaged in marketing of motor vehicles, their components, accessories, elements and spare parts, maintenance services, insurance brokerage and loans. The Company is the sole distributor of several established and emerging global vehicle brands, and provides customers with a broad array of options, ranging from economy to luxury vehicles. The Company has built a retail distribution network in the markets in which it operates. The Debtors have a retail network of 46 and 3 dealerships in Chile and Uruguay, respectively, while the non-Debtors have a network of 19 and 2 dealerships in Peru and Costa Rica, respectively. The Company also distributes vehicles to 160 franchised dealerships, including 68 franchised dealerships located in Chile and 90 franchised dealerships located in Peru. A portion of the Debtors' operations in Uruguay were sold in March 2021. The Debtor operations in Brazil are in the process of wind-down and do not have going concern operations.

B.  Presentation

The Financial Projections herein reflect the consolidated financial results for the Chilean operations (which reflect certain Debtors) and the Peruvian operations (which reflect non-debtors). The Uruguayan, Brazilian and Costa Rican operations are treated as an investment; therefore, only dividend cash flows from these operations are reflected in the Financial Projections.

2

C.  Plan Consummation

The Financial Projections include projected financial statements for 2021-2028 and an Assumed Effective Date of June 30, 2021.

D.  Accounting Policies

The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' consolidated historical financial statements, except for the following pro forma adjustments made for simplification purposes: (1) the operations of Uruguay, Costa Rica and Brazil are not consolidated, but treated as an investment and only reflect the dividend income of such operations; and (2) pro forma debt reflects the principal outstanding, excluding original issue discount ("OID"), and reclassification of certain items from other liabilities.

E.  Total Revenue

Total revenue consists of the sale of new and used vehicles, services, spare parts and commissions, net of value-added taxes, returns, rebates and discounts.

F.  Chile and Peru New Vehicle Markets

As a consequence of COVID-19 in Chile and Peru and the measures implemented to contain it, which included a partial lockdown in Chile and a full lockdown in Peru, the vehicle markets in both countries severely contracted in 2020. The Debtors expect the market to recover to pre-COVID-19 levels in Chile and Peru by 2022. In the long term, based on market estimates, the market in Chile is expected to grow in line with GDP, and the market in Peru is expected to grow at a higher rate than GDP because the current vehicle penetration level is low.

| Chile | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2019A | 2020A | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Light & medium vehicles | 348,668 | 239,742 | 334,860 | 370,000 | 398,700 | 426,800 | 454,800 | 472,500 | 491,000 | 510,200 |
| *Growth (yoy)* | *-17%* | *-31%* | *40%* | *10%* | *8%* | *7%* | *7%* | *4%* | *4%* | *4%* |
| Trucks | 12,249 | 9,871 | 13,319 | 13,551 | 14,093 | 14,657 | 15,243 | 15,548 | 15,859 | 16,176 |
| *Growth (yoy)* | *-16%* | *-19%* | *35%* | *2%* | *4%* | *4%* | *4%* | *2%* | *2%* | *2%* |
| Buses | 3,483 | 2,677 | 3,766 | 3,889 | 3,950 | 4,011 | 4,171 | 4,254 | 4,340 | 4,426 |
| *Growth (yoy)* | *15%* | *-23%* | *41%* | *3%* | *2%* | *2%* | *4%* | *2%* | *2%* | *2%* |

| Peru | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2019A | 2020A | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Light & medium vehicles | 153,410 | 108,292 | 128,560 | 149,800 | 160,286 | 169,903 | 180,097 | 190,903 | 202,357 | 214,499 |
| *Growth (yoy)* | *6%* | *-29%* | *19%* | *17%* | *7%* | *6%* | *6%* | *6%* | *6%* | *6%* |
| Trucks | 16,311 | 10,211 | 12,313 | 14,310 | 15,741 | 17,001 | 18,361 | 19,738 | 21,218 | 22,809 |
| *Growth (yoy)* | *-9%* | *-37%* | *21%* | *16%* | *10%* | *8%* | *8%* | *8%* | *8%* | *8%* |

G.  Cost of Goods Sold

Cost of goods as a percentage of sales is expected to remain relatively flat throughout the projection period.

H.  General and Administrative Expenses

In 2020, the Debtors reduced costs significantly in response to the pandemic and the Reorganized Debtors are projected to continue to implement cost controls going forward.

The Debtors' personnel costs have been impacted by a reduction of headcount in 2020 and the exit from the Premium business in 2020 and 2021. After 2021, the Reorganized Debtors' headcount is projected to increase to deliver top line growth expected from a stronger wholesale market.

Marketing & advertisement expenditures were reduced significantly in 2020 given the impact of the pandemic. As the market recovers, the Reorganized Debtors expect to launch larger marketing & advertising campaigns to increase their market share.

Professional services are expected to increase at the rate of inflation post-2021 to reflect the services of ordinary professionals such as auditors and legal counsel.

Depreciation and amortization expenses are expected to decline through 2022 as a result of asset sales before increasing as a result of an increase in PP&E (asset revaluations and capital expenditures).

**Consolidated SG&A**

| | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|---|---|
| Personnel | $48 | $48 | $50 | $56 | $62 | $68 | $73 | $78 |
| Marketing & advertisement | 12 | 16 | 18 | 20 | 22 | 23 | 26 | 27 |
| Professional services | 7 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Depreciation and amortization[1] | 18 | 17 | 18 | 20 | 23 | 25 | 27 | 30 |
| Other[2] | 21 | 23 | 22 | 25 | 28 | 31 | 34 | 37 |
| **Total SG&A – Consolidated** | **$107** | **$111** | **$116** | **$130** | **$145** | **$159** | **$172** | **$185** |

**Notes**
1 Includes amortization of capitalized leases
2 Includes rent, services, materials and supplies, maintenance, travel, communication, severance, and other general expenses

I.    Working Capital

From 2021 onward, (a) inventory is expected to normalize at a lower level than the historical average due to tight working capital controls and vehicle mix, (b) days of accounts receivable are expected to be lower than in 2020, although at a level higher than in 2019, and (c) days of accounts payable are expected to be consistent in the long term with levels in 2019.

J.    Capital expenditures

After 2021, the Reorganized Debtors expect annual capital expenditures to normalize at a level of approximately $8 million.

K.    Asset Sales

The Company has initiated a divestiture program of non-core real estate and other assets expected to result in proceeds over the next few years as outlined in the Pro Forma Summary Income and Cash Flow Statement below.

L.    Interest Expense

Post-emergence interest expense is forecasted based on the Reorganized Debtors' anticipated pro forma consolidated capital structure. The consolidated pro forma capital structure includes $56 million of local bank debt, $24 million of New Senior Tranche Secured Notes, $229 million of New Junior Tranche Secured Notes, and $111 million of Subordinated Notes. The Pro Forma Summary Income and Cash Flow Statement assume that the Reorganized Debtors elect to PIK interest related to the New Senior Tranche Secured Notes, New Junior Tranche Secured Notes, and Subordinated Notes for the maximum time period permitted under the respective Indentures.

**Pro Forma Capital Structure**

The below table presents the pro forma capital structure based on an Assumed Effective Date of June 30, 2021. The pro forma capital structure assumes that the Reorganized Debtors will have a new working capital facility in place in Chile at emergence.

