**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Jane VanLare
Adam Brenneman

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Automotores Gildemeister SpA, *et al.*,[1] | Case No.:  21-10685 (LGB) |
| Debtors. | Joint Administration Pending |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS TO (A) AUTHORIZE THE DEBTORS-IN-POSSESSION TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZE THE DEBTORS-IN-POSSESSION TO USE CASH COLLATERAL, (C) GRANT LIENS AND PROVIDE CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANT ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (E) MODIFY THE AUTOMATIC STAY, (F) SCHEDULE A FINAL HEARING AND (G) GRANT RELATED RELIEF

---

[1]    The Debtors, together with each of the Debtor's Chilean, Brazilian, and/or Uruguayan tax identification number, as applicable, are:  Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A. (217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A. (89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial Gildemeister S.A. (76.856.310-1), and Bramont Montadora Industrial e Comercial de Vehiculos S.A. (04.926.142/0002-16).  The location of the corporate headquarters and the service address for Automotores Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

Automotores Gildemeister SpA ("Gildemeister") and certain of its affiliates, as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") pursuant to sections 105, 361, 362, 363(c)(2), 363(e), 364(c)(1)-(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United State Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rules 2002-1 and 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Bankruptcy Local Rules") seeking entry of an interim order on an expedited basis, substantially in the form attached hereto as Exhibit A (the "Interim Order"), and following a final hearing to be set by the Court, entry of a final order (the "Final Order"; and, together with the Interim Order, the "Proposed Orders"), *inter alia*:

    (a)    authorizing Gildemeister (the "Borrower") to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, superpriority debtor-in-possession credit facility (the "DIP Facility") subject to the terms and conditions set forth in that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement attached to the Interim Order as Exhibit 1 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), which provides for a committed senior secured delayed draw term loan facility in an aggregate principal amount of up to $26,500,000, consisting of:

        (i)    upon entry of the Interim Order, term loans in an aggregate principal amount of up to $16,950,000 (the "Interim DIP Loans"); and

        (ii)    upon entry of the Final Order, additional term loans in an aggregate principal amount that will not, when combined with all Interim DIP Loans advanced prior to such date, exceed $26,500,000 in aggregate principal amount (together with the Interim DIP Loans, the "DIP Loans");

which DIP Credit Agreement and DIP Facility shall be by and among the Borrower, as borrower, the DIP Guarantors (as defined herein), as guarantors, the several financial institutions or entities from time to time party thereto as Lenders (as defined in the DIP Credit Agreement) (the "DIP Lenders"), Acquiom Agency Services LLC, as administrative agent (in such capacity, together with its successors and permitted assigns, the "DIP Administrative Agent"), TMF Group New York, LLC, as collateral agent

(in such capacity, together with its successors and permitted assigns, the "DIP Collateral Agent"; and, together with the DIP Administrative Agent, the "DIP Agents"; and the DIP Agents, together with the DIP Lenders and all holders of all other DIP Obligations (as defined below), the "DIP Secured Parties");

(b)    authorizing certain of the other Debtors identified in the DIP Documents (as defined below) (such Debtors, the "DIP Guarantors") to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the other DIP Obligations;

(c)    authorizing the Debtors to (i) grant (A) senior secured priming superpriority liens on and security interests in certain DIP Collateral (as defined below) consisting of Prepetition Secured Notes Collateral (as defined below), (B) senior secured superpriority liens on and security interests in all unencumbered assets of the Debtors, and (C) junior secured superpriority liens on an security interests in all assets of the Debtor (other than Excluded Assets (as defined below)) subject to Permitted Priority Liens[2] (as defined below) (other than the Primed Liens (as defined below)), in each case in favor of the DIP Collateral Agent for the benefit of the DIP Secured Parties (any such liens or security interests, together with all liens or security interests granted to secure the DIP Obligations (as defined below), the "DIP Liens"; and all assets or property of the Debtors or the Non-Debtor Pledgors (as defined below) subject to the DIP Liens, the "DIP Collateral") to secure all of the obligations of the Borrower and the DIP Guarantors in respect of the DIP Loans and the other DIP Obligations, and (ii) to execute an intercreditor agreement with respect to the Prepetition Secured Notes Collateral by and among the DIP Loan Parties (as defined below), the DIP Collateral Agent, the Prepetition Secured Notes Collateral Agent (as defined below) and the Prepetition Secured Notes Indenture Trustee (as defined below) (as amended, supplemented or otherwise modified from time to time, the "DIP Intercreditor Agreement");

(d)    authorizing the Debtors (i) to cause certain non-Debtor direct and indirect subsidiaries of the Borrower identified in the DIP Documents (as defined below) (such entities, the "Non-Debtor Pledgors" and, together with the Borrower and the DIP Guarantors, the "DIP Loan Parties") to grant, and authorizing such Non-Debtor Pledgors to grant, (x) *pari passu* DIP Liens on and security interests in certain of the DIP Collateral consisting of Prepetition Secured Notes Collateral and (y) first ranking senior DIP Liens on and security interests in certain of the DIP Collateral consisting of certain

---

[2]    "Permitted Priority Liens" means liens over the assets of the Debtors or the Non-Debtor Pledgors senior by operation of law or otherwise permitted by the Prepetition Secured Notes Documents and solely to the extent any such liens were valid, enforceable, non-avoidable and perfected liens in existence on the Petition Date (including valid liens in existence on the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

unencumbered assets of certain of the Non-Debtor Pledgors, in each case, in favor of the DIP Collateral Agent for the benefit of the DIP Secured Parties to secure all of the obligations of the Borrower and the DIP Guarantors in respect of the DIP Loans and the other DIP Obligations and (ii) to execute the DIP Intercreditor Agreement;

(e)    authorizing the DIP Loan Parties to execute and deliver, and the Debtors to cause the Non-Debtor Pledgors to execute and deliver, the DIP Credit Agreement, the DIP Intercreditor Agreement (as defined below), and other documentation, including security agreements, trust agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, hedging agreements, instruments, notes, each fee letter entered into by any Debtor in connection with the DIP Facility (the "Fee Letters"), and such other documentation which may be necessary or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agents, in each case, as provided under the DIP Credit Agreement and all other Loan Documents (as defined in the DIP Credit Agreement) and as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the DIP Intercreditor Agreement, all Loan Documents (as defined in the DIP Credit Agreement), the Interim Order and the Final Order, the "DIP Documents");

(f)    authorizing the Debtors to execute and deliver the Consorcio Joinder (as defined below) attached to the Interim Order as Exhibit 3;

(g)    authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, administrative agency fees and other fees payable pursuant to the Fee Letters), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other Obligations (as defined in the DIP Credit Agreement) due or payable under the DIP Documents (collectively, the "DIP Obligations") and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(h)    subject to the Carve Out (as defined herein), granting to the DIP Agents for the benefit of the DIP Secured Parties allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(i)    granting to the DIP Collateral Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates (other than

certain excluded property as provided in the DIP Documents (the "Excluded Assets"[3]) for so long as any such property remains an Excluded Asset) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), in each case subject to the Carve Out (as defined herein);

(j)     upon entry of the Final Order and subject to the Carve Out (as defined herein), authorizing the Debtors to waive (i) their right to surcharge the Prepetition Secured Notes Collateral and the DIP Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code and (ii) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(k)     upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (ii) with respect to any of the Prepetition Secured Notes Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined below);

(l)     authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the Interim Order, the Final Order, the DIP Documents and the DIP Budget (subject to the Permitted Variances);

(m)     authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(n)     subject to the restrictions set forth in the DIP Documents, the Interim Order, and the Final Order, authorizing the Debtors to use the Prepetition Secured Notes Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Notes Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral),

---

[3]     "Excluded Assets" as used herein means: (i) that certain peso denominated bank account maintained at Banco Santander Chile (with an account number ending in 6924626-5), which shall not at any time maintain a balance exceeding Chilean pesos in the equivalent value of $5,000,000, (ii) inventory, accounts receivable and accounts holding cash of any Subsidiary of the Borrower domiciled in Peru, (iii) all specified property excluded from collateral under any Collateral Document (as defined in the DIP Credit Agreement) and (iv) assets over which the grant of a junior lien or security interest is prohibited by or in violation of any law, rule or regulation applicable to such Debtor or a term, provision or conduction of any lease, license, contract or agreement to which such Debtor is a party and which are (x) pledged to secure Permitted Debt (as defined in the DIP Credit Agreement) incurred as of the Closing Date by a Debtor (including any Inventory Debt), or (y) pledged to secure Inventory Debt incurred after the Closing Date by a Debtor in accordance with the DIP Credit Agreement, provided that to the extent any relevant prohibition described in this clause (iv) is no longer applicable, such asset shall no longer be an Excluded Asset.

.

resulting from the imposition of the Automatic Stay (as defined below), the Debtors' use, sale or lease of the Prepetition Secured Notes Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral);

(o)    vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents and the Final Order and to deliver any notices of termination described below and as further set forth herein;

(p)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and the Final Order; and

(q)    scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, as set forth in the Motion and the DIP Documents filed with this Court.

In support of this Motion, the Debtors refer to the *Declaration of Eduardo Moyano in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* (the "First Day Declaration") and the *Declaration of Marcelo Messer in Support of Debtors' Motion for Entry of Interim and Final Orders to (A) Authorize the Debtors-In-Possession to Obtain Postpetition Financing, (B) Authorize the Debtors-In-Possession to use Cash Collateral, (C) Grant Liens and Provide Claims with Superpriority Administrative Expense Status, (D) Grant Adequate Protection to the Prepetition Secured Parties, (E) Modify the Automatic Stay, (F) Schedule a Final Hearing and (G) Grant Related Relief* (the "Messer Declaration"), in each case filed contemporaneously herewith.

## PRELIMINARY STATEMENT

1.    The primary factor that precipitated the commencement of these Chapter 11 Cases (as defined below) was the mounting financial obligations resulting from the Debtors' debt issuances and poor economic conditions.  Since the issuance of the Prepetition Secured Notes in

2019, the Debtors' cash flows have not grown to a level necessary to support the Debtors' existing capital structure. The Debtors have struggled financially due to a number of factors, including the COVID-19 pandemic and macroeconomic conditions, which have resulted in decreased consumer confidence in the markets in which the Debtors operate.

2.      The Debtors' current debt service obligations place significant strain on the Debtors' available cash flows. As of the Petition Date (as defined below), the Debtors have outstanding prepetition debt obligations of approximately $566,690,000, of which approximately $35 million will become due by the end of 2023. At the same time, the Debtors are facing approximately $100 million in scheduled cash interest payments over the next three and a half years, putting severe pressure on the Debtors' ability to generate sufficient cash to service such debt obligations. Absent a substantial deleveraging of the Debtors' balance sheet and elimination of a substantial amount of obligations in respect of near- and medium-term debt, the Debtors will not be able to continue to service their debt or conduct their business in the ordinary course.

3.      These conditions caused the Debtors, in the months leading up to filing, to pursue multiple out-of-court restructuring measures, including, among other things, pursuing potential sources of additional financing, as well as engaging in a sale of significant business lines, including the sale of their BMW business in Uruguay, their MINI business in Chile and their MINI and BMW businesses in Perú. In parallel, the Debtors engaged in negotiations with certain of their existing stakeholders regarding a consensual, pre-packaged chapter 11 process. As described in greater detail below, the proposed DIP Facility is the product of extensive negotiations over the course of several months between the Debtors and the DIP Lenders, as well as the Debtors' efforts to explore alternative financing options with their other stakeholders and various third party lending institutions.

- 7 -

4.     The relief requested by this motion is necessary as the Debtors require immediate access to the DIP Facility and Cash Collateral to continue operating in the ordinary course of business during the early stages of the Chapter 11 Cases.  Absent immediate access to the DIP Facility and Cash Collateral, the Debtors would be unable to operate their business and their ability to successfully reorganize would be jeopardized.  Importantly, the DIP Facility is the best, and only viable, postpetition financing option available to the Debtors.

5.     For these reasons, and for the reasons set forth below, in the Messer Declaration and the First Day Declaration, the Debtors believe that entering into the DIP Credit Agreement and the other DIP Documents to provide access to the DIP Facility and use of Cash Collateral will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court enter the Proposed Orders.

## JURISDICTION AND VENUE

6.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363(c)(1)–(3), 364(d)(1), 364(e), 503, 506(c) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Bankruptcy Local Rules 2002-1 and 4001-2.

## BACKGROUND[4]

### I.    The Chapter 11 Filings

9.    On April 12, 2021, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the date and time of such filing, the "Petition Date"). The Debtors are operating their businesses as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in the Debtors' Chapter 11 Cases.

### II.    The Debtors' Businesses

10.    The Debtors are a vehicle importer and distributor primarily operating in Chile and Peru, as well as in Uruguay, Costa Rica and Brazil. The Debtors consist of a network of 228 vehicle dealerships, of which 70 are operated by the Debtors and 158 are independent franchises appointed and supplied by the Debtors. The Debtors have been the sole distributer of passenger and light commercial vehicles produced by Hyundai Motor Company in Chile since 1986 and have been the sole distributor of Hyundai passenger and light commercial vehicles in Peru since 2002. The Debtors are the sole distributors of several other established global vehicle brands, such as Volvo, Jaguar and BMW. The Debtors also provide services authorized by their original equipment manufacturers ("OEMs"), provide OEM parts for the brands of the cars they distribute and offer insurance brokerage services to their customers.

11.    As of the Petition Date, the Debtors have outstanding prepetition debt obligations of approximately $566,690,000, consisting primarily of approximately $509,806,002 in outstanding principal amount and $11,290,079 in accrued and unpaid interest under the 7.50%

---

[4]    A more complete description of the Debtors' corporate structure and businesses, and the events leading to the Chapter 11 Cases, are set forth in the First Day Declaration and the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Automotores Gildemeister SpA and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") (ECF No. 3).

senior secured notes due 2025 that were issued by Gildemeister and guaranteed by the remaining Debtors (the "Prepetition Secured Notes").  The Debtors also have approximately $34,760,520 outstanding aggregate principal amount and $967,730 in accrued and unpaid interest under three series of outstanding unsecured notes issued by Gildemeister and guaranteed by certain of the Debtor entities (collectively, the "Unsecured Legacy Notes"), and $1,943,500 in debt obligations owed to Gildemeister's shareholder (the "Related Party Claims").

### III.    The Proposed Restructuring

12.    Since the issuance of the Prepetition Secured Notes in 2019, the Debtors' cash flows have not grown to a level sufficient to support the Debtors' existing debt obligations on their current terms.  Due to a number of factors, including the recent increase in competition, a decrease in demand for motor vehicles in Chile, Peru and the rest of the Latin American region, substantial depreciations in the Chilean Peso, and the government mandated lockdowns due to the COVID-19 pandemic, the Debtors determined that it would be necessary to restructure their outstanding debt in order to meet their financial obligations over the long term.

13.    To that end, in the months prior to the Petition Date, the Debtors engaged in extensive negotiations and discussions with the holders of the Prepetition Secured Notes.  These discussions culminated in an agreement with certain of the holders of the Prepetition Secured Notes (the "Initial Consenting Noteholders") and of Related Party Claims, who signed a restructuring support agreement with respect to a consensual restructuring on the terms set forth in the *Debtors' Joint Prepackaged Chapter 11 Plan*, dated April 9, 2021 (including all exhibits and supplements thereto, the "Plan") and as memorialized in the Restructuring Support Agreement, dated as of March 31, 2021 (the "RSA"), by and among each of the Debtors and the Initial Consenting Noteholders.  Additional holders of (or parties that will hold) Prepetition Secured Notes subsequently executed joinder agreements to the RSA (the "Joining Consenting

Noteholders", together with the Initial Consenting Noteholders, the "Consenting Noteholders")
prior to the Petition Date.  Together, the Consenting Noteholders hold or will hold approximately
90.9% of the outstanding Prepetition Secured Notes, including approximately 7% of the 7.5%
Notes reflecting trades that have not yet settled.[5]  Pursuant to the terms of the RSA, 90.9% of those
who hold or will hold Claims (as defined in the Plan) in Class 4 (the Prepetition Secured Notes
Secured Claims (as defined in the Plan)) and 69.3% of those who hold or will hold Claims in Class
5 (consisting of the Prepetition Secured Notes Unsecured Deficiency Claims (as defined in the
Plan), Unsecured Notes Legacy Claims (as defined in the Plan) and the Related Party Claims) have
agreed to support the Plan.

14.    Additional information regarding the Debtors' business, capital structure and the
circumstances leading to the commencement of these Chapter 11 Cases is set forth in the First Day
Declaration, which is incorporated by reference herein.

## IV.    Prepetition Secured Notes Indenture

15.    Pursuant to that certain Indenture, dated as of November 7, 2019 (as may have been
amended, restated, amended and restated, supplemented, waived, or otherwise modified from time
to time prior to the Petition Date, the "Prepetition Secured Notes Indenture") and the other Notes
Documents (as defined in the Prepetition Secured Notes Indenture) and any other agreements and
documents executed or delivered in connection therewith, each as may have been amended,
restated, amended and restated, supplemented, waived, or otherwise modified from time to time
prior to the Petition Date, the "Prepetition Secured Notes Documents"), among (a) Gildemeister,
as issuer (in such capacity, the "Prepetition Secured Notes Issuer"), (b) the Prepetition Secured

---

[5]    As of the Petition Date, certain of the existing holders of the Prepetition Secured Notes have sold their
ownership interest in their Prepetition Secured Notes to certain of the Joining Consenting Noteholders.  The transfer
of this ownership interest is anticipated to close soon after the Petition Date.

Notes Guarantors (as defined below), (c) The Bank of New York Mellon, as trustee, registrar, paying agent and transfer agent (in such capacities, the "Prepetition Secured Notes Indenture Trustee"), and (d) TMF Group New York, LLC, as collateral agent (in such capacity, the "Prepetition Secured Notes Collateral Agent"; and, together with the Prepetition Secured Notes Indenture Trustee, the "Prepetition Agents"), the Prepetition Secured Notes Issuer issued the Prepetition Secured Notes. The Prepetition Agents, together with the holders of the Prepetition Secured Notes and all other holders of Prepetition Secured Notes Obligations (as defined below), shall be referred to herein as the "Prepetition Secured Parties."

16.     Pursuant to the Article X of the Prepetition Secured Notes Indenture, the Debtors party thereto (the "Prepetition Secured Notes Guarantors") guaranteed, on a joint and several basis, the Prepetition Secured Notes Obligations under the Prepetition Secured Notes, the Prepetition Secured Notes Indenture and the other the Prepetition Secured Notes Documents.

17.     As of the Petition Date, the Prepetition Secured Notes Issuer and the Prepetition Secured Notes Guarantors were jointly and severally indebted to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $509,806,002 and $11,290,079 in accrued and unpaid interest (collectively, together with any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Prepetition Secured Notes Issuer's or the Prepetition Secured Notes Guarantors' obligations pursuant to, or secured by, the Prepetition Secured Notes Documents, including all Obligations (as defined in the Prepetition Secured Notes Indenture), and all interest,

- 12 -

fees, prepayment premiums, early termination fees, costs and other charges, the "Prepetition Secured Notes Obligations").

18.    Pursuant to the Security Documents (as defined in the Prepetition Secured Notes Indenture) (the "Prepetition Secured Notes Security Documents"), prior to the Petition Date, the Debtors and the Non-Debtor Pledgors in their capacities as "Grantors" or "Pledgors" or words of similar effect (as defined in the Prepetition Secured Notes Security Documents) granted to the Prepetition Secured Notes Collateral Agent, for the benefit of itself and the Prepetition Secured Parties, first priority security interests in and continuing liens (the "Prepetition Secured Notes Liens") on the "Collateral" (as defined in the Prepetition Secured Notes Indenture) (the "Prepetition Secured Notes Collateral").

19.    Pursuant to the Interim Order, the Debtors will be acknowledging, stipulating and agreeing that, as of the Petition Date, (a) the Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Secured Notes Liens were senior in priority over any and all other liens on the Prepetition Secured Notes Collateral, subject only to Permitted Priority Liens (other than the Prepetition Secured Notes Liens); (c) the Prepetition Secured Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Secured Notes Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Secured Notes Liens or Prepetition Secured Notes Obligations exist, and no portion of the Prepetition Secured Notes Liens or Prepetition Secured Notes Obligations is subject to any challenge or defense, including avoidance, disallowance,

disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Secured Notes Documents; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Notes Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent and priority of the Prepetition Secured Notes Liens securing the Prepetition Secured Notes Obligations.

**V.     The Proposed DIP Facility**

20.     During the course of negotiations related to the RSA, the Debtors recognized the need for additional financing during the Chapter 11 Cases and began the process of soliciting prospective lenders with the opportunity to provide a debtor-in-possession credit facility to fund the restructuring. The Debtors contacted nine (9) potential financing sources with experience in Latin American restructurings (in addition to ongoing discussions with the Initial Consenting Noteholders). However, other than the Initial Consenting Noteholders, none of the potential financing sources contacted by the Debtors expressed interest in submitting a non-binding indication of interest or financing proposal.

21.     After careful consideration, and given the Debtors' outreach to various institutions to obtain debtor-in-possession financing, the Debtors determined that the Initial Consenting Noteholders' proposed terms were superior to terms that could be obtained by any other prospective lender. The Debtors negotiated the terms of the debtor-in-possession financing with the Initial Consenting Noteholders over several months as the Debtors sought to secure the best

possible terms under the circumstances. Such negotiations were conducted at arms' length and in good faith. The outcome of such negotiations is the DIP Credit Agreement.

22.    In the days leading up to the Petition Date, the Debtors continued to negotiate with certain of their key creditors to secure broad support for the Plan and obtain additional debtor-in-possession financing. As a result of such negotiations, shortly before the Petition Date, Compañía de Seguros de Vida Consorcio Nacional de Seguros S.A., Banco Consorcio S.A., and Consorcio Corredores de Bolsa S.A. (collectively, "Consorcio") executed a joinder agreement to the RSA (the "Consorcio Joinder") pursuant to which, *inter alia*, (a) Consorcio agreed to be bound by the RSA, (b) Consorcio agreed to purchase debtor-in-possession financing commitments (including any amounts previously advanced in respect thereof) held by certain other Consenting Noteholders in an amount of $2,902,242, which would result in an increase in the DIP Loans available to the Debtors under the DIP Credit Agreement from $23,600,000 to $26,500,000 (such $2,900,000 in additional DIP Loans, the "Additional DIP Commitment"), and (c) the Debtors would agree to pay and reimburse the reasonable and documented fees and expenses incurred by Prieto Abogados SpA and any other counsel reasonably necessary to advise Consorcio in connection with the DIP Documents (such fees and expenses, collectively, the "Consorcio Fees and Expenses").

23.    Access to the proceeds of the DIP Facility, including proceeds in respect of the Additional DIP Commitment, and Cash Collateral will allow the Debtors to maintain business operations during the Chapter 11 Cases, implement the Debtors' business plan, including funding working capital, operational initiatives and capital expenditures, and maintain value for all stakeholders. Importantly, with access to the DIP Facility, the Debtors will commence these Chapter 11 Cases with a strong message to the market that the Company is both well-capitalized and has the liquidity necessary to maintain its operations.

## **RELIEF REQUESTED**

24.    The Debtors request entry of orders, substantially in the form of the Proposed

Orders, pursuant to sections 105, 361, 362, 363(c)(1)–(3), 364(d)(1), 364(e), 503, 506(c) and 507

of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Bankruptcy

Local Rules 2002-1 and 4001-2 granting the following relief:

(a)    authorizing the Borrower to obtain DIP Financing pursuant to the DIP Facility subject to the terms and conditions set forth in the DIP Credit Agreement;

(b)    authorizing the DIP Guarantors to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the other DIP Obligations;

(c)    authorizing the Debtors to (i) grant the DIP Liens over the DIP Collateral, in each case in favor of the DIP Collateral Agent for the benefit of the DIP Secured Parties to secure the DIP Obligations, and (ii) to execute the <u>DIP Intercreditor Agreement</u>;

(d)    authorizing the Debtors to cause the Non-Debtor Pledgors to grant, and authorizing such Non-Debtor Pledgors, (i) to grant, (x) *pari passu* DIP Liens on and security interests in certain of the DIP Collateral consisting of Prepetition Secured Notes Collateral and (y) first ranking senior DIP Liens on and security interests in certain of the DIP Collateral consisting of certain unencumbered assets of certain of the Non-Debtor Pledgors, in each case, in favor of the DIP Collateral Agent for the benefit of the DIP Secured Parties to secure all of the obligations of the Borrower and the DIP Guarantors in respect of the DIP Loans and the other DIP Obligations and (ii) to execute the DIP Intercreditor Agreement;

(e)    authorizing the DIP Loan Parties to execute and deliver, and the Debtors to cause the Non-Debtor Pledgors to execute and deliver, the DIP Credit Agreement, the DIP Intercreditor Agreement, and the other DIP Documents;

(f)    authorizing the Debtors to execute and deliver the Consorcio Joinder;

(g)    authorizing the Debtors to incur the DIP Obligations and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(h)    subject to the Carve Out (as defined herein), granting to the DIP Agents for the benefit of the DIP Secured Parties allowed superpriority

administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(i)     granting to the DIP Collateral Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates (other than any Excluded Asset for so long as any such property remains an Excluded Asset) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), in each case subject to the Carve Out (as defined herein);

(j)     upon entry of the Final Order and subject to the Carve Out (as defined herein), authorizing the Debtors to waive (i) their right to surcharge the Prepetition Secured Notes Collateral and the DIP Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code and (ii) any "**equities of the case**" exception under section 552(b) of the Bankruptcy Code;

(k)     upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (ii) with respect to any of the Prepetition Secured Notes Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined below);

(l)     authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the Interim Order, the Final Order, the DIP Documents and the DIP Budget (subject to the Permitted Variances);

(m)    authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(n)     subject to the restrictions set forth in the DIP Documents, the Interim Order, and the Final Order, authorizing the Debtors to use the Prepetition Secured Notes Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Notes Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral), resulting from the imposition of the Automatic Stay (as defined below), the Debtors' use, sale or lease of the Prepetition Secured Notes Collateral (including Cash Collateral), and the priming of their

- 17 -

respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral);

(o)    vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents and the Final Order and to deliver any notices of termination described below and as further set forth herein;

(p)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and the Final Order; and

(q)    scheduling the Final Hearing to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the proposed Final Order, as set forth in the Motion and the DIP Documents filed with this Court.

## SUMMARY OF MATERIAL TERMS OF DIP FACILITY

25.    The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Bankruptcy Local Rule 4001-2[6]:

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY[7] | |
|---|---|
| **Parties to the Agreement** Bankruptcy Rule 4001(c)(1)(B) | Borrower: Automotores Gildemeister SpA. Guarantors: Certain of the Debtors identified in the DIP Documents. DIP Administrative Agent: Acquiom Agency Services LLC. Collateral Agent: TMF Group New York, LLC. DIP Lenders: The several financial institutions or entities from time to time party to the DIP Facility as Lenders (as defined in the DIP Credit Agreement) pursuant to the DIP Credit Agreement. See DIP Credit Agreement, Preamble. |
| **Borrowing Limits** | The DIP Facility shall consist of a Term Loan or Term Loans to the Loan Parties from time to time in an aggregate principal amount up to |

---

[6]    This summary is qualified in its entirety by the provisions of the DIP Documents and the Proposed Orders.

[7]    Capitalized terms used in this "Summary of Material Terms of the DIP Facility" but not defined in the Motion shall have the meanings ascribed to them in the DIP Credit Agreement.

| | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B), Bankruptcy Local Rule 4001-2(a)(1) | $26,500,000 during the period commencing on and including the Closing Date to but excluding the date occurring five (5) Business Days prior to the Maturity Date.

Term Loans may be requested in two (2) Borrowings.  On the Closing Date, subject to the entry of the Interim DIP Order and the satisfaction or waiver by the Requisite Lenders of the conditions set forth herein, there shall be an initial Borrowing of the Term Loans in the aggregate principal amount of $16,950,000 (the "Initial Draw"), provided, that the Borrower shall have provided a Notice of Borrowing to the Administrative Agent at least one (1) Business Day prior to the Closing Date. Subject to the entry of the Final DIP Order, and the satisfaction or waiver by the Requisite Lenders of the conditions set forth herein for any drawing hereunder, the Loan Parties may request and receive an advance of one Term Loan that will not, when combined with the Initial Draw, exceed the aggregate amount of the Commitments.

*See* DIP Credit Agreement, Sections 2.01 and 2.02. |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B), Bankruptcy Local Rule 4001-2(a)(3) | The Loan Parties shall pay interest on the aggregate outstanding principal amount of the Term Loans owing to each Lender at a rate per annum equal to 11.75%.  Interest shall be paid in kind and automatically capitalized and added to the outstanding principal of each of the respective Term Loans on (x) the last Business Day of each month, (y) on the Maturity Date, and (z) on each other date on which any amount shall become due hereunder pursuant to the terms hereof.

The default rate shall be the interest rate above plus an additional 2.00 percent.

*See* DIP Credit Agreement, Section 2.07(a) and (b). |
| **Collateral** Bankruptcy Rule 4001(c)(1)(B)(i) | All of the assets of the Loan Parties and the Non-Guarantor Pledgors pledged to secure or subject to security interests or liens securing the Obligations under the Loan Documents (including any security interests or liens granted pursuant to the DIP Orders), including the (i) Indenture Collateral, (ii) other unencumbered assets of the Loan Parties and the Costa Rican Subsidiaries as provided in the DIP Orders and Collateral Documents, (iii) all products, profits and proceeds of the items in clauses (i) and (ii), and (iv) proceeds of factoring arrangements, Asset Sales, Inventory Debt and Working Capital Facilities of the Loan Parties and the Costa Rican Subsidiaries (it being understood that all proceeds of all items in the foregoing clauses (i) through and including (iv) shall be deposited, within one (1) Business Day of receipt by the Borrower or any of its Subsidiaries thereof, into a collateral deposit account, subject to a deposit account control agreement on terms acceptable to the Collateral Agent), in each case as |

| | |
|---|---|
| | provided under and described in the Collateral Documents and the DIP Orders. For the avoidance of doubt, Excluded Assets shall not constitute Collateral hereunder.<br><br>*See* DIP Credit Agreement, Section 1.01, definition of "Collateral"; Schedule 1.01(g). |
| **Superpriority Claim**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "<u>DIP Superpriority Claims</u>") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>") but, subject to the entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("<u>Avoidance Proceeds</u>")) in accordance with the DIP Documents and the Interim Order, subject only to the liens on such property and the Carve Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The DIP Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the 507(b) Claims (as defined herein).  No other superpriority claims equal or senior to the DIP Superpriority Claims or the Prepetition Secured Notes Obligations shall be granted or allowed in these Chapter 11 Cases and the Debtors will not seek any other postpetition debtor-in-possession |

| | |
|---|---|
| | financing other than under the DIP Facility except as permitted by the DIP Documents or with the consent of the DIP Secured Parties. |
| | *See* Interim Order, ⁋ 6. |
| **Use of DIP Proceeds** Bankruptcy Rule 4001(c)(1)(B), | Each Loan Party will use the proceeds of the Term Loans, and, if applicable, in compliance with the Approved Budget, subject to the Permitted Variances, each as described in the Officer's Certificate delivered in connection with each requested Borrowing, for (i) general corporate and working capital purposes, (ii) the costs of the administration of the Loan Parties' Chapter 11 Cases, including without limitation the restructuring costs and professional fees of the Loan Parties and Non-Guarantor Pledgors, (iii) payment of reasonable and documented transaction costs, fees and expenses with respect to this Credit Facility, including fees and expenses of legal and other professional advisors to the Lenders and the Agents as provided under the Loan Documents and the DIP Orders, (iv) adequate protection payments, if any, approved by the Bankruptcy Court to the extent such payments are included in the Approved Budget and (v) any other purpose approved by the Bankruptcy Court in the DIP Orders or any other orders entered in the Chapter 11 Cases so long as such use is consistent with the terms of this Agreement and the other Loan Documents. |
| | No portion of the Carve-Out or the Collateral or the proceeds thereof or any proceeds of the Term Loans may be used directly or indirectly by any of the Loan Parties for the payment of fees or expenses incurred by anyone challenging, investigating, preparing, asserting, initiating, joining, commencing, supporting or prosecuting any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Administrative Agent, the Collateral Agent, the Lenders, the Secured Noteholders, and each of their respective Affiliates, officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter, including, without limitation, (i) any so-called "lender liability" claims and causes of action; (ii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Liens granted under the Loan Documents, the Loan Documents, the Liens granted under the Note Documents, the Note Documents or the Note Obligations (including but not limited to any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets); (iii) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, any of the Obligations or the Note |

|  | Obligations; (iv) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Administrative Agent, the Collateral Agent or the Lenders hereunder or under any of the Loan Documents, or (B) the Secured Noteholders under any of the Note Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the Administrative Agent's, the Collateral Agent's or the Lenders' assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents); (v) objecting to, contesting, hindering, delaying or interfering with, in any way, the Administrative Agent's, the Collateral Agent's or the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred or (vi) any Avoidance Action relating to any transaction, occurrence, omission or action related to the Obligations, the Liens granted under the Loan Documents, the Loan Documents, the Liens granted under the Note Documents, the Note Documents or the Note Obligations.  In addition, neither the Carve-Out nor any portion of Term Loan proceeds under the Credit Facility or proceeds of Collateral shall be used in connection with preventing, hindering or delaying the Administrative Agent or Collateral Agent's enforcement or realization upon the Collateral for the benefit of the Lenders once an Event of Default has occurred under the Loan Documents and the Trigger Date Notice has been delivered; provided however, that the Loan Parties and Non-Guarantor Pledgors may use such proceeds solely for the purpose of defending against or enjoining any action taken by any Secured Party in breach of the DIP Orders during the Remedies Notice Period before the Bankruptcy Court.<br><br>*See* DIP Credit Agreement, Section 5.01(a). |
|---|---|
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(3);<br>Bankruptcy Local Rule 4001-2(a)(16) | <u>Agents' Fees</u>.  The Loan Parties shall pay to each Agent for its own account such fees as may from time to time be agreed between the Loan Parties and such Agent.<br><br><u>Lenders' Fees</u>.  Notwithstanding anything else herein to the contrary, the Borrower hereby agrees to pay a fee on each Term Loan in an amount equal to 5.0% of the initial principal amount thereof, as original issue discount payable to the Lender making such Term Loan simultaneously with the making of such Term Loan hereunder.  All such fees shall be fully earned on the respective dates on which the Term Loans are made hereunder, and shall be nonrefundable under any circumstances.<br><br>*See* DIP Credit Agreement, Section 2.08.<br><br>The Loan Parties shall be jointly and severally liable to pay all prepetition and postpetition fees, costs, disbursements and expenses of |

| | |
|---|---|
| | the Agents and the Lenders which, (a) (i) with respect to each Agent, shall be limited to the reasonable and documented fees, costs and expenses of one primary firm of legal counsel plus one firm of local counsel in each appropriate jurisdiction, including, without limitation, any jurisdiction where any Collateral is located and (ii) with respect to each Lender, shall include the reasonable and documented fees, costs and expenses of one primary firm of legal counsel plus one firm of local counsel in each appropriate jurisdiction, including, without limitation, Dechert LLP, Prieto Abogados SpA, Pinheiro Neto, Hernández y Cía, Ferrere Abogados, Costa Rican counsel, and Juan Luis Goldenberger and any other additional counsel reasonably necessary to advise in each appropriate jurisdiction, including without limitation, any jurisdiction where any Collateral is located, plus Link Capital Partners SpA, as financial advisor to Dechert LLP as counsel to the Lenders), in each case that in any way relate to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the Lenders' and their respective Affiliates' holdings of the 7.5% Notes due 2025 under the Indenture, any fees and expenses of any of their advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the definitive documents related thereto, the Loan Documents, the Chapter 11 Cases, the administration of the Credit Facility, any filing, registration, recording or perfection of any security interest contemplated by any Collateral Document and (b) with respect to each Agent and each Lender, shall include all documented fees, costs and expenses incurred in connection with enforcement of rights and remedies with respect to the DIP Credit Facility, the DIP Loan Documents, and/or the Collateral, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith (collectively, the "<u>Agent and Lenders' Fees</u>").  All invoiced and outstanding Agent and Lenders' Fees shall be due and payable in accordance with the DIP Orders.  All invoices for Agent and Lenders' Fees shall be summary invoices without any detailed time entries and (ii) shall not be subject to the US Trustee guidelines. <br><br> *See* DIP Credit Agreement, Section 8.04. |
| **Maturity Date** <br> Bankruptcy Rule 4001(c)(1)(B), Bankruptcy Local Rule 4001-2(a)(10) | The Maturity Date is the earlier of (a) the date occurring sixty five (65) days after the Closing Date (which date may, notwithstanding anything else herein, be extended by the Borrower for up to an additional five (5) Business Days in the event that the Confirmation Order has been entered and so long as the effective date of the Plan shall not have |

| | |
|---|---|
| | occurred), (b) the conversion of any of the Chapter 11 Cases to a case under chapter 7 without the prior written consent of the Requisite Lenders, (c) the dismissal of any of the Chapter 11 Cases without the prior written consent of the Requisite Lenders, (d) the appointment of a chapter 11 trustee without the prior written consent of the Requisite Lenders, (e) the appointment of an examiner with expanded powers without the prior written consent of the Requisite Lenders, (f) the date of consummation of a sale of all or substantially all of the Debtors' assets, unless otherwise consented to in writing by the Requisite Lenders, (g) the effective date of the Plan confirmed in the Chapter 11 Cases, (h) the date the Obligations become due and payable in full under the Loan Documents, whether by acceleration or otherwise due to the occurrence of an Event of Default, and (i) if the Final DIP Order has not been entered by the date that is thirty-five (35) days after the Petition Date (which date may be extended with the prior written consent of the Requisite Lenders).<br><br>*See* DIP Credit Agreement, Section 1.01, Definition of Maturity Date. |
| **Financial Covenants** Bankruptcy Rule 4001(c)(1)(B); Bankruptcy Local Rule 4001-2(a)(2) | At any given time and without duplication, the aggregate value of the accounts receivable then owed to the Borrower (excluding any accounts receivable subject to any factoring transaction), plus the aggregate value of all inventory and cash and Cash Equivalents of the Loan Parties and Non-Guarantor Pledgors, in each case, (x) that are pledged to secure the Obligations on a first lien basis and which are not subject to any other liens, (y) calculated in accordance with IFRS and (z) multiplied by the following factors: 100% in respect of cash and Cash Equivalents, 50% in respect of accounts receivable, and 45% in respect of inventory. Notwithstanding anything herein to the contrary, cash, Cash Equivalents, Vehicles, Vehicle parts, or Vehicle accessories that are collateral securing any obligation of the Borrower or any of its Subsidiaries (contingent or otherwise) under any letters of credit used in connection with the purchase of Vehicle inventory shall not be included in the calculation of Priority Collateral Value.<br><br>The failure of the Priority Collateral Value to equal or exceed 125% of the amount of the Commitments; *provided that*, with respect to any incurrence of Inventory Debt (including the issuance of any letter of credit secured by cash, Cash Equivalents, Vehicles, Vehicle Parts, or Vehicle accessories), or the factoring of any accounts receivable, the test for a Priority Collateral Coverage Failure shall be on a pro forma basis immediately before and immediately after giving effect to the grant of any inventory financing liens, the sale of any accounts |

| | receivable and the proposed release of any Liens securing the Obligations in connection with such incurrence or factoring. |
| | *See* DIP Credit Agreement, Section 1.01, Definitions of "Priority Collateral Value" and "Priority Collateral Coverage Failure." |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget (subject to the Permitted Variances) attached to the Interim Order as Exhibit 2.<br><br>*See* DIP Credit Agreement, Section 5.01(b). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B),<br>Bankruptcy Local Rule 4001-2(a)(10) | (a)      (i) any Loan Party shall fail to pay any principal of any Term Loan when the same shall become due and payable, or (ii) any Loan Party shall fail to pay any interest on the Term Loan or (iii) any Loan Party shall fail to make any other payment under any Loan Document, in each case under this clause (iii) within five (5) Business Days after the same shall become due and payable;<br><br>(b)      any Loan Party shall fail to perform or observe any term, covenant or agreement contained in <u>Section 5.01</u>, <u>Section 5.02</u> or <u>Section 5.03</u> and, (y) with respect to <u>Section 5.01</u> (other than <u>Section 5.01(b)</u> and <u>Section 5.01(x)</u>), remain unremedied for five (5) Business Days; and (z) with respect to <u>Section 5.03</u> (other than <u>Sections 5.03 (a), (f), (g), (h), (i), (j), (k), (m) or (p)</u>), remain unremedied for three (3) Business Days, in each case after the earlier of the date on which (i) any officer of a Loan Party or Non-Guarantor Pledgor becomes aware of such failure or (ii) written notice thereof shall have been given to any Loan Party or Non-Guarantor Pledgor by any Agent or Lender;<br><br>(c)      any uninsured judgments or orders, in the aggregate, for the payment of money in excess of $2,000,000 shall be rendered against any Loan Party or any of its Subsidiaries or any of their respective properties (including, without limitation, assets of any of the Non-Guarantor Pledgors) and all such judgments or orders shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days from the entry thereof;<br><br>(d)      any representation, warranty or certification made or deemed made by any Loan Party or Non-Guarantor Pledgor in any Loan Document or in any certificate required to be delivered in connection herewith or therewith shall be untrue in any material respect as of the date made or deemed made;<br><br>(e)      (i) failure by any Loan Party to pay when due any principal of or interest on or any other amount payable in respect of one or more items of unstayed Debt (other than the Obligations, and |

- 25 -

any other Debt that is owed to an Affiliate (including the Borrower and/or any Subsidiary)) with an aggregate outstanding principal amount exceeding $5 million, in each case, beyond the grace period, if any, provided therefor; or (ii) any other breach or default by any Loan Party with respect to any other term of any unstayed Debt described in the foregoing clause (i), in each case, beyond the grace or cure period, if any, provided therefor, but solely to the extent the effect of such breach or event of default is to cause, or to permit the holder or holders of such unstayed Debt (or a trustee or agent on behalf of such holder or holders) to cause, such unstayed Debt to become or be declared due and payable (or mandatorily redeemable) prior to its Stated Maturity or the Stated Maturity of any underlying obligation, as the case may be; *provided* that clause (ii) of this paragraph (e) shall not apply to secured Debt that becomes due as a result of the voluntary sale or transfer of the property securing such Debt if such sale or transfer is permitted hereunder;

(f)    any Non-Guarantor Pledgor makes a voluntary filing for insolvency or is declared the subject of any insolvency, bankruptcy, liquidation or reorganization proceeding under the laws of any jurisdiction and, only if such proceeding is an involuntary insolvency proceeding, it is not dismissed, stayed, reversed or lifted within twenty (20) days of such declaration;

(g)    the Loan Parties or Non-Guarantor Pledgors, shall have, directly or indirectly, contested, impeded or taken any other action (including the commencement by or on behalf of the Debtors of an Avoidance Action or other legal proceeding seeking any of the following relief or seeking the entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction)  objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, or seeking any the foregoing, with respect to either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the Liens granted pursuant to the Loan Documents or Liens granted pursuant to the Note Documents or (b) the validity, enforceability, characterization or non-avoidability of any of the Obligations or the Note Obligations;

(h)    the occurrence of an unfavorable variance from the Approved Budget in excess of Permitted Variances, in respect of the aggregate disbursements of (x) the Chilean Loan Parties, in aggregate or (y) the Chilean Loan Parties and Automotores Gildemeister Peru S.A., in aggregate;

(i)         the Liens granted under the Collateral Documents to secure the Obligations of the Loan Parties shall not have been perfected in accordance with applicable law as required under the Loan Documents in accordance with such Collateral Documents, the Collateral Annex and Schedule 5.01(y) in any manner that, in the reasonable judgment of the Requisite Lenders, the Administrative Agent or Collateral Agent, is materially detrimental to the rights or interests of the Agents or Lenders thereunder or shall cease to be valid, perfected and enforceable, and to maintain their priority, in each case, in accordance with the Collateral Documents, the Collateral Annex and Schedule 5.01(y), in all respects (unless otherwise agreed to by the Requisite Lenders), or any portion or provision of the Intercreditor Agreement shall have been terminated or declared or asserted by any Loan Party or any Subsidiary thereof or any court or Governmental Authority to be unenforceable;

(j)         any of the Chilean Loan Parties or Automotores Gildemeister Peru S.A. uses Cash Collateral or Term Loans for any item other than those set forth in, and in accordance with, the Approved Budget (subject in each case to the Permitted Variances and tested on an aggregate basis for each of (x) the Chilean Loan Parties and (y) the Chilean Loan Parties and Automotores Gildemeister Peru S.A);

(k)         any Loan Party or Non-Guarantor Pledgor shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for thirty (30) days or, if shorter, the relevant cure or grace period set forth in the relevant Loan Document, after the earlier of the date on which (i) any Responsible Officer of a Loan Party or Non-Guarantor Pledgor becomes aware of such failure, (ii) written notice thereof shall have been given to any Loan Party or Non-Guarantor Pledgor by any Agent or any Lender or (iii) the date on which such breach occurred if such provision is set forth in the relevant Loan Document. For the avoidance of doubt and notwithstanding anything herein to the contrary, no Event of Default shall have occurred pursuant to this Section 6.01(k) unless the breach of the term, covenant or other agreement of the Loan Party or Non-Guarantor Pledgor under the relevant Loan Document has occurred and is continuing and all applicable cure periods, grace periods and notice periods thereunder have expired;

(l)         any non-monetary judgment or order shall be rendered against any Loan Party or any of its Subsidiaries that could be reasonably likely to have a Material Adverse Effect, and there shall be any period of thirty-five (35) consecutive days during which a stay of

- 27 -

enforcement of such judgment or order, by reason of a pending appeal, shall not be in effect and such judgment or order remains in effect;

(m)      any Loan Document after delivery thereof pursuant to Section 3.01, Section 3.02 or Section 5.01(m) shall for any reason cease to be valid and binding on or enforceable against any Loan Party to it, or any such Loan Party shall so state in writing;

(n)      any Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 or Section 3.02 or Section 5.01(m) becomes unenforceable,  unlawful or is declared void, or shall for any reason (other than pursuant to the terms thereof) cease to create a valid (i) *pari passu* Lien on and security interest with respect to the Indenture Collateral pledged by the Non-Guarantor Pledgors, and (ii) a first priority priming Lien on and security interest in all other Collateral, wherever located, (subject only to the Carve-Out), as described in the Collateral Documents and Collateral Annex, or any Loan Party or Non-Guarantor Pledgor shall so assert in writing; or

(o)      a Change of Control shall occur other than as expressly set forth in the Plan;

(p)      an involuntary case or other proceeding is commenced against Holdings, the Borrower or any Subsidiary of the Borrower with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed or unstayed for a period of thirty (30) days; or, except for the Chapter 11 Cases, an order for relief is entered against Holdings, the Borrower or any Subsidiary of the Borrower under the bankruptcy or insolvency laws as now or hereafter in effect;

(q)      except for the Chapter 11 Cases, the Borrower or any of its Subsidiaries (i) commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Borrower or any of its Subsidiaries or for all or substantially all of the property and assets of the Borrower or any of its Subsidiaries or (iii) effects any general assignment for the benefit of creditors (an event of default specified in clause (p), (q) or (r) a "bankruptcy default");

(r)      Holdings (i) commences a voluntary case under an applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of Holdings or for all or substantially all of the property and assets of Holdings or (iii) effects any general assignment for the benefit of creditors;

(s)      the termination of the Restructuring Support Agreement or the occurrence of any Consenting Party Termination Event (as defined in the Restructuring Support Agreement) or Companies Termination Event (as defined in the Restructuring Support Agreement);

(t)      any termination or modification of the Hyundai Letters, the Hyundai Undertaking Agreement, or the Hyundai Distributorship Agreements, in each case, without the consent of the Requisite Lenders in their sole and absolute discretion;

(u)      without the consent of the Requisite Lenders, any Loan Party or Non-Guarantor Pledgor (x) waives any reasonable objection or defense against, or otherwise fails to reasonably contest, any material adverse action, material fine, or material penalty imposed against such Loan Party or Non-Guarantor Pledgor by any Peruvian Authorities in connection with the Customs Claims, or (y) enters into any agreements with any Peruvian Authorities with respect to Customs Claims without the consent of the Requisite Lenders in their sole and absolute discretion;

(v)      any repudiation by Hyundai of any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement;

(w)      the Borrower or any of its Subsidiaries' loss of access to adequate working capital financing to fund any of their operations in any jurisdiction at any time as determined by the Requisite Lenders in their sole and absolute discretion;

(x)      any termination or modification of any settlement or other agreement previously entered into by any Loan Party or Non-Guarantor Pledgor with any Peruvian Authorities or any third parties relating to the Customs Claims on terms that are not acceptable to the Requisite Lenders in their sole and absolute discretion, provided that the Requisite Lenders shall not unreasonably delay notice of whether they consent to any such modification or amendment;

(y)      the receipt by the Loan Parties or any Non-Guarantor Pledgor of any notice of any charge, sanction, levy, or fine threatened or imposed by any government regulator or authority relating to the Customs Claims that, if sustained by any applicable court, government authority, or regulator of competent jurisdiction could have the effect of: (i) enjoining, prohibiting, ceasing, terminating, or impairing or limiting the ability of any Loan Party or any Non-Guarantor Pledgor to conduct their business operations in a manner substantially consistent with their current practices in any jurisdiction, (ii) imposing felony criminal liability on any of the Loan Parties, any Non-Guarantor Pledgor or any of the Senior Managers (as defined in the Restructuring Support Agreement), (iii) imposing any civil or criminal liability of any kind on any Consenting Noteholder (as defined in the Restructuring Support Agreement), any Lender, or any of their Affiliates, or (iv) causing the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, or other obligations associated with the Customs Claims, net of any tax credits related to Customs Claims (recorded in accordance with IFRS), to exceed $40,000,000;

(z)      the occurrence of a Priority Collateral Coverage Failure;

(aa)      the Requisite Lenders shall not be satisfied, in their sole and absolute discretion, with (i) the information and/or documentation provided in response to their anti-corruption due diligence-related requests, and/or (ii) the results of their due diligence review of the compliance policies and procedures relating to, among other things, anti-corruption and other applicable laws, by the date falling forty-five (45) days after the Petition Date, unless the Requisite Lenders provide a written waiver;

(bb)      failure to use the proceeds of any Term Loans in accordance with the proposed use of proceeds described in an Officer's Certificate delivered to the Lenders at the time of such borrowing;

(cc)      entry by the Bankruptcy Court of an order, or Holdings or the Borrower or any of its Subsidiaries files or encourages a motion seeking an order, (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Cases, or (d) terminating or modifying the exclusive right of the Debtors to file a plan of reorganization under section 1121 of the Bankruptcy Code;

(dd)      any Event of Default under any DIP Order shall have occurred;

(ee)      the filing of a motion seeking authority to obtain financing pursuant to Section 364 of the Bankruptcy Code other than Debt expressly permitted under this Agreement or the filing of a chapter 11 plan by the Debtors that is not an Acceptable Plan, in each case, without the prior written consent of the Requisite Lenders;

(ff)      an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Requisite Lenders;

(gg)      the failure to meet any one of the Milestones;

(hh)      the filing of a pleading by any Debtor or any Affiliate of any Debtor seeking to vacate or modify any DIP Order without the prior consent of the Requisite Lenders;

(ii)      the entry of an order without the prior consent of the Requisite Lenders amending, supplementing or otherwise modifying any of the DIP Orders or the reversal, vacation or stay of the effectiveness of any of the DIP Orders;

(jj)      any sale of all or substantially all assets of all of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) the proceeds of such sale indefeasibly satisfy the Obligations in full in cash or (b) such sale is supported by the Requisite Lenders;

(kk)      the granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement other than in respect of the Loan Documents on assets of any Debtor valued in excess of $500,000;

(ll)      the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any super-priority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the Lenders' Superpriority Claims under the Credit Facility;

(mm)      payment of or granting adequate protection with respect to prepetition Debt, other than as expressly agreed in the Loan Documents, or in any of the DIP Orders; or

(nn)      the Adequate Protection Lien Perfection Actions shall not have been completed or executed in the timeframes or manner as required hereunder or in accordance with the DIP Orders, or if the Adequate Protection Liens shall have been determined not to be enforceable by a court of competent jurisdiction.

| | See DIP Credit Agreement, Section 6.01. |
|---|---|
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | 1. No later than 5 days following the Petition Date, the Debtors shall have obtained entry of the Interim DIP Order.<br><br>2. No later than 30 days following the Petition Date, the Debtors shall have completed solicitation of the Plan.<br><br>3. No later than 35 days following the Petition Date, the Debtors shall have obtained entry of the Final DIP Order.<br><br>4. No later than 50 days after the Petition Date, the Debtors shall have obtained entry of an order approving the Disclosure Statement (as defined in the Restructuring Support Agreement) and Solicitation Materials (as defined in the Restructuring Support Agreement).<br><br>5. No later than 50 days after the Petition Date, the Debtors shall have obtained entry of the Confirmation Order.<br><br>6. No later than 15 calendar days following the entry of the Confirmation Order, the effective date of the Plan shall have occurred.<br><br>*See* DIP Credit Agreement, Schedule 1.01(i). |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii)'<br>Bankruptcy Local Rule 4001-2(a)(5) | (a)    *Carve Out*.  As used in the Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, compensation or procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred or accrued by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Creditors' Committee, if applicable, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals") at any time before or on the first business day following delivery by the DIP Agents (acting at the direction of the Requisite DIP Lenders (as defined in the DIP Credit Agreement) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) (x) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $500,000 and (y) Allowed Professional Fees of any Creditors' Committee (if appointed) in an aggregate amount not to exceed $50,000, in each case incurred or accrued after the first business day following delivery by the DIP Agents (acting at the direction of the Requisite DIP |

Lenders, as applicable) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, compensation or procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agents (at the direction of the Requisite DIP Lenders) to the Debtors, their lead restructuring counsel, legal counsel to the Creditors' Committee (if appointed), and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     The Carve-Out shall be senior to all liens and claims (including administrative and superpriority claims) against the Debtors that secure the DIP Obligations, the Prepetition Secured Notes Obligations, the Adequate Protection Obligations, and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens or claims (including administrative and superpriority claims) granted by the Debtors and recognized as valid herein.

(c)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     *No Obligation to Pay Allowed Professional Fees*. None of the DIP Agents, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Debtor Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in the Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Debtor Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     *Payment of Carve Out on or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

*See* Interim Order, ⁋ 5.

| | |
|---|---|
| **Entities with Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b) | The DIP Secured Parties and the Prepetition Secured Parties.<br><br>*See* DIP Credit Agreement, Section 1.01, Definition of "Secured Parties"; Prepetition Secured Notes Indenture, Preamble and Section 1.01, Definition of "Holder." |
| **Waivers/ Modification of Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The Automatic Stay is hereby modified to the extent necessary to permit each applicable DIP Agent (acting at the direction of the Requisite DIP Lenders) to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Court and immediately upon the occurrence of an Event of Default: (i) deliver a notice of an Event of Default to the Debtors; (ii) declare the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains; (iii) declare the termination of the DIP Documents as to any future obligation of the DIP Agents and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties; and (v) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral; *provided* that such declaration shall be subject to the Carve Out and effective two (2) business days following delivery of a notice of an Event of Default by the DIP Agents to the Debtors (and their lead restructuring counsel) (the "Cash Collateral Notice Period") (any such declaration of the foregoing (i) through (v), a "Termination Declaration" and the date of such Termination Declaration, the "Termination Declaration Date"). The Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Creditors' Committee (if appointed), and to the U.S. Trustee. The Automatic Stay otherwise applicable to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties is hereby modified so that, five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"): (A) the applicable DIP Agents acting at the direction of the Requisite DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the respective DIP Documents and the Interim Order and shall be permitted to satisfy the relevant DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out, and (B) the applicable Prepetition Secured Parties shall be entitled to exercise their rights and remedies to satisfy the relevant Prepetition Secured Notes Obligations, Adequate Protection Obligations, 507(b) Claims, and Adequate Protection Liens, in each case (A) and (B), subject to |

and consistent with (i) the Carve Out, (ii) the Interim Order, and (iii) the DIP Documents (including the DIP Intercreditor Agreement), as applicable.  For the avoidance of doubt, during the Remedies Notice Period, the applicable DIP Secured Parties and the applicable Prepetition Secured Parties shall not exercise any rights of foreclosure, set off or other enforcement rights with respect to the assets of the Non-Debtor Pledgors.  Following expiration of the Remedies Notice Period, whether or not the maturity of any of the DIP Obligations shall have been accelerated, the Automatic Stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise will automatically be terminated with respect to the DIP Agents and DIP Lenders and the Prepetition Secured Parties who shall be permitted to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Documents and the Prepetition Secured Notes Documents and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or Prepetition Secured Debt Document or any instrument pursuant to which such DIP Obligations or Prepetition Secured Notes Obligations are evidenced, (x) foreclosing on all of or any portion of the DIP Collateral or Prepetition Secured Notes Collateral including freezing any Cash Collateral held in the Debtors' or Non-Debtor Pledgors' accounts, (y) immediately setting-off any and all amounts in accounts maintained by the Debtors against the DIP Obligations or the Prepetition Secured Notes Obligations, or otherwise enforcing any and all rights against any DIP Collateral or Prepetition Secured Notes Collateral in the possession of the DIP Agents, the Prepetition Agents, or otherwise, including, without limitation, disposition of the DIP Collateral or the Prepetition Secured Notes Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations and the Prepetition Secured Notes Obligations, and (z) taking any other actions or exercising any other rights or remedies permitted under the Interim Order, the DIP Documents, the Prepetition Secured Notes Documents or applicable law, in each case, without further notice to or order of the court unless the Debtors, the Creditors' Committee (if appointed), any other party in interest, and/or the U.S. Trustee have obtained an order of the Court preventing such action.  During the Remedies Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility and (ii) the only basis on which the Debtors, the Creditors' Committee (if appointed), any other party in interest, and the U.S. Trustee shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court shall be to contest whether

|  | an Event of Default has occurred and/or is continuing and the DIP Agents and the DIP Lenders shall consent to such emergency hearing. Except as expressly provided for herein, the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties.<br><br>*See* Interim Order, ⁋ 9(d).<br><br>*Conditions to Use of Prepetition Secured Notes Cash Collateral.*  In the event a circumstance exists which would (1) cause the Restructuring Support Agreement dated as of March 31, 2021 between *inter alia:* the Debtors, the Non-Debtor Pledgors, and the Ad Hoc Group of Secured Noteholders (as may be amended or modified from time to time, the "Restructuring Support Agreement") to terminate automatically, or (2) give the Required Consenting Noteholders (as defined in the Restructuring Support Agreement) the right to deliver a written notice of termination of the Restructuring Support Agreement, in each case, under the terms of Sections 3.01(b) through (ee) thereof and notwithstanding any cure periods that would be otherwise applicable or any other provision of the Interim Order, the Automatic Stay is hereby modified to permit the Ad Hoc Group of Secured Noteholders to immediately terminate the Restructuring Support Agreement and, subject to the provisions of paragraph 9 (including the Cash Collateral Notice Period), terminate the Prepetition Secured Parties' consent to the Debtors' right to use Prepetition Secured Notes Collateral that consists of Cash Collateral pursuant to the Interim Order.<br><br>*See* Interim Order, ⁋ 15(f). |
|---|---|
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Each Lender severally agrees to indemnify each Agent and its respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (to the extent not promptly reimbursed by the Borrower), from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the "Indemnified Costs"); *provided,* |

| | |
|---|---|
| | *however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction.  Without limitation of the foregoing, each Lender agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, reasonable fees and expenses of counsel) payable by the Borrower under Section 8.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  <br><br>*See* DIP Credit Agreement, Section 7.05. |
| ***Pari Passu* Liens and Priming Liens** <br><br>Bankruptcy Local Rule 4001-2(a)(4) | The Collateral Documents, for the benefit of the Secured Parties, shall have a valid and perfected *pari passu* Lien on and security interest in the Indenture Collateral pledged by the Non-Guarantor Pledgors and a first priority Lien on and security interest in all other Collateral in accordance with the Collateral Documents, subject only to the Carve-Out and to Prior Permitted Liens.  <br><br>*See* DIP Credit Agreement, Schedule 1.01(g). |
| **Adequate Protection** <br><br>Bankruptcy Local Rule 4001-2(a)(4) | *Adequate Protection of Prepetition Secured Parties.*  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Secured Notes Collateral (including the Cash Collateral) pledged by the Debtors in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in such Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease or use by the DIP Loan Parties of the Prepetition Secured Notes Collateral, the grant of the *pari passu* DIP Liens over the Prepetition Secured Notes Collateral pledged by the Non-Debtor Pledgors to secure the Prepetition Secured Notes Obligations, the priming of the Prepetition Secured Notes Liens by the DIP Priming Liens pursuant to the DIP Documents and the Interim Order, the payment of any amounts under the Carve Out, and the imposition of the Automatic Stay (the "Adequate Protection Claims").  In consideration of the foregoing, the Prepetition Agents, for the benefit of the Prepetition Secured Parties, are hereby granted the following as Adequate Protection for the priming of the Prepetition Secured Notes |

Liens and use of the Prepetition Secured Notes Collateral (including Cash Collateral) and to secure repayment of an amount equal to such Adequate Protection Claims (collectively, the "Adequate Protection Obligations"):

(a)     *Prepetition Secured Notes Adequate Protection Liens.* The Prepetition Secured Notes Collateral Agent, for itself and for the benefit of the other Prepetition Secured Parties, (x) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of the Prepetition Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral pledged by the Debtors, in each case subject and subordinate only to (i) any DIP Liens and any liens to which the DIP Liens are junior and (ii) the Carve Out; and (y) pursuant to the Adequate Protection Perfection Documents (as defined below) and on the timelines specified in paragraph **Error! Reference source not found.** of the Interim Order, shall be granted by the Non-Debtor Pledgors organized in Costa Rica valid, binding, continuing, enforceable, senior security interests in and liens upon their inventory, cash, and receivables subject to the DIP Liens (together, (x) and (y), the "Adequate Protection Liens").

(b)     *Prepetition Secured Notes Section 507(b) Claims.* Each of the Prepetition Secured Notes Indenture Trustee and the Prepetition Secured Notes Collateral Agent, for itself and for the benefit of the other Prepetition Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Secured Parties' Adequate Protection Claims, with, except as set forth in the Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "507(b) Claims"); which 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral. The 507(b) Claims shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims. Except to the extent expressly set forth in the Interim Order, the Final Order or the DIP Documents, the Prepetition Secured Parties, shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all DIP Commitments have been terminated. For the avoidance of doubt, each of the Prepetition Secured Notes Indenture Trustee and the Prepetition Secured Notes Collateral Agent (for itself and for the benefit of the respective Prepetition Secured Parties it

represents) shall not assert its 507(b) Claims until entry of the Final Order.

(c)     *Prepetition Secured Parties Fees and Expenses*. The DIP Loan Parties shall provide the Prepetition Secured Notes Indenture Trustee and the Prepetition Secured Notes Collateral Agent for itself and for the benefit of the Prepetition Secured Parties current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of:  (i) Emmet, Marvin, & Martin, LLP, as legal counsel to the Prepetition Secured Notes Indenture Trustee, (ii) Ross PLLC, as legal counsel to the Prepetition Secured Notes Collateral Agent and (iii) any other advisors (including local and foreign legal counsel) retained by the Prepetition Secured Notes Indenture Trustee or the Prepetition Secured Notes Collateral Agent (the "Prepetition Agents Adequate Protection Fees and Expenses").  The DIP Loan Parties shall further provide as adequate protection for the ad hoc group of holders of Prepetition Secured Notes party to the Restructuring Support Agreement (as defined below) (the "Ad Hoc Group of Secured Noteholders") current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of:  (i) Dechert LLP, legal counsel to the Ad Hoc Group of Secured Noteholders, (ii) Link Capital Partners S.p.A., as financial advisor to Dechert LLP as counsel to the Ad Hoc Group of Secured Noteholders, (iii) Prieto Abogados S.p.A., Chilean legal counsel to the Ad Hoc Group of Secured Noteholders; (iv) Pinheiro Neto, Brazilian legal counsel to the Ad Hoc Group of Secured Noteholders, (v) Hernández y Cía, Peruvian legal counsel to the Ad Hoc Group of Secured Noteholders, (vi) Ferrere Abogados, Uruguayan legal counsel to the Ad Hoc Group of Secured Noteholders, (vii) Batalla, Costa Rican legal counsel to the Ad Hoc Group of Secured Noteholders, and (viii) any other legal or financial advisors (including local and foreign legal counsel), in each case incurred since November 7, 2019 and relating in any way to the provision of legal services related to the Prepetition Secured Notes, the Debtors, or the Chapter 11 Cases to the Ad Hoc Group of Secured Noteholders (together with the Prepetition Agents Adequate Protection Fees and Expenses, the "Adequate Protection Fees and Expenses").  The Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph **Error! Reference source not found.** of the Interim Order.

(d)     *Milestones and Budget*.  The Ad Hoc Group of Secured Noteholders and the other Prepetition Secured Parties are hereby entitled to performance of those certain case milestones set forth in the DIP Credit Agreement and the Debtor's compliance with the Approved Budget.  Upon payment in full of all DIP Obligations and termination of all DIP Commitments, the Approved Budget shall

| | |
|---|---|
| | continue to be updated in accordance with the terms and conditions of the DIP Credit Agreement.<br><br>     (e)    *Prepetition Secured Parties' Information Rights and Financial Reporting*. The Debtors shall continue to provide the Prepetition Agents, the Prepetition Secured Parties, and the Ad Hoc Group of Secured Noteholders (through its counsel) with financial and other reporting substantially in compliance with the Prepetition Secured Notes Documents.<br><br>     (f)    *Conditions to Use of Prepetition Secured Notes Cash Collateral*. In the event a circumstance exists which would (1) cause the Restructuring Support Agreement dated as of March 31, 2021 between *inter alia:* the Debtors, the Non-Debtor Pledgors, and the Ad Hoc Group of Secured Noteholders (as may be amended or modified from time to time, the "<u>Restructuring Support Agreement</u>") to terminate automatically, or (2) give the Required Consenting Noteholders (as defined in the Restructuring Support Agreement) the right to deliver a written notice of termination of the Restructuring Support Agreement, in each case, under the terms of <u>Sections 3.01</u>(b) through (ee) thereof and notwithstanding any cure periods that would be otherwise applicable or any other provision of the Interim Order, the Automatic Stay is hereby modified to permit the Ad Hoc Group of Secured Noteholders to immediately terminate the Restructuring Support Agreement and, subject to the provisions of paragraph 9 (including the Cash Collateral Notice Period), terminate the Prepetition Secured Parties' consent to the Debtors' right to use Prepetition Secured Notes Collateral that consists of Cash Collateral pursuant to the Interim Order.<br><br>*See* Interim Order, ¶ 15. |
| **Change in Control Provisions**<br><br>Bankruptcy Local Rule 4001-2(a)(11) | "<u>Change of Control</u>" means the occurrence of any of the following at any time: (1) the merger or consolidation of the Borrower with or into another Person or the merger of another Person with or into the Borrower or the merger of any Person with or into a Subsidiary of the Borrower if Capital Stock of the Borrower is issued in connection therewith, or the sale of all or substantially all the assets of the Borrower to another Person, unless holders of a majority of the aggregate voting power of the Voting Stock of the Borrower, immediately prior to such transaction, hold securities of the surviving or transferee Person that represent, immediately after such transaction, at least a majority of the aggregate voting power of the Voting Stock of the surviving Person; (2) Holdings ceases to "beneficially own" (as such term is used in Rules 13d-3 under the Exchange Act), directly or indirectly, at least 50% of the total voting power of the Voting Stock of the Borrower; (3) Holdings ceases to have the power to directly or indirectly elect a majority of the Board of Directors of the Borrower |

| | |
|---|---|
| | (excluding the Independent Directors); or (4) the adoption of a plan relating to the liquidation or dissolution of the Borrower or any of the Loan Parties.<br><br>*See* DIP Credit Agreement, Section 1.01 Definition of "Change of Control". |
| **Prepayment Penalty**<br><br>Bankruptcy Local Rule 4001-2(a)(13) | None. |
| **Funding of Non-Debtor Affiliates**<br><br>Bankruptcy Local Rule 4001-2(a)(15) | None. |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | In accordance with Bankruptcy Local Rule 4001-2(g)(9), upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agents or the Prepetition Agents, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties, and nothing contained in the Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral (including Cash Collateral) or Prepetition Secured Notes Collateral (including Cash Collateral) under section 506(c) of the Bankruptcy Code or otherwise.<br><br>*See* Interim Order, ⁋ 10. |
| **Section 552(b)(1) Waiver** | In accordance with Bankruptcy Local Rule 4001-2(g)(9), the Final Order shall provide and the Debtors have agreed as a condition to obtaining financing under the DIP Facility, that in no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP |

| | Obligations, the Prepetition Secured Notes Obligations, or the Prepetition Secured Notes Collateral.  The Final Order shall provide and the Debtors have agreed as a condition to obtaining financing under the DIP Facility, that in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Agents or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Secured Notes Collateral. |
| | *See* Interim Order, ⁋ 11. |

**BASIS FOR RELIEF**

**I.    Entry into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment**

26.    As described above, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Facility is the best option available under the circumstances of the Chapter 11 Cases.  As such, the Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Documents and obtain the DIP Facility.

27.    Pursuant to Section 364 of the Bankruptcy Code, a debtor is authorized to obtain secured or superpriority financing in the ordinary course of business as an administrative expense when, as here, certain conditions are met.  *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").  Consequently, a debtor has broad discretion in negotiating and entering into a postpetition secured credit agreement, as long as the agreement comports with the debtor's business judgment and does not contravene the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer

to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (stating that a bankruptcy court's "normal function in reviewing requests for postpetition financing is to defer to a debtor's own business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.") (citation omitted); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment") (citation omitted).

28.    Bankruptcy courts will not challenge a debtor's decisions concerning the operation of its business when those decisions reflect a "good faith business judgment, [are] made on a reasonable basis, and [are] 'within the scope of [the trustee's] authority under the Code.'" *In re Taub*, 441 B.R. 211, 216 (Bankr. E.D.N.Y. 2010) (quotation marks and citation omitted); *See In re YL W. 87th Holdings I LLC,* 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing.") (citations omitted). In evaluating whether the business judgment test is met, courts "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).  Applying this standard, "a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion." *Id.*

29.    The Debtors' determination to enter into the DIP Facility represents an appropriate exercise of their sound business judgment and should be approved.  The protections of the Chapter 11 Cases and the critical funding to be provided under the DIP Facility will allow the Debtors to preserve their operations and maintain the value of their estates.  Absent sufficient cash to meet

their obligations during the Chapter 11 Cases, the Debtors likely will be unable to consummate the

necessary transactions to restructure their business.

30.     The Debtors worked closely with their advisors to determine their cash needs for

the chapter 11 process.  The Debtors also negotiated the various components of the DIP Facility

with the DIP Lenders at arm's length and in good faith.  The Debtors determined that the terms of

the resulting DIP Facility are reasonable and the only realistically available option under the

circumstances.  The Debtors believe that they have negotiated the best possible terms for the DIP

Facility, which will permit them to maintain their current operations and emerge quickly from the

chapter 11 process.  As such, and as further described in the First Day Declaration, the Debtors'

decision to enter into the DIP Facility was a sound exercise of their business judgment.

## II.     The Debtors Should Be Authorized to Obtain Postpetition Financing Under Section 364(c) of the Bankruptcy Code

31.     As described above, it is essential that the Debtors obtain access to sufficient

postpetition financing and are authorized to use Cash Collateral to avoid immediate and irreparable

harm to their assets.  The preservation of estate assets, the Debtors' continuing viability and their

ability to maintain value for stakeholders depend heavily upon the expeditious approval of the

relief requested herein.

32.     Section 364 of the Bankruptcy Code authorizes a debtor to incur debt or obtain

credit if the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy

Code.  *See* 11 U.S.C. § 364.  Specifically, section 364 of the Bankruptcy Code authorizes the court,

after notice and hearing, to grant the requested relief: "(1) with priority over any or all

administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured

by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior

lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).

33.     To meet the standards of section 364(c), a debtor need only demonstrate that that "it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)." *Ames Dep't Stores*, 115 B.R. at 37; *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). The statute "imposes no duty [on a debtor] to seek credit from every possible lender" before concluding that such credit is unavailable. *Ames Dep't Stores*, 115 B.R. at 37; *see also Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

34.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

b.      the credit transaction is necessary to preserve the assets of the estate; and

c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Repub. Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *see also Ames Dep't Stores*, 115 B.R. at 37–40; s*ee In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991) (citations omitted); *Crouse Grp.*, 71 B.R. at 549.

35.     Further, if a debtor is unable to obtain unsecured credit as an administrative expense under section 503(b)(1), a court may nonetheless "authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is

not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

**A.     The Necessary Postpetition Financing Is Not Available on an Unsecured Basis**

36.     As stated in the Messer Declaration, the Debtors could not obtain postpetition financing on an unsecured or junior basis. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. *Bray*, 789 F.2d at 1088. Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* Where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the] Debtor to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

37.     The Debtors reasonably concluded that postpetition financing was not available on an unsecured basis following good faith efforts to obtain funding prior to the Petition Date. As set forth above and in the Messer Declaration, given the Debtors' outreach to various stakeholders and third parties in an attempt to obtain financing, the Debtors have a clear understanding of the current availability of postpetition financing and reasonably determined that it was futile to pursue such financing from the market at large on an unsecured basis. Moreover, as set forth in more detail in the First Day Declaration, the DIP Facility is part of the Debtors' consensual, pre-packaged bankruptcy filing pursuant to which the DIP Lenders agree not only to fund the DIP Facility but also to support the Debtors' restructuring transactions. The Debtors' efforts to seek the necessary postpetition financing from sources within the Debtor's existing capital structure and from third parties were reasonable and sufficient and satisfy the statutory requirements of

section 364(c) of the Bankruptcy Code. The Debtors therefore made appropriate and sufficient efforts to confirm that postpetition financing is not available on an unsecured basis.

### B.      The DIP Facility Is Necessary to Preserve and Protect the Assets of the Debtors' Estates

38.      The Debtors are requesting that the Court approve interim availability under the DIP Facility in the aggregate amount of $16,950,000. This amount is essential to the continued operation of the Debtors' business and the Debtors' ability to fund the costs of conducting the Chapter 11 Cases. The liquidity provided by the DIP Facility will also assure the Debtors' vendors, contractors and employees that they will be paid for postpetition services and provide assurances to the Debtors' customers that the Debtors will be able to operate their business during the Chapter 11 Cases. Without such liquidity, the Debtors have determined that they will not be able to adequately fund postpetition business operations. Finally, as detailed in the DIP Credit Agreement, entry of the Interim Order is a prerequisite to funding the DIP Loans. Thus, entry of the Interim Order is crucial to maximizing the value of the Debtors' estates. *See Burtch v. Ganz (In re Mushroom Transp. Co.),* 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to maximize their estates' assets).

### C.      The Terms of the DIP Credit Facility Are Fair, Reasonable and Adequate Under the Circumstances

39.      In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and potential lender. *See In re Farmland Indus., Inc.,* 294 B.R. 855, 885-86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.),* 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

- 47 -

40.     The terms of the DIP Facility and the Proposed Orders were negotiated in good faith and at arm's-length between the DIP Loan Parties and the DIP Secured Parties, resulting in agreements designed to permit the Debtors to obtain needed liquidity and to maximize the value of their assets through the chapter 11 process.  As a result, the Debtors believe that the terms of the DIP Facility are within the range of reasonableness and consistent with market expectations for facilities of this type.  Indeed, not only are the terms of the DIP Facility fair and reasonable, they are an integral part of the Debtors' path to a swift emergence from the Chapter 11 Cases.

41.     Specifically, the Debtors believe that the terms of the DIP Facility are acceptable because:

- The fees, interest rate and other economics are consistent with market rates for other postpetition financing facilities in similar circumstances; and

- The milestones are reasonable, capable of satisfaction and consistent with the Debtors' desire to maximize the value of their estates and minimize the costs of administering the Chapter 11 Cases.

42.     In addition to these considerations, the terms of the DIP Facility were extensively negotiated between the parties over a period of several months, resulting in the following benefits to the Debtors as compared to the original proposal received from the DIP Lenders: (a) an increase in the Commitment Amount (as defined in the DIP Credit Agreement), (b) a reduction in the proposed interest rate, (c) the right to incur Inventory Debt (as defined in the DIP Credit Agreement) and grant liens to secure such Inventory Debt, subject to limitations in the DIP Documents, (d) the right to factor receivables (with and without recourse) in the ordinary course of business and consistent with past practices, subject to the limitations in the DIP Documents, (e) the extension of certain milestone deadlines and (f) the reduction of certain potentially burdensome administrative and reporting requirements.  Accordingly, the Debtors believe that the terms of the DIP Facility are fair, reasonable and adequate under the circumstances.

### III.   The Debtors Should Be Authorized to Obtain Priming Liens Under Section 364(d) of the Bankruptcy Code

43.     Section 364(d)(1) of the Bankruptcy Code provides that a debtor may incur debt "secured by a senior or equal lien on property of the estate that is subject to a lien only if' the court finds, after notice and hearing, that (a) the debtors-in-possession are "unable to obtain such credit otherwise" and (b) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *See In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (holding that debtor must make an effort to obtain credit without the requirement of a priming lien but is not required to seek credit from every possible lender); *Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.),* 300 B.R. 861, 863 (Bankr. W.D. Pa. 2003) (where debtor made efforts by "contact[ing] numerous lenders" and was unable to obtain credit without a priming lien, it had met its burden under section 364(d)); *In re Dunes Casino Hotel,* 69 B.R. 784, 791 (Bankr. D.N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).

44.     Here, the DIP Liens to be granted by the Debtors in the DIP Collateral and extended under the DIP Credit Agreement and the other DIP Documents prime the Prepetition Secured Notes Liens.  While a majority of the holders of the Prepetition Secured Notes have consented to this treatment, subject to approval of the adequate protection provisions described in the DIP Credit Agreement, the priming of the Prepetition Secured Notes Liens nevertheless satisfies the requirements of section 364(d)(1) of the Bankruptcy Code.

**A.      The Necessary Postpetition Financing Is Available Only on a Priming Basis**

45.      As described above and in the Messer Declaration, the Debtors engaged various parties regarding potential postpetition financing and reasonably determined that postpetition credit was available to them only on a priming basis.  This confirmed the Debtors' expectations, given their experiences attempting to secure financing prior to the Petition Date, their communications with key creditors and their analysis of their assets.  Accordingly, the Debtors reasonably determined that postpetition financing was available for the Debtors only on a priming basis.

**B.      The Interests of the Prepetition Secured Noteholders Are Adequately Protected**

46.      The DIP Facility also satisfies section 364(d)'s adequate protection requirement. Section 364(d)(1)(B) of the Bankruptcy Code requires a debtor to establish that "there is *adequate protection* of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B) (emphasis added).  Whether the offered protection is "adequate" is determined on a case-by-case basis and "depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the postpetition loan." *Resol. Tr. Corp. v. Swedeland Dev. Grp, Inc. (In re Swedeland Dev. Grp., Inc.),* 16 F.3d 552, 564 (3d Cir. 1994) (internal citations and quotations omitted); *495 Cent. Park,* 136 B.R. at 631 (explaining that "[t]he goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest") (citations omitted).

47.      Although section 361 of the Bankruptcy Code sets forth three non-exclusive forms of adequate protection *(i.e.,* periodic cash payments, granting replacement liens or for the creditor's realization of the indubitable equivalent of its claim), the concept of adequate protection is designed to give the "parties and the courts flexibility by allowing such other relief as will result

in the realization by the protected entity of the value of its interest in the property involved." *Id.*

(quoting H. R. Rep. No. 95-595, 95th Cong., 1st Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N.

5787, 6296 (1978)).

48.     In order to permit priming, the Prepetition Secured Parties required that the terms

of the DIP Facility include adequate protection in the form of liens, superpriority claims and

payment of fees and expenses to the extent of the aggregate diminution in the value of their

respective interests, if any, in the Prepetition Secured Notes from and after the Petition Date for

any reason, including, without limitation: (a) any such diminution from the priming of any

Prepetition Secured Notes Collateral by the DIP Liens pursuant to the DIP Documents and the

Interim Order; (b) the depreciation, sale, loss, use or collection by any Debtors (or any other

decline in value) of such Prepetition Secured Notes Collateral; or (c) the imposition of the

automatic stay pursuant to section 362 of the Bankruptcy Code.

49.     As described above, the Debtors have provided adequate assurance in the form of

liens, superpriority claims and payment of fees and expenses.  By providing these above forms of

adequate protection, the Debtors have satisfied their burden of demonstrating that the Prepetition

Secured Noteholders are adequately protected.  In addition, the Prepetition Secured Noteholders

are adequately protected because the proceeds of the DIP Facility will be used to fund the Chapter

11 Cases and allow the Debtors to pursue the restructuring of their obligations.  Moreover,

numerous courts have held that a secured creditor is adequately protected where the debtor

reasonably anticipates that its secured creditors will receive more on account of their collateral

taking into account the imposition of the priming lien than if the debtor were unable to obtain the

loan.  *See, e.g., id.* (finding that financed improvements would increase the value of the collateral

and serve as adequate protection for the prepetition secured lender); Hr'g Tr. at 18:5-12 *In re*

*Aeropostale, Inc.,* Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) (ECF No. 113), (finding that secured lenders were adequately protected where liquidity was anticipated to increase slightly allowing the debtors to pursue a sale of their assets, as opposed to forcing an immediate liquidation); *In re Hudson*, No. 208-09480, 2011 WL 1004630, at *9 (Bankr. M.D. Tenn. Mar. 16, 2011) (approving financing to construct a shed required to service a valuable contract, which would increase the value of the collateral more than the amount of the postpetition loan); *In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2008 WL 5875547, at *17 (Bankr. D. Mont. Dec. 17, 2008) (finding that a postpetition financing would provide a "net economic benefit" because it would be used to finance operation of the debtor's business rather than allowing it to "go dark" while it pursued a sale); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) (holding that lien on debtor's property was adequately protected where proceeds of loan would be used to clean up environmental damage on the debtor's property, which was worthless absent such remediation).

50.    Here, the DIP Facility will enable the Debtors to fund the chapter 11 process and eliminate significant financial obligations rather than face the prospect of value-destructive liquidation.  The majority of the holders of the Prepetition Secured Notes support the DIP Facility because they anticipate receiving more on account of the Prepetition Secured Notes Collateral if the Debtors are able to obtain the DIP Facility and restructure through the chapter 11 process. Because the prepetition interests of these parties are adequately protected, the requirements of section 364(d)(1)(B) of the Bankruptcy Code have been fulfilled, and the proposed DIP Facility, including its priming provisions, should be approved.

IV.    **The Debtors Should Be Authorized to Pay the Fees Required by the DIP Secured Parties**

51.    The Debtor believes that the fees contemplated by the DIP Facility are reasonable under the circumstances of these Chapter 11 Cases.  The fees that the Debtors agreed to pay to the DIP Secured Parties, which consist of, as applicable, an interest rate of 11.75% *per annum* on the DIP Loans, and upon an Event of Default, a default interest rate accruing on all DIP Obligations at the otherwise applicable interest rate plus an additional 2.0% *per annum*, an original issue discount ("OID") of 5% on the DIP Loans, certain fees as may be agreed from time to time between the Debtors and DIP Agents, and the reasonable and documented costs and expenses whether incurred before or after the Petition Date, represent the most favorable terms to the Debtors on which the DIP Secured Parties would agree to make the DIP Facility available.  The Debtors considered these fees when determining, in their business judgment, that the DIP Facility constituted the best terms on which the Debtors could obtain postpetition financing.

52.    Courts routinely authorize postpetition lenders to impose fees beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code.  Moreover, such charges often are permitted where the associated financing is, in the debtor's business judgment, beneficial to the debtor's estate.  *See, e.g.,* Final Order, *In re Soupman, Inc.*, Case No. 17-11313 (LSS) (Bankr. D. Del. July 18, 2017) ECF No. 136.  The Debtors also submit that the fees are in line with transactions of this type and should be approved on the facts and circumstances of these cases.

V.    **The Scope of the Carve Out Is Appropriate**

53.    The liens and security interests extended under the DIP Credit Agreement and the other DIP Documents are all subject to the Carve Out.  Courts treat carve outs similarly to other terms created for professional fees that are reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *Ames Dep't Stores*, 115 B.R. at

38 (noting it has been "the uniform practice in this Court . . . to insist on a carve out from a super-priority status and postpetition lien" to pay parties' professionals because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"); *see also* Final Order, *In re Windstream Holdings, Inc.,* Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) ECF No. 376; Interim Order, *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) ECF No. 99; Interim Order, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) ECF No. 43; Final Order, *In re Halcón Res. Corp.*, Case No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) ECF No. 130; Final Order, *In re Ulta Stores, Inc.*, Case No. 09-11854 (BRL) (Bankr. S.D.N.Y. Apr. 29, 2009) ECF No. 97.

54.     Here, the Carve Out is necessary to protect against an unlikely administrative insolvency and to ensure that Debtor's estates retain all rights and powers necessary to pay for the professional services without undue restrictions.  Accordingly, the Court should find that the proposed Carve Out is appropriate in these circumstances and grant the relief requested.

## VI.    The Debtors Should Be Authorized to Enter into the Consorcio Joinder

55.     The Court may grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code.  Under section 363(b)(1) of the Bankruptcy Code, a debtor in possession may "use, sell, or lease" estate property "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  It is well-established in this jurisdiction that a debtor may use, sell or lease estate property under this provision if there is a good business reason for doing so. *See, e.g.*, *In re AMR Corp.*, 490 B.R. 158, 164 (Bankr. S.D.N.Y. 2013) (explaining that "courts in the Second Circuit and elsewhere have required that [the sale, disposition or other use of a debtor's assets] be based upon the sound business judgment of the debtor"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr.

- 54 -

S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

56.    The Debtors' performance under the Consorcio Joinder is undoubtedly a sound exercise of the Debtors' business judgment.  The Consorcio Joinder is the product of arms' length, good faith negotiations among the Debtors, the Initial Consenting Noteholders and Consorcio. Upon execution of the Consorcio Joinder, the Debtors will have the support of additional Claims (as defined in the Plan) in Class 4 (the Prepetition Secured Notes Secured Claims (as defined in the Plan)) and Class 5 (consisting of the Prepetition Secured Notes Unsecured Deficiency Claims (as defined in the Plan), Unsecured Notes Legacy Claims (as defined in the Plan) and Related Party Claims), providing the Debtors with a clear path to confirmation of the Plan.  Moreover, the Debtors' entry into the Consorcio Joinder will increase the DIP Loans available to the Debtors during these Chapter 11 Cases by the amount of the Additional DIP Commitment, further supporting the Debtors' ability to continue operating their business and successfully reorganize pursuant to the Plan.

57.    Pursuant to sections 363 and 503 of the Bankruptcy Code, the Debtors submit that payment of the Consorcio Fees and Expenses is reasonable, necessary and appropriate under the circumstances of these Chapter 11 Cases.  The Court's approval of the Debtors' payment of the Consorcio Fees and Expenses will ensure Consorcio's support of the Plan and the Debtors' access to additional DIP Loans in the amount of the Additional DIP Commitment, helping to pave the way to a consensual plan confirmation.  Accordingly, the Debtors submit that entering into the Consorcio Joinder and payment of the Consorcio Fees and Expenses is consistent with the sound exercise of their business judgment.

## REQUEST FOR SHORTENED INVESTIGATION PERIOD

58.     Bankruptcy Local Rule 4001-2(g)(4)(A) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditor's committee, if any, at least sixty (60) days from the date of its formation to investigate such matters.   Bankruptcy Local Rule 4001-2(g)(4)(C) further provides that the periods for investigation "may be shortened for cause shown, including in prepackaged or prearranged cases."

59.     Under the Interim Order, the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.

60.     In addition, under the Interim Order, certain of the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be subject to a sixty (60) calendar day challenge period on the terms provided in the Interim Order (the "Challenge Period"). During the Challenge Period, parties in interest with requisite standing (including any official committee of unsecured creditors, if appointed) may bring various objections or prosecute certain causes of action relating to the Debtors' stipulations, admissions, agreements and releases relating to Prepetition Secured Notes Documents, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens and the Prepetition Secured Notes Collateral in accordance with the terms of the Proposed Orders (such actions the "Challenges").   In the event a final non-appealable order in favor of a plaintiff sustaining any such Challenge is timely entered during the Challenge Period, then the stipulations, admissions, agreements and releases contained in the Interim Order subject to such successful Challenge shall be subject to the relief granted.   Any

- 56 -

challenges or claims not successfully prosecuted in accordance with the challenge provisions in the Interim Order prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.

61.     Pursuant to Bankruptcy Local Rule 4001-2(g)(4), there is cause to shorten the period for investigation to the Challenge Period.  The Debtors filed these Chapter 11 Cases as part of a prepackaged restructuring, expressly satisfying a basis for cause to shorten the investigation period under Bankruptcy Local Rule 4001-2(g)(4).  Moreover, pursuant to the RSA, holders of 90.9% of the Prepetition Secured Notes in Class 5 under the Plan and 69.3% of the claims in Class 5 under the Plan have agreed to support a consensual restructuring on the terms set forth in the Plan and as memorialized in the RSA.  Accordingly, the Debtors believe that the Challenge Period provides any committee appointed in the Chapter 11 Cases and other parties in interest with sufficient time within which to investigate and/or challenge the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order.

## REQUEST FOR USE OF CASH COLLATERAL

62.     In connection with their implementation of the DIP Facility, the Debtors require access to the Loan Proceeds and to proceeds of the Prepetition Secured Notes Collateral to the extent that they may be considered Cash Collateral solely as a result of the fact that they are held in one or more bank accounts over which the DIP Secured Parties may be granted a security interest.  Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease Cash Collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

63.     With respect to the Loan Proceeds, the DIP Secured Parties are the only entities that possess an interest in such Cash Collateral, and they consent to its use in accordance with the

Approved Budget and the other DIP Documents.  With respect to any proceeds of the Prepetition

Secured Notes Collateral, the Prepetition Secured Parties are the only entities that possess an

interest in such Cash Collateral, and the Ad Hoc Group of Consenting Noteholders which hold a

majority of the Prepetition Secured Notes consent to its use in accordance with the Approved

Budget and the other DIP Documents.  Accordingly, the Debtors request that that they, as Debtors,

be authorized to use any Cash Collateral pursuant to section 363(c)(2)(A) of the Bankruptcy Code.

The preservation of estate assets and the Debtors' ability to maximize value for stakeholders, thus,

depend heavily upon the expeditious approval of the relief requested herein.

64.    The Debtors must maintain sufficient access to cash to satisfy their obligations and

to maintain their assets through the duration of these proceedings.  It is, therefore, essential to the

success of the Chapter 11 Cases that the Debtors immediately obtain authority to use Cash

Collateral.  To the extent the Debtors hold some cash other than the Loan Proceeds or any proceeds

of the Prepetition Secured Notes Collateral, such cash would be wholly insufficient to satisfy the

Debtors' liquidity needs in this Chapter 11 Cases.[8]  The Debtors, therefore, seek immediate

authority to use Loan Proceeds or any proceeds of the Prepetition Secured Notes Collateral on an

interim basis as set forth in this Motion and in the Interim Order to prevent immediate and

irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rules 4001(b).

### REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

65.    Section 362(d) of the Bankruptcy Code authorizes the Court, after notice and a

hearing, to modify the automatic stay granted under section 362 of the Bankruptcy Code to permit

the DIP Lenders to exercise remedies outlined in the DIP Credit Agreement.  Courts routinely

grant such modifications to effectuate financing agreements that comport with a debtor's business

---

[8]    The Debtors reserve all of their rights with respect to any such cash that may constitute Cash Collateral, including the right to request authority to use such cash pursuant to section 363(c)(2) of the Bankruptcy Code.

judgment. *See, e.g.*, Interim Order, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) ECF No. 88 (modifying the automatic stay set forth in section 362 of the Bankruptcy Court to the extent necessary to implement and effectuate the DIP agreement); Interim Order, *In re Chassix Holdings, Inc.*, Case No. 15- 10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) ECF No.67 (accord); Interim Order, *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) ECF No. 26 (accord); Order, *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) ECF No. 59 (accord). Accordingly, the Debtors respectfully request that this Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

## <u>REQUEST FOR A FINDING OF GOOD FAITH</u>

66.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

67.     While "'[g]ood faith,' as used in 11 U.S.C. § 364(e), is not a defined term," generally, good faith may be destroyed by conduct that involves, fraud, collusion or an attempt to take grossly unfair advantage of others. *In re Gen. Growth Props., Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010) (citing *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL 154200, at *4

(S.D.N.Y. June 18, 1992)) (finding sufficient evidence that postpetition financing was entered into in good faith where the loan was "vigorously negotiated at arm's length and in good faith" and there was no contention that the lender otherwise acted in bad faith) (quotation marks and citation omitted).

68.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR INTERIM HEARING AND AUTHORITY TO MAKE INTERIM BORROWINGS UNDER THE DIP FACILITY

69.     Pursuant to Rule 4001(b) of the Bankruptcy Rules, the Debtors request that this Court conduct a hearing on the Debtors' request for interim relief, including for access to the Interim DIP Loans and for the other relief contemplated by the Interim Order.  Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion. Fed. R. Bankr. P. 4001(c).  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985); *see also Ames Dep't Stores,* 115 B.R. at 38.  After the fourteen-day period prescribed by Bankruptcy Rule 4001(c), the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that

it believes prudent in the operation of its business.  *See, e.g., Simasko Prod. Co.,* 47 B.R. at 449;

*Ames Dep't Stores,* 115 B.R. at 36.

70.     Pursuant to Rule 4001(c) of the Bankruptcy Rules, the Debtors respectfully request

that this Court conduct a preliminary hearing on the Motion and authorize the Debtors from the

entry of the Interim Order until the Final Hearing to obtain access to the Interim DIP Loans under

the terms set forth in the DIP Credit Agreement and the Interim Order and to utilize Cash Collateral

to avoid immediate and irreparable harm to the Debtors' estates.

## REQUEST TO ESTABLISH NOTICE
## PROCEDURES AND SCHEDULE FINAL HEARING

71.     The Debtors respectfully request that this Court schedule the Final Hearing and

authorize them to serve the Motion and the signed Interim Order, which fixes the time, date and

manner for the filing of objections, on (a) the Office of the United States Trustee for the Southern

District of New York; (b) the holders of the thirty largest unsecured claims against the Debtors (on

a consolidated basis); (c) the holders of the five largest secured claims against the Debtors (on a

consolidated basis); (d) the Internal Revenue Service; (e) the Securities and Exchange

Commission; and (f) all others that are required to be noticed in accordance with Bankruptcy Rule

2002 and Bankruptcy Local Rule 2002-1.

## NOTICE

72.     No creditors' committee, trustee or examiner has been appointed in these Chapter

11 Cases.  Notice of this Motion has been provided to the following parties, or, in lieu thereof,

their counsel:  (a) the Office of the United States Trustee for the Southern District of New York;

(b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated

basis); (c) the holders of the five largest secured claims against the Debtors (on a consolidated

basis); (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; and (f) all

others that are required to be noticed in accordance with Bankruptcy Rule 2002 and Bankruptcy

Local Rule 2002-1.  The Debtors submit that, in light of the nature of the relief requested, no

other or further notice need be provided.

## **NO PRIOR REQUEST**

73.    No prior request for the relief sought herein has been made to this Court or any

other court.

*[Remainder of page intentionally left blank]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this

Court (a) enter an order, substantially in the form attached hereto as Exhibit A, and (b) grant such

other and further relief as is just and proper.


Dated:     April 14, 2021
           New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*/s/ Jane VanLare*
Jane VanLare
Adam Brenneman

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

## <u>EXHIBIT A</u>

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Automotores Gildemeister SpA, *et al.*,[1] | Case No.:  21-10685 |
| Debtors. | Joint Administration Pending |

**INTERIM ORDER**
**(A) AUTHORIZING THE DEBTORS-IN-POSSESSION TO OBTAIN**
**POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS-**
**IN-POSSESSION TO USE CASH COLLATERAL, (C) GRANTING LIENS**
**AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE**
**PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,**
**(F) SCHEDULING A FINAL HEARING AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "<u>DIP Motion</u>")[2] of Automotores Gildemeister SpA ("<u>Gildemeister</u>")

and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases

(collectively, the "<u>Debtors</u>"), in the above-captioned cases (the "<u>Chapter 11 Cases</u>") and pursuant

to sections 105, 361, 362, 363, 364(c)(1)-(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001,

6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

Rules 2002-1 and 4001-2 of the Local Rules for the United States Bankruptcy Court for the

---

[1]    The Debtors, together with each of the Debtor's Chilean, Brazilian and/or Uruguayan tax identification number, as applicable, are:  Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A. (217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A. (89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial Gildemeister S.A. (76.856.310-1) and Bramont Montadora Industrial e Comercial de Vehiculos S.A. (04.926.142/0002-16).  The location of the corporate headquarters and the service address for Automotores Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

[2]    Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the DIP Motion.

Southern District of New York (together, the "Bankruptcy Local Rules"), seeking entry of this

interim order (the "Interim Order") *inter alia*:

(i) authorizing Gildemeister (the "Borrower") to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, superpriority debtor-in-possession credit facility (the "DIP Facility") subject to the terms and conditions set forth in that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement attached hereto as Exhibit 1 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), which provides for a committed senior secured delayed draw term loan facility in an aggregate principal amount of up to $26,500,000, consisting of:

  (a) upon entry of the Interim Order, term loans in an aggregate principal amount of up to $16,950,000 (the "Interim DIP Loans"); and

  (b) upon entry of the Final Order, additional term loans in an aggregate principal amount that will not, when combined with all Interim DIP Loans advanced prior to such date, exceed $26,500,000 in aggregate principal amount (together with the Interim DIP Loans, the "DIP Loans");

which DIP Credit Agreement and DIP Facility shall be by and among the Borrower, as borrower, the DIP Guarantors (as defined herein), as guarantors, the several financial institutions or entities from time to time party thereto as Lenders (as defined in the DIP Credit Agreement) (the "DIP Lenders"), Acquiom Agency Services LLC, as administrative agent (in such capacity, together with its successors and permitted assigns, the "DIP Administrative Agent"), TMF Group New York, LLC, as collateral agent (in such capacity, together with its successors and permitted assigns, the "DIP Collateral Agent"; and, together with the DIP Administrative Agent, the "DIP Agents"; and the DIP Agents, together with the DIP Lenders and all holders of all other DIP Obligations (as defined below), the "DIP Secured Parties");

(ii) authorizing certain of the other Debtors identified in the DIP Documents (as defined below) (such Debtors, the "DIP Guarantors") to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the other DIP Obligations;

(iii) authorizing the Debtors to (i) grant DIP Liens (as defined below) over the DIP Collateral (as defined below), including: (A) senior secured priming superpriority liens on and security interests in assets of the Debtors consisting of Prepetition Secured Notes Collateral (as defined below), (B) senior secured superpriority liens on and security interests in all unencumbered assets of the Debtors, and (C) junior secured superpriority liens on and security interests in all assets of the Debtors (other than Excluded Assets (as defined below)) subject to Permitted Priority Liens (as defined below) (other than the Primed Liens (as defined below)), in each case in favor of the DIP Collateral Agent for the benefit of the DIP Secured Parties to secure all of the obligations of the Borrower and the DIP Guarantors in respect of

the DIP Loans and the other DIP Obligations, and (ii) to execute an intercreditor agreement with respect to the Prepetition Secured Notes Collateral by and among the DIP Loan Parties (as defined below), the DIP Collateral Agent, the Prepetition Secured Notes Collateral Agent (as defined below) and the Prepetition Secured Notes Indenture Trustee (as defined below) (as amended, supplemented or otherwise modified from time to time, the "DIP Intercreditor Agreement");

(iv)     authorizing the Debtors (i) to cause certain non-Debtor direct and indirect subsidiaries of the Borrower identified in the DIP Documents (as defined below) (such entities, the "Non-Debtor Pledgors" and, together with the Borrower and the DIP Guarantors, the "DIP Loan Parties") to grant, and authorizing such Non-Debtor Pledgors to grant, (x) *pari passu* DIP Liens on and security interests in certain of the DIP Collateral consisting of Prepetition Secured Notes Collateral and (y) first ranking senior DIP Liens on and security interests in certain of the DIP Collateral consisting of certain unencumbered assets of certain of the Non-Debtor Pledgors, in each case, in favor of the DIP Collateral Agent for the benefit of the DIP Secured Parties to secure all of the obligations of the Borrower and the DIP Guarantors in respect of the DIP Loans and the other DIP Obligations and (ii) to execute the DIP Intercreditor Agreement;

(v)      authorizing the DIP Loan Parties to execute and deliver, and the Debtors to cause the Non-Debtor Pledgors to execute and deliver, the DIP Credit Agreement, the DIP Intercreditor Agreement (as defined below), and other documentation, including security agreements, trust agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, hedging agreements, instruments, notes, each fee letter entered into by any Debtor in connection with the DIP Facility (the "Fee Letters"), and such other documentation which may be necessary or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agents, in each case, as provided under the DIP Credit Agreement and all other Loan Documents (as defined in the DIP Credit Agreement) and as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the DIP Intercreditor Agreement, all Loan Documents (as defined in the DIP Credit Agreement) and this Interim Order, the "DIP Documents");

(vi)     authorizing the Debtors to execute and deliver the Consorcio Joinder attached hereto as Exhibit 3 and perform all obligations thereunder (including the payment of the Consorcio Fees and Expenses) in accordance with the terms therein;

(vii)    authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, administrative agency fees and other fees payable pursuant to the Fee Letters), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other Obligations (as defined in the DIP Credit Agreement) due or payable under the DIP Documents

3

(collectively, the "DIP Obligations") and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(viii)   subject to the Carve Out (as defined herein), granting to the DIP Agents for the benefit of the DIP Secured Parties allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(ix)   granting to the DIP Collateral Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates (other than certain excluded property as provided in the DIP Documents (the "Excluded Assets"[3]) for so long as any such property remains an Excluded Asset) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), in each case subject to the Carve Out (as defined herein);

(x)   upon entry of the Final Order and subject to the Carve Out (as defined herein), authorizing the Debtors to waive (a) their right to surcharge the Prepetition Secured Notes Collateral and the DIP Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)   upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Secured Notes Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined below);

(xii)   authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with this Interim Order, the DIP Documents and the DIP Budget (subject to Permitted Variances);

---

[3]   "Excluded Assets" as used herein means: (i) that certain peso denominated bank account maintained at Banco Santander Chile (with an account number ending in 6924626-5), which shall not at any time maintain a balance exceeding Chilean pesos in the equivalent value of $5,000,000, (ii) inventory, accounts receivable and accounts holding cash of any Subsidiary of the Borrower domiciled in Peru, (iii) all specified property excluded from collateral under any Collateral Document (as defined in the DIP Credit Agreement) and (iv) assets over which the grant of a junior lien or security interest is prohibited by or in violation of any law, rule or regulation applicable to such Debtor or a term, provision or conduction of any lease, license, contract or agreement to which such Debtor is a party and which are (x) pledged to secure Permitted Debt (as defined in the DIP Credit Agreement) incurred as of the Closing Date by a Debtor (including any Inventory Debt), or (y) pledged to secure Inventory Debt incurred after the Closing Date by a Debtor in accordance with the DIP Credit Agreement, provided that to the extent any relevant prohibition described in this clause (iv) is no longer applicable, such asset shall no longer be an Excluded Asset.

.

(xiii)   authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xiv)   subject to the restrictions set forth in the DIP Documents and this Interim Order, authorizing the Debtors to use the Prepetition Secured Notes Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Notes Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral), resulting from the imposition of the Automatic Stay (as defined below), the Debtors' use, sale or lease of the Prepetition Secured Notes Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral);

(xv)   vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "<u>Automatic Stay</u>") to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents and the Final Order and to deliver any notices of termination described below and as further set forth herein;

(xvi)   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and the Final Order; and

(xvii)   scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "<u>Final Order</u>"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Eduardo Moyano in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* (the "<u>First Day Declaration</u>"), the *Declaration of Marcelo Messer in Support of Debtors' Motion for Entry of Interim and Final Orders to (A) Authorize the Debtors-In-Possession to Obtain Postpetition Financing, (B) Authorize the Debtors-In-Possession to use Cash Collateral, (C) Grant Liens and Provide Claims with Superpriority Administrative Expense Status, (D) Grant Adequate Protection to the Prepetition Secured Parties, (E) Modify the Automatic Stay, (F) Schedule a Final Hearing and (G) Grant Related Relief* (the "<u>Messer Declaration</u>"), the available DIP Documents and the evidence submitted and arguments

made at the interim hearing held on April 15, 2021 (the "Interim Hearing"); and due and sufficient

notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002,

4001(b), (c) and (d) and all applicable Bankruptcy Local Rules; and the Interim Hearing having

been held and concluded; and all objections, if any, to the interim relief requested in the DIP

Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval

of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable

harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable

and in the best interests of the Debtors and their estates and is essential for the continued operation

of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing

that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors'

business judgment; and after due deliberation and consideration, and good and sufficient cause

appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.    *Petition Date*.  On April 12, 2021 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Southern District of New York (the "Court").  On April ____, 2021, this

Court entered an order approving the joint administration of the Chapter 11 Cases.

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      *Debtors in Possession*.   The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue*.   This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.   Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   The Court may enter a final order consistent with Article III of the United States Constitution.   Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The predicates for the relief sought herein are sections 105, 361, 362, 363, 364(c)(1)-(3), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rules 2002-1 and 4001-2.

D.      *Committee Formation*.   As of the date hereof, the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

E.      *Notice*.   The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).   Proper, timely, adequate, and sufficient notice of the DIP Motion and the Interim Hearing, the best available under the circumstances per the Debtors' belief, has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice of the DIP Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

7

F.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party in interest (but subject to the limitations thereon contained in paragraph 22 below), and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate and agree that:

(i)    *Prepetition Secured Notes*.  Pursuant to that certain Indenture, dated as of November 7, 2019 (as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Prepetition Secured Notes Indenture") and the other Notes Documents (as defined in the Prepetition Secured Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Prepetition Secured Notes Documents"), among (a)  Gildemeister, as issuer (in such capacity, the "Prepetition Secured Notes Issuer"), (b) the Prepetition Secured Notes Guarantors (as defined below), (c) The Bank of New York Mellon, as trustee, registrar, paying agent and transfer agent (in such capacities, the "Prepetition Secured Notes Indenture Trustee"), and (d) TMF Group New York, LLC, as collateral agent (in such capacity, the "Prepetition Secured Notes Collateral Agent"; and, together with the Prepetition Secured Notes Indenture Trustee, the "Prepetition Agents"), the Prepetition Secured Notes Issuer issued 7.50% Senior Secured Notes due 2025 in an aggregate principal amount of $509,806,002 (the "Prepetition Secured Notes").  The Prepetition Agents, together with the holders of the Prepetition Secured Notes and all other holders of Prepetition Secured Notes Obligations (as defined below), shall be referred to herein as the "Prepetition Secured Parties."

(ii)    *Prepetition Secured Notes Guaranty*.  Pursuant to the Article X of the Prepetition Secured Notes Indenture, the Debtors party thereto (the "Prepetition Secured Notes Guarantors") guaranteed, on a joint and several basis, the Prepetition Secured Notes Obligations

(as defined below) under the Prepetition Secured Notes, the Prepetition Secured Notes Indenture, and the other the Prepetition Secured Notes Documents.

(iii)    *Prepetition Secured Notes Obligations*.  As of the Petition Date, the Prepetition Secured Notes Issuer and the Prepetition Secured Notes Guarantors were jointly and severally indebted to the Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, for not less than $509,806,002 in aggregate principal amount and $11,290,079 of accrued and unpaid interest as of the Petition Date on account of the outstanding Prepetition Secured Notes (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Secured Notes Issuer's or the Prepetition Secured Notes Guarantors' obligations pursuant to, or secured by, the Prepetition Secured Notes Documents, including all Obligations (as defined in the Prepetition Secured Notes Indenture), and all interest, fees, prepayment premiums, early termination fees, costs, and other charges, the "Prepetition Secured Notes Obligations").

(iv)    *Prepetition Secured Notes Liens*.  Pursuant to the Security Documents (as defined in the Prepetition Secured Notes Indenture) (the "Prepetition Secured Notes Security Documents"), prior to the Petition Date, the Debtors and the Non-Debtor Pledgors in their capacities as "Grantors" or "Pledgors" or words of similar effect (as defined in the Prepetition Secured Notes Security Documents) granted to the Prepetition Secured Notes Collateral Agent, for the benefit of itself and the Prepetition Secured Parties, first priority security interests in and continuing liens (the "Prepetition Secured Notes Liens") on the "Collateral" (as defined in the

Prepetition Secured Notes Indenture)[5], including, among other things, (i) all equity interests over each of the Debtors and the Non-Debtor Pledgors, (ii) certain equity interests held by each of the Debtors and the Non-Debtor Pledgors, (iii) certain real property owned by the Debtors and the Non-Debtor Pledgors, (iv) certain of the Debtors' intercompany receivables, and (v) certain of the Debtors' factoring agreements, intellectual property, and fixed assets (the "Prepetition Secured Notes Collateral").

(v)    *Validity, Perfection, and Priority of Prepetition Secured Notes Liens and Prepetition Secured Notes Obligations*. The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral were and continue to be valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Secured Notes Liens were senior in priority over any and all other liens on the Prepetition Secured Notes Collateral, subject only to liens over the assets of the

---

[5]    For purposes of this footnote 5, capitalized terms used but not defined herein shall have the meanings ascribed to them in the Prepetition Secured Notes Indenture. Under the Prepetition Secured Notes Indenture, the Prepetition Secured Notes Collateral consists of:

  (a)    on a first-priority basis, all current and future assets (including real estate) of the Company and the Guarantors and the Peruvian and Costa Rican Restricted Subsidiaries that are not encumbered on the Issue Date and are not Excluded Assets;

  (b)    on a second-priority basis, all current and future assets of the Company, the Guarantors, and the Peruvian and Costa Rican Restricted Subsidiaries (including their encumbered real estate) that are not Excluded Assets and are encumbered on the Issue Date as permitted by the Indenture; *provided*, *however*, that granting of the second-priority liens is subject to the receipt of applicable required consents, which the Company will use commercially reasonable efforts to obtain;

  (c)    pledges by Minvest S.A. of 100% of the common shares of the Company;

  (d)    pledges of all intercompany receivables between and among the Company and its subsidiaries and between the various subsidiaries except for Excluded Assets; and

  (e)    the equity interests in the Company and in all existing and future Subsidiaries of the Company and the Guarantors held by the Company or the Guarantors, including the Peruvian and Costa Rican Restricted Subsidiaries, whether wholly or partially owned by the Company or the Guarantors, as well as their equity interests in all joint ventures (other than the Derco Entities); *provided*, that to the extent that a pledge of any equity interests required to be pledged under the Indenture is subject to a pre-existing contractual restriction, the Company and Guarantors shall not be required to pledge the equity interest in any joint venture or non-wholly-owned subsidiary if, after the use of commercially reasonable efforts to obtain the necessary consents and take all such other actions necessary to effectuate a pledge securing the obligations of the Company and the Guarantors under the Notes, such consents have not been obtained and the pledge of such joint venture or non-wholly-owned subsidiary is not permitted without such consent.

Debtors or the Non-Debtor Pledgors senior by operation of law or otherwise permitted by the

Prepetition Secured Notes Documents and solely to the extent any such liens were valid,

enforceable, non-avoidable and perfected liens in existence on the Petition Date (including valid

liens in existence on the Petition Date that are perfected after the Petition Date as permitted by

section 546(b) of the Bankruptcy Code) (the "<u>Permitted Priority Liens</u>"); (c) the Prepetition

Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations of the

Debtors enforceable in accordance with the terms of the applicable Prepetition Secured Notes

Documents; (f) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims

of any kind or nature to any of the Prepetition Secured Notes Liens or Prepetition Secured Notes

Obligations exist, and no portion of the Prepetition Secured Notes Liens or Prepetition Secured

Notes Obligations is subject to any challenge or defense, including avoidance, disallowance,

disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the

Bankruptcy Code or applicable non-bankruptcy law; (g) the Debtors and their estates have no

claims, objections, challenges, causes of action, and/or choses in action, including avoidance

claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for

recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective

affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out

of, based upon or related to the Prepetition Secured Notes Documents; and (h) the Debtors waive,

discharge, and release any right to challenge any of the Prepetition Secured Notes Obligations, the

priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the

Prepetition Secured Notes Liens securing the Prepetition Secured Notes Obligations.

(vi)     *Inventory Financing Facilities Obligations and Liens*. From time to time,

the Debtors and the Non-Debtor Pledgors have entered into financing arrangements with local

finance providers for the provision of working capital to fund their operations and purchase inventory as permitted under the Prepetition Secured Notes Documents (the "Inventory Financing Facilities"). To secure the Debtors' and Non-Debtor Pledgors' obligations under the Inventory Financing Facilities, the Debtors and Non-Debtor Pledgors have granted and from time to time will grant first priority security interests (the "Inventory Financing Facilities Liens") over certain vehicles, vehicle parts, vehicle accessories and/or other inventory or receivables in favor of the lenders under the Inventory Financing Facilities.

(vii)    *No Control*.  None of the Prepetition Secured Parties or the DIP Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Secured Notes Documents.

(viii)    *No Claims or Causes of Action*.  No claims or causes of action are held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties under any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

G.    *Cash Collateral*.  As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the Prepetition Secured Parties or the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.  The Debtors' use of Cash Collateral shall be subject to the terms of this Interim Order and the Debtors' authority to use Cash Collateral of the Prepetition Secured Parties and the DIP Secured Parties, as applicable, may be terminated in accordance with paragraphs and 9 and 13 hereof.

H.    *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Credit Agreement.

(ii)    The Debtors have an immediate and critical need to obtain the DIP Financing and to use Prepetition Secured Notes Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Secured Notes Collateral, the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(iii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Liens and the DIP Superpriority Claims (as defined herein) to the DIP Secured Parties and incurring the Adequate Protection Obligations (as defined herein), in each case subject to the Carve Out, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds and profits generated from the Prepetition Secured Notes Collateral and acquire

13

equipment, inventory and other personal property, certain of which constitute Prepetition Secured Notes Collateral under the Prepetition Secured Notes Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Secured Notes Documents.

(v)    The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds and profits in existence as of the Petition Date also constitute Cash Collateral.

(vi)    Based on the DIP Motion, the First Day Declaration, the Messer Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraph 15 of this Interim Order (the "Adequate Protection"), and the terms on which the DIP Loan Parties may continue to use the Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(vii)    To the extent consent is required, the Prepetition Secured Parties have consented or are deemed under the DIP Intercreditor Agreement or any other applicable Prepetition Secured Notes Documents to have consented to the Debtors' use of Cash Collateral and the other Prepetition Secured Notes Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(viii)    The DIP Financing, the Adequate Protection and the use of the Prepetition Secured Notes Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties.  All of the DIP Loan Parties' obligations and indebtedness arising under, in respect of or in connection with the DIP Financing and the DIP Documents, including, without limitation: all loans made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(ix)    The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the DIP Loan Parties' continued use of the Prepetition Secured Notes Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and the DIP Loan Parties' continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(x)     The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Secured Notes Collateral (including Cash Collateral) are fair and reasonable, reflect the DIP Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Secured Notes Collateral, including the Cash Collateral; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or will be given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Secured Notes Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the DIP Intercreditor Agreement, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(xi)     The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral, the subordination of their liens to the DIP Liens (as defined herein), or the grant of the *pari passu* DIP Liens with respect to the Prepetition Secured Notes Liens granted by the Non-Debtor Pledgors, and the DIP Agents and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties thereunder without the agreement of the Non-Debtor Pledgors to execute the DIP Intercreditor Agreement and to consent to the jurisdiction

of this Court in all matters arising out of or relating to the DIP Loans, the DIP Documents and the DIP Liens and the agreement of the Debtors to cause the Non-Debtor Pledgors to do the same. The consent of the Non-Debtor Pledgors to the jurisdiction of the Court in all of the foregoing matters will create greater availability under the DIP Facility and benefit the Debtors and their estates because it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and to funding their operations and will avoid disruption to the Debtors' business operations.

(xii)    The Debtors have prepared and delivered to the DIP Agents and the advisors to the DIP Lenders an initial budget, a copy of which is attached hereto as <u>Exhibit 2</u> (the "<u>Initial DIP Budget</u>"). The Initial DIP Budget reflects the Debtors' and certain Non-Debtor Pledgors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteen (13) weeks following the Petition Date. The Initial DIP Budget may be modified, amended and updated from time to time in accordance with the DIP Credit Agreement and, once approved by the "Requisite Lenders" (as defined in the DIP Credit Agreement) (the "<u>Requisite DIP Lenders</u>"), shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent approved budget, shall constitute without duplication, an "<u>Approved Budget</u>"). The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances. The DIP Agents and the DIP Lenders are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to the Permitted Variances) as provided in the DIP Credit Agreement, the other DIP Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(xiii)    In accordance with Bankruptcy Local Rule 4001-2(g)(9), upon entry of the Final Order, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Secured Notes Collateral.

(xiv)    In light of the prepackaged nature of the Debtors' Chapter 11 Cases, cause exists to reduce the periods for investigation of the stipulations, acknowledgements, or admissions of the Debtors herein as permitted under Bankruptcy Local Rule 4001-2(g)(4)(c).

I.    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and the use of Prepetition Secured Notes Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents, are therefore in the best interests of the DIP Loan Parties' estates and consistent with the Debtors' exercise of their fiduciary duties.

J.    *Permitted Priority Liens; Continuation of Prepetition Secured Notes Liens*. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Priority Lien (other than any Primed Lien) is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties or a Creditors' Committee (if appointed) to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Priority Lien (other than any Primed

Lien). The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Priority Lien and is expressly subject to the DIP Liens (as defined herein). The Prepetition Secured Notes Liens granted to secure the Prepetition Secured Notes Obligations and the DIP Liens granted to secure the DIP Obligations are continuing liens and the Prepetition Secured Notes Collateral or the DIP Collateral, as applicable, is and will continue to be encumbered by the applicable liens. For the avoidance of doubt, the DIP Liens shall not prime the Inventory Financing Facilities Liens or the Prepetition Secured Notes Liens granted by the Non-Debtor Pledgors. All Prepetition Secured Notes Liens and *pari passu* DIP Liens encumbering the assets of the Non-Debtor Pledgors shall be subject to the terms of the DIP Intercreditor Agreement.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      Motion GRANTED. The interim relief sought in the DIP Motion is granted, the interim relief described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      *Authorization of the DIP Financing and the DIP Documents.*

(a)      The DIP Loan Parties are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith. Subject to the terms of the DIP Documents and this Interim Order, the Borrowers are hereby authorized to borrow

money pursuant to the DIP Credit Agreement and each DIP Guarantor is hereby authorized to provide a guaranty of payment in respect of the Borrower's obligations with respect to such borrowings, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, subject to and in accordance with the Approved Budget (subject to the Permitted Variances), including, without limitation, to provide working capital for the Debtors and to pay interest, fees and expenses and provide adequate protection and make other payments in accordance with this Interim Order and the DIP Documents, as set forth in the DIP Documents. The Debtors are authorized to cause the Non-Debtor Pledgors to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.

(b)    In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents) and to pay all fees and expenses in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agents (acting in accordance with the terms

of the DIP Credit Agreement), may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Approved Budget required to be delivered by the DIP Loan Parties under the DIP Documents shall not be considered amendments or modifications to the Approved Budget or the DIP Documents;

(iii)    the non-refundable payment to the DIP Agents and the DIP Lenders, as the case may be, of all fees, including structuring fees, administrative agent's or collateral agent's fees, upfront fees, closing fees and professional fees payable under the DIP Credit Agreement or the Fee Letters (which fees shall be irrevocable and shall be deemed to have been approved upon entry of this Interim Order, whether or not the fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or DIP Documents (or in any separate letter agreements, including, without limitation, the Restructuring Support Agreement under which the DIP Lenders provided their commitments with respect to the DIP Facility, the Fee Letters between any or all DIP Loan Parties, on the one hand,

and any of the DIP Agents and/or DIP Lenders, on the other, in connection with the DIP Financing)

and the costs and expenses as may be due from time to time under the DIP Documents, including,

without limitation, fees and expenses of the professionals retained by, or on behalf of, any of the

DIP Agents or DIP Lenders (including (i) Dechert LLP, legal counsel to the DIP Lenders, (ii) Link

Capital Partners S.p.A., as financial advisor to Dechert LLP as counsel to the DIP Lenders and the

DIP Administrative Agent, (iii) Ross PLLC, as legal counsel to the DIP Collateral Agent, (iv)

Prieto Abogados S.p.A., Chilean legal counsel to the DIP Lenders and the DIP Administrative

Agent; (v) Pinheiro Neto, Brazilian legal counsel to the DIP Lenders and the DIP Administrative

Agent, (vi) Hernández y Cía, Peruvian legal counsel to the DIP Lenders and the DIP

Administrative Agent, (vii) Ferrere Abogados, Uruguayan legal counsel to the DIP Lenders and

the DIP Administrative Agent, (viii) Batalla, Costa Rican legal counsel to the DIP Lenders and the

DIP Administrative Agent, and (ix) any other local advisor or legal counsel to any of the DIP

Secured Parties in any foreign jurisdictions and any other advisors as are permitted under the DIP

Documents), in each case, as provided for in the DIP Documents (the "DIP Fees and Expenses"),

without the need to file retention motions or fee applications; and

    (iv)    the performance of all other acts required under or in connection

with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims

and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein.

    (c)    The Debtors are hereby authorized to execute, deliver, enter into and, as

applicable, perform all of their obligations (including the payment of the Consorcio Fees and

Expenses) under the Consorcio Joinder in accordance with the terms therein and to take such other

and further acts as may be necessary, appropriate or desirable in connection therewith.

(d)    From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement, respectively, and (until entry of the Final Order) this Interim Order and in compliance with the Approved Budget (subject to the Permitted Variances).

3.    *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party (and in the case of the Debtors, their estates) in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Agents or DIP Lenders, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, interest, costs, fees, expenses and other amounts under the DIP Documents (including this Interim Order).  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable and the use of Cash Collateral shall cease following the Termination Declaration Date (as defined herein) or the occurrence of any event or condition set forth in paragraph 19(b) of this Interim Order, in each case on the terms provided in paragraph 9(d) hereof. Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agents and/or the DIP Lenders (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the

Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      *Non-Debtor Pledgor Actions*.   The agreement of the Non-Debtor Pledgors to execute the DIP Intercreditor Agreement and to consent to the jurisdiction of this Court in all matters arising out of or relating to the DIP Loans, the DIP Documents, and the DIP Liens and the agreement of the Debtors to cause the Non-Debtor Pledgors to do the same are authorized as and shall be compensation for, in consideration for, a necessary inducement for, and on account of the agreement of the DIP Lenders to fund amounts under the DIP Facility and of the Prepetition Secured Parties to consent to the use of their Cash Collateral, the priming of Prepetition Secured Notes Liens by the DIP Liens granted by the Debtors, and the grant of the *pari passu* DIP Liens on the Prepetition Secured Notes Collateral pledged by the Non-Debtor Pledgors to secure the Prepetition Secured Notes Obligations.

5.      *Carve Out*.

(a)      *Carve Out*.  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to

the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, compensation or procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred or accrued by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Creditors' Committee, if applicable, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals") at any time before or on the first business day following delivery by the DIP Agents (acting at the direction of the Requisite DIP Lenders (as defined in the DIP Credit Agreement) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) (x) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $500,000 and (y) Allowed Professional Fees of any Creditors' Committee (if appointed) in an aggregate amount not to exceed $50,000, in each case incurred or accrued after the first business day following delivery by the DIP Agents (acting at the direction of the Requisite DIP Lenders, as applicable) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, compensation or procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agents (at the direction of the Requisite DIP Lenders) to the Debtors, their lead restructuring counsel, legal counsel to the Creditors' Committee (if appointed), and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     The Carve-Out shall be senior to all liens and claims (including administrative and superpriority claims) against the Debtors that secure the DIP Obligations, the Prepetition Secured Notes Obligations, the Adequate Protection Obligations and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens or claims (including administrative and superpriority claims) granted by the Debtors and recognized as valid herein.

(c)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.   Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     *No Obligation to Pay Allowed Professional Fees*.  None of the DIP Agents, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Debtor Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Debtor Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     *Payment of Carve Out on or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

6.      *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions") but, subject to the entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds") in accordance with the DIP Documents and this Interim Order, subject only to the liens on such property and the Carve Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The DIP Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the 507(b) Claims (as defined

herein).  No other superpriority claims equal or senior to the DIP Superpriority Claims or the Prepetition Secured Notes Obligations shall be granted or allowed in these Chapter 11 Cases and the Debtors will not seek any other postpetition debtor-in-possession financing other than under the DIP Facility except as permitted by the DIP Documents or with the consent of the DIP Secured Parties.

7.      *DIP Liens*.  In addition to the DIP Liens granted under clause 7(e) of this paragraph, as security for the DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, or the possession or control by the DIP Agents of, or over, any DIP Collateral, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all liens and security interests granted to the DIP Collateral Agent, for its benefit and for the benefit of the DIP Secured Parties, pursuant to this Interim Order and the DIP Documents, including those to be granted in accordance with clause 7(e) of this paragraph, the "DIP Liens") are hereby granted to the DIP Collateral Agent for its own benefit and the benefit of the DIP Secured Parties (all property identified in clauses (a) through (c) and (e) below being collectively referred to as the "DIP Collateral"):

(a)      *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, as of the Petition Date, was not subject to Permitted Priority Liens, including, without limitation, any and all unencumbered cash of the

28

Debtors (whether maintained with any of the DIP Agents or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing (the "Unencumbered Property"), in each case other than the Avoidance Actions (but, for the avoidance of doubt, "Unencumbered Property" shall include Avoidance Proceeds);

(b)    *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority priming security interest in and lien upon all prepetition and postpetition property of the Debtors, regardless of where located, regardless of whether or not any Prepetition Secured Notes Liens on the assets are voided, avoided, invalidated, lapsed or unperfected (the "DIP Priming Liens").  The DIP Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) that encumber assets of the Debtors (the "Primed Liens").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) subject and junior to the Carve Out, (ii) junior to the Inventory Financing Facilities Liens, (iii) junior to the Permitted Priority Liens (other than the Primed Liens), (iv) senior in all respects to the Prepetition Secured Notes Liens, and (v)

senior to the Adequate Protection Liens; *provided*, *however*, for the avoidance of doubt, no DIP Liens shall encumber any Excluded Asset;

(c)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor that is subject to either (i) the Permitted Priority Liens (other than the Primed Liens), or (ii) the Inventory Financing Facilities Liens, which shall be junior and subordinate to (x) any Permitted Priority Liens (other than the Primed Liens) and (y) any Inventory Financing Facilities Liens; *provided*, *however*, for the avoidance of doubt, no DIP Liens shall encumber any Excluded Asset; and

(d)    *Liens Senior to Certain Other Liens*.  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in these Chapter 11 Cases or in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof; and

(e)    *Non-Debtor Pledgor DIP Liens Ranking Pari Passu to the Prepetition Secured Notes Liens.*  Pursuant to the DIP Documents (including the DIP Intercreditor Agreement), as security for the DIP Obligations, the Debtors shall cause the Non-Debtor Pledgors to, and the Non-Debtor Pledgors shall, grant (x) in the case of Non-Debtor Pledgors organized in Peru, valid,

binding, continuing, enforceable, senior security interests in and liens upon all Prepetition Secured Notes Collateral pledged by the Peruvian Non-Debtor Pledgors (whether directly or in trust) to secure the Prepetition Secured Notes Obligations and which liens shall rank *pari passu* in all respects with the Prepetition Secured Notes Liens and be subject to the DIP Intercreditor Agreement, and (y) in the case of Non-Debtor Pledgors organized in Costa Rica, valid, binding, continuing, enforceable, senior security interests in and liens upon (1) certain unencumbered assets owned by the Costa Rican Non-Debtor Pledgors as provided under the DIP Documents which security interests and liens shall be of first-ranking priority in all respects, and (2) all Prepetition Secured Notes Collateral pledged by the Costa Rican Non-Debtor Pledgors (whether directly or in trust) to secure the Prepetition Secured Notes Obligations, which liens shall rank *pari passu* in all respects with the Prepetition Secured Notes Liens and be subject to the DIP Intercreditor Agreement.

8.    *Excluded Assets and Inventory Financing Facilities Liens.*  Notwithstanding the foregoing provisions of paragraph 7, the DIP Collateral shall not include and no DIP Liens shall encumber the Excluded Assets identified in the DIP Documents for so long as such assets constitute Excluded Assets.  In the event any Debtor or Non-Debtor Pledgor grants an Inventory Financing Facility Lien over any inventory comprised of vehicles, vehicle parts, vehicle accessories and/or other inventory or receivables to secure Inventory Debt (as defined in the DIP Credit Agreement), solely to the extent permitted under the DIP Credit Agreement and consistent with its past practices, (such pledged assets, the "Newly Pledged Inventory") to secure its obligations under an Inventory Financing Facility and such grant is otherwise permitted under the terms of the Prepetition Secured Notes Documents and the DIP Documents, all DIP Liens and Adequate Protection Liens with respect to the Newly Pledged Inventory shall be automatically and

unconditionally released, *provided* that (i) the proceeds of the Inventory Financing Facility secured by the Newly Pledged Inventory will be subject to first ranking and priming DIP Liens and Adequate Protection Liens (in the case of the Non-Debtor Pledgors organized in Costa Rica, as provided under the DIP Documents) and (ii) other than with respect to any Newly Pledged Inventory of the Debtors constituting Excluded Assets, the DIP Secured Parties and the Prepetition Secured Parties shall be given junior DIP Liens and junior Adequate Protection Liens in any Newly Pledged Inventory owned by the Debtors, in each case, without further approval of this Court and subject to the priority and other provisions of this Interim Order, *provided* that such junior DIP Liens and junior Adequate Protection Liens in the Newly Pledged Inventory shall be automatically and unconditionally released without further approval or order of this Court upon any transfer of title to such Newly Pledged Inventory to third parties in the ordinary course of business and consistent with the Debtors' past practices.  Furthermore, in the event any Debtor sells any account receivable consisting of DIP Collateral in a factoring transaction solely to the extent permitted under the DIP Credit Agreement and consistent with its past practices (such assets, the "Factoring Receivables") and such sale is otherwise permitted under the terms of the Prepetition Secured Notes Documents and the DIP Documents, all DIP Liens and Adequate Protection Liens with respect to the Factoring Receivables shall be automatically and unconditionally released, *provided* that the proceeds from the sale of such Factoring Receivables will be subject to first ranking and priming DIP Liens and Adequate Protection Liens.

9.      *Protection of DIP Lenders' Rights*.

(a)      So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Term Loan Commitments (as defined in the DIP Documents) (the "DIP Commitments") under the DIP Documents, subject to the DIP Intercreditor Agreement and unless

32

the DIP Agents (acting at the direction of the Requisite DIP Lenders) have otherwise provided their written consent, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Secured Notes Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent the transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect to this Interim Order, other than, (x) solely as to this clause (iii), the DIP Collateral Agent and the Prepetition Secured Notes Collateral Agent executing the DIP Intercreditor Agreement and the other DIP Documents and the DIP Collateral Agent and the Prepetition Secured Notes Collateral Agent filing financing statements or other documents to perfect the liens granted pursuant to this Interim Order or the DIP Documents, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agents or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or court-approved disposition.

(b)     To the extent any Prepetition Secured Party has possession of any Prepetition Secured Notes Collateral or DIP Collateral or has control with respect to any Prepetition Secured Notes Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Secured Notes Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agents and the DIP Lenders, and such Prepetition Secured Party and the Prepetition Agents shall comply with the instructions of the DIP Collateral Agent with respect to the exercise of such control.

(c)     Any proceeds of Prepetition Secured Notes Collateral subject to the Primed Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Secured Notes Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agents for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements. Any proceeds of Prepetition Secured Notes Collateral subject to DIP Liens ranking *pari passu* to the Prepetition Secured Notes Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Secured Notes Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust and forthwith paid over to the DIP Agents in the same form as received with any necessary endorsements for application in accordance with the DIP Intercreditor Agreement. The DIP Agents are hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Parties. The authorizations in this paragraph are coupled with an interest and are irrevocable.

(d)     The Automatic Stay is hereby modified to the extent necessary to permit each applicable DIP Agent (acting at the direction of the Requisite DIP Lenders) to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Court and immediately upon the occurrence of an Event of Default: (i) deliver a notice of an Event of Default to the Debtors; (ii) declare the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains; (iii) declare the termination of the DIP Documents as to any future obligation of the DIP Agents and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties; and (v) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral; *provided* that such declaration shall be subject to the Carve Out and effective two (2) business days following delivery of a notice of an Event of Default by the DIP Agents to the Debtors (and their lead restructuring counsel) (the "Cash Collateral Notice Period") (any such declaration of the foregoing (i) through (v), a "Termination Declaration" and the date of such Termination Declaration, the "Termination Declaration Date").  The Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Creditors' Committee (if appointed), and to the U.S. Trustee. The Automatic Stay otherwise applicable to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties is hereby modified so that, five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"): (A) the applicable DIP Agents acting at the direction of the Requisite DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the respective DIP Documents and this Interim Order and shall

be permitted to satisfy the relevant DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out, and (B) the applicable Prepetition Secured Parties shall be entitled to exercise their rights and remedies to satisfy the relevant Prepetition Secured Notes Obligations, Adequate Protection Obligations, 507(b) Claims, and Adequate Protection Liens, in each case (A) and (B), subject to and consistent with (i) the Carve Out, (ii) this Interim Order, and (iii) the DIP Documents (including the DIP Intercreditor Agreement), as applicable.  For the avoidance of doubt, during the Remedies Notice Period, the applicable DIP Secured Parties and the applicable Prepetition Secured Parties shall not exercise any rights of foreclosure, set off or other enforcement rights with respect to the assets of the Non-Debtor Pledgors.  Following expiration of the Remedies Notice Period, whether or not the maturity of any of the DIP Obligations shall have been accelerated, the Automatic Stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise will automatically be terminated with respect to the DIP Agents and DIP Lenders and the Prepetition Secured Parties who shall be permitted to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Documents and the Prepetition Secured Notes Documents and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or Prepetition Secured Debt Document or any instrument pursuant to which such DIP Obligations or Prepetition Secured Notes Obligations are evidenced, (x) foreclosing on all of or any portion of the DIP Collateral or Prepetition Secured Notes Collateral including freezing any Cash Collateral held in the Debtors' or Non-Debtor Pledgors' accounts, (y) immediately setting-off any and all amounts in accounts maintained by the Debtors against the DIP Obligations or the Prepetition Secured Notes Obligations, or otherwise enforcing any and all rights against any DIP Collateral or Prepetition

Secured Notes Collateral in the possession of the DIP Agents, the Prepetition Agents, or otherwise, including, without limitation, disposition of the DIP Collateral or the Prepetition Secured Notes Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations and the Prepetition Secured Notes Obligations, and (z) taking any other actions or exercising any other rights or remedies permitted under this Interim Order, the DIP Documents, the Prepetition Secured Notes Documents or applicable law, in each case, without further notice to or order of the court unless the Debtors, the Creditors' Committee (if appointed), any other party in interest, and/or the U.S. Trustee have obtained an order of the Court preventing such action.  During the Remedies Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility and (ii) the only basis on which the Debtors, the Creditors' Committee (if appointed), any other party in interest, and the U.S. Trustee shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court shall be to contest whether an Event of Default has occurred and/or is continuing and the DIP Agents and the DIP Lenders shall consent to such emergency hearing.  Except as expressly provided for herein, the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties.

(e)        No rights, protections or remedies of the DIP Agents or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or

stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

10.    *Limitation on Charging Expenses Against Collateral*.    In accordance with Bankruptcy Local Rule 4001-2(g)(9), upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agents or the Prepetition Agents, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral (including Cash Collateral) or Prepetition Secured Notes Collateral (including Cash Collateral) under section 506(c) of the Bankruptcy Code or otherwise.

11.    *No Marshaling*.    In accordance with Bankruptcy Local Rule 4001-2(g)(9), the Final Order shall provide and the Debtors have agreed as a condition to obtaining financing under the DIP Facility, that in no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Notes Obligations, or the Prepetition Secured Notes Collateral.  The Final Order shall provide and the

Debtors have agreed as a condition to obtaining financing under the DIP Facility, that in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Agents or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Secured Notes Collateral.

12.    *Payments Free and Clear*.  Any and all payments or proceeds remitted to, by or through the DIP Agents on behalf of the DIP Secured Parties pursuant to the provisions of this Interim Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

13.    *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, the DIP Documents, and the Approved Budget (subject to the Permitted Variances), to use all Cash Collateral; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth, (b) except on the terms and conditions of this Interim Order, the DIP Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court and (c) following the occurrence of an Event of Default, the Debtors' use of Cash Collateral of the Prepetition Secured Parties shall terminate simultaneously with the termination of the Debtors' authority to use Cash Collateral of the DIP Secured Parties following the Cash Collateral Notice Period.

14.    *Disposition of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Agent and the Requisite DIP Lenders (and no such consent shall be implied, from any other

action, inaction or acquiescence by the DIP Agent or the Requisite DIP Lenders, or an order of this Court), except: (i) for sales of the Debtors' inventory in the ordinary course of business as permitted by the DIP Documents, (ii) as otherwise provided for in the DIP Documents and this Interim Order, or (iii) as otherwise permitted by an order of the Court and consented to by the DIP Agents and the Requisite DIP Lenders.

15.    *Adequate Protection of Prepetition Secured Parties*.    The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Secured Notes Collateral (including the Cash Collateral) pledged by the Debtors in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in such Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease or use by the DIP Loan Parties of the Prepetition Secured Notes Collateral, the grant of the *pari passu* DIP Liens over the Prepetition Secured Notes Collateral pledged by the Non-Debtor Pledgors to secure the Prepetition Secured Notes Obligations, the priming of the Prepetition Secured Notes Liens by the DIP Priming Liens pursuant to the DIP Documents and this Interim Order, the payment of any amounts under the Carve Out, and the imposition of the Automatic Stay (the "Adequate Protection Claims").  In consideration of the foregoing, the Prepetition Agents, for the benefit of the Prepetition Secured Parties, are hereby granted the following as Adequate Protection for the priming of the Prepetition Secured Notes Liens and use of the Prepetition Secured Notes Collateral (including Cash Collateral) and to secure repayment of an amount equal to such Adequate Protection Claims (collectively, the "Adequate Protection Obligations"):

(a)    *Prepetition Secured Notes Adequate Protection Liens*.    The Prepetition

Secured Notes Collateral Agent, for itself and for the benefit of the other Prepetition Secured

Parties, (x) is hereby granted (effective and perfected upon the date of this Interim Order and

without the necessity of the execution of any mortgages, security agreements, pledge agreements,

financing statements or other agreements) in the amount of the Prepetition Secured Parties

Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all

of the DIP Collateral pledged by the Debtors, in each case subject and subordinate only to (i) any

DIP Liens and any liens to which the DIP Liens are junior and (ii) the Carve Out; and (y) pursuant

to the Adequate Protection Perfection Documents (as defined below) and on the timelines specified

in paragraph 18 of this Interim Order, shall be granted by the Non-Debtor Pledgors organized in

Costa Rica valid, binding, continuing, enforceable, senior security interests in and liens upon their

inventory, cash, and receivables subject to the DIP Liens (together, (x) and (y), the "Adequate

Protection Liens").

(b)    *Prepetition Secured Notes Section 507(b) Claims*.    Each of the Prepetition

Secured Notes Indenture Trustee and the Prepetition Secured Notes Collateral Agent, for itself and

for the benefit of the other Prepetition Secured Parties, is hereby granted, subject to the Carve Out,

an allowed superpriority administrative expense claim as provided for in section 507(b) of the

Bankruptcy Code in the amount of the Prepetition Secured Parties' Adequate Protection Claims,

with, except as set forth in this Interim Order, priority in payment over any and all administrative

expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the

"507(b) Claims"); which 507(b) Claims shall have recourse to and be payable from all of the DIP

Collateral.  The 507(b) Claims shall be subject and subordinate only to the Carve Out and the DIP

Superpriority Claims.  Except to the extent expressly set forth in this Interim Order, the Final Order

or the DIP Documents, the Prepetition Secured Parties, shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all DIP Commitments have been terminated. For the avoidance of doubt, each of the Prepetition Secured Notes Indenture Trustee and the Prepetition Secured Notes Collateral Agent (for itself and for the benefit of the respective Prepetition Secured Parties it represents) shall not assert its 507(b) Claims until entry of the Final Order.

(c)    *Prepetition Secured Parties Fees and Expenses*. The DIP Loan Parties shall provide the Prepetition Secured Notes Indenture Trustee and the Prepetition Secured Notes Collateral Agent for itself and for the benefit of the Prepetition Secured Parties current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of: (i) Emmet, Marvin, & Martin, LLP, as legal counsel to the Prepetition Secured Notes Indenture Trustee, (ii) Ross PLLC, as legal counsel to the Prepetition Secured Notes Collateral Agent and (iii) any other advisors (including local and foreign legal counsel) retained by the Prepetition Secured Notes Indenture Trustee or the Prepetition Secured Notes Collateral Agent (the "Prepetition Agents Adequate Protection Fees and Expenses"). The DIP Loan Parties shall further provide as adequate protection for the ad hoc group of holders of Prepetition Secured Notes party to the Restructuring Support Agreement (as defined below) (the "Ad Hoc Group of Secured Noteholders") current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of: (i) Dechert LLP, legal counsel to the Ad Hoc Group of Secured

Noteholders, (ii) Link Capital Partners S.p.A., as financial advisor to Dechert LLP as counsel to the Ad Hoc Group of Secured Noteholders, (iii) Prieto Abogados S.p.A., Chilean legal counsel to the Ad Hoc Group of Secured Noteholders; (iv) Pinheiro Neto, Brazilian legal counsel to the Ad Hoc Group of Secured Noteholders, (v) Hernández y Cía, Peruvian legal counsel to the Ad Hoc Group of Secured Noteholders, (vi) Ferrere Abogados, Uruguayan legal counsel to the Ad Hoc Group of Secured Noteholders, (vii) Batalla, Costa Rican legal counsel to the Ad Hoc Group of Secured Noteholders, and (viii) any other legal or financial advisors (including local and foreign legal counsel), in each case incurred since November 7, 2019 and relating in any way to the provision of legal services related to the Prepetition Secured Notes, the Debtors, or the Chapter 11 Cases to the Ad Hoc Group of Secured Noteholders (together with the Prepetition Agents Adequate Protection Fees and Expenses, the "Adequate Protection Fees and Expenses").  The Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph 20 of this Interim Order.

(d)    *Milestones and Budget*.  The Ad Hoc Group of Secured Noteholders and the other Prepetition Secured Parties are hereby entitled to the Debtor's compliance with the Approved Budget (subject to the Permitted Variances) and performance of those certain case milestones set forth in the DIP Credit Agreement with respect to entry of this Interim Order, the completion of Plan solicitation and entry of the Final Order.  Upon payment in full of all DIP Obligations and termination of all DIP Commitments, the Approved Budget shall continue to be updated in accordance with the terms and conditions of the DIP Credit Agreement.

(e)    *Prepetition Secured Parties' Information Rights and Financial Reporting*. The Debtors shall continue to provide the Prepetition Agents, the Prepetition Secured Parties, and

the Ad Hoc Group of Secured Noteholders (through its counsel) with financial and other reporting substantially in compliance with the Prepetition Secured Notes Documents.

(f)    *Conditions to Use of Prepetition Secured Notes Cash Collateral*.  In the event a circumstance exists which would (1) cause the Restructuring Support Agreement dated as of March 31, 2021 between *inter alia:* the Debtors, the Non-Debtor Pledgors, and the Ad Hoc Group of Secured Noteholders (as may be amended or modified from time to time, the "Restructuring Support Agreement") to terminate automatically, or (2) give the Required Consenting Noteholders (as defined in the Restructuring Support Agreement) the right to deliver a written notice of termination of the Restructuring Support Agreement, in each case, under the terms of Sections 3.01(b) through (ee) thereof and notwithstanding any cure periods that would be otherwise applicable or any other provision of this Interim Order, the Automatic Stay is hereby modified to permit the Ad Hoc Group of Secured Noteholders to immediately terminate the Restructuring Support Agreement and, subject to the provisions of paragraph 9 (including the Cash Collateral Notice Period), terminate the Prepetition Secured Parties' consent to the Debtors' right to use Prepetition Secured Notes Collateral that consists of Cash Collateral pursuant to this Interim Order.

16.    *The DIP Intercreditor Agreement*.  To the extent provided in this Interim Order, each of the Prepetition Secured Parties are deemed to consent to and agree not to contest: (1) the grant of all DIP Liens, (2) the priming by the DIP Liens of the Prepetition Secured Notes Liens granted by the Debtors, (3) the grant of the *pari passu* DIP Liens over the Prepetition Secured Notes Collateral pledged to secure the Prepetition Secured Notes Obligations by the Non-Debtor Pledgors, (4) the execution of the DIP Documents, including the DIP Intercreditor Agreement, and

(5) the DIP Loan Parties' compliance with the terms thereof and of this Interim Order, in each case subject to the terms of this Interim Order.

17.    *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties holding interests that are secured by Primed Liens; *provided* that any of the Prepetition Agents, each acting on its own behalf or at the direction of the requisite Prepetition Secured Parties, may request further or different adequate protection, subject to and consistent with the terms of the DIP Intercreditor Agreement, and the Debtors or any other party in interest may contest any such request.

18.    *Perfection of DIP Liens and Adequate Protection Liens*.

(a)    Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 hereof and the Adequate Protection Liens granted pursuant to paragraph 15 hereof, the DIP Agents, on behalf of the DIP Secured Parties, and the Prepetition Agents, on behalf of the Prepetition Secured Parties, are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate and perfect the liens and security interests granted to them hereunder or under the DIP Documents ("Perfection

Actions"). Whether or not the DIP Agents, on behalf of the DIP Lenders, or the Prepetition Agents, on behalf of the Prepetition Secured Parties, shall, in their sole discretion, choose to take such Perfection Actions, the liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order. Upon the request of the DIP Agents or the Prepetition Agents, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further validate, perfect, preserve and enforce the DIP Liens; *provided*, *however*, that notwithstanding anything to the contrary herein, no Debtor or Non-Debtor Pledgor shall be required to take any Perfection Action, or to consent to or cooperate with any Perfection Action, with respect to any DIP Lien in any jurisdiction outside the United States except as provided in the DIP Documents, including the Collateral Annex (as defined in the DIP Credit Agreement) and Schedule 5.01(y) to the DIP Credit Agreement; *provided, further, however*, that notwithstanding anything to the contrary herein, no later than (x) 30 days following the entry of this Interim Order in respect of Debtors organized in Uruguay and (y) 25 days following the entry of this Interim Order in respect of the Debtors organized in Chile and the Non-Debtor Pledgors organized in Costa Rica, such respective Debtors and Non-Debtor Pledgors shall execute and deliver local collateral documents (the "Additional Collateral Perfection Documents") and shall take Perfection Actions consisting of filing and recordation of such Additional Collateral Perfection Documents with applicable registries to perfect the Adequate Protection Liens securing the Adequate Protection Claims of the Prepetition Secured Parties in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in such Prepetition Secured Notes Collateral (including Cash

Collateral) from and after the Petition Date up to $40,000,000 in the Debtors' and Non-Debtors' previously unencumbered inventory, accounts receivable, and Cash and Cash Equivalents in Chile, Uruguay and Costa Rica, which Perfection Actions consisting of filings and recordations with applicable registries shall be substantially consistent (1) with the Perfection Actions required under the Collateral Documents (as defined in the DIP Credit Agreement) to perfect the DIP Liens over such assets, (2) the Collateral Annex and (3) Schedule 5.01(y) to the DIP Credit Agreement; *provided*, *further*, the formal acceptance by any applicable registries of the aforementioned filings and recordations in respect of the junior Adequate Protection Liens shall not be required within the specified time periods set forth in this paragraph. The Additional Collateral Perfection Documents shall be substantially consistent with the Collateral Documents perfecting the DIP Liens over such assets, the Collateral Annex and Schedule 5.01(y) to the DIP Credit Agreement in each case modified *mutatis mutandi* to grant and perfect the Adequate Protection Liens or otherwise in form and substance acceptable to the Prepetition Agents (acting at the direction of the Required Noteholders (as defined in the Prepetition Secured Notes Indenture)). Any enforcement of the Adequate Protection Liens shall be subject to the provisions of the DIP Intercreditor Agreement. All documents implementing the Perfection Actions described herein will be deemed to have been recorded and filed as of the Petition Date, or as otherwise provided in the Additional Collateral Perfection Documents or the DIP Documents, including the Collateral Annex (as defined in the DIP Credit Agreement) and Schedule 5.01(y) to the DIP Credit Agreement.

(b)     A copy of this Interim Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a copy of this Interim Order for filing and/or recording, as

applicable.  The Automatic Stay shall be modified to the extent necessary to permit the applicable

DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and the

immediately preceding subparagraph (a).

19.    *Preservation of Rights Granted Under this Interim Order*.

(a)    Other than the Carve Out, the Permitted Priority Liens (other than the

Primed Liens) and the liens and claims of the Prepetition Secured Parties against the assets of the

Non-Debtor Pledgors ranking *pari passu* with the DIP Obligations under the DIP Documents, no

claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order

to the DIP Agents and the DIP Lenders or the Prepetition Agents and the Prepetition Secured

Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations

remain outstanding, and, except as otherwise expressly provided in this Interim Order, the DIP

Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security

interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of

the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security

interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to

or made *pari passu* with any liens arising after the Petition Date including, without limitation, any

liens or security interests granted in favor of any federal, state, municipal or other domestic or

foreign governmental unit (including any regulatory body), commission, board or court for any

liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or

security interests of the DIP Loan Parties.

(b)    The occurrence of (i) any Event of Default (as defined in the DIP Credit

Agreement) or (ii) any violation by the DIP Loan Parties of any of the terms of this Interim Order,

shall, after notice by the DIP Agents (acting in accordance with the terms of this Interim Order) in

writing to the Borrower, constitute an event of default under this Interim Order (each an "Event of Default") and, upon any such Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code: (A) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Interim Order shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the

DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the

DIP Lenders, the Prepetition Agents, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated.

20.    *Payment of Fees*.    The Fee Letters are hereby approved, and the Debtors are authorized to and shall pay the DIP Fees and Expenses, as provided in the DIP Documents.  Subject to the review procedures set forth in this paragraph 20, payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the DIP Secured Parties and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from the Debtors after the Closing Date (as defined in the DIP Credit Agreement) prior to confirmation of a chapter 11 plan, each professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the Creditors' Committee (if appointed), and the U.S. Trustee (together, the "Review Parties").  Any objections raised by the Debtors, the Creditors' Committee (if appointed), or the U.S. Trustee with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) business days after the receipt by the Review Parties (the "Review Period").  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the DIP Loan Parties shall pay

such invoices within five (5) business days.  If an objection to a professional's invoice is received within the Review Period, the DIP Loan Parties shall promptly pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Credit Agreement) the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtors).  No attorney or advisor to the DIP Secured Parties or any Prepetition Secured Party for whom the Debtors are obligated to pay Adequate Protection Fees and Expenses or DIP Fees and Expenses pursuant to this Interim Order shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to (i) the DIP Secured Parties in connection with or with respect to the DIP Facility; and (ii) the Prepetition Secured Parties in connection or with respect to these matters, are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

21.    *Limits to Lender Liability*.  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties (in each case, in their capacities as such) of any liability for any claims arising from the prepetition or postpetition activities of the DIP Loan Parties in the operation of their business, or in connection with their restructuring efforts. So long as the DIP Secured Parties comply with their obligations under the DIP Documents and

their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

22.     *Effect of Stipulations on Third Parties*.

(a)     The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.

(b)     The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (i) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, inter alia, in this paragraph) by no later than (A) sixty (60) calendar days after entry of this Interim Order, (B) any later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of the Required Noteholders (as defined in the Prepetition Secured Notes Indenture)) and the DIP Agents (with the consent of

53

the Requisite DIP Lenders), and (C) any later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing clauses (A), (B), and (C), the "Challenge Period"), (1) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Notes Obligations or the Prepetition Secured Notes Liens, or (2) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Secured Notes Documents, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens and the Prepetition Secured Notes Collateral; and (ii) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.

(c)      If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (i) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (ii) the obligations of the DIP Loan Parties under the

Prepetition Secured Notes Documents, including the Prepetition Secured Notes Obligations, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (iii) the Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (iv) the Prepetition Secured Notes Obligations and the Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Secured Notes Documents, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens and the Prepetition Secured Notes Collateral shall be deemed forever waived, released and barred.

(d)    If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless

remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Secured Notes Documents, the Prepetition Secured Notes Obligations, or the Prepetition Secured Notes Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

23.    *Release*.  Effective as of the date of entry of this Interim Order, each of the Non-Debtor Pledgors, the Debtors, and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, the Ad Hoc Group of Secured Noteholders (including any former, current, or future members), and each of their respective Representatives (as defined herein) (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors, Non-Debtor Pledgors, and the Debtors' estates (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date including, without limitation, any Avoidance Actions or actions for recharacterization or equitable subordination (collectively, the "Released Claims") of any kind, nature or description, whether matured or

unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state, federal, or foreign local law or otherwise, arising out of or related to (as applicable) (x) the Debtors, the Non-Debtor Pledgors, the Chapter 11 Cases; and (y) the Prepetition Secured Notes Documents, the DIP Documents, the Restructuring Support Agreement, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder; in each case that the Debtors or the Non-Debtor Pledgors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.

24.    *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Secured Notes Collateral (including Cash Collateral) or any portion of the Carve Out may be used directly or indirectly,

(a)    in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection,

priority or enforceability of or asserting any defense, counterclaim or offset with respect to the

DIP Obligations, the Prepetition Secured Notes Obligations and/or the liens, claims, rights, or

security interests securing or supporting the DIP Obligations or the Prepetition Secured Notes

Obligations granted under this Interim Order, the Final Order, the DIP Documents, or the

Prepetition Secured Notes Documents, including, in the case of each of (i) and (ii), without

limitation, any claims or challenges relating to the allocation of value as between encumbered or

unencumbered assets of the Debtors or claims alleged for lender liability or pursuant to

section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-

bankruptcy law or otherwise *provided* that, notwithstanding anything to the contrary herein, the

Debtors and the Creditors' Committee may use the proceeds of the Carve Out to investigate but

not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential

claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to

an aggregate cap of no more than $50,000;

(b)     to prevent, hinder, or otherwise delay or interfere with the Prepetition

Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization

on the Prepetition Secured Notes Obligations, Prepetition Secured Notes Collateral, DIP

Obligations, DIP Collateral and the liens, claims and rights granted to such parties under the

Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the

Prepetition Secured Notes Documents and this Interim Order;

(c)     to seek to subordinate, recharacterize, disallow, or avoid any of the DIP

Obligations or the Prepetition Secured Notes Obligations;

(d)    to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agents, or the DIP Lenders under this Interim Order, the Prepetition Secured Notes Documents or the DIP Documents, as applicable;

(e)    to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and 507(b) Claims granted to the Prepetition Secured Parties; or

(f)    to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget (subject to the Permitted Variances)), in each case unless all DIP Obligations, Prepetition Secured Notes Obligations, Adequate Protection Obligations and claims granted to the DIP Agent, DIP Lenders or Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash or otherwise agreed to in writing by the DIP Secured Parties.

25.    *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations) or any other order entered by this Court (other than the Final Order, when entered), the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject

to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget (subject to the Permitted Variances).

26.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee (if appointed), any other statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Secured Notes Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

27.    *Exculpation*.  Nothing in this Interim Order, the DIP Documents, the Prepetition Secured Notes Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the DIP Loan Parties in the operation of their businesses, or in connection with their restructuring efforts.  Except as provided under the applicable DIP

Documents or applicable law, (a) the DIP Secured Parties and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for: (i) the safekeeping of the DIP Collateral or Prepetition Secured Notes Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral and Prepetition Secured Notes Collateral shall be borne by the Debtors.

28.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the Prepetition Secured Notes Collateral (including the Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties, Prepetition Agents or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the DIP Loan Parties and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

29.    *Master Proof of Claim*.  The Prepetition Agents, and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Secured Notes Obligations arising under the Prepetition Secured

Notes Documents, including, without limitation, any principal, unpaid interest, fees, expenses and

other amounts under the Prepetition Secured Notes Documents.  The statements of claim in respect

of such indebtedness set forth in this Interim Order, together with any evidence accompanying the

DIP Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs

of claim in respect of such debt and such secured status.  However, in order to facilitate the

processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to

the Debtors' estates, each of the Prepetition Agents is authorized to file in the Debtors' lead

chapter 11 case *In re Automotores Gildemeister SpA*, Case No. 21-10685, a master proof of claim

on behalf of its respective Prepetition Secured Parties on account of any and all of their respective

claims arising under the applicable Prepetition Secured Notes Documents and hereunder (each, a

"Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim

by any of the Prepetition Agents, it shall be deemed to have filed a proof of claim in the amount

set forth opposite its name therein in respect of its claims against each of the Debtors of any type

or nature whatsoever with respect to the applicable Prepetition Secured Notes Documents, and the

claim of each applicable Prepetition Secured Party (and each of its respective successors and

assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of

claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to

identify whether any Prepetition Secured Party acquired its claim from another party and the

identity of any such party or to be amended to reflect a change in the holders of the claims set forth

therein or a reallocation among the holders of the claims asserted therein resulting from the transfer

of all or any portion of such claims.  The provisions of this paragraph 29 and each Master Proof

of Claim are intended solely for the purpose of administrative convenience and shall not affect the

right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan

proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach

any instruments, agreements or other documents evidencing the obligations owing by each of the

Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other

documents will be provided upon written request to counsel to the Prepetition Agents.  The DIP

Agents and the DIP Lenders shall similarly not be required to file proofs of claim with respect to

their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion

and the record established at the Interim Hearing are deemed sufficient to, and do, constitute proofs

of claim with respect to their obligations, secured status, and priority.

30.     *Insurance*.  To the extent that any of the Prepetition Agents is listed as loss payee

under the Borrowers', the DIP Guarantors', or the Non-Debtor Pledgors' insurance policies, the

applicable DIP Agents are also deemed to be the loss payee under such insurance policies and,

subject to this Interim Order, shall act in that capacity and distribute any proceeds recovered or

received in respect of any such insurance policies to the payment in full of the DIP Obligations

(other than contingent indemnification obligations as to which no claim has been asserted) and to

the payment of the applicable Prepetition Secured Notes Obligations.

31.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions

of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable

*nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy

Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local

Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall

be immediately effective and enforceable upon its entry and there shall be no stay of execution or

effectiveness of this Interim Order.

32.    *Modification of DIP Documents and Approved Budget*.  The DIP Loan Parties are hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties providing for any consensual non-material modifications to the Approved Budget or the DIP Documents, or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Documents *provided*, *however*, that notice of any material modification or amendment to the DIP Documents shall be provided to counsel to a Creditors' Committee (if appointed) and to the U.S. Trustee (collectively, the "Notice Parties"), each of whom shall have five (5) business days from the date of such notice within which to object, in writing, to such modification or amendment.  If any of the Notice Parties timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis. The Debtors shall provide a copy of each Approved Budget to the Notice Parties once it is approved by the DIP Agents and the Requisite DIP Lenders.

33.    *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

34.    *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed

to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the applicable DIP Agents and the DIP Lenders and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

35.    *Miscellaneous*.  Upon request of any of the DIP Agents, the Prepetition Agents, or the Ad Hoc Group of Secured Noteholders, the Debtors' advisors shall make themselves reasonably available (including for reasonable weekly telephone conferences) to discuss significant items and developments in the Chapter 11 Cases, including with respect to any material contracts, any material litigation, and any material operational or regulatory items.

36.    *Credit Bidding*.  Each of the DIP Agents (at the direction of the Requisite DIP Lenders) and the Prepetition Agents (at the direction of the Required Holders as defined in the Prepetition Secured Noted Indenture, as applicable), shall have the unqualified right to "credit bid" up to the full amount of the DIP Obligations or the Prepetition Secured Notes Obligations, as applicable, in connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Secured Notes Collateral, respectively, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral or Prepetition Secured Notes Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code (subject in each case to the DIP Intercreditor Agreement); provided that nothing in this paragraph 36 shall impair the rights of any party in interest provided

for in paragraph 22 of this Interim Order. The DIP Agent (at the direction of the Requisite DIP

Lenders) and the Required Holders (as defined in the Prepetition Secured Noted Indenture), shall

have the absolute right to assign, transfer, sell or otherwise dispose of its rights to credit bid, except

as may be prohibited by the DIP Documents or as precluded by any sale procedures order entered

by the Court.

37.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in

each case to the extent applicable, are satisfied by the contents of the DIP Motion.

38.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order

does not create any rights for the benefit of any third party, creditor, equity holder or any direct,

indirect or incidental beneficiary.

39.     *Necessary Action*.   The Debtors, the DIP Secured Parties and the Prepetition

Secured Parties are authorized to take all actions as are necessary or appropriate to implement the

terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the

Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or

appropriate to implement the terms of this Interim Order.

40.     *Retention of Jurisdiction*.  The Court shall retain exclusive jurisdiction to resolve

any and all disputes arising under or related to the DIP Loans, the DIP Loan Documents, and/or

the provisions of this Interim Order, and to enforce all of the conditions of the DIP Loan

Documents and this Interim Order.  The Non-Debtor Pledgors are deemed to consent to the

jurisdiction of the Court in respect of all matters relating to the DIP Loans and the DIP Documents

and shall be deemed to have agreed to have not contested such jurisdiction in any jurisdiction in

which the DIP Collateral is located. The provisions of this Interim Order, and this retention of

jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one

or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

41.    *Final Hearing*.  The Final Hearing is scheduled for _____, 2021 at _____  ___.m. before this Court.

42.    *Objections*.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) the U.S. Trustee; (b) entities listed as holding the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) proposed counsel to the Debtors, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York NY 10006 (Attn.: Jane VanLare and Adam Brenneman); (d) counsel to the DIP Collateral Agent, Ross PLLC, 1345 Avenue of the Americas, 33rd Floor,  New York, NY 10105, (Attn.: Mildred Quinones-Holmes; (e) counsel to the Ad Hoc Group of Secured Noteholders, the DIP Lenders, and the DIP Administrative Agent, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036 (Attn.: Allan Brilliant and Steve Wolpert); (f) the Creditors' Committee (if appointed) and its legal counsel, (g) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) any other party that has filed a request for notices with this Court pursuant to Bankruptcy Rule 2002, with a copy to the Court's chamber, in each case to allow actual receipt by the foregoing no later than _____, 2021 at 4:00 p.m., prevailing Eastern Time and otherwise in conformity with the Court's order establishing notice and case management procedures.

43.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any party that has filed a request for notices with this Court.


Dated: _____, 2021
      New York, NY                           _____
                                     HONORABLE LISA G. BECKERMAN
                                     UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1**

**DIP Credit Agreement**

**SUPERPRIORITY SENIOR SECURED PRIMING**
**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of April [●], 2021**

**among**

**AUTOMOTORES GILDEMEISTER SpA**

**as Borrower**

**THE GUARANTORS NAMED HEREIN**

**as Guarantors**

**THE LENDERS FROM TIME TO TIME PARTIES HERETO**

**as Lenders**

**and**

**Acquiom Agency Services LLC**

**as Administrative Agent**

**and**

**TMF Group New York, LLC**

**as Collateral Agent**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** ................................................... 1

Section 1.01.   Certain Defined Terms ............................................................... 1
Section 1.02.   Computation of Time Periods; Other Definitional Provisions .......... 30
Section 1.03.   Accounting Terms .................................................................... 31
Section 1.04.   U.S. Dollars .......................................................................... 31

**ARTICLE II AMOUNTS AND TERMS OF THE TERM LOANS** ..................................... 31

Section 2.01.   The Term Loans ..................................................................... 31
Section 2.02.   Amount of Each Borrowing ........................................................ 31
Section 2.03.   Notice of Borrowing ................................................................ 31
Section 2.04.   Funding of Borrowings ............................................................. 32
Section 2.05.   Repayment of Term Loans ......................................................... 32
Section 2.06.   Prepayments. ........................................................................ 32
Section 2.07.   Interest. ............................................................................... 33
Section 2.08.   Fees. ................................................................................... 33
Section 2.09.   [Reserved]. ........................................................................... 33
Section 2.10.   Yield Protection. .................................................................... 34
Section 2.11.   Payments and Computations ...................................................... 35
Section 2.12.   Taxes. ................................................................................. 37
Section 2.13.   Sharing of Payments, Etc ......................................................... 39
Section 2.14.   [Reserved]. ........................................................................... 40
Section 2.15.   Defaulting Lenders .................................................................. 40
Section 2.16.   Evidence of Debt ................................................................... 41

**ARTICLE III CONDITIONS OF LENDING** ............................................................... 43

Section 3.01.   Conditions Precedent to Effectiveness of this Agreement and
                the Initial Draw .................................................................... 43
Section 3.02.   Conditions Precedent to the Term Loans on Each Draw Date
                after the Closing Date ............................................................ 47

**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ............................................ 50

Section 4.01.   Representations and Warranties of the Loan Parties ....................... 50

**ARTICLE V COVENANTS OF THE LOAN PARTIES** ................................................. 57

Section 5.01.   Affirmative Covenants .............................................................. 57
Section 5.02.   Negative Covenants ................................................................. 68
Section 5.03.   Reporting Requirements ............................................................ 74

**ARTICLE VI EVENTS OF DEFAULT** ...................................................................... 77

Section 6.01.   Events of Default ................................................................... 77

**ARTICLE VII THE AGENTS** ................................................................................ 84

Section 7.01.   Authorization and Action ........................................................... 84
Section 7.02.   Agents' Reliance, Etc .............................................................. 86
Section 7.03.   Agents and their Affiliates ........................................................ 86

Section 7.04.      Lender Credit Decision ................................................................. 87
Section 7.05.      Indemnification. ........................................................................... 87
Section 7.06.      Successor Agents ......................................................................... 88
Section 7.07.      Administrative Agent May File Proofs of Claim............................ 88

**ARTICLE VIII MISCELLANEOUS**.................................................................... **89**

Section 8.01.      Amendments, Etc ......................................................................... 89
Section 8.02.      Notices, Etc. ................................................................................ 90
Section 8.03.      No Waiver; Remedies .................................................................. 93
Section 8.04.      Costs and Expenses..................................................................... 93
Section 8.05.      Right of Set-off ........................................................................... 94
Section 8.06.      Binding Effect ............................................................................. 95
Section 8.07.      Assignments and Participations. ................................................. 95
Section 8.08.      Execution in Counterparts ........................................................... 98
Section 8.09.      Confidentiality ............................................................................ 98
Section 8.10.      Release of Collateral ................................................................... 98
Section 8.11.      Patriot Act Notice ....................................................................... 99
Section 8.12.      Jurisdiction, Etc........................................................................... 99
Section 8.13.      Governing Law ............................................................................ 99
Section 8.14.      WAIVER OF JURY TRIAL......................................................... 100
Section 8.15.      Limitation of Liability................................................................. 100
Section 8.16.      Collateral Documents.................................................................. 100
Section 8.17.      [Reserved]................................................................................... 100
Section 8.18.      No Personal Liability of Directors, Officers, Employees and
                   Equity Holders ............................................................................ 100
Section 8.19.      Loan Party Obligations Joint and Several..................................... 100

**ARTICLE IX GUARANTY**........................................................................... **101**

Section 9.01.      Guaranty; Limitation of Liability................................................. 101
Section 9.02.      Guaranty Absolute ...................................................................... 101
Section 9.03.      Waivers and Acknowledgments. ................................................. 103
Section 9.04.      Subrogation ................................................................................ 103
Section 9.05.      Guaranty Supplements ................................................................ 104
Section 9.06.      Subordination.............................................................................. 104
Section 9.07.      Continuing Guaranty; Assignments ............................................. 105

**ARTICLE X COLLATERAL SECURITY**....................................................... **105**

Section 10.01.     Security ...................................................................................... 105
Section 10.02.     Security Documents..................................................................... 106
Section 10.03.     Release ....................................................................................... 107
Section 10.04.     Collateral Agent is Third Party Beneficiary .................................. 108
Section 10.05.     Collateral Agent .......................................................................... 108
Section 10.06.     Compensation and Indemnity ...................................................... 109
Section 10.07.     Replacement of Collateral Agent.................................................. 110

SCHEDULES

Schedule 1.01(a)    Applicable Lending Offices
Schedule 1.01(b)    Term Loan Commitments
Schedule 1.01(e)    Permitted Debt
Schedule 1.01(f)    Permitted Liens
Schedule 1.01(g)    Collateral Annex
Schedule 1.01(h)    Closing Date Guarantors
Schedule 3.01(d)    Closing Date Local Collateral Documents
Schedule 4.01(b)    Subsidiaries
Schedule 4.01(d)    Authorizations, Approvals, Actions, Notices and Filings
Schedule 4.01(f)    Disclosed Litigation
Schedule 4.01(l)    Tax Issues
Schedule 4.01(p)    Owned Real Property and Leases
Schedule 4.01(q)    Investments
Schedule 5.01(y)    Post-Closing Covenants
Schedule 5.02(d)    Payment Restrictions
Schedule 5.02(f)    Related Party Transactions
Schedule 8.07(a)    Direct Competitors

EXHIBITS

Exhibit A      Form of Assignment and Acceptance
Exhibit B-1    Form of U.S. Promissory Note
Exhibit B-2    Form of Chilean Promissory Note
Exhibit C      Form of Intercreditor Agreement
Exhibit D      Form of Guaranty Supplement

## CREDIT AGREEMENT

SUPERPRIORITY SENIOR SECURED PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**") dated as of April [●], 2021, among AUTOMOTORES GILDEMEISTER SpA, a *Sociedad Por Acciones* organized under the laws of Chile, as the Borrower, the Guarantors party hereto, the Lenders from time to time party hereto, and TMF Group New York, LLC, as collateral agent and Acquiom Agency Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**", and together with the Collateral Agent, the "**Agents**") for the Lenders referred to herein.

WHEREAS, the Loan Parties and certain of its affiliates have entered into the Restructuring Support Agreement (as defined below) regarding the material terms of a comprehensive restructuring (the "**Restructuring**") of the Loan Parties and certain of its affiliates, which will be implemented in accordance with the terms and conditions set forth in the Restructuring Support Agreement and Plan Term Sheet attached as Exhibit A thereto;

WHEREAS, in accordance with the Restructuring Support Agreement, the Borrower, a chapter 11 debtor-in-possession and the other Loan Parties, each a chapter 11 debtor-in-possession (collectively, the "**Debtors**") intend to implement the Restructuring by commencing the Chapter 11 Cases under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and to seek confirmation of a chapter 11 plan of reorganization on the terms and conditions specified in the Restructuring Support Agreement and the Plan Term Sheet (the "**Plan**");

WHEREAS, the Debtors have requested that the Lenders provide the credit facility hereunder (the "**Credit Facility**") in an aggregate principal amount up to $26,500,000.00 (the "**Commitment Amount**"), and the Lenders are willing to do so on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.  <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**7.50% Senior Secured Notes Due 2025**" means the secured notes issued by the Borrower pursuant the Indenture.

"**Acceptable Plan**" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

"**Acquired Debt**" means Debt of a Person existing at the time the Person merges with or into or becomes a Subsidiary and not Incurred in connection with, or in contemplation of, the Person merging with or into or becoming a Subsidiary. Acquired Debt will be deemed to have been Incurred at the time such Person becomes a Subsidiary or at the time it merges or consolidates with the Borrower or any other Loan Party or at the time such Debt is assumed in connection with the acquisition of assets from such Person.

"**Additional Guarantor**" shall have the meaning specified in Section 9.05.

"**Administrative Agent**" has the meaning specified in the preamble to this Agreement.

"**Administrative Agent's Account**" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lenders and Borrower from time to time.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under direct or indirect common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"**Agents**" has the meaning specified in the preamble to this Agreement and the meaning is equally applicable to "Agent", as appropriate.

"**Applicable Lending Office**" means, with respect to each Lender, such Lender's Domestic Lending Office.

"**Approval of the Independent Directors**" and words of similar effect mean, with respect to any transaction subject to approval by the Independent Directors, (x) if no Independent Directors have been elected by the holders of the Preferred Stock or, if such Independent Directors have resigned, at the time approval is sought, that a majority of the directors then in office have approved such transaction, (y) if the holders of the Preferred Stock have elected only one (1) Independent Director, that such Independent Director has approved such transaction, and (z) if the holders of the Preferred Stock have elected two (2) Independent Directors, that at least one (1) Independent Director has approved such transaction and no Independent Director has voted against such transaction.

"**Approved Budget**" shall have the meaning specified in Section 5.01(b)(i).

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means any sale, lease, transfer or other disposition (including a Sale and Leaseback Transaction) of the Collateral or any assets by the Borrower or any Subsidiary of the Borrower, including by means of a merger, consolidation or similar transaction and including

2

any sale or issuance of the Equity Interests of any Subsidiary of the Borrower (each of the above referred to as a "disposition"); *provided*, that the following are not included in the definition of "Asset Sale":

(1)    a disposition to the Borrower or a Subsidiary of the Borrower, including the sale or issuance by the Borrower or any Subsidiary of the Borrower of any Equity Interests of any Subsidiary of the Borrower to the Borrower or any Subsidiary of the Borrower; *provided*, that the aggregate fair market value of all assets transferred or otherwise disposed of pursuant to this clause (1) from the Borrower or any Guarantor to any Non-Guarantor Pledgor shall not exceed US$100,000 per calendar year;

(2)    (A) the disposition by the Borrower or any Subsidiary of the Borrower, in the ordinary course of business and consistent with past practice, of (i) cash and cash management investments, (ii) inventory and other assets acquired and held for resale in the ordinary course of business, (iii) damaged, worn out or obsolete assets, (iv) rights granted to others pursuant to leases or licenses, and (B) with the consent of the Requisite Lenders, the disposition by the Borrower or any Subsidiary of the Borrower of cash or inventory or payment of any amounts in connection with the Customs Claims or in connection with one or more vehicle recalls or exchanges in Peru (including any vehicles in customs or in transit to Peru) in connection with the Customs Claims, provided that the consent of the Requisite Lenders shall not be required for any single disposition or a series of dispositions made in accordance with a general program of dispositions in connection with the Customs Claims that has already been approved by the Requisite Lenders;

(3)    the sale or discount of accounts receivable, checks or similar instruments arising in the ordinary course of business in connection with the compromise or collection thereof or in connection with a factoring transaction, in each case in the ordinary course of business and consistent with past practice provided, that (i) no Event of Default has occurred and is continuing and (ii) the prior written consent of the Requisite Lenders shall be required to the extent any sale or discount of accounts receivable, checks or similar instruments or factoring transaction would result in a Priority Collateral Coverage Failure;

(4)    a transaction covered by Section 5.02(j);

(5)    a Restricted Payment permitted under Section 5.02(b) or a Permitted Investment;

(6)    the issuance of Disqualified Stock or Preferred Stock pursuant to Section 5.02(a);

(7)    leases or subleases of real property at the Borrower's headquarters located at 11000 Avenida Las Condes, Santiago, Chile for fair market value, the proceeds of which are used for working capital of the Borrower;

(8)    any disposition in a transaction or series of related transactions of assets with a fair market value of less than US$100,000 (or the equivalent in other currencies);

3

*provided*, that the aggregate fair market value of all assets transferred or otherwise disposed of pursuant to this clause (8) shall not exceed US$250,000 in any calendar year; and

"**Assignment and Acceptance**" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 8.07 or the definition of "**Eligible Assignee**"), and accepted by the Administrative Agent, in accordance with Section 8.07 and in substantially the form of Exhibit A hereto or any other form approved by the Administrative Agent.

"**Automobile Retailing Activities**" means new and used Vehicle and Vehicle parts retailing, wholesaling, leasing and related activities.

"**Average Life**" means, with respect to any Debt, the quotient obtained by dividing (i) the sum of the products of (x) the number of years from the date of determination to the dates of each successive scheduled principal payment of such Debt and (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"**Avoidance Actions**" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Loan Parties arising under Chapter 5 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

"**Borrower**" means Automotores Gildemeister SpA.

"**Borrowing**" means a borrowing consisting of Term Loans made by the Lenders ratably according to their respective Term Loan Commitments.

"**Budget Variance Report**" shall have the meaning specified in Section 5.01(b)(ii).

"**Business Day**" means a day other than a Saturday, Sunday or any day on which banking institutions are authorized or required by law to close in The City of New York, New York or Santiago, Chile.

"**Capital Expenditures**" means, for any Person for any period, the sum of, without duplication, (a) all cash expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with IFRS, reflected as additions to property, plant or equipment on a consolidated balance sheet of such Person plus (b) the aggregate principal amount of all Debt (including obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures.  For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock of a corporation, partnership interests or other equivalent interests (however designated, whether

voting or non-voting) in such Person's equity, entitling the holder to receive a share of the profits and losses, and a distribution of assets, after liabilities, of such Person.

"**Capitalized Leases**" mean, with respect to any Person, any leases of any property which, in conformity with IFRS, is required to be capitalized on the balance sheet of such Person.

"**Carve-Out**" means the sum total of:

(a)    all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, and interest at the statutory rate (without regard to the notice set forth in clause (c) below);

(b)    all reasonable fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;

(c)    to the extent allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, whether by interim order, interim compensation procedures order, final order, or otherwise, all unpaid fees, costs, and expenses of persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "**Debtors' Professional Fees**") or Creditors' Committee pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (the "**Committee's Professional Fees**" and, together with the Debtors' Professional Fees, the "**Professional Fees**"), in each case incurred or accrued at any time on or before the first business day following delivery by the Agent of a Trigger Date Notice (as defined below);

(d)    all unpaid Professional Fees incurred or accrued on and after the Trigger Date (including all success, incentive or other similar fees not earned prior to the Trigger Date) and allowed by the Bankruptcy Court at any time whether by interim order, interim compensation procedures order or otherwise; provided that, (i) the payment of any such Debtors' Professional Fees incurred or accrued on or after the Trigger Date shall not exceed $500,000 in the aggregate and (ii) the payment of any such Committee's Professional Fees incurred or accrued on or after the Trigger Date shall not exceed $50,000 in the aggregate.

"**Cash Collateral**" means all cash, negotiable instruments, documents of title, securities, deposit accounts or other Cash Equivalents whenever acquired which constitutes Collateral, including all proceeds, products, offspring, rents, or profits relating to the same.

"**Cash Equivalents**" means (1) U.S. dollars, Chilean pesos, Costa Rican Colones, Peruvian soles, Uruguayan pesos or money in other currencies received in the ordinary course of business, (2) United States Government Obligations or certificates representing an ownership interest in United States Government Obligations with maturities not exceeding one year from the date of acquisition, (3)(i) demand deposits, (ii) time deposits and certificates of deposit with maturities of one year or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding one year from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the laws of the United States or any state thereof having capital, surplus and undivided profits in excess of US$500 million whose

5

short-term debt is rated "A-2" or higher by S&P or "P-2" or higher by Moody's, (4) repurchase obligations with a term of not more than seven (7) days for underlying securities of the type described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above, (5) commercial paper rated at least A+ by S&P and maturing within six months after the date of acquisition, (6)(a) marketable direct obligations issued or unconditionally guaranteed by Chile to the extent such obligations are the full faith and credit obligations of Chile and so long as the sovereign debt rating of Chile is rated A+ or higher by S&P, (b) time deposits or certificates of deposit in Chilean pesos, Peruvian soles or U.S. dollars of a Chilean or Peruvian bank (other than any Affiliate of the Borrower), as the case may be, the commercial paper or other short-term unsecured debt obligations of which (or in the case of a bank that is the principal subsidiary of a holding company, the holding company) are rated the highest rating of any Chilean or Peruvian bank and at least A+ by S&P, or (c) commercial paper of a Chilean or Peruvian issuer (other than any Affiliate of the Borrower) the long-term unsecured debt obligations of which are rated the highest rating of a Chilean or Peruvian issuer, as the case may be, but in no event less than the equivalent short-term rating of A+ by S&P, and maturing within 90 days (unless the short-term rating is not less than A+ by S&P, in which case maturing within one year from the date of acquisition thereof by the Borrower or any of its Subsidiaries), or (7) money market funds at least 95% of the assets of which consist of investments of the type described in clauses (1) through (6) above.

"**Cause of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided that* notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means the occurrence of any of the following at any time: (1) the merger or consolidation of the Borrower with or into another Person or the merger of another Person with or into the Borrower or the merger of any Person with or into a Subsidiary of the Borrower if Capital Stock of the Borrower is issued in connection therewith, or the sale of all or substantially all the assets of the Borrower to another Person, unless holders of a majority of the aggregate voting power of the Voting Stock of the Borrower, immediately prior to such transaction, hold securities of the surviving or transferee Person that represent, immediately after such transaction, at least a majority of the aggregate voting power of the Voting Stock of the surviving Person; (2) Holdings ceases to "beneficially own" (as such term is used in Rules 13d-3 under the Exchange Act), directly or indirectly, at least 50% of the total voting power of the Voting Stock of the Borrower; (3) Holdings ceases to have the power to directly or indirectly elect a majority of the Board of Directors of the Borrower (excluding the Independent Directors); or (4) the adoption of a plan relating to the liquidation or dissolution of the Borrower or any of the Loan Parties.

"**Chapter 11 Cases**" has the meaning specified in the Restructuring Support Agreement.

"**Chilean Loan Party**" means the Borrower and each Subsidiary of the Borrower that is organized under the law of Chile and is a Loan Party hereunder.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Loan Parties.

"**Closing Date**" has the meaning specified in Section 3.01.

"**Collateral**" means, all of the assets of the Loan Parties and the Non-Guarantor Pledgors pledged to secure or subject to security interests or liens securing the Obligations under the Loan Documents (including any security interests or liens granted pursuant to the DIP Orders), including the (i) Indenture Collateral, (ii) other unencumbered assets of the Loan Parties and the Costa Rican Subsidiaries as provided in the DIP Orders and Collateral Documents, (iii) all products, profits and proceeds of the items in clauses (i) and (ii), and (iv) proceeds of factoring arrangements, Asset Sales, Inventory Debt and Working Capital Facilities of the Loan Parties and the Costa Rican Subsidiaries (it being understood that all proceeds of all items in the foregoing clauses (i) through and including (iv) shall be deposited, within one (1) Business Day of receipt by the Borrower or any of its Subsidiaries thereof, into a collateral deposit account, subject to a deposit account control agreement on terms acceptable to the Collateral Agent), in each case as provided under and described in the Collateral Documents and the DIP Orders. For the avoidance of doubt, Excluded Assets shall not constitute Collateral hereunder.

"**Collateral Agent**" means TMF Group New York, LLC ("**TMF**"), performing its duties and exercising its rights and powers hereunder and under the applicable Collateral Documents by or through any TMF Sub-Agent, in each case duly appointed in accordance with Section 10.07. For the avoidance of doubt, when reference is made herein to the Collateral Agent, such reference, to the extent applicable, shall be deemed to include the TMF Sub-Agents. The use of the term "agent" in this Agreement with reference to the Collateral Agent is merely used as a

matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

"**Collateral Annex**" means the Collateral Annex attached hereto as Schedule 1.01(g).

"**Collateral Documents**" means the existing security agreements and amendments to existing security agreements delivered in connection with the Indenture, each of the collateral documents, instruments and agreements delivered or to be delivered pursuant to Sections 5.01 (m), (n) and (t) hereof and each other local law agreement, in each case, that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Commitment Amount**" has the meaning specified in the recitals to this Agreement.

"**Confidential Information**" means information that any Loan Party furnishes to any Agent or any Lender in a writing designated as confidential, but does not include any such information that is or becomes generally available to the public or that is or becomes available to such Agent or such Lender from a source other than the Loan Parties that is not, to the best of such Agent's or such Lender's knowledge, acting in violation of a confidentiality agreement with a Loan Party.

"**Confirmation Order**" means an order issued by the Bankruptcy Court in form and substance satisfactory to the Agents and the Lenders confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consenting Noteholders**" has the meaning ascribed to such term in the Restructuring Support Agreement.

"**Consolidated Net Income**" means, for any period, the aggregate net income (or loss) of the Borrower and its Subsidiaries for such period determined on a consolidated basis in conformity with IFRS; *provided*, that the following (without duplication) will be excluded in computing Consolidated Net Income:

(1)     the net income (but not loss) of any Person that is not a Subsidiary of the Borrower, except to the extent of the lesser of: (x) the dividends or other distributions actually paid in cash to the Borrower or any of its Subsidiaries (subject to clause (3) below) by such Person during such period, and (y) the Borrower's pro rata share of such Person's net income earned during such period;

(2)     any net income (or loss) of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition;

8

(3)      the net income (but not loss) of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of such net income would not have been permitted for the relevant period by charter or by any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary;

(4)      any net after-tax gains or losses attributable to Asset Sales or the extinguishment of Debt;

(5)      any net after-tax extraordinary gains or losses; and

(6)      the cumulative effect of a change in accounting principles.

"**Costa Rican Subsidiary**" means any Subsidiary of the Borrower that is formed under the laws of Costa Rica and has 50% or more of its assets located in the Republic of Costa Rica, which, as of the Closing Date are Gildemeister Costa Rica S.A. and Inmobiliaria Los Seis CR ILS S.A.

"**Credit Facility**" has the meaning specified in the recitals to this Agreement.

"**Creditors' Committee**" means any official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases.

"**Customs Claims**" means any Claim or Cause of Action assertable against Automotores Gildemeister Peru S.A., any Loan Party, or any Related Party of any Loan Party, arising out of, or relating to the importation of certain H1 vehicles into Peru not in compliance with applicable law.

"**Customs Claims Event**" has the meaning specified in the definition of "Material Adverse Effect".

"**Debt**" of any Person means, without duplication: (1) all indebtedness of such Person for borrowed money; (2) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (3) all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments, excluding obligations in respect of trade letters of credit or bankers' acceptances issued in respect of trade payables to the extent not drawn upon or presented, or, if drawn upon or presented, the resulting obligation of the Person is paid in ten (10) Business Days; (4) all obligations of such Person to pay the deferred and unpaid purchase price of property or services which are recorded as liabilities under IFRS, excluding trade accounts payable in the ordinary course of business and not past due for more than 90 days; (5) all obligations of such Person as lessee under Capitalized Leases; (6) all Debt of other Persons guaranteed by such Person to the extent so guaranteed; (7) all Debt of other Persons secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person; and (8) all obligations of such Person under Hedging Agreements.  The amount of Debt of any Person will be deemed to be: (A) with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation; (B) with respect to Debt secured by a Lien on an asset of such Person but not otherwise the obligation, contingent or otherwise, of such Person, the lesser of (x) the fair market value of such asset on the date the Lien attached and (y)

9

the amount of such Debt; (C) with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt; (D) with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement is terminated at that time due to default by such Person; and (E) otherwise, the outstanding principal amount thereof.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar law of the United States or other non U.S. applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"**Default Interest**" has the meaning specified in <u>Section 2.07(b)</u>.

"**Defaulted Amount**" means, with respect to any Lender at any time, any amount required to be paid by such Lender to any Agent or any other Lender hereunder or under any other Loan Document at or prior to such time that has not been so paid as of such time, including, without limitation, any amount required to be paid by such Lender to (a) any other Lender pursuant to <u>Section 2.13</u> to purchase any participation in Loans owing to such other Lender and (b) any Agent pursuant to <u>Section 7.05</u> to reimburse such Agent for such Lender's ratable share of any amount required to be paid by the Lenders to such Agent as provided therein.  In the event that a portion of a Defaulted Amount shall be deemed paid pursuant to <u>Section 2.15(a)</u>, the remaining portion of such Defaulted Amount shall be considered a Defaulted Amount originally required to be paid hereunder or under any other Loan Document on the same date as the Defaulted Amount so deemed paid in part.

"**Defaulting Lender**" means, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or

10

(ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"**Derco Entities**" means, collectively, Sociedad de Créditos Automotrices S.A., Sociedad Comercial e Inmobiliaria Autoshopping S.A., and Sociedad Comercial de Ecovalor S.A.

"**DIP Orders**" means the Interim DIP Order and the Final DIP Order, each of which shall be in form and substance reasonably acceptable to each of the Loan Parties, the Agents and each of the Lenders, each in its respective reasonable discretion and acceptable to the Requisite Lenders in their sole discretion.

"**Disclosed Litigation**" has the meaning specified in <u>Section 4.01(f)</u>.

"**Disqualified Equity Interests**" means Equity Interests that by their terms or upon the happening of any event are:

(1)   required to be redeemed or redeemable at the option of the holder prior to the Stated Maturity of the Notes for consideration other than Qualified Equity Interests, or

(2)   convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Debt;

*provided*, that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an Asset Sale or Change of Control occurring prior to the Stated Maturity of the Notes if those provisions:

(A)   are no more favorable to the Lenders than <u>Section 5.02(e)</u>; and

(B)   specifically state that repurchase or redemption pursuant thereto will not be required prior to the payment in full of the Loan Parties' Obligations under this Agreement and the other Loan Documents.

"**Disqualified Stock**" means Capital Stock constituting Disqualified Equity Interests.

11

"**Domestic Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" opposite its name on Schedule 1.01(a) hereto or in the Assignment and Acceptance pursuant to which it became a Lender, as the case may be, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Administrative Agent.

"**Draw Date**" means the date of the making of any Term Loan.

"**Eligible Assignee**" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; or (d) any other Person approved by the Administrative Agent (such approval not to be unreasonably withheld); *provided*, *however*, that (i) any Person listed on Schedule 8.07(a) hereto constituting a direct competitor of the Loan Parties shall not be an Eligible Assignee and (ii) each of the Loan Parties, Non-Guarantor Pledgors or any of their respective Affiliates shall not be an Eligible Assignee.

"**Environmental Action**" means any action, suit, demand, written demand letter, claim, written notice of non-compliance or violation, written notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health, safety or the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"**Environmental Law**" means any applicable Federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction, decree or judicial or legally enforceable agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of or exposure to Hazardous Materials.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Debt convertible into equity.

"**Escrow Bank**" has the meaning specified in Section 2.15(b).

"**Events of Default**" has the meaning specified in Section 6.01.

"**Excluded Assets**" means (i) the Santander Account, (ii) inventory, accounts receivable and accounts holding cash of any Subsidiary of the Borrower domiciled in Peru, (iii) all specified property excluded from collateral under any Collateral Document and (iv) assets over which the grant of a junior lien or security interest is prohibited by or in violation of any law, rule or regulation applicable to such Debtor or a term, provision or conduction of any lease, license, contract or agreement to which such Debtor is a party and which are (x) pledged to secure Permitted Debt incurred as of the Closing Date by a Debtor (including any Inventory Debt), or (y)

pledged to secure Inventory Debt incurred after the Closing Date by a Debtor in accordance with this Agreement, provided that to the extent any relevant prohibition described in this clause (iv) is no longer applicable, such asset shall no longer be an Excluded Asset.

"**Excluded Taxes**" has the meaning specified in <u>Section 2.12(a)</u>.

"**Extraordinary Receipt**" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including, without limitation, proceeds of insurance (including, without limitation, any key man life insurance but excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings) and condemnation awards (and payments in lieu thereof) and indemnity payments; *provided, however,* that an Extraordinary Receipt shall not include (i) cash receipts received from proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay such third party (or to reimburse such third party for its prior payment of) such claim and the costs and expenses of such third party with respect thereto or (ii) tax refunds or pension plan reversions.

"**Factoring Receivables**" has the meaning specified in <u>Section 10.03(d).</u>

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Internal Revenue Code.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Final DIP Order**" means the order entered by the Bankruptcy Court approving the Credit Facility on a final basis.

"**Fiscal Year**" means a fiscal year of the Loan Parties ending on December 31 in any calendar year.

"**Fund**" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

13

"**Governmental Authority**" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"**Governmental Authorization**" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"**Guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part; *provided*, that the term "Guarantee" does not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"**Guarantee Obligation**" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt of any other Person in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

14

"**Guarantors**" means each of the Subsidiaries of the Borrower party hereto as a Guarantor hereunder that is a Debtor and any Additional Guarantor that is a Debtor. As of the Closing Date, the Guarantors are listed on Schedule 1.01(g) hereto.

"**Hazardous Materials**" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, per- or polyfluoroalkyl substances, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials, wastes or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"**Hedging Agreements**" means (i) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (ii) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates.

"**Holdings**" means Minvest, S.A.

"**Hyundai**" means Hyundai Motor Company.

"**Hyundai Distributorship Agreements**" shall have the meaning assigned to such term in the Restructuring Support Agreement.

"**Hyundai Letters**" shall have the meaning assigned to such term in the Restructuring Support Agreement.

"**Hyundai Undertaking Agreement**" shall have the meaning assigned to such term in the Restructuring Support Agreement.

"**IFRS**" means the international financial reporting standards as issued by the International Accounting Standards Board.

"**Incur**" means, with respect to any Debt or Capital Stock, to incur, create, issue, assume or Guarantee such Debt or Capital Stock. If any Person becomes a Subsidiary of the Borrower on any date after the Closing Date, the Debt and Capital Stock of such Person outstanding on such date will be deemed to have been Incurred by such Person on such date for purposes of Section 5.02(a), but will not be considered the sale or issuance of Equity Interests for purposes of Section 5.02(e). The accretion of original issue discount or payment of interest in kind will not be considered an Incurrence of Debt.

"**Indemnified Person**" has the meaning specified in Section 8.04(b).

"**Indenture**" means the Indenture, dated as of November 7, 2019, by and among the Borrower, the guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent, and TMF Group New York, LLC, under which the 7.50% Senior Secured Notes due 2025 were issued.

"**Indenture Collateral**" means all of the assets of the Loan Parties and Non-Guarantor Pledgors pledged to secure the Note Obligations pursuant to the Note Documents.

15

"**Indenture Trustee**" means The Bank of New York Mellon, as trustee under the Indenture.

"**Independent Directors**" means the two (2) members of the Board of Directors of the Borrower elected by the holders of the Preferred Stock from time to time.

"**Independent Financial Advisor**" means an accounting firm, appraisal firm, investment banking firm or consultant that is, in the judgment of the Borrower's Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction, and which Independent Financial Advisor shall be subject to the Approval of the Independent Directors.

"**Initial Approved Budget**" has the meaning specified in Section 5.01(b).

"**Initial Draw**" has the meaning specified in Section 2.02.

"**Initial Lenders**" means, the Lenders listed on Schedule 1.01(b) as of the date of this Agreement.

"**Intercreditor Agreement**" means the intercreditor agreement, substantially in the form attached as Exhibit C, dated as of the date hereof, duly executed and delivered by the Indenture Trustee, the Collateral Agent (as defined in the Indenture), the Collateral Agent hereunder and the Loan Parties and the Non-Guarantor Pledgors (or otherwise acknowledged by the Loan Parties and the Non-Guarantor Pledgors and binding thereon).

"**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"**Interim DIP Order**" means the order entered by the Bankruptcy Court approving the Credit Facility on an interim basis.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Inventory Debt**" means Debt incurred by the Borrower or any Subsidiary of the Borrower pursuant to a commercial paper or factoring program or solely to directly purchase, lease, finance or guarantee the purchasing, leasing or financing of Vehicles, Vehicle parts or Vehicle accessories in the ordinary course of business of the Borrower and its Subsidiaries or receivables, or to refinance or guarantee the refinancing of Inventory Debt, which Debt (x) is secured only by Vehicles, Vehicle parts, Vehicle accessories or receivables, to the extent, at any date of determination thereof, the aggregate amount of Inventory Debt secured by Vehicles, Vehicle parts, Vehicle accessories or receivables does not exceed, as applicable, the depreciated book value of such Vehicles, Vehicle parts, Vehicle accessories or receivables as determined in accordance with IFRS applied on a consistent basis (*provided*, that the Borrower and its Subsidiaries shall have the

right to substitute the collateral securing such Debt with, as applicable, Vehicles, Vehicle parts or Vehicle accessories with a depreciated book value that is equal to or less than the depreciated value of such collateral), or (y) is unsecured and provides for a borrowing base which may not exceed 100% of the value of such Vehicles, Vehicle parts or Vehicle accessories; *provided further* that Inventory Debt consisting of letters of credit issued on behalf of the Borrower or any Subsidiary of the Borrower in the ordinary course of business and consistent with past practice for the purpose of acquiring Vehicles, Vehicle parts or Vehicle accessories may be secured by (i) cash or Cash Equivalents in an amount up to the purchase price of such inventory and/or (ii) such inventory.

"**Investment**" means (i) any direct or indirect advance, loan or other extension of credit to another Person, (ii) any capital contribution to another Person, by means of any transfer of cash or other property or in any other form, (iii) any purchase or acquisition of Equity Interests, bonds, notes or other Debt, or other instruments or securities issued by another Person, including the receipt of any of the above as consideration for the disposition of assets or rendering of services, (iv) any purchase, redemption or acquisition of the 7.5% Senior Secured Notes due 2025, or (v) any Guarantee of any obligation of another Person.  If the Borrower or any of its Subsidiaries sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary so that, after giving effect to that sale or disposition, such Person is no longer a Subsidiary of the Borrower, all remaining Investments of the Borrower and its Subsidiaries in such Person shall be deemed to have been made at such time.

"**Leaseback Agreements**" means collectively (i) the leaseback agreement entered into by and among the Borrower and Banco Internacional, by means of public deed executed on February 27, 2017 before the Notary Public of Santiago Mr. Cosme Fernando Gomila Gatica, as amended by means of public deed executed on May 18, 2018, before the Notary Public of Santiago Mr. Patricio Raby Benavente, and public deed executed on July 31, 2020, before the Notary Public of Santiago Mr. René Benavente Cash, in respect to the property denominated "Lote C-1", located in Paicaví No. 2,770, city and borough of Concepción; (ii) the leaseback agreement entered into by and among the Borrower and Banco Internacional, by means of public deed executed on May 18, 2018 before the Notary Public of Santiago Mr. Patricio Raby Benavente, in respect to the property located in El Gabino No. 13,066 and Avenida La Dehesa No. 1,845, borough of Lo Barnechea, city of Santiago; (iii) the leaseback agreement entered into by and among the Borrower and Tanner, by means of public deed executed on January 6, 2017, before the Notary Public of Santiago Mrs. María Soledad Santos Múñoz, in respect to the property denominated "Lote B-1" located in Talcahuano Highway, previously Paicaví number 3280-A, borough of Concepción; (iv) the leaseback agreement entered into by and among the Borrower and Tanner, by means of public deed executed on May 30, 2017, before the Notary Public of Santiago Mrs. María Soledad Santos Múñoz, in respect to the property located in Chiloé 839 and Chiloé 859 and 861, borough and city of Punta Arenas; (v) the leaseback agreement entered into by and among the Borrower and Tanner, by means of public deed executed on January 6, 2017,  before the Notary Public of Santiago Mrs. María Soledad Santos Múñoz, in respect to the property located in Rengifo 474, city and borough of Puerto Montt; and (vi) the leaseback agreement entered into by and among the Borrower and Tanner, by means of public deed executed on March 6, 2017, before the Notary Public of Santiago Mrs. María Soledad Santos Múñoz, in respect to the property denominated "Lote C-1" and "Lote C-2-B" located in Licanco, borough of Padre las Casas.

17

"**Lenders**" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 8.07 for so long as such Initial Lenders or Person, as the case may be, shall be a party to this Agreement.

"**Lien**" means any mortgage, deed of trust, pledge, security interest, encumbrance, lien or charge of any kind, or interests created pursuant to trust, escrow, security, agency or similar arrangements (including any conditional sale or other title retention agreement or Capitalized Lease).

"**Loan**" means a Term Loan.

"**Loan Documents**" means (a) this Agreement, (b) the Promissory Notes, (c) the Collateral Documents, (d) the Intercreditor Agreement and (e) any and all other agreements, documents, instruments or certificates from time to time duly executed and/or delivered by any Loan Party in connection with any of the foregoing to which any Agent or Lender is a party or is an intended beneficiary as evidenced by the terms thereof, in each case as amended.

"**Loan Parties**" means, collectively, the Borrower and each of the Guarantors.

"**Loan Parties' Accounts**" means the account of the Loan Parties specified by the Borrower in writing to the Administrative Agent from time to time.

"**Manufacturer**" means a vehicle manufacturer which is a party to an importation and distribution agreement with the Borrower or any Subsidiary of the Borrower.

"**Margin Stock**" has the meaning specified in Regulation U.

"**Material Adverse Effect**" means any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a material adverse effect on (i) the business, results of operations, value, or financial condition of the Loan Parties and the Non-Guarantor Pledgors taken as a whole, (ii) the legality, validity or enforceability of any Loan Document or any DIP Order, (iii) the ability of the Loan Parties and the Non-Guarantor Pledgors to perform their respective obligations under the Restructuring Support Agreement or the Loan Documents, (iv) the value of the Collateral, (v) the perfection or priority of the liens granted pursuant to the Loan Documents or any DIP Order, or (vi) the ability of the Agents or the Lenders to enforce the Loan Documents; *provided, however,* that none of the following shall constitute, or shall be considered in determining whether there has occurred or could reasonably be expected to occur, a "Material Adverse Effect": (i) effects resulting from changes generally affecting financial, banking, credit, securities, or commodities markets, the economy in general, or prevailing interest rates or general capital market conditions in the United States, (ii) a change in the IFRS or interpretations thereof after the date hereof, (iii) the filing of the Chapter 11 Cases, the DIP Orders, any actions or omissions taken with the consent of the Requisite Lenders or compliance by any party with the covenants and agreements herein, (iv) any natural disaster, weather-related events or other acts of God, acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway; or (v) the impact of the COVID-19 pandemic; provided, further, however, that any of the changes, events or effects referred to in clauses (i), (ii), (iv) or (v) immediately above may be taken into account in determining whether a Material

18

Adverse Effect has occurred or would reasonably be expected to occur to the extent any such change, event or effect affects the Loan Parties and the Non-Guarantor Pledgors, taken as a whole, in a disproportionate manner when compared to the effect of such changes, events or effects on other persons engaged in the business and geographic market in which the Loan Parties and the Non-Guarantor Pledgors operate; and provided, further, however, that any failure by the Loan Parties and the Non-Guarantor Pledgors to meet internal or other financial projections or forecasts for any period shall not, by itself, be deemed a Material Adverse Effect (it being understood, however, that the facts or occurrences giving rise to or contributing to such failure may be taken into account in determining whether there has been a Material Adverse Effect); and provided, further, however, that any event, change, effect, occurrence, development, circumstance or change of fact related to the Customs Claims (a "**Customs Claims Event**") disclosed orally or in writing to the Lenders or Lenders' counsel prior to the date that is five (5) Business Days prior to the Closing Date shall not, individually, or in the aggregate with another Customs Claims Event, be deemed a Material Adverse Effect, (it being understood, however, that the facts or occurrences arising out of the Customs Claims Events may be taken into account in determining whether there has been a Material Adverse Effect).

"**Maturity Date**" means the earlier of (a) the date occurring sixty five (65) days after the Closing Date (which date may, notwithstanding anything else herein, be extended by the Borrower for up to an additional five (5) Business Days in the event that the Confirmation Order has been entered and so long as the effective date of the Plan shall not have occurred), (b) the conversion of any of the Chapter 11 Cases to a case under chapter 7 without the prior written consent of the Requisite Lenders, (c) the dismissal of any of the Chapter 11 Cases without the prior written consent of the Requisite Lenders, (d) the appointment of a chapter 11 trustee without the prior written consent of the Requisite Lenders, (e) the appointment of an examiner with expanded powers without the prior written consent of the Requisite Lenders, (f) the date of consummation of a sale of all or substantially all of the Debtors' assets, unless otherwise consented to in writing by the Requisite Lenders, (g) the effective date of the Plan confirmed in the Chapter 11 Cases, (h) the date the Obligations become due and payable in full under the Loan Documents, whether by acceleration or otherwise due to the occurrence of an Event of Default, and (i) if the Final DIP Order has not been entered by the date that is thirty-five (35) days after the Petition Date (which date may be extended with the prior written consent of the Requisite Lenders).

"**Milestones**" means the milestones listed on Schedule 1.01(i).

"**Moody's**" means Moody's Investor Services, Inc.

"**Net Cash Proceeds**" means:

(a)    with respect to any Asset Sale, the excess, if any, of (i) the sum of cash and Cash Equivalents received by the Borrower or any of its Subsidiaries (including without limitation (i) payments in respect of deferred payment obligations to the extent corresponding to, principal, but not interest, when received in the form of cash, and (ii) proceeds from the conversion of other consideration received when converted to cash) over the sum of (1) brokerage commissions and other fees and expenses related to such Asset Sale, including fees and expenses of counsel, accountants and investment bankers; (2) provisions for taxes as a result of such Asset Sale proceeds and for which appropriate reserves have been made in accordance with IFRS, (3) payments

required to be made to holders of minority interests in Subsidiaries as a result of such Asset Sale or to repay Debt outstanding at the time of such Asset Sale that is secured by a Lien on the property or assets sold, and (4) appropriate amounts to be provided as a reserve against liabilities associated with such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and indemnification obligations associated with such Asset Sale, with any subsequent reduction of the reserve other than by payments made and charged against the reserved amount to be deemed a receipt of cash;

(b)    with respect to the incurrence or issuance of any Debt by any of the Loan Parties not expressly permitted hereunder, an amount equal to the excess of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (ii) the underwriting discounts and commissions, and other out-of-pocket costs, fees, commissions, premiums and expenses incurred by any of the Loan Parties in connection with such incurrence or issuance to the extent such amounts were not deducted in determining the amount referred to in clause (i); and

(c)    with respect to any Extraordinary Receipt received by any of the Loan Parties that is not otherwise included in clauses (a) or (b) above, an amount equal to the excess, if any, of (i) the sum of the cash and Cash Equivalents received in connection therewith over (ii) the sum of (A) premiums and expenses incurred by the Borrower or its Subsidiaries and (B) federal, state, provincial, foreign and local taxes reasonably estimated (on a consolidated basis) to be actually payable within the current or the immediately succeeding tax year as a result of any gain recognized in connection therewith; provided, however, that Net Cash Proceeds in respect of insurance proceeds on account of damaged property shall not be deemed Net Cash Proceeds to the extent such proceeds shall have been used to repair and/or replace such damaged property on account of which such insurance proceeds were paid.

"**Newly Pledged Inventory**" has the meaning specified in Section 10.03(d).

"**Non-Guarantor Pledgors**" means, collectively, the Subsidiaries of the Borrower that are not Guarantors and that have pledged assets constituting Indenture Collateral and any additional assets pledged pursuant to the Loan Documents to secure the Obligations hereunder. As of the Closing Date, the Non-Guarantor Pledgors are: Holdings, Gildemeister Costa Rica S.A., Inmobiliaria Los Seis CR ILS S.A., Maquinaria Nacional S.A., Motor Mundo S.A. and Automotores Gildemeister Peru S.A.

"**Note Documents**" has the meaning ascribed to such term in the Indenture.

"**Note Obligations**" means the aggregate outstanding principal amount of the 7.5% Senior Secured Notes due 2025, together with accrued and unpaid interest thereon, unpaid fees, costs and expenses in respect thereof, and all other obligations of the Loan Parties arising under the Indenture.

"**Notice of Borrowing**" has the meaning specified in Section 2.03.

"**Obligations**" means all indebtedness and other obligations (including without limitation the Term Loans, contingent obligations, the Guaranteed Obligations of the Guarantors, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other

amounts) payable by any Loan Party or any of the Non-Guarantor Pledgors under any Loan Document to the Agents and/or Lenders.

"**Officer's Certificate**" means a certificate signed in the name of the Borrower (or any other applicable Loan Party) by a Responsible Officer.

"**Opinion of Counsel**" means a written opinion of counsel, who may be an employee of or counsel for the Borrower, obtained at the expense of the Borrower, or the surviving or transferee Person or a Subsidiary of the Borrower, and who is reasonably acceptable to the Administrative Agent and the Requisite Lenders.

"**Other Connection Taxes**" has the meaning specified in Section 2.12(a)(iii).

"**Other Taxes**" has the meaning specified in Section 2.12(e).

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"**Permitted Business**" means any of the businesses in which the Borrower and its Subsidiaries are engaged on the Closing Date, and any business reasonably related thereto (including, for the avoidance of doubt, any ordinary course of business lease or sublease of real property not being used by the Borrower at any given time).

"**Permitted Debt**" means:

(1)      unsecured Debt of the Borrower or any Subsidiary of the Borrower pursuant to Working Capital Facilities *provided*, that the aggregate principal amount thereof at any time outstanding shall not exceed US$15 million (or the equivalent in other currencies), less the amount of mandatory reductions of such Debt made pursuant to the terms thereof and not concurrently refinanced by the Incurrence of Debt;

(2)      Debt of the Borrower or any Subsidiary of the Borrower (other than Debt incurred by any Peruvian Subsidiary) owing to the Borrower or any other Subsidiary of the Borrower so long as such Debt continues to be owed to the Borrower or a Subsidiary of the Borrower and which, if the obligor is the Borrower or a Guarantor, is subordinated in right of payment to the Obligations of the Loan Parties on terms acceptable to the Administrative Agent and the Requisite Lenders;

(3)      Debt of the Loan Parties pursuant to this Agreement and the other Loan Documents;

(4)      Debt ("**Permitted Refinancing Debt**") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance (all of the above, for purposes of this clause, "**refinance**") then outstanding Debt in an amount not to exceed the principal amount of the Debt so refinanced, plus customary and reasonable premiums, fees and expenses; *provided*, that:

21

(A)    in case the Debt to be refinanced is Subordinated Debt, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is outstanding, is expressly made subordinate in right of payment to the Obligations at least to the extent that the Debt to be refinanced is subordinated to the Obligations,

(B)    the new Debt does not have a Stated Maturity prior to the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is at least equal to the remaining Average Life of the Debt to be refinanced,

(C)    in no event may Debt of the Borrower or Subsidiary of the Borrower be refinanced pursuant to this clause by means of any Debt of any Subsidiary that is not a Guarantor, and, with respect to Debt incurred by any Peruvian Subsidiary pursuant to clause (15) of the definition of "Permitted Debt", such refinancing Debt does not satisfy the requirements of such clause (15); and

(D)    Debt Incurred pursuant to clauses (1)(*Unsecured Debt in respect of Working Capital Facilities in an amount up to $15M*), (2)(*Certain Subordinated Inter-Company Debt*), (5)(*Hedging Agreements in an amount up to US$15M*), (6)(*Debt consisting of Performance Bonds in an amount up to US$15M*), (10)(*Guarantees of Permitted Debt*), (11)(*Overdrafts in the ordinary course of business*), (12)(*Inventory Debt in the ordinary course of business, subject to certain other restrictions*), (13)(*Other Indebtedness incurred after the Closing Date in an amount up to $1M*) and (14)(*Subordinated and Pledged Inter-Company Debt of Peruvian Subsidiary*), of the definition of "Permitted Debt" may not be refinanced pursuant to this clause;

(5)    Hedging Agreements of the Borrower or any Subsidiary of the Borrower entered into in the ordinary course of business for the purpose of limiting risks associated with the business of the Borrower and any Subsidiaries of the Borrower and not for speculation, in an aggregate amount not to exceed US$15 million outstanding at any one time;

(6)    Debt consisting of performance bonds, appeal bonds, surety bonds, customs bonds and other similar bonds and reimbursement obligations Incurred by the Borrower or any Subsidiary of the Borrower in the ordinary course of business on standard terms and on an arms' length basis securing the performance of franchise or license obligations or contractual obligations in respect of bid, supply or service contracts of the Borrower or any Subsidiary of the Borrower (in each case, other than in respect of any other category of Permitted Debt), in an aggregate amount not to exceed US$15 million outstanding at any one time;

(7)    Acquired Debt in an aggregate amount following the Closing Date of US$1 million;

(8)    Debt of the Borrower or any Subsidiary of the Borrower outstanding on the Closing Date that is listed on Schedule 1.01(e) or for which the principal amount is less than US$50,000; *provided*, that the aggregate amount of Debt pursuant to this clause (8) that is not listed on Schedule 1.01(e) shall not, in the aggregate, exceed US$100,000;

(9)    [Reserved];

22

(10)    Debt of the Borrower or any other Loan Party consisting of Guarantees of Debt of the Borrower or any Subsidiary of the Borrower Incurred under any other clause of this definition of "Permitted Debt" or as otherwise permitted Section 5.02(a);

(11)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds or Debt in respect of netting services, automatic clearinghouse arrangements, overdraft protections and similar arrangements in connection with deposit accounts, in each case in the ordinary course of business;

(12)    unless an Event of Default has occurred and is continuing, Inventory Debt in the ordinary course of business and consistent with past practices and in accordance with the Approved Budget, *provided* that, the prior written consent of the Requisite Lenders shall be required if the Incurrence of Inventory Debt (which for purposes of this covenant may include, without limitation, the issuance of any letters of credit secured by cash, Cash Equivalents, Vehicles, Vehicle parts, or Vehicle accessories) would result in a Priority Collateral Coverage Failure;

(13)    Debt of the Borrower or any Subsidiary of the Borrower Incurred on or after the Closing Date not otherwise permitted in an aggregate principal amount at any time outstanding not to exceed US$1.0 million (or the equivalent in other currencies);

(14)    with the prior written consent of the Requisite Lenders in each case, secured Debt of the Peruvian Subsidiaries pursuant to Working Capital Facilities; and

(15)    Debt of one or more Peruvian Subsidiaries owed to the Borrower or any other Subsidiary of the Borrower in an aggregate amount not to exceed US$500,000, provided that (i) such Debt shall be secured by otherwise unencumbered assets of such Peruvian Subsidiary acceptable to the Requisite Lenders, the fair market value of which shall exceed the aggregate outstanding amount of such Debt at all times and (ii) such Debt shall be pledged as Collateral to the Collateral Agent in a manner acceptable to the Requisite Lenders and the Collateral Agent.

"**Permitted Investments**" means:

(1)    any Investment in the Borrower or in any other Loan Party that is engaged in a Permitted Business, any Investment by a Peruvian Subsidiary in another Peruvian Subsidiary, and any Investment by a Costa Rican Subsidiary in another Costa Rican Subsidiary;

(2)    any Investment in Cash Equivalents;

(3)    any Investment by the Borrower or any Subsidiary of the Borrower in a Person, if as a result of such Investment, such Person becomes a Guarantor engaged in a Permitted Business;

(4)    Investments received as non-cash consideration in an Asset Sale made pursuant to and in compliance with Section 5.02(e);

(5)    Hedging Agreements otherwise permitted under this Agreement;

23

(6)    (i) receivables owing to the Borrower or any Subsidiary of the Borrower if created or acquired in the ordinary course of business, (ii) endorsements for collection or deposit in the ordinary course of business, and (iii) securities, instruments or other obligations received in compromise or settlement of debts created in the ordinary course of business, or by reason of a composition or readjustment of debts or reorganization of another Person, or in satisfaction of claims or judgments;

(7)    Investments in Costa Rican Subsidiaries, and joint ventures in an aggregate amount, taken together with all other Investments made in reliance on this clause, not to exceed US$1.25 million (or the equivalent in other currencies) (net of, with respect to the Investment in any particular Person, the cash return thereon received after the Closing Date as a result of any sale for cash, repayment, redemption, liquidating distribution or other cash realization (not included in Consolidated Net Income), not to exceed the amount of Investments in such Person made after the Closing Date in reliance on this clause);

(8)    payroll, travel and other loans or advances to, or Guarantees issued to support the obligations of, officers and employees, in each case in the ordinary course of business, not in excess of US$500,000 (or the equivalent in other currencies) outstanding at any time;

(9)    extensions of credit to customers and suppliers in the ordinary course of business, not in excess of US$7.5 million (or the equivalent in other currencies) (net of any amounts insured against any credit losses by a reputable insurance carrier);

(10)    the provision of a letter of credit by the Borrower or any Subsidiary of the Borrower in respect of inventory purchases by Affiliates of the Borrower or any Subsidiary of the Borrower which inventory purchases are for the benefit of the Borrower or any such Subsidiary of the Borrower; *provided*, *further*, that the Borrower or any Subsidiary of the Borrower is then subsequently named as the purchaser of such inventory;

(11)    Investments existing on the Closing Date that are listed on Schedule 4.01(q) or whose fair market value is less than US$100,000; *provided*, that the aggregate amount of Investments pursuant to this clause (11) that are not listed on such schedule shall not, in the aggregate, exceed US$250,000 as of the Closing Date or at any time;

(12)    in addition to Investments listed above, Investments in Persons (other than any Peruvian Subsidiary) engaged in Permitted Businesses in an aggregate amount, taken together with all other Investments made in reliance on this clause, not to exceed US$1.0 million (or the equivalent in other currencies) (net of, with respect to the Investment in any particular Person made pursuant to this clause, the cash return thereon received after the Closing Date as a result of any sale for cash, repayment, redemption, liquidating distribution or other cash realization (not included in Consolidated Net Income) not to exceed the amount of such Investments in such Person made after the Closing Date in reliance on this clause);

(13)    Investments consisting of the operating leases for the real property owned by Automotores Gildemeister Peru S.A. and located in the Villa El Salvador district of Lima, Peru and registered under title numbers 14145876 and 14145877 in the Real Property Registration Office of Lima; and

24

(14)   Investments in one or more Peruvian Subsidiaries in an aggregate amount not to exceed US$500,000, provided that such Investments shall satisfy all requirements of clause (15) under the definition of "Permitted Debt".

"**Permitted Liens**" means:

(1)   Liens existing on the Closing Date that are listed on <u>Schedule 1.01(f)</u> or that secure Debt with a principal amount less than US$50,000; *provided*, that the aggregate amount of Debt pursuant to this clause (1) that is not listed on such schedule shall not, in the aggregate, exceed US$100,000 as of the Closing Date or at any time.

(2)   Liens securing the Note Obligations and the Obligations including any Liens granted as adequate protection under the DIP Orders;

(3)   pledges or deposits under worker's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts or leases, or to secure public or statutory obligations, surety bonds, customs duties and the like, or for the payment of rent, in each case incurred in the ordinary course of business and not securing Debt;

(4)   Liens imposed by law, such as carriers', vendors', warehousemen's and mechanics' liens, in each case for sums not yet due or being contested in good faith and by appropriate proceedings and for which appropriate reserves have been made in accordance with IFRS;

(5)   Liens in respect of taxes and other governmental assessments and charges which are not yet due or which are being contested in good faith and by appropriate proceedings;

(6)   Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the proceeds thereof;

(7)   minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property, not interfering in any material respect with the conduct of the business of the Borrower and its Subsidiaries;

(8)   licenses or leases or subleases as licensor, lessor or sublessor of any of its property, including intellectual property, in the ordinary course of business;

(9)   customary Liens in favor of trustees and escrow agents, and netting and setoff rights, banker's liens and the like in favor of financial institutions and counterparties to financial obligations and instruments;

(10)   options, put and call arrangements, rights of first refusal and similar rights relating to Investments in joint ventures, partnerships and the like;

25

(11)   judgment liens, and Liens securing appeal bonds or letters of credit issued in support of or in lieu of appeal bonds, so long as no Event of Default then exists as a result thereof;

(12)   Liens (including the interest of a lessor under a Capitalized Lease) on property that secure Debt permitted hereunder for the purpose of financing all or any part of the purchase price or cost of construction or improvement of such property (including, for the avoidance of doubt, improvements on property consisting of undeveloped land) and which attach within 180 days after the date of such purchase or the completion of construction or improvement;

(13)   Liens on property of a Person at the time such Person becomes a Subsidiary of the Borrower; *provided*, that such Liens were not created in contemplation thereof and do not extend to any other property of the Borrower or any Subsidiary;

(14)   Liens on property at the time the Borrower or any of the Subsidiaries acquires such property, including any acquisition by means of a merger or consolidation with or into the Borrower or a Subsidiary of such Person; *provided*, that such Liens were not created in contemplation thereof and do not extend to any other property of the Borrower or any Subsidiary;

(15)   Liens securing Debt or other obligations of the Borrower or a Subsidiary to the Borrower or a Subsidiary that is a Guarantor;

(16)   Liens securing Hedging Agreements so long as such Hedging Agreements relate to Debt for borrowed money that is, and is permitted hereunder, secured by a Lien on the same property securing such Hedging Agreements;

(17)   Liens described in clause (x) of the definition of "Inventory Debt" and Liens securing letters of credit constituting "Inventory Debt" which shall be in each case granted in the ordinary course of business and consistent with past practices;

(18)   Extensions or renewals of any Liens referred to in clauses (1)(*Liens listed on Schedule 1.01(f)*), (2)(*Liens securing the Note Obligations*), (12)(*Liens on property that secure Debt permitted hereunder for the specific purpose described herein* ), (13)(*Liens on property of a Person that becomes a Subsidiary*) or (14)(*Liens on property acquired by the Borrower or any Subsidiary in connection with the refinancing of the obligations secured thereby*); *provided*, that such Lien does not extend to any other property and, except as contemplated by the definition of "Permitted Refinancing Debt", the amount secured by such Lien is not increased;

(19)   other Liens securing obligations in an aggregate amount not exceeding US$750,000 (or the equivalent in other currencies);

(20)   Liens on inventory that secure Debt incurred in accordance with clause (14) of the definition of "Permitted Debt"; and

(21)   Liens securing Debt permitted by clauses (12) and (15) of the definition of "Permitted Debt".

"**Permitted Variance**" has the meaning specified in Section 5.01(b)(ii).

26

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"**Peruvian Authorities**" shall mean, as the case may be, all applicable national, regional, provincial, district and municipal authorities with regulatory oversight or legal authority relating to the Customs Claims in Peru.

"**Peruvian Subsidiary**" means any Subsidiary of the Borrower that is formed under the laws of Peru and has 50% or more of its assets located in Peru, which, as of the Closing Date, are Maquinaria Nacional S.A., Motor Mundo S.A., and Automotores Gildemeister Peru S.A.

"**Petition Date**" means the date on which the Loan Parties commenced their Chapter 11 Cases.

"**Preferred Stock**" means, with respect to any Person, any and all Capital Stock which is preferred as to the payment of dividends or distributions, upon liquidation or otherwise, over another class of Capital Stock of such Person.

"**Priority Collateral Coverage Failure**" means the failure of the Priority Collateral Value to equal or exceed 125% of the amount of the Commitments; *provided that*, with respect to any incurrence of Inventory Debt (including the issuance of any letter of credit secured by cash, Cash Equivalents, Vehicles, Vehicle Parts, or Vehicle accessories), or the factoring of any accounts receivable, the test for a Priority Collateral Coverage Failure shall be on a pro forma basis immediately before and immediately after giving effect to the grant of any inventory financing liens, the sale of any accounts receivable and the proposed release of any Liens securing the Obligations in connection with such incurrence or factoring.

"**Priority Collateral Value**" means, at any given time and without duplication, the aggregate value of the accounts receivable then owed to the Borrower (excluding any accounts receivable subject to any factoring transaction), plus the aggregate value of all inventory and cash and Cash Equivalents of the Loan Parties and Non-Guarantor Pledgors, in each case, (x) that are pledged to secure the Obligations on a first lien basis and which are not subject to any other liens, (y) calculated in accordance with IFRS and (z) multiplied by the following factors: 100% in respect of cash and Cash Equivalents, 50% in respect of accounts receivable, and 45% in respect of inventory. Notwithstanding anything herein to the contrary, cash, Cash Equivalents, Vehicles, Vehicle parts, or Vehicle accessories that are collateral securing any obligation of the Borrower or any of its Subsidiaries (contingent or otherwise) under any letters of credit used in connection with the purchase of Vehicle inventory shall not be included in the calculation of Priority Collateral Value.

"**Prior Permitted Liens**" means liens over the assets of the Debtors or the Non-Debtor Pledgors senior by operation of law or otherwise permitted by the Note Documents and solely to the extent any such liens were valid, enforceable, non-avoidable and perfected liens in existence on the Petition Date (including valid liens in existence on the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

"**Promissory Note**" means, as applicable, (i) a U.S. Promissory Note, in substantially the form of Exhibit B-1 hereto, or (ii) a Chilean Promissory Note, in substantially the form of Exhibit B-2 hereto, of each of the Loan Parties payable to any Lender evidencing all or any portion of the Term Loans payable by the Loan Party to such Lender.

"**Qualified Equity Interests**" means all Equity Interests of a Person other than Disqualified Equity Interests.

"**Register**" has the meaning specified in <u>Section 8.07(d)</u>.

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Related Party**" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

"**Related Party Transaction**" has the meaning specified in 5.02(f).

"**Required Consenting Noteholders**" has the meaning ascribed to such term in the Restructuring Support Agreement.

"**Requisite Lenders**" means, at any time, Lenders (other than Defaulting Lenders) having Loans and unused Commitments representing more than 50% of the sum of the outstanding Loans and outstanding Term Loan Commitments at such time.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer or treasurer of a Loan Party or a duly authorized signatory holding a valid power of attorney or other similar authorization to act on behalf of such Loan Party and to bind such Loan Party in accordance with the terms of such power of attorney or other similar authorization. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement, dated as of March 31, 2021, by and among the Borrower, the other Loan Parties and certain of its affiliates and Consenting Noteholders thereunder, as amended, restated, modified or supplemented from time to time in accordance with the provisions thereof.

"**S&P**" means Standard & Poor's, a division of The McGraw Hill Companies, Inc.

28

"**Sale and Leaseback Transaction**" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"**Santander Account**" means the Peso denominated account of the Borrower at Banco Santander with account number 6924626-5.

"**Secured Noteholders**" means the holders of the 7.5% Senior Secured Notes due 2025.

"**Secured Parties**" means the Agents and the Lenders.

"**Self-Reporting**" means Automotores Gildemeister Perú S.A. reporting to the National Superintendence of Customs and Tax Administration ("SUNAT") the circumstances relating to the Customs Claims.

"**Stamp Tax**" means the stamp tax payable pursuant Chilean Decree Law No. 3,475 of 1980, as amended, in respect of any debt.

"**Stated Maturity**" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"**Subordinated Debt**" means any Debt of the Borrower or any other Loan Party which is subordinated in right of payment to Obligations under this Agreement and the other Loan Documents, as applicable, pursuant to a written agreement to that effect.

"**Subsidiary**" means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof). Unless otherwise specified, "Subsidiary" means a Subsidiary of the Company.

"**Superpriority Claim**" means any allowed claim against any Loan Party or its respective estate in the Chapter 11 Cases which is an allowed administrative expense claim of the kind specified in section 364(c)(1), Section 507(b) of the Bankruptcy Code, or otherwise, with priority over all other administrative claims.

"**Supplemental Collateral Agent**" has the meaning specified in Section 7.01(c).

"**Taxes**" has the meaning specified in Section 2.12(a).

"**Term Loan Commitment**" means the "Commitment" of each Lender set forth opposite such Lender's name in Schedule 1.01(b) hereto to provide Term Loans hereunder, subject to the terms and conditions set forth herein.

"**Term Loans**" means any loan advanced to the Borrower pursuant to Section 2.01 hereunder.

"**TMF Sub-Agent**" means one or more of TMF's Subsidiaries or Affiliates, including, but not limited to, TMFs BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., TMF Chile Asesorías Empresariales Limitada, TMF COSTA RICA (TMFCR), LTDA., TMF Perú S.R.L. and TMF Trust Company (Uruguay) S.A.

"**Transaction**" means consummation of the transactions contemplated by the Loan Documents.

"**Trigger Date**" shall mean the date upon which a Trigger Date Notice is delivered to the Debtors.

"**Trigger Date Notice**" shall mean a written notice delivered by email (or other electronic means) by the Administrative Agent, at the direction of the Lenders, to the Debtors, their lead restructuring counsel, counsel to the Creditors' Committee (if a Creditors' Committee is appointed) and the United States Trustee, which notice may be delivered following the occurrence of an Event of Default under the DIP Order then in effect or under the Loan Documents.

"**United States Government Obligations**" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, provided that the full faith and credit of the United States of America is pledged in support thereof.

"**Vehicles**" means all now existing or hereafter acquired new and used motorcycles, automobiles, sport utility vehicles, trucks and vans of all types and descriptions, whether held for sale, lease, rental or operational purposes, which relate to the Borrower or any of its Subsidiary's Automobile Retailing Activities.

"**Voting Stock**" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person

"**Working Capital Facilities**" means, one or more credit facilities, the proceeds of which are used only for working capital, with banks or other lenders providing for revolving credit loans or term loans or the issuance of letters of credit or bankers' acceptances or the like.

Section 1.02. Computation of Time Periods; Other Definitional Provisions. In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "including" shall be deemed to be followed by the phrase "without limitation". References in the Loan Documents to any agreement or contract shall mean and be a reference to such agreement or contract as amended, amended and restated,

supplemented or otherwise modified from time to time in accordance with its terms.  The terms "herein", "hereof", and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  All references in any Loan Document to statutes and regulations shall include all related rules and implementing regulations and any amendments of same and any successor statutes, rules and regulations.

Section 1.03.  <u>Accounting Terms</u>.  All accounting terms not specifically defined herein shall be construed in accordance with IFRS reporting standards consistent with those applied in the preparation of the financial statements referred to in <u>Section 5.03</u>.

Section 1.04.  <u>U.S. Dollars</u>.  All Term Loans shall have been made in U.S. Dollars, and all payments made or to be made to the Agents and/or the Lenders shall be in U.S. Dollars and neither any Agent nor any Lender is required to accept any payment other than in U.S. Dollars.

## ARTICLE II

## AMOUNTS AND TERMS OF THE TERM LOANS

Section 2.01.  <u>The Term Loans.</u>  Subject to compliance with the terms, conditions and covenants contained herein and in the other Loan Documents, each Lender severally, but not jointly, agrees to make a Term Loan or Term Loans to the Loan Parties from time to time during the period commencing on and including the Closing Date to but excluding the date occurring five (5) Business Days prior to the Maturity Date (such period, the "**Availability Period**"); *provided, that* the aggregate principal amount of the Term Loans (i) made by any Lender shall not in any event exceed the Term Loan Commitment of such Lender and (ii) shall not, in any event during the Availability Period exceed, in the aggregate, the Commitment Amount (plus any capitalized paid in kind interest pursuant to <u>Section 2.07(a)</u>).  Any Term Loan repaid or prepaid may not be reborrowed.

Section 2.02.  <u>Amount of Each Borrowing</u>.  Term Loans may be requested in two (2) Borrowings.  On the Closing Date, subject to the entry of the Interim DIP Order and the satisfaction or waiver by the Requisite Lenders of the conditions set forth herein, there shall be an initial Borrowing of the Term Loans in the aggregate principal amount of $16,950,000 (the "**Initial Draw**"), provided, that the Borrower shall have provided a Notice of Borrowing to the Administrative Agent at least one (1) Business Day prior to the Closing Date. Subject to the entry of the Final DIP Order, and the satisfaction or waiver by the Requisite Lenders of the conditions set forth herein for any drawing hereunder, the Loan Parties may request and receive an advance of one Term Loan that will not, when combined with the Initial Draw, exceed the aggregate amount of the Commitments.

Section 2.03.  <u>Notice of Borrowing</u>.  The Borrower shall give the Administrative Agent by 1:00 p.m. (ET) at least two (2) Business Day's prior written notice of each Borrowing of Term Loans (or such later time as shall be reasonably acceptable to the Administrative Agent) (each such notice, a "**Notice of Borrowing**").  Each Notice of Borrowing shall specify (i) the aggregate principal amount of the Term Loans to be made pursuant to such Borrowing, (ii) the date of Borrowing (which shall be a Business Day) and (iii) the name of the Loan Party making such Borrowing, and shall be in form and substance satisfactory to the Lenders.  The Administrative

31

Agent shall promptly give each Lender written notice of each proposed borrowing of Term Loans, of such Lender's proportionate share thereof and of other matters covered by the related Notice of Borrowing.

Section 2.04.   Funding of Borrowings.  Subject to the terms and conditions hereof, no later than 12:00 p.m. (New York City time) on the date specified in each Notice of Borrowing, each Lender shall make available its applicable percentage of the aggregate amount of Term Loans requested to be made on such date in U.S. dollars by wire transfer and in immediately available funds to the Administrative Agent's Account, the Administrative Agent shall remit the aggregate of the amounts so made available by such Lenders as specified by the Borrower in writing.

Section 2.05.   Repayment of Term Loans.  The Borrower shall repay the Term Loans to the Administrative Agent on the Maturity Date in an amount equal to the aggregate principal amount of the Term Loans outstanding on such date, together with all interest and other amounts owing hereunder in full in cash.

Section 2.06.   Prepayments.

(a)        Optional Prepayment.  The Loan Parties may, upon delivery to the Administrative Agent by no later than 1:00 p.m. (ET) at least one (1) Business Day's prior written notice stating the proposed date and aggregate principal amount of the prepayment, and, if such notice is given the Loan Parties shall, prepay the outstanding aggregate principal amount of the Term Loans in whole or ratably in part, together with accrued interest on the prepaid amount to the date of such prepayment, without premium.  No amounts so repaid or prepaid may be reborrowed pursuant to this Agreement.

(b)        Mandatory Prepayment.

(i)        The Loan Parties shall, no later than five (5) Business Days following the date of receipt of any Net Cash Proceeds by any Loan Party at any time after the Closing Date, prepay the Term Loans in an amount equal to 100% of such Net Cash Proceeds, provided that if, prior to the date on which any such prepayment is required to be made hereunder, the Loan Parties shall have delivered an Officer's Certificate to the Administrative Agent stating that such Net Cash Proceeds are reasonably expected to be reinvested (or committed to be reinvested) to replace additional Collateral or, solely in the event of insurance proceeds received under clause (c) of the definition of "Net Cash Proceeds", to repair the assets which are the subject of the property or casualty insurance claim or condemnation proceeding giving rise to such Net Cash Proceeds, in each case within ninety (90) days (or as otherwise agreed by the Requisite Lenders) after such Net Cash Proceeds are received and the Requisite Lenders have delivered written approval (which may be via electronic mail) in their sole discretion of the reinvestment of such Net Cash Proceeds in the manner described in the Officer's Certificate; provided that any Net Cash Proceeds from an Asset Sale of Indenture Collateral shall be applied to repay the Obligations and the Note Obligations in accordance with the terms of the Intercreditor Agreement, and, provided further that, each mandatory prepayment under this Section 2.06(b), to the extent applied,

32

shall result in an immediate corresponding dollar-for-dollar permanent reduction of the aggregate amount of Obligations outstanding and each such prepayment shall be applied ratably to each of the Term Loans.

(ii)     The Loan Parties shall deliver to the Administrative Agent written notice of any prepayment made under this subsection (b) by no later than 1:00 p.m. (ET) at least one (1) Business Day's prior to the date of such payment.   All prepayments under this subsection (b) shall be made together with (A) accrued interest to the date of such prepayment on the principal amount of the Term Loans then being prepaid and (B) any amounts owing pursuant to Section 8.04.

Section 2.07.   Interest.

(a)     Scheduled Interest.   The Loan Parties shall pay interest on the aggregate outstanding principal amount of the Term Loans owing to each Lender at a rate per annum equal to 11.75%.   Interest shall be paid in kind and automatically capitalized and added to the outstanding principal of each of the respective Term Loans on (x) the last Business Day of each month, (y) on the Maturity Date, and (z) on each other date on which any amount shall become due hereunder pursuant to the terms hereof.

On or prior to each capitalization of interest, the Borrower shall deliver to each Lender a duly executed *allonge (hoja de prolongación)* to each Chilean Promissory Note, with signatures duly authorized before a Chilean notary public and evidence that the Borrower has paid the Stamp Tax associated with such increase in the principal amount of the respective Term Loans.

(b)     Default Interest.   Upon the occurrence and during the continuance of an Event of Default, the Loan Parties shall pay interest ("**Default Interest**") on the unpaid principal amount of the Term Loans, and any and all other amounts owing hereunder or under the other Loan Documents, to each Lender, on demand, at a rate per annum equal to 2.00% plus the rate then applicable to the Term Loans, in each case, accruing and payable all in cash from the date such Event of Default occurs until the date on which such Event of Default is no longer continuing.

Section 2.08.   Fees.

(a)     Agents' Fees.   The Loan Parties shall pay to each Agent for its own account such fees as may from time to time be agreed between the Loan Parties and such Agent.

(b)     Lenders' Fees.   Notwithstanding anything else herein to the contrary, the Borrower hereby agrees to pay a fee on each Term Loan in an amount equal to 5.0% of the initial principal amount thereof, as original issue discount payable to the Lender making such Term Loan simultaneously with the making of such Term Loan hereunder.   All such fees shall be fully earned on the respective dates on which the Term Loans are made hereunder, and shall be nonrefundable under any circumstances.

Section 2.09.   [Reserved].

Section 2.10.   Yield Protection.

(a)      Increased Costs Generally.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)      subject any Agent or Lender to any Taxes (other than (A) Additional Amounts, (B) Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or Agent of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or Agent (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender or Agent, as the case may be, such additional amount or amounts as will compensate such Lender or Agent, as the case may be, for such additional costs incurred or reduction suffered.

(b)      Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Term Loan Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Loan Parties will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      Certificates for Reimbursement.  A certificate of a Lender or Agent setting forth the amount or amounts necessary to compensate such Lender or Agent or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Loan Parties, shall be conclusive absent manifest error.  The Loan Parties shall pay such Lender or Agent the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)      Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Loan Parties shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than

34

nine months prior to the date that such Lender notifies the Loan Parties of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.11.    <u>Payments and Computations</u>.

(a)    The Loan Parties shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in <u>Section 2.15</u>), not later than 11:00 A.M. (New York City time) on the day when due in U.S. dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time, in the sole discretion of the Administrative Agent, shall be deemed to have been received on the next succeeding Business Day. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Loan Parties is in respect of principal, interest, fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender, to such Lenders for the account of their respective Applicable Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lenders and (ii) if such payment by the Loan Parties is in respect of any Obligation then payable hereunder to one Lender, to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to <u>Section 8.07(d)</u>, from and after the effective date of such Assignment and Acceptance, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the Lender assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)    The Loan Parties hereby authorize each Lender and each of its Affiliates, if and to the extent payment owed to such Lender is not made when due hereunder or under the other Loan Documents, to charge from time to time, to the fullest extent permitted by law, against any or all of each of the Loan Parties' Accounts with such Lender or such Affiliate any amount so due.

(c)    All computations of interest shall be made by the Administrative Agent on the basis of a year of 365 or 366 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable.  Each determination by the Administrative Agent of an interest rate, fee or commission hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment or other fee, as the case may be.

(e)    Unless the Administrative Agent shall have received notice from the Loan Parties prior to the date on which any payment is due to any Lender hereunder that any of the Loan

35

Parties will not make such payment in full, the Administrative Agent may assume that the Loan Parties have made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent any of the Loan Parties shall not have so made such payment in full to the Administrative Agent, each such Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent, at the Federal Funds Rate.

(f)    Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Agents and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Agents and the Lenders in the following order of priority:

(i)    first, to the payment of all of the fees, indemnification payments, costs and expenses that are due and payable to the Agents (solely in their respective capacities as Agents) under or in respect of this Agreement and the other Loan Documents on such date, ratably based upon the respective aggregate amounts of all such fees, indemnification payments, costs and expenses owing to the Agents on such date;

(ii)    second, to the payment of all of the indemnification payments, costs and expenses that are due and payable to the Lenders under Section 8.04 hereof, the Security Agreement and any similar section of any of the other Loan Documents on such date, ratably based upon the respective aggregate amounts of all such indemnification payments, costs and expenses owing to the Lenders on such date;

(iii)    third, to the payment of all of the amounts that are due and payable to the Administrative Agent and the Lenders under Sections 2.11 and 2.13 hereof on such date, ratably based upon the respective aggregate amounts thereof owing to the Administrative Agent and Lenders on such date;

(iv)    fourth, to the payment of all of the accrued and unpaid interest on the Loans that is due and payable to the Lenders under Section 2.07(a) on such date, ratably based upon the respective aggregate amounts of all such interest owing to the Lenders on such date;

(v)    fifth, to the payment of the principal amount of all of the outstanding Term Loans that is due and payable to the Lenders on such date, ratably based upon the respective aggregate amounts of all such principal owing to the Administrative Agent and the Lenders on such date; and

(vi)    sixth, to the payment of all other Obligations of the Loan Parties owing under or in respect of the Loan Documents that are due and payable to the Agents and the other Secured Parties on such date, ratably based upon the

respective aggregate amounts of all such Obligations owing to the Agents and the other Secured Parties on such date.

If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the Obligations to which, or the manner in which, such funds are to be applied, the Administrative Agent shall distribute such funds ratably among the Lenders in accordance with the outstanding principal amounts of the Term Loans they hold at such time, in repayment or prepayment of such of the outstanding Term Loans or other Obligations then owing to such Lender, as the Administrative Agent may, in its discretion, so determine.

Section 2.12.  Taxes.

(a)    Additional Amounts. All payments of or in respect of principal, interest and premium, if any, with respect to any Obligation or pursuant to any Loan Document will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by any Governmental Authority ("**Taxes**"), unless such withholding or deduction is required by law or by the interpretation or administration thereof. In the event of any withholding or deduction of Taxes imposed, levied collected, withheld or assessed by or within (i) Chile, (ii) any political subdivision of Chile or any authority therein or thereof having power to tax, or (iii) any other jurisdiction by, from or through which such payments are made in respect of any Obligation or Loan Document, (x) the Loan Parties will pay to any Lender or Agent (as applicable) such additional amounts ("**Additional Amounts**") as will result in the receipt by each Lender or Agent (as applicable) of the net amount of principal, interest and/or premium that would otherwise have been receivable by such Lender or Agent in the absence of such withholding or deduction, (y) the Borrower will make such deductions, and (z) the Borrower will timely pay the full amount deducted to the applicable Governmental Authority; except that no such Additional Amounts will be payable:

(i)    in respect of any Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof),

(ii)    in respect of any Taxes that would not have been so withheld or deducted but for the existence of any present or former connection (including, without limitation, a permanent establishment in Chile) between the Lender, Agent, applicable recipient of payment or beneficial owner of the Obligation or Loan Document (or, if the Lender, Agent, applicable recipient of a payment or beneficial owner is an estate, nominee, trust, partnership, corporation or other business entity, between a fiduciary, settlor, beneficiary, member or shareholder of, or possessor of power over, the Lender, Agent, applicable recipient of a payment or beneficial owner) and the jurisdiction imposing such Tax, other than the mere receipt of such payment pursuant to such Obligation or Loan Document or the mere holding or

37

ownership of the Obligation or Loan Document or beneficial interest or the enforcement of rights thereunder (such Taxes, "**Other Connection Taxes**");

(iii)     in respect of any Taxes that would not have been so withheld or deducted if the Obligation or Loan Document had been presented for payment within 30 days after the date on which the payment first became due to the extent presentation is required (except to the extent that the Lender or Agent would have been entitled to Additional Amounts had the Obligation or Loan Document been presented for payment on the last day of such 30-day period);

(iv)     in respect of any Taxes that would not have been so withheld or deducted but for the failure by the Lender, Agent, applicable recipient of any payment or beneficial owner of any Obligation or Loan Document to (x) make a customary declaration of non-residence, or any other claim or filing for exemption, in each case to which it is entitled under applicable law or (y) comply with any customary certification, identification, information, documentation or other reporting requirement under applicable law concerning its nationality, residence, identity or connection with Chile or with any jurisdiction through which payments are made; provided, that such declaration or compliance was required as a precondition to exemption from all or part of such Taxes and the Borrower has given the Lenders and Agents at least 30 days prior notice that they will be required to comply with such requirements;

(v)     in respect of any estate, inheritance, gift, value added, sales, use, excise, transfer, personal property or similar taxes, duties, assessments or other governmental charges;

(vi)     in respect of any Taxes that are payable other than by deduction or withholding from payments on any Obligation or Loan Document (excluding, for the avoidance of doubt, any such Taxes that would have been paid by deduction or withholding had the payor deducted or withheld and remitted such Taxes to the applicable taxing authority in accordance with applicable law);

(vii)     where such Taxes are imposed pursuant to FATCA; or

(viii)     in respect of any combination of clauses (i) through (vii) above (and this clause (viii), together with clauses (i)-(vii), "**Excluded Taxes**").

(b)     All references to principal, premium, if any, and interest in respect of the Obligations or pursuant to any Loan Document will be deemed also to refer to any Additional Amounts which may be payable as set forth in this Agreement or any Loan Document.

(c)     Notwithstanding the foregoing, the limitations on the Loan Parties' obligations to pay Additional Amounts set forth in clause (iv) of Section 2.12(a) above will not apply if the provision of any certification, identification, information, documentation or other reporting requirement described in such clause (iv) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a Lender, Agent, beneficial owner of or recipient of a payment pursuant to any Obligation or Loan Document than comparable information

38

or other reporting requirements imposed under United States tax law, regulations and administrative practice (such as IRS Forms W-8BEN-E (or other applicable Form W-8) and W-9).

(d)     The Borrower will furnish to the Administrative Agent, within 60 days after the date the payment of any Taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment by the Loan Parties, or, if such receipts are not obtainable, other evidence of such payments by the Loan Parties reasonably satisfactory to the Administrative Agent. Copies of such receipts will be made available to the Lenders and other Agents upon written request.

(e)     The Loan Parties will promptly pay when due any present or future stamp, court or similar documentary taxes that arise in Chile or any jurisdiction from which or through which payments are made upon the execution, delivery or registration of any Loan Document, including but not limited to the Stamp Tax ("**Other Taxes**").

(f)     Each Lender shall promptly deliver to the Borrower and the Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent) (i) executed copies of IRS Form W-9 or W-8 or any other applicable IRS tax form and (ii) an administrative questionnaire, in either the form provided to such lender by the Administrative Agent or a form agreed and acceptable to the Administrative Agent.

Section 2.13.   Sharing of Payments, Etc.   If any Lender shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to Section 8.07) (a) on account of Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) on account of Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, such Lender shall forthwith purchase from the other Lenders such interests or participating interests in the Obligations due and payable or owing to them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; *provided, however*, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each other Lender shall be rescinded and such other Lender shall repay to the purchasing Lender the purchase price to the extent of such Lender's ratable share (according to the proportion of (i) the purchase price paid to such Lender to (ii) the aggregate purchase price paid to all Lenders) of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such other Lender's

required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Loan Parties hereby agree that any Lender so purchasing an interest or participating interest from another Lender pursuant to this <u>Section 2.13</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender were the direct creditor of the Borrower in the amount of such interest or participating interest, as the case may be.

Section 2.14.   <u>[Reserved]</u>.

Section 2.15.   <u>Defaulting Lenders</u>.

(a)     In the event that, at any one time, (i) any Lender shall be a Defaulting Lender, (ii) such Defaulting Lender shall owe a Defaulted Amount to any Agent or any of the other Lenders and (iii) any of the Loan Parties shall make any payment hereunder or under any other Loan Document to the Administrative Agent for the account of such Defaulting Lender, then the Administrative Agent may, on its behalf or on behalf of such other Agents or such other Lenders and to the fullest extent permitted by applicable law, apply at such time the amount so paid by any Loan Party to or for the account of such Defaulting Lender to the payment of each such Defaulted Amount to the extent required to pay such Defaulted Amount.  In the event that the Administrative Agent shall so apply any such amount to the payment of any such Defaulted Amount on any date, the amount so applied by the Administrative Agent shall constitute for all purposes of this Agreement and the other Loan Documents payment, to such extent, of such Defaulted Amount on such date.  Any such amount so applied by the Administrative Agent shall be retained by the Administrative Agent or distributed by the Administrative Agent to such other Agents or such other Lenders, ratably in accordance with the respective portions of such Defaulted Amounts payable at such time to the Administrative Agent, such other Agents and such other Lenders and, if the amount of such payment made by any Loan Party shall at such time be insufficient to pay all Defaulted Amounts owing at such time to the Administrative Agent, such other Agents and such other Lenders, in the following order of priority:

(i)     first, to the Agents for any Defaulted Amounts then owing to them, in their capacities as such, ratably in accordance with such respective Defaulted Amounts then owing to the Agents; and

(ii)     second, to any other Lenders for any Defaulted Amounts then owing to such other Lenders, ratably in accordance with such respective Defaulted Amounts then owing to such other Lenders.

Any portion of such amount paid by any of the Loan Parties for the account of such Defaulting Lender remaining, after giving effect to the amount applied by the Administrative Agent pursuant to this subsection (b), shall be applied by the Administrative Agent as specified in subsection (b) of this <u>Section 2.15</u>.

(b)     In the event that, at any one time, (i) any Lender shall be a Defaulting Lender, (ii) such Defaulting Lender shall not owe a Defaulted Amount and (iii) the any Loan Party,

any Agent or any other Lender shall be required to pay or distribute any amount, then the Loan Party or such Agent or such other Lender shall pay such amount to the Administrative Agent to be held by the Administrative Agent, to the fullest extent permitted by applicable law, in escrow or the Administrative Agent shall, to the fullest extent permitted by applicable law, hold in escrow such amount otherwise held by it.  Any funds held by the Administrative Agent in escrow under this subsection (b) shall be deposited by the Administrative Agent in an account with a bank (the "**Escrow Bank**") selected by the Administrative Agent, in the name and under the control of the Administrative Agent, but subject to the provisions of this subsection (b).  The terms applicable to such account, including the rate of interest payable with respect to the credit balance of such account from time to time, shall be the Escrow Bank's standard terms applicable to escrow accounts maintained with it.  Any interest credited to such account from time to time shall be held by the Administrative Agent in escrow under, and applied by the Administrative Agent from time to time in accordance with the provisions of, this subsection (b).  The Administrative Agent shall, to the fullest extent permitted by applicable law, apply all funds so held in escrow from time to time to the extent necessary to pay any amount payable by such Defaulting Lender hereunder and under the other Loan Documents to the Administrative Agent or any other Lender, as and when such amounts are required to be made or paid and, if the amount so held in escrow shall at any time be insufficient to pay all such amounts required to be paid at such time, in the following order of priority:

(i)        first, to the Agents for any amounts then due and payable by such Defaulting Lender to them hereunder, in their capacities as such, ratably in accordance with such respective amounts then due and payable to the Agents; and

(ii)        second, to any other Lenders for any amount then due and payable by such Defaulting Lender to such other Lenders hereunder, ratably in accordance with such respective amounts then due and payable to such other Lenders.

In the event that any Lender that is a Defaulting Lender shall, at any time, cease to be a Defaulting Lender, any funds held by the Administrative Agent in escrow at such time with respect to such Lender shall be distributed by the Administrative Agent to such Lender and applied by such Lender to the Obligations owing to such Lender at such time under this Agreement and the other Loan Documents ratably in accordance with the respective amounts of such Obligations outstanding at such time.

(c)        The rights and remedies against a Defaulting Lender under this Section 2.15 are in addition to other rights and remedies that the Agents and other Lenders may have against such Defaulting Lender with respect to any Defaulted Amount.  Nothing in this Section 2.15 is intended to limit or affect any rights and/or remedies the Loan Parties may have with respect to any Defaulting Lender hereunder, under applicable law or otherwise.

Section 2.16.  Evidence of Debt.

(a)        Each Lender shall maintain in accordance with its usual practice records evidencing the indebtedness of the Loan Parties to such Lender resulting from the Term Loans owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

41

(b)    The Register maintained by the Administrative Agent pursuant to <u>Section 8.07(d)</u> shall include (i) the amount of the Term Loans held by each Lender, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Loan Parties to each Lender hereunder, and (iv) the amount of any sum received by the Administrative Agent from the Loan Parties hereunder and each Lender's share thereof.

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and entries made in good faith by each Lender in its account or accounts pursuant to subsection (a) above, shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Loan Parties to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement, absent manifest error; *provided, however*, that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the Obligations of the Loan Parties under this Agreement.

(d)    <u>Promissory Notes</u>. On the date of Borrowing, or in the case of any change after the Closing Date in the identity of any Lender, or as the result of any Assignment and Acceptance, in the principal amount of the Term Loans held by any Lender, promptly upon the request of any Lender, the Loan Parties shall execute and deliver to such Lender, with a copy to the Administrative Agent, either:

(i)    one or more duly executed promissory notes in substantially the form of Exhibit B-1 hereto (each, a "**U.S. Promissory Note**"), payable to such Lender in the aggregate principal amount equal to the Term Loans held by such Lender; or

(ii)    one or more duly executed promissory notes under Chilean Law and constituting a *título ejecutivo* in the form attached as Exhibit B-2 hereto (each a "**Chilean Promissory Note**"), with signatures authorized before a Chilean notary public and evidence that the Borrower has paid or arranged for the payment of Stamp Tax associated with such Chilean Promissory Note. For the avoidance of doubt, the amounts payable in respect of the Term Loans by the Borrower under this Agreement and the Chilean Promissory Notes shall be, in any case, without duplication. Any reduction (by repayment, prepayment or otherwise) in the principal amount of the Term Loans outstanding shall discharge *pro tanto* the equivalent face amount of the Chilean Promissory Notes evidencing such Term Loans. Upon any prepayment of Term Loans (1) if such prepayment (or any portion thereof) is in an amount equal to the amount evidenced by one or more Chilean Promissory Notes, each Lender (or its designee) will return such Chilean Promissory Notes to the Borrower in order for such Chilean Promissory Notes to be cancelled; <u>provided</u>, that failure to return any Chilean Promissory Note shall not affect the Borrower's obligations in respect of any other Term Loans or any other amounts payable by the Borrower under the Loan Documents, and (2) if such prepayment (or any portion thereof) is in an amount that is less than the amount evidenced by a single Chilean Promissory Note, the Borrower shall deliver an

*allonge* (*hoja de prolongación*) in respect of such Chilean Promissory Note evidencing the then outstanding amount under the Term Loans under such Credit Facility, with signatures therein authorized before a Chilean notary public.

Upon receipt by the Borrower of an affidavit of any Lender certifying to the best of its knowledge as to the loss, theft, destruction or mutilation of any Chilean Promissory Note, then the Parties agree that such Chilean Promissory Note will be replaced pursuant to the provisions of articles 88 to 97 of Chilean Law 18.092 on Bills of Exchange and Promissory Notes (*Letra de Cambio y Pagaré*), as amended from time to time. Any expenses relating to the process of replacement of a Chilean Promissory Note under such law shall be borne by the relevant Lender.

(e)     [Reserved]

(f)     None of the execution, delivery, participation, or assignment of any Promissory Note, or the commencement of any judicial enforcement proceeding or exercise of any other right or remedy in connection with any Promissory Note, or the total or partial collection of any Promissory Note, shall be deemed to be a novation or waiver of any right of any Lender under, or an amendment of any term or condition of, this Agreement or any other Loan Document, including with respect to the governing law thereof. The rights and claims of any Lender under the Promissory Notes shall not replace or supersede the rights and claims of such Lender under this Agreement or any other Loan Document and each of the Lenders agrees that, notwithstanding any provision of any Promissory Note, it shall not demand payment of any amount under any Promissory Note unless such amount is then due and payable (whether at stated maturity, by acceleration or otherwise) by the Borrower in accordance with the terms of this Agreement and the other Loan Documents.  All references to Promissory Notes in the Loan Documents shall mean Promissory Notes, if any, to the extent issued hereunder.

## ARTICLE III

## CONDITIONS OF LENDING

Section 3.01.  <u>Conditions Precedent to Effectiveness of this Agreement and the Initial Draw</u>.  This Agreement shall become effective on and as of the first date (the "**Closing Date**") on which the following conditions have been satisfied or waived in writing by the Lenders, and the obligation of each Lender to make any Term Loans on the Closing Date under the terms and conditions hereof is subject to the satisfaction or waiver by such Lender in writing of such conditions precedent before or concurrently with (and continuing on) the Closing Date, each in form and substance satisfactory to each of the Agents and Lenders in its sole discretion:

(a)     <u>Loan Documents</u>. The Administrative Agent and the Lenders shall have received from the Loan Parties, on or before the Closing Date, counterparts of this Agreement and any other Loan Document (including without limitation the Collateral Documents and the Intercreditor Agreement), and any Agent fee letter, in each case duly executed by each party thereto, provided that, in the case of the Collateral Document to be executed in Peru, the Administrative Agent and the Lenders shall be provided with a PDF copy of the executed version of the private deed (*minuta*) of said Collateral Document.

43

(b)     _Restructuring Support Agreement_. The Restructuring Support Agreement remains in effect and there exists no event or condition that would permit the Consenting Noteholders party thereto the right to terminate the Restructuring Support Agreement.

(c)     _Budget_. The Administrative Agent and the Lenders shall have received the Initial Approved Budget, the initial update thereto and the initial Budget Variance Report referred to in Section 5.01(b), and there shall have been no unfavorable variance from the Approved Budget (from the perspective of (x) the Chilean Loan Parties' businesses in aggregate, or (y) the Chilean Loan Parties' and Automotores Gildemeister Peru S.A.'s businesses in aggregate) in excess of Permitted Variances.

(d)     _Valid Security Interest_. (i) The Collateral Documents shall have been duly executed and delivered to the Collateral Agent, and, except as otherwise provided in such Collateral Documents and the Collateral Annex, subject to the execution, delivery, registration, completion or satisfaction of each of the post-closing items and steps set forth in Schedule 5.01(y), the Collateral Agent, for the benefit of the Secured Parties, shall have (x) a valid and perfected _pari passu_ Lien on and security interest in the Indenture Collateral pledged by the Non-Guarantor Pledgors under the Collateral Documents subject to Prior Permitted Liens (other than Prior Permitted Liens securing the Notes Obligations), (y) a valid and perfected first priority priming Lien on and security interest in the Indenture Collateral pledged by the Debtors under the Collateral Documents (to the extent provided under the Collateral Documents and the Intercreditor Agreement), subject only to the Carve-Out and to Prior Permitted Liens (other than Prior Permitted Liens securing the Notes Obligations), and (z) a valid and perfected first priority Lien on and security interest in the unencumbered assets pledged by the Debtors and the Non-Guarantor Pledgors under the Collateral Documents, subject only to the Carve-Out.

(e)     _Closing Certificate_.  The Administrative Agent and the Lenders shall have received (i) a certificate of each Loan Party, dated as of the Closing Date and duly executed by a Responsible Officer thereof, which shall (A) certify that attached thereto is a true and complete copy of the resolutions or written consents of its shareholders, board of directors, board of managers, members or other governing body authorizing the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, and that such resolutions or written consents have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect, (B) identify by name and title and bear the signatures of the officers, managers, directors or authorized signatories of such Loan Party authorized to sign the Loan Documents to which it is a party on the Closing Date and (C) certify (x) that attached thereto is a true and complete copy of the certificate or articles of incorporation or organization (or memorandum of association or other equivalent thereof) of such Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws or operating, management, partnership or similar agreement and (y) that such documents or agreements have not been amended (except as otherwise attached to such certificate and certified therein as being the only amendments thereto as of such date) and (ii) a good standing (or equivalent) certificate as of a recent date for such Loan Party from its jurisdiction of organization, to the extent available.

44

(f)    <u>Officer's Certificate</u>.  The Administrative Agent and the Lenders shall have received a certificate signed by a Responsible Officer of the Borrower certifying as of the Closing Date to the matters set forth in <u>Sections 3.01(g)</u>, <u>(i)</u>, and <u>(m)</u>.

(g)    <u>No Event of Default</u>. No default or Event of Default shall have occurred and be continuing.

(h)    <u>Fees</u>. All fees required to be paid on the Closing Date for which the Borrower has received a written invoice at least one (1) Business Day prior to the Closing Date, including accrued Agent and Lenders' Fees required to be paid pursuant to the Restructuring Support Agreement or this Agreement, any Agent fee letter, or any of the Loan Documents shall have been paid on the Closing Date concurrently with the initial borrowings under the Credit Facility.

(i)    <u>Representations and Warranties</u>. All representations and warranties made by any Loan Party in any Loan Document or otherwise in writing shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that any such representation and warranty that expressly relates to a given date or period shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of the respective date or for the respective period, as the case may be.

(j)    <u>Financial Statements</u>. The Administrative Agent and Lenders shall have received the draft unaudited and consolidated financial statements of the Borrower and its Subsidiaries for the Fiscal Quarter ending on or about September 30, 2020 and December 31, 2020, together with such other financial reports and information concerning such Loan Parties as the Lenders shall reasonably request.

(k)    <u>Legal Opinions</u>. (i) A favorable opinion of Cleary Gottlieb Steen & Hamilton LLP, counsel for the Loan Parties and as to such matters as any Lender or the Administrative Agent may reasonably request, including, without limitation, the enforceability of Loan Documents, compliance with laws and regulations, and such other matters as shall be reasonably requested thereby, and (ii) a favorable opinion of counsel for the Loan Parties in each of the jurisdictions in which any Loan Party or Non-Guarantor Pledgor is organized or formed and any jurisdiction where Collateral is located, as to the authority, power and capacity of the applicable Loan Party to enter into the Loan Documents to perform its obligations thereunder, the validity of the security interests purported to be granted and perfection thereof under applicable law, the enforceability of the Collateral Documents evidencing the liens granted to the Collateral Agent to secure the Obligations and such other matters as the Requisite Lenders request.

(l)    <u>USA PATRIOT Act</u>. No later than three (3) days in advance of the Closing Date, the Administrative Agent shall have received all documentation and other information that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act, to the extent requested at least five (5) days prior to the Closing Date.

(m)     No Material Adverse Effect. Since December 31, 2019, there shall not have occurred or exist any changes, circumstances or events that, individually or in the aggregate, have had or would reasonably be expected to result in a Material Adverse Effect, other than any change, circumstance or event disclosed to the Lenders not less than thirty (30) Business Days prior to the Closing Date.

(n)     No Restrictions. There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of the Administrative Agent or the Requisite Lenders, prohibits, restricts or imposes a materially adverse condition on the Loan Parties, the Credit Facility or the exercise by the Administrative Agent, the Collateral Agent or the Lenders of their rights as a secured party with respect to the Collateral.

(o)     No Litigation. There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) would reasonably be expected to result in a Material Adverse Effect or, if adversely determined, would reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Credit Facility, the Collateral or the transactions contemplated thereby.

(p)     Third-Party Consents. All governmental and third party consents and approvals necessary in connection with the Credit Facility shall have been obtained (without the imposition of any conditions that are not acceptable to the Administrative Agent, the Collateral Agent and the Requisite Lenders) and shall remain in effect; and no law or regulation shall be applicable, in the reasonable judgment of the Administrative Agent, the Collateral Agent and the Requisite Lenders, that restrains, prevents or imposes a Material Adverse Effect upon the Credit Facility, the Collateral or the Transactions contemplated thereby.

(q)     Governmental Approval. The Administrative Agent and Lenders shall be satisfied that all approvals, acknowledgments and consents with respect to the Loan Parties from all applicable Governmental Authorities shall have been received in connection with the execution, delivery and performance of this Agreement and the other Loan Documents.

(r)     Notice of Borrowing. The Administrative Agent shall have received a Notice of Borrowing in accordance with Section 2.03.

(s)     Hyundai.  The Requisite Lenders shall have received an executed copy of the Hyundai Letters, the Hyundai Distributorship Agreement and the Hyundai Undertaking Agreement on terms that are acceptable to the Requisite Lenders, and the Hyundai Letters, the Hyundai Distributorship Agreement and the Hyundai Undertaking Agreement shall, in each case, have not been terminated, modified, or repudiated and remain in full force and effect.

(t)     Promissory Notes and Stamp Taxes. The Lenders shall have received (with a copy to the Administrative Agent) the applicable Promissory Notes (either a U.S. Promissory Note or a Chilean Promissory Note) for the account of each Lender requesting a Promissory Note, together with evidence satisfactory to the Requisite Lenders that the Borrower has paid or arranged for the payment of Stamp Tax associated with such Promissory Note, in accordance with Section 2.16.

(u)    Self-Reporting. Prior to the Closing Date, Automotores Gildemeister Peru S.A. shall have completed the Self-Reporting.

(v)    Adequate Working Capital Financing. The Requisite Lenders shall have determined in their sole and absolute discretion that the Loan Parties and their Subsidiaries will have adequate working capital financing to fund their operations in any jurisdiction at all times.

(w)    Customs Claims Settlement. Any settlement or other agreement previously entered into between any of the Loan Parties and/or any Non-Guarantor Pledgors and any Peruvian Authorities or any other third party relating to the Customs Claims shall have not been terminated, modified, or repudiated and shall remain in full force and effect.

(x)    Interim DIP Order. The Interim DIP Order shall have been entered by the Bankruptcy Court, which order is in full force and effect and is not stayed or subject to a stay pending appeal.

Section 3.02.    Conditions Precedent to the Term Loans on Each Draw Date after the Closing Date. In addition to the satisfaction of the conditions set forth in Section 3.01, the obligation of each Lender to make the Term Loans during the Availability Period is subject to its satisfaction or waiver in writing by such Lender of each of the following conditions precedent before or concurrently with (and continuing on) each Draw Date:

(a)    Notice of Borrowing. The Administrative Agent shall have received a Notice of Borrowing in accordance with Section 2.03 along with an Officer's Certificate from the Loan Parties certifying that the proceeds of the draw will be used to:

(1) on or about the Borrowing date, following delivery of the [•] vehicle units ordered from Hyundai on [•], 2021, pay the required $[•] million payment relating to such delivery;

(2) on or about the Borrowing date, pay the $[•] million in L/C reimbursement obligations relating to the $[•] L/C advance made on [•], 2021; and/or

(3) provide $[•] million of general working capital to the Loan Parties, together with a reasonably detailed description of the proposed specific use(s) of such proceeds, together with the proposed timing thereof.

(b)    No Event of Default. Immediately prior to the funding of any Term Loan and immediately following the funding of any Term Loan, no Default or Event of Default shall exist or be continuing.

(c)    Valid Security Interest. (i) Subject to, and except as otherwise provided in, Schedule 5.01(y), the Collateral Documents and the Collateral Annex, the Liens on and security interests in the Indenture Collateral pledged by the Non-Guarantor Pledgors securing the Obligations shall remain (x) a valid and perfected *pari passu* Lien on and security interest in the Indenture Collateral pledged by the Non-Guarantor Pledgors under the Collateral Documents subject to Prior Permitted Liens (other than Prior Permitted Liens securing the Notes Obligations), (y) a valid and perfected first priority priming Lien on and security interest in the Indenture Collateral pledged by the Debtors under the Collateral Documents (to the extent provided under

the Collateral Documents and the Intercreditor Agreement), subject only to the Carve-Out and to Prior Permitted Liens (other than Prior Permitted Liens securing the Notes Obligations), and (z) a valid and perfected first priority Lien on and security interest in the unencumbered assets pledged by the Debtors and the Non-Guarantor Pledgors under the Collateral Documents, subject only to the Carve-Out, and (ii) the Collateral Documents set forth on Schedule 3.01(d) shall have been duly executed and delivered to the Collateral Agent.

(d)     Representations and Warranties. All representations and warranties made by any Loan Party in any Loan Document or otherwise in writing shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on each Draw Date, except that any such representation and warranty that expressly relates to a given date or period shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of the respective date or for the respective period, as the case may be, in each case immediately prior to, and after giving effect to, the funding of any Term Loans.

(e)     No Material Adverse Effect. Since March 31, 2021, there shall not have occurred or exist any change, circumstance or event that, individually or in the aggregate, have had or would reasonably be expected to result in a Material Adverse Effect.

(f)     Fees. All fees, including accrued Agent and Lenders' Fees required to be paid pursuant to the Restructuring Support Agreement or this Agreement or any of the Loan Documents for which the Borrower has received a written invoice at least one (1) Business Day prior to the relevant Draw Date shall have been paid or will be paid concurrently with the making of such Term Loan.

(g)     Compliance with Budget. The Lenders shall have received an Approved Budget and the making of such Term Loan on such date complies with the Approved Budget in effect at such time, subject to Permitted Variances.

(h)     No Restrictions. There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of the Administrative Agent or the Requisite Lenders, prohibits, restricts or imposes a materially adverse condition on the Loan Parties, the Credit Facility or the exercise by the Administrative Agent, the Collateral Agent or the Lenders of their rights as a secured party with respect to the Collateral.

(i)     Hyundai. The Hyundai Letters, the Hyundai Distributorship Agreement and the Hyundai Undertaking Agreement shall have not been terminated, modified, or repudiated and remain in full force and effect.

(j)     Adequate Working Capital Financing. The Requisite Lenders shall have determined in their sole and absolute discretion that the Loan Parties and their Subsidiaries will have adequate working capital financing to fund their operations in any jurisdiction at all times.

(k)     Restructuring Support Agreement. The Restructuring Support Agreement remains in effect and there exists no circumstance, event or condition that would permit the Consenting Noteholders party thereto the right to terminate the Restructuring Support Agreement (disregarding any grace, notice or cure period thereunder).

(l)    <u>Customs Claims Settlement</u>.  Any settlement or other agreement previously entered into between any of the Loan Parties and/or any Non-Guarantor Pledgors and any Peruvian Authorities or any other third party relating to the Customs Claims shall have not been terminated, modified, or repudiated and shall remain in full force and effect.

(m)    <u>DIP Orders</u>.  With respect to

(i) the Initial Draw, the Interim DIP Order shall have been entered by the Bankruptcy Court, which order is in full force and effect and is not stayed or subject to a stay pending appeal, and

(ii) any subsequent draw after the Initial Draw, (x) no later than (a) 30 days following the entry of the Interim DIP Order, in respect of the Debtors organized in Uruguay and (b) 25 days following the entry of the Interim DIP Order in respect of the Chilean Loan Parties and the Costa Rican Subsidiaries, the Loan Parties and the Non-Guarantor Pledgors shall execute Additional Collateral Perfection Documents (as defined in the Interim DIP Order)  and shall take Perfection Actions (as defined in the Interim DIP Order) consisting of the filing and recordation of such Additional Collateral Perfection Documents with applicable registries to perfect the Adequate Protection Liens (as defined in the Interim DIP Order) securing the Adequate Protection Claims (as defined in the Interim DIP Order) of the Secured Noteholders' in an amount equal to the aggregate diminution in value of the Secured Noteholders' interests in the Prepetition Secured Notes Collateral (as defined in the Interim DIP Order) (including Cash Collateral (as defined in the Interim DIP Order) from and after the Petition Date up to $40,000,000 in the Loan Parties' and Non-Guarantor Pledgors' previously unencumbered inventory, accounts receivable, and cash and Cash Equivalents in Chile, Uruguay and Costa Rica, which Perfection Actions (as defined in the Interim DIP Order) consisting of filings and recordations with applicable registries shall be substantially consistent (1) with such Perfection Actions required under the Collateral Documents in order to perfect the DIP Liens (as defined in the Interim DIP Order) over such assets, (2) the Collateral Annex and (3) Schedule 5.01(y); provided, further, the formal acceptance by any applicable registries of the aforementioned filings and recordations in respect of the junior Adequate Protection Liens shall not be required within the specified time periods set forth in this paragraph. The Additional Collateral Perfection Documents shall be substantially consistent with the Collateral Documents perfecting the DIP Liens over such assets, the Collateral Annex and Schedule 5.01(y) (or otherwise in form and substance acceptable to the Collateral Agent under the Indenture (acting at the direction of the Secured Noteholders), in each case, in accordance with the Interim DIP Order (the actions required to be taken pursuant to this clause (x) are collectively referred to as the "**Adequate Protection Lien Perfection Actions**") and (y) the Final DIP Order shall have been entered, which order is in full force and effect and is not stayed or subject to a stay pending appeal.

49

# ARTICLE IV

# REPRESENTATIONS AND WARRANTIES

Section 4.01.  <u>Representations and Warranties of the Loan Parties</u>.  Each Loan Party represents and warrants as follows:

(a)    Each Loan Party (i) is validly organized and existing under the laws of the jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification (unless the failure to so qualify as a foreign entity would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect), (ii) is duly qualified and in good standing (to the extent that such concept is applicable in such jurisdiction) in each jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed, except where the failure to so qualify or be licensed would not be reasonably expected to have a Material Adverse Effect and (iii) has all requisite power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

(b)    Set forth on <u>Schedule 4.01(b)</u> hereto is a complete and accurate list of all Subsidiaries of each Loan Party, showing as of the date hereof (as to each such Subsidiary) the jurisdiction of its formation, the number of shares, membership interests or partnership interests (as applicable) of each class of its Equity Interests authorized, and the number outstanding, on the date hereof and the percentage of each such class of its Equity Interests owned (directly or indirectly) by such Loan Party and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the date hereof.  All of the outstanding Equity Interests in each Subsidiary have been validly issued, are fully paid and non-assessable and are owned by the Persons set forth in <u>Schedule 4.01(b)</u> and, to the extent owned by a Loan Party, are free and clear of all Liens, except those created under the Collateral Documents and Prior Permitted Liens.

(c)    Subject to the entry of the DIP Orders, the execution, delivery and performance by each Loan Party or Non-Guarantor Pledgor of each Loan Document to which it is or is to be a party, and the consummation of the Transaction, are within such Loan Party's corporate or organizational powers, have been duly authorized by all necessary corporate action, and do not (i) contravene such Loan Party's or such Non-Guarantor Pledgor's or such organizational or constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award applicable to such Loan Party, except for any such violation which would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting any Loan Party, any of its Subsidiaries or any of their properties, except for any such conflict, breach, default or required payment which would not, either individually or in the aggregate reasonably be expected to have a Material Adverse Effect or (iv) except for the Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of

50

any Loan Party or any of its Subsidiaries. No Loan Party or any of its Subsidiaries is in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(d)     Other than entry of the DIP Orders, no Governmental Authorization, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by any Loan Party or Non-Guarantor Pledgor of any Loan Document to which it is or is to be a party, or for the consummation of the Transactions contemplated thereby, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the maintenance of the priority thereof) or (iv) subject to the terms of the DIP Orders, the exercise by any Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the authorizations, approvals, actions, notices and filings specifically contemplated in the Collateral Documents or listed on Schedule 4.01(d) hereto, all of which (other than those specifically contemplated by the Collateral Documents) have been duly obtained, taken, given or made and are in full force and effect. All applicable waiting periods in connection with the Transaction have expired without any action having been taken by any competent authority restraining, preventing or imposing materially adverse conditions upon the Transaction or the rights of the Loan Parties or their Subsidiaries freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(e)     This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party or Non-Guarantor Pledgor thereto. Subject to the entry of the relevant DIP Order, this Agreement is, and each other Loan Document when delivered hereunder will be the legal, valid and binding obligation of each Loan Party or Non-Guarantor Pledgor thereto, enforceable against such Loan Party or Non-Guarantor Pledgor in accordance with its terms.

(f)     Except as has been previously disclosed in writing to the Administrative Agent and the Lenders prior to the Closing Date, (x) to the knowledge of any Responsible Officer of any Loan Party there is no event, occurrence, circumstance, or fact that could reasonably give rise to any, and (y) there is no action, suit, investigation, litigation or proceeding affecting any Loan Party (including any Environmental Action), pending or threatened before any Governmental Authority or arbitrator that (i) would be reasonably likely to have a Material Adverse Effect (other than the matters described in Schedule 4.01(f) hereto) (the "**Disclosed Litigation**") or (ii) purports to affect the legality, validity or enforceability of any Loan Document, the Indenture, or the consummation of the Transaction, and there has been no adverse change in the status, or financial effect on any Loan Party or any of its Subsidiaries, of the Disclosed Litigation from that described on Schedule 4.01(f) hereto.

(g)     The Loan Parties' consolidated unaudited financial statements for the year ended December 31, 2020 and for the three months ended September 30, 2020, copies of which have been furnished to each Lender, fairly present in all material respects the consolidated financial condition of the Borrower and its Subsidiaries as at such dates and the consolidated results of

operations of the Borrower and its Subsidiaries for the periods ended on such dates, all in accordance with IFRS, and since December 31, 2019, there have been no changes, circumstances or events that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect, other than any change, circumstance or event disclosed to the Lenders not less than thirty (30) Business Days prior to the Closing Date.

(h)     No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loan have been or will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(i)     No Loan Party is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(j)     (i) Subject to the entry of the relevant DIP Order (with respect to the Debtors) and completion of the post-closing items listed on Schedule 5.01(y), except as otherwise provided in the Collateral Documents and the Collateral Annex, all filings and recordings have been made (or shall be made) in the relevant public registries, all necessary notices have been given (or shall be given) and consents have been obtained (or shall be obtained) and all other actions necessary to perfect and protect the security interests in the Collateral created under the Collateral Documents have been duly made or taken (or shall be made or taken) and are in full force and effect, so that the Collateral Documents create in favor of the Collateral Agent for the benefit of the Secured Parties (x) a valid and perfected *pari passu* Lien on and security interest in the Indenture Collateral pledged by the Non-Guarantor Pledgors under the Collateral Documents subject to Prior Permitted Liens (other than Prior Permitted Liens securing the Notes Obligations), (y) a valid and perfected first priority priming Lien on and security interest in the Indenture Collateral pledged by the Debtors under the Collateral Documents (to the extent provided under the Collateral Documents and the Intercreditor Agreement), subject only to the Carve-Out and to Prior Permitted Liens (other than Prior Permitted Liens securing the Notes Obligations), and (z) a valid and perfected first priority Lien on and security interest in the unencumbered assets pledged by the Debtors and the Non-Guarantor Pledgors under the Collateral Documents, subject only to the Carve-Out, and (ii) all filings and other actions necessary or desirable to perfect and protect the security interests granted under the Collateral Documents to secure the obligations of the Loan Parties have been duly taken (or shall be duly taken), in each case in accordance with the terms and conditions of the relevant Collateral Document and the Collateral Annex.

(ii) The Loan Parties are the legal and beneficial owners of their assets comprising Collateral free and clear of any Lien, except for the Liens and security interests created or permitted under the Loan Documents, Permitted Liens and the Carve-Out.

(iii) With respect to the Non-Guarantor Pledgors, (A) all filings and other actions necessary to perfect and protect the security interests in the Indenture Collateral pledged by the Non-Guarantor Pledgors have been duly made or taken and are in full force and effect, in each case subject to and in accordance with Schedule 5.01(y), the Collateral Annex and the Collateral Documents and (B) the Note Documents create in favor of the Collateral Agent under the Indenture for the benefit of the Secured Noteholders a valid and, together with such filings and

other actions, perfected security interests in the Indenture Collateral and all filings and other actions necessary or desirable to perfect and protect such security interests in favor of the Secured Noteholders in the Indenture Collateral have been duly taken.

(iv)    Except as expressly permitted by the Indenture, each of the Non-Guarantor Pledgors has not received any notice any adverse claim by any Person in respect of its ownership of, or entitlement to, the assets comprising the Collateral, other than any adverse claims made by third parties in the ordinary course of business.

(k)    (i)    Except with respect to what has been previously disclosed to the Lenders with respect to the Customs Claims, the operations and properties of each Loan Party and each of its Subsidiaries comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing material obligations or costs, and no circumstances exist that would be reasonably likely to (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties that would reasonably be expected to have a Material Adverse Effect or (B) cause any such property to be subject to any material restrictions or Liens on ownership, occupancy, use or transferability under any Environmental Law.

(ii)    Except for matters that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (A) there are no and to the knowledge of any of the Loan Parties never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries or, to the knowledge of the Loan Parties, on any property formerly owned, leased or operated by any Loan Party or any of its Subsidiaries; (B) there is no friable asbestos or asbestos-containing material on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries; (C) to the knowledge of any of the Loan Parties, Hazardous Materials have not been released, discharged or disposed of nor has any Person been exposed to Hazardous Materials on any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries; (D) neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to any Governmental Authority or the requirements of any Environmental Law; and (E) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries at the time owned or operated by said entity have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any of its Subsidiaries.

(l)    (i)    Each Loan Party and each of its Subsidiaries has filed, has caused to be filed or has been included in all income and other material tax returns (federal, state, local and foreign) required to be filed and has paid all taxes shown thereon to be due, together with applicable interest and penalties.

(ii)     Except as set forth on <u>Schedule 4.01(l)</u>, no issues have been raised by any federal, state, local or foreign tax authorities in respect of tax periods for which the applicable statute of limitations for assessment or collection has not expired that, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect.

(m)     Neither the business nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that would be reasonably likely to have a Material Adverse Effect.

(n)     Set forth in <u>Schedule 1.01(e)</u> is a complete and accurate list of all Debt of the Loan Parties as of the Closing Date, other than Indebtedness with an aggregate principal amount in excess of $100,000 and Indebtedness of the types described in clauses (6) and (11) in the definition of "Permitted Debt".

(o)     Set forth in <u>Schedule 1.01(f)</u> is a complete and accurate list of all Liens granted by the Loan Parties as of the Closing Date, other than Liens of the types described in clauses (3), (4), (5), (7), (8) and (9) of the definition of "Permitted Liens".

(p)     (i)     Set forth in <u>Schedule 4.01(p)</u> is a complete and accurate list of all real property owned by any Loan Party or any of its Subsidiaries, as of the Closing Date, showing the street address, county or other relevant jurisdiction, state, record owner and book value thereof as of the date set forth therein, and details of any mortgage or any lien on such real property (including the outstanding amount of the mortgage, maturity date and identity of the mortgagee). Each Loan Party or such Subsidiary has good, marketable and insurable fee simple title to such real property, free and clear of all Liens, other than Liens created or permitted by the Loan Documents.

(ii)     Set forth in <u>Schedule 4.01(p)</u> is a complete and accurate list, as of the Closing Date, of all leases of the real property under which any Loan Party is the lessee, showing as of the date hereof the material terms thereof (including the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof) to the reasonable satisfaction of the Administrative Agent. To the knowledge of the Loan Parties, each such lease is the legal, valid and binding obligation of the lessor thereof, enforceable in accordance with its terms.

(iii)     Set forth in Schedule 4.01(p) is a complete and accurate list, as of the Closing Date, of all leases of real property under which any Loan Party is the lessor, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof. To the knowledge of the Loan Parties, each such lease is the legal, valid and binding obligation of the lessee thereof, and enforceable in accordance with its terms.

(iv)     Set forth in <u>Schedule 4.01(p)</u> is a complete and accurate list, as of the Closing Date, of all bank accounts held by the Loan Parties and Non-Guarantor Pledgors and the balance of each of such accounts as of two (2) Business Days prior to the Closing Date.

54

(q)    Set forth in <u>Schedule 4.01(q)</u> is a complete and accurate list of all Investments involving amounts in excess of $100,000 held by each Loan Party or any of their Subsidiaries on the date hereof, showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(r)    [Reserved].

(s)    [Reserved].

(t)    No Default or Event of Default has occurred or is continuing under the Loan Documents.

(u)    No broker's or finder's fee or commission will be payable with respect to this Agreement or any of the transactions contemplated hereby, and the Loan Parties hereby indemnify the Agents and the Lenders against, and agrees that it will hold the Agents and the Lenders harmless from, any claim, demand or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

(v)    <u>OFAC</u>. No Loan Party or Non-Guarantor Pledgor or to the knowledge of each Loan Party and each Responsible Officer, no owner that controls any Loan Party or Non-Guarantor Pledgor, (i) is a person whose property or interest in property is blocked or is currently subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or is currently subject to the sanctions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

(w)    <u>Anti-Terrorism Laws</u>. No Loan Party or Non-Guarantor Pledgor is in violation of any applicable federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, relating to terrorism or money laundering, including the United States Executive Order No. 13224 on Terrorist Financing.

(x)    <u>Patriot Act; Foreign Corrupt Practices Act</u>. To the extent applicable, each Loan Party and Non-Guarantor Pledgor is in compliance, in all respects, with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (b) the Patriot Act. No part of the proceeds of the Term Loans will be used, directly or indirectly by any Loan Party or Non-Guarantor Pledgor, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain,

55

retain or direct business or obtain any improper advantage, in violation by any Loan Party or Non-Guarantor Pledgor of the United States Foreign Corrupt Practices Act of 1977, as amended.

(y)     The properties of the Loan Parties are insured to the extent required by and in accordance with Section 5.01(g).

(z)     <u>Disclosure</u>. All written information (other than forecasts, budgets, pro forma information and other forward-looking information and information of a general economic or industry specific nature that has been or will be made available to the Administrative Agent by the Loan Parties) is or will be, when furnished and taken as a whole, complete and correct in all material respects, and does not or will not, when furnished and taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates thereto). All budgets, financial statements and reports furnished to the Administrative Agent and/or the Lenders hereunder have been prepared in good faith based upon assumptions reasonably believed to be reasonable when made (it being understood that projections are as to future events and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, that the projections are not a guarantee of financial performance and no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material).

(aa)     <u>Compliance with Laws</u>. Except with respect to what has been previously disclosed to the Lenders with respect to the Customs Claims, each Loan Party and each Non-Guarantor Pledgor is in compliance with all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) applicable to it or its property of the jurisdiction of its incorporation or organization, including without limitation, all laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees relating to transactions with affiliates, lending, debt collection, privacy, customs, the import or export of materials or goods, safety, labor or employee discrimination, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

(bb)     <u>Compliance with Hyundai Agreements</u>.  No Loan Party or any Non-Guarantor Pledgor is in receipt of any notice from Hyundai that Hyundai does not intend to renew the Hyundai Distributorship Agreements as provided in the Restructuring Support Agreement or in the Hyundai Letters or otherwise repudiates any agreement made in the Hyundai Letters or any event, occurrence, change, development or circumstance indicating that Hyundai either (i) has commenced a process (A) for winding down its business relationships with any Loan Party or any Non-Guarantor Pledgor or (B) to initiate a business relationship with a replacement distributor of automobiles in Chile or Peru other than the Loan Parties and Non-Guarantor Pledgors or (ii) has initiated any business relationship with any distributor of automobiles in Chile or Peru other than the Loan Parties and Non-Guarantor Pledgors.  The Loan Parties and Non-Guarantor Pledgors are in compliance with all obligations under the Hyundai Letters, the Hyundai Distributorship

Agreements, the Hyundai Undertaking Agreement and, if executed, any settlements entered into with Peruvian Authorities relating to the Customs Claims.

(cc)    Customs Claims. All known facts relating to the Customs Claims have been disclosed in writing or orally to the Lenders or their counsel.

(dd)    No Other Material Assets.  There are no material assets in Brazil or Costa Rica that have not already been disclosed in writing to the Lenders prior to the Closing Date.

# ARTICLE V

## COVENANTS OF THE LOAN PARTIES

Section 5.01.  Affirmative Covenants.  So long as any Term Loan or any other Obligation of any Loan Party under any Loan Document shall remain unpaid or any Term Loan Commitment of any Lender remain outstanding:

(a)    Use of Proceeds, Etc.

(i)    Each Loan Party will use the proceeds of the Term Loans, and, if applicable, in compliance with the Approved Budget, subject to the Permitted Variances, each as described in the Officer's Certificate delivered in connection with each requested Borrowing, for (i) general corporate and working capital purposes, (ii) the costs of the administration of the Loan Parties' Chapter 11 Cases, including without limitation the restructuring costs and professional fees of the Loan Parties and Non-Guarantor Pledgors, (iii) payment of reasonable and documented transaction costs, fees and expenses with respect to this Credit Facility, including fees and expenses of legal and other professional advisors to the Lenders and the Agents as provided under the Loan Documents and the DIP Orders, (iv) adequate protection payments, if any, approved by the Bankruptcy Court to the extent such payments are included in the Approved Budget and (v) any other purpose approved by the Bankruptcy Court in the DIP Orders or any other orders entered in the Chapter 11 Cases so long as such use is consistent with the terms of this Agreement and the other Loan Documents.

(ii)    (x) The Chilean Loan Parties shall use Cash Collateral of the Secured Parties and cash proceeds from the collection of accounts receivable or from the sale of inventory in the ordinary course of business, consistent with past practices, subject to the Permitted Variances, for general corporate and working capital purposes subject to the relevant Approved Budget (including without limitation for the posting of cash or Cash Equivalents as collateral for one or more letters of credit that constitute Permitted Debt hereunder) and (y) the Loan Parties (other than the Chilean Loan Parties) shall use Cash Collateral of the Secured Parties and cash proceeds from the collection of accounts receivable or from the sale of inventory in the ordinary course of business, consistent with past practices, for general corporate and working capital purposes (including without limitation for the posting of cash or Cash Equivalents as collateral for one or more letters of credit that constitute Permitted Debt hereunder).

(iii)    Notwithstanding the foregoing, no portion of the Carve-Out or the Collateral or the proceeds thereof or any proceeds of the Term Loans may be used directly or indirectly by any of the Loan Parties for the payment of fees or expenses incurred by anyone

challenging, investigating, preparing, asserting, initiating, joining, commencing, supporting or prosecuting any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Administrative Agent, the Collateral Agent, the Lenders, the Secured Noteholders, and each of their respective Affiliates, officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter, including, without limitation, (i) any so-called "lender liability" claims and causes of action; (ii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Liens granted under the Loan Documents, the Loan Documents, the Liens granted under the Note Documents, the Note Documents or the Note Obligations (including but not limited to any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets); (iii) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, any of the Obligations or the Note Obligations; (iv) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Administrative Agent, the Collateral Agent or the Lenders hereunder or under any of the Loan Documents, or (B) the Secured Noteholders under any of the Note Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the Administrative Agent's, the Collateral Agent's or the Lenders' assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents); (v) objecting to, contesting, hindering, delaying or interfering with, in any way, the Administrative Agent's, the Collateral Agent's or the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred or (vi) any Avoidance Action relating to any transaction, occurrence, omission or action related to the Obligations, the Liens granted under the Loan Documents, the Loan Documents, the Liens granted under the Note Documents, the Note Documents or the Note Obligations.  In addition, neither the Carve-Out nor any portion of Term Loan proceeds under the Credit Facility or proceeds of Collateral shall be used in connection with preventing, hindering or delaying the Administrative Agent or Collateral Agent's enforcement or realization upon the Collateral for the benefit of the Lenders once an Event of Default has occurred under the Loan Documents and the Trigger Date Notice has been delivered; provided however, that the Loan Parties and Non-Guarantor Pledgors may use such proceeds solely for the purpose of defending against or enjoining any action taken by any Secured Party in breach of the DIP Orders during the Remedies Notice Period before the Bankruptcy Court.

(b)        Delivery of Budgets and Variance Reports.

(i)        No later than two (2) Business Days prior to the Closing Date, the Borrower shall deliver to the Administrative Agent [and each of the Lenders] an initial budget, which shall be acceptable to the Requisite Lenders in their sole and absolute discretion, take into account market conditions and obligations under the Loan Parties' and Non-Guarantor Pledgors' distribution agreements and consist of the following (the "**Initial Approved Budget**"):

1)  forecasted receipts and disbursements for the 13-weeks commencing on the Monday prior to the Closing Date with respect to the Chilean Loan Parties and Automotores Gildemeister Peru S.A.;

2) projections for the anticipated amount of Inventory Debt to be outstanding during each week with respect to the Chilean Loan Parties and Automotores Gildemeister Peru S.A.; and

3) projections of the accounts receivable subject to factoring arrangements during each week and the amount of proceeds from such factoring arrangements with respect to the Chilean Loan Parties and Automotores Gildemeister Peru S.A.

(ii)    Delivery and Form of Updated Budgets: The Initial Approved Budget shall be updated by the tenth (10th) calendar day of each calendar month thereafter (or the first Business Day thereafter if the 10th is not a Business Day).  Each such updated budget shall be in form and substance substantially similar to the Initial Approved Budget and reasonably satisfactory to the Requisite Lenders, provided that if the Requisite Lenders do not object to such updated budget within two (2) Business Days following receipt thereof, such proposed updated budget shall be deemed reasonably satisfactory to the Requisite Lenders (each, an "**Updated Approved Budget**"), provided further, that neither the Initial Approved Budget nor any Updated Approved Budget shall be modified in any manner without the prior written consent of the Requisite Lenders (which shall not be unreasonably withheld).    The term "**Approved Budget**" shall mean the Initial Approved Budget until such time as an Updated Approved Budget is approved, following which such Updated Approved Budget shall constitute the Approved Budget until a subsequent Updated Approved Budget is so approved.  Until replaced by an Updated Approved Budget, the prior Approved Budget shall remain in effect for all purposes hereof.  The Chilean Loan Parties and Automotores Gildemeister Peru S.A. shall adhere to and comply with the Approved Budget (subject in each case to the Permitted Variances and tested on an aggregate basis for each of (x) the Chilean Loan Parties in aggregate and (y) the Chilean Loan Parties and Automotores Gildemeister Peru S.A. in aggregate).

(iii)    Delivery of Budget Variance Report: Commencing on Friday, April 30, 2021 and biweekly thereafter (or the next Business Day if such Friday is not a Business Day) (or such more frequent period as may be agreed among the Borrower and the Requisite Lenders from time to time), the Loan Parties shall deliver to the Administrative Agent [and each of the Lenders] a variance report for the two-week period ending on the Friday prior to the reporting date (the "**Reporting Period**") comparing the actual receipts and disbursements of the Chilean Loan Parties and Automotores Gildemeister Peru S.A on a line-item basis, to the values set forth in the Approved Budget for such Reporting Period (each, a "**Budget Variance Report**") with an explanation of each material variance.

(iv)    Permitted Variance and Variance Period. The total aggregate disbursements for each of (x) the Chilean Loan Parties in aggregate, and (y) the Chilean Loan Parties and Automotores Gildemeister Peru S.A. in aggregate, shall not exceed 120% of the total aggregate disbursement amounts set forth in the Approved Budget for the periods (each such period, a "**Variance Period**") from (1) April 1, 2021 through and including April 30, 2021 and (2) during each calendar month thereafter,(those variances from the Approved Budget within a Variance Period beneath both of the 120% thresholds, collectively, the "**Permitted Variances**"). On the fifth (5th) Business Day after the end of the Variance Period, the Borrower shall provide to the Administrative Agent [and each of the Lenders] an explanation of all material variances in the

Variance Period and a certification that budget variances of (x) the Chilean Loan Parties in aggregate, and (y) the Chilean Loan Parties and Automotores Gildemeister Peru S.A. in aggregate, have not exceeded the Permitted Variances during the Variance Period.

(c)    Compliance with Laws.  The Borrower shall comply, and cause each of its Subsidiaries to comply, in all material respects, with all applicable laws, rules, regulations and orders, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(d)    Know Your Customer.  Promptly after the request by any Lender or Agent, the Borrower shall, and shall cause each of its Subsidiaries to, deliver all documentation and other information that such Lender or Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(e)    Payment of Taxes, Etc.  The Borrower shall, and shall cause each of its Subsidiaries to, pay or discharge before the same become delinquent (i) all material taxes (including stamp taxes), governmental and regulatory assessments and governmental charges levied or imposed upon such Person or its income or profits or property, and (ii) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Borrower or any of its Subsidiaries, other than any such tax, assessment, charge or claim (x) the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves (to the extent required by IFRS) have been established or (y) where the failure to discharge such tax, assessment, charge or claim, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(f)    Compliance with Environmental Laws.  Except in each case with respect to what has been previously disclosed to the Lenders with respect to the Customs Claims, the Borrower shall comply, and cause each of its Subsidiaries to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all Environmental Permits necessary for its operations and properties; and conduct, and cause each of its Subsidiaries to conduct, any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up Hazardous Materials from any of its properties, required by and in accordance with the requirements of all Environmental Laws; *provided*, however, that neither any Loan Party nor any of its Subsidiaries shall be required to undertake any such investigation, cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances.

(g)    Maintenance of Insurance.  The Borrower shall, and shall cause each of its Subsidiaries to, provide or cause to be provided for itself insurance (including appropriate self-insurance) against loss or damage of the kinds customarily insured against by corporations similarly situated in the industry in which the Borrower and the other Loan Parties are then conducting business and owning like properties, including, but not limited to, products liability insurance and public liability insurance, with reputable insurers, in such amounts, with such

deductibles and by such methods as are customary for corporations similarly situated in the industry in which the Borrower and the other Loan Parties are then conducting business; *provided*, that neither the Borrower nor the other Loan Parties shall be required to maintain business interruption insurance.

(h)     <u>Preservation of Legal Existence, Etc.</u>  The Borrower shall, and shall cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve and keep in full force and effect its existence and the existence of the Borrower and each of its Subsidiaries in accordance with their respective organizational documents, and the material rights, permits, licenses, and franchises of the Borrower and each of its Subsidiaries.

(i)     <u>Visitation Rights</u>.  At any reasonable time during normal business hours and from time to time upon reasonable notice, the Borrower shall, and shall cause each of its Subsidiaries to, permit any of the Agents or the Requisite Lenders, or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, such Loan Party and any of its Subsidiaries, and to discuss the affairs, finances and accounts of such Loan Party and any of its Subsidiaries with any of their officers, directors or members at the Borrower's expense; provided that only one such visit of the Agent and Requisite Lenders per Fiscal Year shall be at the expense of the Borrower.

(j)     <u>Keeping of Books</u>.  The Borrower shall, and shall cause each of its Subsidiaries to, keep, proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of such Loan Party and each such Subsidiary in accordance with generally accepted accounting principles in effect from time to time.

(k)     <u>Maintenance of Properties, Etc.</u>  The Borrower shall, and shall cause each of its Subsidiaries to, cause all properties used or useful in the conduct of each of its business to be maintained and kept in present condition, repair and working order as may be necessary so that the business of the Loan Parties and Non-Guarantor Pledgors may be properly and advantageously conducted at all times; *provided*, that nothing in this Section prevents the Borrower or any other Loan Party from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, beneficial in the conduct of the business of the Loan Parties taken as a whole.

(l)     <u>Payment of Administrative Expenses</u>.  Subject to the DIP Budget, the Loan Parties shall pay allowed administrative expenses and any other allowed Claims permitted by an order of the Bankruptcy Court, in each case, as they become due and payable.

(m)     <u>Covenant to Give Security</u>.  Upon the acquisition of any asset after the Closing Date by any Loan Party or Non-Guarantor Pledgor (the "**Additional Security Pledgor**"), which asset is of the same category of asset as those assets substantially all of which have been pledged (or purported to be pledged) by such Additional Security Pledgor  (or by an Affiliate (the "**Additional Security Pledgor Affiliate**") of such Additional Security Pledgor that is a Loan Party or a Non-Guarantor Pledgor and is organized in the same jurisdiction as such Additional Security Pledgor) to the Collateral Agent or any other Secured Party under the applicable Collateral Documents executed on the Closing Date by such Additional Security Pledgor (or by such Additional Security Pledgor Affiliate, as applicable), then such Additional Security Pledgor shall:

(i)    furnish to the Collateral Agent a description of such asset in detail reasonably satisfactory to the Collateral Agent within three (3) Business Days following the acquisition thereof; and

(ii)    as relevant, at the expense of the Loan Parties, the Loan Parties shall, and shall cause each of the Non-Guarantor Pledgors to,

(x) to the extent that such actions were required to be taken with respect to such category of asset under the Collateral Annex and the Collateral Documents, execute and deliver to the Collateral Agent such additional mortgages, pledges, assignments, security agreement supplements, and other security agreements as specified by, and in form and substance reasonably satisfactory to the Collateral Agent, but in any event each in substantially similar form to the existing Collateral Documents under which such category of asset is currently pledged (or purported to be pledged) (and deliver any legal opinions or officer's certificates or any other document requested by the Collateral Agent, each in substantially similar form to those delivered in connection with the current pledge (or purported pledge) of such category of asset), securing payment of all the Obligations of the Loan Parties under the Loan Documents and constituting Liens on all such assets; and

(y) to the extent that such actions were required to be taken with respect to such category of asset under the Collateral Annex and the Collateral Documents, take any other action from time to time as the Collateral Agent may reasonably deem necessary or desirable in perfecting and preserving the Liens of, such guaranties, mortgages, pledges, assignments, security agreement supplements, and security agreements.

For the avoidance of doubt, to the extent that any Liens created in accordance with this Section 5.02 are on assets that constitute Newly Pledged Inventory or Factoring Receivables, such Liens shall be subject to the automatic release provisions in Section 10.03.

(n)    _Further Assurances_. Subject in each case to the Collateral Documents, the Collateral Annex and Schedule 3.01(d), the Borrower shall, and shall cause each of its Subsidiaries to:

(i)    Promptly upon (and in any event within three (3) Business Days of (or such other longer period as may be reasonably agreed among counsel to the Borrower and counsel to the Agent and Lenders in the relevant local jurisdiction where such Loan Document is executed, acknowledged, filed or recorded)) written request by any Agent, or any Lender through the Administrative Agent, correct, and cause each of its Subsidiaries promptly to correct, any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and

(ii)    Promptly upon (and in any event within three (3) Business Days of (or such other longer period as may be reasonably agreed among counsel to the Borrower and counsel to the Agent and Lenders in the relevant local jurisdiction where such Loan Document is executed, acknowledged, filed or recorded)) written request by any Agent, or any Lender through the Administrative Agent, pursuant to the terms set forth in the Collateral Documents, the Collateral Annex or as otherwise may be required in furtherance of the terms set forth in the Collateral Documents or the Collateral Annex), do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (A) carry out more effectively the provisions of the Loan Documents, (B) to the fullest extent permitted by applicable law and agreements with third parties, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

(iii)    Within fifteen (15) Business Days after the end of each calendar month, execute a pledge without conveyance over the accounts receivable acquired by each Loan Party formed in Chile during the previous month, in form and substance satisfactory to the Collateral Agent, and provide evidence of the registration of such pledge in the *Registro de Prenda sin Desplazamiento*.

(iv)    Cause the balance of the Santander Account to be at all times equal to or less than US$5,000,000.

(v)    Make commercially reasonable efforts to obtain the consent of the lessors under each of the Leaseback Agreements to grant a pledge without conveyance over the Borrower's purchase option granted therein, and within fifteen (15) Business Days after obtaining such consent, execute a pledge without conveyance over each of the Leaseback Agreements, in form and substance satisfactory to the Collateral Agent, and provide evidence of the registration of such pledge in the *Registro de Prenda sin Desplazamiento*.

(vi)    File for registration within the term set forth in each Collateral Document after the Collateral Documents have been entered into, any Collateral Document at the relevant public registry in the relevant jurisdiction (or any other registry specified by the Lenders), obtain the registration of such Collateral Documents (*Inscripción Definitiva*) no later than in the term set forth in each Collateral Document, pay all expenses incurred in connection with necessary translation and filings, and provide to the Collateral Agent a copy of evidence of such registration subject to the timeline set forth in each of the Collateral Documents and the Collateral Annex and if such timeline is not specified, within three (3) days of receipt thereof by the relevant Loan Party.

63

(vii)    For the avoidance of doubt, to the extent that there is any conflict between this <u>Section 5.01(n)</u> and the terms of any Collateral Document, the terms of Collateral Document shall prevail.

(o)    <u>Preparation of Environmental Reports</u>.   Upon and during the continuance of an Event of Default relating to a circumstance pertaining to an Environmental Action, Environmental Law or Hazardous Materials, permit the Administrative Agent on ten (10) Business Days' prior written notice to the Borrower to retain an environmental consulting firm to prepare an environmental site assessment report to evaluate such circumstance at the sole expense of the Loan Parties, and each Loan Party hereby agrees to promptly pay the reasonable costs and expenses of such report and grants and agrees to cause any Subsidiary that owns any property described in such request to grant at the time of such request to the Agents, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants and customary access terms, to enter onto their respective properties to undertake such an assessment.

(p)    <u>Compliance with Terms of Leaseholds</u>.   The Borrower shall, and shall cause each of its Subsidiaries to, make all material payments and otherwise perform in all material respects all obligations in respect of all material leases of real property to which each Loan Party or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated prior to the end of their term or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any material default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(q)    <u>Lender Calls.</u>   Upon the reasonable request of the Requisite Lenders, at a time to be mutually agreed with the Requisite Lenders at any time or after the delivery of financial statements pursuant to <u>Section 5.03</u>, the Borrower, including a Responsible Officer of the Borrower, shall participate in a conference call with Lenders to discuss the financial condition and results of operations of the Loan Parties and Non-Guarantor Pledgors with respect to which such financial statements were delivered.

(r)    <u>Information Regarding Collateral</u>.   Promptly upon, and in any event within two (2) Business Days of the relevant change (or such later date as reasonably agreed by the Collateral Agent, including each TMF Sub-Agent, as applicable, and the Requisite Lenders), the Borrower shall, and shall cause each of its Subsidiaries to, deliver a written notice of any change (i) in any Loan Party's or Non-Guarantor Pledgor's legal name , (ii) in any Loan Party's or Non-Guarantor Pledgor's type of organization, (iii) in any Loan Party's or Non-Guarantor Pledgor's jurisdiction of organization or (iv) in any Loan Party's or Non-Guarantor Pledgor's organizational identification number (or analogous concept under applicable law), in each case, to the extent such information is necessary to enable the Collateral Agent, through its TMF Sub-Agent, to perfect or maintain the perfection and priority of its security interest in the Collateral of the relevant Loan Party or Non-Guarantor Pledgor, together with a certified copy of the applicable organizational document reflecting the relevant change.

(s)    <u>Laws</u>.  The Borrower shall, and shall cause each of its Subsidiaries to, promptly perform and observe, all conditions, requirements and other terms and provisions of each resolution, notice, approval, consent or other action of or by any Governmental Authority in any way relating to the execution, delivery or performance of this Agreement or any other Loan Document or any transaction contemplated hereby or thereby.

(t)    <u>Covenant to Guarantee Obligations and Give Security</u>.  Upon the formation or acquisition after the Closing Date of any direct or indirect Subsidiary, the Borrower shall (or as applicable shall cause the applicable Subsidiary to) cause such newly formed or acquired Subsidiary to execute a joinder to this Agreement substantially in the form attached hereto as Exhibit D and Guarantee the Obligations under this Agreement and the other Loan Documents and secure such Guarantee by granting first priority Liens over all of its assets (other than Excluded Assets) and, within thirty (30) days after the formation or acquisition of such Subsidiary, or such other longer period as may be reasonably agreed among counsel to the Borrower and counsel to the Lenders in the relevant local jurisdiction, execute all documents reasonably requested by the Administrative Agent or the Collateral Agent (at the direction of the Requisite Lenders) to pledge the assets of such Subsidiary to secure the Obligations hereunder and the pledge of Capital Stock in such Subsidiary held by a Loan Party.  Notwithstanding any provision herein to the contrary, the immediately preceding sentence shall not require any existing Non-Guarantor Pledgor to become a Guarantor.

(u)    <u>Hyundai Agreements</u>.  The Borrower shall, and shall cause each of its Subsidiaries to, comply with all obligations under the Hyundai Letters, the Hyundai Distributorship Agreements and the Hyundai Undertaking Agreement.  The Loan Parties shall provide (i) a copy of any notice received by any Loan Party from Hyundai regarding its intent not to renew any of the Hyundai Distributorship Agreements to the Requisite Lenders within one (1) Business Day following receipt thereof and (ii) notify the Requisite Lenders within three (3) Business Days following any event, occurrence, change, development or circumstance that has occurred that, in the Loan Parties' reasonable belief, indicates that Hyundai either (a) will commence or has commenced a process (1) for winding down its business relationships with any Loan Party or Non-Guarantor Pledgor or (2) to initiate a business relationship with a replacement distributor of automobiles in Chile other than the Loan Parties and Non-Guarantor Pledgors or (b) will initiate or has initiated any business relationship with any distributor of automobiles in Chile other than the Loan Parties and Non-Guarantor Pledgors.

(v)    <u>Costa Rican Bank Accounts</u>. The Borrower shall cause each Costa Rican Subsidiary to deposit all cash and Cash Equivalents into any collateral deposit account of such Costa Rican subsidiary acceptable to the Collateral Agent.

(w)    <u>Customs Claims</u>.  The Borrower shall, and shall cause each of its Subsidiaries to, (A) provide the Lenders and their counsel with all known information materially relating to the Customs Claims, any negotiations or discussions with Peruvian Authorities relating to the Customs Claims, or discussions by Senior Managers (as defined in the Restructuring Support Agreement) with the board of directors of any of the Loan Parties or Non-Guarantor Pledgors, the media, Hyundai or any creditors of or claimants against the Loan Parties and/or the Non-Guarantor Pledgors, any trading counterparties, or any of the foregoing's agents or professionals of any kind materially related to the Customs Claims within one (1) Business Day of receipt of such

information, (B) provide the Lenders' counsel with at least forty-eight (48) hours' notice (or, if such notice is impossible, as much notice as is practicable) of all meetings scheduled with any Peruvian Authorities regarding the Customs Claims, and allowing the Lenders' counsel to attend all such meetings that are attended by Automotores Gildemeister Peru S.A.'s counsel, and (C) take all reasonable, necessary and prudent actions to expeditiously resolve the Customs Claims in the best interest of the Loan Parties and their stakeholders in consultation with the Required Consenting Noteholders.

(x)     Restructuring Support Agreement Covenants. The Borrower shall, and shall cause each of its Subsidiaries to, comply with all other covenants and obligations set forth in the Restructuring Support Agreement (subject in each case to the grace periods, cure periods and notice periods set forth in the Restructuring Support Agreement). All covenants and obligations of each of the Loan Parties and the Non-Guarantor Pledgors set forth in the Restructuring Support Agreement are hereby incorporated herein by reference, and shall apply to this Agreement *mutatis mutandis* as if fully set forth herein. For the avoidance of doubt, neither the Borrower nor any of its Subsidiaries shall be deemed to have failed to comply with this Section 5.01(x), unless the breach of its obligations and covenants under the Restructuring Support Agreement is existing and continuing and all applicable grace periods, cure periods and notice periods under the Restructuring Support Agreement shall have expired.

(y)     Post-Closing Covenants.

(i) no later than (a) 30 days following the entry of the Interim DIP Order, in respect of the Debtors organized in Uruguay and (b) 25 days following the entry of the Interim DIP Order in respect of the Chilean Loan Parties and the Costa Rican Subsidiaries, the Loan Parties and the Non-Guarantor Pledgors shall execute Additional Collateral Perfection Documents (as defined in the Interim DIP Order) and shall take Perfection Actions (as defined in the Interim DIP Order) consisting of the filing and recordation of such Additional Collateral Perfection Documents with applicable registries to perfect the Adequate Protection Liens (as defined in the Interim DIP Order) securing the Adequate Protection Claims (as defined in the Interim DIP Order) of the Secured Noteholders' in an amount equal to the aggregate diminution in value of the Secured Noteholders' interests in the Prepetition Secured Notes Collateral (as defined in the Interim DIP Order) (including Cash Collateral (as defined in the Interim DIP Order) from and after the Petition Date up to $40,000,000 in the Loan Parties' and Non-Guarantor Pledgors' previously unencumbered inventory, accounts receivable, and cash and Cash Equivalents in Chile, Uruguay and Costa Rica, which Perfection Actions consisting of filings and recordations with applicable registries shall be substantially consistent (1) with such Perfection Actions required under the Collateral Documents in order to perfect the DIP Liens (as defined in the Interim DIP Order) over such assets, (2) the Collateral Annex and (3) Schedule 5.01(y); provided, further, the formal acceptance by any applicable registries of the aforementioned filings and recordations in respect of the junior Adequate Protection Liens shall not be required within the specified time periods set forth in this paragraph. The Additional Collateral Perfection Documents shall be substantially consistent with the Collateral Documents perfecting the DIP Liens over such assets, the Collateral

Annex and Schedule 5.01(y) (or otherwise in form and substance acceptable to the Collateral Agent under the Indenture (acting at the direction of the Secured Noteholders), in each case, in accordance with the Interim DIP Order; and

(ii)  The Borrower shall, and shall cause each of its Subsidiaries to, take each of the actions described on Schedule 5.01(y), notwithstanding anything to the contrary contained herein or in any other Loan Document with respect to any such action, in each case, in the form or manner specified thereon, and no later than the dates specified thereon (or such later dates as are reasonably agreed by the Collateral Agent, acting at the direction of the Requisite Lenders).  All representations and warranties contained in this Agreement and the other Loan Documents shall be deemed modified (or waived on a limited basis) to the extent necessary to give effect to the foregoing (and to permit the taking of the actions described on Schedule 5.01(y) within the time periods specified thereon), and, to the extent any provision of this Agreement or any other Loan Document would be violated or breached (or any non-compliance with any such provision would result in a Default or Event of Default hereunder) as a result of any such extended deadline, such provision shall be deemed modified (or waived on a limited basis) to the extent necessary to give effect to this Section 5.01(y).

(z)      Compliance Due Diligence.  The Borrower shall, and shall cause each of its Subsidiaries to, provide, within a reasonable period of time but in no event later than five (5) Business Days (or such other longer period as approved in advance in the sole and absolute discretion of the Requisite Lenders), to the Lenders or their counsel, all information and documentation requested by the Lenders, in their sole and absolute discretion, for the purpose of completing their due diligence of the Loan Parties' respective compliance policies and procedures relating to, among other things, anti-corruption and compliance with anti-corruption and other applicable laws, and cooperating with the Lenders in completion of such review, the results of which review must be satisfactory to the Requisite Lenders in their sole and absolute discretion.

(aa)      Milestones.  The Loan Parties shall commence and execute the Chapter 11 Cases and implement the Restructuring in accordance with the Milestones.

(bb)      Pleadings.  The Debtors shall provide Lenders' counsel with drafts of pleadings and proposed orders in accordance with the "Court Filings" section of the Plan Term Sheet (and in any event no later than three (3) business days prior to their filing with the Bankruptcy Court), unless circumstances render such notice impracticable, in which case the Debtors shall consult in good faith with the Requisite Lenders and their counsel regarding the substance of any such proposed filing; *provided*, that, for the avoidance of doubt, delivery of such pleadings and proposed orders in accordance with the Debtors' obligations under the Restructuring Support Agreement shall be deemed to satisfy this subsection (bb).  Such pleadings shall not conflict with the terms of the Loan Documents, the Restructuring Support Agreement or the Plan Term Sheet and, prior to the filing with the Bankruptcy Court, shall be in form and substance reasonably acceptable to the Requisite Lenders; provided that, if the Requisite Lenders fail to provide a response to any draft pleading within three (3) Business Days following receipt thereof, the Debtors shall be entitled to treat such failure as the Requisite Lenders' consent to the filing of

67

such pleading, provided that in no event shall failure to respond to the draft pleadings constitute a waiver by the Requisite Lenders of their right to object to any such pleading after it is filed.

Section 5.02. <u>Negative Covenants</u>. So long as any Loan or any other Obligation of any Loan Party under any Loan Document shall remain unpaid or any Term Loan Commitment of any Lender remain outstanding:

(a) <u>Debt and Disqualified Stock or Preferred Stock</u>. The Borrower, directly or indirectly, (1) will not, and will not permit any of its Subsidiaries to, Incur any Debt, and (2) will not, and will not permit any of its Subsidiaries, to Incur any Disqualified Stock, and will not permit any of its Subsidiaries to Incur Preferred Stock (other than Disqualified Stock and/or Preferred Stock of Subsidiaries held by the Borrower or any Subsidiary of the Borrower, so long as it is so held), except:

(i) Debt under the Loan Documents; and

(ii) Permitted Debt.

Notwithstanding any other provision of this covenant, for purposes of determining compliance with this covenant, increases in Debt solely due to fluctuations in the exchange rates of currencies will not be deemed to exceed the maximum amount that the Borrower or any Subsidiary of the Borrower may Incur under this covenant. For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Debt, the U.S. dollar-equivalent principal amount of Debt denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Debt was Incurred; *provided*, that if such Debt is Incurred to refinance other Debt denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Debt does not exceed the principal amount of such Debt being refinanced. The principal amount of any Debt Incurred to refinance other Debt, if Incurred in a different currency from the Debt being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Debt is denominated that is in effect on the date of such refinancing.

For purposes of determining compliance with, and the outstanding principal amount of, any particular Debt Incurred pursuant to and in compliance with this covenant, (i) the outstanding principal amount of any item of Debt will be counted only once; (ii) the amount of Debt issued at a price that is less than the principal amount thereof will be equal to the face amount of such Debt; and (iii) Guarantees of, or obligations in respect of letters of credit or similar instruments relating to, Debt which is otherwise included in the determination of a particular amount of Debt will not be included and (iv) the accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Debt of the same instrument or the payment of regularly scheduled dividends on Disqualified Stock in the form of additional Disqualified Stock with the same terms will not be deemed to be an Incurrence of Debt for purposes of this covenant; *provided*, that any such outstanding additional Debt or Disqualified Stock paid in respect of Debt Incurred pursuant to any provision of clause (ii) above will be

68

counted as Debt outstanding thereunder for purposes of any future Incurrence under such provision.

(b)    <u>Restricted Payments</u>. The Borrower will not, and will not permit any Subsidiary of the Borrower to, directly or indirectly, (the payments and other actions described in the following clauses (1) through (4) being collectively "**Restricted Payments**"): (1) declare or pay any dividend or make any distribution on its Equity Interests held by Persons other than the Borrower or any other Loan Party; (2) purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Borrower or any direct or indirect parent of the Borrower held by Persons other than the Borrower or any other Loan Party; (3) repay, redeem, repurchase, defease or otherwise acquire or retire for value, or make any payment on or with respect to, any Subordinated Debt except a payment of interest or principal at Stated Maturity; or (4) make any Investment other than a Permitted Investment, except:

(i)    dividends or distributions by a Subsidiary of the Borrower payable, on a pro rata basis or on a basis more favorable to the Borrower, to all holders of any class of Capital Stock of such Subsidiary a majority of which is held, directly or indirectly through Subsidiaries, by the Borrower; or

(ii)    the purchase, redemption or other acquisition or retirement for value of Equity Interests of the Borrower or any direct or indirect parent in exchange for, or out of the proceeds of a substantially concurrent offering of, Qualified Equity Interests of the Borrower or of a cash contribution to the common equity of the Borrower.

*provided*, that in the case of clause (ii), no Default has occurred and is continuing or would occur as a result thereof. Not later than the date of making any Restricted Payment, the Borrower will deliver to the Administrative Agent an Officer's Certificate stating that the Restricted Payment is permitted and setting forth in reasonable detail the basis upon which the calculations required by the covenant were calculated.

(c)    <u>Liens, Etc.</u> The Borrower will not, and will not permit any Subsidiary of the Borrower to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of its properties or assets, whether owned at the Closing Date or thereafter acquired, other than:

(i)    Liens created under the Loan Documents;

(ii)    Prior Permitted Liens; and

(iii)    Permitted Liens.

(d)    <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>. The Borrower will not, and will not permit any Subsidiary of the Borrower to, directly or indirectly, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of the Borrower to (i) pay dividends or make any other distributions on or in respect of any Equity Interests of the Subsidiary owned by the Borrower or any other Subsidiary of the Borrower, (ii) pay any Debt or other obligation owed

to the Borrower or any other Subsidiary of the Borrower, (iii) make loans or advances to, or Guarantee any Debt or other obligations of, or make any Investment in, the Borrower or any other Subsidiary of the Borrower, or (iv) transfer any of its property or assets to the Borrower or any other Subsidiary of the Borrower.

The provisions of Section 5.02(d) do not apply to any encumbrances or restrictions:

(1)    existing on the Closing Date or any other agreements in effect on the Closing Date that are listed on Schedule 5.02(d), and any amendments, modifications, restatements, renewals, replacements, extensions or refinancings of any of the foregoing; *provided*, that the encumbrances and restrictions in the amendment, modification, restatement, extension, renewal, replacement or refinancing are no less favorable to the Lenders than the encumbrances or restrictions being amended, modified, restated, extended, renewed, replaced or refinanced;

(2)    existing under or by reason of applicable law, rule, regulation or order;

(3)    existing with respect to any Person, or to the property or assets of any Person, at the time the Person is acquired by the Borrower or any Subsidiary of the Borrower, such encumbrances or restrictions (i) are not applicable to any other Person or the property or assets of any other Person and (ii) were not put in place in anticipation of such event and any amendments, modifications, restatements, extensions, renewals, replacements or refinancings of any of the foregoing; *provided*, that the encumbrances and restrictions in the amendment, modification, restatement, extension, renewal, replacement or refinancing are, taken as a whole, in the good faith judgment of the Borrower, no less favorable in any material respect to the Lenders than the encumbrances or restrictions being amended, modified, restated, extended, renewed, replaced or refinanced;

(4)    of the type described in clause (d)(iv) arising or agreed to in the ordinary course of business (i) that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license, conveyance or similar contract, including with respect to intellectual property, (ii) that restrict in a customary manner, pursuant to provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements, the transfer of ownership interests in, or assets of, such partnership, limited liability company, joint venture or similar Person or (iii) by virtue of any Lien on, or agreement to transfer, option or similar right with respect to any property or assets of, the Borrower or any Subsidiary of the Borrower;

(5)    with respect to a Subsidiary of the Borrower and imposed pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of, or property and assets of, the Subsidiary of the Borrower that is permitted by Section 5.02(e);

(6)    contained in the terms governing any Debt if (i) the encumbrances or restrictions are ordinary and customary for a financing of that type and (ii) the encumbrances or restrictions either (x) would not, at the time agreed to, be expected to materially adversely affect the ability of the Borrower to make payments on the Obligations or (y) in the case of any Permitted

Refinancing Debt, are no less favorable in any material respect to the Lenders than those contained in the agreements governing the Debt being refinanced;

(7)    existing pursuant to purchase money obligations for property acquired in the ordinary course of business and Capitalized Leases or operating leases that impose encumbrances or restrictions discussed in clause (d)(iv) above only on the property so acquired or covered thereby;

(8)    required pursuant to this Agreement and the other Loan Documents;

(9)    covenants in a franchise or other agreement entered into in the ordinary course of business with a Manufacturer customary for franchise agreements in the vehicle retailing industry, that would not be expected to adversely affect the ability of the Borrower to make payments on the Obligations; or

(10)    covenants in Inventory Debt customary for inventory financings in the automobile retailing industry, that would not be expected to materially adversely affect the ability of the Borrower to make payments on the Obligations.

(e)    <u>Asset Sales</u>. The Borrower will not, and will not permit any Subsidiary of the Borrower to, directly or indirectly, make any Asset Sale unless the following conditions are met:

(1)    The Asset Sale is for fair market value;

(2)    At least 85% of the consideration consists of cash received at closing;

(3)    [Reserved]; and

(4)    In the case of an Asset Sale of Collateral used outside the ordinary course of business for which the Net Cash Proceeds from any one transaction, any series of related transactions or transactions over the course of a fiscal quarter that, in each case, exceed US$5.0 million, Net Cash Proceeds from such Asset Sale of Collateral:

(A)    to the extent the asset or assets subject to an Asset Sale are subject to a Lien described under clauses (1) or (13) of Permitted Liens and the documentation thereof requires such Net Cash Proceeds be applied to repay or redeem the Debt secured by such Liens, to permanently repay or redeem such Debt (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Borrower or any Loan Party (but only to the extent such Net Cash Proceeds are actually used to repay or redeem such Debt), or

(B)    shall be applied pursuant to <u>Section 2.06(b)</u>.

(f)    <u>Transactions with Affiliates</u>. The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering

of any service with any Affiliate of the Borrower or any Subsidiary of the Borrower (a "**Related Party Transaction**"), except with the Approval of the Independent Directors and upon fair and reasonable terms that are not materially less favorable to the Borrower or any Subsidiary of the Borrower than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Borrower.  Prior to entering into any Related Party Transaction with a value, or series of Related Party Transactions with an aggregate value, in excess of US$10.0 million (or the equivalent in other currencies), the Borrower must obtain and deliver to the Administrative Agent a favorable written opinion from a nationally recognized (in the relevant jurisdiction) Independent Financial Advisor as to the fairness of the transaction to the Borrower and its Subsidiaries from a financial point of view.

The foregoing paragraph does not apply to:

(1)   any transaction (w) between the Borrower and a Guarantor, (x) among Guarantors, (y) among Costa Rican Subsidiaries and (z) among Peruvian Subsidiaries;

(2)   the payment of reasonable and customary regular fees to directors of the Borrower who are not employees of the Borrower;

(3)   any Restricted Payments of a type described in Sections 5.02(b)(1), 5.02(b)(2), or 5.02(b)(iii) but only if and to the extent permitted by Section 5.02(b);

(4)   transactions pursuant to any contract or agreement in effect on the Closing Date and listed on Schedule 5.02(f), as amended, modified or replaced from time to time so long as the amended, modified or new agreements, are not less favorable to the Borrower and its Subsidiaries than those in effect on the Closing Date;

(5)   capital increases to maintain *pro rata* ownership in the Derco Entities in an amount not to exceed US$350,000 per annum so long as the other owners of the Derco Entities have also contributed a *pro rata* amount of capital in cash; and

(6)   payments of the Obligations under this Agreement and the other Loan Documents;

*provided*, that any payment to, or in respect of, a director under clause (2) is subject to Approval by the Independent Directors.

(g)   Line of Business. The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, engage in any business other than a Permitted Business.

(h)   Anti-Layering. Neither the Borrower nor any Guarantor may, directly or indirectly, incur any Debt that is subordinated in right of payment to other Debt of the Borrower or the Guarantors unless such Debt is also subordinated in right of payment to the Obligations on substantially identical terms. This does not apply to distinctions between categories of Debt that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Debt.

(i)      Operations and Obligations of Peruvian Subsidiaries. Without limiting the other restrictions in this Agreement applicable to the Borrower and its Subsidiaries (including the Peruvian Subsidiaries), the Peruvian Subsidiaries will not:

(1)      grant any Liens on any of their assets to secure any Debt other than, for the avoidance of doubt, (i) secured Debt owed to any other Subsidiary of the Borrower in compliance with clause (15) of the definition of "Permitted Debt", (ii) Inventory Debt and (iii) Liens (including the interest of a lessor under a Capitalized Lease) on property that secures Debt Incurred under clause (6) of the definition of "Permitted Debt";

(2)      incur any obligations to guarantee any Debt of any other entity, other than to the extent set forth herein, (i) the Obligations, (ii) Debt owed to any other Subsidiary of the Borrower in compliance herewith, (iii) Inventory Debt, (iv) Debt Incurred under clause (6), and clause (15) of the definition of "Permitted Debt" and (v) obligations to guarantee Debt where such guarantee obligation is itself guaranteed by an entity that is not an Affiliate of the Borrower; or

(3)      enter into transactions with Affiliates or other related parties without the Approval of the Independent Directors; or

(4)      grant any Liens on any of their assets to secure any Working Capital Facilities without the prior written consent of the Requisite Lenders.  For the avoidance of doubt, the restriction set forth in this clause (4) does not apply to Inventory Debt.

(j)      Consolidation, Merger or Sale of Assets by the Borrower; No Lease of All or Substantially All Assets. The Borrower will not, directly or indirectly, in a single transaction or series of related transactions, consolidate with or merge with or into any Person, or sell, convey, transfer, or otherwise dispose of (or cause or permit any Subsidiary of the Borrower to sell, assign, transfer, convey or otherwise dispose of) all or substantially all of its assets as an entirety or substantially an entirety (determined on a consolidated basis for the Borrower and its Subsidiaries), to any Person or permit any Person to merge with or into the Borrower.

(k)      Consolidation, Merger or Sale of Assets by a Guarantor. No Guarantor may, in a single transaction or series of related transactions, (1) consolidate with or merge with or into any Person, sell, convey, transfer or dispose of, all or substantially all its assets as an entirety or substantially as an entirety, to any Person, or (2) permit any Person to merge with or into a Guarantor.

(l)      Accounts.  The Borrower will not, and will not permit any Subsidiary of the Borrower to create or establish any new accounts holding cash that are not pledged in favor of the Collateral Agent in form and substance satisfactory to the Requisite Lenders and Collateral Agent.

(m)      Restructuring Support Agreement.  The Borrower shall not, and shall not permit its Subsidiaries to, take any action prohibited by the Restructuring Support Agreement (taking into account any and all grace periods, cure periods and notice periods under the Restructuring Support Agreement). All covenants and obligations of each of the Loan Parties and the Non-Guarantor Pledgors set forth in the Restructuring Support Agreement are hereby incorporated herein by reference, and shall apply to this Agreement *mutatis mutandis* as if fully set forth herein. For the avoidance of doubt, neither the Borrower nor any of its Subsidiaries shall

73

have failed to comply with this Section 5.02(m), unless the Borrower's or its Subsidiaries' action or failure to act would constitute a breach of its obligations and covenants under the Restructuring Support Agreement and all applicable grace periods, cure periods and notice periods under the Restructuring Support Agreement for the breach of such obligations or covenants shall have expired.

(n)    Amendments to Constitutive Documents.  The Borrower shall not, and shall not permit any of its Subsidiaries to, amend its certificate of incorporation or bylaws or other constitutive documents other than amendments that could not reasonably expected to have a Material Adverse Effect.

(o)    Capital Expenditures.  The Borrower shall not, and shall not permit any of its Subsidiaries to, make any Capital Expenditures not set forth in reasonable detail in the Approved Budget in effect at the relevant time.

(p)    Negative Pledge.  The Borrower shall not permit, and shall not permit any of its Subsidiaries to, enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets (i) except in favor of the Secured Parties or (ii) in connection with any existing Debt listed on Schedule 1.01(f) or customary restrictions in connection with Permitted Debt that is secured by a Permitted Lien so long as the Liens in favor of the Secured Parties are specifically permitted.

(q)    Changes to Accounting; Fiscal Year.  The Borrower shall not, and shall cause its Subsidiaries to not, make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by the IFRS or (ii) Fiscal Year.

(r)    Superpriority Claims.  The Loan Parties will not seek authorization for or permit the existence of any Superpriority Claim that is senior or *pari passu* in right of payment to the Obligations, except for the Carve-Out.

(s)    Modifications to DIP Orders.  The Loan Parties will not seek authorization for or permit any DIP Order or any other order of the Bankruptcy Court with respect to the Credit Facility to be modified, reversed, vacated, amended or stayed, without the prior written consent of the Administrative Agent and the Lenders.

Section 5.03.    Reporting Requirements.  So long as any Term Loan or any other Obligation of any Loan Party under any Loan Document shall remain unpaid or any Term Loan Commitment of any Lender remain outstanding, the Loan Parties will furnish or cause to be furnished to the Administrative Agent, Collateral Agent and the Lenders in electronic form:

(a)    Weekly Reports.  As soon as they are available, but in any event by no later than each Friday (or the immediate preceding Business Day if Friday is not a Business Day), commencing on Friday April [·],2021,

(i)    reporting of inventory, accounts receivable and cash value for the Chilean Loan Parties, Automotores Gildemeister Peru S.A and the Costa Rican Subsidiaries and restricted cash of the Chilean Loan Parties and

(ii) reporting of Priority Collateral Value for and as of the Friday of the immediate prior week along with an Officer's Certificate executed by the chief financial officer of the Borrower certifying that, as of the Friday of the immediate prior week, there did not exist a Priority Collateral Coverage Failure.

(b) <u>Monthly Financial Statements</u>. As soon as they are available, but in any event within 30 calendar days after the end of each of month, copies of its unaudited financial statements (on a consolidated basis) in respect of the relevant period (including a profit and loss account, balance sheet and cash flow statement), in English, prepared by the Borrower on a basis consistent with the audited financial statements of the Borrower, but excluding all notes to the financial statements, and in accordance with IFRS, together with a certificate signed by the person then authorized to sign financial statements on behalf of the Borrower to the effect that such financial statements are true in all material respects and present fairly the financial position of the Borrower as at the end of, and the results of its operations for, the relevant quarterly period;

(c) <u>Quarterly Financial Statements</u>. As soon as they are available, but in any event within 60 calendar days after the end of each of the first, second and third fiscal quarters of the Borrower, copies of its unaudited financial statements (on a consolidated basis) in respect of the relevant period (including a profit and loss account, balance sheet and cash flow statement), in English, prepared on a basis consistent with the audited financial statements of the Borrower and in accordance with IFRS, together with a certificate signed by the person then authorized to sign financial statements on behalf of the Borrower to the effect that such financial statements are true in all material respects and present fairly the financial position of the Borrower as at the end of, and the results of its operations for, the relevant quarterly period;

(d) <u>Annual Financial Statements</u>. As soon as they are available, but in any event within 120 calendar days after the end of each Fiscal Year of the Borrower, copies of its audited financial statements (on a consolidated basis) in respect of such Fiscal Year (including a profit and loss account, balance sheet and cash flow statement), in English, prepared in accordance with IFRS and audited by a member firm of an internationally recognized firm of independent accountants and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and be accompanied by an Officer's Certificate to the effect that (A) the financial statements contained in such report fairly present, in all material respects, the consolidated financial condition the Loan Parties as of the date of such financial statement and the results of their operations for the period covered thereby; and (B) such financial statements have been prepared in accordance with IFRS.

(e) <u>Collateral Sale</u>. Not later than 30 calendar days after the end of each month, a report identifying a list of all Collateral with an individual fair market value of more than US$50,000 or an aggregate fair market value of more than US$150,000 that the Borrower, any of the other Loan Parties or the Non-Guarantor Pledgors sold or disposed of during the prior month, other than Inventory sold in the ordinary course of business.

(f) <u>Default Notice</u>. As soon as a Responsible Officer of any Loan Party obtains actual knowledge of and in any event within two (2) Business Days after the occurrence of each Default, breach of any covenant or representation made by the Borrower and any of its Subsidiaries under the Restructuring Support Agreement, or any event, development or occurrence reasonably

75

likely to have a Material Adverse Effect continuing on the date of such statement, a statement of a Responsible Officer of the Loan Parties setting forth details of such Default and the action that the Loan Parties have taken and propose to take with respect thereto (if curable). For the avoidance of doubt, delivery of such statement in accordance with the Debtors' obligations under the Restructuring Support Agreement containing content that otherwise would meet the requirement of this Section 5.03(f), shall be deemed to satisfy this Section 5.03(f).

(g)    Litigation.  Promptly after a Responsible Officer of any Loan Party obtains actual knowledge of the occurrence thereof, notice of the commencement or existence of any event or circumstance that could reasonably give rise to, actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting any Loan Party or any of its Subsidiaries of the type described in Section 4.01(f), and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on any Loan Party or any of its Subsidiaries of the Disclosed Litigation from that described on Schedule 4.01(f) hereto.

(h)    Securities Reports.  Promptly after the sending or filing thereof, copies of all proxy statements, financial statements and reports that any Loan Party or any of its Subsidiaries sends to all stockholders, and copies of all regular, periodic and special reports, and all registration statements, that any Loan Party or any of its Subsidiaries files with the Securities and Exchange Commission or any governmental authority that may be substituted therefor, or with any national securities exchange.

(i)    Creditor Reports.  Promptly after the furnishing thereof, copies of any material statement or report furnished to any holder of Debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 5.01 or Section 5.03.]

(j)    Agreement Notices.  Promptly upon receipt thereof, copies of all notices, requests and other documents received by any Loan Party under or pursuant to any instrument, indenture, loan or credit or similar agreement with respect to Debt in excess of $250,000 and, from time to time upon request by the Administrative Agent, such information and reports regarding such instruments, indentures and loan and credit and similar agreements as the Administrative Agent may reasonably request.

(k)    Events Affecting Plan. Provide prompt (and in any event within one (1) Business Day) written notice of any occurrence of any event, change or circumstance that would reasonably be expected to (a) cause any condition precedent to the Plan to not be satisfied or (b) become materially less likely to be satisfied. For the avoidance of doubt, delivery of such report in accordance with the Debtor's obligations under the Restructuring Support Agreement containing content that otherwise would meet the requirement of this Section 5.03(k) shall be deemed to satisfy this Section 5.03(k).

(l)    [Reserved].

(m)    Environmental Conditions. Other than with respect to the Customs Claims, upon a Responsible Officer of any Loan party obtaining actual knowledge thereof, notice of any Environmental Action against or of any noncompliance by any Loan Party or any of its

76

Subsidiaries with any Environmental Law or Environmental Permit or of any release of or exposure to Hazardous Materials by any Loan Party or any of its Subsidiaries or with respect to any of their properties that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property described in mortgages or any other Collateral Documents to be subject to any material restrictions or Liens on ownership, occupancy, use or transferability under any Environmental Law; and, thereafter, prompt notice of any material developments in such Environmental Action or condition of noncompliance.

(n)     Real Property.  At the same time as delivery of financial statements under Section 5.03(b), a report identifying all owned and leased real property disposed of by any Loan Party and Non-Guarantor Pledgor during such Fiscal Year, a list and description (including the street address, county or other relevant jurisdiction, state, record owner, book value thereof and, in the case of leases of property, lessor, lessee, expiration date and annual rental cost thereof) of all real property acquired or leased during such Fiscal Year and a description of such other changes in the information included in such Schedules as may be necessary for such Schedules to be accurate and complete.

(o)     Insurance.  At the same time as delivery of financial statements under Section 5.03(a), a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party containing such additional information as any Agent, or any Lender through the Administrative Agent, may reasonably specify.

(p)     Other Information.  Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender through the Administrative Agent, may from time to time reasonably request and conducting lender calls upon reasonable request and reasonable prior notice; provided that, each Loan Party that is the recipient of such a request shall have three (3) Business Days (or such longer period as agreed to in writing by the Requisite Lenders) to furnish the information requested.

## ARTICLE VI

## EVENTS OF DEFAULT

Section 6.01.   Events of Default.  If any of the following events ("**Events of Default**") shall occur:

(a)     (i) any Loan Party shall fail to pay any principal of any Term Loan when the same shall become due and payable, or (ii) any Loan Party shall fail to pay any interest on the Term Loan or (iii) any Loan Party shall fail to make any other payment under any Loan Document, in each case under this clause (iii) within five (5) Business Days after the same shall become due and payable;

(b)     any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 5.01, Section 5.02 or Section 5.03 and, (y) with respect to Section 5.01 (other than Section 5.01(b) and Section 5.01(x)), remain unremedied for five (5) Business Days; and (z) with respect to Section 5.03 (other than Sections 5.03 (a), (f), (g), (h), (i), (j), (k),

(m) or (p)), remain uremedied for three (3) Business Days, in each case after the earlier of the date on which (i) any officer of a Loan Party or Non-Guarantor Pledgor becomes aware of such failure or (ii) written notice thereof shall have been given to any Loan Party or Non-Guarantor Pledgor by any Agent or Lender;

(c)    any uninsured judgments or orders, in the aggregate, for the payment of money in excess of $2,000,000 shall be rendered against any Loan Party or any of its Subsidiaries or any of their respective properties (including, without limitation, assets of any of the Non-Guarantor Pledgors) and all such judgments or orders shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days from the entry thereof;

(d)    any representation, warranty or certification made or deemed made by any Loan Party or Non-Guarantor Pledgor in any Loan Document or in any certificate required to be delivered in connection herewith or therewith shall be untrue in any material respect as of the date made or deemed made;

(e)    (i) failure by any Loan Party to pay when due any principal of or interest on or any other amount payable in respect of one or more items of unstayed Debt (other than the Obligations, and any other Debt that is owed to an Affiliate (including the Borrower and/or any Subsidiary)) with an aggregate outstanding principal amount exceeding $5 million, in each case, beyond the grace period, if any, provided therefor; or (ii) any other breach or default by any Loan Party with respect to any other term of any unstayed Debt described in the foregoing clause (i), in each case, beyond the grace or cure period, if any, provided therefor, but solely to the extent the effect of such breach or event of default is to cause, or to permit the holder or holders of such unstayed Debt (or a trustee or agent on behalf of such holder or holders) to cause, such unstayed Debt to become or be declared due and payable (or mandatorily redeemable) prior to its Stated Maturity or the Stated Maturity of any underlying obligation, as the case may be; *provided* that clause (ii) of this paragraph (e) shall not apply to secured Debt that becomes due as a result of the voluntary sale or transfer of the property securing such Debt if such sale or transfer is permitted hereunder;

(f)    any Non-Guarantor Pledgor makes a voluntary filing for insolvency or is declared the subject of any insolvency, bankruptcy, liquidation or reorganization proceeding under the laws of any jurisdiction and, only if such proceeding is an involuntary insolvency proceeding, it is not dismissed, stayed, reversed or lifted within twenty (20) days of such declaration;

(g)    the Loan Parties or Non-Guarantor Pledgors, shall have, directly or indirectly, contested, impeded or taken any other action (including the commencement by or on behalf of the Debtors of an Avoidance Action or other legal proceeding seeking any of the following relief or seeking the entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction)    objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, or seeking any the foregoing, with respect to either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the Liens granted pursuant to the Loan Documents or Liens granted pursuant to the Note Documents or (b) the validity, enforceability, characterization or non-avoidability of any of the Obligations or the Note Obligations;

78

(h)     the occurrence of an unfavorable variance from the Approved Budget in excess of Permitted Variances, in respect of the aggregate disbursements of (x) the Chilean Loan Parties, in aggregate or (y) the Chilean Loan Parties and Automotores Gildemeister Peru S.A., in aggregate;

(i)     the Liens granted under the Collateral Documents to secure the Obligations of the Loan Parties shall not have been perfected in accordance with applicable law as required under the Loan Documents in accordance with such Collateral Documents, the Collateral Annex and Schedule 5.01(y) in any manner that, in the reasonable judgment of the Requisite Lenders, the Administrative Agent or Collateral Agent, is materially detrimental to the rights or interests of the Agents or Lenders thereunder or shall cease to be valid, perfected and enforceable, and to maintain their priority, in each case, in accordance with the Collateral Documents, the Collateral Annex and Schedule 5.01(y), in all respects (unless otherwise agreed to by the Requisite Lenders), or any portion or provision of the Intercreditor Agreement shall have been terminated or declared or asserted by any Loan Party or any Subsidiary thereof or any court or Governmental Authority to be unenforceable;

(j)     any of the Chilean Loan Parties or Automotores Gildemeister Peru S.A. uses Cash Collateral or Term Loans for any item other than those set forth in, and in accordance with, the Approved Budget (subject in each case to the Permitted Variances and tested on an aggregate basis for each of (x) the Chilean Loan Parties and (y) the Chilean Loan Parties and Automotores Gildemeister Peru S.A);

(k)     any Loan Party or Non-Guarantor Pledgor shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for thirty (30) days or, if shorter, the relevant cure or grace period set forth in the relevant Loan Document, after the earlier of the date on which (i) any Responsible Officer of a Loan Party or Non-Guarantor Pledgor becomes aware of such failure, (ii) written notice thereof shall have been given to any Loan Party or Non-Guarantor Pledgor by any Agent or any Lender or (iii) the date on which such breach occurred if such provision is set forth in the relevant Loan Document. For the avoidance of doubt and notwithstanding anything herein to the contrary, no Event of Default shall have occurred pursuant to this Section 6.01(k) unless the breach of the term, covenant or other agreement of the Loan Party or Non-Guarantor Pledgor under the relevant Loan Document has occurred and is continuing and all applicable cure periods, grace periods and notice periods thereunder have expired;

(l)     any non-monetary judgment or order shall be rendered against any Loan Party or any of its Subsidiaries that could be reasonably likely to have a Material Adverse Effect, and there shall be any period of thirty-five (35) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal, shall not be in effect and such judgment or order remains in effect;

(m)     any Loan Document after delivery thereof pursuant to Section 3.01, Section 3.02 or Section 5.01(m) shall for any reason cease to be valid and binding on or enforceable against any Loan Party to it, or any such Loan Party shall so state in writing;

(n)    any Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 or Section 3.02 or Section 5.01(m) becomes unenforceable, unlawful or is declared void, or shall for any reason (other than pursuant to the terms thereof) cease to create a valid (i) *pari passu* Lien on and security interest with respect to the Indenture Collateral pledged by the Non-Guarantor Pledgors, and (ii) a first priority priming Lien on and security interest in all other Collateral, wherever located, (subject only to the Carve-Out), as described in the Collateral Documents and Collateral Annex, or any Loan Party or Non-Guarantor Pledgor shall so assert in writing; or

(o)    a Change of Control shall occur other than as expressly set forth in the Plan;

(p)    an involuntary case or other proceeding is commenced against Holdings, the Borrower or any Subsidiary of the Borrower with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed or unstayed for a period of thirty (30) days; or, except for the Chapter 11 Cases, an order for relief is entered against Holdings, the Borrower or any Subsidiary of the Borrower under the bankruptcy or insolvency laws as now or hereafter in effect;

(q)    except for the Chapter 11 Cases, the Borrower or any of its Subsidiaries (i) commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Borrower or any of its Subsidiaries or for all or substantially all of the property and assets of the Borrower or any of its Subsidiaries or (iii) effects any general assignment for the benefit of creditors (an event of default specified in clause (p), (q) or (r) a "**bankruptcy default**");

(r)    Holdings (i) commences a voluntary case under an applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of Holdings or for all or substantially all of the property and assets of Holdings or (iii) effects any general assignment for the benefit of creditors;

(s)    the termination of the Restructuring Support Agreement or the occurrence of any Consenting Party Termination Event (as defined in the Restructuring Support Agreement) or Companies Termination Event (as defined in the Restructuring Support Agreement);

(t)    any termination or modification of the Hyundai Letters, the Hyundai Undertaking Agreement, or the Hyundai Distributorship Agreements, in each case, without the consent of the Requisite Lenders in their sole and absolute discretion;

(u)    without the consent of the Requisite Lenders, any Loan Party or Non-Guarantor Pledgor (x) waives any reasonable objection or defense against, or otherwise fails to reasonably contest, any material adverse action, material fine, or material penalty imposed against

such Loan Party or Non-Guarantor Pledgor by any Peruvian Authorities in connection with the Customs Claims, or (y) enters into any agreements with any Peruvian Authorities with respect to Customs Claims without the consent of the Requisite Lenders in their sole and absolute discretion;

(v)     any repudiation by Hyundai of any agreement made in the Hyundai Letters or the Hyundai Undertaking Agreement;

(w)     the Borrower or any of its Subsidiaries' loss of access to adequate working capital financing to fund any of their operations in any jurisdiction at any time as determined by the Requisite Lenders in their sole and absolute discretion;

(x)     any termination or modification of any settlement or other agreement previously entered into by any Loan Party or Non-Guarantor Pledgor with any Peruvian Authorities or any third parties relating to the Customs Claims on terms that are not acceptable to the Requisite Lenders in their sole and absolute discretion, provided that the Requisite Lenders shall not unreasonably delay notice of whether they consent to any such modification or amendment;

(y)     the receipt by the Loan Parties or any Non-Guarantor Pledgor of any notice of any charge, sanction, levy, or fine threatened or imposed by any government regulator or authority relating to the Customs Claims that, if sustained by any applicable court, government authority, or regulator of competent jurisdiction could have the effect of: (i) enjoining, prohibiting, ceasing, terminating, or impairing or limiting the ability of any Loan Party or any Non-Guarantor Pledgor to conduct their business operations in a manner substantially consistent with their current practices in any jurisdiction, (ii) imposing felony criminal liability on any of the Loan Parties, any Non-Guarantor Pledgor or any of the Senior Managers (as defined in the Restructuring Support Agreement), (iii) imposing any civil or criminal liability of any kind on any Consenting Noteholder (as defined in the Restructuring Support Agreement), any Lender, or any of their Affiliates, or (iv) causing the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, or other obligations associated with the Customs Claims, net of any tax credits related to Customs Claims (recorded in accordance with IFRS), to exceed $40,000,000;

(z)     the occurrence of a Priority Collateral Coverage Failure;

(aa)     the Requisite Lenders shall not be satisfied, in their sole and absolute discretion, with (i) the information and/or documentation provided in response to their anti-corruption due diligence-related requests, and/or (ii) the results of their due diligence review of the compliance policies and procedures relating to, among other things, anti-corruption and other applicable laws, by the date falling forty-five (45) days after the Petition Date, unless the Requisite Lenders provide a written waiver;

(bb)     failure to use the proceeds of any Term Loans in accordance with the proposed use of proceeds described in an Officer's Certificate delivered to the Lenders at the time of such borrowing;

(cc)     entry by the Bankruptcy Court of an order, or Holdings or the Borrower or any of its Subsidiaries files or encourages a motion seeking an order, (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (b) converting the Chapter 11 Cases

to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Cases, or (d) terminating or modifying the exclusive right of the Debtors to file a plan of reorganization under section 1121 of the Bankruptcy Code;

(dd)    any Event of Default under any DIP Order shall have occurred;

(ee)    the filing of a motion seeking authority to obtain financing pursuant to Section 364 of the Bankruptcy Code other than Debt expressly permitted under this Agreement or the filing of a chapter 11 plan by the Debtors that is not an Acceptable Plan, in each case, without the prior written consent of the Requisite Lenders;

(ff)    an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Requisite Lenders;

(gg)    the failure to meet any one of the Milestones;

(hh)    the filing of a pleading by any Debtor or any Affiliate of any Debtor seeking to vacate or modify any DIP Order without the prior consent of the Requisite Lenders;

(ii)    the entry of an order without the prior consent of the Requisite Lenders amending, supplementing or otherwise modifying any of the DIP Orders or the reversal, vacation or stay of the effectiveness of any of the DIP Orders;

(jj)    any sale of all or substantially all assets of all of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) the proceeds of such sale indefeasibly satisfy the Obligations in full in cash or (b) such sale is supported by the Requisite Lenders;

(kk)    the granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement other than in respect of the Loan Documents on assets of any Debtor valued in excess of $500,000;

(ll)    the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any super-priority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the Lenders' Superpriority Claims under the Credit Facility;

(mm)    payment of or granting adequate protection with respect to prepetition Debt, other than as expressly agreed in the Loan Documents, or in any of the DIP Orders; or

(nn)    the Adequate Protection Lien Perfection Actions shall not have been completed or executed in the timeframes or manner as required hereunder or in accordance with the DIP Orders, or if the Adequate Protection Liens shall have been determined not to be enforceable by a court of competent jurisdiction.

then, and in any such event (other than a bankruptcy default) and at any time thereafter, subject to the DIP Orders, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Agents and the Lenders to exercise their remedies under the DIP Orders and the Loan Documents, and the Administrative Agent may, and

at the direction of the Requisite Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times:

    i.    terminate any Term Loan Commitment, and thereupon such Commitments shall terminate immediately;

    ii.    declare the Term Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Term Loans so declared to be due and payable, together with all accrued but unpaid interest thereon and all fees and other Obligations of the Loan Parties accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each of the Loan Parties; <u>provided</u> that, upon the occurrence of a bankruptcy default, all Term Loan Commitments shall automatically terminate and the principal of the Term Loans then outstanding, together with accrued but unpaid interest thereon and all fees and other Obligations of the Loan parties accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each of the Loan Parties;

    iii.    following the delivery of two (2) Business Days written notice by the Administrative Agent to the Debtors and the Non-Guarantor Pledgors (and their restructuring counsel) (the "**Cash Collateral Notice Period**"), subject to the Carve Out, cease to permit the Debtors' and Non-Guarantor Pledgors' continued use of any cash collateral, provided, that during the Cash Collateral Notice Period, the Loan Parties and the Non-Guarantors Pledgors shall only be permitted to make ordinary course operational cash disbursements;

    iv.    following the delivery of five (5) business days' written notice by the Administrative Agent to the Debtors and the Non-Guarantor Pledgors (and their restructuring counsel), the Creditors Committee, if any, and the United States Trustee thereof (the "**Remedies Notice Period**"), exercise all rights and remedies provided for in the DIP Loan Documents or at law including: (a) foreclose upon all of the Collateral, including freezing cash collateral held in any of the Debtors' or Non-Guarantor Pledgor's accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors or the Non-Guarantor Pledgors against the Obligations, or otherwise enforce any and all rights against the Collateral in its possession or otherwise, including, without limitation, disposition of the Collateral and application of net cash proceeds thereof to satisfaction of the Obligations; and (c) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the Loan Documents or applicable law.

During the Remedies Notice Period, (i) the Debtors are prohibited from requesting any further draws and (ii) the only basis on which the Debtors and/or the Creditors' Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Bankruptcy Court shall be to contest whether an Event of Default has occurred and/or is continuing and the Lenders shall consent to such emergency hearing. The automatic stay imposed

under section 105 or section 362(a) of the Bankruptcy Code or otherwise, as to the Lenders and Agent, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order in the event that the Debtors, the Creditors' Committee, if any, any other party in interest and/or the United States Trustee have not obtained an order from the Bankruptcy Court to the contrary prior to the expiration of the Remedies Notice Period.

Upon the occurrence of an Event of Default, subject to the DIP Orders, the Administrative Agent or the Collateral Agent may, and at the direction of the Requisite Lenders shall, exercise any rights and remedies provided to the Administrative Agent and/or the Collateral Agent under the Loan Documents or at law or equity, including under any applicable law of the jurisdiction where any Collateral is located. Each of the Loan Parties shall use cooperate with the Administrative Agent, Collateral Agent and the Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise, including without limitation take any steps or execute any documentation as the Collateral Agent deems necessary to enforce the Liens on any Collateral in any jurisdiction.

## ARTICLE VII

## THE AGENTS

Section 7.01.   <u>Authorization and Action</u>.

(a)     Each Lender hereby appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto, including the execution of the Loan Documents and filing of any documents in accordance with the regulatory requirements of any Governmental Authority and consistent with this Agreement.   As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Term Loans), no Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Requisite Lenders, and such instructions shall be binding upon all Lenders and all holders of Promissory Notes; *provided, however*, that no Agent shall be required to take any action that exposes such Agent to personal liability or that is contrary to this Agreement or applicable law.   Each Agent agrees to give to each Lender prompt notice of each notice given to it by the Borrower pursuant to the terms of this Agreement.

(b)     In furtherance of the foregoing, each Lender hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.   In this connection, the Collateral Agent (and any Supplemental Collateral Agents appointed by the Collateral Agent pursuant to <u>Section 7.01(c)</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights or remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of this <u>Article VII</u> (including, without limitation, <u>Section 7.05</u> as though any such

84

Supplemental Collateral Agents were an "Agent" under the Loan Documents) as if set forth in full herein with respect thereto.

(c)      Any Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder at the direction of the Collateral Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Collateral Agent may also from time to time, when the Collateral Agent deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "**Supplemental Collateral Agent**") with respect to all or any part of the Collateral; *provided, however*, that no such Supplemental Collateral Agent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Collateral Agent.  Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Collateral Agent to more fully or certainly vest in and confirm to such Supplemental Collateral Agent such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Collateral Agent.  If any Supplemental Collateral Agent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall automatically vest in and be exercised by the Collateral Agent until the appointment of a new Supplemental Collateral Agent.  No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Supplemental Collateral Agent that it selects in accordance with the foregoing provisions of this Section 7.01(c) in the absence of such Agent's gross negligence or willful misconduct.

(d)      It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(e)      The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent: (i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing; (ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief

Law; and (iii) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(f)     The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the relevant circumstances), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent in writing by the Borrower or a Lender.

(g)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 7.02.   <u>Agents' Reliance, Etc</u>.   Neither any Agent nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, each Agent: (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or e-mail transmission) believed by it to be genuine and signed or sent by the proper party or parties.

Section 7.03.   <u>Agents and their Affiliates</u>. With respect to the Term Loans held by it and any Promissory Notes issued to it, each of the Administrative Agent and the Collateral Agent shall

have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though each of the Administrative Agent and the Collateral Agent was not an Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent and the Collateral Agent in their individual capacities, the Administrative Agent and the Collateral Agent and their affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if the Administrative Agent and the Collateral Agent (and/or the Affiliates of either) were not an Agent and without any duty to account therefor to the Lenders.  No Agent shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Agent.

Section 7.04.  <u>Lender Credit Decision</u>.    Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on the financial statements referred to in <u>Section 4.01</u> and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

Section 7.05.  <u>Indemnification</u>.

(a)    Each Lender severally agrees to indemnify each Agent and its respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (to the extent not promptly reimbursed by the Borrower), from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the "**Indemnified Costs**"); *provided, however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction.  Without limitation of the foregoing, each Lender agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, reasonable fees and expenses of counsel) payable by the Borrower under <u>Section 8.04</u>, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this <u>Section 7.05</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

(b)    [Reserved].

(c)    For purposes of this Section 7.05, each Lender's respective ratable share of any amount shall be determined, at any time, according to the ratio of (i) the aggregate principal amount of the Term Loans outstanding at such time and owing to such Lender and (ii) the aggregate principal amount of all Term Loans at such time.  The failure of any Lender to reimburse any Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to such Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent for such other Lender's ratable share of such amount.  Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 7.06.  Successor Agents.  Any Agent may resign at any time by giving written notice thereof to the Lenders and the Loan Parties and may be removed at any time with or without cause by the Requisite Lenders upon ten (10) days' prior written notice delivered by the Requisite Lenders to such Agent.  Upon any such resignation or removal, the Requisite Lenders shall have the right to appoint a successor Agent.  If no successor Agent shall have been so appointed by the Requisite Lenders, and shall have accepted such appointment, within 30 days after the retiring Agent's giving of notice of resignation or the Requisite Lenders' removal of the retiring Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $250,000,000.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent and, in the case of a successor Collateral Agent, upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Requisite Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents.  If within 45 days after written notice is given of the retiring Agent's resignation or removal under this Section 7.06 no successor Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Agent's resignation or removal shall become effective, (b) the retiring Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Requisite Lenders shall thereafter perform all duties of the retiring Agent under the Loan Documents until such time, if any, as the Requisite Lenders appoint a successor Agent as provided above.  After any retiring Agent's resignation or removal hereunder as Agent shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

Section 7.07.  Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under this Agreement and the Loan Documents) allowed in such judicial proceeding;

(b) to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor; and/or

(c) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under this Agreement and the Loan Documents. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01.  Amendments, Etc.  No amendment or waiver of, or forbearance from taking any action in respect of, any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (or, in the case of the Collateral Documents, consented to) by the Requisite Lenders (and, in the case of any amendment to any Loan Document, the Loan Parties), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided, however*, that:

(a) no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders (other than any Lender that is, at such time, a Defaulting Lender), do any of the following at any time:

(i)    waive any of the conditions specified in <u>Section 3.01</u>; or

(ii)    change the definition of "Requisite Lenders" or otherwise change the number of Lenders or the Term Loan Commitment of any Lender or the percentage of the aggregate unpaid principal amount of the Loans that, shall be required for the Lenders or any of them to take any action hereunder; or

(iii)    reduce or forgive the principal of the Term Loans, or stated rate of interest (other than Default Interest) on the Term Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender;

(iv)    postpone any date scheduled for any payment of principal of the Term Loans, or interest (other than Default Interest) on the Term Loans pursuant to <u>Section 2.04</u> or <u>2.07</u> or any date fixed for any payment of fees hereunder to a Lender without the consent of such Lender

(v)    change the order of application of any prepayment of Term Loans from the application thereof set forth in the applicable provisions of <u>Section 2.06(b)</u>, in any manner that materially adversely affects the Lenders without the consent of such Lender

(vi)    change the order of application of payments set forth in <u>Section 2.11(f)</u>; or

(vii)    other than in connection with a transaction specifically permitted under this Agreement, release any material portion of the Collateral in any transaction or series of related transactions.

(b)    no amendment, waiver or consent shall, unless in writing and signed by the Requisite Lenders and each Lender specified below for such amendment, amend, waive, modify or consent to any departure from the provisions of this <u>Section 8.01</u> in a manner that would adversely affect the rights of any Lender under this <u>Section 8.01</u> without the consent of such Lender;

provided, further, that no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents.

Section 8.02.    <u>Notices, Etc.</u>

(a)    All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic or telecopy communication) and mailed, telegraphed, telecopied or delivered, or (y) as and to the extent set forth in <u>Section 8.02(b)</u> and in the proviso to this <u>Section 8.02(a)</u>, in an electronic medium and as delivered as set forth in <u>Section 8.02(b)</u> if

to any Loan Party, at the Borrower's address at:

90

Automotores Gildemeister SpA
11000 Avenida Las Condes, Las Condes,
Santiago, Chile
Telephone: +56 984195029
Email: emoyano@gildemeister.cl / eyubero@gildemeister.cl
Attention: Eduardo Moyano / Elena Yubero

with copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York, 10006
United States
Telephone +1 212 225 2704 / +1 212 225 2872 / +1 212 225 2197
Email: abrenneman@cgsh.com / jvanlare@cgsh.com / khailey@cgsh.com
Attention: Adam Brenneman/ Jane VanLare / Kara A. Hailey

to the Administrative Agent:

Acquiom Agency Services LLC
Attn: Automotores Gildemeister SpA Administrator
150 South 5th Street, Suite 2600
Minneapolis, MN 55402
Email: loanagency@srsacquiom.com

with copy to:

Dechert LLP
Three Bryan Park
1095 Avenue of the Americas, New York, NY 10036
Email: allan.brilliant@dechert.com and jeffrey.katz@dechert.com

to the Collateral Agent:

TMF Group New York, LLC. (or any TMF Sub-Agent)
48 Wall Street, 27thFloor
New York, NY 10005
Telephone:
Fax : (212) 346-9012
Attention: Ed O'Connell

and, if to any Lender, at the address specified opposite its name on Schedule 1.01(a) hereto and if to any other Lender, at the address specified in the Assignment and Acceptance pursuant to which it became a Lender, or as to any other party, at such other address as shall be designated by such party in a written notice to the other parties, *provided, however*, that materials and information described in Section 8.02(b) shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Loan Parties by the

Administrative Agent. All such notices and other communications shall, when mailed, telegraphed or telecopied, be effective when deposited in the mails, delivered to the telegraph company or transmitted by telecopier, respectively, except that notices and communications to any Agent pursuant to Article II, III or VII shall not be effective until received by such Agent. Delivery by telecopier of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Promissory Notes or of any Exhibit hereto to be executed and delivered hereunder shall be effective as delivery of an original executed counterpart thereof. As agreed to among the Loan Parties, including as set forth in subsection (b) below, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

(b)      Each of the Loan Parties hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding (i) any notice of any prepayment of the Term Loans pursuant to Section 2.06, (ii) any notice of a Default or Event of Default under this Agreement or (iii) any certificate, agreement or other document required to be delivered to satisfy any condition set forth in Article III of this Agreement (all such non-excluded communications being referred to herein collectively as "**Communications**"), by delivering the Communications by e-mail to an e-mail address specified by the Administrative Agent to the Borrower. In addition, each of the Loan Parties agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents. Each of the Loan Parties further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system reasonably acceptable to the Loan Parties (the "**Platform**").

(c)      The Platform is provided on an "as is" and "as available" basis and the Agent Parties (as defined below) make no representation or warranty of any kind as the accuracy or completeness of the Communications or as to the adequacy of the Platform, and expressly disclaim any liability for any errors or omissions in the Communications. In no event shall the Administrative Agent or any of its Affiliates or any of their respective officers, directors, employees, agents, advisors or representatives (collectively, the "**Agent Parties**") have any liability to the Borrower, any Lender or any other Person or entity for damages of any kind, including, without limitation, any direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of either Borrower's or the Administrative Agent's delivery of any Communications through the internet, except to the extent the liability of any Agent Party is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Agent Party's gross negligence or willful misconduct.

(d)      The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the

Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to (i) notify the Administrative Agent in writing (including by e-mail) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 8.03.  No Waiver; Remedies.  No failure on the part of any Lender or any Agent to exercise, and no delay in exercising, any right hereunder or under any Promissory Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 8.04.  Costs and Expenses.

(a)    The Loan Parties shall be jointly and severally liable to pay all prepetition and post-petition fees, costs, disbursements and expenses of the Agents and the Lenders which, (a) (i) with respect to each Agent, shall be limited to the reasonable and documented fees, costs and expenses of one primary firm of legal counsel plus one firm of local counsel in each appropriate jurisdiction, including, without limitation, any jurisdiction where any Collateral is located and (ii) with respect to each Lender, shall include the reasonable and documented fees, costs and expenses of one primary firm of legal counsel plus one firm of local counsel in each appropriate jurisdiction, including, without limitation, Dechert LLP, Prieto Abogados SpA, Pinheiro Neto, Hernández y Cía, Ferrere Abogados, Costa Rican counsel, and Juan Luis Goldenberger and any other additional counsel reasonably necessary to advise in each appropriate jurisdiction, including without limitation, any jurisdiction where any Collateral is located, plus Link Capital Partners SpA, as financial advisor to Dechert LLP as counsel to the Lenders), in each case that in any way relate to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the Lenders' and their respective Affiliates' holdings of the 7.5% Notes due 2025 under the Indenture, any fees and expenses of any of their advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the definitive documents related thereto, the Loan Documents, the Chapter 11 Cases, the administration of the Credit Facility, any filing, registration, recording or perfection of any security interest contemplated by any Collateral Document and (b) with respect to each Agent and each Lender, shall include all documented fees, costs and expenses incurred in connection with enforcement of rights and remedies with respect to the DIP Credit Facility, the DIP Loan Documents, and/or the Collateral, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith (collectively, the "**Agent and Lenders' Fees**"). All invoiced and outstanding Agent and Lenders' Fees shall be due and payable in accordance with the DIP Orders. All invoices for Agent and Lenders' Fees shall be summary invoices without any detailed time entries and (ii) shall not be subject to the US Trustee guidelines.

(b)    The Loan Parties agree, jointly and severally, to indemnify and hold each Agent and the Lenders and their respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "**Indemnified Person**")

harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by or asserted against an Indemnified Person by reason of or resulting from the Credit Facility, the Loan Documents, the Collateral, the transactions contemplated thereby or hereby or by any thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing (including, without limitation, any Environmental Action), whether or not any such Indemnified Person is a party thereto and whether or not brought by any Loan Party or any other person or entity, except to the extent resulting from the gross negligence, bad faith, or willful misconduct of an Indemnified Person, in each case as determined by a final non-appealable order of a court of competent jurisdiction.  In all such litigation, or the preparation therefor, each Agent and the Lenders shall each be entitled to select their own counsel and, in addition to the foregoing indemnity, the Loan Parties agree to pay promptly the reasonable fees and expenses of all such counsel.

(c)       If the Collateral Agent should at any time due to local legal requirements take title to the Collateral located in Costa Rica, the Loan Parties hereby agree that the Loan Parties and its Affiliates shall pay and reimburse the Collateral Agent for any and all costs related to the taking of possession of such Collateral, including operating costs, losses, fees, taxes, incurred or suffered by the Collateral Agent. Additionally, the Collateral Agent shall then be empowered to immediately proceed to liquidate such Collateral by any reasonable means according to the nature of such Collateral, including the hiring of an expert on the matter. The Collateral Agent will sell such Collateral at an authorized price agreed to by the Lenders, however, the Collateral Agent shall not be responsible as to the value obtained for such a sale after said approval. The Collateral Agent shall also be entitled to require instructions from the Required Lenders regarding the manner in which to proceed.

(d)       If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender, in its sole discretion.

(e)       Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Loan Parties contained in Section 2.11 and Section 2.13 and this Section 8.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

Section 8.05.   Right of Set-off.   Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Term Loans due and payable pursuant to the provisions of Section 6.01, each Agent and each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender or such Affiliate to or for the credit or the account of any Loan Party against any and all of the Obligations of the Loan Parties now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender shall have made any demand under this

Agreement or the other Loan Documents and although such Obligations may be unmatured.  Each Agent and each Lender agrees promptly to notify the Loan Parties after any such set-off and application; *provided, however*, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Agent and each Lender and their respective Affiliates under this <u>Section 8.05</u> are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender and their respective Affiliates may have.

Section 8.06.   <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been duly executed by each Loan Party and each Agent and the Administrative Agent shall have been notified by each Initial Lender that such Initial Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, each Agent and each Lender and their respective successors and assigns, except that none of the Loan Parties shall have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.

Section 8.07.   <u>Assignments and Participations</u>.

(a)     Each Lender may assign all or a portion of its Commitments, Term Loans, rights and obligations under this Agreement (including, without limitation, any Promissory Note held by it) without the consent of the Administrative Agent or any of the Loan Parties: (i) to an Eligible Assignee and (ii) with respect to any assignment to another Lender, to an affiliate of such Lender or a fund engaged in investing in commercial loans that is advised or managed by such Lender or the advisor or manager of such Lender; provided that, any assignee under this clause (a), to the extent such assignee is not already a party to the Restructuring Support Agreement or an affiliate of a party that is already a party to the Restructuring Support Agreement, shall execute a joinder to the Restructuring Support Agreement. Except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement and the other Loan Documents (including without limitation all Collateral Documents), the aggregate principal amount of the Term Loans being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $1,000,000 (or such lesser amount as shall be approved by the Administrative Agent).  The parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Promissory Note or Promissory Notes (if any) subject to such assignment.  Assignment and transfers of any Terms Loans or Commitments to the Borrower or any of its Subsidiaries shall not be permitted under any circumstances.

(b)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, and upon payment by the parties to the Assignment and Acceptance to the Administrative Agent an administrative fee of $3,500.00, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under <u>Section 2.11</u>, <u>Section 2.13</u> and <u>Section</u>

8.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)    By executing and delivering an Assignment and Acceptance, each Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 5.03 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Loan Parties, shall maintain at its address referred to in Section 8.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the principal amount of the Term Loans owing to, each Lender from time to time (the "**Register**"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Loan Parties, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Loan Parties or any Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with any Promissory Note or Promissory Notes subject to such assignment, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in form and substance satisfactory to the Administrative Agent, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Loan Parties and each other Agent. In the case of any assignment

96

by a Lender, within five (5) Business Days after its receipt of such notice, upon request by a Lender to the Borrower shall execute and deliver, at such Borrower's own expense, to the Lender in exchange for the surrendered Promissory Note or Promissory Notes (if any) a new Promissory Note payable to such Eligible Assignee in an amount equal to the principal amount of the Term Loans assigned to such Eligible Assignee pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Promissory Note or Promissory Notes prior to such assignment has retained any amount of the Term Loans, a new Promissory Note to such assigning Lender in an amount equal to the principal amount of the Term Loans retained by it hereunder.  Such new Promissory Note or Promissory Notes shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in form and substance satisfactory to the Lenders.

(f)    [Reserved].

(g)    Each Lender may sell participations to one or more Persons (other than any Loan Party, Non-Guarantor Pledgors or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Term Loans owing to it and any Promissory Note or Promissory Notes held by it); *provided, however*, that (i) such Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Promissory Note for all purposes of this Agreement, (iv) the Loan Parties, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest (other than Default Interest) on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release a substantial portion of the value of the Collateral or the value of the Guaranties and (vi) the participating banks or other entities shall be entitled to the benefit of Section 2.12 to the same extent as if they were a Lender but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and only if such participant agrees to comply with Section 2.12(e) and Section 2.12(a)(v) as though it were a Lender.

(h)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 8.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Loan Parties furnished to such Lender by or on behalf of the Loan Parties; *provided, however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender.

(i)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time (and without the consent of the Administrative Agent or the Loan Parties) create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Term Loans owing to it and any Promissory Note or Promissory Notes held by it)

97

in favor of any Federal Reserve Bank, in accordance with Regulation A of the Board of Governors of the Federal Reserve System, or any Federal Home Loan Bank.

(j)      Notwithstanding anything to the contrary contained herein, any Lender that is a Fund that invests in bank loans may, in accordance with applicable Law, without the consent of the Administrative Agent or the Loan Parties, create a security interest in all or any portion of the Term Loans owing to it, its Commitments, and the Promissory Note or Promissory Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities, *provided, however*, that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 8.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(k)      Notwithstanding any other provision hereof, no Loan Party shall be entitled to assign or otherwise transfer any of its rights or obligations hereunder or under any of the other Loan Documents in any circumstance.

Section 8.08.    Execution in Counterparts.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.    Delivery by telecopier or email transmission of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

Section 8.09.    Confidentiality.    Neither any Agent nor any Lender shall disclose any Confidential Information to any Person without the consent of the Loan Parties, other than (a) to such Agent's or such Lender's Affiliates and their officers, directors, employees, agents and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the Federal Home Loan Bank, the Federal Deposit Insurance Corporation, the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender, (d) to any rating agency when required by it; provided that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender, (e) in connection with any litigation or proceeding to which such Agent or such Lender or any of its Affiliates may be a party, (f) to any other party to this Agreement or (g) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document.

Section 8.10.    Release of Collateral.    Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party or Non-Guarantor Pledgor, as the case may be, in accordance with the terms of the Loan Documents, the Collateral Agent will, at the Borrower's expense, execute and deliver to such Loan Party or Non-Guarantor Pledgor such documents as such Loan Party or Non-Guarantor Pledgor may reasonably request to evidence the release of such

item of Collateral from the Lien granted under the Collateral Documents in accordance with the terms of the Loan Documents.

Section 8.11.  <u>Patriot Act Notice</u>.  Each Lender and each Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act. The Loan Parties shall, and shall cause each of their Subsidiaries to, provide to the extent commercially reasonable, such information and take such actions as are reasonably requested by any Agents or any Lender in order to assist the Agents and the Lenders in maintaining compliance with the Patriot Act.

Section 8.12.  <u>Jurisdiction, Etc.</u>

(a)     Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from retaining or exercising) jurisdiction, nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)     Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any of the courts described in clause (a) above.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Notwithstanding the foregoing, the Agents may determine that security documentation relating to the Collateral shall be governed by local or foreign law, as applicable.

Section 8.13.  <u>Governing Law</u>.  This Agreement, the Promissory Notes and the other Loan Documents (unless otherwise expressly provided therein) shall be governed by, and construed in accordance with the internal laws of the State of New York (including Section 5-1401 and 5-1402 of the General Obligations Law of the State of New York), without regard to conflicts of laws principles that would require application of another law.  For the avoidance of doubt, the Collateral

Documents shall be governed by the laws of the jurisdiction where the applicable Collateral is located.

Section 8.14.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE LOAN PARTIES AND THE AGENTS AND LENDERS IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE TERM LOANS OR THE ACTIONS OF ANY AGENT OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.

Section 8.15.   <u>Limitation of Liability</u>.  Each of the Borrower and the other Loan Parties agrees not to assert any claim against any Agent, any Lender or any of their Affiliates, or any of their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Term Loans, the actual or proposed use of the proceeds of the Term Loans, the Loan Documents or any of the transactions contemplated by the Loan Documents.

Section 8.16.   <u>Collateral Documents</u>.  Each Lender, for the benefit of the Agents, consents and agrees to the terms of the Collateral Documents as the same may be in effect or may be amended from time to time in accordance with its terms and the terms of this Agreement, and authorizes and directs the Collateral Agent to enter into the Collateral Documents and to perform its obligations and exercise its rights and remedies thereunder in accordance therewith, subject in each case to any discretion that may be provided to the Collateral Agent by any of the terms of any such Collateral Document.

Section 8.17.   [Reserved].

Section 8.18.   <u>No Personal Liability of Directors, Officers, Employees and Equity Holders</u>.  No direct or indirect stockholder, partner, member, equity holder, employee, officer or director, as such, past, present or future, of any Loan Party or any successor entity shall have any personal liability in respect of the obligations of the Loan Parties under any Loan Document by reason of his, her or its status as such stockholder, partner, member, equity holder, employee, officer or director, except to the extent such Person (a) is a Loan Party, (b) has assumed such obligations of a Loan Party, or (c) otherwise has agreed in writing to have such personal liability. For avoidance of doubt, nothing contained in this <u>Section 8.18</u> shall limit, restrict, impair or otherwise affect any Lien granted by any Person referred to in this <u>Section 8.18</u>, any indebtedness or obligation secured by any such Lien or any right or remedy of any Agent or Lender with respect to any such Lien, all of which shall be and remain in full force and effect in accordance with their terms.

Section 8.19.   <u>Loan Party Obligations Joint and Several</u>.  All obligations of the Loan Parties hereunder and under the other Loan Documents shall be joint and several obligations thereof.

**ARTICLE IX**

**GUARANTY**

Section 9.01.    <u>Guaranty; Limitation of Liability</u>.

(a)    Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "**Guaranteed Obligations**"), and agrees to pay any and all reasonable expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by any Agent or any Lender in enforcing any rights under this Guaranty or any other Loan Document. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Agent or any Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

(b)    Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each Lender, hereby confirms that it is the intention of all such Persons that this Guaranty and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Debtor Relief Laws, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Administrative Agent, the Lenders and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

(c)    Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Agents and the Lenders under or in respect of the Loan Documents.

Section 9.02.    <u>Guaranty Absolute</u>. Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Agent or any Lender with respect thereto.  The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan

101

Party or whether the Borrower or any other Loan Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e)     any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)     any failure of any Agent or any Lender to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Agent or such Lender, as the case may be (each Guarantor waiving any duty on the part of the Agents and the Lenders to disclose such information);

(g)     the failure of any other Person to execute or deliver this Guaranty, any Guaranty Supplement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Agent or any Lender that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety, in its capacity as a guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Agent or any Lender or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

Section 9.03.    <u>Waivers and Acknowledgments</u>.

(a)    Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, intent to accelerate, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Agent or any Lender protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)    Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)    Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)    Each Guarantor acknowledges that the Collateral Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Collateral Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)    Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Agent or any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Agent or such Secured Party, as the case may be.

(f)    Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in <u>Section 9.02</u> and this <u>Section 9.03</u> are knowingly made in contemplation of such benefits.

Section 9.04.    <u>Subrogation</u>. Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party or any other insider guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Agent or any Lender against the Borrower, any other Loan Party or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in

equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party or any other insider guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty, such amount shall be received and held in trust for the benefit of the Secured Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to any Secured Party of all or any part of the Guaranteed Obligations, and (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash, the Agents and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

Section 9.05.  <u>Guaranty Supplements</u>. Upon the execution and delivery by any Person of a guaranty supplement in substantially the form of EXHIBIT D hereto (each, a "**Guaranty Supplement**"), (a) such Person shall be referred to as an "**Additional Guarantor**" and shall become and be a Guarantor hereunder, and each reference in this Guaranty to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and each reference in any other Loan Document to a "**Guarantor**" shall also mean and be a reference to such Additional Guarantor, and (b) each reference herein to " this Guaranty," "hereunder," "hereof" or words of like import referring to this Guaranty, and each reference in any other Loan Document to the "**Guaranty**," "thereunder," "thereof" or words of like import referring to this Guaranty, shall mean and be a reference to this Guaranty as supplemented by such Guaranty Supplement.

Section 9.06.  <u>Subordination</u>. Each Guarantor hereby subordinates any and all debts, liabilities and other Obligations owed to such Guarantor by each other Loan Party (the "**Subordinated Obligations**") to the Guaranteed Obligations to the extent and in the manner hereinafter set forth in this <u>Section 9.06</u>:

(a)    <u>Prohibited Payments, Etc</u>. Except during the continuance of an Event of Default, each Guarantor may receive payments from any other Loan Party on account of the Subordinated Obligations.  After the occurrence and during the continuance of any Event of Default, however, unless the Requisite Lenders otherwise agree, no Guarantor shall demand, accept or take any action to collect any payment on account of the Subordinated Obligations.

(b)    <u>Prior Payment of Guaranteed Obligations</u>.  In any proceeding under any Debtor Relief Laws relating to any other Loan Party, each Guarantor agrees that the Agents and the Lenders shall be entitled to receive payment in full in cash of all Guaranteed Obligations

(including all interest and expenses accruing after the commencement of a proceeding under any Debtor Relief Laws, whether or not constituting an allowed claim in such proceeding ("**Post-Petition Interest**")) before such Guarantor receives payment of any Subordinated Obligations.

(c)    Turn-Over. After the occurrence and during the continuance of any Event of Default, each Guarantor shall, if the Administrative Agent, acting at the direction of, or with the consent of, the Requisite Lenders, so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Agents and the Lenders and deliver such payments to the Administrative Agent on account of the Guaranteed Obligations (including all Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

(d)    Administrative Agent Authorization.  After the occurrence and during the continuance of any Event of Default, the Administrative Agent acting at the direction of, or with the consent of, the Requisite Lenders, is authorized and empowered (but without any obligation to so do), in its discretion, (i) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and to apply any amounts received thereon to the Guaranteed Obligations (including any and all Post-Petition Interest), and (ii) to require each Guarantor (A) to collect and enforce, and to submit claims in respect of, Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the Guaranteed Obligations (including any and all Post-Petition Interest).

Section 9.07.   Continuing Guaranty; Assignments. This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agents and the Lenders and their successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, any Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of the Term Loans owing to it and any Promissory Note or Promissory Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise, in each case as and to the extent provided in Section 9.07. No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Secured Parties; provided that any Guarantor may assign its rights to the applicable Loan Party in a transaction permitted pursuant to Section 5.02(k).

# ARTICLE X

# COLLATERAL SECURITY

Section 10.01. Security. Pursuant to the Collateral Documents, the Obligations of the Loan Parties hereunder and any other Loan Document will be secured by the Collateral pursuant to the Collateral Documents.  Pursuant to the terms of the Intercreditor Agreement and the DIP Orders, (i) the Liens on Indenture Collateral pledged by the Loan Parties in favor of the Secured Parties shall be senior to and prime to the Liens granted in favor of the Collateral Agent under the

Indenture pursuant to the Note Documents, (ii) the Liens on Indenture Collateral pledged by the Non-Guarantor Pledgors in favor of the Secured Parties shall be *pari passu* to the Liens granted in favor of the Collateral Agent under the Indenture pursuant to the Note Documents, and (iii) the Secured Parties shall be granted first priority liens over the Separate First Lien Collateral (as defined in the Intercreditor Agreement).

Section 10.02. <u>Security Documents.</u>

(a)     As provided in the Collateral Annex, each of the Loan Parties shall, and each of the Loan Parties shall cause each of the Non-Guarantor Pledgors to, enter into certain security agreements or amendments to existing security agreements setting forth the terms of the Liens granted under the Collateral Documents to secure the Obligations of the Loan Parties under this Agreement and the other Loan Documents. Subject to the terms of, and limitations under, the Collateral Documents and the Collateral Annex, these security interests will secure the payment and performance when due of the Obligations of the Loan Parties under this Agreement and the other Loan Documents.  Except otherwise as provided in the Collateral Documents, the Collateral Annex and <u>Schedule 5.01(y)</u>, the Liens created by the Collateral Documents will be perfected on the Closing Date in accordance with the Collateral Documents and the Collateral Annex (unless otherwise directed by the Requisite Lenders in their sole discretion) in a manner satisfactory to the Collateral Agent and the Requisite Lenders.

(b)     The Collateral Documents will be governed by the laws of the jurisdiction in which the Collateral is located and will be in form and substance satisfactory to the Collateral Agent and the Requisite Lenders in consultation with their respective counsel. Only the Collateral Agent has the right to realize upon the Collateral pursuant to such Collateral Documents and this Agreement and shall do so as directed in writing by the Requisite Lenders or the Administrative Agent (at the direction of the Requisite Lenders).  Subject to the DIP Orders, disposition of Collateral under the Collateral Documents may be enforced only upon an acceleration of the Obligations following an Event of Default. The Collateral Agent will enter into the Collateral Documents in its own name (or that of its applicable TMF Sub-Agent) as a secured party on behalf of the Lenders. Each Lender will be deemed to appoint the Collateral Agent as its agent under the Collateral Documents and authorizes it to act as such and in accordance with the written directions given to the Collateral Agent by the Requisite Lenders. The Collateral Agent and each of the Loan Parties agree that the Collateral Agent shall act based on the written instructions given to the Collateral Agent by the Requisite Lenders or the Administrative Agent (at the direction of the Requisite Lenders).

(c)     The Lender will not have any direct rights under the Collateral Documents and may not, either individually or collectively, take any action to enforce any indirect rights in their favor under the Collateral Documents except that the Requisite Lenders may directly instruct the Collateral Agent in writing and to the extent permitted hereby, to act if any amount is due and owing under the Promissory Notes (whether by acceleration or otherwise). The Collateral Agent will, at the expense of the Loan Parties, enter into the relevant release documents and do all other such things as are necessary in order to release of any security interest created by the Collateral Documents as may be permitted or required by the terms of the Collateral Documents and as instructed in writing by the Requisite Lenders.

(d)    Subject to the terms of this Agreement and the Collateral Documents, the Loan Parties will have the right to sell or otherwise dispose of any or all of the Collateral, subject to the other covenants provided for under this Agreement; *provided*, that the sale or other disposition complies with Section 5.02(e).

Section 10.03. Release. The Borrower, the other Loan Parties and the Non-Guarantor Pledgors will be entitled to the release of the Liens on the Collateral securing the Obligations under any one or more of the following circumstances:

(a)    other than with respect to Collateral that is subject to a floating lien pledge and is sold or otherwise disposed of in the ordinary course of business, with the written consent of the Collateral Agent (not to be unreasonably withheld) in connection with any sale or other disposition of such Collateral (including by way of merger or consolidation) to a Person that is not (either before or after giving effect to such transaction) the Borrower or any Loan Party made in accordance with the terms of this Agreement and the Collateral Documents;

(b)    in the case of Collateral that is subject to a floating lien pledge and is sold or otherwise disposed of in the ordinary course of business, in connection with any sale or other disposition of such Collateral (including by way of merger or consolidation) to a Person that is not (either before or after giving effect to such transaction) the Borrower or any other Loan Party or Non-Guarantor Pledgor made in accordance with the terms of this Agreement and the Collateral Documents;

(c)    if any Guarantor or Non-Guarantor Pledgor ceases to be a Subsidiary of the Borrower in accordance with the terms of this Agreement and the Collateral Documents, with the written consent of the Collateral Agent (not to be unreasonably withheld), the Liens on all of the Collateral held by such Guarantor, Non-Guarantor Pledgor shall be released;

(d)    upon repayment in full of all of the Obligations (including principal, interest, premium and fees and expenses) of the Loan Parties under this Agreement and the other Loan Documents; or

To the extent Collateral has been sold or disposed of in accordance with this Agreement and the Collateral Documents, the Collateral Agent shall execute such releases, termination statements or other documents to evidence a release of the Liens on Collateral in accordance with the foregoing provision as requested and produced by the Borrower upon delivery of an Officer's Certificate and an Opinion of Counsel stating that the release of Liens is permitted by this Agreement and the terms of the Collateral Documents. Without affecting the Collateral Agent's responsibilities and duties contained herein, the Collateral Agent shall be entitled to request such documentation it deems appropriate to evidence compliance with this Agreement and Collateral Documents prior to executing any such documents. In the event any Debtor or Non-Guarantor Pledgor grants an Lien over any inventory comprised of vehicles, vehicle parts, vehicle accessories, or other inventory or receivables to secure Inventory Debt hereunder, solely to the extent permitted in this Agreement and consistent with its past practices (such pledged assets, the "**Newly Pledged Inventory**") to secure its obligations under such Inventory Debt, all Liens granted in favor of the Collateral Agent with respect to the Newly Pledged Inventory shall be automatically and unconditionally released, provided that (i) the proceeds of the Inventory Debt

secured by the Newly Pledged Inventory will be subject to first ranking and priming Liens granted in favor of the Collateral Agent  (in the case of the Non-Guarantor Pledgors organized in Costa Rica, as provided under the Collateral Documents), and (ii) other than with respect to any Newly Pledged Inventory of the Debtors constituting Excluded Assets, the Secured Parties and the Secured Noteholders shall be given junior Liens in any Newly Pledged Inventory owned by the Debtors, subject to the priority and other provisions of the DIP Orders, provided that such junior Liens in the Newly Pledged Inventory shall be automatically and unconditionally released upon any transfer of title to such Newly Pledged Inventory to third parties in the ordinary course of business and consistent with the Debtors' past practices.  Furthermore, in the event any Debtor or Non-Guarantor Pledgor sells any account receivable consisting of Collateral in a factoring transaction solely to the extent permitted under this Agreement and consistent with its past practices (such assets, the "**Factoring Receivables**") and such sale is otherwise permitted under the terms of the Note Documents and the Loan Documents, all Liens and with respect to the Factoring Receivables shall be automatically and unconditionally released, provided that the proceeds of the factoring transactions will be subject to first ranking and priming Liens granted in favor of the Collateral Agent.

Section 10.04. Collateral Agent is Third Party Beneficiary. Each TMF Sub-Agent party to any Loan Document or Collateral Document is an intended third party beneficiary of the provisions of this Agreement, including this Article X.

Section 10.05. Collateral Agent. (a) The Collateral Agent is appointed by the Lenders as the collateral agent for the benefit of the Secured Parties and shall initially act as the collateral agent under this Agreement and the Collateral Documents. The duties of the Collateral Agent shall be administrative in nature, and no Collateral Agent shall have any duties or responsibilities except for those expressly set forth in this Agreement or in the applicable Collateral Documents and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or the applicable Collateral Documents. The Collateral Agent will be the holder (directly or through co-trustees or agents) of all Liens on the Collateral and will be entitled to exercise remedies on such Collateral on behalf of all Lenders and shall do so upon an instruction given by the Requisite Lenders or the Administrative Agent (at the direction of the Requisite Lenders). Except as provided in the Agreement or the Collateral Documents, the Collateral Agent will not be obligated:

(i)      to act upon directions purported to be delivered to it by any Person;

(ii)      to foreclose upon or otherwise enforce any Lien; or

(iii)      to take any other action whatsoever with regard to any or all of the Collateral Documents, the Liens created thereby or the Collateral.

Any proceeds from the Collateral received by the Collateral Agent or any TMF Sub-Agent for the benefit of the Lenders under the Intercreditor Agreement shall be immediately transferred to the Administrative Agent's Account for distribution by the Administrative Agent pursuant to Section 2 hereof.

For the avoidance of doubt and notwithstanding anything to the contrary herein, all of the rights, protections, immunities and indemnities granted to the Administrative Agent hereunder shall also inure to the benefit of the Collateral Agent (including each TMF Sub-Agent) acting hereunder and under the Collateral Documents and all of the provisions of this Agreement granting such rights, protections, immunities and indemnities shall apply to the Collateral Agent (and to each such TMF Sub-Agent) as if such Persons were named in such provisions. Without affecting the Collateral Agent's responsibilities and duties contained herein, the Collateral Agent shall be entitled to request information from the Administrative Agent regarding the identity of any Lenders purporting to be the Requisite Lenders. Additionally, all actions performed by the Collateral Agent will be done upon written instructions given by the Requisite Lenders, and in consultation with its counsel, the cost of which will be borne by the Loan Parties.

(b)    For the avoidance of doubt and for the purposes of Article 18 of Law No. 20,190 of the Republic of Chile, TMF Group New York, LLC. (and, as applicable, its Subsidiaries and Affiliates party to a Collateral Document applicable to Collateral located in Chile) is hereby authorized, in its capacity as Collateral Agent for the Lenders, to perform the following acts on behalf of the Lenders: (i) to appear as Collateral Agent in Chile in one or more public deeds, accepting the Collateral Documents in which the Collateral Agent (or such Subsidiary or Affiliate) will be empowered to agree in said documents to all the necessary and appropriate clauses, terms and conditions; (ii) to grant, execute, deliver and perform any other act, contract, agreement, document or instrument in connection with the above, or the documents executed thereunder, which may be necessary to authorize or grant such Collateral Documents and to fulfill the acts mentioned in sub clause (i) above, whether such agreements are granted by public deed or private instrument, and said documents or agreements may be in such form and contain such provisions as the Collateral Agent shall approve or agree; (iii) to do and perform any and all other acts which may be necessary or desirable to complete and execute the Collateral Documents and perfect, maintain and preserve the Collateral Documents and the security interest created thereby; and (iv) to delegate the above powers to one or more sub-agents. Each Lender and each of the Loan Parties, expressly accept the appointment of the Collateral Agent (or such Subsidiary or Affiliate) as such for the Lenders. The provisions of this clause 10.05(b) shall be construed in accordance with and governed by the laws of the Republic of Chile. For purposes of number 4 of Article 18 of Law No. 20,190 of the Republic of Chile, together with the Chilean collateral agency agreement a legalized copy of this Agreement shall be recorded with a Chilean Notary Public.

Section 10.06. Compensation and Indemnity. (a) The Loan Parties will pay the Collateral Agent as agreed upon in writing for its services. The Loan Parties will reimburse the Collateral Agent upon request for all reasonable out-of-pocket expenses, disbursements and advances incurred or made by the Collateral Agent, including the reasonable compensation and expenses of the Collateral Agent's counsel.

(b)    Each of the Loan Parties will indemnify the Collateral Agent and its officers, directors, employees, representatives and agents for, and hold them harmless against, any claim, loss or liability or expense (including reasonable and documented attorney's fees and expenses) incurred by them without gross negligence or willful misconduct on their part arising out of or in connection with its duties hereunder and under this Agreement, the Loan Documents and the Collateral Documents, including the reasonable and documented costs and expenses of

109

defending themselves against any claim or liability and of complying with any process served upon them in connection with the exercise or performance of any of their powers or duties thereunder.

(c)    The provisions of this Section 10.06 shall survive the resignation or removal of the Collateral Agent and the termination of this Agreement.

Section 10.07. Replacement of Collateral Agent. (a) The Collateral Agent may resign upon 90 days prior written notice to the Borrower, the Administrative Agent and the Lenders. The Requisite Lenders may remove the Collateral Agent in their sole discretion by written notice to the Administrative Agent, the Collateral Agent and the Borrower.

(b)    A resignation or removal of the Collateral Agent and appointment of a successor Collateral Agent will become effective only upon the successor Collateral Agent's acceptance of appointment as provided in this Section.

(c)    If the Collateral Agent has been removed or resigns, or if there is otherwise a vacancy in the office of the Collateral Agent for any other reason, the Requisite Lenders will promptly provide written notice to the Administrative Agent to appoint a successor Collateral Agent selected by such Requisite Lenders, and the Administrative Agent shall forthwith, unconditionally, make such appointment within two Business Days. If a successor Collateral Agent does not deliver its written acceptance within 90 days after the retiring Collateral Agent resigns or is removed, the retiring Collateral Agent (at the expense of the Borrower), the Borrower or the Requisite Lenders may petition any court of competent jurisdiction for the appointment of a successor Collateral Agent.

(d)    Upon delivery by the successor Collateral Agent of a written acceptance of its appointment to the retiring Collateral Agent, the Borrower and the Administrative Agent, (i) the retiring Collateral Agent will transfer all property held by it as Collateral Agent to the successor Collateral Agent, (ii) the resignation or removal of the retiring Collateral Agent will become effective, and (iii) the successor Collateral Agent will have all the rights, powers and duties of the Collateral Agent under this Agreement. Upon request of any successor Collateral Agent, the Administrative Agent or the Borrower or any other Loan Party, as applicable, will execute any and all instruments for fully vesting in, and confirming to, the successor Collateral Agent all such rights and powers. If requested in writing by the Borrower or any other Loan Party, the Administrative Agent shall, at the expense of the Loan Parties, provide notice of the appointment of a successor Collateral Agent in accordance with clause (c) above to all Lenders within five (5) Business Days of such event, and include in the notice the name and address of the successor Collateral Agent.

(e)    In the event the Collateral Agent resigns or is removed under this Article X, the Collateral Agent shall also be deemed to have resigned or been removed under each of the Collateral Documents. Any successor Collateral Agent, unless otherwise agreed to in a writing between the successor Collateral Agent and the Requisite Lenders, shall be deemed to be appointed as Collateral Agent under each of the Collateral Documents. After the 90 day period without appointment of a successor Collateral Agent pursuant to Section 10.07.(c), the retiring Collateral Agent may resign under each Collateral Document and a Lender shall be deemed to be appointed as Collateral Agent under each of the Collateral Documents.

[*remainder of page left intentionally blank.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

[BORROWER]


By: _____
     Name:
     Title:

[GUARANTORS]


By: _____
     Name:
     Title:

ACKNOWLEDED AND AGREED:


[NON-GUARANTOR PLEDGORS]
as Non-Guarantor Pledgor


By: _____
Name: [•]
Title:   Authorized Signatory

[COLLATERAL AGENT]


By: _____
     Name:
     Title:

[ADMINISTRATIVE AGENT]
as Administrative Agent


By: _____
    Name: _____
    Title: _____

1

[LENDERS]
as an Initial Lender

By: _____

    Name: _____

    Title: _____

**<u>EXHIBIT 2</u>**

**Initial DIP Budget**

**Automotores Gildemeister SpA**
**DIP Budget**
USD million

| Chilean Debtors + Peru | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Week beginning: | abr-12 | abr-19 | abr-26 | may-03 | may-10 | may-17 | may-24 | may-31 | jun-07 | jun-14 | jun-21 | jun-28 | jul-05 |
| **Opening Available Cash Balance** | **$58.0** | **$60.6** | **$53.8** | **$47.4** | **$56.3** | **$53.0** | **$50.4** | **$44.9** | **$56.7** | **$55.2** | **$67.9** | **$48.1** | **$49.6** |
| **Cash flow from operating activities** | | | | | | | | | | | | | |
| Receipts from sales | $17.0 | $17.0 | $13.3 | $22.8 | $23.6 | $19.2 | $23.5 | $21.9 | $20.3 | $24.3 | $20.4 | $19.2 | $20.4 |
| General local suppliers | (1.7) | (2.0) | (2.0) | (2.4) | (3.3) | (3.3) | (1.9) | (3.3) | (3.3) | (1.9) | (3.3) | (2.5) | (2.4) |
| Suppliers - International | (2.2) | (0.3) | (2.1) | (1.8) | (0.5) | (0.4) | (1.8) | - | (2.2) | (2.8) | (1.7) | - | (0.4) |
| Suppliers - Vehicle inventory | (20.5) | (13.3) | (52.1) | (3.4) | (47.7) | (6.2) | (16.3) | - | (22.4) | 3.3 | (27.4) | - | (15.6) |
| Suppliers - Spare Parts inventory | - | (0.3) | - | (0.5) | - | - | - | (0.5) | - | - | - | - | (0.4) |
| Personnel costs | (0.7) | - | (1.3) | (0.4) | (1.1) | - | (1.8) | (0.4) | (0.4) | (0.7) | (1.1) | (0.7) | (0.4) |
| Custom duties and taxes | (2.3) | (5.1) | (3.8) | (3.4) | (3.9) | (6.5) | (4.1) | (3.3) | (3.8) | (6.6) | (3.8) | (1.9) | (3.3) |
| Leases | - | - | - | - | (0.8) | - | - | (0.8) | - | - | - | - | (0.8) |
| Dividend receipts | 0.4 | - | - | - | 0.4 | - | - | - | - | 0.4 | - | - | - |
| Other operating receipts & Other operating disbursements | - | (4.1) | - | - | - | (4.0) | - | - | - | - | - | - | - |
| **Net cash flow of operating activities** | **($10.0)** | **($8.2)** | **($47.9)** | **$11.0** | **($33.3)** | **($1.3)** | **($2.3)** | **$13.6** | **($11.7)** | **$9.4** | **($16.8)** | **$14.2** | **($2.9)** |
| **Cash flow from investing activities** | | | | | | | | | | | | | |
| Proceeds from asset sales | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow of investing activities** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Cash flow from financing activities** | | | | | | | | | | | | | |
| Factoring receipts | 1.8 | 5.6 | - | 3.5 | 5.0 | 3.5 | 1.5 | 3.5 | - | 8.0 | 2.0 | 1.0 | 16.0 |
| Bank debt proceeds | - | - | 47.0 | - | 20.8 | - | - | - | 16.4 | - | - | - | - |
| Bank debt repayments | (4.3) | (4.1) | (5.4) | (4.5) | (4.5) | (4.7) | (4.5) | (4.3) | (6.1) | (4.6) | (4.5) | (3.0) | (3.9) |
| Bank debt commissions and fees | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.1) | (0.2) |
| DIP loan proceeds | 17.0 | - | - | - | 9.6 | - | - | - | - | - | - | - | - |
| Related party receipts | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Related party disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt restructuring and related fees | (0.8) | - | - | (0.9) | (0.2) | - | - | (0.9) | - | - | (0.3) | (10.6) | - |
| Other financing disbursements | (0.8) | - | - | - | (0.5) | - | - | - | - | - | - | - | - |
| **Net cash flow of financing activities** | **$12.6** | **$1.3** | **$41.5** | **($2.0)** | **$30.0** | **($1.3)** | **($3.2)** | **($1.8)** | **$10.1** | **$3.3** | **($2.9)** | **($12.7)** | **$11.9** |
| **Net cash flow** | **$2.6** | **($6.8)** | **($6.4)** | **$8.9** | **($3.3)** | **($2.6)** | **($5.5)** | **$11.8** | **($1.6)** | **$12.7** | **($19.8)** | **$1.5** | **$9.0** |
| **Closing Available Cash** | **$60.6** | **$53.8** | **$47.4** | **$56.3** | **$53.0** | **$50.4** | **$44.9** | **$56.7** | **$55.2** | **$67.9** | **$48.1** | **$49.6** | **$58.5** |

**Automotores Gildemeister SpA**
**DIP Budget - Chilean Debtors**
USD million

## AG SpA & Chilean Subsidiaries

| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week beginning: | abr-12 | abr-19 | abr-26 | may-03 | may-10 | may-17 | may-24 | may-31 | jun-07 | jun-14 | jun-21 | jun-28 | jul-05 |
| **Opening Available Cash Balance** | $8.1 | $11.6 | $6.0 | $5.4 | $12.7 | $12.4 | $13.4 | $5.2 | $13.4 | $4.1 | $20.2 | $5.4 | $4.1 |
| **Cash flow from operating activities** | | | | | | | | | | | | | |
| Receipts from sales | $5.7 | $5.7 | $2.1 | $11.1 | $11.9 | $7.4 | $11.7 | $10.2 | $8.7 | $12.7 | $8.8 | $9.7 | $8.2 |
| General local suppliers | (0.3) | (0.6) | (0.6) | (1.1) | (2.0) | (2.0) | (0.6) | (2.0) | (2.0) | (0.6) | (2.0) | (1.5) | (1.1) |
| Suppliers - International | - | - | - | - | (0.4) | (0.1) | (1.8) | - | (0.4) | - | (1.5) | - | (0.4) |
| Suppliers - Vehicle inventory | (20.5) | (13.3) | - | (3.4) | (21.3) | (3.7) | (16.3) | - | (13.8) | - | (19.3) | - | (15.6) |
| Suppliers - Spare Parts inventory | - | (0.3) | - | (0.5) | - | - | - | (0.5) | - | - | - | - | (0.4) |
| Personnel costs | - | - | (0.6) | (0.4) | (0.4) | - | (1.1) | (0.4) | (0.4) | (0.4) | (1.1) | - | (0.4) |
| Custom duties and taxes | - | (2.8) | (1.5) | (1.0) | (1.5) | (4.2) | (1.7) | (1.0) | (1.5) | (4.3) | (1.5) | - | (1.0) |
| Leases | - | - | - | - | (0.8) | - | - | (0.8) | - | - | - | - | (0.8) |
| Dividend receipts | 0.4 | - | - | - | 0.4 | - | - | - | - | 0.4 | - | - | - |
| Other operating receipts & Other operating disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow of operating activities** | ($14.7) | ($11.3) | ($0.6) | $4.6 | ($14.2) | ($2.5) | ($9.8) | $5.6 | ($9.3) | $8.2 | ($16.6) | $8.2 | ($11.5) |
| **Cash flow from investing activities** | | | | | | | | | | | | | |
| Proceeds from asset sales | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital expenditures | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow of investing activities** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash flow from financing activities** | | | | | | | | | | | | | |
| Factoring receipts | 1.8 | 5.6 | - | 3.5 | 5.0 | 3.5 | 1.5 | 3.5 | - | 8.0 | 2.0 | 1.0 | 16.0 |
| Bank debt proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank debt repayments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank debt commissions and fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP loan proceeds | 17.0 | - | - | - | 9.6 | - | - | - | - | - | - | - | - |
| Related party receipts | 1.1 | - | 0.1 | - | - | - | 0.1 | - | - | - | 0.1 | - | - |
| Related party disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt restructuring and related fees | (0.8) | - | - | (0.9) | (0.2) | - | - | (0.9) | - | - | (0.3) | (10.6) | - |
| Other financing disbursements | (0.8) | - | - | - | (0.5) | - | - | - | - | - | - | - | - |
| **Net cash flow of financing activities** | $18.2 | $5.6 | $0.1 | $2.6 | $13.9 | $3.5 | $1.6 | $2.6 | - | $8.0 | $1.8 | ($9.6) | $16.0 |
| **Net cash flow** | $3.5 | ($5.7) | ($0.6) | $7.3 | ($0.3) | $1.0 | ($8.2) | $8.2 | ($9.3) | $16.2 | ($14.8) | ($1.3) | $4.5 |
| **Closing Available Cash** | $11.6 | $6.0 | $5.4 | $12.7 | $12.4 | $13.4 | $5.2 | $13.4 | $4.1 | $20.2 | $5.4 | $4.1 | $8.6 |
| **DIP Balance**[1] | | | | | | | | | | | | | |
| Beginning Balance | - | 17.0 | 17.0 | 17.0 | 17.0 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 |
| Draws / (Paydowns) | 17.0 | - | - | - | 9.6 | - | - | - | - | - | - | - | - |
| **Ending Balance** | 17.0 | 17.0 | 17.0 | 17.0 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 |
| Total DIP Facility | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 | 26.5 |
| **DIP Availability** | $9.6 | $9.6 | $9.6 | $9.6 | - | - | - | - | - | - | - | - | - |

(1) Does not include PIK interest

## **EXHIBIT 3**

**Consorcio Joinder**

**JOINDER AGREEMENT**

This Joinder Agreement (this "Joinder Agreement") to the Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "Restructuring Support Agreement"), dated as of April 12, 2021 by and among Automotores Gildemeister SpA and certain of its affiliates as Companies, the Shareholder and Consenting Noteholders, or investment managers for the Consenting Noteholders of the 7.50% Notes due 2025 (each as defined in the Restructuring Support Agreement), is executed and delivered by Compañía de Seguros de Vida Consorcio Nacional de Seguros S.A., a *sociedad anonima* organized under the laws of Chile, Banco Consorcio S.A. a *sociedad anonima* organized under the laws of Chile, and Consorcio Corredores de Bolsa S.A., a *sociedad anonima* organized under the laws of Chile (the "Joining Consenting Noteholders") and Automotores Gildemeister SpA (the "Company"). Each capitalized term used herein but not defined herein shall have the meaning set forth in the Restructuring Support Agreement.

1. **Agreement to be Bound**. The Joining Consenting Noteholders hereby acknowledge that they have read and understand the Restructuring Support Agreement and agree to be bound by the terms and conditions thereunder. The Joining Consenting Noteholders shall be deemed Consenting Noteholders (as defined in the Restructuring Support Agreement) under the terms of the Restructuring Support Agreement with all of the rights and obligations of Consenting Noteholders thereunder, *except* that the Joining Consenting Noteholders shall have no rights or obligations with respect to sections 1.01, 1.02(c), 1.03(a)(F)-(Q), 1.03(b), 1.06(a), (b), (c), and (e), and 2.01(b)-(d)(i).

2. **DIP Commitment**. The Joining Consenting Noteholders commit to purchase debtor-in-possession financing commitments (including any amounts previously advanced in respect thereof) held by certain other Consenting Noteholders in an amount of $2,902,242 (the "DIP Commitment") as reflected in Exhibit A hereto at a purchase price equal to the amount of all DIP Term Loans previously advanced in respect of the purchases DIP Commitments (net of any original issue discount applied at the time of such advance) and to provide such debtor-in-possession to the Companies under the terms and conditions set forth in the Restructuring Support Agreement and the DIP Credit Agreement (as defined in the Restructuring Support Agreement). The Joining Consenting Noteholders hereby agree to execute the assignment agreement (the "DIP Assignment") attached hereto as Exhibit A and to make all payments and to perform all obligations under the DIP Assignment to effect the purchase such DIP Commitment no later than one business day following the execution of this Joinder Agreement.

3. **Fees and Expenses**. The Companies shall promptly pay and reimburse the reasonable and documented fees and expenses incurred by Prieto Abogados SpA, any other counsel reasonably necessary to advise the Joining Consenting Noteholders in connection with the DIP Loan Documents, which fees and expenses will include any fees payable to the Administrative Agent under the DIP Loan Documents to effect the assignments described in Section 2 hereof.

4. **Representations and Warranties**. The Joining Consenting Noteholders hereby makes, as of the date hereof, the representations and warranties of the Consenting Noteholders set forth in Section 2.01 of the Restructuring Support Agreement to each of the Companies.

5. **Governing Law**. Section 6.05 of the Restructuring Support Agreement is incorporated by reference as if set forth fully herein, except that any references to "Agreement" shall be replaced with references to "Joinder Agreement."

6. **Execution of Joinder Agreement**. Execution and delivery of this Joinder Agreement by each of the Joining Consenting Noteholders constitutes the execution and delivery by such Joining Consenting Noteholder of the Restructuring Support Agreement in its capacity as Consenting

Noteholder, without further action of any party.  This Agreement may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic mail in portable document format (pdf) shall be effective as delivery of a manually executed counterpart of this Assignment.

     Date Executed: April 12, 2021

[*Remainder of Page Intentionally Left Blank - Signature Pages Follow*]

[*Signature Pages to Joinder Agreement*]

**COMPANY**

**Automotores Gildemeister SpA**

By: _____
Name:
Title:

**CONSENTING NOTEHOLDERS**

**Compañía de Seguros de Vida Consorcio Nacional de Seguros S.A.,**
as a Consenting Noteholder

By: _____
Name:
Title:

By: _____
Name:
Title:

Address:
Telephone:
Email:

*[Signature Pages to Joinder Agreement]*

**Banco Consorcio S.A.,**
as a Consenting Noteholder


By: _____
Name:
Title:



By: _____
Name:
Title:



Address:
Telephone:
Email:

*[Signature Pages to Joinder Agreement]*

**Consorcio Corredores de Bolsa S.A.,**
as a Consenting Noteholder


By: _____
Name:
Title:


By: _____
Name:
Title:


Address:
Telephone:
Email:

*[Signature Pages to Joinder Agreement]*

## **Exhibit A**

DIP Assignment

## FORM OF ASSIGNMENT AND ACCEPTANCE

Reference is made to the Superpriority Senior Secured Priming Debtor-in-Possession Credit Agreement, expected to be executed and effective on or about April 14, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time, "**Credit Agreement**"; the terms defined therein, unless otherwise defined herein, being used herein as therein defined) among AUTOMOTORES GILDEMEISTER S.p.A., a *Sociedad Por Acciones* organized under the laws of Chile, as debtor-in-possession and the Borrower, the other Loan Parties thereto from time to time, the Lenders from time to time party thereto, and Acquiom Agency Services LLC, as Administrative Agent, and TMF Group New York, LLC, as Collateral Agent. The date all conditions precedent to the effectiveness of the Credit Agreement are satisfied shall be referred to herein as the "**Closing Date.**"

Each party identified on the signature page hereto as "Assignor" (the "**Assignor**") and the party identified on the signature page hereto as "Assignee" (the "**Assignee**") agrees with respect to all information relating to it and its assignment hereunder and on Schedule 1 hereto as follows:

1.    For an agreed consideration equal to the Aggregate Amount of Term Loans Assigned as reflected on Schedule 1, each Assignor hereby irrevocably sells and assigns, without recourse except as to the representations and warranties made by it herein, to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, an interest in and to the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents (including without limitation all Collateral Documents) as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Credit Agreement including all Commitments and Term Loans of the Assignor reflected on Schedule 1 hereof. After giving effect to such sale and assignment, the amount of the Commitments held by each Assignee and the amount of all Term Loans owing to each Assignees will be as set forth on Schedule 1 hereto.

2.    Each Assignor (i) represents and warrants that its name set forth on its signature page hereto is its legal name, that it is the legal and beneficial owner of the interest or interests being assigned by it hereunder and that such interest or interests are free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; and (iv) attaches the Promissory Note or Promissory Notes, held by the Assignor in an amount equal to the Term Loans assumed by the Assignee pursuant hereto, duly endorsed by the Assignor to the Assignee, or, upon request of the Assignee, the Borrower shall execute and deliver replacement Promissory Notes to the Assignee in an amount equal to the Term Loans assumed by

the Assignee pursuant hereto, provided that the Borrower shall be under no obligation to execute and deliver a new Promissory Note or Promissory Notes in exchange for such Promissory Note or Promissory Notes if the Borrower is required to pay again the Stamp Tax assessed on such new Promissory Note or Promissory Notes unless the Assignee, or any other party, has paid such tax if required by applicable law.

3.      The Assignee (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Section 5.03 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon any Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) represents and warrants that its name set forth on its signature page hereto is its legal name; (iv) confirms that it is an Eligible Assignee; (v) appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms thereof, together with such powers' and discretion as are reasonably incidental thereto; (vi) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Credit Agreement are required to be performed by it as a Lender; (vii) attaches any applicable tax forms, certificates or documents as required under Section 2.12 of the Credit Agreement; (viii) represents and warrants to Administrative Agent that Assignee has full power and authority, is legally authorized and has taken all action necessary to execute and deliver this assignment and to consummate the transactions contemplated hereby; and (ix) to the extent the Assignee is not already a party to the Restructuring Support Agreement, shall execute a joinder to the Restructuring Support Agreement.

4.      Following the execution of this Assignment and Acceptance, it will be delivered to the Administrative Agent for acceptance and recording by the Administrative Agent. The effective date for this Assignment and Acceptance (the "**Effective Date**") shall be the date of acceptance hereof by the Administrative Agent.

5.      Upon such acceptance and recording by the Administrative Agent, as of the Effective Date, (i) such Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and (ii) such Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement (other than its rights and obligations under the Loan Documents that are specified under the terms of such Loan Documents to survive the payment in full of the Obligations of the Loan Parties under the Loan Documents to the extent any claim thereunder relates to an event arising prior to the Effective Date of this Assignment and Acceptance) and, if this Assignment and Acceptance covers all of the remaining portion of the rights and obligations of such Assignor under the Credit Agreement, such Assignor shall cease to be a party thereto.

6.      Upon such acceptance and recording by the Administrative Agent, from and after the Effective Date, the Administrative Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees with respect thereto) to such Assignee. Such Assignor and such Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Effective Date directly between themselves.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.      This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Assignment and Acceptance by facsimile or email transmission shall be effective as delivery of an original executed counterpart of this Assignment and Acceptance.

[*Remainder of page left intentionally blank.*]

IN WITNESS WHEREOF, each Assignor and each Assignee have caused this Assignment and Acceptance to be executed by their officers thereunto duly authorized as of the date specified thereon.

Effective Date (if other than date of acceptance by Administrative Agent):

April 14, 2021.

**ASSIGNORS**                             as Assignor


By: _____
    Name:
    Title:


Address:
Telephone:
Email:



as Assignor


By: _____
    Name:
    Title:


Address:
Telephone:
Email:

**ASSIGNEES**                             **Compañía de Seguros de Vida Consorcio Nacional de Seguros S.A.,**
as Assignee



By: _____
Name:
Title:

By: _____
Name:
Title:


Address:
Telephone:
Email:

**Banco Consorcio S.A.,**
as Assignee


By: _____
Name:
Title:



By: _____
Name:
Title:



Address:
Telephone:
Email:

**Consorcio Corredores de Bolsa S.A.,**
as Assignee


By: _____
Name:
Title:



By: _____
Name:
Title:



Address:
Telephone:
Email:

Accepted this _____ day of _____, 20__

Acquiom Agency Services LLC,
        as Administrative Agent


By:     _____
        Name:
        Title: