**ALSTON & BIRD LLP**
William Hao
90 Park Avenue
New York, NY 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: william.hao@alston.com

-and-

**ALSTON & BIRD LLP**
William Sugden (*pro hac vice* pending)
Jacob Johnson (*pro hac vice* pending)
Christopher Coleman (*pro hac vice* pending)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: will.sugden@alston.com
       jacob.johnson@alston.com
       chris.coleman@alston.com

*Attorneys for Baion Group, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 21-10685 |
| Automotores Gildemeister, SpA, *et al.*,[1] | Chapter 11 |
| Debtors. | (Joint Administration Requested) |

**PRELIMINARY OBJECTION OF BAION GROUP, LLC TO (I) DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) SCHEDULING A COMBINED HEARING TO CONSIDER THE ADEQUACY OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN, (B) ESTABLISHING DEADLINES AND**

---

[1] The "***Debtors***," together with each of the Debtor's Chilean, Brazilian, and/or Uruguayan tax identification number, as applicable, are: Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A. (217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A. (89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial Gildemeister S.A. (76.856.310-1), and Bramont Montadora Industrial e Comercial de Vehiculos S.A. (04.926.142/0002-16). The location of the corporate headquarters and the service address for Automotores Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

**PROCEDURES TO FILE OBJECTIONS TO THE DISCLOSURE STATEMENT AND PLAN, (C) APPROVING THE SOLICITATION PROCEDURES, (D) APPROVING THE FORM AND MANNER OF NOTICE OF THE COMBINED HEARING, (E) ESTABLISHING PROCEDURES FOR ANY PROPOSED ASSUMPTION AND CURE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO THE PLAN, (F) DIRECTING THAT A MEETING OF CREDITORS NOT BE CONVENED AND (G) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT AND (B) CONFIRMING THE PLAN AND (II) DEBTORS' MOTION FOR ENTRY OF AN ORDER EXTENDING THE TIME, AND, UPON THE EFFECTIVE DATE OF THE PLAN, WAIVING THE REQUIREMENT TO FILE SCHEDULES, STATEMENTS OF FINANCIAL AFFAIRS AND FINANCIAL REPORTS FOR NON-DEBTOR SUBSIDIARIES**

Baion Group, LLC ("**Baion**") submits this preliminary objection (the "**Objection**") to the *Debtors' Motion for Entry of (I) An Order (A) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Confirmation of the Plan, (B) Establishing Deadlines and Procedures to File Objections to the Disclosure Statement and Plan, (C) Approving the Solicitation Procedures, (D) Approving the Form and Manner of Notice of the Combined Hearing, (E) Establishing Procedures For Any Proposed Assumption and Cure of Executory Contracts and Unexpired Leases Pursuant to the Plan, (F) Directing That A Meeting of Creditors Not Be Convened and (G) Granting Related Relief; and (II) An Order (A) Approving the Adequacy of the Disclosure Statement and (B) Confirming the Plan* [D.E. 22] (the "**Solicitation Procedures Motion**" and the disclosure statement for which approval was sought thereby, the "**Disclosure Statement**"),[2] and Debtors' *Motion for Entry of an Order Extending the Time, and, upon the Effective Date of the Plan, Waiving the Requirement to File Schedules, Statements of Financial Affairs and Financial Reports for Non-Debtor Subsidiaries* [D.E. 7] (the "**Schedules Extension/Waiver Motion**").

---

[2] Any capitalized term not defined herein shall have the meaning ascribed to the term in the Disclosure Statement.

