CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Jane VanLare
Adam Brenneman

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Automotores Gildemeister SpA, *et al.*,[1] | Case No.  21-10685 (LGB) |
| Debtors. | Jointly Administered |

**DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS' ENTRY INTO**
**THE ADDITIONAL NOTEHOLDER RSA**

Automotores Gildemeister SpA ("Gildemeister") and certain of its affiliates, as debtors and

debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby submit

this motion (the "Motion") seeking entry of an order substantially in the form attached hereto as

**Exhibit A** (the "Order") authorizing the Debtors to enter into that certain Additional Noteholder

Restructuring Support Agreement, substantially in the form attached hereto as **Exhibit B** (the

---

[1]     The Debtors, together with each of the Debtor's Chilean, Brazilian, and/or Uruguayan tax identification number, as applicable, are:  Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A. (217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A. (89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial Gildemeister S.A. (76.856.310-1), and Bramont Montadora Industrial e Comercial de Vehiculos S.A. (04.926.142/0002-16).   The location of the corporate headquarters and the service address for Automotores Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

"Additional Noteholder RSA"), by and among Gildemeister and Baion Group, LLC ("Baion" or

the "Additional Noteholder").

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* from the United States District Court for the

Southern District of New York dated January 31, 2012 (Preska, C.J.).  This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order

consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory basis for the relief requested herein are sections 105(a) and 363, of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

**BACKGROUND**[2]

**A.      The Chapter 11 Filings**

4.      On April 12, 2021, each of the Debtors filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code (the date and time of such filing, the "Petition Date").  The

Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108

of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has

been appointed in the Debtors' Chapter 11 Cases.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Eduardo Moyano Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Motions and Applications* (the "First Day Declaration").  In addition, a more complete description of the Debtors' corporate structure and businesses, and the events leading to the Chapter 11 Cases, are set forth in the First Day Declaration and the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Automotores Gildemeister SpA and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") (ECF No. 3), as amended in the *Amended Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Automotores Gildemeister SpA and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Amended Disclosure Statement") (ECF No. 27).

### B.    The Debtors' Businesses

5.       The Debtors are a vehicle importer and distributor primarily operating in Chile and Peru, as well as in Uruguay, Costa Rica and Brazil.  The Debtors consist of a network of 228 vehicle dealerships, of which seventy are operated by the Debtors and 158 are independent franchises appointed and supplied by the Debtors.  The Debtors have been the sole distributer of passenger and light commercial vehicles produced by Hyundai Motor Company in Chile since 1986 and have been the sole distributor of Hyundai passenger and light commercial vehicles in Peru since 2002.  The Debtors are the sole distributors of several other established global vehicle brands, such as Volvo, Jaguar and BMW.  The Debtors also provide services authorized by their original equipment manufacturers ("OEMs"), provide OEM parts for the brands of the cars they distribute and offer insurance brokerage services to their customers.

6.       As of the Petition Date, the Debtors have outstanding prepetition debt obligations of approximately $566,690,000, consisting primarily of approximately $509,806,002 in outstanding principal amount and $11,290,079 in accrued and unpaid interest under the 7.50% senior secured notes due 2025 that were issued by Gildemeister and guaranteed by the remaining Debtors (the "7.5% Notes due 2025").   The Debtors also have approximately $34,760,520 outstanding aggregate principal amount and $967,730 in accrued and unpaid interest under three series of outstanding unsecured notes issued by Gildemeister and guaranteed by certain of the Debtor entities (collectively, the "Unsecured Legacy Notes"), and $1,943,500 in debt obligations (the "Related Party Claims") owed to Minvest S.A., Gildemeister's shareholder (the "Shareholder").

### C.    The Prepetition RSA

7.       Since the issuance of the 7.5% Notes due 2025 in 2019, the Debtors' cash flows have not grown to a level sufficient to support the Debtors' existing debt obligations on their

current terms.  Due to a number of factors, including the recent increase in competition, a decrease in demand for motor vehicles in Chile, Peru and the rest of the Latin American region, substantial depreciations in the Chilean Peso, and the government mandated lockdowns due to the COVID-19 pandemic, the Debtors determined that it would be necessary to restructure their outstanding debt in order to meet their financial obligations over the long term.

8.      To that end, in the months prior to the Petition Date, the Debtors engaged in extensive negotiations and discussions with the holders of the 7.5% Notes due 2025.  These discussions culminated in an agreement with certain of the holders of the 7.5% Notes due 2025 (the "Initial Consenting Noteholders") and of Related Party Claims, who signed a restructuring support agreement with respect to a consensual restructuring on the terms set forth in the *Debtors' Joint Prepackaged Chapter 11 Plan*, dated April 9, 2021 (including all exhibits and supplements thereto, the "Plan") and as memorialized in the Restructuring Support Agreement, dated as of March 31, 2021 (the "RSA"), by and among each of the Debtors and the Initial Consenting Noteholders.  The Debtors commenced a pre-petition solicitation of the Plan on April 9, 2021 (the "Solicitation Date").  Additional holders of (or parties that were subsequently to hold) 7.5% Notes due 2025 subsequently executed joinder agreements to the RSA (the "Joining Consenting Noteholders", together with the Initial Consenting Noteholders, the "Consenting Noteholders") prior to the Petition Date.  Together, as of the date hereof, the Consenting Noteholders hold approximately 90.9% of the outstanding 7.5% Notes due 2025.

**D.     The Additional Noteholder RSA**

9.      Prior to and after the commencement of solicitation, the Debtors actively engaged in negotiations and discussions with Baion Group LLC ("Baion"), a holder of the 7.5% Notes due 2025 and Unsecured Legacy Notes, regarding the treatment of claims under the Debtors' proposed Plan.  On April 14, 2021, Baion filed an objection, among other things, to the Debtors' solicitation

procedures scheduling motion, and subsequently served discovery requests relating to its anticipated objections to the Plan and Disclosure Statement.

4.      As a result of continued negotiations among the parties, the Debtors, the Consenting Noteholders, and Baion agreed to certain modifications of the Plan, resolving Baion's anticipated objections to the Plan.  On April 22, 2021, Baion executed the Additional Noteholder RSA, which attached certain modifications to the Plan.

5.      Pursuant to the Additional Noteholder RSA, Baion has agreed to, *inter alia*: (a) vote to accept the Plan as modified and grant the releases set forth in the Plan, including by not "opting out" of the releases (the "Release Election"), (b) not change or withdraw such vote or Release Election, subject to certain exceptions as described in the Additional Noteholder RSA, (c) not, directly or indirectly object or initiate any legal proceedings that would have the effect of preventing the acceptance, approval or implementation of the Plan, and (d) withdraw any discovery requests it has previously served.

6.      Under the Plan as modified, certain technical modifications to the distribution mechanics for the New Notes were implemented at the request of the Unsecured Legacy Notes Indenture Trustees.  The Plan also provides that distributions in respect of the 7.5% Notes due 2025 Claims and the Unsecured Legacy Notes Claims shall be subject to the charging liens of the Senior Secured Notes Trustee and the Unsecured Legacy Notes Trustees, as applicable and extends certain provisions to cover the Unsecured Legacy Notes Trustees, including with respect to exculpation and the payment of Restructuring Expenses.  In addition, under the Plan as modified, the treatment of Allowed Unsecured Notes and Related Party Claims has been amended to reflect the following:

**(e) Class 5 (Unsecured Notes and Related Party Claims)**

(1)   *Classification*: Class 5 consists of the Unsecured Notes and Related Party Claims against the applicable Debtor.

(2)   *Allowance*: On the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) $111,796,081 of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,106 of 7.5% Notes due 2021 Claims, (iii) $23,205,373 of 8.25% Notes due 2021 Claims, (iv) $2,664,771 of 6.75% Notes due 2023 Claims which, in each case, for the Claims described in sub-clauses (i) through (iv) includes the aggregate principal amount of such Claims and any accrued and unpaid interest through the Petition Date. The Minvest Loan Claim shall be Allowed in the amount of $1,643,500, and the Share Purchase Agreement Claim shall be Allowed in the amount of $300,000.

(3)   *Treatment*: On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each Holder of an Allowed Unsecured Notes and Related Party Claim shall receive:

   A.   if such holder is not a New Junior Tranche Secured Notes Substituting Creditor, $0.1939 in principal amount of the New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such holder; or

   B.   if such holder (i) voted to accept the Plan and (ii) affirmatively elects on its Letter of Transmittal to receive such holder's New Junior Tranche Secured Notes Substitute Distribution (a "<u>New Junior Tranche Secured Notes Substituting Creditor</u>"):

      i.   $0.1939 in Cash for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such New Junior Tranche Secured Notes Substituting Creditor subject to a total aggregate cap on all Cash distributions payable to all electing New Junior Tranche Secured Notes Substituting Creditors of $3,000,000 (the "<u>Cash Distribution Cap</u>"); *provided*, that, to the extent the total Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors would result in Cash distributions under this clause 3.2(e)(3)(B)(i) exceeding the Cash Distribution Cap, the Disbursing Agent shall allocate the Cash distributions not exceeding the Cash Distribution Cap proportionally among the Allowed Unsecured Notes and Related Party Claims held by the New Junior Tranche Secured Notes Substituting Creditors (based on the proportion that each such New Junior Tranche Secured Notes Substituting Creditor's Allowed Unsecured Notes and Related Party Claim bears to the sum of all Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors); and

      ii.   $0.1939 in aggregate principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims for which no Cash distribution was made pursuant to clause 3.2(e)(3)(B)(i) due to the Cash Distribution Cap (together, (i) and (ii), a "<u>New Junior Tranche Secured Notes Substitute Distribution</u>").

   For the avoidance of doubt, no holder of Allowed Unsecured Notes and Related Party Claims shall receive a recovery under the Plan of more than $0.1939 in Cash and New Junior Tranche Secured Notes combined for each $1.00 of their Allowed Unsecured Notes and Related Party Claims.