4

| $ in millions | Pre[1] | Δ | Pro forma |
|---|---|---|---|
| *Existing debt:* | | | |
| Bank debt | $56 | – | $56 |
| DIP | 24 | (24) | – |
| 7.5% Secured Notes due 2025 | 510 | (510) | – |
| 7.5% Unsecured Notes due 2021 | 10 | (10) | – |
| 8.25% Unsecured Notes due 2021 | 22 | (22) | – |
| 6.75% Unsecured Notes due 2023 | 3 | (3) | – |
| *New debt:* | | | |
| New Senior Secured Notes | – | 24 | 24 |
| New Junior Secured Notes | – | 229 | 229 |
| New Subordinated Notes | – | 111 | 111 |
| **Total debt** | **$624** | **($204)** | **$420** |
| Unrestricted cash | (41) | – | (41) |
| **Net debt** | **$583** | **($204)** | **$379** |

**Note**
**1** Excludes accrued interest

## Pro Forma Summary Income and Cash Flow Statement

The pro forma summary income and cash flow statement assumes that the Reorganized Debtors will have a new working capital facility in place in Chile at emergence.

| Pro forma summary income and cash flow statement | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|---|---|
| Total revenue | $925 | $1,031 | $1,154 | $1,314 | $1,484 | $1,638 | $1,794 | $1,942 |
| COGS | (777) | (874) | (978) | (1,112) | (1,256) | (1,386) | (1,517) | (1,643) |
| SG&A | (107) | (111) | (116) | (130) | (145) | (159) | (172) | (185) |
| Other adjustments[1] | 20 | 20 | 21 | 24 | 27 | 30 | 33 | 35 |
| **EBITDA** | **$61** | **$66** | **$82** | **$96** | **$111** | **$124** | **$138** | **$149** |
| Change in working capital | (107) | (78) | (42) | (43) | (48) | (43) | (43) | (39) |
| Cash taxes | 1 | (8) | (2) | (3) | (5) | (6) | (8) | (9) |
| CapEx | (6) | (8) | (8) | (8) | (8) | (8) | (8) | (8) |
| Other[2] | 27 | (28) | (13) | (10) | (9) | (6) | (8) | (4) |
| Disposal of assets | 57 | 116 | 45 | – | – | – | – | – |
| **Unlevered free cash flow** | **$33** | **$61** | **$62** | **$31** | **$40** | **$60** | **$72** | **$89** |
| Cash interest | (13) | (17) | (18) | (19) | (39) | (40) | (41) | (42) |
| Debt issuance / (repayment) | (14) | (36) | (34) | 1 | (1) | (11) | (10) | (18) |
| Other[3] | (10) | (0) | 0 | (0) | (0) | (3) | (0) | (0) |
| **Levered free cash flow** | **$18** | **$7** | **$10** | **$13** | **$0** | **$6** | **$20** | **$28** |
| Unrestricted cash | $83 | $91 | $101 | $114 | $114 | $120 | $141 | $169 |
| Restricted cash | 22 | 43 | 52 | 60 | 69 | 75 | 83 | 87 |

**Notes**
**1** Includes adjustments related to depreciation and amortization, discontinued operations and the reclassification of supplier credits as working capital
**2** Includes dividends from associates, investments in associates, related party loans, equity financing, other operating cash flows and other investing cash flows
**3** Includes transaction expenses and foreign exchange differences

## Projected Debt Balances

| Projected debt balances | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|---|---|
| Bank debt | $95 | $132 | $151 | $169 | $186 | $196 | $209 | $215 |
| Senior Tranche New Secured Notes | – | – | – | – | – | – | – | – |
| Junior Tranche New Secured Notes | 225 | 188 | 169 | 184 | 184 | 184 | 184 | 184 |
| Subordinated Notes | 117 | 128 | 142 | 156 | 168 | 181 | 195 | 210 |

# EXHIBIT D

## Liquidation Analysis

# **LIQUIDATION ANALYSIS**

## **Introduction**

This hypothetical Liquidation Analysis (the "Liquidation Analysis") represents the liquidation value of the assets of the Debtors and certain assets pledged to the 7.5% Notes due 2025 (as defined in the Plan, or the "Secured Notes") that are owned by non-Debtor entities located in Peru and Costa Rica.  This Liquidation Analysis includes such non-Debtor assets in its calculations because the liquidation of the Debtor entities would trigger contractual defaults and allow Holders of the Secured Notes to foreclose on the non-Debtor collateral.

Section 1129(a)(7) of the Bankruptcy Codes requires that each Holder of an Impaired Allowed Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

The purpose of the Liquidation Analysis that follows is to provide information in order for the Bankruptcy Court to determine that the Plan satisfies this requirement.  The Liquidation Analysis was prepared to assist the Bankruptcy Court in making this determination and should not be used for any other purpose.  To demonstrate that the Plan satisfies this standard, the Debtors, in consultation with their legal and financial advisors, have prepared the Liquidation Analysis under a hypothetical liquidation under Chapter 7 that: (i) estimates the realizable liquidation value of the Debtors' assets and (ii) estimates the distribution to creditors resulting from the liquidation, net of estimated Chapter 7 related fees and wind down costs.

Under Chapter 7, the assets of the Debtors would be subject to liquidation and values would be measured under an orderly liquidation value ("OLV") premise.  OLV reflects the gross amount, in USD million, translated from various foreign currencies using the exchange rates as of December 31, 2020 that can be realized from a liquidation sale, given reasonable market exposure to find a purchaser, with the seller being compelled to sell on an "as-is", "where is" basis, as of a specific date.  This analysis is based upon several significant assumptions.  The Liquidation Analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.  In fact, some of these assets may not be available for sale for an undetermined period of time, and they may diminish in value if a local bankruptcy proceeding is also commenced in various jurisdictions such as Chile or Uruguay and/or a local administrator is named to administer one or more of the estates during the pendency of a Chapter 7 proceeding or a foreign court-appointed liquidation.

This Liquidation Analysis was prepared in connection with the filing of the Debtors' Disclosure Statement and Plan. The Debtors have prepared this Liquidation Analysis based on a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. The Liquidation Analysis presents the Debtors' determination of the hypothetical liquidation value of their businesses if a Chapter 7 trustee (the "Trustee") were appointed and charged with winding down the estates.  Under a Chapter 7 liquidation, it is assumed solely for purposes of this analysis that the Trustee would sell all of the Debtors' major assets or surrender them to the respective lien holders, and the cash proceeds, net of liquidation related costs, would then be distributed to holders of claims in accordance with relevant local laws.  Estimating recoveries in any hypothetical Chapter 7 liquidation case is uncertain due to the number of unknown variables.  Thus, extensive use of estimates and assumptions have been made that, although considered reasonable, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  In the event of a Chapter 7 liquidation, actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.  Similarly, the actual amount of allowed claims in a Chapter 7 liquidation could materially and significantly differ from the amount of claims estimated in the Liquidation Analysis.

The Liquidation Analysis presents only information provided by the Debtors' management and does not include an independent evaluation of the underlying assumptions. The Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

This Liquidation Analysis considers certain regulations set forth by the liquidation statutes in the jurisdictions in which the Debtors' and non-Debtor affiliate assets are located—Chile, Uruguay, Brazil, Peru, and Costa Rica.

**THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE THAN THAT EXPLAINED ABOVE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION. THIS ANALYSIS ASSUMES "LIQUIDATION VALUES" BASED ON THE DEBTORS' BUSINESS JUDGMENT IN CONSULTATION WITH THE DEBTORS' ADVISORS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM ANY GOING CONCERN SALE OF THE DEBTORS' ASSETS OR BUSINESS UNITS WOULD BE MORE THAN HYPOTHETICAL LIQUIDATION VALUES, THE COSTS ASSOCIATED WITH ANY SALE WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER OF THE DEBTORS' BUSINESSES. THE UNDERLYING FINANCIAL INFORMATION IN THE LIQUIDATION ANALYSIS WAS NOT COMPILED OR EXAMINED BY ANY INDEPENDENT ACCOUNTANTS. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.**

**THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR THE PURPOSES OF ESTIMATING THE ASSET PROCEEDS AVAILABLE IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED AS OR CONSTITUTES A CONCESSION OR ADMISSION FOR ANY PURPOSE OTHER THAN THE PRESENTATION OF A HYPOTHETICAL LIQUIDATION ANALYSIS FOR PURPOSES OF THE BEST INTERESTS TEST. THE LIQUIDATION ANALYSIS SHOULD BE READ IN CONJUNCTION WITH THE ACCOMPANYING ASSUMPTIONS.**

<u>**General Assumptions**</u>

The Liquidation Analysis is based upon an estimate of the proceeds that may be realized by the Debtors in the event that the Debtors' and certain non-Debtor assets are liquidated in an orderly manner under Chapter 7 of the Bankruptcy Code. The Liquidation Analysis assumes foreign liquidation proceedings in a total of five jurisdictions: the three countries where Debtor assets are located: Chile, Uruguay, and Brazil, as well as non-Debtor jurisdictions of Peru and Costa Rica. As noted, proceeds of non-Debtor assets are included in these calculations because a liquidation of the Debtors would trigger contractual rights allowing Holders of the Secured Notes to foreclose on non-Debtor collateral located in Peru and Costa Rica. In addition, the liquidation of the Debtors assets will likely result in the liquidation of the group's non-Debtor operations as well due to the fact that the Debtors and non-Debtors hold distribution contracts for the importation of vehicles and spare parts with the same counterparties and the liquidation of the Debtors will likely cause the rescission of the distribution contracts in all the jurisdictions in which

the Debtors and non-Debtors operate. The Liquidation Analysis does not include recoveries resulting from any potential preference claims, fraudulent conveyance litigation, or other avoidance actions, if such actions exist. The Liquidation Analysis is based upon the Debtors' unaudited balance sheet as of December 31, 2020 (unless otherwise noted) and upon projections developed by the Debtors for certain assets to reflect various probable offsets or adjustments deemed to be a more accurate predictor of value in a liquidation scenario. Management of the Debtors does not believe at this time that projected information on other assets or liabilities would vary significantly. However, this analysis is subject to change as a result of any changes to the Debtors' planned operating activities.

In addition to the above, the following key assumptions were made:

- Liquidation Analysis Depends on Estimates and Assumptions. The determination of the hypothetical proceeds from, and costs of the liquidation of the assets, is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, and economic uncertainties and contingencies beyond the control of the Debtors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation and unanticipated events and circumstances could affect the ultimate results in an actual Chapter 7 liquidation. The Debtors prepared the Liquidation Analysis for the sole purpose of establishing a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code (a "Chapter 7 Liquidation") upon conversion of these Chapter 11 Cases (the "Chapter 7 Conversion Date") on the Effective Date of the Chapter 11 Plan. No independent appraisals were conducted in preparing the Liquidation Analysis. The Liquidation Analysis is not intended and should not be used for any other purpose other than set forth herein. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. Accordingly, while deemed reasonable based on the facts currently available, neither the Debtors nor their advisors make any representations or warranties that the actual results would or would not approximate the estimates and assumptions represented in the Liquidation Analysis.

- Conversion and Appointment of a Trustee: On the Chapter 7 Conversion Date, it is assumed that a trustee would be appointed (the "Chapter 7 Trustee") to oversee the liquidation of the estates. As a baseline, the Liquidation Analysis used each of the Debtors' unaudited assets and liabilities as of December 31, 2020, and then, as set forth herein, the book values of certain assets and liabilities were adjusted, where appropriate, to reflect various probable offsets or adjustments deemed to be a more accurate predictor of value in a liquidation scenario. These unaudited estimates are derived from each Debtor's financial statements or more recent financial information, where available. The Debtors do not believe the use of such estimates will result in a material change to estimated recoveries on conversion unless otherwise noted.

- Liquidation Process and Time. Following the appointment of a Chapter 7 Trustee, the liquidation period is assumed to last a total of 7 to 12 months to substantially liquidate all of the Debtors' and non-Debtor affiliate assets in the five jurisdictions, depending on the country and scenario assumed. This Liquidation Analysis further assumes that the liquidation process commences immediately following the Chapter 7 Conversion Date and all reasonable efforts are taken to liquidate assets in accordance with the bankruptcy laws of the country in which the assets are domiciled. For example, under the Chilean bankruptcy law, the liquidation of assets must be performed in a seven-month period in the case of real estate and four months for all other assets. The Liquidation Period may be extended four additional months by agreement of a majority of the creditors. Although the Chilean bankruptcy law provides for additional four-month extensions, in reality, additional extensions are difficult to obtain. For the Debtors located in

3

Chile, this analysis assumes the liquidation is performed in the time frame provided by the Chilean bankruptcy law with no extensions in the low-end of the estimated recovery range (the "Low Scenario"), and a single four-month extension in the high-end of the estimated recovery range (the "High Scenario").  For the Debtors located in Uruguay, the Low Scenario assumes a Liquidation Period of 7 months and the High Scenario assumes 12 months.  The Liquidation Analysis assumes a liquidation of all of the Debtors' assets including (a) cash and equivalents, (b) accounts receivable, (c) inventories, (d) property, plant and equipment, (e) intellectual property and (f) other assets.  The Liquidation Analysis assumes that the Trustee does not possess the operational expertise or capability to continue to operate the Debtors' business efficiently or safely for the extended period required to conduct a going concern sale process.  The individual sale of all marketable assets of the estate are assumed to take place concurrently with each other.  Actual asset sales and wind-down of operations would happen immediately after service to customers is discontinued on the Conversion Date.  All distributions would be made as and when proceeds from the disposition of assets and collection of receivables are received; however, the projected recoveries have not been discounted to reflect the present value of any distributions.

- Estimates of Claims: In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on a review of their books and records as of December 31, 2020.  The Liquidation Analysis also includes estimates for Claims that could be asserted and Allowed in a Chapter 7 Liquidation, including Administrative Expenses, employee-related obligations, wind down costs (as detailed herein), Chapter 7 Trustee fees, and other Allowed Claims.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims.  For purposes of the Liquidation Analysis, the Debtors have estimated the amounts of Allowed Claims and provided ranges of projected recoveries based on certain assumptions.  Therefore, the Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any purpose other than considering the hypothetical distributions under a Chapter 7 liquidation.  Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession or admission by the Debtors.  The actual amounts of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts set forth in the Liquidation Analysis.