**OBJECTION**

1.      Billed by the Debtors as a conventional "prepack," it is anything but that. The Debtors and their RSA counterparties—the Consenting Noteholders, who hold a majority of the Debtors' Secured Notes[3]—have not come to the Court with a broad consensus that was reached prepetition. To Baion's knowledge, none of the other non-insider creditors impaired by the Plan—the holders of the 8.25% Notes due 2021, the 6.75% Notes due 2023, and the 7.5% Notes due 2021 (the "*Unsecured Notes*" and the holders, the "*Unsecured Noteholders*") or the trustees under the indentures governing the Unsecured Notes—were involved in the formulation of the proposed Plan. Indeed, the post-filing growth in Consenting Noteholder support appears mostly fueled by additional purchases of the Secured Notes by pre-existing RSA parties.[4] The only parties in interest—to Baion's knowledge—to sign or generally agree with the RSA are: (a) the Consenting Noteholders and some of the other holders of the Secured Notes, most if not all of whom hold material equity positions in the Debtors, and (b) insiders of the Debtors, who have been improperly incentivized to abdicate their role in the process. This process is being controlled *by* the Consenting Noteholders (through the RSA and the DIP financing) *for* the same Consenting Noteholders (as the secured creditors *and future equity owners*[5] of the Reorganized Debtors under the proposed Plan).

---

[3] The "*Secured Notes*" means the 7.5% Notes due 2025.

[4] See *Declaration of Eduardo Moyano in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* (noting that the 90% of Secured Notes supporting the plan include "approximately 7% of the 7.5% Notes reflecting trades that have not yet settled").

[5] While not necessarily fatal to confirmation of a plan, the fact that a senior class is proposing to sandwich Unsecured Noteholders between their new senior secured debt and new equity which they will control is noteworthy and unusual. Ordinarily, in a pre-pack, one would assume that *unsecured* debt would be squeezed down to the level of equity. That is not the case here. Baion intends to get to the bottom of this. However, at this juncture, it is worth noting that the treatment of the Unsecured Noteholders under the Plan essentially squeezes the economic life out of these creditors. They are offered new, unsecured notes with a 14-year maturity where the Debtors will have the ability to PIK most or all of the interest for much or all of the life of the new notes. Given this, it is not surprising that the Consenting Noteholders would want to grab the equity of the Reorganized Debtors. The proposed treatment of the Unsecured

2. Based upon a preliminary review of the Disclosure Statement, the "prepack" path forward proposed by the Debtors appears to be hopelessly compromised from the outset. Indeed, the plan of reorganization (the "**Plan**") proposed by the Disclosure Statement does not appear to be confirmable. As set forth below, and based upon a preliminary review, Baion highlights the following initial infirmities, certain of which go to the nature of the proposed Plan described by the Disclosure Statement, others of which go to the adequacy of the disclosure the Debtors provide:

**A.    The Plan's Classification Structure is Unconfirmable and Was Engineered to Improperly Benefit Insiders and the Consenting Noteholders.**

3. The proposed Plan purports to be a separate plan for each Debtor,[6] but it does not propose to treat creditors in a manner consistent therewith. Consider, for example, the proposed treatment of claims against Debtor Bramont Montadora Industrial e Comercial de Vehiculos S.A. ("*Bramont*"). Bramont is a guarantor of the 8.25% Notes and the Secured Notes, but is *not* a guarantor on the other Unsecured Notes or an obligor on the insider claims of Minvest S.A. ("*Minvest*") (more on the Minvest claims below). However, the proposed Plan for Bramont includes allowed claims against Bramont in favor of the 7.5% Notes due 2021 Claims ($9,858,106), the 6.75% Notes due 2023 Claims ($2,664,771), Minvest's insider claims—the Minvest Loan Claim ($1,643,500) and Share Purchase Agreement Claim ($300,000). None of these creditors have a legal right to recover against Bramont, but the proposed separate Plan for Bramont proposes to pay all of them. All told, as proposed, the Plan appears to allow

---

Noteholders will leave them with permanently impaired debt that, presumably, the Consenting Noteholders believe they will be able to purchase for pennies on the dollar.