(4)   *Voting*: Class 5 is Impaired. Holders of Unsecured Notes and Related Party Claims are entitled to vote to accept or reject the Plan. For the avoidance of doubt, notwithstanding the Cash-Out Electing Holders' waiver of distributions on account of their 7.5% Notes due 2025 Unsecured Deficiency Claims, the Cash-Out Electing Holders shall be permitted to vote the full Allowed amount of their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5 for purposes of confirmation; of the Plan.

7.      Contemporaneously with Baion's execution of the Additional Noteholder RSA, the Consenting Noteholders executed the Consent attached hereto as <u>Exhibit C</u>, consenting to the modifications to the Plan contemplated by the Additional Noteholder RSA, agreed to extend certain milestones contained in the RSA (and, in their capacity as DIP Lenders, certain milestones contained in the DIP Credit Agreement), agreed to waive the right to select a Cash distribution on account of their 7.5% Notes due 2025 Unsecured Deficiency Claims, and certain Consenting Noteholders agreed to provide the exit financing necessary to fund the cash distribution option for Class 5.  The Shareholder similarly executed a Consent, attached hereto as <u>Exhibit D</u> agreeing to the modifications to the Plan and in which the Shareholder agreed to waive the right to select a Cash distribution on account of its Related Party Claims in Class 5.

8.      With the addition of Baion, the Debtors have achieved overwhelming support of the Plan among Holders of Claims in Classes 4 and 5.  Pursuant to the terms of the RSA and the Additional Noteholder RSA,  94.0% of those who hold or will hold Claims (as defined in the Plan) in Class 4 (the 7.5% Notes due 2025 Secured Claims (as defined in the Plan)), and 82.7% of those who hold or will hold Claims in Class 5 (consisting of the 7.5% Notes due 2025 Unsecured Deficiency Claims (as defined in the Plan), Unsecured Notes Legacy Claims (as defined in the Plan) and the Related Party Claims) have agreed to support the Plan.

9.      The Debtors intend to seek expeditious approval of the Disclosure Statement and confirmation of the Plan in accordance with the terms of the RSA and the Additional Noteholder RSA.  The Debtors believe that the Plan represents the best prospect for restructuring the Debtors' capital structure, maximizing the value of the Debtors' assets for the benefit of all stakeholders, and providing the Debtors with adequate liquidity to continue as efficient and competitive vehicle importers and distributors serving the people of Chile, Peru and other Latin American countries.

## RELIEF REQUESTED

10.     By this Motion, the Debtors seek authorization to enter into the Additional

Noteholder RSA pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

## BASIS FOR RELIEF

**A.      Entry Into the Additional Noteholder RSA Is An Exercise of Sound Business
         Judgment**

11.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor],

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363(b), courts require only that the

debtor show "a good business reason" for such actions.  *See, e.g.*, *Official Comm. Of Unsecured

Creditors v. Enron Corp.*, 335 B.R. 22, 28 (S.D.N.Y. 2005) (quoting *Comm. Of Equity Sec.

Holdings v. Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also In re Adelphia Commc'ns

Corp.*, No. 02-41729, 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003).  Moreover,

"[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct." *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-

Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416

F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business

judgment rule on the merits is a near-Herculean task").

12.     Additionally, under section 105(a) of the Bankruptcy Code, "[t]he court may issue

any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §

105(a).  Courts in this and other districts have relied on both sections 105(a) and 363(b) when

approving a plan support agreement, finding that such relief is entirely consistent with the

applicable provisions of the Bankruptcy Code.  *See, e.g.*,  Order, *In re Tronox Inc.*, Case No. 09-

10156 (Bankr. S.D.N.Y. Dec. 23, 2009), ECF No. 1030 (order authorizing debtors to enter into and to implement terms of a postpetition plan support agreement pursuant to both sections 105(a) and 363(b)); Order, *In re Bally Total Fitness of Greater N.Y.*, Case No. 08-14818 (Bankr. S.D.N.Y. July 9, 2009), ECF No. 1231 (authorizing entry into postpetition plan support agreement and exit financing commitment letters); Order, *In re Movie Gallery, Inc.*, Case No. 07-33849 (Bankr. E.D. Va. Feb. 6, 2008), ECF No. 1430 (authorizing entry into postpetition plan support agreement); Order, *In re Glob. Power Equip. Group, Inc.*, No. 06-11045 (Bankr. D. Del. Oct. 31, 2007), ECF No. 1914 (same).

13.     As described above, the Additional Noteholder RSA represents significant advances towards the Debtors' emergence from these Chapter 11 Cases.  Entering into the Additional Noteholder RSA is a sound and reasonable exercise of the Debtors' business judgment that will secure the support of the Additional Noteholder, together with the Consenting Noteholders, for the Plan as modified, and enable the Debtors to move expeditiously towards confirmation and consummation of a plan of reorganization with the support of support of 94% the holders of Claims in Class 4 and 82.7% of the holders of Claims in Class 5.  The Additional Noteholder RSA and terms of the modifications to the Plan as provided therein are the result of vigorous, arms' length negotiations among the Debtors, the Additional Noteholder and the Consenting Noteholders.

14.     For the foregoing reasons, the Debtors believe that the relief requested by this Motion is warranted and appropriate under the circumstances.  Accordingly, the Debtors submit that granting the relief requested in this Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest and respectfully request that the Court authorize the Debtors

to assume the Additional Noteholder RSA pursuant to sections 105(a) and 363 of the Bankruptcy Code.

**B.        Cause Exists to Modify the Automatic Stay to Effectuate the Relief Requested**

15.        Section 362(a) of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  *Id*. at § 362(d)(1).

16.        The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to modify the automatic stay solely to the extent necessary to permit the relief requested in this motion and, for the reasons described herein, believe this relief is appropriate in the context of entering into and implementing the Additional Noteholder RSA.

<u>NOTICE</u>

17.        No creditors' committee, trustee or examiner has been appointed in these Chapter 11 Cases.  Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the holders of the five largest secured claims against the Debtors (on a consolidated basis); (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; and (f) all others that are required to be noticed in accordance with Bankruptcy Rule 2002 and Local Rule 2002-1.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

18.    No prior motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

WHEREFORE for the reasons set forth herein, the Debtors respectfully request that this Court (a) enter the order, substantially in the form attached hereto as Exhibit A, and (b) grant such other and further relief as is just and proper.

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Dated:  April 23, 2021
       New York, New York        */s/ Jane VanLare*
_____
                                 Jane VanLare
                                 Adam Brenneman

                                 One Liberty Plaza
                                 New York, New York 10006
                                 Telephone: (212) 225-2000
                                 Facsimile: (212) 225-3999

                                 *Proposed Counsel for the Debtors*
                                 *and Debtors-in-Possession*

## EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Automotores Gildemeister SpA, *et al.*,[1] | Case No.  21-10685 (LGB) |
| Debtors. | Jointly Administered |

### ORDER AUTHORIZING ENTRY INTO THE ADDITIONAL NOTEHOLDER RSA

Upon the motion (the "Motion")[2] of Automotores Gildemeister SpA ("Gildemeister") and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), for entry of an order, as more fully described in the Motion, authorizing the Debtors to enter into the Additional Noteholder RSA; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated January 31, 2012*; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having found that the Debtors' notice of

---

[1]    The Debtors, together with each of the Debtor's Chilean, Brazilian, and/or Uruguayan tax identification number, as applicable, are:  Automotores Gildemeister SpA (79.649.140-K), AG Créditos SpA (76.547.689-5), Marc Leasing, S.A. (96.658.270-7), Fonedar S.A. (216288040014), Camur S.A. (216589740015), Lodinem S.A. (217115010014), Carmeister S.A. (96.630.690-7), Maquinaria Nacional S.A. (Chile) (96.812.980-5), RTC S.A. (89.414.100-K), Fortaleza S.A. (76.856.380-2), Maquinarias Gildemeister S.A. (78.862.000-8), Comercial Gildemeister S.A. (76.856.310-1), and Bramont Montadora Industrial e Comercial de Vehiculos S.A. (04.926.142/0002-16).  The location of the corporate headquarters and the service address for Automotores Gildemeister SpA is: 11000 Avenida Las Condes Vitacura, Santiago, Chile.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

the Motion and opportunity for a hearing on the Motion was appropriate and no other notice need

be provided; and the Court having reviewed the Motion and having heard the statements in support

of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just

cause for the relief granted herein; and upon all of the proceedings had before the Court; and after

due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      The Debtors are authorized to enter into the Additional Noteholder RSA.

3.      The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

4.      Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the

contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry,

(ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the

relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay,

take any action and perform any act authorized under this Order.

5.      This Court shall retain exclusive jurisdiction with respect to all matters arising from

or related to the implementation, interpretation or enforcement of this Order.


Dated: _____, 2021
       New York, New York                    _____
                                             HONORABLE LISA G. BECKERMAN
                                             UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

**Additional Noteholder RSA**

*Execution Version*

## ADDITIONAL NOTEHOLDER RESTRUCTURING SUPPORT AGREEMENT

This supplemental Restructuring Support Agreement (this "Additional Noteholder Restructuring Support Agreement" or this "Agreement") dated as of April 22, 2021 (the "Execution Date") is entered into by and among Baion Group, LLC holding the amounts of 8.25% Notes due 2021 and 7.5% Notes due 2025 (the "Gildemeister Notes") reflected on their signature pages hereto (the "Additional Noteholders") and Automotores Gildemeister SpA (the "Company"). The Company and the Additional Noteholders may each be referred to herein as a "Party" and, collectively, as the "Parties."

## RECITALS

**WHEREAS**, the Company is party to a Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "Restructuring Support Agreement"), dated as of March 31, 2021 by and among Automotores Gildemeister SpA and certain of its affiliates as Companies, the Shareholder, and the Consenting Noteholders (each as defined in the Restructuring Support Agreement).

**WHEREAS**, pursuant to the Restructuring Support Agreement, (i) on April 9, 2021, the Company and certain of its affiliates (collectively, the "Debtors") commenced solicitation of a prepackaged plan of reorganization (the "Plan") to effect the Restructuring (as defined in the Restructuring Support Agreement) and (ii) on April 12, 2021 (the "Petition Date") the Debtors filed voluntary petitions commencing cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to effect the Restructuring as set forth in the Plan which Chapter 11 Cases are being jointly administered under the caption *In re Automotores Gildemeister SpA*, Case No. 21-10685 before the Honorable Lisa G. Beckerman. Each capitalized term used herein but not defined herein shall have the meaning set forth in the Plan.