- Factors Considered in Valuing Hypothetical Liquidation Proceeds:  Factors that could negatively impact the recoveries set forth in the Liquidation Analysis, include, but are not limited to: (a) turnover of key personnel; (b) challenging economic conditions mainly driven by the COVID-19 pandemic in the Debtors' key markets; (c) delays in the liquidation process; (d) loss of market share to key competitors; and (e) termination of key importation rights by the Original Equipment Manufacturers (or "OEMs") due to the liquidation commencement.  These factors may limit the amount of the proceeds generated by the liquidation of the Debtors' assets (the "Liquidation Proceeds") available to the Trustee.

- Tax Consequences:  The Debtors' management believes that it is unlikely that material taxable gains would be triggered through a liquidation of the Debtors' assets.  However, if there were to be a taxable gain from the liquidation of the Debtors' assets, the Debtors believe that any realized gains would result in only minimal tax liability, if any, because such gains would be subject to potential offset by the Debtors' current pretax losses and/or net operating loss carry forwards.

- Waterfall and Recovery Range:  The Liquidation Analysis assumes that the proceeds generated from the liquidation of all of the Debtors' assets as of the Chapter 7 Conversion Date, will be reasonably available to the Trustee.  After deducting the costs of liquidation, including the Trustee's fees and expenses and other administrative expenses incurred in the liquidation, the

Trustee would allocate net Liquidation Proceeds to holders of Claims and equity holders at each Debtor entity in accordance with the priority scheme set forth in section 726 of the Bankruptcy Code and respective foreign insolvency laws.  The Liquidation Analysis estimates low and high recovery percentages for Claims and Equity Interests upon the Trustee's application of the Liquidation Proceeds.  As a starting point, the Debtors used the unaudited December 31, 2020 financial statements as a proxy for expected asset values on the Chapter 7 Conversion Date (unless otherwise noted) and made pro-forma adjustments to those values to reflect, where appropriate, various probable offsets or adjustments deemed to be a more accurate predictor of value in a liquidation scenario.  While the Debtors expect to continue to incur obligations in the ordinary course of business until the Chapter 7 Conversion Date (which obligations have not been reflected herein), the ultimate inclusion of such additional obligations is not expected to materially change the results of the Liquidation Analysis.  The Liquidation Analysis does not reflect any potential recoveries that might be realized by the Trustee's potential pursuit of any avoidance actions, as the Debtors have not completed an analysis of the viability of such avoidance actions.  The Debtors have worked with their advisors to estimate ranges of recoveries as provided in this Liquidation Analysis.  These ranges are estimates and should not be relied upon by any party.  The Debtors do not provide assurance of any recovery in a Chapter 7 scenario.

**Notes to Liquidation Analysis**

The following Notes to the Liquidation Analysis identify and describe the significant assumptions that were utilized in its preparation.

1. **Notes on Estimated Liquidation Value of Assets**

    (A) Cash and Equivalents.  The Debtors' cash and cash equivalents comprise cash balances and time deposits with maturities of three months or less from the Chapter 7 Conversion Date that are subject to an insignificant risk of changes in their fair market value, and are used by the Debtors in the management of their short-term commitments.  The Liquidation Analysis assumes that operations during the liquidation period would not generate additional cash available for distribution except for net proceeds from the disposition of non-cash assets.  The cash and cash equivalent values are based on the balance sheet date as of December 31, 2020 and are expected to be representative of the cash available for liquidation.  The estimated recovery on the adjusted pro-forma balance of Cash and Cash Equivalents is estimated at 100%.

    (B) Restricted Cash:  This amount consists of cash collateral placed with a financial institution to open letters of credit for the purchase of new vehicles or spare parts inventory from an OEM.  This cash has been paid to the financial institution acting as the agent of the purchase order.  In effect, this amount reflects prepaid inventory because the OEM will be paid from this cash collateral once it makes delivery of the vehicles or spare parts the Debtor(s) ordered, at which point inventory will be recognized by the Debtor.  As a result, the estimated recovery rate on the restricted cash balance is assumed to be consistent with the estimated recovery on inventory which is based on the specific automotive brand and ranges between 40% to 60%, as described further in note (F).

    (C) Accounts Receivable:  Accounts receivables include insured receivables from wholesale and retail customers, non-insured receivables from wholesale and retail customers, credit card receivables, fleet sales receivables (bulk sales to individual companies or governments), advances made to certain suppliers and other receivables. The pro-forma accounts receivable balance includes

adjustment for offset advances to certain suppliers with payables owed to those same suppliers and related party receivables reclassified to net related party receivables.

The recovery of the pro-forma receivables will be impacted by: (1) impact on collections as a result of loss of warranty from the sale of new vehicles (see inventory section for more details); and (2) the credit-worthiness of wholesale customers with receivables. Estimated recovery percentages have been assigned to different categories of receivables ranging between 20% and 100%, with receivables recovery ranging between 40% and 60%; VAT receivables and loans to employees with 100% recovery; and other receivables ranging between 20% and 40%. As a result, the overall estimated recovery on the Accounts Receivable ranges between 37.55% to 57.03%.

(D) <u>Accounts Receivable from Related Entities</u>:  The Debtors' accounts receivable from related entities totals approximately USD 73.3 million.  This Liquidation Analysis estimates that these balances are not recoverable in liquidation given that substantially all of the balance is held between Debtors, netting out in the consolidation of the Debtors' estates.

(E) <u>Prepaid Expenses</u>. Prepaid expenses consist primarily of performance guarantees and guaranteed deposits, as well as prepaid insurance, prepaid leases, prepaid maintenance and prepaid advertising. The Debtors do not estimate a recovery on these assets as the majority refer to guarantees that may be exercised under a liquidation scenario; insurance policies that would be maintained during the wind-down of operations and/or relatively minor prepayments whose unamortized balances will be difficult and lengthy in practice to recover.

(F) <u>Inventory</u>. Inventory is comprised of new vehicles, used vehicles and spare parts. A portion of the inventory is used as collateral for bank debt used to finance its purchases.

The liquidation of new and used vehicle inventory will be impacted by:

(1) Lack of warranty coverage. The Debtors are the sole importers of the new vehicle and spare parts automotive brands sold in each jurisdiction and, accordingly, the Debtors provide the warranty  services in the countries in which they operate. As a result, the liquidation of the Debtors may result in no warranty guarantee for the inventory sold during the Liquidation Period. This may be mitigated by certain brands establishing distribution agreements with other parties or honoring warranties themselves, but this is uncertain. As a result, the risk of an un-honored warranty will likely remain during the Liquidation Period;

(2) Uncertain Demand.  Vehicle markets are sensitive to GDP growth and consumer confidence. Demand for new and used vehicles may be negatively impacted as a result of the COVID-19 pandemic's impact on the economies in which the Debtors operate due to potentially higher unemployment, lower access to credit and lower consumer confidence;

(3) Consumer price elasticity. The perceived consumer value of different brands will result in potentially different levels of discounts required to liquidate the new and used inventory; and

(4) Form of payment. The unwillingness of the Debtors to receive used vehicles as partial payment for new vehicles will result in only creditworthy customers or cash only purchases. As a result, it is assumed that the new vehicle recovery will range between 40% and 60% depending on the brand and jurisdiction and 30% and 50% for used vehicle or discontinued vehicles inventory.