[6] *See* Plan at 1 ("Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of claims and interests set forth in ARTICLE III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan contemplates no substantive consolidation of any of the Debtors.")

approximately $15 million in claims against Bramont for which Bramont is not liable. The Debtors cannot confirm a plan that proposes to pay money to non-creditors of a particular Debtor while leaving its actual creditors impaired. *See* 11 U.S.C. § 502(b)(1) (claims cannot be allowed against a debtor unless valid under applicable nonbankruptcy law); *see also* 11 U.S.C. § 1129(a)(1) (requiring that a plan be consistent with, *inter alia*, section 502 of the Bankruptcy Code).

4.      The problem highlighted with respect to Bramont can be more broadly generalized. Even though the Plan purports to be a separate plan for each Debtor, it operates to allow a claim of a creditor against *any* Debtor as a claim against *all* Debtors. In the aggregate, this operates to award substantial compensation to non-creditors of certain Debtors, specifically corporate insiders, and to illegally and improperly dilute recoveries of legal creditors of the same Debtors. Similarly, the purported Liquidation Analysis was conducted as if all of the claims could be asserted against all of the Debtors and all intercompany claims were ignored. This is facially incorrect.[7] Accordingly, the Liquidation Analysis is misleading, as it does not indicate whether section 1129(a)(7) has been met on a per-claim/per-Debtor basis.[8] If the Debtors want to confirm separate Plans for each Debtor, as they claim to be attempting to do, they must meet the standards of section 1129 with respect to *each* Debtor.

5.      Due to Debtors' improper consolidated view of Plan classification, the proposed classification structure also fails. Section 1122(a) of the Bankruptcy Code permits a debtor to classify claims "in a particular class *only if* such claim … is substantially similar to the other claims … of such class." *See* 11 U.S.C. § 1122(a). In order to achieve their "prepack," the Debtors are

---

[7] As an example, the Debtors project that recoveries on the 6.75% Notes will be 7.45% - 10.08%, which is the exact same range of recovery as the 8.25% Notes. However, the 6.75% Noteholders' have rights to recover from six Debtor entities, while the 8.25% Noteholders' may legally only recover against two entities. *See* Disclosure Statement, Exhibit D at 11.

[8] There are many other additional objections to the Liquidation Analysis, including exceptionally low liquidation values; but these are objections for another day.

5

forced to include a number of different kinds of "claims" into Class 5 that do not abide by this standard. Class 5 may only contain claims that are "substantially similar," but as currently structured, it lumps together and treats identically: the insider claims (which each may only be asserted against a single Debtor), the 7.5% Notes due 2025 Deficiency Claims, and the claims of the Unsecured Noteholders. As shown by the chart below, the composition of the Debtors (and nondebtor Peruvian and Costa Rican affiliates) liable on these claims differs widely:

| Entity[1] | Filing Status | Note Claims by Issuance | | | | Minvest's Claims |
|---|---|---|---|---|---|---|
| | | 7.5% \| 2021 | 8.25% \| 2021 | 6.75% \| 2023 | 7.5% \| 2025 | |
| Automotores Gildemeister SpA | Debtor | Issuer | Issuer | Issuer | Issuer | Share Purchase Agreement Claim |
| AG Creditos SpA | Debtor | Guarantor | | | Guarantor | |
| Bramont Montadora Industrial e Comercial de Vehiculos S.A. | Debtor | | Guarantor | | Guarantor | |
| Camur S.A. | Debtor | Guarantor | Guarantor | | Guarantor | |
| Carmeister S.A. | Debtor | Guarantor | | | Guarantor | |
| Comercial Gildemeister S.A. | Debtor | Guarantor | | | Guarantor | |
| Fonedar S.A. | Debtor | Guarantor | Guarantor | | Guarantor | |
| Fortaleza S.A. | Debtor | Guarantor | | | Guarantor | |
| Lodinem S.A. | Debtor | Guarantor | Guarantor | | Guarantor | Minvest Loan Claim |
| Maquinaria Nacional S.A. (Chile) | Debtor | Guarantor | | | Guarantor | |
| Maquinarias Gildemeister S.A. | Debtor | Guarantor | | | Guarantor | |
| Marc Leasing, S.A. | Debtor | Guarantor | Guarantor | Guarantor | Guarantor | |
| RTC S.A. | Debtor | Guarantor | | | Guarantor | |
| Gildemeister Costa Rica S.A. | Nondebtor | | | | Pledgor | |
| Inmobiliaria Los Seis CR ILS S.A. | Nondebtor | | | | Pledgor | |
| Automotores Gildemeister Peru S.A. | Nondebtor | | | | Pledgor | |
| Manasa Peru S.A. – sub of AG Peru | Nondebtor | | | | Pledgor | |
| Motor Mundo S.A. – sub of AG Peru | Nondebtor | | | | Pledgor | |