**WHEREAS**, the Additional Noteholders have previously filed objections to certain relief sought by the Debtors in the Chapter 11 Cases but desire to settle all such objections and to support the confirmation of the Plan as amended pursuant to the terms provided herein.

**WHEREAS**, each Party and its respective counsel and other advisors has reviewed or has had the opportunity to review this Additional Noteholder Restructuring Support Agreement and each Party has agreed, subject to the conditions contained herein, to support the confirmation of the Plan in accordance with this Additional Noteholder Restructuring Support Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.    Conditions Precedent. This Additional Noteholder Restructuring Support Agreement shall be effective from the date the following conditions precedent have been satisfied  (the "Agreement Effective Date"):

   a.    The Company shall have obtained the consent of the Consenting Noteholders by receiving an executed form of a consent to the modifications to the Plan set forth in Exhibit A hereto (the "Consent"), and such Consent shall have become effective according to its terms; and

   b.    The Bankruptcy Court shall have entered an order approving and authorizing the Debtors to enter into this Additional Noteholder Restructuring Support Agreement.

2.      Plan Amendments.  Upon the effectiveness of this Additional Noteholder Restructuring Support Agreement, the Company hereby agrees to:

a.      no later than the date falling 2 business days after the Agreement Effective Date, seek authority of the Bankruptcy Court to enter into this Additional Noteholder Restructuring Support Agreement on an emergency basis;

b.      no later than the date falling 2 business days after the Bankruptcy Court enters an order approving the Company's execution of this Additional Noteholder Restructuring Support Agreement, amend the treatment of the 7.5% Notes due 2025 Secured Claims under Class 4 and the Unsecured Notes and Related Party Claims under Class 5 of the Plan and certain related Plan provisions as provided in Exhibit A hereto; and

c.      no later than the date falling 2 business days after the Bankruptcy Court enters an order approving the Company's execution of this Additional Noteholder Restructuring Support Agreement, the Company shall send a notice to all creditors entitled to vote under the Plan (i) informing them of the execution of this Additional Noteholder Restructuring Support Agreement, (ii) amending the terms of the Plan (x) to add the Additional Noteholders to the definitions of "Exculpated Parties," "Released Parties," and "Releasing Parties" under the Plan, (y) as provided in Exhibit A hereto with respect to the Plan Treatment of Classes 4 and 5 under the Plan, and (z) to make any required conforming changes, and supplementing the Disclosure Statement accordingly, (iii) extending the Voting Deadline  to return their ballots on the amended Plan to the Balloting Agent to May 18, 2021 (the "New Voting Deadline"), and (iv) permitting any creditor that has previously returned a ballot voting on the Plan the opportunity to change their vote up to the New Voting Deadline.

3.      Agreement to be Bound.

a.      The Additional Noteholders acknowledge that they have read, understand, and agree to be bound by the terms of this Additional Noteholder Restructuring Support Agreement.

b.      Each Additional Noteholder agrees, severally and not jointly, that it shall with respect to all Claims or Interests held by such Additional Noteholder, whether beneficially owned or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, and inclusive of any Claims or Interests such Additional Noteholder acquires prior to the Plan Effective Date:

i. vote to accept the Plan (as amended pursuant to this Additional Noteholder Restructuring Support Agreement) and grant the releases set forth in the Plan, including by  not "opting out" of the releases (the "Release Election"), by delivering its duly executed and completed ballot before the date on which votes on the Plan are required to be submitted in accordance with the Solicitation Materials;

ii. not change or withdraw (or cause to be changed or withdrawn) such vote or Release Election; provided that (x) if, prior to consummation of the Plan, the treatment of such Additional Noteholders' Claims under Class 4 or Class 5 of the Plan is modified in a manner adverse to the Additional Noteholders' economic interests without the consent of such Additional Noteholders, or (y) this Additional Noteholder Restructuring Support Agreement is terminated in accordance with the terms of Section 5 hereof, then each of the Additional Noteholders shall have the right to revoke its vote in favor of the Plan and its Release Election, and the Debtors shall take all steps necessary to assist in such revocation, and upon such revocation

2

any such vote and Release Election shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Additional Noteholder Restructuring Support Agreement, and the ballots casting such votes and Release Elections may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission);

iii. not, in any capacity, directly or indirectly (w) object, initiate any legal proceedings, or enforce rights as a holder of Claims and Interests that would have the effect of preventing the acceptance, approval or implementation of the Restructuring or the Plan; (x) file, vote for, or enter into any letter of intent or other agreement regarding any restructuring, workout, liquidation or plan of reorganization for any of the Companies under any applicable bankruptcy or insolvency laws other than the Restructuring or the Plan; (y) take any action to accelerate any Claims and Interests or to enforce or foreclose on, or otherwise exercise remedies in respect of the 7.5% Notes due 2025 or the 8.25% Notes due 2021; or (z) solicit, encourage, or direct any person, including, without limitation, the indenture trustee or any collateral trustee under the 2025 Notes Indenture or the 2021 8.25% Notes Indenture, to undertake any action prohibited by the foregoing clauses (w)-(y) of this paragraph 4(b)(iii); and

iv. promptly withdraw any discovery requests or subpoenas served on the Company, any of the Company's officers or directors, and any Consenting Noteholders.

4.    Fees and Expenses.  The Companies shall promptly pay and reimburse the reasonable and documented fees and expenses incurred by Alston & Bird LLP necessary to advise the Additional Noteholders in connection with the Plan and this Additional Noteholder Restructuring Support Agreement in an aggregate amount not to exceed $175,000 and not object to the application from Alston & Bird LLP for substantial contribution under section 503(b)(3)(D) of the Bankruptcy Code (the "Substantial Contribution Application"); *provided* that the payment of fees and expenses under this section shall be conditioned upon the approval by the Bankruptcy Court of the Substantial Contribution Application.

5.    Termination.  This Additional Noteholder Restructuring Support Agreement and the obligations of the Company and the Debtors with respect to the Additional Noteholders herein shall automatically terminate immediately upon termination of the Consent.

6.    Representations and Warranties.  Each of the Additional Noteholders, severally and not jointly, represents and warrants to the Companies that:

a.    Securities Law Representations.  Such Additional Noteholder (i) intends to acquire its portion of the New Notes or USA Holdco LLC Units (the "New Securities") under the Plan for investment, solely for its own account (or for the account of those for whom or for which, as the case may be, it is acting as investment advisor, manager or in a similar capacity) and not with a view to, or for resale in connection with, the distribution thereof in violation of applicable securities laws; (ii) will not distribute any portion of the New Securities it may acquire, except in compliance with this Additional Noteholder Restructuring Support Agreement and the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws or pursuant to an available exemption therefrom, and (iii) acknowledges that (A) the offer and sale of the New Securities has not been registered under the Securities Act, (B) the offering and sale of the New Securities is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) or Regulation S of the Securities Act or Section 1145 of the Bankruptcy Code, as applicable and (C) there is no established market for the New Securities

3

and it is not anticipated that there will be any public market for the New Securities in the foreseeable future;

b.      Beneficial Ownership; No Transfer.  (i) Such Additional Noteholder (A) has full power and authority to act on behalf of and consent to matters concerning such 7.5% Notes due 2025 or 8.25% Notes due 2021 for which it is the sole beneficial owner or has sole investment or voting discretion and to dispose of, exchange, assign and transfer such 7.50% Notes due 2025, (B) holds no other 7.5% Notes due 2025 or 8.25% Notes due 2021 on or prior to the Voting Deadline and (C) has made no prior transfer of, and has not entered into any other agreement to transfer, in whole or in part, any portion of its right, title, or interests in any of the 7.5% Notes due 2025 or 8.25% Notes due 2021 that is inconsistent or conflicts with the representations and warranties of such Additional Noteholder set forth in this Section 6.b, would otherwise render it unable to comply with this Additional Noteholder Restructuring Support Agreement and perform its obligations hereunder; and (ii) other than pursuant to this Additional Noteholder Restructuring Support Agreement, such 7.5% Notes due 2025 or 8.25% Notes due 2021 are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Additional Noteholder's performance of its obligations contained in this Additional Noteholder Restructuring Support Agreement at the time such obligations are required to be performed;

c.      Existence; Enforceability.  It is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Additional Noteholder Restructuring Support Agreement is a legal, valid, and binding obligation of such Additional Noteholder, enforceable against it in accordance with its terms.

d.      No Consent or Approval.  Except as expressly provided in this Additional Noteholder Restructuring Support Agreement or the Plan, no consent or approval is required by any other person or entity in order for it to carry out the Restructuring contemplated by, and perform its respective obligations under, this Additional Noteholder Restructuring Support Agreement.

e.      Power and Authority.  It has, or will have, all requisite corporate, partnership, limited liability company or similar power and authority to enter into this Additional Noteholder Restructuring Support Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, this Additional Noteholder Restructuring Support Agreement.

f.      Authorization; Execution.  The execution, delivery and performance of this Additional Noteholder Restructuring Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or similar action on its part and this Additional Noteholder Restructuring Support Agreement has been duly executed and delivered by it.

g.      No Conflicts. The execution, delivery and performance of this Additional Noteholder Restructuring Support Agreement by it do not and will not violate (i) any provision of law, rule or regulation applicable to it, (ii) its certificate of incorporation or by-laws (or other organizational documents), (iii) any order of any court or other governmental authority or regulatory body applicable to it, or (iv) any of the Companies' material contracts or agreements except as would be waived, consented to or cured, if curable, prior to the consummation of the Restructuring.

h.      Governmental Consents.  The execution, delivery and performance by it of this Additional Noteholder Restructuring Support Agreement do not and will not require any registration or filing with, consent or approval of, or notice to, or any other action to, with, or by, any federal, state or other governmental authority or regulatory body, except any filings in

connection with the Chapter 11 Cases, including the approval of this Additional Noteholder Restructuring Support Agreement.

       i.      <u>Representation by Counsel</u>.  It has been represented by counsel in connection with this Additional Noteholder Restructuring Support Agreement and the transactions contemplated by this Additional Noteholder Restructuring Support Agreement.

       j.      <u>Proceedings</u>.  Other than the Chapter 11 Cases, no litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would materially adversely affect its ability to enter into this Additional Noteholder Restructuring Support Agreement or perform its obligations hereunder.