The liquidation of spare parts inventory will be impacted by:

(1) Existence of bulk purchasing.  There is a limited market for the purchase of spare parts in bulk involving a significant volume of SKUs in many of the jurisdictions in which the Debtors operate, which will likely result in depressed prices for spare parts;

(2) Addressable spare parts market for each brand.  The existing vehicle market size with which the spare parts inventory will be compatible will be an important factor in determining the attractiveness to customers and necessary discounts required to spur demand; and

(3) Demand expectation for spare parts.  The expected spare parts demand as a result of the COVID-19 pandemic is likely to increase as consumers opt to fix their existing vehicles for longer as they defer replacements for newer models.  As a result, it is assumed that the spare parts inventory will range between 4% and 22%.

Consequently, the aggregated recovery of inventory is estimated to range between 40% and 50%.

(G) <u>Property, Plant and Equipment</u>:  Property, plant and equipment  ("<u>PP&E</u>") assets consist primarily of land, building, leased assets, equipment and other assets.  PP&E includes real estate property in Chile and Uruguay held in trust and serving as collateral for the Secured Notes.  In addition, there are assets held in trust as collateral for the Secured Notes from non-Debtors which are being reflected as proceeds from non-Debtors in this analysis.  As a result, this analysis reflects those assets that are held in trust for the benefit of the Secured Notes and those which are not.  The analysis considers capital gains for properties whose recovery is higher than its fiscal value, as well as offsets by the Debtors' current pretax losses and net operating loss carry forwards. The estimated recovery range of land and building assets ranges between 25% and 60% depending on the individual property's location and marketability.  The remaining PP&E is primarily related to leased assets and equipment.  Leased assets include leases which are accounted for as assets under IFRS 16 and therefore reflect an accounting treatment rather than a true asset owned by the Debtors.  As a result, a recovery of zero is assumed for this category and consequently no related claim is recognized.  The remaining equipment assets reflects technology-related hard assets, furniture and fixtures and supplies for which a recovery of 10% to 40% has been assumed depending on the type of asset.  As a result, the overall recovery of PP&E is assumed to be between 36% and 44%.

(H) <u>Intangible Assets</u>. Intangible assets relate to software licenses, trademarks and goodwill.  Given the nature of these assets, no recovery is assumed for the purpose of this liquidation analysis.

(I) <u>Investments</u>:  The investments reflect primarily the investment of the Chilean parent's equity holding in its subsidiaries, including Debtors and non-Debtor subsidiaries, and joint ventures (or "<u>JV</u>") in which Automotores Gildemeister SpA holds a 50% interest.  The Debtors do not expect to obtain a recovery from the disposition of joint venture interests.  In the event of a liquidation under Chapter 7 of the Bankruptcy Code, the JV's business will be significantly impacted, which would reduce the value of the JV and likely result in disputes with the JV partner.  The Debtors have assumed that any potential recovery will be offset by potential disputes resolutions with its JV partner, thus resulting in zero recovery from its JV assets.

(J) <u>Deferred Tax Assets balances</u>:  Deferred tax assets are recognized by the Debtors in respect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes.  Deferred tax assets and liabilities were not included as their recovery is assumed to be zero and no claim exists.

**2.    Notes on Expenses and Claims Associated with the Liquidation of Assets**

(A) <u>Chapter 7 Trustee Fees</u>.  Trustee fees are the fees associated with the appointment of a Chapter 7 trustee in accordance with section 362 of the Bankruptcy Code.  Trustee fees are estimated based on the requirements of the Bankruptcy Code and historical experiences in other similar cases and are projected to be approximately 3% of gross liquidation proceeds, excluding cash, in accordance with section 362 of the Bankruptcy Code.  In addition, local administrator fees are included in these amounts based on the local Bankruptcy laws and Debtors' management best estimates.

(B) <u>Chapter 7 Professional Fees</u>.  Such amounts include legal, investment banking, appraisal, brokerage, and accounting services required to assist the Debtors and the Trustee with the liquidation process and assumes such wind-down and associated fees.  Fee estimates are based upon the Debtors' management's review and guidance on such costs.

(C) <u>Wind-Down Expenses</u>.  Wind-down revenues and expenses reflect the continuance of operations necessary to liquidate inventory on hand, including the Debtors' staff, rents and operating expenditures in each of the countries, however excluding broker and third-party commissions on sale of any assets.  The Low Scenario assumes a Liquidation Period of 7 months across the Debtors, while the High Scenario assumes a period of 11 months for the Chilean Debtors (assuming a four-month extension is granted by the Chilean Bankruptcy Court) and 12 months for the Uruguayan Debtors. In the case of Brazil, a much shorter liquidation time frame is assumed given the immaterial assets in the Brazilian Debtor. In addition, a portion of corporate staff will need to be retained to deal with Trustee requests, creditor queries and to maintain a minimum level of books and records. Revenue collections are assumed to be zero as vehicle sales revenue is captured in the inventory liquidation and the maintenance services segment is assumed to be shut down at conversion date. Expenses related to those staff who remain are expected to be higher than in historical periods due to the need to motivate corporate and sales staff to provide their services during this period. Expenses are expected to decline near the end of the Liquidation Period to zero.

(D) <u>Commissions on Real Estate & Other Sales</u>.  Commissions on real estate sales reflect the assumed commission on the liquidation of real estate and general assets of the Debtors.  Commission estimates were based upon the Debtors' management's review and guidance on such costs and range between 1% and 5% depending on the jurisdiction.

(E) <u>Administrative Claims – Employee Notice Period Compensation</u>.  These amounts comprise salaries and termination expenses.  These expenses include the costs associated with the four-week notice period that the Debtors must provide to the Debtors' employees under Chilean law, before terminating them.  It is assumed that if the employees do not receive compensation during the full notice period, they may not work during the wind-down period.

(F) <u>Severance and Other Personnel Related Costs</u>:  Severance and other personnel related costs are those that would be due and payable pursuant to the Chilean liquidation statute.  In accordance with the Chilean liquidation statute, the Debtors' employees are entitled to severance payments that accrue until the date of payment and up to a maximum of three months' minimum wages (currently equal to 90 UF or approximately USD 3,700) for each year of work, or a fraction thereof if there is a remainder of more than six months, with a limit of ten years.  Any amount exceeding the three

months' wages is treated as an unsecured, non-priority claim. These amounts relate to the accrued vacations and personnel withholdings during the 180 days before the Petition Date. Management and advisors have adopted the accrual in the Debtors' Balance Sheet as of December 31, 2020 as an approximate estimate of the balance that would be due in such a scenario for the purposes of this Liquidation Analysis.

(G) Outstanding taxes.  Outstanding taxes relate to taxes owed to tax authorities, such as withholding taxes and income taxes, in the countries in which the Debtors operate, which will be required to be paid from the Debtors' estates.

## 3. Notes on Distribution of Proceeds

(A) 2025 Secured Notes.  This amount reflects the outstanding balance of the Secured Notes as of December 31, 2020.  The Secured Notes are secured by first-priority liens on certain of the Debtors' and non-Debtors' real estate and other assets and will receive the benefit of its liquidation value. No further interest on the 2025 Secured Notes' principal is assumed to accrue during the liquidation.

(B) Secured Bank Debt and Factored Receivables:  Represents the secured claims from financial institutions used to purchase inventory and mortgages of certain real estate properties, as well as factoring providers.