---

[1] This information comes from Disclosure Statement at 17-18.

6

6.  In sum, the Debtors' proposed classification structure seeks to circumvent the classification and voting structure mandated by the Bankruptcy Code. The result is that, under the proposed Plan, the Consenting Noteholders would be empowered to approve, on behalf of the Unsecured Noteholders and without regard to their views and votes, a gift to corporate insiders by virtue of treating such insiders' structurally junior claims on par with the claims of the Unsecured Noteholders.[9]

7.  Prior to the commencement of these cases, Baion served informal document requests on the Debtors and the Consenting Noteholders in an effort to, among other things, understand the basis for this proposed classification. To date, neither the Debtors nor the Consenting Noteholders has produced a single document to Baion; indeed, the Consenting Noteholders have taken the position that they are not obligated to provide Baion any of the documents that it has sought. Baion will be serving formal document requests in connection with this objection and submits that appropriate disclosures from the Debtors and the Consenting Noteholders will assist the Court in assessing whether the claims proposed to be treated in Class 5 are, in fact, "substantially similar."

**B.  The Restructuring Process is Tainted by a Number of Only Partially Disclosed Insider Transactions and Gives Releases to a Broad Swath of Insiders.**

8.  During the weeks preceding solicitation, the Debtors appear to have secured numerous forms of compensation for corporate insiders. Some of the following arise under the terms of the Plan; others were committed prepetition. However, the Disclosure Statement provides

---

[9] As a result, the Solicitations Procedures Motion also fails to meet the requirements under the *Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York*, as updated on June 27, 2013 (the "**SDNY Prepack Guidelines**"), which require that the motion "represent that the requisite acceptances of such plan have been obtained from each class of claims or interests as to which solicitation is required except as provided in Part III(A)(iii) below [requiring a representation that the debtor is requesting confirmation under 1129(b) with respect to nonaccepting voting classes]" SDNY Prepack Guidelines III(A)(ii).

7

only opaque references to a number of these troubling insider connections and deals, particularly with respect to Minvest, which owns (directly or indirectly) the common stock of the Debtors, and Ricardo Lessmann, who owns some or all of Minvest and is AG's president and chief executive officer. For example:

i. *Acknowledgment and Treatment of Structurally Junior Insider Claims:*

- Minvest, the Debtors' corporate parent, which is wholly owned by Ricardo Lessmann, amongst others, was party to an insider transaction on the eve of bankruptcy, generating the Minvest Loan Claim, whereby, three weeks ago (March 26, 2021) an intercompany claim against Debtor Lodinem, S.A. was transferred to pay Minvest on account of a loan owed to Minvest by a former non-debtor affiliate. Under the Plan, Minvest would recover on this claim *pari passu* with the Unsecured Noteholders.

- The Plan provides for *pari passu* treatment for a separate intercompany claim asserted by Minvest against Automotores Gildemesiter SpA under a 2016 Share Purchase Agreement. Again, no information is provided as to why this claim—which is asserted against only one obligor (as compared to the multiple obligors to the Unsecured Notes)—is classified alongside and provided *pari passu* treatment with the Unsecured Notes.

ii. *Retention and Compensation of Mr. Lessmann Post-Transaction:* Mr. Lessmann has been rewarded with the post-restructuring chairmanship over USA Holdco, the future parent of the Reorganized Debtors. *See* Disclosure Statement at 25. Aside from this disclosure, no further information is provided in the Disclosure Statement