7.      <u>Transfer of Interests</u>.

       a.      Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Additional Noteholder to sell, use, assign, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly, any or all of its Gildemeister Notes; *provided, however*, that for the period commencing as of the Execution Date until (x) the termination of this Agreement pursuant to the terms hereof (the "<u>Restricted Period</u>"), no Additional Noteholder shall sell, assign, transfer, pledge, participate, hypothecate or otherwise dispose of, directly or indirectly ("<u>Transfer</u>") any Gildemeister Notes and any purported Transfer of any Gildemeister Notes shall be void and without effect (other than any Transfer or purported Transfer to a prime broker or in connection with derivatives or financing transactions, including repurchase agreements, until such time as the prime broker or counterparty to a derivative or financing transaction acquires title free and clear of any obligation to return the Gildemeister Notes to the Additional Noteholder sufficiently in advance of the New Voting Deadline to permit the Additional Noteholder to comply with its obligations hereunder), *unless* (i) the transferee is an Additional Noteholder or (ii) if the transferee is not an Additional Noteholder prior to the Transfer, such transferee delivers to the Company, at or prior to the time of the proposed Transfer, an executed copy of the transfer agreement (a "<u>Transfer Agreement</u>") in the form attached as <u>Exhibit B</u> hereto pursuant to which such transferee shall assume all obligations of the Additional Noteholder transferor hereunder in respect of the Gildemeister Notes being Transferred*; provided* that no Additional Noteholder shall Transfer any or all of its Gildemeister Notes to any person or entity that the Additional Noteholder has actual knowledge of the identity of such counterparty and actual knowledge that such counterparty is an adverse party to any pending litigation against any of the Company; *provided further* that the Additional Noteholders shall have no duty to inquire or determine the identity of the counterparty to the Transfer or whether such counterparty is an adverse party to any pending litigation against any of the Company.

       b.      Upon consummation of any Transfer in compliance with Section 7.a, (i) any person or entity that is a transferee shall be fully bound by this Agreement as an "Additional Noteholder" and shall be a "Party" hereunder and (ii) the transferor shall no longer be bound by the Agreement or the obligations, nor have any rights, hereunder with respect to any Gildemeister Notes that have been Transferred.  This Agreement shall in no way be construed to preclude the Additional Noteholders from acquiring additional Gildemeister Notes; *provided*, *however*, that any additional claims and interests acquired by any Additional Noteholder after executing this Agreement shall automatically and immediately upon acquisition by such Additional Noteholder be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company and counsel to the Additional Noteholders of such acquisition.  Upon execution of this Agreement (on its signature pages hereto), an Additional Noteholder shall notify the Company of the total principal amount of claims and interests held by such Additional Noteholder as of the date

of execution of this Agreement; *provided* that the Companies shall keep such information confidential, which obligation shall survive the termination of this Agreement.

8.      <u>Governing Law</u>.

a.      THIS ADDITIONAL NOTEHOLDER RESTRUCTURING SUPPORT AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

b.      All actions and claims pursuant to this Additional Noteholder Restructuring Support Agreement shall be heard and determined by the Bankruptcy Court.

c.      EACH PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING PURSUANT TO THIS ADDITIONAL NOTEHOLDER RESTRUCTURING SUPPORT AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.      <u>Execution of Additional Noteholder Restructuring Support Agreement</u>.  This Additional Noteholder Restructuring Support Agreement may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Additional Noteholder Restructuring Support Agreement by telecopy or electronic mail in portable document format (pdf) shall be effective as delivery of a manually executed counterpart of this Additional Noteholder Restructuring Support Agreement.

[*Remainder of Page Intentionally Left Blank - Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Additional Noteholder Restructuring Support Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first written above.

**COMPANY**

**Automotores Gildemeister SpA**

By: _____
Name:
Title:

**ADDITIONAL NOTEHOLDERS**

**Baion Group, LLC,**
as a Joining Additional Consenting Noteholder
holding ████████████████

By: _____
Name: Lewis Schwartz
Title:  Authorized Signatory

Address: Josh Weisser
         c/o Contrarian Capital Management,
         LLC
         411 West Putnam Ave. #425
         Greenwich, CT 06830
Telephone: + (203) 862-8278
Email:  jweisser@contrariancapital.com

## Exhibit A

Amendments to the Plan

1) The following defined terms are added to Section 1.1 of the Plan:

    a. "Additional Noteholder RSA" shall mean that certain Additional Noteholder Restructuring Support Agreement, dated April 22, 2021, by and among Gildemeister and Baion Group, LLC and its affiliates.

    b. "Consenting Noteholders" shall mean (i) the Holders of 7.5% Notes due 2025 that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement (as defined in the RSA) to counsel to the Company Parties from time to time agreeing to be bound thereby and (ii) solely with respect to the releases and exculpations granted under the Plan, the signatories to the Additional Noteholder RSA.

    c. "New Junior Tranche Secured Notes Substitute Distribution" shall have the meaning given such term in Section 3.2 of the Plan.

    d. "New Junior Tranche Secured Notes Substituting Creditor" shall have the meaning given such term in Section 3.2 of the Plan.

2) Article I, Section 61 of the Plan shall be amended to reflect the following provisions:

> 61. *"Disbursing Agent"* means, unless otherwise set forth in this Plan, the Reorganized Debtors or any Entity selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

3) Article I, Section 71 of the Plan shall be amended to reflect the following provisions:

> 71. *"Exculpated Parties"* means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) to the maximum extent permitted by law, each Consenting Noteholder, the Ad Hoc Group of Consenting Noteholders, and each member of the Ad Hoc Group of Consenting Noteholders; (d) to the maximum extent permitted by law, the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Unsecured Legacy Notes Trustees; and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

4) Article I, Section 152 of the Plan shall be amended to reflect the following provisions:

> 152. "*Restructuring Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of (a) the Consenting Noteholders in any way related to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the Consenting Noteholders' holdings of the 7.5% Notes due 2025, any fees and expenses of any Ad Hoc Group Advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, and the transactions contemplated thereby, (b) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent and (c) the Unsecured Legacy Notes Trustees, subject to a total aggregate cap of $100,000 for the Unsecured Legacy Notes Trustees under the 2021 8.25% Notes Indenture and the 2023 Notes Indenture (which cap shall not apply to any settlement costs incurred by any of the Unsecured Legacy Notes Trustees after the Effective Date).

    5)   A new Section 177A shall be added to Article I of the Plan to reflect the following provisions:

> 177A.   "*Unsecured Legacy Notes Indentures*" means the Indentures that govern the Unsecured Legacy Notes, under which the Unsecured Legacy Notes Trustees serve as trustees.

    6)   The treatment of Claims under Section 3.2(e) of the Plan in respect of Class 5 (Unsecured Notes and Related Party Claims) shall be amended to reflect the following provisions:

> **(e)  Class 5 (Unsecured Notes and Related Party Claims)**
>
>   (1)   *Classification*: Class 5 consists of the Unsecured Notes and Related Party Claims against the applicable Debtor.
>
>   (2)   *Allowance*: On the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) $111,796,081 of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,106 of 7.5% Notes due 2021 Claims, (iii) $23,205,373 of 8.25% Notes due 2021 Claims, (iv) $2,664,771 of 6.75% Notes due 2023 Claims which, in each case, for the Claims described in sub-clauses (i) through (iv) includes the aggregate principal amount of such Claims and any accrued and unpaid interest through the Petition Date. The Minvest Loan Claim shall be Allowed in the amount of $1,643,500, and the Share Purchase Agreement Claim shall be Allowed in the amount of $300,000.
>
>   (3)   *Treatment*: On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each Holder of an Allowed Unsecured Notes and Related Party Claim shall receive:
>
>     A.   if such holder is not a New Junior Tranche Secured Notes Substituting Creditor, $0.1939 in principal amount of the New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such holder; or
>
>     B.   if such holder (i) voted to accept the Plan and (ii) affirmatively elects on its Letter of Transmittal to receive such holder's New Junior Tranche Secured Notes Substitute Distribution (a "<u>New Junior Tranche Secured Notes Substituting Creditor</u>"):
>
>       i.   $0.1939 in Cash for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such New Junior Tranche Secured Notes Substituting Creditor subject to a total aggregate cap on all Cash distributions payable to all electing New Junior Tranche Secured Notes Substituting Creditors of $3,000,000 (the "<u>Cash Distribution Cap</u>"); *provided*, that, to the extent the total Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors would result in Cash distributions under this clause 3.2(e)(3)(B)(i) exceeding the Cash Distribution Cap, the Disbursing Agent shall allocate the Cash distributions not exceeding the Cash Distribution Cap proportionally among the Allowed Unsecured Notes

and Related Party Claims held by the New Junior Tranche Secured Notes Substituting Creditors (based on the proportion that each such New Junior Tranche Secured Notes Substituting Creditor's Allowed Unsecured Notes and Related Party Claim bears to the sum of all Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors); and

ii.  $0.1939 in aggregate principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims for which no Cash distribution was made pursuant to clause 3.2(e)(3)(B)(i) due to the Cash Distribution Cap (together, (i) and (ii), a "New Junior Tranche Secured Notes Substitute Distribution").

For the avoidance of doubt, no holder of Allowed Unsecured Notes and Related Party Claims shall receive a recovery under the Plan of more than $0.1939 in Cash and New Junior Tranche Secured Notes combined for each $1.00 of their Allowed Unsecured Notes and Related Party Claims.

(4)  *Voting*: Class 5 is Impaired. Holders of Unsecured Notes and Related Party Claims are entitled to vote to accept or reject the Plan. For the avoidance of doubt, notwithstanding the Cash-Out Electing Holders' waiver of distributions on account of their 7.5% Notes due 2025 Unsecured Deficiency Claims, the Cash-Out Electing Holders shall be permitted to vote the full Allowed amount of their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5 for purposes of confirmation of the Plan.