(C) Unsecured Notes:  Represents the balances with respect to the 2011 Unsecured Notes due in 2021, the 2016 Unsecured Notes due in 2021 and the 2013 Unsecured Notes due in 2023. These Unsecured Notes reflect the noteholders who did not participate in the 2016 or 2019 debt restructurings.

(D) General Unsecured Claims. General unsecured claims include: (G1) accounts payable due to vendors; (G2) the estimated under-secured portion of secured debt; (G3) the non-priority portion of the severance payments that exceeds the three-month minimum wages amount; and (G4) other potential contingent claims. Although not directly included in the Liquidation Analysis, the analysis considers accounts payables and potential contingent claims in Peru and Costa Rica.

## Conclusion

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in this case, including (i) increased costs and expenses of a liquidation, including priority amounts and likely fees due to a Trustee and its professional advisors, (ii) the erosion in value of assets in the context of the expeditious liquidation required and the "forced sale" atmosphere that would prevail in multiple jurisdictions, and (iii) the difficulty in being able to sell individual assets or components of businesses, the Debtors have determined that confirmation of this Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

## Debtors' Hypothetical Liquidation Analysis

| USD Million, unless otherwise noted | Note | Book Value 2020 | Pro-Forma Value 2020 | Hypothetical Recovery % Low | High | Hypothetical Recovery $ Low | High |
|---|---|---|---|---|---|---|---|
| **I. ESTIMATED LIQUIDATION VALUE OF ASSETS** | | | | | | | |
| Cash and Restricted Cash | 1A, 1B | 90.8 | 25.4 | 100.00% | 100.00% | 25.4 | 25.4 |
| Accounts Receivable | 1C | 53.4 | 49.8 | 37.33% | 56.76% | 18.6 | 28.3 |
| Accounts Receivable from Related Parties | 1D | 73.3 | 73.3 | 0.00% | 0.00% | - | - |
| Prepaid Expenses and Guarantee Deposits | 1E | 8.4 | 8.4 | 0.00% | 0.00% | - | - |
| Inventory | 1F | 48.9 | 114.3 | 40.68% | 49.83% | 46.5 | 56.9 |
| Collateral Inventory | 1F | 9.5 | 9.5 | 44.08% | 54.08% | 4.2 | 5.1 |
| Property, Plant & Equipment | 1G | 187.7 | 39.7 | 7.65% | 9.09% | 3.0 | 3.6 |
| PP&E Collateral Assets for 2025 Secured Note | 1G | - | 148.0 | 44.08% | 54.08% | 65.2 | 80.0 |
| Investments | 1I | 160.4 | 160.4 | 0.00% | 0.00% | - | - |
| Intangibles | 1H | 9.2 | 9.2 | 0.00% | 0.00% | - | - |
| **Total Assets** | | 641.7 | 638.1 | 25.54% | 31.25% | 163.0 | 199.4 |
| Net proceeds from non-debtors | 1G | | | | | 49.9 | 61.7 |
| **Total Gross Proceeds Available** | | 641.7 | 638.1 | 33.35% | 40.93% | 212.8 | 261.1 |
| **II. ADMINISTRATIVE AND PRIORITY CLAIMS RELATED TO THE LIQUIDATION OF ASSETS** | | | | | | | |
| Chapter 7 Trustee Fees | 2A | | | | | (8.0) | (9.4) |
| Chapter 7 Professional Fees | 2B | | | | | (14.0) | (22.0) |
| Wind-Down Revenues, Expenses, and Charges | 2C | | | | | (17.5) | (20.8) |
| Commissions on Real Estate & Other Sales | 2D | | | | | (1.6) | (1.9) |
| Employee Notice Period Compensation | 2E | | | | | (2.2) | (2.2) |
| Other Amounts due to Employees | 2F | | | | | (2.7) | (2.7) |
| Severance | 2F | | | | | (21.0) | (21.0) |
| Outstanding Taxes | 2G | | | | | (1.0) | (1.0) |
| **Total Administrative And Priority Claims** | | | | | | (68.0) | (81.1) |
| **Net Proceeds Available For Distribution** | | | | | | 144.8 | 180.0 |

### III. DISTRIBUTION OF PROCEEDS
#### Payment Of Secured Claims

| 1st Lien Secured Claims | | Book Value | Pro-Forma Value Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|---|---|
| 7.50% Notes due in 2025 | 3A | 509.8 | 509.8 | 509.8 | 18.17% | 21.95% | 92.6 | 111.9 |
| Banco de Chile | 3B | 0.5 | 0.5 | 0.5 | 100.00% | 100.00% | 0.5 | 0.5 |
| Banco Internacional | 3B | 8.9 | 8.9 | 8.9 | 40.11% | 51.79% | 3.6 | 4.6 |
| Tanner Leasing | 3B | 6.4 | 6.4 | 6.4 | 39.11% | 50.47% | 2.5 | 3.2 |
| Banco BTG Pactual Chile | 3B | 2.8 | 2.8 | 2.8 | 30.42% | 38.15% | 0.8 | 1.1 |
| Banco Santander | 3B | 3.6 | 3.6 | 3.6 | 40.06% | 50.28% | 1.4 | 1.8 |
| Factoring Providers | 3B | 9.9 | 9.9 | 9.9 | 36.21% | 55.98% | 3.6 | 5.5 |
| **Total 1st Lien Secured Claims** | | 541.8 | 541.8 | 541.8 | 19.39% | 23.74% | 105.0 | 128.6 |
| **Excess Proceeds Available For Payment Of 2nd Lien Claims** | | | | | | | 0.2 | 0.5 |
| **Total Proceeds Available For Payment Of General Unsecured Claims** | | | | | | | 39.8 | 51.4 |

#### Payment Of General Unsecured Claims

| 1st Lien Secured Debt Deficiency Claims | | Book Value | Pro-forma Value Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|---|---|
| 7.50% Notes due in 2025 (Deficiency Claim) | 3D2 | | 417.2 | 397.9 | 7.81% | 10.48% | 32.6 | 41.7 |
| Banco de Chile (Deficiency Claim) | 3D2 | | - | - | - | - | - | - |
| Banco Internacional (Deficiency Claim) | 3D2 | | 5.4 | 4.3 | 7.44% | 10.07% | 0.4 | 0.4 |
| Tanner Leasing (Deficiency Claim) | 3D2 | | 3.9 | 3.1 | 7.44% | 10.07% | 0.3 | 0.3 |
| Banco BTG Pactual Chile (Deficiency Claim) | 3D2 | | 1.9 | 1.7 | 7.44% | 10.07% | 0.1 | 0.2 |
| Banco Santander (Deficiency Claim) | 3D2 | | 2.2 | 1.8 | 7.44% | 10.07% | 0.2 | 0.2 |
| Factoring Providers (Deficiency Claim) | 3D2 | | 6.3 | 4.4 | 7.44% | 10.07% | 0.5 | 0.4 |
| **Total 1st Lien Secured Debt Deficiency Claims** | | | 436.8 | 413.2 | 7.80% | 10.47% | 34.1 | 43.3 |
| **Unsecured Notes** | | | | | | | | |
| 7.50% Notes due in 2021 | 3C | 9.6 | 9.6 | 9.6 | 7.81% | 10.48% | 0.8 | 1.0 |
| 8.25% Notes due in 2021 | 3C | 22.5 | 22.5 | 22.5 | 7.45% | 10.08% | 1.7 | 2.3 |
| 6.75% Notes due in 2023 | 3C | 2.6 | 2.6 | 2.6 | 7.45% | 10.08% | 0.2 | 0.3 |
| **Total Unsecured Debt** | | 34.8 | 34.8 | 34.8 | 7.55% | 10.19% | 2.6 | 3.5 |
| **General Unsecured Claims** | | | | | | | | |
| Other Unsecured Claims | | - | - | - | | | - | - |
| Pre-Petition Accounts Payable | 3D1,3 | 75.4 | 71.9 | 71.9 | 3.89% | 5.77% | 2.8 | 4.1 |
| Other Contingent liabilities | 3D4 | 8.3 | 8.3 | 8.3 | 3.89% | 5.77% | 0.3 | 0.5 |
| **Total Other Unsecured Claims** | | 83.7 | 80.2 | 80.2 | 3.89% | 5.77% | 3.1 | 4.6 |
| **Total General Unsecured Claims** | | | 551.7 | 528.2 | 7.21% | 9.74% | 39.8 | 51.4 |
| **Proceeds Available To Shareholders** | | | | | | | - | - |