8

        as to current or future employment agreements for Mr. Lessmann or any of the other officers and directors.

   iii.  *Renewal of the Headquarters Lease:* AG leases its headquarters from "a company controlled by certain of the shareholders that own Minvest S.A., including Ricardo Lessmann." Disclosure Statement at 20. That lease was extended on March 1, 2021. Instead of including any historical context on the value and payments made pursuant to this lease, the Debtors merely say that it has been independently appraised and that, as a result, "the annual lease payments are approximately $1.2 million." *Id.*

   iv.  *Continued Familial Contractual Relationships*: The Debtors disclose that they have a contractual relationship with Novapromo, a company "owned by Sebastian Lessmann, the son of Richard Lessman" to "manufacture[], develop[] and import[] safety kits and document holders." Disclosure Statement at 20. This contract remains in place despite the fact that the Debtors have "wound down" their "third party after-market accessories business." *See* Disclosure Statement at 13.

9.    Without disclosure or valuation, and in spite of the numerous related party transactions disclosed only in the most opaque fashion, the Plan proposes to provide releases to insiders—Minvest, Mr. Lessmann, and all of the Debtors' directors and officers—***for no consideration***.[10] The Disclosure Statement makes no mention of any analysis of the value of

---

[10] Plan 8.3 provides for release by the Debtors of the Released Parties. The Released Parties include the Debtors and their Affiliates and Related Parties. Minvest is an Affiliate of the Debtors, and Related Parties include the Debtors':

    current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants,

9

claims against these insiders. At the very least, there may be a potential preference claim arising on account of the payments to Minvest under the 2016 Share Purchase Agreement. *However*, the Debtors seek to stonewall on disclosure of these matters through the filing of the Schedules Extension/Waiver Motion, which seeks to extend their statutory deadline to prepare and provide these critical pieces of information to creditors such as Unsecured Noteholders until *after* they propose to have this Court confirm their Plan. *See* Schedules Extension/Waiver Motion ¶ 10.

### C.    In the Face of Nondisclosure, the Debtors' Improperly Seek to Avoid Filing SOFAs and Schedules.

10.    The Plan appears to be fatally compromised and structured to deliver value to corporate insiders in return for their support and willingness to walk away from their current equity. The extent of this conflict is not fully known. Moreover, the Debtors have not filed public financials since the second quarter of 2020. Finally, the Debtors have *not* filed petitions for their Costa Rican and Peruvian operations and have not disclosed sufficient information to determine whether their liquidation would generate value for the Unsecured Noteholders.[11]

11.    These problems are heightened by the filing of the Schedules Extension/Waiver Motion. If granted the Debtors will deprive this Court, Unsecured Noteholders, and others of critical information until *after* confirmation of the Plan. Their stated basis for seeking this relief is a desire to "stabiliz[e] their business." Schedules Extension/Waiver Motion at ¶ 13. This is not

---

investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

[11] The Costa Rican entities are pledgors under the Secured Notes and the Consenting Noteholders' will be receiving a similar pledge in connection with their take-back paper—the New Junior Tranche Secured Notes. *See* Disclosure Statement at p. 26. By doing this, the Debtors appear to be seeking to avoid scrutiny of the value of these entities or their financial dealings with insiders. Is there equity in these subsidiaries that would be available for the benefit of Unsecured Noteholders? By not filing bankruptcy petitions for these entities, the Debtors deprive the Court and Unsecured Noteholders of any answer to this basic question. Similarly, if the Debtors' have their way, only the Consenting Noteholders and the insiders of these entities will ever know if these entities engaged in potentially avoidable transactions which might inure to the benefit of Unsecured Noteholders.