7)  Section 4.4 of the Plan shall be amended to reflect the following provisions:

4.4  **Exit Financing.**

Subject to the terms, conditions and limitations as more fully set forth in the Exit Financing Commitment Agreement (as may be amended from time to time with the consent of the Debtors and the Exit Financing Parties), on the Plan Effective Date the Exit Financing Parties shall advance to the Debtors an amount of Cash sufficient to fund all Cash-Out Distributions and the Cash component of the New Junior Tranche Secured Notes Substitute Distributions only and which amount in no event shall exceed $15.6 million. The Exit Financing Parties will receive New Senior Tranche Secured Notes in aggregate principal amount equal to all amounts advanced to fund the Cash-Out Distributions and New Junior Tranche Secured Notes Substitute Distributions.

8)  Section 6.3 of the Plan shall be amended to reflect the following provisions:

6.3   **Disbursing Agent.**

     Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of the 7.5% Notes due 2025 Claims shall be made to or at the direction of the Senior Secured Notes Trustee, which shall, to the extent directed, act as disbursing agent for distributions to holders of the 7.5% Notes due 2025 Claims and may transfer such distributions by the Debtors (as applicable) to the holders of the 7.5% Notes due 2025 Claims as directed.  Irrespective of how distributions in respect of the 7.5% Notes due 2025 Claims are made, such distributions shall be subject in all respects to the right of the Senior Secured Notes Trustee to assert the charging lien in Section 7.06 of the 2025 Notes Indenture against such distributions if the obligations of payments owed to the Senior Secured Notes Trustee are not satisfied.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of the Unsecured Legacy Notes Claims shall be made to or at the direction of the Unsecured Legacy Notes Trustees, which shall, to the extent directed, act as disbursing agent for distributions to holders of the Unsecured Legacy Notes Claims and may transfer such distributions by the Debtors (as applicable) to the holders of the Unsecured Legacy Notes Claims as directed.  Irrespective of how distributions in respect of the Unsecured Legacy Notes Claims are made, such distributions shall be subject in all respects to the right of the Unsecured Legacy Notes Trustees to assert the charging lien in Section 6.08 of each of the Unsecured Legacy Notes Indentures against such distributions if the obligations of payments owed to the Unsecured Legacy Notes Trustees are not satisfied.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

     The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

     Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash by the Reorganized Debtors.

    9)   Section 6.4(b) of the Plan shall be amended to reflect the following provisions:

(b)   surrender and transfer the Holder's 7.5% Notes due 2025 to the applicable indenture trustee via a Deposit/Withdrawal at Custodian ("<u>DWAC</u>"), if ATOP is not available.

    10) Section 6.5(b)(2) of the Plan shall be amended to reflect the following provisions:

(2)   surrender and transfer to the applicable indenture trustee via DWAC (if ATOP is not available) its 7.5% Notes due 2025 or Unsecured Legacy Notes.

    11) Section 6.5(e) of the Plan shall be amended to reflect the following provisions:

> (e)    On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with DTC's customary procedures (which may be through ATOP or via DWAC, if ATOP is not available), the New Secured Notes and New Subordinated Notes corresponding to each Qualified Holder that has completed the procedures specified in clause (b)(1) above; provided, however, that if the Effective Date has not occurred by thirty (30) calendar days after the Distribution Election Deadline, the foregoing deadlines may be extended and the foregoing procedures may be amended by the Debtors and the Consenting Noteholders in a written notice provided to the Disbursing Agent.

12) Section 6.5(g) of the Plan shall be amended to reflect the following provisions:

> (g)    The Disbursing Agent and/or any applicable broker or agent shall use reasonable best efforts to cause the tender into ATOP or transfer via DWAC (if ATOP is not available) of all the 7.5% Notes due 2025 or Unsecured Legacy Notes.  Any Holder of the 7.5% Notes due 2025 or the Unsecured Legacy Notes who fails to (i) surrender the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes required to be tendered under the Plan or verify its position in the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes and (ii) provide a completed Letter of Transmittal to the Disbursing Agent together with any documents required in connection therewith within one hundred eighty (180) days after the Effective Date shall have its Claims and its distribution of New Notes pursuant to the Plan on account of its 7.5% Notes due 2025 Secured Claims or Unsecured Notes Claims discharged and forfeited and shall not participate in any distribution under the Plan.  Any property in respect of such forfeited 7.5% Notes due 2025 Secured Claims or the Unsecured Notes Claims would revert to the Reorganized Debtors.

## Exhibit B

Form of Transfer Agreement

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Additional Noteholder Restructuring Support Agreement (the "Agreement"), dated as of [●], by and among the Company and Additional Noteholders of the 8.25% Notes due 2021 and 7.5% Notes due 2025, including the transferor (the "Transferor") to the Transferee of any [8.25% Notes due 2021 and/or 7.5% Notes due 2025], and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed an Additional Noteholder under the terms of the Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Date Executed: _____

_____
Print name of Transferee

_____
Name:
Title:

Address:
_____

_____

_____

Attention:
_____
Telephone:
_____
Facsimile:
_____

### Transferor's Principal Amount Held

| Note | Amount |
|---|---|
| 7.50% Notes due 2025 | US$ |
| 8.25% Notes due 2021 | US$ |

## **<u>EXHIBIT C</u>**

**Consenting Noteholder Consent**

**EXECUTION VERSION**

## CONSENT

This CONSENT is hereby provided by the undersigned Consenting Noteholders (the "Consenting Noteholders") under that certain Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "Restructuring Support Agreement") by and among Automotores Gildemeister SpA and certain of its affiliates as Companies, the Shareholder and Consenting Noteholders, or investment managers for the Consenting Noteholders of the 7.50% Notes due 2025 (each as defined in the Restructuring Support Agreement), dated as of March 31, 2021. Each capitalized term used herein but not defined herein shall have the meaning set forth in the Restructuring Support Agreement.

**WHEREAS,** the Companies commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") on April 12, 2021, with such cases jointly administered under Case No. 21-10685, and contemporaneously therewith filed a plan of reorganization at ECF No. 2 (the "Plan") in conformance with the terms and conditions of the Restructuring Support Agreement;

**WHEREAS**, certain holders of 8.25% Notes due 2021 and 7.5% Notes due 2025 (the "Additional Noteholders") filed objections to certain relief sought by the Debtors in the Chapter 11 Cases;

**WHEREAS**, the undersigned Consenting Noteholders and the Additional Noteholders wish to settle all such objections and to support the confirmation of the Plan as modified in the attached Exhibit A;

**WHEREAS**, in response to the settlement reached among the Consenting Noteholders and the Additional Noteholders, the Companies intend to modify the Plan as set forth in Exhibit A;

**NOW THEREFORE**, the Consenting Noteholders consent and agree as follows:

1.    Conditions Precedent. This Consent shall be effective from the date all of the following conditions precedent have been satisfied (the "Consent Effective Date"):

    a.  Baion Group LLC shall have provided evidence satisfactory to the Consenting Noteholders that it has informed the United States Trustee appointed in the Chapter 11 Cases that it will not serve on and have withdrawn its agreement to serve on any official committee of unsecured creditors proposed in the Debtors' Chapter 11 Cases;

2.    Consent to Plan Modification. The Consenting Noteholders hereby consent to the modifications of the Plan as set forth in Exhibit A hereto, waive any right to terminate support of the Plan on the basis of such modifications, and agree that all references in the Restructuring Support Agreement to the Plan Term Sheet and the Plan shall be construed to incorporate the modifications as set forth in Exhibit A. Those certain Consenting Noteholders who have agreed to provide the Companies with debtor-in-possession financing (the "DIP Lenders") likewise consent, in their capacity as DIP Lenders, to the Plan modifications in Exhibit A, and waive any

termination rights under the DIP Loan Documents arising from the modification of the Plan as set forth in Exhibit A.

      3.    <u>Extension of Plan Milestones</u>.  The Consenting Noteholders (in their capacity as Consenting Noteholders under the Restructuring Support Agreement, and for those Consenting Noteholders who are DIP Lenders, likewise in their capacity at DIP Lenders) hereby agree to extend the following Milestones (as defined in the Plan Term Sheet):

      a.  Milestone 7 (completion of solicitation) shall be extended by 5 days;

      b.  Milestone 9 (approval of the disclosure statement) shall be extended by 3 days;

      c.  Milestone 10 (confirmation of the plan) shall be extended by 3 days.

      4.    <u>Waiver of Cash-Out Option</u>.  The Consenting Noteholders hereby waive any right to elect to receive substitute cash consideration on account of any of their Unsecured Notes Claims in Class 5 of the amended Plan.

      5.    <u>Effectiveness</u>.  This Consent shall be effective upon the execution of that certain Additional Noteholder Restructuring Support Agreement dated April 22, 2021 by and among Baion Group, LLC, holding the amounts of 8.25% Notes due 2021 and 7.5% Notes due 2025, and Automotores Gildemeister SpA.

      6.    <u>Termination of Consent</u>.  This consent shall automatically terminate immediately upon the appointment of any unsecured creditor's committee in the Chapter 11 Cases.