**Claim Recovery Summary based on Debtors' Hypothetical Liquidation Analysis**

| USD million, unless otherwise noted | Claim | Recovery $ | | Recovery % | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **Secured Claims (Combined Recovery - Secured + Deficiency)** | | | | | |
| 7.50% Notes due in 2025 | 509.8 | 125.2 | 153.6 | 24.56% | 30.13% |
| Banco de Chile | 0.5 | 0.5 | 0.5 | 100.00% | 100.00% |
| Banco Internacional | 8.9 | 4.0 | 5.1 | 44.57% | 56.64% |
| Tanner Leasing | 6.4 | 2.8 | 3.5 | 43.64% | 55.46% |
| Banco BTG Pactual Chile | 2.8 | 1.0 | 1.2 | 35.59% | 44.37% |
| Banco Santander | 3.6 | 1.6 | 2.0 | 44.52% | 55.28% |
| Factoring Providers | 9.9 | 4.0 | 6.0 | 40.96% | 60.41% |
| **Total Secured + Deficiency** | **541.8** | **139.1** | **171.9** | **25.67%** | **31.72%** |
| **Unsecured Notes** | | | | | |
| 7.50% 2016 Notes due in 2021 | 9.6 | 0.8 | 1.0 | 7.81% | 10.48% |
| 8.25% 2011 Notes due in 2021 | 22.5 | 1.7 | 2.3 | 7.45% | 10.08% |
| 6.75% 2013 Notes due in 2023 | 2.6 | 0.2 | 0.3 | 7.45% | 10.08% |
| **Total unsecured notes** | **34.8** | **2.6** | **3.5** | **7.55%** | **10.19%** |
| **Other Unsecured Claims** | | | | | |
| Pre-Petition Accounts Payable | 71.9 | 2.8 | 4.1 | 3.89% | 5.77% |
| Other Contingent liabilities | 8.3 | 0.3 | 0.5 | 3.89% | 5.77% |
| **Total other unsecured claims** | **80.2** | **3.1** | **4.6** | **3.89%** | **5.77%** |

# EXHIBIT E

## Organizational Chart

# Corporate Structure



# EXHIBIT F

## Valuation Analysis

**ESTIMATED ENTERPRISE VALUATION OF THE REORGANIZED DEBTORS ON A
CONSOLIDATED BASIS**

**THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A
PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED
THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS
VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE
INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE
HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN
INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR
ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE
DEBTORS.** Solely for the purpose of the Plan and Disclosure Statement, Rothschild & Co US Inc. ("Rothschild &
Co"), as investment banker to the Debtors, has estimated a range of the total enterprise value ("Total Enterprise
Value") and implied equity value ("Plan Equity Value") of the Reorganized Debtors, on a consolidated going concern
basis that is pro forma for the transactions contemplated by the Plan.

In preparing the estimates presented below, Rothschild & Co relied upon the accuracy, completeness, and
fairness of financial and other information contained within the business plan furnished by the Debtors' management
(the "Financial Projections"). Rothschild & Co did not attempt to independently audit or verify such information, nor
did it perform an independent appraisal of the assets or liabilities of the Debtors.

As a result of the analysis described below and for purposes of the Plan, Rothschild & Co estimated the Total
Enterprise Value of the Reorganized Debtors on a consolidated basis to be approximately $460 million to $530 million
with a mathematical midpoint estimate of approximately $495 million, as of June 30, 2021. Based on estimated pro
forma net debt of $359 million[1] as of the assumed Effective Date, the estimated Total Enterprise Value of the
Reorganized Debtors results in a Plan Equity Value of $101 million to $171 million with a mathematical midpoint
estimate of approximately $136 million. Rothschild & Co has assumed no changes that would materially affect
estimated value occur between the date of the Disclosure Statement and the assumed Effective Date.

Rothschild & Co's estimated Total Enterprise Value does not constitute an opinion as to the fairness from a
financial point of view of the consideration to be received under the Plan or under the terms and provisions of the Plan.
This valuation analysis is based on information as of March 26, 2021 and is based on financial information provided
by the Debtors' management, including the Financial Projections attached as Exhibit C of the Disclosure Statement.
This valuation analysis is based on a number of assumptions, including but not limited to a successful reorganization
of the Debtors' business in a timely manner, the achievement of the Financial Projections (including contemplated
asset sales), continuity of a qualified management team, and capital market conditions consistent with those that
existed as of March 26, 2021.

Neither Rothschild & Co nor the Debtors have any obligation to update, revise, or reaffirm the valuation
analysis and do not intend to do so.

**ROTHSCHILD & CO DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS
IN CONNECTION WITH THE ESTIMATES OF THE TOTAL ENTERPRISE VALUE AND PLAN EQUITY
VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF ESTIMATES OF THE DEBTORS
WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE TOTAL
ENTERPRISE VALUE AND PLAN EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR
NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A
GOING CONCERN IN LIQUIDATION OR OTHERWISE. THE ESTIMATE OF THE RANGE OF THE
TOTAL ENTERPRISE VALUE PREPARED BY ROTHSCHILD & CO REPRESENTS THE
HYPOTHETICAL ENTERPRISE VALUE RANGE OF THE REORGANIZED DEBTORS. SUCH
ESTIMATE WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN
AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH**

---

[1] Reflecting reorganization value of $91 million for the New Subordinated Notes

**ESTIMATE REFLECTS A COMPUTATION OF THE RANGE OF THE ESTIMATED TOTAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.**

**THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE TOTAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, ROTHSCHILD & CO, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, FUNDED DEBT, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS OR SECURITIES, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICE OF SECURITIES.**

Rothschild & Co assumed that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate, currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Total Enterprise Value and Plan Equity Value ranges assume the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Total Enterprise Value and Plan Equity Value. In estimating Total Enterprise Value, Rothschild & Co: (a) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections; (b) discussed the Debtors' operations and future prospects with the Debtors' senior management team; (c) reviewed certain publicly available financial data for, and considered the market value of, companies that Rothschild & Co deemed generally relevant in analyzing the value of the Reorganized Debtors; (d) considered certain economic and industry information relevant to the operating businesses; and (e) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Rothschild & Co assumed and relied on the accuracy and completeness of all financial and other information furnished to them by the Debtors' management as well as publicly available information. The estimated ranges of Total Enterprise Value and Plan Equity Value do not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan. Rothschild & Co has not been asked to express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance or at any time.