10

acceptable. The Debtors' and the Consenting Noteholders are seeking to pursue these cases as a "prepack" without the consent or input of critical parties such as the Unsecured Noteholders. They chose the time, place, and manner of their bankruptcy filings. And the Debtors and Consenting Noteholders each elected to categorically deny all of Baion's prior informal discovery requests. They should have filed these critical documents contemporaneous with the filing of their petitions if they want to proceed on their proposed timeline. Baion requests that they be compelled to provide these critical documents on the timeline prescribed by the Bankruptcy Code.

12.     Completed, timely SOFAs, coupled with an active creditors' committee, will be necessary to identify the full panoply of benefits being provided to insiders in return for their cooperation and to determine whether the Unsecured Noteholders are being improperly treated under the Plan. Baion respectfully urges the Court to ensure that these protections to the bankruptcy process are kept in place.

### D.     **The Solicitation and Voting Process are Deeply Flawed.**

13.     The solicitation and voting process appears on its face to be deeply flawed and appears to have been designed to prevent meaningful engagement with the Unsecured Noteholders, while circumventing the absolute priority rule through improper payments to corporate insiders. Unsecured Noteholders, unless an official committee is appointed to investigate these matters, will be denied a voice in the Plan voting and confirmation process. On its face, the Debtors' path to a "consensual" prepack does not even require the participation of the Unsecured Noteholders because the Debtors claim that they can achieve class acceptance with the alleged deficiency

11

claims of the Consenting Noteholders. According to the Debtors' theory, this Court can confirm the Plan even over the dissent of *all* Unsecured Noteholders.[12]

14. In light of this position, it is not surprising that the Debtors do not appear to even focus on the universe of who the holders of Unsecured Notes actually are and attempt to provide them adequate information. For instance, upon information and belief, *most* of the holders of Unsecured Notes are retail investors in Chile, many of whom likely only speak Spanish. The Debtors do not appear to believe it is even relevant to consider translating the 389-page Disclosure Statement into the native language of most of the holders of Unsecured Notes. If the Debtors want the extraordinary relief of a discharge of indebtedness with the benefits provided by the rules of cramdown,[13] they should be compelled to provide Unsecured Noteholders the right to meaningfully participate in this proceeding, including providing them a Spanish language version of the Disclosure Statement.

## CONCLUSION

15. Baion stands ready to negotiate with the Debtors and the Consenting Noteholders in good faith. Indeed, Baion has sought to do so since last autumn. However, the current trajectory of these cases is deeply flawed. Baion has only been afforded the opportunity to review the materials filed by the Debtors for the last several days. As highlighted above, the path forward appears to be deeply flawed in many respects, which go to (a) the adequacy of the Disclosure Statement, (b) the substance of the proposed Plan, and (c) the failure of the Debtors to make full

---

[12] It is unclear at this time how the Debtors propose to meet the one-half-in-number requirement with respect to Class 5.

[13] Upon information and belief, cramdown is not a right that would be provided to the Debtors were they to file for insolvency in Chile.

and frank disclosures of their assets and liabilities through the Schedules Extension/Waiver Motion.

16. Baion is continuing to review the materials provided by the Debtors and will supplement this objection in due course. To date, Baion has served informal discovery on the Debtors and the Consenting Noteholders, but no disclosures have been provided. Baion will be serving formal discovery shortly. In the interim, Baion respectfully requests that the Court deny the Schedules Extension/Waiver Motion.

Dated: New York, New York
April 14, 2021

Respectfully submitted,

/s/ *William Hao*
William Hao
**ALSTON & BIRD LLP**
90 Park Avenue
New York, NY 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: william.hao@alston.com

-and-

**ALSTON & BIRD LLP**
William Sugden (*pro hac vice* pending)
Jacob Johnson (*pro hac vice* pending)
Christopher Coleman (*pro hac vice* pending)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: will.sugden@alston.com
         jacob.johnson@alston.com
         chris.coleman@alston.com

*Attorneys for Baion Group, LLC*

**CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing document was served by CM/ECF on April 14, 2021 upon all parties who receive notice in this matter pursuant to the Court's CM/ECF System.

                              /s/ *William Hao*
                              William Hao

                              *Attorney for Baion Group, LLC*