Date Executed: April 22, 2021

*[Remainder of Page Intentionally Left Blank - Signature Pages Follow]*

**CONSENTING NOTEHOLDERS**

**Elliott Associates, L.P.**, as a
Consenting Noteholder

By: Elliott Investment Management L.P.,
as attorney-in-fact

By: _____
Name: Elliot Greenberg
Title: Vice President

Address: Elliott Greenberg, Elliott
Investment Management L.P.
Phillips Point, East Tower, Suite 1000

777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2772
Email: egreenberg@elliottmgmt.com

**Elliott International, L.P.**, as a
Consenting Noteholder

By: Hambledon, Inc., its General Partner
By: Elliott Investment Management L.P.,
as attorney-in-fact

By: _____
    Name: Elliot Greenberg
    Title: Vice President

Address: Elliott Greenberg, Elliott
Investment Management L.P.
Phillips Point, East Tower, Suite 1000
777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2772
Email: egreenberg@elliottmgmt.com

**The Liverpool Limited Partnership**, as a
Consenting Noteholder

By: Elliott Investment Management L.P., as
attorney-in-fact

By: _____
Name: Elliot Greenberg
Title: Vice President

Address: Elliott Greenberg, Elliott Investment
Management L.P.
Phillips Point, East Tower, Suite 1000
777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2772
Email: egreenberg@elliottmgmt.com

**Blake Capital LLC**, as a
Consenting Noteholder
By: Elliott Investment Management L.P.,
as attorney-in-fact

By: _____
    Name: Elliot Greenberg
    Title: Vice President

Address: Elliott Greenberg, Elliott Investment
Management L.P.
Phillips Point, East Tower, Suite 1000
777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2370
Email: egreenberg@elliottmgmt.com

*[Signature Pages to Consent]*

**Helios Associates LLC**, as a
Consenting Noteholder


By: _____
Name: Elliot Greenberg
Title: Vice President

Address: Elliott Greenberg, Elliott
Investment Management L.P.
Phillips Point, East Tower, Suite 1000
777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2370
Email: egreenberg@elliottmgmt.com


**Warrington LLC**, as a
Consenting Noteholder

By: Elliott Investment Management L.P., as
attorney-in-fact


By: _____
Name: Elliot Greenberg
Title: Vice President

Address: Elliott Greenberg, Elliott
Investment Management L.P.
Phillips Point, East Tower, Suite 1000
777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2370
Email: egreenberg@elliottmgmt.com


**Helios Offshore Capital LLC**, as a
Consenting Noteholder


By: _____
Name: Elliot Greenberg
Title: Vice President

Address: Elliott Greenberg, Elliott
Investment Management L.P.
Phillips Point, East Tower, Suite 1000
777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2370
Email: egreenberg@elliottmgmt.com


**Maidenhead LLC**, as a
Consenting Noteholder

By: Elliott Investment Management L.P., as
attorney-in-fact


By: _____
Name: Elliot Greenberg
Title: Vice President

Address: Elliott Greenberg, Elliott Investment
Management L.P.
Phillips Point, East Tower, Suite 1000
777 South Flagler Drive,
West Palm Beach, FL 33401
United States of America
Telephone: + (212) 478-2370
Email: egreenberg@elliottmgmt.com


[*Signature Pages to Consent*]

**Islington Partners L.P.**, as a Consenting
Noteholder holding ███████████

By: Elliott Investment Management L.P., as
attorney-in-fact

By: _____
Name: Elliot Greenberg
Title: Vice President

Address: Elliot Greenberg, Elliott
Investment Management L.P.
600 Steamboat Road, Greenwich, CT 06830
United States of America
Telephone: + (212) 478-2370
Email: egreenberg@elliottmgmt.com

## CONSENTING NOTEHOLDERS

**Barcel Corporation**, as a
Consenting Noteholder

By: _____
    Name: Michael Treisman
    Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

**Bain Capital Distressed and Special
Situations 2013 (A), L.P.**, as a
Consenting Noteholder

By: _____
    Name: Michael Treisman
    Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

[*Signature Pages to Consent*]

**Bain Capital Distressed and Special Situations 2013 (A2 Master), L.P.**, as a Consenting Noteholder

By: _____
     Name: Michael Treisman
     Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

**Future Fund Board of Guardians**, as a Consenting Noteholder

By: _____
     Name: Michael Treisman
     Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

**Kaiser Foundation Hospitals**, as a Consenting Noteholder

By: _____
     Name: Michael Treisman
     Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

[*Signature Pages to Consent*]

**Kaiser Permanente Group Trust**, as a
Consenting Noteholder

By: _____
     Name: Michael Treisman
     Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

**Bain Capital Credit Managed Account
(PSERS), L.P.**, as a
Consenting Noteholder

By: _____
     Name: Michael Treisman
     Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

**Bain Capital High Income Partnership,
L.P.,** as a
Consenting Noteholder

By: _____
     Name: Michael Treisman
     Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

[*Signature Pages to Consent*]

**Bain Capital Distressed and Special
Situations 2013 (B), L.P.**, as a
Consenting Noteholder

By: _____

    Name: Michael Treisman
    Title: Managing Director

Address: 200 Clarendon St.
Boston, MA 02116
Telephone: 617-516-2700
Email: mtreisman@baincapital.com

[*Signature Pages to Consent*]

**CONSENTING NOTEHOLDERS**

**Compañía de Seguros de Vida Consorcio
Nacional de Seguros S.A.,**
as a Consenting Noteholder

By: _____
Name: Renato Sepúlveda
Title: CFO

By: _____
Name: Sebastián Bertelsen
Title: Gerente Inversiones

Address: Renato Sepúlveda, Compañía de
Seguros de Vida Consorcio Nacional de
Seguros S.A., El Bosque Sur 180, Piso 13, Las
Condes, Santiago de Chile
Telephone: +562 2230 4013
Email: Renato.sepulveda@consorcio.cl

*[Signature Pages to Consent]*

**Consorcio Corredores de Bolsa S.A.,**
as a Consenting Noteholder

By: _____
Name: Pablo Lillo
Title: Gerente General

By: _____
Name: Cristián Fuentes
Title: Subgerente de Inversiones

Address: Pablo Lillo Consorcio Corredores de
Bolsa, El Bosque Sur 180, Piso 5, Las Condes,
Santiago de Chile
Telephone: : +56 22 7131313
Email: plillo@consorciocb.cl

**Banco Consorcio S.A.,**
as a Consenting Noteholder


By: _____
Name: Francisco Ignacio Ossa
Title: Gerente General



By: _____
Name: Mara Forer
Title: CFO

Address: Mara Forer Iagolnitzer, Banco
Consorcio, El Bosque Sur 180, Piso 7, Las
Condes, Santiago de Chile
Telephone: +562 27871800
Email: mforer@bancoconsorcio.cl

*[Signature Pages to Consent]*

**CONSENTING NOTEHOLDERS**

**Glendon Capital Management, L.P.**,
as a Consenting Noteholder

By: _____
      Name: Haig Maghakian
      Title: Authorized Person

Address: Attn: Haig Maghakian
           2425 Olympic Blvd., Suite 500E
           Santa Monica, CA 90404

Telephone: 310-907-0459
Email: hmaghakian@glendoncap.com

## Exhibit A

Amendments to the Plan

1) The following defined terms are added to Section 1.1 of the Plan:

    a. "Additional Noteholder RSA" shall mean that certain Additional Noteholder Restructuring Support Agreement, dated April 22, 2021, by and among Gildemeister and Baion Group, LLC and its affiliates.

    b. "Consenting Noteholders" shall mean (i) the Holders of 7.5% Notes due 2025 that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement (as defined in the RSA) to counsel to the Company Parties from time to time agreeing to be bound thereby and (ii) solely with respect to the releases and exculpations granted under the Plan, the signatories to the Additional Noteholder RSA.

    c. "New Junior Tranche Secured Notes Substitute Distribution" shall have the meaning given such term in Section 3.2 of the Plan.

    d. "New Junior Tranche Secured Notes Substituting Creditor" shall have the meaning given such term in Section 3.2 of the Plan.

2) Article I, Section 61 of the Plan shall be amended to reflect the following provisions:

> 61. "*Disbursing Agent*" means, unless otherwise set forth in this Plan, the Reorganized Debtors or any Entity selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

3) Article I, Section 71 of the Plan shall be amended to reflect the following provisions:

> 71. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) to the maximum extent permitted by law, each Consenting Noteholder, the Ad Hoc Group of Consenting Noteholders, and each member of the Ad Hoc Group of Consenting Noteholders; (d) to the maximum extent permitted by law, the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Unsecured Legacy Notes Trustees; and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

4) Article I, Section 152 of the Plan shall be amended to reflect the following provisions:

152.  "*Restructuring Expenses*" means all prepetition and postpetition reasonable and documented fees and expenses of (a) the Consenting Noteholders in any way related to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the Consenting Noteholders' holdings of the 7.5% Notes due 2025, any fees and expenses of any Ad Hoc Group Advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, and the transactions contemplated thereby, (b) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent and (c) the Unsecured Legacy Notes Trustees, subject to a total aggregate cap of $100,000 for the Unsecured Legacy Notes Trustees under the 2021 8.25% Notes Indenture and the 2023 Notes Indenture (which cap shall not apply to any settlement costs incurred by any of the Unsecured Legacy Notes Trustees after the Effective Date).

5)  A new Section 177A shall be added to Article I of the Plan to reflect the following provisions:

177A.  "*Unsecured Legacy Notes Indentures*" means the Indentures that govern the Unsecured Legacy Notes, under which the Unsecured Legacy Notes Trustees serve as trustees.

6)  The treatment of Claims under Section 3.2(e) of the Plan in respect of Class 5 (Unsecured Notes and Related Party Claims) shall be amended to reflect the following provisions:

**(e)  Class 5 (Unsecured Notes and Related Party Claims)**

(1)  *Classification*: Class 5 consists of the Unsecured Notes and Related Party Claims against the applicable Debtor.

(2)  *Allowance*: On the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) $111,796,081 of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,106 of 7.5% Notes due 2021 Claims, (iii) $23,205,373 of 8.25% Notes due 2021 Claims, (iv) $2,664,771 of 6.75% Notes due 2023 Claims which, in each case, for the Claims described in sub-clauses (i) through (iv) includes the aggregate principal amount of such Claims and any accrued and unpaid interest through the Petition Date. The Minvest Loan Claim shall be Allowed in the amount of $1,643,500, and the Share Purchase Agreement Claim shall be Allowed in the amount of $300,000.