In performing its analysis, Rothschild & Co considered and applied (as applicable) the following valuation methodologies to the operations of the Debtors: (a) a discounted cash flow analysis, (b) a publicly-traded companies analysis, and (c) a precedent transactions analysis.

<u>Discounted cash flow analysis</u>

A discounted cash flow ("<u>DCF</u>") analysis is an enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business, plus a present value of the estimated terminal value of that asset or business. Rothschild & Co's DCF analysis used the Financial Projections' estimated debt-free, after-tax free cash flows through December 31, 2028. These cash

flows were then discounted at a range of estimated weighted average costs of capital ("Discount Rate") for the Reorganized Debtors. The Discount Rate reflects the estimated blended rate of return that would be expected by debt and equity investors to invest in the Reorganized Debtors' business based on a target capital structure. The Total Enterprise Value was determined by calculating the present value of the Reorganized Debtors' consolidated unlevered after-tax free cash flows, including projected asset sales, based on the Financial Projections, plus an estimate for the value of the Reorganized Debtors beyond the projection period, known as the terminal value. In determining the estimated terminal value of the Reorganized Debtors, Rothschild & Co relied upon the perpetuity growth method which estimates a range of the values of the Reorganized Debtors at the end of the projection period based on applying a perpetuity growth rate to terminal year cash flows. The range of growth rates was selected based on estimates of the long-term GDP growth rates and long-term inflation rates for the core countries where the Reorganized Debtors operate their businesses, as well as considerations related to the Reorganized Debtors' industry.

To determine the Discount Rate range, Rothschild & Co used the estimated cost of equity and the estimated after-tax cost of debt for the Reorganized Debtors, assuming a targeted, long-term, debt-to-total capitalization ratio. Rothschild & Co calculated the cost of equity based on (i) the capital asset pricing model, which assumes that the expected equity return is a function of the risk-free rate, country risk premium, equity risk premium, and the correlation of the stock performance of the selected publicly traded companies to the return on the broader market, (ii) an adjustment related to the historical equity risk premium based on the absolute levels of companies' equity market capitalizations, and (iii) an adjustment to reflect the Reorganized Debtors' substantial degree of concentration of business associated with Hyundai and to reflect the risk related to the customs issue in Peru. Rothschild & Co did not make an independent assessment of the go-forward tax environment.

Publicly-traded companies analysis

A publicly-traded companies analysis estimates the value of a company based on a comparison with certain other publicly-traded companies in lines of business and with operating characteristics similar in certain respects to the company being valued. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to certain of the Reorganized Debtors' financial metrics to imply a Total Enterprise Value for the Reorganized Debtors. Although the selected companies were compared to the Reorganized Debtors for the purposes of this analysis, no entity used in this analysis is closely comparable to the Reorganized Debtors. The selection of publicly-traded entities for this purpose was based upon characteristics that were deemed relevant based on Rothschild & Co's professional judgment. The selection of appropriate companies is a matter of judgment and subject to limitations due to sample size and the availability of meaningful market-based information. Accordingly, Rothschild & Co's comparison of the selected companies to the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics, diversity of business operations, diversity of geographic locations, size, concentration of suppliers, and other factors that could affect the relative values of the selected companies and the Reorganized Debtors.

Precedent transactions analysis

A precedent transactions analysis estimates the value of a company by examining public and private mergers and acquisitions. Under this approach, transaction values are commonly expressed as multiples of various measures of financial metrics such as EBITDA. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Reorganized Debtors. Rothschild & Co reviewed M&A transactions involving automotive importers and retailers in South and Central America. The transactions analyzed occurred in different fundamental and other market conditions from those prevailing in the marketplace currently and, therefore, may not be the best indication of value in the current market. The analysis of selected precedent transactions necessarily involves complex considerations and judgments concerning financial and operating characteristics and other factors that could affect the acquisition value of the companies concerned. The reasons for and circumstances surrounding each acquisition are specific to such transaction. There are inherent differences between the businesses, operations, market conditions at the time of such transaction, and prospects of each target and of the Reorganized Debtors. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions, and issues that could affect the price an acquirer is willing to pay in

3

an acquisition. The number of completed transactions for which public data is available also limits this analysis. Furthermore, the data available for the precedent transactions may have discrepancies due to varying sources of information.

**<u>Exhibit B</u>**

Redline

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Adam Brenneman
Jane VanLare

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

| | |
|---|---|
| *In re* : | Chapter 11 |
| Automotores Gildemeister SpA, *et al*.,[1] : | |
| : | Case No. 21 ‑‑‑‑‑‑-10685 (‑‑‑‑LGB) |
| Debtors. : | |
| : | Joint Administration Requested |

------------------------------------------------------------------ X

---

**AMENDED DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF AUTOMOTORES GILDEMEISTER SPA AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**Dated: April 914, 2021**

---

[1]        The Debtors, together with each of the Debtor's Chilean, Brazilian, and/or Uruguayan tax identification number, as applicable, are:  Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A. (217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A. (89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial Gildemeister S.A. (76.856.310-1), and Bramont Montadora Industrial e Comercial de Vehiculos S.A. (04.926.142/0002-16).  The location of the corporate headquarters and the service address for Automotores Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

**IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN**

    **A.    What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession".

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy.  Because solicitation of acceptances begins before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.  Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.  If the solicitation of votes in this case extends beyond the Petition Date, the timeline of this prepackaged plan of reorganization may extend beyond the timeline of other prepackaged cases.

    **B.    Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  To perform a prepetition solicitation of the Plan, section 1126(b) of the Bankruptcy Code requires that the Debtors comply with section 1125 of the Bankruptcy Code, which requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding whether to accept or reject the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

    **C.    Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  In general, a Holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the Plan and (iii) the Holder of such Claim or Interest will receive or retain property under the Plan on account of such Claim or Interest.

Under the Plan, the only classes of claims that meet these requirements are Classes 4 and 5.  A Holder of a Claim in Classes 4 and 5 is entitled to vote to accept or reject the Plan if such Holder held such Claim as of ~~May 7~~April 9, 2021 (the "Voting Record Date").  Holders of 7.5% Notes due 2025 will be entitled to vote BOTH their 7.5% Notes due 2025 Secured Claims in Class 4 and their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5; their votes in each Class will be used to evaluate satisfaction with the Bankruptcy Code's requirements for Plan confirmation.

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted such plan, and thus the Holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Plan, the Holders of Claims in these Classes are not entitled to vote:

- Class 1;

## XVI. RECOMMENDATION

The Debtors believe the Plan is in the best interest of all creditors and urge the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots and Master Ballots so they will be received by the Balloting Agent no later than May 7, 2021.

Dated: April 914, 2021

Respectfully submitted,

Automotores Gildemeister SpA
(on behalf of itself and each of the Debtors)

By:/s/ Eduardo Moyano
Name: Eduardo Moyano
Title: Chief Financial Officer

Prepared by:

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
1 Liberty Plaza
New York, New York 10006

Telephone:        (212) 225-2000
Facsimile:        (212) 225-3999

*Proposed Counsel for the*
*Debtors and Debtors in Possession*