(3)  *Treatment*: On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each Holder of an Allowed Unsecured Notes and Related Party Claim shall receive:

A.  if such holder is not a New Junior Tranche Secured Notes Substituting Creditor, $0.1939 in principal amount of the New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such holder; or

B.  if such holder (i) voted to accept the Plan and (ii) affirmatively elects on its Letter of Transmittal to receive such holder's New Junior Tranche Secured Notes Substitute Distribution (a "New Junior Tranche Secured Notes Substituting Creditor"):

i.  $0.1939 in Cash for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such New Junior Tranche Secured Notes Substituting Creditor subject to a total aggregate cap on all Cash distributions payable to all electing New Junior Tranche Secured Notes Substituting Creditors of $3,000,000 (the "Cash Distribution Cap"); *provided*, that, to the extent the total Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors would result in Cash distributions under this clause 3.2(e)(3)(B)(i) exceeding the Cash Distribution Cap, the Disbursing Agent shall allocate the Cash distributions not exceeding the Cash Distribution Cap proportionally among the Allowed Unsecured Notes

> and Related Party Claims held by the New Junior Tranche Secured Notes Substituting Creditors (based on the proportion that each such New Junior Tranche Secured Notes Substituting Creditor's Allowed Unsecured Notes and Related Party Claim bears to the sum of all Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors); and
>
> ii.    $0.1939 in aggregate principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims for which no Cash distribution was made pursuant to clause 3.2(e)(3)(B)(i) due to the Cash Distribution Cap (together, (i) and (ii), a "New Junior Tranche Secured Notes Substitute Distribution").
>
> For the avoidance of doubt, no holder of Allowed Unsecured Notes and Related Party Claims shall receive a recovery under the Plan of more than $0.1939 in Cash and New Junior Tranche Secured Notes combined for each $1.00 of their Allowed Unsecured Notes and Related Party Claims.
>
> (4)  *Voting*: Class 5 is Impaired. Holders of Unsecured Notes and Related Party Claims are entitled to vote to accept or reject the Plan. For the avoidance of doubt, notwithstanding the Cash-Out Electing Holders' waiver of distributions on account of their 7.5% Notes due 2025 Unsecured Deficiency Claims, the Cash-Out Electing Holders shall be permitted to vote the full Allowed amount of their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5 for purposes of confirmation of the Plan.

7)  Section 4.4 of the Plan shall be amended to reflect the following provisions:

> 4.4    **Exit Financing.**
>
> Subject to the terms, conditions and limitations as more fully set forth in the Exit Financing Commitment Agreement (as may be amended from time to time with the consent of the Debtors and the Exit Financing Parties), on the Plan Effective Date the Exit Financing Parties shall advance to the Debtors an amount of Cash sufficient to fund all Cash-Out Distributions and the Cash component of the New Junior Tranche Secured Notes Substitute Distributions only and which amount in no event shall exceed $15.6 million.  The Exit Financing Parties will receive New Senior Tranche Secured Notes in aggregate principal amount equal to all amounts advanced to fund the Cash-Out Distributions and New Junior Tranche Secured Notes Substitute Distributions.

8)  Section 6.3 of the Plan shall be amended to reflect the following provisions:

6.3  **Disbursing Agent.**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of the 7.5% Notes due 2025 Claims shall be made to or at the direction of the Senior Secured Notes Trustee, which shall, to the extent directed, act as disbursing agent for distributions to holders of the 7.5% Notes due 2025 Claims and may transfer such distributions by the Debtors (as applicable) to the holders of the 7.5% Notes due 2025 Claims as directed.  Irrespective of how distributions in respect of the 7.5% Notes due 2025 Claims are made, such distributions shall be subject in all respects to the right of the Senior Secured Notes Trustee to assert the charging lien in Section 7.06 of the 2025 Notes Indenture against such distributions if the obligations of payments owed to the Senior Secured Notes Trustee are not satisfied.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of the Unsecured Legacy Notes Claims shall be made to or at the direction of the Unsecured Legacy Notes Trustees, which shall, to the extent directed, act as disbursing agent for distributions to holders of the Unsecured Legacy Notes Claims and may transfer such distributions by the Debtors (as applicable) to the holders of the Unsecured Legacy Notes Claims as directed.  Irrespective of how distributions in respect of the Unsecured Legacy Notes Claims are made, such distributions shall be subject in all respects to the right of the Unsecured Legacy Notes Trustees to assert the charging lien in Section 6.08 of each of the Unsecured Legacy Notes Indentures against such distributions if the obligations of payments owed to the Unsecured Legacy Notes Trustees are not satisfied.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash by the Reorganized Debtors.

9)   Section 6.4(b) of the Plan shall be amended to reflect the following provisions:

(b)    surrender and transfer the Holder's 7.5% Notes due 2025 to the applicable indenture trustee via a Deposit/Withdrawal at Custodian ("DWAC"), if ATOP is not available.

10) Section 6.5(b)(2) of the Plan shall be amended to reflect the following provisions:

(2)    surrender and transfer to the applicable indenture trustee via DWAC (if ATOP is not available) its 7.5% Notes due 2025 or Unsecured Legacy Notes.

11) Section 6.5(e) of the Plan shall be amended to reflect the following provisions:

(e)     On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with DTC's customary procedures (which may be through ATOP or via DWAC, if ATOP is not available), the New Secured Notes and New Subordinated Notes corresponding to each Qualified Holder that has completed the procedures specified in clause (b)(1) above; provided, however, that if the Effective Date has not occurred by thirty (30) calendar days after the Distribution Election Deadline, the foregoing deadlines may be extended and the foregoing procedures may be amended by the Debtors and the Consenting Noteholders in a written notice provided to the Disbursing Agent.

12) Section 6.5(g) of the Plan shall be amended to reflect the following provisions:

(g)     The Disbursing Agent and/or any applicable broker or agent shall use reasonable best efforts to cause the tender into ATOP or transfer via DWAC (if ATOP is not available) of all the 7.5% Notes due 2025 or Unsecured Legacy Notes.  Any Holder of the 7.5% Notes due 2025 or the Unsecured Legacy Notes who fails to (i) surrender the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes required to be tendered under the Plan or verify its position in the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes and (ii) provide a completed Letter of Transmittal to the Disbursing Agent together with any documents required in connection therewith within one hundred eighty (180) days after the Effective Date shall have its Claims and its distribution of New Notes pursuant to the Plan on account of its 7.5% Notes due 2025 Secured Claims or Unsecured Notes Claims discharged and forfeited and shall not participate in any distribution under the Plan.  Any property in respect of such forfeited 7.5% Notes due 2025 Secured Claims or the Unsecured Notes Claims would revert to the Reorganized Debtors.

**<u>EXHIBIT D</u>**

**Shareholder Consent**

**EXECUTION VERSION**

## CONSENT

This CONSENT is hereby provided by Minvest S.A. (the "<u>Shareholder</u>") under that certain Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "<u>Restructuring Support Agreement</u>") by and among Automotores Gildemeister SpA and certain of its affiliates as Companies, the Shareholder and Consenting Noteholders, or investment managers for the Consenting Noteholders of the 7.50% Notes due 2025 (each as defined in the Restructuring Support Agreement), dated as of March 31, 2021. Each capitalized term used herein but not defined herein shall have the meaning set forth in the Restructuring Support Agreement.

**WHEREAS,** the Companies commenced voluntary cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") on April 12, 2021, with such cases jointly administered under Case No. 21-10685, and contemporaneously therewith filed a plan of reorganization at ECF No. 2 (the "<u>Plan</u>") in conformance with the terms and conditions of the Restructuring Support Agreement;

**WHEREAS**, certain holders of 8.25% Notes due 2021 and 7.5% Notes due 2025 (the "<u>Additional Noteholders</u>") filed objections to certain relief sought by the Debtors in the Chapter 11 Cases;

**WHEREAS**, the Shareholder, Consenting Noteholders, and the Additional Noteholders wish to settle all such objections and to support the confirmation of the Plan as modified in the attached <u>Exhibit A</u>;

**WHEREAS**, in response to the settlement reached among the Shareholder, Consenting Noteholders and the Additional Noteholders, the Companies intend to modify the Plan as set forth in Exhibit A;

**NOW THEREFORE**, the Shareholder consents and agrees as follows:

1.      <u>Consent to Plan Modification</u>.  The Shareholder hereby consents to the modifications of the Plan as set forth in Exhibit A hereto, waives any right to terminate support of the Plan on the basis of such modifications, and agrees that all references in the Restructuring Support Agreement to the Plan Term Sheet and the Plan shall be construed to incorporate the modifications as set forth in Exhibit A.

2.      <u>Waiver of Cash-Out Option</u>.  The Shareholder hereby waives any right to elect to receive substitute cash consideration on account of any of its Unsecured Notes Claims in Class 5 of the amended Plan.

3.      <u>Effectiveness</u>.  This Consent shall be effective upon the execution of that certain Additional Noteholder Restructuring Support Agreement dated April 22, 2021 by and among Baion Group, LLC, holding the amounts of 8.25% Notes due 2021 and 7.5% Notes due 2025, and Automotores Gildemeister SpA.

4.    <u>Termination of Consent</u>.  This consent shall automatically terminate immediately upon the appointment of any unsecured creditor's committee in the Chapter 11 Cases.


Date Executed: April 22, 2021

[*Remainder of Page Intentionally Left Blank - Signature Pages Follow*]

**SHAREHOLDER**

**Minvest S.A.**, as Shareholder

By:

Name: RICARDO LESSMANN
Title: PRESIDENT

3

**EXHIBIT A**

**Plan Modification**

### Exhibit A

Amendments to the Plan

1) The following defined terms are added to Section 1.1 of the Plan:

    a.   "<u>Additional Noteholder RSA</u>" shall mean that certain Additional Noteholder Restructuring Support Agreement, dated April 22, 2021, by and among Gildemeister and Baion Group, LLC and its affiliates.

    b.   "<u>Consenting Noteholders</u>" shall mean (i) the Holders of 7.5% Notes due 2025 that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a Joinder, or a Transfer Agreement (as defined in the RSA) to counsel to the Company Parties from time to time agreeing to be bound thereby and (ii) solely with respect to the releases and exculpations granted under the Plan, the signatories to the Additional Noteholder RSA.

    c.   "<u>New Junior Tranche Secured Notes Substitute Distribution</u>" shall have the meaning given such term in Section 3.2 of the Plan.

    d.   "<u>New Junior Tranche Secured Notes Substituting Creditor</u>" shall have the meaning given such term in Section 3.2 of the Plan.

2) Article I, Section 61 of the Plan shall be amended to reflect the following provisions:

> 61.  "*Disbursing Agent*" means, unless otherwise set forth in this Plan, the Reorganized Debtors or any Entity selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

3) Article I, Section 71 of the Plan shall be amended to reflect the following provisions:

> 71.  "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) to the maximum extent permitted by law, each Consenting Noteholder, the Ad Hoc Group of Consenting Noteholders, and each member of the Ad Hoc Group of Consenting Noteholders; (d) to the maximum extent permitted by law, the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Unsecured Legacy Notes Trustees; and (e) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

4) Article I, Section 152 of the Plan shall be amended to reflect the following provisions:

152.   *"Restructuring Expenses"* means all prepetition and postpetition reasonable and documented fees and expenses of (a) the Consenting Noteholders in any way related to the Debtors or the Restructuring including, without limitation, any such fees and expenses incurred since November 7, 2019 relating to the Consenting Noteholders' holdings of the 7.5% Notes due 2025, any fees and expenses of any Ad Hoc Group Advisors, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Restructuring Support Agreement, the Plan, the Definitive Documents, and the transactions contemplated thereby, (b) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent and (c) the Unsecured Legacy Notes Trustees, subject to a total aggregate cap of $100,000 for the Unsecured Legacy Notes Trustees under the 2021 8.25% Notes Indenture and the 2023 Notes Indenture (which cap shall not apply to any settlement costs incurred by any of the Unsecured Legacy Notes Trustees after the Effective Date).

   5)   A new Section 177A shall be added to Article I of the Plan to reflect the following provisions:

177A.   *"Unsecured Legacy Notes Indentures"* means the Indentures that govern the Unsecured Legacy Notes, under which the Unsecured Legacy Notes Trustees serve as trustees.

   6)   The treatment of Claims under Section 3.2(e) of the Plan in respect of Class 5 (Unsecured Notes and Related Party Claims) shall be amended to reflect the following provisions:

**(e)  Class 5 (Unsecured Notes and Related Party Claims)**

   (1)   *Classification*: Class 5 consists of the Unsecured Notes and Related Party Claims against the applicable Debtor.

   (2)   *Allowance*: On the Plan Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) $111,796,081 of 7.5% Notes due 2025 Unsecured Deficiency Claims, (ii) $9,858,016 of 7.5% Notes due 2021 Claims, (iii) $23,205,373 of 8.25% Notes due 2021 Claims, (iv) $2,664,771 of 6.75% Notes due 2023 Claims which, in each case, for the Claims described in sub-clauses (i) through (iv) includes the aggregate principal amount of such Claims and any accrued and unpaid interest through the Petition Date. The Minvest Loan Claim shall be Allowed in the amount of $1,643,500, and the Share Purchase Agreement Claim shall be Allowed in the amount of $300,000.

   (3)   *Treatment*: On the Plan Effective Date (or as soon as practicable thereafter), in full and final satisfaction, settlement, release, discharge of and exchange for each Allowed Unsecured Notes and Related Party Claim, each Holder of an Allowed Unsecured Notes and Related Party Claim shall receive:

      A.   if such holder is not a New Junior Tranche Secured Notes Substituting Creditor, $0.1939 in principal amount of the New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such holder; or

      B.   if such holder (i) voted to accept the Plan and (ii) affirmatively elects on its Letter of Transmittal to receive such holder's New Junior Tranche Secured Notes Substitute Distribution (a "New Junior Tranche Secured Notes Substituting Creditor"):

         i.   $0.1939 in Cash for each $1.00 of Allowed Unsecured Notes and Related Party Claims held by such New Junior Tranche Secured Notes Substituting Creditor subject to a total aggregate cap on all Cash distributions payable to all electing New Junior Tranche Secured Notes Substituting Creditors of $3,000,000 (the "Cash Distribution Cap"); *provided*, that, to the extent the total Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors would result in Cash distributions under this clause 3.2(e)(3)(B)(i) exceeding the Cash Distribution Cap, the Disbursing Agent shall allocate the Cash distributions not exceeding the Cash Distribution Cap proportionally among the Allowed Unsecured Notes

and Related Party Claims held by the New Junior Tranche Secured Notes Substituting Creditors (based on the proportion that each such New Junior Tranche Secured Notes Substituting Creditor's Allowed Unsecured Notes and Related Party Claim bears to the sum of all Allowed Unsecured Notes and Related Party Claims held by all New Junior Tranche Secured Notes Substituting Creditors); and

ii.   $0.1939 in aggregate principal amount of New Junior Tranche Secured Notes for each $1.00 of Allowed Unsecured Notes and Related Party Claims for which no Cash distribution was made pursuant to clause 3.2(e)(3)(B)(i) due to the Cash Distribution Cap (together, (i) and (ii), a "New Junior Tranche Secured Notes Substitute Distribution").

For the avoidance of doubt, no holder of Allowed Unsecured Notes and Related Party Claims shall receive a recovery under the Plan of more than $0.1939 in Cash and New Junior Tranche Secured Notes combined for each $1.00 of their Allowed Unsecured Notes and Related Party Claims.

(4)   *Voting*: Class 5 is Impaired. Holders of Unsecured Notes and Related Party Claims are entitled to vote to accept or reject the Plan. For the avoidance of doubt, notwithstanding the Cash-Out Electing Holders' waiver of distributions on account of their 7.5% Notes due 2025 Unsecured Deficiency Claims, the Cash-Out Electing Holders shall be permitted to vote the full Allowed amount of their 7.5% Notes due 2025 Unsecured Deficiency Claims in Class 5 for purposes of confirmation of the Plan.

7)   Section 4.4 of the Plan shall be amended to reflect the following provisions:

**4.4   Exit Financing.**

Subject to the terms, conditions and limitations as more fully set forth in the Exit Financing Commitment Agreement (as may be amended from time to time with the consent of the Debtors and the Exit Financing Parties), on the Plan Effective Date the Exit Financing Parties shall advance to the Debtors an amount of Cash sufficient to fund all Cash-Out Distributions and the Cash component of the New Junior Tranche Secured Notes Substitute Distributions only and which amount in no event shall exceed $15.6 million.  The Exit Financing Parties will receive New Senior Tranche Secured Notes in aggregate principal amount equal to all amounts advanced to fund the Cash-Out Distributions and New Junior Tranche Secured Notes Substitute Distributions.

8)   Section 6.3 of the Plan shall be amended to reflect the following provisions:

6.3    **Disbursing Agent.**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Plan Effective Date.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of the 7.5% Notes due 2025 Claims shall be made to or at the direction of the Senior Secured Notes Trustee, which shall, to the extent directed, act as disbursing agent for distributions to holders of the 7.5% Notes due 2025 Claims and may transfer such distributions by the Debtors (as applicable) to the holders of the 7.5% Notes due 2025 Claims as directed.  Irrespective of how distributions in respect of the 7.5% Notes due 2025 Claims are made, such distributions shall be subject in all respects to the right of the Senior Secured Notes Trustee to assert the charging lien in Section 7.06 of the 2025 Notes Indenture against such distributions if the obligations of payments owed to the Senior Secured Notes Trustee are not satisfied.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of the Unsecured Legacy Notes Claims shall be made to or at the direction of the Unsecured Legacy Notes Trustees, which shall, to the extent directed, act as disbursing agent for distributions to holders of the Unsecured Legacy Notes Claims and may transfer such distributions by the Debtors (as applicable) to the holders of the Unsecured Legacy Notes Claims as directed.  Irrespective of how distributions in respect of the Unsecured Legacy Notes Claims are made, such distributions shall be subject in all respects to the right of the Unsecured Legacy Notes Trustees to assert the charging lien in Section 6.08 of each of the Unsecured Legacy Notes Indentures against such distributions if the obligations of payments owed to the Unsecured Legacy Notes Trustees are not satisfied.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash by the Reorganized Debtors.

9)    Section 6.4(b) of the Plan shall be amended to reflect the following provisions:

(b)    surrender and transfer the Holder's 7.5% Notes due 2025 to the applicable indenture trustee via a Deposit/Withdrawal at Custodian ("<u>DWAC</u>"), if ATOP is not available.

10)    Section 6.5(b)(2) of the Plan shall be amended to reflect the following provisions:

(2)    surrender and transfer to the applicable indenture trustee via DWAC (if ATOP is not available) its 7.5% Notes due 2025 or Unsecured Legacy Notes.

11)    Section 6.5(e) of the Plan shall be amended to reflect the following provisions:

(e)    On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors will cause to be distributed, in accordance with DTC's customary procedures (which may be through ATOP or via DWAC, if ATOP is not available), the New Secured Notes and New Subordinated Notes corresponding to each Qualified Holder that has completed the procedures specified in clause (b)(1) above; provided, however, that if the Effective Date has not occurred by thirty (30) calendar days after the Distribution Election Deadline, the foregoing deadlines may be extended and the foregoing procedures may be amended by the Debtors and the Consenting Noteholders in a written notice provided to the Disbursing Agent.

12) Section 6.5(g) of the Plan shall be amended to reflect the following provisions:

(g)    The Disbursing Agent and/or any applicable broker or agent shall use reasonable best efforts to cause the tender into ATOP or transfer via DWAC (if ATOP is not available) of all the 7.5% Notes due 2025 or Unsecured Legacy Notes.  Any Holder of the 7.5% Notes due 2025 or the Unsecured Legacy Notes who fails to (i) surrender the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes required to be tendered under the Plan or verify its position in the applicable 7.5% Notes due 2025 or Unsecured Legacy Notes and (ii) provide a completed Letter of Transmittal to the Disbursing Agent together with any documents required in connection therewith within one hundred eighty (180) days after the Effective Date shall have its Claims and its distribution of New Notes pursuant to the Plan on account of its 7.5% Notes due 2025 Secured Claims or Unsecured Notes Claims discharged and forfeited and shall not participate in any distribution under the Plan.  Any property in respect of such forfeited 7.5% Notes due 2025 Secured Claims or the Unsecured Notes Claims would revert to the Reorganized Debtors.